PUBLIC COUNSEL
REBECCA BROWN (SBN 345805)
rbrown@publiccounsel.org
SOPHIA WRENCH (SBN 354416)
swrench@publiccounsel.org
AMELIA PIAZZA (SBN 342473)
apiazza@publiccounsel.org
VANESSA RAE YOUNG (SBN 352693)
vyoungviniegra@publiccounsel.org
ELIZABETH HERCULES-PAEZ (SBN 320944)
eherculespaez@publiccounsel.org
610 South Ardmore Avenue
Los Angeles, CA 90005
Tel: 213-385-2977

*Attorneys for Plaintiffs*
Additional Counsel Listed on Following Page

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

L.T., SEVAK MESROBIAN, JOSE MAURO SALAZAR GARZA, AND J.M., on behalf of themselves and all others similarly situated; COALITION FOR HUMANE IMMIGRANT RIGHTS,

Plaintiffs,

v.

U.S. IMMIGRATION AND CUSTOMS ENFORCEMENT; TODD M. LYONS, Acting Director, U.S. Immigration and Customs Enforcement; JAIME RIOS, Acting Director of Los Angeles Field Office, Enforcement and Removal Operations, U.S. Immigration and Customs Enforcement; U.S. DEPARTMENT OF HOMELAND SECURITY; KRISTI NOEM, Secretary, U.S. Department of Homeland Security,

Defendants.

Case No. 5:26-cv-00322-SSS-RAO

**DECLARATION OF WILLIAM ADAMS IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION**

**CLASS ACTION**

IMMIGRANT DEFENDERS LAW CENTER
ALVARO M. HUERTA (SBN 274787)
ahuerta@immdef.org
CARSON ADRIANNA SCOTT (SBN 337102)
cscott@immdef.org
ALISON STEFFEL (SBN 346370)
asteffel@immdef.org
634 S. Spring Street, 10th Floor
Los Angeles, CA 90014
Tel: 213-634-0999

COALITION FOR HUMANE IMMIGRANT RIGHTS
CARL BERGQUIST (*pro hac vice*)
cbergquist@chirla.org
2351 Hempstead Road
Ottawa Hills, OH 43606
Tel: 310-279-6025

ADAM REESE (SBN 362898)
areese@chirla.org
2533 West Third Street, Suite 101
Los Angeles, CA 90057
Tel: 213-353-1333

WILLKIE FARR & GALLAGHER LLP
NICHOLAS REDDICK (SBN 288779)
nreddick@willkie.com
STEPHEN HENRICK (SBN 310539)
shenrick@willkie.com
ALYXANDRA VERNON (SBN 327699)
avernon@willkie.com
JACOB KARIM (SBN 340376)
jkarim@willkie.com
333 Bush Street, 34th Floor
San Francisco, CA 94104
Tel: 415-858-7400

*Attorneys for Plaintiffs*

# TABLE OF CONTENTS


I. Background .......... 1

II. Methodology .......... 3

III. Opinions and Summary of Findings .......... 5

IV. Detailed Findings .......... 8

A. Without Any Justification, Adelanto Fails to Provide the Basic Necessities Inmates Receive in Prisons Such As Adequate Food, Water, Clean Facilities, Soap, Clothing, and Bedding/Linens. .......... 8

i. While Prisons Serve Sufficient Quantities of Nutritious Food After Kitchen Workers Prepare It in Sanitary Conditions, Adelanto Does Not .......... 8

ii. While Prisons Provide Clean Drinking Water in Sufficient Quantities for the Facility Population, Adelanto Does Not .......... 13

iii. While Prisons Adequately Ensure Cleanliness of the Facility, Adelanto Does Not .......... 16

iv. While Prisons Provide Serviceable, Temperature-Appropriate Clothing, Linens and Mattresses, Adelanto Does Not. .......... 19

B. Without Any Justification, Adelanto Imposes Significantly More Restrictive Conditions on the Day-to-Day Life of its Population Than a Prison Does to its Inmates .......... 23

i. While Prisons Protect Privacy with Respect to Toilets and Showers, Adelanto Does Not .......... 24

ii. While Prisons Provide Reasonable Visitation Policies, Adelanto Does Not. .......... 26

iii. While Prisons Provide Recreation and Programming, Adelanto Does Not. .......... 29

a. Count Procedures at Adelanto Are More Restrictive and Disruptive than in Criminal Facilities. .......... 29

b. Adelanto Provides Detainees with Less Outdoor Time Than Prisons. .......... 32

c. Adelanto Does Not Provide the Same Educational, Recreational, or Religious Programming as Prisons .......... 35

iv. While Prisons Use Restrictive Housing Pursuant to Safeguards and with Minimum Specified Conditions for Out-of-Cell Access, Adelanto Does Not .......... 38

C. Without Any Justification, Adelanto Fails to Accommodate Disabilities the Way a Prison Would. .......... 43

I, William Adams, declare that:

1. I have personal knowledge of the facts set forth below and, if called to testify, I could and would do so competently.

**I. Background**

2. I am the owner and lead consultant of Correctional Litigation Solutions ("CLS"). CLS provides expert testimony and consulting services regarding industry standards for, among other things, policies and procedures relating to correctional systems, prisons, and jails.

3. Before becoming the owner of CLS, I was employed with the California Department of Corrections ("CDCR") for more than 26 years, from 1988 to 2014. There, I served in officer, supervisory, management, and administrative roles in level three (medium security) and level four (maximum security) institutions. From my experience, I am aware of the policies and procedures essential to maintaining and enhancing safety and security in correctional facility settings. I have participated in the training of employees in correctional institutions at all levels.

4. I began my employment with CDCR on January 4, 1988. I attended the Basic Correctional Officer Academy shortly thereafter. On June 1, 1993, I was promoted to Correctional Sergeant. As a sergeant, I supervised Prison Facilities, Prison Yards, Prison Kitchen, Watch Office, Central Control, Receiving and Release, Inmate Transportation, Mental Health Unit, Outside Patrol Sergeant, and served two years as an In-Service Training Sergeant.

5. On January 1, 2001, I was promoted to Correctional Lieutenant. As a lieutenant, I served as the second-line supervisor for all Correctional Officers and first-line supervisor for all sergeants. I routinely supervised facilities housing an average daily population of 1,200 inmates, twenty correctional officers, and two sergeants, often cross covering a second facility. I served as Watch Commander where I was in charge of the entire prison. I served as the escape commander and interim emergency commander as needed. While in that position, I was responsible

for 4,700 inmates and all staff members on institutional grounds. I served as Visiting Lieutenant and was a trainee member of the Special Emergency Response Team. I commanded the R. J. Donovan Correctional Facility Honor Guard as well.

6. In late 2007, I spent time as a Litigation Coordinator; I was utilized by the California Department of Corrections and Rehabilitation's Office of Legal Affairs, and the California Department of Justice ("DOJ"), Office of the Attorney General, as a prison expert including on prison administration, prison gangs, use of force, inmate politics and behaviors, inmate cultural norms, and various other matters. I served as an expert in several trials and provided consulting services to the California DOJ and CDCR on multiple matters requiring my intimate knowledge of, and long-time experience with, matters of prison administration.

7. On September 1, 2014, I retired from the CDCR, having served over 26 years at three institutions and in several special positions. The minority of my career was spent in administration, giving me a breadth of operational experience and constant inmate and staff contact over the years. Even during my time in administrative positions, I continued to remain qualified as a peace officer, and to train correctional officers, sergeants, lieutenants, and other prison staff as needed, and was a regular, weekly use of force instructor for all staff members until my retirement.

8. I have served as an expert witness in over 50 state court cases regarding general prison matters, including prison and jail administration, interpretation of CDCR documents, CDCR policies and procedures, use of force, and prison gangs. My representations have included matters in Alaska and numerous counties throughout California, including Contra Costa, Kern, Kings, Los Angeles, Marin, Riverside, Sacramento, San Bernardino, San Diego, San Mateo, Solano, and Stanislaus.

9. I have also served as an expert witness in over 60 cases in federal courts regarding prison and jail administration, general prison culture, CDCR rules and policies, prison gang culture, emergency response, inmate cultural norms, and use of

force applications and options. I have been deposed and/or testified in matters pending before the United States District Courts for the Northern, Eastern and Southern Districts of California, the Eastern District of North Carolina, the Western District of Michigan (Southern Division), the Western District of New York, and the Districts of Arizona and New Mexico. I have additionally provided expert report and consulting services for actions in the United States District Courts for the Central District of California, Northern District of Mississippi, Northern District of Ohio, Eastern District of Pennsylvania, and the District of Maryland.

10. I have provided services in civil and criminal matters, for both the prosecution/plaintiff and the defense.

11. My full curriculum vitae is attached as Exhibit A. It details my background, presentations, training, expertise and certifications. It also contains a list of cases in which I have provided consulting services or expert testimony, including those in which I was retained as a prison management/corrections expert.

## II. Methodology

12. In this declaration, I opine on conditions at the Adelanto ICE Processing Center Facility ("Adelanto") as compared to the short and long-term criminal detention facilities that I have decades of experience managing. My 26 years of experience in California corrections and the American Correctional Association Standards ("ACA Standards"), which I understand apply at Adelanto, inform my analysis.

13. Specifically, I am informed that in 2019, the U.S. Immigration and Customs Enforcement ("ICE") signed a contract with the GEO Group Inc., a for-profit prison corporation, for the operation of Adelanto. Page 2 of that contract specifies that, among other things, "[a]ll services shall be furnished in compliance with the following regulations/policies/standards: American Correctional Association (ACA) Standards[.]" Ex. B at 2. The contract further specifies that all services must

be furnished in compliance with the 2011 Performance-Based National Detention Standards ("PBNDS") as revised in December 2016. *Id.*

14. I considered the most current version (Fifth Edition) of the ACA Standard's Performance-Based Standards and Expected Practices for Adult Correctional Institutions in forming my opinions given that the contract specifies they apply at Adelanto. Numerous federal, state, and local law enforcement agencies, including the State of California's CDCR and the Federal Bureau of Prisons, follow the ACA Standards. Compliance with ACA Standards is the gold standard in the corrections industry for institutional policy and procedure design.

15. I further considered the standards for California correctional facilities as codified in California Code of Regulations Title 15, which I understand establishes California's legal requirements for prison conditions. These rules provide a useful benchmark for comparing how civil detainees at Adelanto are treated in contrast to criminal inmates in California. Title 15 has provisions covering both California state prisons (Sections 3000 to 3999.32) and shorter-term detention facilities such as county jails (Sections 1004 to 1280). Title 15 comports with the ACA Standards and sets the statutory basis for the operations of the CDCR.

16. The CDCR also issues an Operations Manual (the "CDCR DOM") that describes in greater detail how California correctional institutions carry out their responsibilities under Title 15. I considered portions of this document with respect to Inmate Count procedures as detailed herein.

17. Because ICE's 2019 contract with GEO Group Inc. also requires conditions at Adelanto to comply with the PBNDS, I considered those standards in evaluating how Adelanto is treating its detainee population.

18. I am also informed that Adelanto staff must follow policies listed in two manuals: 1) ICE's National Detainee Handbook ("NDH"), and 2) The GEO Group, Inc.'s supplement to the NDH titled, "GEO's Revised Supplement to NDH for the

Adelanto ICE Processing Center" ("GRS NDH"). I have accordingly considered the standards in the NDH and in a portion of the GRS NDH supplied by counsel.

19. I also reviewed 21 declarations from the following individuals who are or were detained at Adelanto: A.A., A.A.A.A., Aguilar, A.K., Arnold, Ding, E.M., Flores, Frederick, J.M., Karamychev, L.T., Lopez, Mesrobian, Pereira-Amaya, Rodriguez-Arzola, Ruiz-Escobar, Salazar-Garza, Samaan, Smith, and Winfield.

20. I also considered investigations of the Adelanto facility performed by the California Department of Justice ("Cal DOJ") and Disability Rights California ("DRC"). Both of these documents are publicly available.[1]

## III. Opinions and Summary of Findings

21. I understand that unlike incarcerated inmates in prisons, immigrants at Adelanto are detained under civil law. I also understand that legally, a facility housing civil detainees should have less restrictive practices and conditions than prisons.

22. In my opinion, detainees at Adelanto are subject to a number of significantly more restrictive practices than those imposed on inmates in California criminal correctional facilities. To the extent these restrictive practices are security measures, they serve no legitimate purpose and are unnecessary, excessive, and harmful to the detainees housed there.

23. As one example, the GRS NDH states and detainee declarations confirm that visits at Adelanto are limited to one hour, although visits tend to last less than an hour. GRS NDH at 16; A.A.A.A. Decl. ¶ 48. During those visits, detainees are only permitted to hug their families twice, once at the start and once at the end of the visit,

[1] *See* Immigration Detention in California: A Comprehensive Review with a Focus on Mental Health, Cal. Dep't of Justice, https://oag.ca.gov/system/files/media/immigration-detention-2025.pdf (2025); "They Treat Us Like Dogs in Cages:" Inside the Adelanto Ice Processing Center, Disability Rights Cal., https://www.disabilityrightsca.org/drc-advocacy/investigations/inside-the-adelanto-ice-processing-center (July 17, 2025).

and may not touch their families during the visit. A.A.A.A. Decl. ¶ 47; Arnold Decl. ¶ 35; Frederick Decl. ¶ 28.

24. This is far more restrictive than necessary and is not standard at state criminal facilities in California. In CDCR prisons, there are no per se time limits on visitation. As long as the visiting room has capacity, inmates can stay with their guests as long as they desire. Correctional administrators also generally encourage contact visits where possible because contact with loved ones supports the well-being and mental health of the incarcerated population. Touching allows inmates to discuss personal issues with someone they love and respect. Being able to hug a child or hold hands with a spouse promotes emotional wellness for inmates and can serve as a reminder that there are people on the outside who care about them.

25. As another example, I understand that the practice at Adelanto is to undertake six headcounts (at 6:30 a.m., 10:30 a.m., 6:30 p.m., 11:00 p.m., 1:00 a.m., and 3:00 a.m.) of the population, which span longer than an hour. I understand that while the count is underway, detainees cannot leave their sleeping quarters to get drinking water, take a shower, make a video call, make a phone call, or get food. I also understand that according to some of the detainees, the lights stay on for the count well into the evening or early morning hours. Ding Decl. ¶ 35; Mesrobian Decl. ¶ 55; Ruiz-Escobar Decl. ¶ 10; Salazar-Garza Decl. ¶ 26; Winfield Decl. ¶ 37.

26. In prisons, counts are developed so that during the day time, the facility has time to conduct hearings, meet with people in custody, allow programs to occur, and otherwise minimize disruption to normal operations. In my experience, counts in a prison usually clear within 15–20 minutes and it is rarely the case that all inmates need to be in their cells for a count to be successfully conducted. Excessive and inefficient counting limits the business that occurs during the day, can amplify frustration, and is unnecessary.

27. Adelanto's substandard conditions as compared to prisons also serve no penological purpose, and in fact undermine the security of the facility. Prisons

provide their inmates with sufficient quantities of nutritious food, potable water, a clean environment, consistent access to soap, serviceable and temperature-appropriate clothing, linens and mattresses, an appropriate degree of privacy when using toilet and shower facilities, access to the outdoors, and various educational, recreational, and religious programming. By refusing to provide all of these things to detainees, as I discuss below, Adelanto risks significantly harming the detainees' physical and mental health. Adelanto also risks lowering the population morale overall to a point where orderly operation of the facility could be impacted because fights or riots could break out. Inmates feel respected and appreciated when given a basic standard of treatment acknowledging their humanity and sufficient activities to pass time during the day.

28. I also understand that the practice at Adelanto is to use restrictive housing to punish inmates for speaking up about concerns. I further understand that Adelanto keeps detainees in restrictive housing in their cells for 23 hours a day or more, in conditions that are far more restrictive than would be imposed for even the most dangerous inmates in a California prison. This is inappropriate and unjustifiable. It does nothing for a facility's security to treat detainees in this manner.

29. Finally, Adelanto is not providing for disability accommodations the way a correctional facility in California would. In forcing inmates with mobility issues to sleep on upper bunk beds and in failing to provide sufficient Americans with Disabilities Act ("ADA")-compliant showers, for example, Adelanto is failing to provide accommodations mandated by the ACA Standards and that are readily provided in prisons.

## IV. Detailed Findings

### A. Without Any Justification, Adelanto Fails to Provide the Basic Necessities Inmates Receive in Prisons Such As Adequate Food, Water, Clean Facilities, Soap, Clothing, and Bedding/Linens.

30. Providing for the basic needs of a detained population and maintaining clean living spaces are critical to the functioning of a detention facility. People in custody are entitled to conditions that are hygienic and safe. This means providing access to sanitary and nutritious food and potable water, ensuring sufficient cleanliness, and giving out adequate clothing and bedding.

31. I understand that Adelanto is not providing these things. As described herein, multiple detainee and third-party accounts document inedible, spoiled food that is not served hygienically; water that looks and smells unsafe for human consumption and that is not supplied in sufficient quantities to meet the needs of the detainee population; a lack of clean toilets and showers; inadequate access to soap and other hygiene products; failure to provide suitable clothing and linens, including inadequate laundry practices; and non-serviceable mattresses that are both leaking material and insufficient to facilitate sleep. As a matter of detention security, there is no reason detainees at Adelanto should be subject to these conditions.

#### i. While Prisons Serve Sufficient Quantities of Nutritious Food After Kitchen Workers Prepare It in Sanitary Conditions, Adelanto Does Not.

32. The evidence I have reviewed demonstrates that Adelanto is not serving its population the equivalent caliber and quantities of food, or abiding by the same food safety standards, as would a prison. Adelanto is treating its detainees significantly more restrictively by failing to provide nutritious cuisine, and by not ensuring cooking facilities are clean and hygienic. There is no penological justification for these practices. To the contrary, failing to provide edible food increases the risk that detainees will suffer harm from conditions like malnutrition or

food poisoning. Failing to satisfy basic needs also risks impacting population morale to the point that the orderly operation of the facility could become jeopardized.

33. The ACA Standards and California's Title 15 regulations set baselines regarding the food that criminal inmates must receive.

34. Under the ACA Standards, there should be a written policy, procedure and practice requiring food service staff to pre-plan menus in advance to include flavor, texture, temperature, appearance, and palatability. 5-ACI-5C-05. Meals should be provided at least three times in a 24-hour period, with two of the meals being hot meals, 5-ACI-5C-16, and an institution must "compl[y] with all applicable health codes and regulations of the governing jurisdiction." 5-ACI-5D-01. Additionally, there must be weekly, monthly, and annual sanitation inspections. *Id.* The institution must provide therapeutic diets as prescribed by appropriate clinicians, 5-ACI-5C-06, and special diets for inmates whose religious beliefs require adherence to religious dietary laws. 5-ACI-5C-07.

35. Multiple provisions of Title 15 of the California Code of Regulations similarly require nutritious food to be served in California prisons and jails at regular intervals and in sanitary conditions. *E.g.*, Cal. Code Regs. Tit. 15, §§ 1240, 3050 (food shall be served three times any 24-hour period, with at least two hot meals for inmates in prison settings; supplemental food must be served if more than 14 hours elapses between evening and morning meals); *id*. §§ 1241, 3050 (setting minimum nutritional and caloric requirements); *id.* §§ 1245, 3052 (establishing standards for kitchen hygiene).

36. In my experience, including 21 years in supervisory roles that included overseeing prison kitchen operations, prisons comply with, and usually exceed, the above food and food safety requirements by serving nutritious food prepared in hygienic settings.

37. I can personally attest to the portion sizes, quality, and nutritional value of prison cuisine, as I have eaten hundreds of the same meals served to the inmates as

part of my supervisory duties. At each meal served in a CDCR correctional facility, a lieutenant or their designee must eat the same food the inmates eat. This employee, alongside a designated inmate, then fills out a "meal samplers' report" that notes various conditions about the food such as temperature, portion sizes, and taste. (Other officers are forbidden from alerting the kitchen staff as to when the lieutenant or designee is in line to receive his or her ration, meaning the employee doing the sample report gets a random and representative sample of the food prepared). In my experience, the food served in a California prison consistently meets or exceeds all applicable requirements, including the ACA Standards and those of Title 15. Additionally, in my experience, hot food is served twice daily.

38. To the best of my recollection, I never got sick eating the food served to me as part of my meal sampling duties and I do not remember any food smelling or appearing spoiled. I have also personally observed excellent hygienic practices in prison kitchens. For example, prisons generally rotate the food supply such that whatever food is being served on a given day arrives that morning or the day before. The food delivered is fresh and not rotten. In my time as a Central Kitchen Sergeant, I also observed inmate workers thoroughly disinfecting and cleaning the kitchens at the end of each day.

39. The PBNDS require Adelanto to provide the same hot, nutritious, and sanitary food, and sanitary meal preparation, as a criminal facility. Specifically, detainees are to be "provided a nutritionally balanced diet that is prepared and presented in a sanitary and hygienic food service operation." 2011 PBNDS § 4.1(I) at p. 228; *see also* 2011 PBNDS § 4.1(II)(9) at p. 228 ("[F]ood service personnel shall provide nutritious and appetizing meals."). With respect to the timing of meals, "[o]rdinarily detainees shall be served three meals every day, at least two of which shall be hot meals . . . [and] [t]he dining room schedule must allow no more than 14 hours between the evening meal and breakfast." 2011 PBNDS § 4.1(V)(D)(1) at p. 232. The guidelines further contain extensive requirements for food sanitation. For

example, they provide that detainees "shall be protected from injury and illness by adequate food service training and the application of sound safety and sanitation practices in all aspects of food service and dining room operations." 2011 PBNDS § 4.1(II)(3) at p. 228.

40. Likewise, the NDH and GRS NDH state that detainees have "the right to [three] balanced nutritious meals" that are "approved by a dietitian, [and] served in a clean, safe place." NDH at 7, 18–19; GRS NDH at 16.

41. The evidence I have reviewed demonstrates that Adelanto is not serving edible food to its detainee population, in contrast to all of the above standards and what in my experience is standard practice at California prisons. Multiple detainees have described how the food they receive is spoiled/rotten and lacks nutritional value. A.A.A.A. Decl. ¶¶ 40–43; A.K. Decl. ¶ 21; Ding Decl. ¶ 38; E.M. Decl. ¶¶ 13–14; Flores Decl. ¶ 20; Mesrobian Decl. ¶ 58; Rodriguez-Arzola Decl. ¶ 27.

42. Detainees also report that the food does not meet basic thresholds for caloric intake, and many have reported significant weight loss. E.M. Decl. ¶¶ 13–14; Frederick Decl. ¶¶ 37–38; J.M. Decl. ¶ 28; Samaan Decl. ¶ 19; Smith Decl. ¶ 23; Winfield Decl. ¶ 25.

43. Detainees have also noted that food is prepared and served in unsanitary conditions: A.A.A.A. Decl. ¶ 42; Mesrobian Decl. ¶¶ 56–57; Smith Decl. ¶ 22; Winfield Decl. ¶ 26.

44. My understanding of the conditions at Adelanto is further supported by investigations of the Adelanto Detention Center performed by DRC, the agency designated under federal law to protect and advocate for the rights of Californians with disabilities, which found similar issues with Adelanto's provision of food. Limited access to food was a recurring issue in DRC's 2025 monitoring tour of Adelanto. *See* They Treat Us Like Dogs in Cages, *supra* note 1, at 12. While walking through housing units, DRC observed several individuals pointing at their mouths and shaking their heads "no" to indicate they were not receiving food. *See id.* When DRC

asked Adelanto staff when lunch would be served, staff responded that "feeding" would be provided starting at 11:00 a.m., but most detainees interviewed by DRC between 1:00 pm and 4:00 p.m. reported that they had not received food since 5:00 a.m. to 8:00 a.m. *Id.* Many further expressed fear that they would not eat until potentially 10:00 p.m. *Id.* DRC reported that the inconsistency in and delays of meal distribution have caused many individuals at Adelanto to experience prolonged states of hunger and physical pain. *Id.* One individual who spoke with DRC reported significant weight loss within twenty days of their arrival at Adelanto. *Id.*; *see also* Smith Decl. ¶ 23 (loss of 35 pounds); Winfield Decl. ¶ 25 (loss of 25 pounds). DRC noted that individuals with diabetes faced struggles in managing blood sugar due to the inconsistency of meals. *See* They Treat Us Like Dogs in Cages, *supra* note 1, at 12–13. Most individuals interviewed by DRC reported poor food quality and portions too small to keep them satisfied. *Id.* Many individuals further shared that they were experiencing gastric issues, such as stomach cramping and pain, due to the poor food quality. *Id.*; *see also* Mesrobian Decl. ¶ 58 ("I have seen people get stomach aches and diarrhea because of food poisoning.").

45. **Summary of Opinion:** Food service at Adelanto fails to meet the ACA Standards or PBNDS requirements, compliance with which is a condition of GEO Group Inc.'s contract with ICE to operate the facility. Adelanto does not serve the same quantity or quality of food, or prepare food under the same conditions, as does a criminal facility. The food at Adelanto is in many instances inedible, under portioned, and/or prepared or delivered in unsanitary conditions. Adelanto lacks any penological justification for failing to provide its detainees with sufficient quantities of quality, nutritious food cooked pursuant to basic standards of hygiene, as doing so does not make the facility any more secure. To the contrary, Adelanto's failure to provide edible food raises safety concerns. It increases the risk of harm to individual detainees, and it risks building up resentment in the population, which is dangerous

because it can lead to outbreaks of fights and other breakdowns in orderly operations that pose a risk to inmate safety.

**ii. While Prisons Provide Clean Drinking Water in Sufficient Quantities for the Facility Population, Adelanto Does Not.**

46. The evidence I have reviewed demonstrates that Adelanto is not providing its detainee population with the same access to potable drinking water that inmates receive in prison. There is no penological justification for Adelanto's failure to provide clean drinking water in sufficient quantities for all detainees. To the contrary, the absence of potable water poses the same risks of detainee harm and worsening institutional morale as the absence of edible food.

47. The ACA Standards require that clean, potable drinking water be provided in detention facilities. These include a requirement that the facility ensure that its water is regularly tested by an independent agency or company to ensure the safety of the water. 5-ACI-5D-02.

48. In my experience, prisons comply with these water-safety requirements. Staff and inmates in California prisons drink from the same water supply, including at times from the same water fountains. I drank the water in California prisons countless times over the course of my career. To the best of my recollection, I never experienced any problems or noticed water that appeared unsafe for human consumption in any way. Additionally, to the best of my recollection, the water was never brown or yellow.

49. Every cell in a California prison has continuous access to potable drinking water, and water fountains are located throughout the facility. To the extent inmates ever identify issues with the drinking water, in my experience prison staff place high priority on investigating and then identifying and remediating the problem if one exists. Moreover, in facilities that require additional water safety treatment (as for example because of high levels of contaminants specific to the environment where the facility is located), it is my experience that the State of California pays for

additional filtration systems. I recall water safety testing occurring in California correctional facilities approximately once every three months, although I was not involved in overseeing such testing while employed with the CDCR.

50. Like the ACA Standards, the PBNDS provides that "[s]afe, potable water shall be available throughout the facility." 2011 PBNDS § 1.2(II)(13) at p. 19. The regulation also states, "[a]t least annually, a state laboratory shall test samples of drinking and wastewater to ensure compliance with applicable standards. A copy of the testing and safety certification shall be maintained on site." 2011 PBNDS § 1.2(V)(A)(5) at p. 21. The PBNDS also states, "Clean, potable drinking water must be available." 2011 PBNDS § 4.1(V)(D)(1) at p. 232. Detainees also shall have access to potable water in hold rooms. 2011 PBNDS § 2.6 (V)(A)(13) at p. 101.

51. The evidence I have reviewed demonstrates that Adelanto is not providing potable water as a criminal facility would.

52. As an initial matter, it is my understanding that staff at Adelanto only provides drinking water via jugs placed in communal areas. E.M. Decl. ¶ 16; Flores Decl. ¶ 18; Frederick Decl. ¶ 39; J.M. Decl. ¶ 26; Ruiz-Escobar Decl. ¶ 25; Salazar-Garza Decl. ¶ 24; Samaan Decl. ¶ 18. As noted above, it is standard practice in a California prison for each cell to have independent and continuous access to drinking water. There are also fountains throughout common areas of facilities. In my opinion, Adelanto's practice of only providing drinking water in communal water jugs that run out, and not through independent and continuous access, is unusual and a significant departure from the ordinary operating conditions of a California criminal detention facility, including those located in areas with similar desert climates as Adelanto. Further, in my opinion this practice is not necessary for any facility-security purpose.

53. Multiple declarants also have stated that the jugs are not sanitary, and that they have observed contaminants such as mold, sand or other material inside. A.A.A.A. Decl. ¶ 39; Ding Decl. ¶ 40; Flores Decl. ¶ 18; Frederick Decl. ¶ 39; Karamychev Decl. ¶ 26; Mesrobian Decl. ¶ 47; Ruiz-Escobar Decl. ¶ 25; Winfield

Decl. ¶ 27. Providing inmates with water from dirty containers is inconsistent with standard practice at California detention facilities. On occasion, as for example in times of great heat during the summer, I observed prisons make use of Cambro water containers to facilitate moving drinking water to the inmate population faster and in larger quantities than merely using a fountain. However, kitchen workers always sanitized and cleaned them before filling them with water and ice. And even in this scenario, I have never seen water being provided to inmates that appeared dirty, either because the water itself was yellow and brown or because it was being served from a dirty container.

54. Multiple declarants also have stated that the water that comes out of the faucets is dirty, discolored, and/or foul smelling. A.A.A.A. Decl. ¶ 38; A.K. Decl. ¶ 19; E.M. Decl. ¶ 16; Flores Decl. ¶ 18; Frederick Decl. ¶ 41; Mesrobian Decl. ¶ 48; Ruiz-Escobar Decl. ¶ 26; Salazar-Garza Decl. ¶ 24; Samaan Decl. ¶ 18; Smith Decl. ¶ 24; Winfield Decl. ¶ 29.

55. In addition to the water itself being dirty, many declarants also have inconsistent access to the "drinking" water as it is not accessible from their sleeping quarters, unlike in prisons. A.A.A.A. Decl. ¶¶ 39–40; E.M. Decl. ¶ 16; Flores Decl. ¶ 18; Frederick Decl. ¶¶ 39–40, 42; J.M. Decl. ¶¶ 26–27; Mesrobian Decl. ¶ 49; Rodriguez-Arzola Decl. ¶ 26; Ruiz-Escobar Decl. ¶ 25; Salazar-Garza Decl. ¶ 24; Samaan Decl. ¶ 18; Smith Decl. ¶ 24; Winfield Decl. ¶ 28.

56. My understanding of the conditions at Adelanto is further supported by the DRC report discussed above. Individuals who spoke with DRC reported that detainees are dehydrated and a general concern that there is not enough drinking water. *See* They Treat Us Like Dogs in Cages, *supra* note 1, at 13. Individuals who spoke with DRC reported that water from sinks and drinking fountains appeared "cloudy and has an unusual taste." *Id.*

57. **Summary of Opinion:** Adelanto does not provide detainees with the same access to potable water as does a criminal facility. In failing to provide access

to clean drinking water, Adelanto is violating its own promises to comply with the ACA Standards and PBNDS requirements. Instead of providing detainees with ready access to potable water in their cells, Adelanto makes them drink from contaminated or dirty containers. Unlike the water available in prisons, the water at Adelanto from these containers and the tap/faucet is frequently described as dirty or irregular. Moreover, Adelanto does not provide drinking water in sufficient quantities for all detainees. Adelanto lacks any penological justification for denying detainees reliable access to clean drinking water. Adelanto's failure to do so makes the facility less safe, both by increasing the risk of harm to individual detainees and by worsening population morale, which could lead to violent disruptions such as fights or riots that pose a security threat to both detainees and staff.

**iii. While Prisons Adequately Ensure Cleanliness of the Facility, Adelanto Does Not.**

58. The evidence I have reviewed demonstrates that Adelanto is not providing its detainee population with the same level of facility cleanliness, including the same consistent access to soap and cleaning products, that inmates receive in prison. The presence of mold in cells is especially alarming. There is no penological justification for Adelanto's failure to maintain a clean environment. To the contrary, failing to ensure a hygienic facility risks allowing for the spread of disease and could potentially compromise the health of detainees and staff. It also poses the same risks of detainee harm and worsening institutional morale as failing to provide edible food and clean drinking water.

59. The ACA Standards specify that "weekly sanitation inspections of all facility areas by a qualified departmental staff member" are required, as are "comprehensive and thorough monthly inspections by a safety or sanitation specialist." 5-ACI-5D-01. It also requires facilities maintain "[a] written housekeeping plan for all areas of the facility's physical plant," including "provid[ing] for daily housekeeping and regular maintenance by assigning specific

duties and responsibilities to staff and inmates." 5-ACI-5D-05. And it mandates facilities "provide[] for the control of vermin and pests." 5-ACI-5D-04.

60. Section 1280 of Title 15 of the California Code of Regulations also requires facility administrators to "develop written policies and procedures for the maintenance of an acceptable level of cleanliness, repair and safety throughout the facility," including the provision of a "regular schedule of housekeeping tasks and inspections to identify and correct unsanitary or unsafe conditions or work practices which may be found." Cal. Code Regs. Tit. 15 § 1280.

61. In addition, the ACA Standards provide that "[e]ach offender should be provided soap." 5-ACI-5D-14. Title 15 is to the same effect. Section 3061 (governing longer-term facilities such as prisons) states, "Inmates shall be provided products for washing hands, … including but not limited to: soap…." Cal. Code Regs. Tit. 15 § 3061.

62. In my experience, prisons comply with these sanitation requirements. Each housing unit in a criminal facility has groups of porters, who are inmate employees charged with keeping the area and other parties of the facility such as the kitchen clean. Porters have access to and use disinfectant material and typically serve on either the "second watch" (6:00 a.m. to 2:00 p.m.) or "third watch" (2:00 p.m. to 10:00 p.m.). They can either be paid or volunteers. Staff inspect the cleanliness of the facility on a daily basis.

63. In my experience, porters do a very good job of keeping the units clean. Frequently, units will compete amongst each other to have the cleanest facilities so as to secure bragging rights and extra perks like additional outdoor time. In addition, porters receive "good time" credit whereby each day they work allows them to serve one day of their remaining sentence on parole rather than in a facility.

64. Criminal facilities also supply adequate tools for the porters to use to clean the facilities. These include toilet brushes, scrub brushes, and towels. Porters receive special protective equipment and training on how to clean up messes that

could pose a biological hazard such as blood. In my experience, CDCR facilities generally meet or exceed relevant community standards for cleanliness, including by providing good quality disinfectants for use in cleaning.

65. In my experience, prisons also comply with the obligation to provide soap to inmates. Prisoners are issued bars of soap upon request. In dormitory-style housing, soap is also made available in bathrooms. Sometimes the facility provides communal bars of soap. Other times, inmate porters fill dispensers with liquid or powdered soap. I do not recall any situation in which soap was not made available to detainees in a California prison on a timely basis during my 26 years as a CDCR employee.

66. I do not recall seeing mold in a California prison except to the extent it was discovered around a plumbing chase leak. Even then, mold would be an extremely uncommon occurrence. In such rare situations, the issue would be addressed immediately upon it being brought to facility staff's attention. The presence of mold in dormitories would not be tolerated in a state prison facility; prison staff are aware that mold poses a serious health risk. Typical practice in my experience is to "red-line" any area with a hazard such as mold (that is, cordon off the area and not allow inmates to enter or access it until full remediation has occurred).

67. Notably, Adelanto must also provide sanitary conditions and soap. The PBNDS provide that "facility cleanliness and sanitation shall be maintained at the highest level," 2011 PBNDS § 1.2(II)(1) at p. 19, and that "a high standard of facility sanitation and general cleanliness" should be maintained. 2011 PBNDS § 1.2(V)(3) at p. 21. Likewise, the NDH states, "[i]t is important to keep the facility clean for your health and safety." NDH at 23. Both the PBNDS and NDH state each detainee shall have access to soap. PBNDS § 2.1(II)(6) at p. 49; *see also* PBNDS § 2.6(V)(B)(6) at p. 101; *see also* NDH at 8, 19, 22.

68. The evidence I have reviewed demonstrates that Adelanto is not providing its detainee population with the same consistent level of facility cleanliness

and sanitation that inmates receive in prison, including failing to remediate mold. A.A.A.A. Decl. ¶¶ 48–49; Arnold Decl. ¶¶ 13, 29–31; Ding Decl. ¶¶ 36–37; Flores Decl. ¶ 21; Frederick Decl. ¶¶ 33–34; Karamychev Decl. ¶¶ 27–28; L.T. Decl. ¶¶ 23–24, 27; Mesrobian Decl. ¶¶ 40–42, 51, 56; Rodriguez-Arzola Decl. ¶¶ 24–25; Ruiz-Escobar Decl. ¶¶ 27–28; Salazar-Garza Decl. ¶ 28; Smith Decl. ¶¶ 25–27; Winfield Decl. ¶¶ 32–33. It also indicates that Adelanto is not providing detainees with consistent access to soap the way prison does. A.A.A.A. Decl. ¶ 44; Mesrobian Decl. ¶ 54. There is no penological justification for failing to do so. To the contrary, failing to ensure access to a sanitary facility risks allowing for the spread of disease and jeopardizes the health of both detainees and staff. It also poses the same hazards of worsening institutional morale as failing to provide edible food and clean drinking water.

69. **Summary of Opinion:** Adelanto does not provide detainees with equivalent levels of facility cleanliness and consistent sanitation, or access to soap, as a prison. In failing to do so, Adelanto is violating its own promises to comply with the ACA Standards and PBNDS requirements. Detainees describe that the facility is not cleaned by staff and they are not provided with sufficient cleaning materials to properly clean themselves. Adelanto lacks any penological justification for treating detainees in this manner. The failure to provide sanitary facilities also worsens population morale. In my experience as a corrections officer, inmates derive a significant amount of pride and satisfaction from being able to maintain a clean living space.

**iv. While Prisons Provide Serviceable, Temperature-Appropriate Clothing, Linens and Mattresses, Adelanto Does Not.**

70. The evidence I have reviewed demonstrates that Adelanto is not providing its detainee population with the same access to serviceable, temperature-appropriate clothing and bed linen as inmates receive in prison. There is no penological justification for Adelanto failing to provide these items, as without them,

population morale and inmate health both will likely suffer. With respect to serviceable mattresses, Adelanto is putting the facility at additional risk by allowing detainees to use mattresses that leak material such as stuffing. A prison would never allow an inmate to have a leaking mattress for the simple and obvious reason that such a mattress could be used to hide contraband.

71. The ACA Standards and California's Title 15 regulations require the issuance of climate-appropriate materials, with specified dates for detainees to exchange them for new/cleaner ones.

72. The ACA Standards requires facilities to "provide for the issue of suitable clothing to all inmates," including specifically clothes that are "climatically suitable" and "durable." 5-ACI-5D-08. Inmates must also have access to "three complete sets of clean clothing per week." 5-ACI-5D-10. Facilities must also have policies for "the issue of suitable, clean bedding and linen, including two sheets, pillow and pillowcase, one mattress not to exclude a mattress with integrated pillow, and sufficient blankets to provide comfort under existing temperature controls." 5-ACI-5D-12. Linens and towels must be exchanged weekly, and blanket exchange must be available at least quarterly. *Id.*

73. Likewise, Sections 1260, 1270, and 3030 of Title 15 require that inmates be provided linens and clothing (with caveats for suicide prevention). Cal. Code Regs. Tit. 15, §§ 1260, 1270, 3030. Sections 1262, 1271, and 3031 provide for weekly laundry exchanges for clothing and washable items like sheets and towels. *Id.* §§ 1262, 1271, 3031.

74. Sections 1270 and 1272 of Title 15 further provide that detainees are to receive a serviceable mattress without holes, tears, and with sufficient padding. *Id.* §§ 1270, 1272.

75. In my experience, prisons comply with these clean-clothing and bedding requirements. Inmates receive standard issue prison attire that is clean and dry. Prison facilities I have supervised have sanitary and effective laundry systems.

Inmates are each issued a mesh laundry bag, and they can exchange items of their state-issued clothing for clean replacements on a one-to-one basis during yard time. For materials that are standardized in sizing across the whole inmate population like sheets and blankets, prison facilities bring a laundry cart around to cells and exchange soiled items for new, fresh ones roughly once a week. I have never known a prison laundry system to return garments in wet, soiled, or otherwise unsanitary conditions.

76. State prisons also allow for inmates to buy their own supplemental clothing from the commissary or its equivalent. The institution does not provide free laundering of these extra garments, but inmates can (and do) wash such items themselves. The inmates typically buy laundry soap flakes from the commissary and use provided paint buckets or wash basins to launder these items by hand before rinsing them off in the showers. The inmates are then allowed to dry these clothes by hanging them off the side of their bunks.

77. The facilities also provide clothing and bedding that is temperature appropriate. For example, in my experience prisons usually issue wool blankets to inmates for the colder winter months and cotton blankets during the warmer summer months.

78. Facilities also provide mattresses that are serviceable, including by confirming that they are not torn or leaking material. To do otherwise presents a serious safety issue: a mattress with a ripped opening could be used to hide contraband like weapons. In my experience, when prison staff see a mattress with a tear, they use a fluoroscope to x-ray it to see if material has been hidden inside. Mattresses in prison are also in my estimation suitably thick for inmates to sleep, as are the standard issue prison pillows.

79. Notably, Adelanto also should be providing detainees access to clean clothing, appropriate bedding, and clean linens. Specifically, the PBNDS requires staff to "issue clothing and bedding items that are appropriate for the facility environment and local weather conditions." 2011 PBNDS § 2.1(V)(C) at p. 53.

Similar to the ACA Standards, the PBNDS states that the expected outcomes of its detention standards are that "[e]ach detainee shall have suitable, clean bedding, linens, blankets and towels" and "sufficient clean clothing that is properly fitted; climatically suitable, durable and presentable[.]" 2011 PBNDS § 4.5(II)(2)–(3) at p. 327.

80. The evidence I have reviewed demonstrates that Adelanto is not providing inmates with the same access to suitable clothing, linen, and bedding/mattresses that they would receive in a California prison. Detainees describe unsanitary laundry practices, for example, where clothes do not come back clean. Arnold Decl. ¶ 33; Frederick Decl. ¶ 30; L.T. Decl. ¶ 28; Mesrobian Decl. ¶¶ 66–67; Ruiz-Escobar Decl. ¶ 24; Winfield Decl. ¶ 31. Declarants are cold, clothes are dirty and have holes, blankets are thin, and mattresses are thin and leak material, and declarants have described the temperature in cells as oscillating between frigidly cold and swelteringly hot. A.A.A.A. Decl. ¶ 15; A.K. Decl. ¶ 20; Ding Decl. ¶ 34; J.M. Decl. ¶ 32; L.T. Decl. ¶¶ 25–26; Mesrobian Decl. ¶¶ 53, 65–68; Rodriguez-Arzola Decl. ¶ 28; Smith Decl. ¶ 28; Winfield Decl. ¶¶ 7, 38.

81. My understanding of the conditions at Adelanto is further supported by the DRC report discussed above. Another individual with an acute spinal condition told DRC that his facility-issued mattress was damaged and was causing significant pain to his spine when he lay on it. *See* They Treat Us Like Dogs in Cages, *supra* note 1, at 12. Despite submitting multiple requests for a new or additional mattress, he never received a response. *Id.* at 11.

82. **Summary of Opinion:** Adelanto does not provide detainees with the same access to clean clothes, linens, or bedding/mattresses as does a criminal facility. In failing to do so, Adelanto is violating its own promises to comply with the ACA Standards and PBNDS requirements. Detainees describe the laundry as unsanitary, the mattresses as ripped/thin/damaged, and the sheets/bedding as insufficiently warm or protective. Adelanto lacks any penological justification for failing to give its

detainees suitable clothes, linens, or beds. Inmates are at greater risk of harm if their clothing is soiled. The failure to provide usable clothes and bedding also worsens population morale. And as to damaged mattresses, Adelanto presents a security risk in letting detainees continue to use them.

**B. Without Any Justification, Adelanto Imposes Significantly More Restrictive Conditions on the Day-to-Day Life of its Population Than a Prison Does to its Inmates.**

83. Beyond providing for basics such as food, water, and a clean environment, custodial facilities determine the conditions under which their populations experience day-to-day life through a variety of programs and policies. For example, prisons provide their inmate populations with the dignity that comes from privacy protections when using the restroom, consistent with population safety. Prisons further give inmates visitation opportunities with loved ones and encourage their residents to better themselves with recreational, educational, or religious programs and opportunities, including access to outdoor spaces. And when criminal institutions need to take security measures such as counting the inmates to make sure all are present or separating some inmates from the general population, they strive to do so in a way that will minimize disruption to the facility as a whole.

84. The evidence I have reviewed demonstrates that Adelanto is not providing its detainee population with the same treatment with respect to day-to-day life experiences as a criminal facility. As described herein, multiple detainee and third-party accounts of Adelanto document a lack of adequate privacy standards around toilet and shower use; a visitation policy that, for no justifiable reason, prevents adults from holding their children or their loved one's hands except briefly at the outset of a visit, while arbitrarily capping the length of all visitors regardless of the circumstances; significantly restrictive policies surrounding detainee counts and access to the outdoors; a lack of educational, recreational, or religious programming;

and inappropriate, punitive use of restrictive housing. As a matter of detention security, there is no reason detainees at Adelanto should be subject to these conditions.

**i. While Prisons Protect Privacy with Respect to Toilets and Showers, Adelanto Does Not.**

85. The evidence I have reviewed demonstrates that Adelanto is not providing its detainee population with the same level of privacy that inmates receive in prison with respect to use of toilets and showers. As I detail below, Adelanto has placed toilets inside cells containing as many as eight people, without providing any privacy screens for those toilets. California prisons do not do this: in general, cells with two inmates have their own toilets inside the cell. In dormitory-style housing with more than two people sharing a living space, toilets are external to the living/bunk areas and have privacy screens. I also understand from the evidence I have reviewed that Adelanto, unlike a prison, has showers that face each other with no privacy divider preventing two showering detainees from being able to view each other. There is no penological justification for requiring detainees to use toilets and showers in plain view of others as Adelanto does. To the contrary, depriving inmates of privacy protections does not add to the security of the facility, and in fact makes detention less safe and more humiliating for detainees.

86. Privacy of one's body and bodily functions are very important to maintaining order in a correctional facility. Providing proper privacy in these sensitive areas makes detainees feel respected because they are being treated with basic decency. That feeling of respect, in turn, leads to a better population morale that minimizes instances of fighting or other disruptions to the facility. Other inmates also need to be protected from harassing behavior with reasonable privacy limitations on visibility.

87. In my experience, prisons ensure adequate privacy while providing for the safety of the facility.

88. The CDCR has four levels of prisons. Level I and Level II facilities, for inmates who pose lower security concerns, typically consist of dormitory style housing with a communal bathroom external to the sleeping area. Level III (medium security) and Level IV (maximum security) facilities typically consist of two-person cells, each with their own toilet.

89. In Level I and Level II prisons, facilities provide privacy screens for both the toilets and showers. Toilets have screens or dividers that allow a person's head and neck to be visible as a safety measure. As to showers, typically there are screens that prevent viewing of a person from their knees to the chest/mid-section.

90. In Level III and Level IV prisons, typically when an inmate needs to use the toilet, the inmate drapes a sheet from the top bunk to the door until use of the toilet is complete.

91. Adelanto is required to ensure some forms of privacy. In fact, the PBNDS are the most explicit as to requirements for privacy. Even as to holding rooms (i.e., those rooms where a detainee may be confined for at most twelve hours while awaiting further processing, in contrast to a sleeping area where a detainee must spend the majority of their time), the PBNDS specify that "stainless steel, combination lavatory/toilet fixtures ***with modesty panels***, in compliance with the applicable federal and state accessibility standards," must be provided. 2011 PBNDS § 2.6(V)(A)(6) at p. 100 (emphasis added). As to showers and toilet facilities, they further specify that "[d]etainees shall be provided with a reasonably private environment in accordance with safety and security needs." 2011 PBNDS § 4.5(V)(E)(3) at p. 329.

92. The evidence I have reviewed demonstrates that Adelanto does not afford its detainee population the same privacy accommodations that California prisons provide, or that the PBNDS regulations mandate. Multiple detainees report being housed in a cell with multiple cellmates, yet not having a privacy divider for use of the toilet. A.A.A.A. Decl. ¶ 10; Salazar-Garza Decl. ¶ 23; Samaan Decl. ¶ 15; Winfield Decl. ¶ 35. Detainees also report that in the shower area, there are no

privacy curtains or dividers between shower stalls such that two detainees showering at the same time have clear views of each other. Frederick Decl. ¶ 32; Mesrobian Decl. ¶¶ 43, 46; Ruiz-Escobar Decl. ¶ 27; Salazar-Garza Decl. ¶ 25; Winfield Decl. ¶ 35.

93. Of particular note, Adelanto's practice of placing more than two inmates in a cell with a toilet and no privacy screen is significantly more restrictive than a California prison. As detailed above, California prisons either have two-man cells with a toilet or a dormitory style floor plan with separate restrooms with privacy screens.

94. **Summary of Opinion:** Adelanto does not provide detainees with the same level of privacy for use of the toilet and shower as does a criminal facility. A California prison would not place more than two inmates in a cell that contains a toilet without providing a privacy screen for that toilet. California prisons also provide privacy screens in the showers. Adelanto lacks any penological justification for failing to protect inmate privacy in these settings. Criminal institutions are able to effectively balance the security of the facility with ensuring that inmates receive protection from the embarrassment and degradation of having to use restroom and shower facilities while totally exposed to other strangers.

**ii. While Prisons Provide Reasonable Visitation Policies, Adelanto Does Not.**

95. The evidence I have reviewed demonstrates that Adelanto's visitation policies—in particular, its arbitrary allowance of only one hour per visit at most no matter the circumstances and its bans on allowing detainees to hold their children or their guest's hands for the duration of contact visits—lack penological justification and are more punitive than any institutional practice I have come across in over 26 years as a corrections officer.

96. The ACA Standards-recommended practice for regular visitation is that a written policy, procedure, and practice should provide that the length of visits may be

limited only by the institution's schedule, space, and personal constraints, or when there are substantial reasons to justify the limitations. 5-ACI-7D-14. ACA Standards also require a facility to establish a "[w]ritten policy, procedure, and practice to provide that inmate visiting facilities permit informal communication, ***including opportunity for physical contact***." 5-ACI-7D-16 (emphasis added). The comment to this section notes that "[t]he degree of informality of inmate visiting facilities should be consistent with the institution's overall security requirements." *Id.* The standard *does not* limit the contact between parents and their children, or deny inmates and visitors the ability to hold hands.

97. Title 15 is to the same effect. Section 3172.2 requires institutions to provide a minimum of twelve hours of visitation per week. Cal. Code Regs. Tit. 15, § 3172.2. As to the length of visits, Section 3170.1 also provides that limits in general should be imposed only to "avoid overcrowding or the inequitable allocation of visiting time[.]" Section 3175 specifically provides that, in addition to inmates and visitors being allowed to "briefly embrace and/or kiss" "at the beginning and end of each visit," for the *entirety* of a visit, "[i]ncarcerated persons and their visitors may hold hands," "an incarcerated person may hold their minor children" or other "minor children accompanied by an adult," and nursing mothers may breast-feed their children in the visiting area if they do so discreetly and while covered. Section 3177 even provides that certain inmates are allowed overnight family visits.

98. In my experience, California prisons follow (and frequently exceed) these standards in crafting their visitation policies. There are no per se or automatic time limits on the length of a visit. Visiting hours in prison generally run the length of a business day on days when visitation is permitted. So long as there is sufficient space, inmates can stay with their guests as long as they choose during that period. When the visiting room reaches capacity, prisons terminate inmate visits (without prejudice to renewal of the visit if the crowd dies down) on a first-in, first-out basis to allow for everyone to have some visiting time.

99. Also in my experience, California prisons allow consistent contact during visitations in compliance with these standards. Adult inmates routinely hold their minor children for the duration of a visit. So long as inmates and their visitors are not engaged in lewd/sexual conduct or actions that could be deemed offensive to children, they are also permitted to hold hands with visitors for the entirety of the visit.

100. The PBNDS that apply at Adelanto provide that "the number of visitors a detainee may receive and the length of visits shall be limited only by reasonable constraints of space, scheduling, staff availability, safety, security and good order," with the instruction that visitation should be "for the maximum period practicable but not less than one hour with special consideration given to family circumstances and individuals who have traveled long distances." 2011 PBNDS § 5.7(II)(6) at p. 392. As to physical contact, they state: "[o]rdinarily, within the bounds of propriety, handshaking, embracing and kissing are permitted only at the beginning and end of the visit; however, staff may limit physical contact to minimize opportunities for contraband introduction and to otherwise maintain the orderly operation of the visiting area." 2011 PBNDS § 5.7(V)(I)(4) at p. 397. The PBNDS provisions do not bar parents from holding their children during visits. A separate portion of the PBNDS specifies that "[f]acilities that allow visitations by minor children, stepchildren and foster children should try to facilitate contact visitation when possible." 2011 PBNDS § 5.7(V)(I)(2)(b) at p. 396. Nor do the standards explicitly bar inmates from breastfeeding during visitation.

101. The GRS NDH treats the PBNDS minimum as a maximum, stating that all visits are capped at one hour absent special approval from the Facility Administrator or designee. GRS NDH at 16.

102. The evidence I have reviewed demonstrates that Adelanto is treating its civil detainee population more restrictively than inmates in a criminal correctional facility with respect to visitation policy. In particular, visits are capped at one hour and are often cut short before then, and detainees at Adelanto are not allowed to hold

their children or hold the hands of their spouses for the entirety of the visit. A.A.A.A. Decl. ¶¶ 48–49; Arnold Decl. ¶ 35; Frederick Decl. ¶¶ 27–28; Salazar-Garza Decl. ¶ 31; *see also* Arnold Decl. ¶ 37 (noting the cost of communication with family, including $4 for a 45-minute call, with video calls being 21 cents a minute or $6 for 30 minutes). Detainees have also noted that breastfeeding is not permitted. A.A.A.A. Decl. ¶ 47 ("One time, I witnessed an infant being brought to a detainee who had been breastfeeding. The baby kept reaching for its mother and the officers kept telling them they could not have contact. Eventually, the baby had to be taken outside because it was so frustrated and couldn't understand."). Although I have never worked in a women's correctional facility, I am informed that female inmates are allowed to breastfeed their children when they visit.

103. Adelanto's extra restrictions on visitation do not serve to enhance the security of the facility, and in fact risk destabilizing security by increasing population resentment and lowering morale.

104. **Summary of Opinion:** Adelanto's visitation policies are more restrictive than those of a California prison, and there is no penological justification supporting them. They also violate Adelanto's commitment to abide by the ACA Standards and the PBNDS. There is no basis for a one-hour limit on visitation regardless of the circumstances. Parents should also be allowed to hold their children, and visitors should be allowed to hold hands with inmates for the duration of contact visits.

**iii. While Prisons Provide Recreation and Programming, Adelanto Does Not.**

**a. Count Procedures at Adelanto Are More Restrictive and Disruptive than in Criminal Facilities.**

105. The evidence I have reviewed demonstrates that Adelanto's count procedures are more restrictive than those of a prison, without any penological justification. The count process at Adelanto is significantly disruptive: it occurs six times a day, including twice during peak operational hours of the facility (10:30 a.m.

and 6:30 p.m.). Detainees cannot leave their quarters during each of these counts, the counts often take more than an hour each to clear, and some detainees have stated they cause the facility to keep the lights on much later into the night than a prison would. In California prisons, by contrast, it is rarely ever the case that all inmates must be physically present in their cells for a count, and counts typically clear in 15-20 minutes. Adelanto's inefficient and disruptive count process does not enhance the safety or security of the facility.

106. The ACA Standards provide that an institution must have a system for physically counting inmates. 5-ACI-3A-13. The comment to this section provides that "counts should be scheduled so they do not conflict with the activity programs and normal operating procedures of the facility." *Id.*

107. Section 3017 of Title 15 mandates that inmates must be present at designated times and places for counts and must do so pursuant to institution procedures. Cal. Code Regs. Tit. 15 § 3017.

108. The CDCR DOM indicates that a physical count of all inmates must be performed a minimum of four times each calendar day; all inmate movement and activity should cease during count; and movement should not resume until after count clears. CDCR DOM, Article 16, 52020.4. All institutions of the CDCR are expected to conduct counts at 12:30 a.m., 2:30 a.m., 4:30 a.m., 11:00 a.m., 4:00 p.m., and 9:00 p.m. (the 12:30, 2:30 and 4:30 counts occur while inmates are sleeping). The 11:00 a.m. count is a specialized count called the "close custody" count and generally only applies to inmates serving life sentences or long sentences (although it includes some minimum security level inmates as well). The 11:00 a.m. count does not affect the entire institution, but only those inmates who are classified to receive close custody counts, thereby reducing the impact of counts upon the regular activities of the inmate population.

109. In my experience, criminal facilities comply with these regulations. Counts at a criminal institution must be cleared within one hour. Usually, however,

they clear within approximately 15–20 minutes. As soon as the count clears, inmates are free to resume normal activities. This means that at most California state prisons, inmates are only subject to at most two counts during peak facility hours that last a combined total of at most 40 minutes. As to the 11:00 a.m. count, typically corrections officers will count the applicable inmates in their area of the facility. CDCR facilities do not require all of the inmates, or even just that subset of the population subject to the count, to have to go back to their cells during the 11:00 a.m. count. Even during evening counts, some inmates are "out counted" (that is, counted out of their cell during count if needed). In my experience, it is rarely if ever the case in a CDCR facility that all inmates must be returned to and counted in their cells. Doing a count of this nature only occurs if there is some unusual exigent circumstance like an escape, a major facility-wide disturbance, or a natural disaster.

110. As to evening counts, based upon my experience, different agencies and facilities determine the time that they will turn down the lighting in housing units and facility areas in the evening. In CDCR facilities, for example, lights are turned down to approximately 50% of their normal level after the final count in the evening, which occurs at 9:00 p.m. The reason for this is to ensure that when all daily activities have come to a close, inmates have an opportunity to get the best possible sleep. Televisions in the day room are turned off, and inmates are required to turn down their radios and personal televisions and must use their headphones so as not to disturb the sleep of others. Correctional staff members are encouraged to limit noise in the unit areas. Officers also use flashlights in California prisons after lights are turned down in a manner that does not cause undue disruption to sleep. For example, officers generally do not shine lights directly in inmates' faces while performing night counts.

111. The evidence I have reviewed demonstrates that Adelanto conducts counts six times a day (at 6:30 a.m., 10:30 a.m., 6:30 p.m., 11:00 p.m., 1:00 a.m., and 3:00 a.m.). During each of these counts, which often last longer than an hour each, detainees cannot leave their sleeping quarters, meaning they cannot access drinking

water, take a shower, make a video call, make a phone call, get food, or resume normal activities. This means that at Adelanto, detainees are subject to three to four counts during waking hours that last a combined total of more than three to four hours. Arnold Decl. ¶ 12; Frederick Decl. ¶ 40; Mesrobian Decl. ¶ 74; Salazar-Garza Decl. ¶ 22; Samaan Decl. ¶ 16.

112. Nothing in the PBNDS appears to require this. Like the ACA Standards, the PBNDS emphasize that "[c]ounts shall be scheduled to achieve full accountability with minimal interference with daily work and activity schedules." 2011 PBNDS § 2.8(V)(A)(1) at p. 112. And the NDH states counts occur "at least three (3) times per day at hours that limit interference with daily activities." NDH at p. 23.

113. There is no custodial reason for so many prolonged and disruptive facility-wide in-cell counts. Requiring all detainees to stop whatever they are doing to return to their cells for a count of over an hour each is unduly burdensome. California prisons are able to accurately and safely account for all inmates without resorting to these measures, and Adelanto should be able to do the same.

114. **Summary of Opinion:** Adelanto's count procedures are more restrictive than those of a California prison, and there is no penological justification supporting them. Because they are unnecessarily restrictive, they also violate Adelanto's commitment to abide by the ACA Standards and PBNDS. To my knowledge, California prisons do not force all of its inmates to remain in their cells for multiple hours in the middle of the day to the exclusion of all other programming or keep lights on long into the morning when inmates are trying to sleep. These count procedures do not make the facility more secure.

**b. Adelanto Provides Detainees with Less Outdoor Time Than Prisons.**

115. The evidence I have reviewed demonstrates that Adelanto does not provide its detainee population with as much access to the outdoors as prison. Adelanto only offers its population at most one hour of access to the larger outdoor

yard each day. This is far less time outdoors than most state prisons provide to their inmates. There is no penological justification for Adelanto's practice, as nothing about restricting time outdoors makes the facility safer or more secure. In fact, ensuring that individuals get enough time outdoors helps improve morale and health, and contributes to the orderly operation of the facility.

116. Section 3044 of Title 15 provides different levels of access to outdoor facilities depending on an inmate's privilege group. Cal. Code Regs. Tit. 15 § 3044. Most inmates fall into one of two groups: Group A (inmates who are either on full-time work or training assignments, or who have been diagnosed as totally disabled) or Group B (inmates who are either on half-time assignments, involuntarily unassigned, who have been placed in the group as the result of certain rule violations). Inmates in these groups are entitled to "[a]ccess to yard, recreation and entertainment activities during the incarcerated person's non-working/training hours and limited only by security needs." *Id.* Even inmates in the more restrictive Privilege Group C (that is, inmates who refuse to accept or perform assignments, twice refuse to accept assigned housing, who are deemed program failures as defined in the regulations, or who commit certain offenses such as indecent exposure) are entitled to "no less than ten hours of exercise in an outdoor, covered or enclosed setting each week." *Id.*

117. In my experience, California prisons comply with these regulations and offer inmates substantial access to the outdoor yard. Yard time at a prison usually starts after breakfast and runs until dinner time. It resumes again after the evening count clears before concluding around 9:00 p.m. In both minimum and maximum security prisons, inmates are allowed to use the yard for as much time as they want so long as they do not have any competing obligation such as a job assignment or class. Inmates are frequently outside for more than an hour each day as their schedule allows.

118. PBNDS provide that at Contract Detention Facilities like Adelanto, detainees should "have at least four hours a day access, seven days a week, to outdoor recreation, weather and scheduling permitted." PBNDS § 5.4(II)(2) at p. 370.

119. Adelanto's conditions are significantly more restrictive than those of a prison, and do not demonstrate efforts to comply with what the PBNDS envisions. The evidence I have reviewed shows that detainees are given just one hour of access to the larger outdoor yard each day, with sometimes no access at all. A.K. Decl. ¶ 20; Arnold Decl. ¶ 27; Ding Decl. ¶ 41; Frederick Decl. ¶¶ 23–24; Mesrobian Decl. ¶ 69; Salazar-Garza Decl. ¶ 29; Samaan Decl. ¶ 17; Winfield Decl. ¶ 39. Some declarants stated that for weeks at a time, Adelanto restricted their access to outdoor areas including the large yard after one detainee allegedly tried to escape. J.M. Decl. ¶ 34 (noting a six-week period in which no detainees were allowed to use the yard); Mesrobian Decl. ¶ 70 (same). Even if this alleged escape prompted Adelanto staff to make modifications to the facility, *see* Mesrobian Decl. ¶ 70 (staff claimed to be fixing a fence), alternative arrangements to allow outdoor access while those modifications occurred should have been made. For example, in my experience it is typical to allow outdoor access even if work is being performed on a facility's perimeter: temporary fencing can be used to keep detainees away from where the work is occurring, and adding additional officers to the area can keep inmates from entering that area. The evidence I have reviewed does not suggest that Adelanto attempted to make any accommodations to allow some outdoor access, as a prison would have done in this scenario.

120. There is no security or penological justification for restricting detainees' access to the outdoors as Adelanto does. Prisons, dealing with adjudicated criminal populations, do not require such draconian measures. To the extent a particular detainee attempts to escape, that detainee can be transferred to a more secure facility or placed in more restrictive housing. It is also highly unlikely that a detainee could

escape from Adelanto given that the facility is located in a remote portion of the California desert, which in itself acts as a way to secure detainees.

121. I am aware that detainees at Adelanto receive access to a "mini-yard," a small area that is open above but enclosed by tall concrete and metal, cage-like walls for several hours a day. *E.g.*, Arnold Decl. ¶ 17; J.M. Decl. ¶ 30; Samaan Decl. ¶ 17. This access is not equivalent to the larger outdoor yard access of a prison. California prisons also have mini yards, but they are only for inmates who are in administrative segregation. There is no security justification for subjecting the outdoor access of an entire detainee population to the restrictions of administrative segregation.

122. **Summary of Opinion:** In only granting detainees at most one hour of outdoor recreation time a day, Adelanto is subjecting them to more restrictive confinement than a prison. It is also violating the PBNDS requirements that it committed to honor. There is no security or other justification for restricting outdoor access in this manner.

**c. Adelanto Does Not Provide the Same Educational, Recreational, or Religious Programming as Prisons.**

123. The evidence I have reviewed demonstrates that Adelanto does not provide its detainee population with the same amount of access to educational, recreational, or religious programming as would a prison. There is no security or other justification for Adelanto not doing so.

124. Part 7 of the ACA Standards deals with Inmate Programs and provides for educational and recreational programming and religious services. Section 7(B) requires an institution to establish "a comprehensive education program, available to all inmates who are eligible," *e.g.*, 5-ACI-7B-01, and "[v]ocational training programs," *e.g.*, 5-ACI-7B-03, according to a needs assessment of the institutional population. ACA Standards Section 7(F) requires giving the population "the opportunity to participate in the practices of their faith group as enhanced through the supplemental contributions of community resources." 5-ACI-7F. ACA Standards

Section 7(C) requires an institution to establish "a comprehensive recreational program that includes leisure-time activities and outdoor exercise," 5-ACI-7C-01, including making "available in proportion to the inmate population" "[f]acilities and equipment suitable for the planned leisure activities." 5-ACI-7C-04. The comment to this section further recommends a facility have the following: "an outdoor recreation area; a gymnasium with seats for spectators; an auditorium with stage equipment; game rooms, and games such as table tennis, shuffleboard, chess, checkers, cards, and so forth; weightlifting apparatus and other physical fitness conditioning equipment and space for their use; locker rooms, showers, and dressing rooms; a music room; and space for arts, crafts, and hobbies." 5-ACI-7C-04.

125. Title 15 provides similar standards. Section 3220, for example, provides that "incarcerated persons shall be provided an equal opportunity to participate in constructive recreational and physical education programs under safe and secure conditions." Cal. Code Regs. Tit. 15 § 3220. Section 3210, similarly, requires institutions to "make every reasonable effort to provide for the religious and spiritual welfare of all interested incarcerated persons" and allow for reasonable time and accommodation for religious services. *Id.* § 3210. Many of Title 15's provisions also presuppose that an institution provides academic and recreational opportunities. *See id.* § 3220.4 (establishing criteria for which movies can be screened at California prisons); *id.* § 3220.2 (academic recreation programs must be based on curriculum frameworks from the Board of Education); *id.* § 3190 (inmates who participate in "institution academic or Career Technical Educational programs" may keep textbooks necessary for completing their education requirements).

126. In my experience, the term "programming" refers to activities that inmates and/or detainees may engage in to facilitate rehabilitation or recreation.

127. During my time as a peace officer in the CDCR, I was aware of multiple programs provided to the inmate population in the state prison system. Among these were religious programming and educational programming, up to and including

attainment of a general equivalency diploma (GED), high school diploma, associates, and bachelor's degrees.

128. Vocational and trade training were also offered to the inmate population. Some examples of this training were vocational eyewear manufacturing, small engine repair, janitorial and housekeeping, office services and related technologies, dairy, and bakery, to name a few.

129. State prison inmates were also encouraged to attend self-help and self-improvement classes such as Alcoholics Anonymous (AA), Narcotics Anonymous (NA), Criminal and Gang Members Anonymous (CGA), the Keyhea religious program, Getting Out by Going In (GOGI), alternatives to violence, anger management, and other voluntary programming that encouraged introspection and rehabilitative effort.

130. The CDCR Division of Rehabilitative Programs (DRP) supports the provision of comprehensive programs such as arts in corrections, grant programs, adult education, career and technical education, continuing education, library services, post-secondary education, and student support services. DRP's offering of treatment programs includes cognitive behavioral interventions, occupational mentor certification program, and youth offender trauma-focused treatment program.

131. For those inmates who will be released from the system, the DRP offers prerelease programs such as California identification card program and the transitions program to help support re-entry. *See, e.g.*, In-Prison Programs, Cal. Dep't of Corr. & Rehab., https://www.cdcr.ca.gov/rehabilitation/programs/inprison/ (last visited Mar. 4, 2026).

132. Beyond formal programming offered by the institution itself, it is common for prisons to allow inmates to lead volunteer classes and activities. For example, inmates can conduct group exercise classes together.

133. The PBNDS also requires facilities to offer "other programmatic activities such as education classes or speakers, sobriety programs such as alcoholics

anonymous, and other organized activities or recreational programs." 2011 PBNDS § 5.4(V)(F) at p. 374.

134. The evidence I have reviewed shows that Adelanto offers no meaningful educational opportunities, religious services, or programming to its detainee population. Arnold Decl. ¶ 28; Ding Decl. ¶ 41; Frederick Decl. ¶¶ 43, 52–56; Ruiz-Escobar Decl. ¶¶ 35, 39.

135. There is no justification for denying detainees the benefit of programming. Many inmates have been in Adelanto for over a year (for example, Arnold Decl. ¶ 2; Ruiz-Escobar Decl. ¶¶ 5–6) and would benefit from these kinds of programs the way criminal inmates do. Even for those only in Adelanto on a shorter-term basis, programming helps to boost morale and give detainees something to do to pass the time, thereby helping diffuse conflict and contribute to an orderly facility. Denying inmates meaningful programming makes a facility less, rather than more, secure.

136. **Summary of Opinion:** Adelanto is subjecting detainees to more restrictive confinement than a prison by failing to provide any access to meaningful religious, educational, or recreational programming. Adelanto is violating its commitments to honor the ACA Standards and PBNDS in doing so. There is also no security or other justification for Adelanto doing so.

**iv. While Prisons Use Restrictive Housing Pursuant to Safeguards and with Minimum Specified Conditions for Out-of-Cell Access, Adelanto Does Not.**

137. The evidence I have reviewed demonstrates that Adelanto subjects its detainees to harsher conditions via the use of restrictive housing than a criminal institution. In particular, declarants have testified that Adelanto staff placed them in restrictive housing to punish them for speaking out about inhumane conditions. It is inappropriate to use restrictive housing for this purpose. Furthermore, Adelanto

forces detainees to remain in cells for longer, and with fewer privileges, than would a prison subjecting an inmate to restrictive housing.

138. The ACA Standards provide that institutions may place inmates in a "special management unit/cell for periods of time less than 22 hours per day" under certain circumstances, including if they "pose a threat" (which in my experience means that the inmate's presence in general population poses some risk or danger to the facility, even if the inmate himself does not directly threaten operations), are on "administrative status," need "protective custody," or are subject to "disciplinary detention." 4-ACI-4A. Inmates "who [themselves] pose a direct and clear threat to the safety of persons or a clear threat to the safe and secure operation of the facility," by contrast, may be "segregated from general population and placed in restrictive housing units/cells for periods of time 22 hours per day or greater." 4-ACI-4B.

139. The ACA Standards dedicate an entire article (Article 4) to procedures governing both special management housing (4A) and restrictive housing (4B). 5-ACI-4. The overriding goal of this section is to remove from the general population "inmates who threaten the secure and orderly management of the institution [and/or who] pos[e] a threat to others or who pose a danger to themselves." *Id.* Critically, "[s]uch assignments are made appropriately and justifiably, and offenders placed into such categories are treated justly, calmly, humanely, in a constitutionally correct manner, and prepared for return to less restrictive units." *Id.*

140. Among other protections, as to both special management housing and restrictive housing, a facility must "provide living conditions that approximate those of the general inmate population," with "all exceptions . . . clearly documented." 5-ACI-4A-02; 5-ACI-4B-04. Inmates are also to "receive a minimum of one hour of exercise per day outside their cells, five days a week" absent security or safety concerns. 5-ACI-4A-24; 5-ACI-4B-24.

141. The comment to ACA Standards 5-ACI-4A-04 notes specifically that "[t]otal isolation as punishment for a rule violation is not an acceptable practice[.]" 5-ACI-4A-04.

142. Title 15 is to the same effect. See Cal. Code Regs. Tit. 15 §§ 1053, 3335 (rules governing when inmates can be placed in restrictive housing); *id.* §§ 3343 (rules governing release from restrictive housing). Section 3348, in particular, codifies that inmates in restrictive housing are to be treated the same as members of the general population with respect to living conditions, clothing, and meals. *Id.* § 3348. Section 3348(i) specifies that "[i]ncarcerated persons assigned to RHU shall be offered a minimum of 20 hours of out-of-cell time per week," of which at least 10 total hours three times a week must be exercise periods while the other 10 "may be comprised of a combination of additional exercise periods, individual or group programs, and rehabilitative programs." *Id.*

143. California prisons comply with the above standards for restrictive housing. In my experience, it is an unacceptable practice in California prisons for staff to retaliate against an inmate by using restrictive housing to punish complaints about living conditions. Were such retaliation to occur, it would violate the ACA Standards and Title 15. The offending staff members would face consequences. I also know that inmates in restrictive housing are given time to use a full RHU yard, which is an area that in my experience is usually around 625 square feet and that contains exercise equipment and a toilet and sink. Of course, access to the RHU yard must always be consistent with the safety and security needs of the facility. For example, a particularly violent inmate known to pose a risk of attacking others might receive an hour of "walk alone" time in the yard, but a group of 20 inmates who are all in restrictive housing but who do not pose a threat to each other might be placed on the yard together for longer. It is further my experience that inmates in restrictive housing are given out-of-cell time to bathe, use the telephone, and perform other activities.

144. Section 2.12 of the PBNDS establishes standards for two types of special management units for housing segregation: Administrative Segregation and Disciplinary Segregation. These standards differ from the practice of California prisons, in that the CDCR as a general matter does not impose disciplinary segregation. However, much like the ACA Standards, the PBNDS specifies that detainees in restrictive housing must be provided "basic living conditions that approximate those provided to the general population," 2011 PBNDS § 2.12(II)(11) at p. 172, including "individual recreation or appropriate group recreation time," 2011 PBNDS § 2.12(II)(14), and "programs and services such as commissary, library, religious guidance and recreation." 2011 PBNDS § 2.12(II)(19). In addition, disciplinary segregation is only intended for serious rule violations: "[a] detainee shall be placed in disciplinary segregation only after a finding by a disciplinary hearing panel that the detainee is guilty of a prohibited act or rule violation classified at a 'greatest,' 'high' or 'high-moderate' level[.]" 2011 PBNDS § 2.12(II)(5).

145. The evidence I have reviewed demonstrates that Adelanto staff impose restrictive housing in retaliation for inmates peacefully protesting the conditions of the facility via sit-ins or hunger strikes or otherwise speaking out. Arnold Decl. ¶¶ 20–22, 24; Frederick Decl. ¶¶ 46–47; Karamychev Decl. ¶¶ 29–37; Mesrobian Decl. ¶¶ 44–45; Salazar-Garza Decl. ¶¶ 32–34; Samaan Decl. ¶ 20. One detainee even reports being placed in restrictive housing because he had to wear a heart monitor and Adelanto staff did not want other detainees to be able to touch the device. J.M. Decl. ¶¶ 9–10.

146. In a California prison, imposing administrative segregation is not a proper response to a hunger strike, for speaking out about conditions, or because an inmate has to wear a heart monitor. In my experience, a facility that discovers an inmate is on a hunger strike will both engage with them to find out why and monitor their condition. After a specified amount of time, the facility's medical staff come to take the individual's weight and vital signs on a daily basis. Although I never saw this

scenario occur, it is my understanding that if an inmate performing a hunger strike were no longer able to make informed decisions for himself because of how the strike had impacted his health, the facility would take the inmate to medical and provide life-saving nutrition. It is inappropriate to mass migrate all inmates on a hunger strike to administrative segregation and then do nothing to monitor their condition.

147. Adelanto personnel also only allow detainees in restrictive housing between 30 to 60 minutes per day out of their cell. Arnold Decl. ¶ 16; Frederick Decl. ¶ 48; Karamychev Decl. ¶ 33. And numerous detainees have made concerning statements about other inappropriate conditions of restrictive housing at Adelanto. Arnold Decl. ¶¶ 18–19 (four gallons of water allocated across as many as 40 people and unreasonable meal schedule); Ding Decl. ¶¶ 25–28 (restrictive housing only had cold water and was dirty, including with trash and hair, and detainee lost five pounds during three days in restrictive housing due to meal quality and frequency); Frederick Decl. ¶¶ 49–50 (detainee not allowed to use the bathroom for hours while locked outside in a mini-yard and forced to spend time in an uncleaned cell).

148. There is no penological justification for Adelanto's restrictive housing policies. Using restrictive housing to punish detainees for raising concerns fosters distrust between the facility population and staff. When concerns are raised, they should be received by staff and addressed appropriately.

149. **Summary of Opinion:** Adelanto is subjecting detainees to a restrictive housing policy that is far more punitive than that of a prison. There is no penological justification for using placement in restrictive housing as a tool to punish inmates who voice concerns. There is similarly no justification for why inmates in Adelanto's restrictive housing cannot be given more than an hour of total time per day out of their cells or otherwise be provided with equivalent conditions as those of prisons.

**C. Without Any Justification, Adelanto Fails to Accommodate Disabilities the Way a Prison Would.**

150. The evidence I have reviewed demonstrates that Adelanto is not offering disability accommodations to its detainee population. In particular, declarants have stated that detainees with mobility issues are forced onto top bunk beds, and there are not enough ADA-compliant showers. Staff at Adelanto also do not help disabled detainees perform tasks that the detainees' disabilities prevent them from doing alone. There is no penological justification for denying these accommodations, and Adelanto's practice is significantly more restrictive than that of a California prison where disabilities are routinely and proactively accommodated to ensure equal access to programs and activities.

151. The ACA Standards provide in a comment to 5-ACI-2C-11 that "[i]f the facility accepts individuals with disabilities, it must provide for their housing and use of facility resources." 5-ACI-2C-11. The ACA Standards require that inmates with disabilities be "housed in a manner that provides for their safety and security," 5-ACI-2C-11, including that they be given "housing [that is . . . ] designed for their use and provides for integration with other inmates." *Id.* In addition, the institution must have "written policy, procedure, and practice [to] provide for the assignment of appropriately trained individuals to assist disabled offenders who cannot otherwise perform basic life functions." 5-ACI-2C-12. The institution must also "provide education, equipment, and facilities, and the support necessary for inmates with disabilities to perform self-care and personal hygiene in a reasonably private environment," 5-ACI-2C-13, which the comment defines as "one which will maintain the dignity of the disabled individual in light of that person's disability." *Id.*

152. It is my experience that California prisons comply with these standards and other applicable laws such as the ADA. As a CDCR peace officer, I observed ADA training provided to the employees of correctional facilities on numerous occasions. It was my experience in California corrections that disability

accommodations were typically proactively offered, rather than having the onus placed on the inmate to request them. If an inmate presented with mobility challenges, for example, our standard practice was to assign them to a lower bunk on the first floor of a multi-floor facility so the inmate would not have to go up and down stairs or climb up to a top bunk. I also recall that a number of showers in the prisons where I worked either had ADA-accommodation chairs built in, or could be easily fitted with those devices. I estimate that, in general, there were six such showers for every group of 200 inmates. Able-bodied inmates were also able to obtain a paid position of inmate caregiver, through which it became their responsibility to assist other disabled inmates with tasks such as using the restroom.

153. Notably, Adelanto also should be providing detainees with disability accommodations as per the PBNDS. Section 4.8, "Disability Identification, Assessment, and Accommodation," "requires that facilities housing ICE/ERO detainees act affirmatively to prevent disability discrimination." 2011 PBNDS § 4.8(I) at p. 344. Additionally, PBNDS requires the facility to "ensure that detainees with disabilities are able to physically access its programs, services, and activities," including specifically "toileting and bathing facilities." 2011 PBNDS § 4.8(V)(D)(1) at p. 348. PBNDS also specifies that "it is incumbent upon facility staff to identify detainees with impairments that are open, obvious, and apparent," and "staff should be particularly vigilant for impairments that affect a detainee's mobility or ability to communicate." 2011 PBNDS § 4.8(V)(C) at p. 348.

154. Likewise, the NDH states that detainees have "the right to request and receive reasonable accommodations that provide an equal opportunity to access, participate in, or benefit from the facility's programs, activities, and services available to other detainees." NDH at 9.

155. The evidence I have reviewed demonstrates that Adelanto is not accommodating the disabilities of its detainee population the way a criminal institution would. For example, multiple declarants have noted that detainees with

mobility issues are often assigned to upper bunks and/or cells on the second floor. Ding Decl. ¶¶ 18, 19, 24; L.T. Decl. ¶ 10; Ruiz-Escobar Decl. ¶ 33. One inmate recounted the story of how another urinated in her bed because staff did not assist in bringing the other inmate to the restroom. Ding Decl. ¶ 23. Inmates have also noted that Adelanto lacks a sufficient number of ADA-compliant showers such that they have to wait in long lines to shower. Flores Decl. ¶ 16; L.T. Decl. ¶ 12.

156. There is no penological justification for Adelanto's refusal to accommodate disabilities. Doing so makes the facility significantly less safe, as it increases the chances that a disabled inmate will suffer harm. It also prevents disabled inmates from being able to fully participate in life at Adelanto.

157. **Summary of Opinion:** Adelanto is not offering disability accommodations to its detainee population, in violation of the promises Adelanto made to comply with the ACA Standards and PBNDS requirements. The evidence I have reviewed documents that multiple detainees with mobility issues must use top bunks, and the facility lacks sufficient ADA-compliant showers. There is no penological or facility security justification for denying disabled people reasonable accommodations.

I declare under penalty of perjury that the foregoing is true and correct. Executed on March 5, 2026 in Monument, Colorado.

William Adams

# EXHIBIT A

WILL ADAMS
Correctional Litigation Solutions
Tel. No. 760-889-0436
Email: will.adams@corrlitsolutions.com
www.corrlitsolutions.com

**LITIGATION COORDINATOR AND**

**CORRECTIONAL COUNSELOR II SPECIALIST (Retired)**

I began my employment with the California Department of Corrections and Rehabilitation ("CDCR") on January 4, 1988. I started my career as a Correctional Officer and have held the positions of Officer, Sergeant, Lieutenant, Captain, and Correctional Counselor II ("CCII") Specialist. I retired on September 1, 2014. I have coordinated and testified regarding litigation matters on a broad range of cases, including Proposition 36, SB-9, Miller Habeas, Juvenile Life Without Parole, Albino Hearings, Juvenile Transfer Hearings, and cases involving protection of confidential law enforcement documents. I have consulted on hundreds of civil and criminal cases for both the plaintiff/prosecution and the defense. In addition to the cases listed below, I have consulted in camera with courts on prison matters, prison life, and other prison-related issues to assist judges in understanding prison procedures, operations, and law enforcement operations in the prison setting.

**BACKGROUND**

| | |
|---|---|
| 1/4/88 | Correctional Officer |
| 6/1/93 | Correctional Sergeant |
| 1/1/01 | Correctional Lieutenant |
| 11/30/06 | CCII Specialist |
| 9/1/14 | Retired |

I spent six months as a Facility Captain (out of classification) at Kern Valley State Prison in 2008, then returned to CCII Specialist.

I have been recognized in various state courts as an expert in general prison administration, prison issues, prison narcotics trafficking, prison gang activities, use of force, inmate weapon manufacture, and inmate in-custody culture and behaviors.

I have been recognized as an expert witness in various federal courts regarding Use of Force policy, confidential CDCR records, general prison policies and procedures,

disciplinary process, impact munitions, and CDCR Confidential Informant protection requirements/procedures.

I have served as lead investigator, and provided expert testimony, in several criminal trials.

## PROFESSIONAL CONFERENCES AND PRESENTATIONS

On June 19, 2015, I was a presenter at the University of Southern California, Gould School of Law, Post-Conviction Justice Project, Juvenile Life Without Parole Sentencing Forum. I presented information to the attendees as a guest speaker regarding the topics of Use of Prison Experts in Criminal Cases and Prison Gang Activity and Culture.

## EXPERT WITNESS TESTIMONY / PRISON EXPERT CONSULTING

### FEDERAL CASES

***L.T. et al. v. U.S. Immigration and Customs Enforcement et al.***, *United States District Court, Central District of California*, Case No. 5:26–cv–00322 (Civil, Plaintiff, Living Conditions and Prison Administration).

***Estate of Conrad Madrid v. County of Tulare et al.***, *United States District Court, Eastern District of California*, Case No. 1:24-cv-00351 (Civil, Defense, Custody Procedures Expert).

***Ellis v. Arias et al.***, *United States District Court, Southern District of California*, Case No. 3:24-cv-00713 (Civil, Plaintiff, Failure to Protect, Prison Expert, R&R Expert).

***Estate of Yuriy Palaszeski v. County of Stanislaus et al.***, *United States District Court, Eastern District of California*, Case No. 2:24-cv-01974 (Civil, Plaintiff, Wrongful Death). Corrections expert/consultant only, no testimony. Case settled before deposition or trial.

***Estate of Julien Deveroux v. County of Kern et al.***, *United States District Court, Eastern District of California*, Case No. 1:23-cv-00239 (Civil, Plaintiff, Prison/Jail Expert). Summary judgement granted, action re-filed in state court.

***Mack v. Bucks County et al.***, *United States District Court, Eastern District of Pennsylvania*, Case No. 2:23-cv-04386 (Civil, Defense, Use of Force and Correctional Administration Expert).

***Corbin, Administrator of the Estate of Joshua Patterson, v. Bucks County et al.***, *United States District Court, Eastern District of Pennsylvania*, Case No. 2:23-cv-02784 (Civil, Plaintiff, Prison Administration, Inmate/Detainee/Search & Facility Intake Operations, Introduction of Dangerous Contraband/Smuggling/Narcotics Prevention). Case settled before deposition or trial.

***Cole v. Ashtabula County et al.***, *United States District Court, Northern District of Ohio,* Case No. 1:23-cv-01093 (Civil, Plaintiff, Wrongful Death, Correctional Administration, Contraband Prevention, Safety and Welfare Monitoring). Case dismissed before deposition/trial.

***DeSoucy et al. v. County of San Bernardino et al.***, *United States District Court, Central District of California*, Case No. 5:23-cv-01287 (Civil, Defense, Jail Intake Procedures, In-processing, Prison Expert).

***Campbell v. Mbah et al.***, *United States District Court, District of Maryland*, Case No. 1:23-cv-00478 (Civil, Plaintiff, Use of Force, Prison Expert).

***G. et al. v. Tulare County et al.***, *United States District Court, Eastern District of California*, Case No. 1:23-cv-00500 (Civil, Defense, Prison Administration and Procedures Expert/Consulting).

***Pena v. Cibola County et al.***, *United States District Court, District of New Mexico*, Case No. 1:22-cv-00516- (Civil, Plaintiff, Prison Administration Expert/Consulting). Testified at Deposition 12/19/2025.

***Bess v. Peffley***, *United States District Court, Northern District of California*, Case No. 3:22-cv-00341 (Civil, Plaintiff, Prison Administration and Procedures). Testified at Deposition 1/24/25. Case settled before trial 2/5/2026.

***Moya v. Coleman et al.***, *United States District Court, District of Arizona*, Case No. 2:22-cv-00394 (Civil, Plaintiff, Prison Administration Expert/Consulting). Testified at Deposition 3/13/2024. Case settled before trial 11/5/2025.

***Hernandez v. City of Philadelphia et al.***, *United States District Court, Eastern District of Pennsylvania*, Case No. 2:22-cv-0027 (Civil, Plaintiff, Use of Force/Prison Expert/Prison Administration Expert/Consulting). Case settled before trial in 2024.

***Ortiz v. Saidhamad et al.***, *United States District Court, District of Arizona*, Case No. 2:22-cv-01471 (Civil, Plaintiff, Prison Administration Expert/Duty to Protect, Consulting). Testified at Deposition 8/14/2024. Case settled before trial in 2024.

***Valentine v. Torres-Quezada et al.***, *United States District Court, Northern District of California*, Case No. 4:22-cv-01520 (Civil, Plaintiff, Prison Expert, Use of Force, Inmate Politics, Tactical Alarm Response). Testified at Deposition 3/1/2024. Testified at Trial 9/16/2024 and 9/17/2024. Verdict for Plaintiff.

***Pagan v. Edward McMahon et al.***, *United States District Court, Eastern District of North Carolina, Southern Division*, Case No. 7:22-cv-00001 (Civil, Plaintiff, Negligence, Wrongful Injury, Emergency Response, Use of Force, Access to Medical Care). Testified at Deposition 7/9/2025.

***Estate of Maurice Monk v. Wellpath Community Care, LLC et al.***, *United States District Court, Northern District of California*, Case No. 3:22-cv-04037 (Civil, Plaintiff, Wrongful Death, Medication Pass Procedures for Officers, Correctional Administration, Inmate Safety and Welfare Checks). Case settled before deposition in March 2025.

***Akinola v. Stafford-Schroyer et al.***, *United States District Court, District of Maryland*, Case No.1:22-cv-00657 (Civil, Plaintiff, Prison Administration, Duty to Protect/Escort Procedures).

***Torres v. Paredes et al.***, *United States District Court, Southern District of California*, Case No. 3:22-cv-00448 (Civil, Plaintiff, Prison Administration & Duty to Protect). Testified at Deposition 5/17/24. Case settled before trial in August 2025.

***Anderson et al. v. Alameda County et al.***, *United States District Court, Northern District of California*, Case No. 4:22-cv-01577 (Civil, Plaintiff, Prison Administration Expert/Consulting). Case settled before trial in February 2024.

***Coderre et al. v. Burton et al.***, *United States District Court, Eastern District of California*, Case No. 2:21-cv-00965 (Civil, Plaintiff, Prison Administration Expert). Case settled before trial 10/20/2025.

***Herrera v. The GEO Group et al.***, *United States District Court, District of New Mexico*, Case No. 2:21-cv-00922 (Civil, Plaintiff, Prison Administration Expert/Consultant). Case settled before trial in August 2023.

***Garcia et al. v. City of Farmersville et al.***, *United States District Court, Eastern District of California*, Case No. 1:21-cv-00482 (Civil, Defense, Prison /Jail Administration Expert/Consulting). Testified at Deposition 7/13/2023. Case settled before trial in February 2026.

***Harrison v. Plains Regional et al.***, *United States District Court, District of New Mexico*, Case No. 1:21-cv-00395 (Civil, Plaintiff, Prison Administration Expert/Consulting). Testified at Deposition 5/19/2023.

***Culberson et al. v. Clay County et al.***, *United States District Court, Northern District of Mississippi, Aberdeen Division*, Case No. 1:21-cv-00114 (Civil, Plaintiff, Prison Administration Expert/Consulting).

***Hehrer v. Clinton County et al.***, *United States District Court, Western District of Michigan, Southern Division*, Case No. 1:20-cv-01079 (Civil, Plaintiff, Prison Administration/Expert). Testified at Deposition 9/6/2023.

***Ortega v. USA***, *United States District Court, Eastern District of California*, Case No. 1:19-cv-00999 (Civil, Defense, Use of Force, Prison Administration Expert/Consulting for USDOJ/US Attorney). Case settled before trial in October 2023.

***Sernas v. Unknown Cantrell et al.***, *United States District Court, District of Arizona*, Case No. 2:19-cv-00730 (Civil, Plaintiff, Prison Expert). Testified at Deposition 1/5/2023. Case settled at trial 12/9/2025.

***Vaughn v. Hampton et al.***, *United States District Court, Southern District of California*, Case No. 3:19-cv-01687 (Civil, Plaintiff, Prison Administration and Policy Expert/Consulting). Testified at Deposition 11/12/2020. Case settled before trial in March 2022.

***Samaniego v. C.D.C.R.***, *United States District Court, Eastern District of California*, Case No. 2:19-cv-02606 (Civil, Defense, Consultant).

***Vaughn v. Parker***, *United States District Court, Southern District of California*, Case No. 3:18-cv-02098 (Civil, Plaintiff, Prison Administration Expert/Consulting). Case settled before trial in June 2024.

***Schauwecker et al. v. Arizona***, *United States District Court, District of Arizona*, Case No. 2:18-cv-01062 (Civil, Plaintiff, Consultant).

***Dunsmore v. Thomas***, *United States District Court, Eastern District of California*, Case No. 2:17-cv-02355 (Civil, Plaintiff, Prison Administration & Operations, Use of Force). Case settled before trial in June 2024.

***Romero v. New Mexico et al.****, United States District Court, District of New Mexico*, Case No. 1:17-cv-00724 (Civil, Plaintiff, Consultant). Case dismissed.

***Smith v. Baugh et al.***, *United States District Court, Western District of New York*, Case No. 1:16-cv-00906 (Civil, Plaintiff, Prison Administration Expert/Consulting). Testified at Deposition 10/20/2023. Case settled before trial in 2024.

***Williams v. Baker et al.***, *United States District Court, Eastern District of California*, Case No. 1:16-cv-01540 (Civil, Defense, Prison Administration & Use of Force Expert/Consulting for USDOJ/US Attorney). Trial 7/3/2025. Verdict for defense. No testimony at trial.

***Hypolite v. Zamora***, *United States District Court, Eastern District of California*, Case No. 1:14-cv-01199 (Civil, Defense – CA OAG). Testified at Trial 6/24/2017. Verdict for defense.

***King v. Deathriage et al.***, *United States District Court, Eastern District of California*, Case No. 1:14-cv-00111 (Civil, Defense – CA OAG, Consultant). Verdict for defense.

***Carranza v. Brown***, *United States District Court, Southern District of California*, Case No. 3:14-cv-00773 (Prison Administration, Use of Force Expert) (Civil, Plaintiff). Testified at Deposition 9/21/2020. Testified at Trial 1/26-27/2023. Verdict for defense.

***Adame v. Mariscal et al.***, *United States District Court, Eastern District of California*, Case No. 1:14-cv-01596 (Civil, Defense, Consultant – CA OAG).

***Gooden v. Baptista et al.***, *United States District Court, Northern District of California*, Case No. 5:13-cv-00352 (Civil, Defense, Consultant – CA OAG).

***Edwards v. Swarthout***, *United States District Court, Eastern District of California*, Case No. 2:13-cv-2218 (Civil, Plaintiff, Prison Administration and Operations Expert – Modified Programs). Case settled before trial 9/15/25.

***Hernandez v. Hernandez et al.***, *United States District Court, Eastern District of California*, Case No. 1:13-cv-1625 (Civil, Defense, Consultant – CA OAG).

***Montgomery v. Sanchez et al.***, *United States District Court, Eastern District of California*, Case No. 1:13-cv-0247 (Civil, Defense, Consultant – CA OAG).

***Williams v. Steglinski et al.***, *United States District Court, Eastern District of California*, Case No. 1:12-cv-00786 (Civil, Defense – CA OAG). Testified at Trial 4/20-21/2016. Verdict for defense.

***Garcia v. Juarez***, *United States District Court, Eastern District of California*, Case No. 1:12-cv-00750 (Civil, Defense, Consultant – CA OAG).

***Johnson v. Rodriguez***, *United States District Court, Eastern District of California*, Case No. 1:12-cv-00820 (Civil, Defense, Consultant – CA OAG).

***Tilei v. California Department of Corrections and Rehabilitation***, *United States District Court, Northern District of California*, Case No. 12-cv-01688 (Civil, Plaintiff, Consultant). Case settled before trial in January 2018.

***Kinnamon v. Latia et al.***, *United States District Court, Eastern District of California*, Case No. 1:12-cv-01325 (Civil, Defense, Consultant – CA OAG).

***Washington v. Samuels***, *United States District Court, Eastern District of California*, Case No. 1:12-cv-01404 (Defense – CA OAG). Testified at Trial 8/3/2016. Verdict for defense.

***Martinez v. Allison et al.***, *United States District Court, Eastern District of California*, Case No. 1:11-cv-01749(Civil, Defense – CA OAG). Testified at Trial 5/18/2016. Verdict for defense.

***Taylor v. Ohannesson et al.***, *United States District Court, Eastern District of California*, Case No. 1:11-cv-00538 (Civil, Defense, Consultant – CA OAG).

***Quezada v. Lindsey et al.***, *United States District Court, Eastern District of California*, Case No. 1:10-cv-01402 (Civil, Defense, Consultant – CA OAG).

***Lamon v. Adams et al.***, *United States District Court, Eastern District of California*, Case No. 1:09-cv-00205 (Civil, Defense, Consultant – CA OAG).

***Mannings v. Palermo et al.***, *United States District Court, Eastern District of California*, Case No. 1:12-cv-02038 (Civil, Defense, Consultant – CA OAG).

***Anderson v. Hansen et al.***, *United States District Court, Eastern District of California*, Case No. 1:09-cv-01924 (Civil, Defense – CA OAG). Testified at Trial 9/24/2014. Verdict for defense.

***Carter v. Fernandez et al.***, *United States District Court, Eastern District of California*, Case No. 1:08-cv-01841 (Civil, Defense – CA OAG). Testified at Trial 3/15/2012. Verdict for defense.

***James v. Wilber et al.***, *United States District Court, Eastern District of California*, Case No. 1:08-cv-00351 (Civil, Defense, Consultant – CA OAG).

***Thomas v. Garcia et al.***, *United States District Court, Eastern District of California*, Case No. 1:08-cv-00689 (Civil, Defense – CA OAG). Testified at Trial 7/25/2013. Verdict for defense.

***Carpenter v. Sullivan et al.***, *United States District Court, Eastern District of California*, Case No. 1:07-cv-00114 (Civil, Defense – CA OAG). Testified at Trial 3/19/2014. Verdict for defense.

***Pulliam v. Lozano et al.***, *United States District Court, Eastern District of California*, Case No. 1:07-cv-00964 (Defense – CA OAG). Testified at Trial 12/11/2013. Verdict for defense.

***Hackworth v. Torres et al.***, *United States District Court, Eastern District of California*, Case No. 1:06-cv-00773 (Civil, Defense, Consultant – CA OAG).

## STATE CASES

***People v. McCutcheon***, *Superior Court of California, County of Contra Costa*, Case No. 5-100762-4 (Criminal, Defense, Prison Expert).

***Valson v. Lopez***, *Superior Court of California, County of Kern*, Case No. S-1500-CL-279245 (Civil, Defense, Consultant – CA OAG).

***In Re: Green***, *Superior Court of California, County of Kern*, Case No. JW090568-02 (Criminal, Defense, Prison Expert). Testified at Juvenile Hearing 10/5/22. Defendant retained in prison.

***Weaver v. CDCR***, *Superior Court of California, County of Kings*, Case No. 18C0082 (Civil, Plaintiff, Prison Expert). Testified at Deposition 8/16/22. Testified at Trial 5/26/2023. Verdict for defense.

***People v. Venya***, *Superior Court of California, County of Los Angeles*, Case No. TA126680 (Criminal, Prosecution). Testified 3/20/2017.

***People v. Arana***, *Superior Court of California, County of Los Angeles*, Case No. TA049253 (Prison Expert).

***People v. Goree***, *Superior Court of California, County of Los Angeles*, Case No. BA 245379 (Criminal, Defense, Court Appointed Consultant, Prison Expert). Testified 6/28/2016. Defendant retained in prison.

***People v. Winn***, *Superior Court of California, County of Los Angeles*, Case No. KA038352 (Criminal, Defense, Prison Expert).

***People v. Pithyakorn***, *Superior Court of California, County of Los Angeles*, Case No. BA447659-02 (Criminal, Defense, Prison Expert, Inmate Culture/Politics Expert). Testified at Trial 12/12/2016. Defendant acquitted.

***People v. Alfred***, *Superior Court of California, County of Los Angeles*, Case No. BA324848-01 (Criminal, Defense, Prison Expert).

***People v. Johnson***, *Superior Court of California, County of Los Angeles*, Case No. NA020150 (Criminal, Defense, Prison Expert).

***In Re: Joel A. Salinas on Habeas Corpus***, *Superior Court of California, County of Los Angeles*, Case No. NA039263 (Criminal, Defense, Prison Expert).

***People v. Asprilla***, *Superior Court of California, County of Los Angeles*, Case No. VA056356 (Criminal, Defense, Prison Expert).

***People v. Fulker***, *Superior Court of California, County of Los Angeles*, Case No. NA038054-01 (Criminal, Defense, Prison Expert).

***People v. Hottinger***, *Superior Court of California, County of Los Angeles*, Case No. BA132937-01 (Criminal, Defense, Prison Expert).

***People v. Matas***, *Superior Court of California, County of Los Angeles*, Case No. BA056631 (Criminal, Defense, Prison Expert).

***People v. Ozaeta***, *Superior Court of California, County of Los Angeles*, Case No. GA025203 (Criminal, Defense, Prison Expert).

***People v. Zaragoza***, *Superior Court of California, County of Los Angeles*, Case No. KA048005 (Criminal, Defense, Prison Expert). Testified at Trial 3/12/2020.

***People v. Bumphus***, *Superior Court of California, County of Los Angeles*, Case No. NA048613-03 (Criminal, Defense, Prison Expert). Testified at Trial 12/19/2019. Verdict for defense.

***People v. Sandoval***, *Superior Court of California, County of Los Angeles*, Case No. BA448920-02 (Criminal, Defense, Prison Expert, Inmate/Gang Politics Expert). Testified at Trial 7/10/2018. Defendant acquitted.

***People v. Gaines***, *Superior Court of California, County of Los Angeles*, Case No. TA063063 (Criminal, Defense, Prison Expert).

***People v. Armstrong, Jacquelyn Christell***, *Superior Court of California, County of Los Angeles*, Case No. BA457171-01 (Criminal, Defense, Consulting Only, Post-Sentence Process of CDCR, CDCR Classification System).

***People v. Jones***, *Superior Court of California, County of Los Angeles*, Case No. VA018101 (Criminal, Defense, Prison Expert).

***People v. Isauro Aguirre***, *Superior Court of California, County of Los Angeles*, Case No. BA425180, Capital Case (Criminal, Defense, Prison Expert, Inmate/Gang Politics, Expert, Inmate Job Availability). Testified 12/5/2017 during sentencing phase only. Verdict of capital punishment.

***People v. Tooker***, *Superior Court of California, County of Marin*, Case No. SC197709-SF-001971-A AES (Criminal, Defense, Expert Report only).

***People v. Aston***, *Superior Court of California, County of Riverside*, Case No. HEF970146 (Criminal, Defense). Testified 10/16/2015.

***People v. Lewis***, *Superior Court of California, County of Riverside*, Case No. INF058881 (Criminal, Defense, Prison Expert).

***People v. Gonzales***, *Superior Court of California, County of Riverside*, Case No. SWF1401712 (Criminal, Defense, Prison Expert).

***People v. Guinn***, *Superior Court of California, County of Riverside*, Case No. CR38392 (Criminal, Defense, Prison Expert).

***People v. Jackson***, *Superior Court of California, County of Riverside*, Case No. RIF1401943 (Criminal, Defense, Prison Expert).

***People v. Kimbrough***, *Superior Court of California, County of Riverside*, Case No. RIF1311963 (Criminal, Defense, Prison Expert).

***People v. Cardin***, *Superior Court of California, County of Riverside*, Case No. SWF017487 (Criminal, Defense, Prison Expert).

***People v. Gallegos***, *Superior Court of California, County of Riverside*, Case No. CR-58553 (Criminal, Defense, Prison Expert). Testified at Trial 10/4/2016.

***People v. Cheybun***, *Superior Court of California, County of Riverside*, Case No. RIF1409956 (Criminal, Defense, Prison Expert).

***People v. Raines***, *Superior Court of California, County of Riverside*, Case No. RIF 133614 (Criminal, Defense, Prison Expert).

***People v. Lucero***, *Superior Court of California, County of Riverside*, Case No. RIF123822 (Criminal, Defense, Prison Expert). Testified 9/28/18.

***People v. Gutierrez***, *Superior Court of California, County of Riverside*, Case No. RIF128721 (Criminal, Defense, Prison Expert). Testified 5/4/18.

***People v. DeLuna***, *Superior Court of California, County of Sacramento*, Case No. 95F02423 (Criminal, Defense, Prison Expert). Testified at trial 12/9/16.

***Carranza v. California Department of Corrections and Rehabilitation***, *Superior Court of California, County of San Bernardino*, Case No. CIVRS1201373 (Civil, Plaintiff, Prison Expert). Testified at Deposition August 2017. Case settled before trial.

***People v. Govind***, *Superior Court of California, County of San Diego*, Case No. **SCS166437** (Criminal, Prosecution, Investigator). Testified. Defendant acquitted.

***People v. Watson***, *Superior Court of California, County of San Diego*, Case No. SCD215231 (Criminal, Defense, Prison Expert).

***People v. Rowe***, *Superior Court of California, County of San Diego*, Case No. SCE199406 (Criminal, Defense, Prison Expert).

***People v. Kirchner***, *Superior Court of California, County of San Diego*, Case No. CRN26291 (Criminal, Defense, Prison Expert).

***People v. Battreall***, *Superior Court of California, County of San Diego*, Case No. SCD278999 (Criminal, Defense, Prison Expert).

***People v. Russell***, *Superior Court of California, County of San Mateo*, Case No. SC031458A (Criminal, Defense, Prison Expert).

***People v. Taylor***, *Superior Court of California, County of Solano*, Case No. VC20664 (Criminal, Defense, Prison Expert).

***People v. Hennig***, *Superior Court of California, County of Solano*, Case No. FCR189160 (Criminal, Defense, Prison Expert).

***People v. Secrease***, *Superior Court of California, County of Solano*, Case No. VC43681 (Criminal, Defense, Prison Expert). Testified at Juvenile Transfer Hearing 10/12/2023.

***Strauss v. CDCR***, *Superior Court of California, County of Solano*, Case No. FCS053459 (Civil, Plaintiff, Prison Expert). Case dismissed at summary judgement.

***In re: Roy Ayala Jr.***, *Superior Court of California, County of Stanislaus*, Case No. 140233 (Criminal, Defense, Prison Expert).

***People v. Martinez***, *Superior Court of California, County of Stanislaus*, Case No. 1498584 (Criminal, Defense, Prison Expert).

***Chipps v. Alaska Dept. of Corrections, et al.***, *Superior Court for the State of Alaska, Third Judicial District at Anchorage*, Case No. 3AN-21-06142 CI (Civil, Plaintiff, Prison Administration Expert/Consulting). Testified at Deposition 7/15/2024. Verdict for defense.

**OTHER**

***Appeal of David Hicks***, *State of California, State Personnel Board*, Case No. 14-1578 (Prison Alarm Response Expert, Employment, Administrative Law Court). Testified for Appellant Hicks, 2015. Partial finding for appellant.

***Appeal of Barney Huyck***, *State of California, State Personnel Board*, Case No. 14-1682K, 14-1766K, 14-1767K (Consolidated) (Consultant, Prison Expert).

**TRAINING EXPERIENCE**

I have been a trainer and/or master trainer in the following:

- Use of Force Policy and Procedures (Master)
- Tactical Alarm Response (Master)
- Def. Tech. / Federal Arms Factory Certified Impact Munitions Instructor (Master)
- Inmate Transportation/Hospital Coverage (Trainer)
- Mechanical Restraint Application and Techniques (Trainer)
- Officer Safety Tactics (Trainer)
- Conflict Management (Trainer)
- Blood Borne Pathogens (Master)
- Electrified Fence Master Trainer (Master)
- Electrified Fence Trainer for Master Trainers (Master)
- Emergency Procedures (Trainer)
- Escape Procedures (Trainer)
- Inmate Staff Relations (Trainer)

- Litigation Procedures (Trainer)
- Range Safety Officer (Trainer)

I have received the following certifications:

- Disciplinary Hearing Officer
- Senior Disciplinary Hearing Officer
- FEMA Emergency Response
- CDC Internal Affairs Investigation
- Cardiopulmonary Resuscitation
- Basic First Aid
- Basic Supervision
- Advanced Supervision
- Sergeant's Academy
- Lieutenant's Academy
- Classroom Presentation Skills
- CDCR Emergency Operations – Conflict/Crisis Management
- Defense Technology/Federal Laboratories Factory Certified Impact Weapons and Munitions Instructor
- Equal Employment Opportunity (EEO) Counsellor

**CURRENT AND PRIOR PROFESSIONAL AND COMMUNITY MEMBERSHIPS INCLUDE**

- California Narcotic Officer's Association
- Fraternal Order of Police, San Diego, Lodge #10
- Former Chapter President, Founding Member, California Correctional Supervisor's Organization (San Diego, Chapter 7)
- Former Job Steward, California Correctional Peace Officers Association
- Former Chief Job Steward, California Correctional Peace Officers Association
- Former Equal Employment Opportunity Counselor, R. J. Donovan Correctional Facility, San Diego, CA
- California Correctional Peace Officers Foundation
- California Correctional Peace Officers Association, Retired Chapter
- Member, American Legion, Post 26, Bakersfield, CA
- Lifetime Member, American Legion Post 209, Colorado Springs, CO
- Meudell Oildale Lodge No. 695, Free and Accepted Masons, Bakersfield, CA
- Kiwanis International Club, Bakersfield, CA
- American Correctional Association
- Aircraft Owners and Pilots Association
- American Radio Relay League

- Committee Member, Citizen's Bond Oversight Committee, Bakersfield City School District, Bakersfield, CA
- Member of the Board, Trinity Anglican Church, Bakersfield CA
- Centurian Daylight Lodge No. 195, Ancient Free and Accepted Masons, Monument, CO
- Member of The Board, Jackson Creek North Homeowners Association, Monument, CO

# EXHIBIT B

**SOLICITATION/CONTRACT/ORDER FOR COMMERCIAL ITEMS**

*OFFEROR TO COMPLETE BLOCKS 12, 17, 23, 24, & 30*

1. REQUISITION NUMBER:
PAGE 1 OF 60

2. CONTRACT NO.: 70CDCR20D00000009
3. AWARD/EFFECTIVE DATE:
4. ORDER NUMBER:
5. SOLICITATION NUMBER: 70CDCR20R00000002
6. SOLICITATION ISSUE DATE: 10/16/2019

7. FOR SOLICITATION INFORMATION CALL: a. NAME [redacted] b. TELEPHONE NUMBER (No collect calls) 202-732-[redacted]
8. OFFER DUE DATE/LOCAL TIME: ES

9. ISSUED BY — CODE ICE/DCR
ICE/Detention Compliance & Removals
Immigration and Customs Enforcement
Office of Acquisition Management
801 I Street, NW [redacted]
WASHINGTON DC 20536

10. THIS ACQUISITION IS: [X] UNRESTRICTED OR [ ] SET ASIDE: % FOR:
[ ] SMALL BUSINESS
[ ] HUBZONE SMALL BUSINESS
[ ] SERVICE-DISABLED VETERAN-OWNED SMALL BUSINESS
[ ] WOMEN-OWNED SMALL BUSINESS (WOSB) ELIGIBLE UNDER THE WOMEN-OWNED SMALL BUSINESS PROGRAM
[ ] EDWOSB
[ ] 8(A)
NAICS:
SIZE STANDARD:

11. DELIVERY FOR FOB DESTINATION UNLESS BLOCK IS MARKED [ ] SEE SCHEDULE
12. DISCOUNT TERMS: Net 30
13a. [ ] THIS CONTRACT IS A RATED ORDER UNDER DPAS (15 CFR 700)
13b. RATING:
14. METHOD OF SOLICITATION: [ ] RFQ [ ] IFB [X] RFP

15. DELIVER TO — CODE ICE/ERO
ICE Enforcement & Removal
Immigration and Customs Enforcement
801 I Street, NW
[redacted]
Washington DC 20536

16. ADMINISTERED BY — CODE ICE/DCR
ICE/Detention Compliance & Removals
Immigration and Customs Enforcement
Office of Acquisition Management
801 I Street, NW [redacted]
WASHINGTON DC 20536

17a. CONTRACTOR/OFFEROR — CODE 6127064650000 — FACILITY CODE:
GEO GROUP INC THE
ATTN [redacted]
4955 TECHNOLOGY WAY
BOCA RATON FL 334313367
TELEPHONE NO. 5619997359

18a. PAYMENT WILL BE MADE BY — CODE ICE-ERO-FHQ-DMD
DHS, ICE
Burlington Finance Center
P.O. Box 1620
Attn: ICE-ERO/DRO-FHQ-DMD
Williston VT 05495-1620

[ ] 17b. CHECK IF REMITTANCE IS DIFFERENT AND PUT SUCH ADDRESS IN OFFER
18b. SUBMIT INVOICES TO ADDRESS SHOWN IN BLOCK 18a UNLESS BLOCK BELOW IS CHECKED [ ] SEE ADDENDUM

| 19. ITEM NO. | 20. SCHEDULE OF SUPPLIES/SERVICES | 21. QUANTITY | 22. UNIT | 23. UNIT PRICE | 24. AMOUNT |
|---|---|---|---|---|---|
| | DUNS Number: 612706465<br>NAICS Code: 561612<br>PSC: S206<br><br>Contracting Officer (CO): [redacted] 202-732-[redacted]<br>Contracting Officer's Representative (COR): [redacted]<br>760-561-[redacted]<br>Alternate COR: [redacted] 213-312-[redacted] | | | | |

*(Use Reverse and/or Attach Additional Sheets as Necessary)*

25. ACCOUNTING AND APPROPRIATION DATA: See schedule
26. TOTAL AWARD AMOUNT (For Govt. Use Only): $2,136,133,870.80

[ ] 27a. SOLICITATION INCORPORATES BY REFERENCE FAR 52.212-1, 52.212-4. FAR 52.212-3 AND 52.212-5 ARE ATTACHED. ADDENDA [ ] ARE [ ] ARE NOT ATTACHED.
[X] 27b. CONTRACT/PURCHASE ORDER INCORPORATES BY REFERENCE FAR 52.212-4. FAR 52.212-5 IS ATTACHED. ADDENDA [X] ARE [ ] ARE NOT ATTACHED.

[X] 28. CONTRACTOR IS REQUIRED TO SIGN THIS DOCUMENT AND RETURN 1 COPIES TO ISSUING OFFICE. CONTRACTOR AGREES TO FURNISH AND DELIVER ALL ITEMS SET FORTH OR OTHERWISE IDENTIFIED ABOVE AND ON ANY ADDITIONAL SHEETS SUBJECT TO THE TERMS AND CONDITIONS SPECIFIED.

[ ] 29. AWARD OF CONTRACT: OFFER DATED . YOUR OFFER ON SOLICITATION (BLOCK 5), INCLUDING ANY ADDITIONS OR CHANGES WHICH ARE SET FORTH HEREIN, IS ACCEPTED AS TO ITEMS:

30a. SIGNATURE OF OFFEROR/CONTRACTOR: [redacted]
31a. UNITED STATES OF AMERICA (SIGNATURE OF CONTRACTING OFFICER): [redacted]

30b. NAME AND TITLE OF SIGNER (Type or print): [redacted] Executive Vice President
30c. DATE SIGNED: 12/19/2019
31b. NAME OF CONTRACTING OFFICER (Type or print): [redacted]
31c. DATE SIGNED:

| 19. ITEM NO. | 20. SCHEDULE OF SUPPLIES/SERVICES | 21. QUANTITY | 22. UNIT | 23. UNIT PRICE | 24. AMOUNT |
|---|---|---|---|---|---|
| | The purpose of this contract is to establish detention, transportation and medical services in the Los Angeles Area of Responsibility at Adelanto Detention Facility and the Desert View Modified Community Correctional Facility in accordance with the Performance Work Statement for this Contract (supplemented by PWS Requirement D Addendum).<br><br>All services shall be furnished in compliance with the following regulations/policies/standards:<br><br>2011 Performance Based National Detention Standards (PBNDS 2011)as revised in DEC 2016<br>Prison Rape Elimination Act (PREA) standards for DHS detention facilities<br>American Correctional Association (ACA) Standards<br>National Commission on Correctional Health Care(NCCHC) Standards<br><br>All IDIQ terms and conditions flow down to the Task Orders.<br><br>Scope of work changes must be submitted in writing and approved by a warranted ICE Contracting Officer. Any work conducted outside the scope of the terms of this contract will be<br>Continued ... | | | | |

32a. QUANTITY IN COLUMN 21 HAS BEEN

☐ RECEIVED ☐ INSPECTED ☐ ACCEPTED, AND CONFORMS TO THE CONTRACT, EXCEPT AS NOTED: ____________

| 32b. SIGNATURE OF AUTHORIZED GOVERNMENT REPRESENTATIVE | 32c. DATE | 32d. PRINTED NAME AND TITLE OF AUTHORIZED GOVERNMENT REPRESENTATIVE |
|---|---|---|
| 32e. MAILING ADDRESS OF AUTHORIZED GOVERNMENT REPRESENTATIVE | | 32f. TELEPHONE NUMBER OF AUTHORIZED GOVERNMENT REPRESENTATIVE |
| | | 32g. E-MAIL OF AUTHORIZED GOVERNMENT REPRESENTATIVE |

| 33. SHIP NUMBER<br>☐ PARTIAL ☐ FINAL | 34. VOUCHER NUMBER | 35. AMOUNT VERIFIED CORRECT FOR | 36. PAYMENT<br>☐ COMPLETE ☐ PARTIAL ☐ FINAL | 37. CHECK NUMBER |
|---|---|---|---|---|
| 38. S/R ACCOUNT NUMBER | 39. S/R VOUCHER NUMBER | 40. PAID BY | | |

| 41a. I CERTIFY THIS ACCOUNT IS CORRECT AND PROPER FOR PAYMENT | | 42a. RECEIVED BY *(Print)* | |
|---|---|---|---|
| 41b. SIGNATURE AND TITLE OF CERTIFYING OFFICER | 41c. DATE | 42b. RECEIVED AT *(Location)* | |
| | | 42c. DATE REC'D *(YY/MM/DD)* | 42d. TOTAL CONTAINERS |

NAME OF OFFEROR OR CONTRACTOR
GEO GROUP INC THE

| ITEM NO. (A) | SUPPLIES/SERVICES (B) | QUANTITY (C) | UNIT (D) | UNIT PRICE (E) | AMOUNT (F) |
|---|---|---|---|---|---|
| | at the contractor's own risk.<br><br>The Contractor shall not be entitled to a guaranteed minimum on any CLIN for any day unless the Contractor has made the number of beds that constitute that guaranteed minimum available to ICE on such day.<br><br>The following is a list of attachments hereby incorporated into this Contract:<br>Attachment 1: G-391 Attachments<br>Attachment 2: QASP Attachments<br>Attachment 3: IHSC National Formulary FY 2019<br>Attachment 4: IHSC Form 067 Request for approval of non-formulary medications<br>Attachment 5: IHSC Minimum Staffing Requirements Standards<br>Attachment 6: IHSC Intake Screening Form<br>Attachment 7: IHSC Sample Clinical Practice Guidelines<br>Attachment 8: IHSC electronic Quality Medical Care (QMC) Audit tool<br>Attachment 9: IHSC electronic Quality Medical Care (QMC) Incident Report<br>Attachment 10: Requirements Traceable Matrix (RTM)<br>Attachment 11: ICE [redacted] Policy<br>Attachment 12: ICE [redacted] Policy<br>Attachment 13: Lyons Settlement Agreement<br>Attachment 14: Franco Settlement Agreement<br>Attachment 15: Screening ICE Detainees Health Form<br>Attachment 16: PWS Addendum 1<br>Attachment 17: Requirement D PWS Addendum<br>Attachment 18: Section B Supplies or Services and Price Costs<br>Attachment 19: Section C Performance Work Statement dated 10/25/2019<br>Attachment 20: Contract Clauses<br>Attachment 21: Section K Completed by Contractor<br>Attachment 22: Contractor's Proposal dated 12/19/2019<br>Attachment 23:ICE Design Standards for Contractor Detention Facilities (CDFs)<br>Attachment 24: Executive Office for Immigration Review (EOIR) Design Standards<br>Attachment 25: Structure Cable Plant Standards<br>Attachment 26: Health Design Standards<br>Attachment 27: IHSC Design Standards Supplement<br>Continued ... | | | | |

NAME OF OFFEROR OR CONTRACTOR
GEO GROUP INC THE

| ITEM NO. (A) | SUPPLIES/SERVICES (B) | QUANTITY (C) | UNIT (D) | UNIT PRICE (E) | AMOUNT (F) |
|---|---|---|---|---|---|
| | Attachment 28: Adelanto Detention Facility Collective Bargaining Agreement between GEO and United Government Security Officers of America International Union and its Local #880 (Effective April 23, 2018-April 22, 2021)<br><br>Funding will be provided at the Task Order level.<br><br>Pursuant to FAR 52.216-22(b), the maximum amount of services the Contractor shall furnish under this IDIQ is [redacted] and the minimum amount of services the Government shall order under this IDIQ is [redacted]<br><br>If a DOL Wage Determination or CBA incorporation results in an increase to employee wages that is above the annual escalation already noted in the contract, the vendor must submit a request for equitable adjustment and provide sufficient documentation to the CO's satisfaction.<br>No additional contractor employee wage adjustments will be paid by ICE if those increased wage amounts falls within/is less than the annual percentage escalation built into the CLIN.<br><br>The ultimate completion date of this IDIQ is 12/19/2034 if all options are exercised. Thus, the total duration of this IDIQ is from 12/20/2019 to 12/19/2034.<br>Period of Performance: 12/20/2019 to 12/19/2034 | | | | |
| 0001 | Desert View Pre-Transition/Mobilization<br><br>POP: 12/20/2019-06/19/2020<br><br>Monthly Rate: [redacted]<br>Obligated Amount: $0.00<br>Product/Service Code: S206<br>Product/Service Description: HOUSEKEEPING- GUARD | | | | [redacted] |
| 0001A | Desert View Transition<br><br>POP: 06/20/2020 - 08/19/2020<br><br>Monthly Rate: [redacted]<br>Continued ... | | | | [redacted] |

NAME OF OFFEROR OR CONTRACTOR
GEO GROUP INC THE

| ITEM NO. (A) | SUPPLIES/SERVICES (B) | QUANTITY (C) | UNIT (D) | UNIT PRICE (E) | AMOUNT (F) |
|---|---|---|---|---|---|
| | Obligated Amount: [redacted]<br>Product/Service Code: S206<br>Product/Service Description: HOUSEKEEPING- GUARD | | | | |
| 0002 | Adelanto Detention Bed Day Rate<br>Guaranteed Minimum<br>1 to 1,455 beds<br><br>Periods of Performance and Rates:<br>12/20/2019-12/19/2020 (532,530 Beds) [redacted]<br>12/20/2020-12/19/2021 (531,075 Beds)<br>12/20/2021-12/19/2022 (531,075 Beds)<br>12/20/2022-12/19/2023 (531,075 Beds)<br>12/20/2023-12/19/2024 (532,530 Beds)<br><br>Obligated Amount: [redacted]<br>Product/Service Code: S206<br>Product/Service Description: HOUSEKEEPING- GUARD | | | | [redacted] |
| 0002A | Desert View Detention Services<br>Guaranteed Minimum<br>(1-600 beds)<br><br>Periods of Performance and Rates:<br>08/20/2020-12/19/2020 (73,200 Beds) [redacted]<br>12/20/2020-12/19/2021 (219,000 Beds)<br>12/20/2021-12/19/2022 (219,000 Beds)<br>12/20/2022-12/19/2023 (219,000 Beds)<br>12/20/2023-12/19/2024 (219,600 Beds)<br>Obligated Amount: [redacted]<br>Product/Service Code: S206<br>Product/Service Description: HOUSEKEEPING- GUARD | | | | [redacted] |
| 0003 | Adelanto Detention Services<br>Above Guaranteed Minimum<br>(1456-1940 beds)<br><br>Periods of Performance and Rates:<br>12/20/2019-12/19/2020 (177,510 Beds) [redacted]<br>12/20/2020-12/19/2021 (177,025 Beds)<br>12/20/2021-12/19/2022 (177,025 Beds)<br>12/20/2022-12/19/2023 (177,025 Beds)<br>12/20/2023-12/19/2024 (177,510 Beds)<br>Obligated Amount: [redacted]<br>Continued ... | | | | [redacted] |

NAME OF OFFEROR OR CONTRACTOR
GEO GROUP INC THE

| ITEM NO. (A) | SUPPLIES/SERVICES (B) | QUANTITY (C) | UNIT (D) | UNIT PRICE (E) | AMOUNT (F) |
|---|---|---|---|---|---|
| | Product/Service Code: S206<br>Product/Service Description: HOUSEKEEPING- GUARD | | | | |
| 0003A | Desert View Detention Services<br>Above Guaranteed Minimum<br>(601-750 beds)<br><br>Periods of Performance and Rates:<br>08/20/2020-12/19/2020 (18,300 Beds) [redacted]<br>12/20/2020-12/19/2021 (54,750 Beds)<br>12/20/2021-12/19/2022 (54,750 Beds)<br>12/20/2022-12/19/2023 (54,750 Beds)<br>12/20/2023-12/19/2024 (54,900 Beds)<br>Obligated Amount: $0.00<br>Product/Service Code: S206<br>Product/Service Description: HOUSEKEEPING- GUARD | | | | [redacted] |
| 0004 | Adelanto Guaranteed Transportation Monthly Fee<br><br>Monthly Rate<br><br>Period of Performance and Rates:<br>12/20/2019-08/19/2020 (8) [redacted]<br>08/20/2019-12/19/2020 (4)<br>12/20/2020-12/19/2021 (12)<br>12/20/2021-12/19/2022 (12)<br>12/20/2022-12/19/2023 (12)<br>12/20/2023-12/19/2024 (12)<br>Obligated Amount: [redacted]<br>Product/Service Code: S206<br>Product/Service Description: HOUSEKEEPING- GUARD | | | | [redacted] |
| 0005 | Adelanto On Call Stationary/Transportation Guards<br><br>Overtime Hourly Rate [redacted]<br><br>NTE Amount: [redacted] hours per year<br>Obligated Amount: [redacted]<br>Product/Service Code: S206<br>Product/Service Description: HOUSEKEEPING- GUARD | | | | [redacted] |
| 0005A | Desert View On-Call Stationary/Transportation<br>Guard Hours<br>Continued ... | | | | [redacted] |

NAME OF OFFEROR OR CONTRACTOR
GEO GROUP INC THE

| ITEM NO. (A) | SUPPLIES/SERVICES (B) | QUANTITY (C) | UNIT (D) | UNIT PRICE (E) | AMOUNT (F) |
|---|---|---|---|---|---|
| | Overtime Hourly Rate: [redacted]<br><br>NTE: [redacted] hours<br>Obligated Amount: [redacted]<br>Product/Service Code: S206<br>Product/Service Description: HOUSEKEEPING- GUARD | | | | |
| 0006 | Adelanto Detainee Work Program<br>Rate: $1.00 Per Day per Detainee<br><br>NTE: [redacted] days<br>Obligated Amount: [redacted]<br>Product/Service Code: S206<br>Product/Service Description: HOUSEKEEPING- GUARD | | | | [redacted] |
| 0006A | Desert View Detainee Work Program<br>Rate: $1.00 Per Day per Detainee<br><br>NTE: [redacted] days<br>Obligated Amount: [redacted]<br>Product/Service Code: S206<br>Product/Service Description: HOUSEKEEPING- GUARD | | | | [redacted] |
| 0007 | Adelanto Facility Upgrades<br><br>*No facility modifications or other work planned under this CLIN may be initiated without a negotiated proposal and with approval by the Contracting Officer via a contract modification and funding obligated via task order.<br><br>NTE: [redacted]<br>Obligated Amount: [redacted]<br>Product/Service Code: S206<br>Product/Service Description: HOUSEKEEPING- GUARD | | | | [redacted] |
| 0007A | Desert View Facility Upgrades<br><br>*No facility modifications or other work planned under this CLIN may be initiated without a negotiated proposal and with approval by the Contracting Officer via a contract modification<br>Continued ... | | | | [redacted] |

NAME OF OFFEROR OR CONTRACTOR
GEO GROUP INC THE

| ITEM NO. (A) | SUPPLIES/SERVICES (B) | QUANTITY (C) | UNIT (D) | UNIT PRICE (E) | AMOUNT (F) |
|---|---|---|---|---|---|
| | and funding obligated via task order.<br><br>NTE: [redacted]<br>Obligated Amount: [redacted]<br>Product/Service Code: S206<br>Product/Service Description: HOUSEKEEPING- GUARD | | | | |
| 1001 | Adelanto Detention Services<br><br>Guaranteed Minimum (1 to 1,455 Beds)<br><br>Period of Performance and Rate:<br>12/20/2024-12/19/2025 (531,075 Beds) [redacted]<br>12/20/2025-12/19/2026 (531,075 Beds)<br>12/20/2026-12/19/2027 (531,075 Beds)<br>12/20/2027-12/19/2028 (532,530 Beds)<br>12/20/2028-12/19/2029 (531,075 Beds)<br>Amount: [redacted] Option Line Item)<br>12/20/2024<br>Product/Service Code: S206<br>Product/Service Description: HOUSEKEEPING- GUARD | | | | [redacted] |
| 1001A | Desert View Detention Services<br>Guaranteed Minimum<br>(1 to 600 Beds)<br><br>Periods of Performance and Rate:<br><br>12/20/2024-12/19/2025 (219,000 Beds) [redacted]<br>12/20/2025-12/19/2026 (219,000 Beds)<br>12/20/2026-12/19/2027 (219,000 Beds)<br>12/20/2027-12/19/2028 (219,600 Beds)<br>12/20/2028-12/19/2029 (219,000 Beds)<br>Amount: [redacted] (Option Line Item)<br>12/20/2024<br>Product/Service Code: S206<br>Product/Service Description: HOUSEKEEPING- GUARD | | | | [redacted] |
| 1002 | Adelanto Detention Services<br>Above Guaranteed Minimum<br>(1,456-1,940 beds)<br><br>Period of Performance and Rate:<br><br>Continued ... | | | | [redacted] |

NAME OF OFFEROR OR CONTRACTOR
GEO GROUP INC THE

| ITEM NO. (A) | SUPPLIES/SERVICES (B) | QUANTITY (C) | UNIT (D) | UNIT PRICE (E) | AMOUNT (F) |
|---|---|---|---|---|---|
| | 12/20/2024-12/19/2025 (177,025 Beds) [redacted]<br>12/20/2025-12/19/2026 (177,025 Beds)<br>12/20/2026-12/19/2027 (177,025 Beds)<br>12/20/2027-12/19/2028 (177,510 Beds)<br>12/20/2028-12/19/2029 (177,025 Beds)<br>Amount: [redacted] Option Line Item)<br>12/20/2024<br>Product/Service Code: S206<br>Product/Service Description: HOUSEKEEPING- GUARD | | | | |
| 1002A | Desert View Detention Services<br>Above Guaranteed Minimum Rate<br>(601-750 beds)<br><br>Period of Performance and Rate:<br><br>12/20/2024-12/19/2025 (54,750 Beds) [redacted]<br>12/20/2025-12/19/2026 (54,750 Beds)<br>12/20/2026-12/19/2027 (54,750 Beds)<br>12/20/2027-12/19/2028 (54,900 Beds)<br>12/20/2028-12/19/2029 (54,750 Beds)<br>Amount: [redacted] (Option Line Item)<br>12/20/2024<br>Product/Service Code: S206<br>Product/Service Description: HOUSEKEEPING- GUARD | | | | [redacted] |
| 1003 | Adelanto Guaranteed Transportation Monthly Fee<br><br>Monthly Rate<br><br>Period of Performance and Rate:<br><br>12/20/2024-12/19/2025 (12) [redacted]<br>12/20/2025-12/19/2026 (12)<br>12/20/2026-12/19/2027 (12)<br>12/20/2027-12/19/2028 (12)<br>12/20/2028-12/19/2029 (12)<br>Amount: [redacted] (Option Line Item)<br>12/20/2024<br>Product/Service Code: S206<br>Product/Service Description: HOUSEKEEPING- GUARD | | | | [redacted] |
| 1004 | Adelanto On-Call Stationary/Transportation Guard Hours<br>Continued ... | | | | [redacted] |

NAME OF OFFEROR OR CONTRACTOR
GEO GROUP INC THE

| ITEM NO. (A) | SUPPLIES/SERVICES (B) | QUANTITY (C) | UNIT (D) | UNIT PRICE (E) | AMOUNT (F) |
|---|---|---|---|---|---|
| | [redacted] Hourly Rate<br><br>NTE: [redacted] hours per year<br>Amount: [redacted] Option Line Item)<br>12/20/2024<br>Product/Service Code: S206<br>Product/Service Description: HOUSEKEEPING- GUARD | | | | |
| 1004A | Desert View On-Call Stationary/Transportation Guard Hours<br><br>Hourly Rate: [redacted]<br><br>NTE: [redacted] hours<br>Amount: [redacted] Option Line Item)<br>12/20/2024<br>Product/Service Code: S206<br>Product/Service Description: HOUSEKEEPING- GUARD | | | | [redacted] |
| 1005 | Adelanto Detainee Work Program<br>Rate: $1.00 Per Day Per Detainee<br><br>NTE: [redacted] days<br>Amount: [redacted] (Option Line Item)<br>12/20/2024<br>Product/Service Code: S206<br>Product/Service Description: HOUSEKEEPING- GUARD | | | | [redacted] |
| 1005A | Desert View Detainee Work Program<br>Rate: $1.00 per day per detainee<br><br>NTE: [redacted]<br>Amount: [redacted] Option Line Item)<br>12/20/2024<br>Product/Service Code: S206<br>Product/Service Description: HOUSEKEEPING- GUARD | | | | [redacted] |
| 1006 | Adelanto Facility Upgrades<br><br>*No facility modifications or other work planned under this CLIN may be initiated without a negotiated proposal and with approval by the<br>Continued ... | | | | [redacted] |

NAME OF OFFEROR OR CONTRACTOR
GEO GROUP INC THE

| ITEM NO. (A) | SUPPLIES/SERVICES (B) | QUANTITY (C) | UNIT (D) | UNIT PRICE (E) | AMOUNT (F) |
|---|---|---|---|---|---|
| | Contracting Officer via a contract modification and funding obligated via task order.<br><br>NTE: [redacted]<br>Amount: [redacted] Option Line Item)<br>12/20/2024<br>Product/Service Code: S206<br>Product/Service Description: HOUSEKEEPING- GUARD | | | | |
| 1006A | Desert View Facility Upgrades<br><br>*No facility modifications or other work planned under this CLIN may be initiated without a negotiated proposal and with approval by the Contracting Officer via a contract modification and funding obligated via task order.<br><br>NTE: [redacted]<br>Amount: [redacted] (Option Line Item)<br>12/20/2024<br>Product/Service Code: S206<br>Product/Service Description: HOUSEKEEPING- GUARD | | | | [redacted] |
| 2001 | Adelanto Detention Services<br>Guaranteed Minimum<br>1 to 1,455 Beds<br><br>Periods of Performance and Rates:<br>12/20/2029 - 12/19/2030 (531,075 Beds) [redacted]<br>12/20/2030 - 12/19/2031 (531,075 Beds)<br>12/20/2031 - 12/19/2032 (532,530 Beds)<br>12/20/2032 - 12/19/2033 (531,075 Beds)<br>12/20/2033 - 12/19/2034 (531,075 Beds)<br>Amount: [redacted] (Option Line Item)<br>12/20/2029<br>Product/Service Code: S206<br>Product/Service Description: HOUSEKEEPING- GUARD | | | | [redacted] |
| 2001A | Desert View Detention Services<br>Guaranteed Minimum<br>1 to 600 Beds<br><br>Period of Performance and Rates:<br>12/20/2029 - 12/19/2030 [redacted]<br>Continued ... | | | | [redacted] |

NAME OF OFFEROR OR CONTRACTOR
GEO GROUP INC THE

| ITEM NO. (A) | SUPPLIES/SERVICES (B) | QUANTITY (C) | UNIT (D) | UNIT PRICE (E) | AMOUNT (F) |
|---|---|---|---|---|---|
| | 12/20/2030 - 12/19/2031 (219,000 Beds) [redacted]<br>12/20/2031 - 12/19/2032 (219,600 Beds)<br>12/20/2032 - 12/19/2033 (219,000 Beds)<br>12/20/2033 - 12/19/2034 (219,000 Beds)<br>Amount: $160,233,696.00(Option Line Item)<br>12/20/2029<br>Product/Service Code: S206<br>Product/Service Description: HOUSEKEEPING- GUARD | | | | |
| 2002 | Adelanto Detention Services<br>Above Guaranteed Minimum<br>1,456 - 1,940 Beds<br><br>Period of Performance and Rates:<br>12/20/2029 - 12/19/2030 (177,025 Beds) [redacted]<br>12/20/2030 - 12/19/2031 (177,025 Beds)<br>12/20/2031 - 12/19/2032 (177,510 Beds)<br>12/20/2032 - 12/19/2033 (177,025 Beds)<br>12/20/2033 - 12/19/2034 (177,025 Beds)<br>Amount: [redacted]Option Line Item)<br>12/20/2029<br>Product/Service Code: S206<br>Product/Service Description: HOUSEKEEPING- GUARD | | | | [redacted] |
| 2002A | Desert View Detention Services<br>Above Guaranteed Minimum Rate<br>601-750 beds<br><br>Periods of Performance and Rates:<br>12/20/2029 - 12/19/2030 (54,750 Beds) [redacted]<br>12/20/2030 - 12/19/2031 (54,750 Beds)<br>12/20/2031 - 12/19/2032 (54,900 Beds)<br>12/20/2032 - 12/19/2033 (54,750 Beds)<br>12/20/2033 - 12/19/2034 (54,750 Beds)<br>Amount: [redacted]Option Line Item)<br>12/20/2029<br>Product/Service Code: S206<br>Product/Service Description: HOUSEKEEPING- GUARD | | | | [redacted] |
| 2003 | Adelanto Guaranteed Transportation<br>Monthly Rate<br><br>Periods of Performance and Rates:<br>12/20/2029 - 12/19/2030 (12) [redacted]<br>Continued ... | | | | [redacted] |

**CONTINUATION SHEET** REFERENCE NO. OF DOCUMENT BEING CONTINUED 70CDCR20D00000009 PAGE 13 OF 60

NAME OF OFFEROR OR CONTRACTOR
GEO GROUP INC THE

| ITEM NO. (A) | SUPPLIES/SERVICES (B) | QUANTITY (C) | UNIT (D) | UNIT PRICE (E) | AMOUNT (F) |
|---|---|---|---|---|---|
| | 12/20/2030 - 12/19/2031 (12) [redacted]<br>12/20/2031 - 12/19/2032 (12)<br>12/20/2032 - 12/19/2033 (12)<br>12/20/2033 - 12/19/2034 (12)<br>Amount: [redacted]Option Line Item)<br>12/20/2029<br>Product/Service Code: S206<br>Product/Service Description: HOUSEKEEPING- GUARD | | | | |
| 2004 | Adelanto On-Call Stationary / Transportation Guard Hours<br><br>Hourly Rate: [redacted]<br><br>NTE: [redacted]hours<br>Amount: [redacted]Option Line Item)<br>12/20/2029<br>Product/Service Code: S206<br>Product/Service Description: HOUSEKEEPING- GUARD | | | | [redacted] |
| 2004A | Desert View On-Call Stationary / Transportation Guard Hours<br><br>Hourly Rate: [redacted]<br><br>NTE: [redacted]hours<br>Amount: [redacted]Option Line Item)<br>12/20/2029<br>Product/Service Code: S206<br>Product/Service Description: HOUSEKEEPING- GUARD | | | | [redacted] |
| 2005 | Adelanto Detainee Work Program<br>Rate: $1.00 Per Day Per Detainee<br><br>NTE: [redacted] days<br>Amount: [redacted]Option Line Item)<br>12/20/2029<br>Product/Service Code: S206<br>Product/Service Description: HOUSEKEEPING- GUARD | | | | [redacted] |
| 2005A | Desert View Detainee Work Program<br>Rate: $1.00 per day<br><br>Continued ... | | | | [redacted] |

NAME OF OFFEROR OR CONTRACTOR
GEO GROUP INC THE

| ITEM NO. (A) | SUPPLIES/SERVICES (B) | QUANTITY (C) | UNIT (D) | UNIT PRICE (E) | AMOUNT (F) |
|---|---|---|---|---|---|
| | NTE: [redacted]<br>Amount: [redacted]Option Line Item)<br>12/20/2029<br>Product/Service Code: S206<br>Product/Service Description: HOUSEKEEPING- GUARD | | | | |
| 2006 | Adelanto Facility Upgrades<br><br>*No facility modifications or other work planned under this CLIN may be initiated without a negotiated proposal and with approval by the Contracting Officer via a contract modification and funding obligated via task order.<br><br>NTE: [redacted]<br>Amount: [redacted](Option Line Item)<br>12/20/2029<br>Product/Service Code: S206<br>Product/Service Description: HOUSEKEEPING- GUARD | | | | [redacted] |
| 2006A | Desert View Facility Upgrades<br><br>*No facility modifications or other work planned under this CLIN may be initiated without a negotiated proposal and with approval by the Contracting Officer via a contract modification and funding obligated via task order.<br><br>NTE: [redacted]<br>Amount: [redacted]Option Line Item)<br>12/20/2029<br>Product/Service Code: S206<br>Product/Service Description: HOUSEKEEPING- GUARD<br><br>Invoice Instructions for ICE - ERO Contracts: See Section G of the Contract Clauses.<br><br>The obligated amount of award: [redacted] The total for this award is shown in box 26. | | | | [redacted] |

**AMENDMENT OF SOLICITATION/MODIFICATION OF CONTRACT**

1. CONTRACT ID CODE | PAGE 1 OF 2 PAGES

| 2. AMENDMENT/MODIFICATION NO. | 3. EFFECTIVE DATE | 4. REQUISITION/PURCHASE REQ. NO. | 5. PROJECT NO. (If applicable) |
|---|---|---|---|
| P00001 | See Block 16C | | |

6. ISSUED BY CODE ICE/DCR

ICE/Detention Compliance & Removals
Immigration and Customs Enforcement
Office of Acquisition Management
801 I Street, NW [redacted]
WASHINGTON DC 20536

7. ADMINISTERED BY *(If other than Item 6)* CODE

8. NAME AND ADDRESS OF CONTRACTOR *(No., street, county, State and ZIP Code)*

GEO GROUP INC THE
ATTN [redacted]
4955 TECHNOLOGY WAY
BOCA RATON FL 334313367

CODE 6127064650000 FACILITY CODE

(x) 9A. AMENDMENT OF SOLICITATION NO.

9B. DATED *(SEE ITEM 11)*

X 10A. MODIFICATION OF CONTRACT/ORDER NO. 70CDCR20D00000009

10B. DATED *(SEE ITEM 13)* 12/19/2019

**11. THIS ITEM ONLY APPLIES TO AMENDMENTS OF SOLICITATIONS**

☐ The above numbered solicitation is amended as set forth in Item 14. The hour and date specified for receipt of Offers ☐ is extended. ☐ is not extended.
Offers must acknowledge receipt of this amendment prior to the hour and date specified in the solicitation or as amended, by one of the following methods: (a) By completing Items 8 and 15, and returning ____________ copies of the amendment; (b) By acknowledging receipt of this amendment on each copy of the offer submitted ; or (c) By separate letter or telegram which includes a reference to the solicitation and amendment numbers. FAILURE OF YOUR ACKNOWLEDGEMENT TO BE RECEIVED AT THE PLACE DESIGNATED FOR THE RECEIPT OF OFFERS PRIOR TO THE HOUR AND DATE SPECIFIED MAY RESULT IN REJECTION OF YOUR OFFER If by virtue of this amendment you desire to change an offer already submitted, such change may be made by telegram or letter, provided each telegram or letter makes reference to the solicitation and this amendment, and is received prior to the opening hour and date specified.

12. ACCOUNTING AND APPROPRIATION DATA *(If required)*
See Schedule

**13. THIS ITEM ONLY APPLIES TO MODIFICATION OF CONTRACTS/ORDERS. IT MODIFIES THE CONTRACT/ORDER NO. AS DESCRIBED IN ITEM 14.**

| CHECK ONE | |
|---|---|
| | A. THIS CHANGE ORDER IS ISSUED PURSUANT TO: *(Specify authority)* THE CHANGES SET FORTH IN ITEM 14 ARE MADE IN THE CONTRACT ORDER NO. IN ITEM 10A. |
| | B. THE ABOVE NUMBERED CONTRACT/ORDER IS MODIFIED TO REFLECT THE ADMINISTRATIVE CHANGES *(such as changes in paying office, appropriation date, etc.)* SET FORTH IN ITEM 14, PURSUANT TO THE AUTHORITY OF FAR 43.103(b). |
| | C. THIS SUPPLEMENTAL AGREEMENT IS ENTERED INTO PURSUANT TO AUTHORITY OF: |
| X | D. OTHER *(Specify type of modification and authority)* FAR 43.103(b)(1) Administrative Changes |

**E. IMPORTANT:** Contractor ☒ is not. ☐ is required to sign this document and return ____________ copies to the issuing office.

14. DESCRIPTION OF AMENDMENT/MODIFICATION *(Organized by UCF section headings, including solicitation/contract subject matter where feasible.)*

DUNS Number: 612706465
NAICS Code: 561612
PSC: S206

Contracting Officer (CO): Abeer Saleh, abeer.saleh@ice.dhs.gov 202-732-2627
Contracting Officer's Representative (COR): [redacted]
760-561-[redacted]
Alternate COR: [redacted] 213-312-[redacted]

The purpose of this modification is to clarify that Attachment 28 of this contract: The
Continued ...

Except as provided herein, all terms and conditions of the document referenced in Item 9 A or 10A, as heretofore changed, remains unchanged and in full force and effect.

| 15A. NAME AND TITLE OF SIGNER *(Type or print)* | | 16A. NAME AND TITLE OF CONTRACTING OFFICER *(Type or print)* | |
|---|---|---|---|
| | | [redacted] | |
| 15B. CONTRACTOR/OFFEROR | 15C. DATE SIGNED | 16B. UNITED STATES OF AMERICA | 16C. DATE SIGNED |
| *(Signature of person authorized to sign)* | | [redacted] *(Signature of Contracting Officer)* | |

NSN 7540-01-152-8070
Previous edition unusable

STANDARD FORM 30 (REV. 10-83)
Prescribed by GSA
FAR (48 CFR) 53.243

**CONTINUATION SHEET**

REFERENCE NO. OF DOCUMENT BEING CONTINUED: 70CDCR20D00000009/P00001



NAME OF OFFEROR OR CONTRACTOR: GEO GROUP INC THE

| ITEM NO. (A) | SUPPLIES/SERVICES (B) | QUANTITY (C) | UNIT (D) | UNIT PRICE (E) | AMOUNT (F) |
|---|---|---|---|---|---|
| | Adelanto Detention Facility Collective Bargaining Agreement between GEO and United Government Security Officers of America International Union and its Local #880 (Effective April 23, 2018-April 22, 2021) is also known as U.S. Department of Labor Employment Standards Administration Wage and Hour Division Wage Determination Numbered: CBA-2018-11398, Revision 0, Date of Last Revision: 06/22/2018. | | | | |
| | ***If a DOL Wage Determination or CBA incorporation results in an increase to employee wages that is above the annual escalation already noted in the contract, the vendor must submit a request for equitable adjustment and provide sufficient documentation to the CO's satisfaction. No additional contractor employee wage adjustments will be paid by ICE if those increased wage amounts falls within/is less than the annual percentage escalation built into the CLIN. | | | | |
| | All other terms and conditions remain the same. Period of Performance: 12/20/2019 to 12/19/2034 | | | | |

**AMENDMENT OF SOLICITATION/MODIFICATION OF CONTRACT**

1. CONTRACT ID CODE

PAGE OF PAGES: 1 2

| | | | |
|---|---|---|---|
| 2. AMENDMENT/MODIFICATION NO. P00002 | 3. EFFECTIVE DATE See Block 16C | 4. REQUISITION/PURCHASE REQ. NO. N/A | 5. PROJECT NO. *(If applicable)* |
| 6. ISSUED BY CODE ICE/DM/DC-LAGUNA | | 7. ADMINISTERED BY *(If other than Item 6)* CODE | |

ICE/Detent Mngt/Detent Contract-LAG
Immigration and Customs Enforcement
Office of Acquisition Management
24000 Avila Road, [redacted]
Attn: [redacted], (949)425-[redacted]
Laguna Niguel CA 92677

8. NAME AND ADDRESS OF CONTRACTOR *(No., street, county, State and ZIP Code)*

GEO GROUP INC THE
ATTN [redacted]
4955 TECHNOLOGY WAY
BOCA RATON FL 334313367

CODE 6127064650000 | FACILITY CODE

(x) 9A. AMENDMENT OF SOLICITATION NO.

9B. DATED *(SEE ITEM 11)*

x 10A. MODIFICATION OF CONTRACT/ORDER NO. 70CDCR20D00000009

10B. DATED *(SEE ITEM 13)* 12/19/2019

**11. THIS ITEM ONLY APPLIES TO AMENDMENTS OF SOLICITATIONS**

☐ The above numbered solicitation is amended as set forth in Item 14. The hour and date specified for receipt of Offers ☐ is extended. ☐ is not extended.
Offers must acknowledge receipt of this amendment prior to the hour and date specified in the solicitation or as amended , by one of the following methods: (a) By completing Items 8 and 15, and returning ________ copies of the amendment; (b) By acknowledging receipt of this amendment on each copy of the offer submitted ; or (c) By separate letter or telegram which includes a reference to the solicitation and amendment numbers. FAILURE OF YOUR ACKNOWLEDGEMENT TO BE RECEIVED AT THE PLACE DESIGNATED FOR THE RECEIPT OF OFFERS PRIOR TO THE HOUR AND DATE SPECIFIED MAY RESULT IN REJECTION OF YOUR OFFER If by virtue of this amendment you desire to change an offer already submitted , such change may be made by telegram or letter, provided each telegram or letter makes reference to the solicitation and this amendment, and is received prior to the opening hour and date specified.

12. ACCOUNTING AND APPROPRIATION DATA *(If required)*
none

**13. THIS ITEM ONLY APPLIES TO MODIFICATION OF CONTRACTS/ORDERS. IT MODIFIES THE CONTRACT/ORDER NO. AS DESCRIBED IN ITEM 14.**

| CHECK ONE | |
|---|---|
| | A. THIS CHANGE ORDER IS ISSUED PURSUANT TO: *(Specify authority)* THE CHANGES SET FORTH IN ITEM 14 ARE MADE IN THE CONTRACT ORDER NO. IN ITEM 10A. |
| | B. THE ABOVE NUMBERED CONTRACT/ORDER IS MODIFIED TO REFLECT THE ADMINISTRATIVE CHANGES *(such as changes in paying office, appropriation date, etc.)* SET FORTH IN ITEM 14, PURSUANT TO THE AUTHORITY OF FAR 43.103(b). |
| | C. THIS SUPPLEMENTAL AGREEMENT IS ENTERED INTO PURSUANT TO AUTHORITY OF: |
| X | D. OTHER *(Specify type of modification and authority)* Bilateral - FAR 43.103(b)(1) Administrative Changes |

**E. IMPORTANT:** Contractor ☐ is not. ☒ is required to sign this document and return 1 copies to the issuing office.

14. DESCRIPTION OF AMENDMENT/MODIFICATION *(Organized by UCF section headings, including solicitation/contract subject matter where feasible.)*

DUNS Number: 612706465
Contracting Officer's Representative (COR): [redacted]
760-561-[redacted]
Alternate COR: [redacted] 213-312[redacted]

This is a no cost administration modification to include Attachment 29 - Wage Determination 2015-5630 R.12 Date 12-23-2019.

LIST OF CHANGES:
Reason for Modification: Other Administrative Action
Continued ...

Except as provided herein, all terms and conditions of the document referenced in Item 9 A or 10A, as heretofore changed, remains unchanged and in full force and effect.

| | | | |
|---|---|---|---|
| 15A. NAME AND TITLE OF SIGNER *(Type or print)* [redacted] Executive Vice President | | 16A. NAME AND TITLE OF CONTRACTING OFFICER *(Type or print)* [redacted] | |
| 15B. CONTRACTOR [redacted] (Signature of person authorized to sign) | 15C. DATE SIGNED 2/27/2020 | 16B. UNITED STATES OF AMERICA [redacted] | 16C. DATE SIGNED [redacted] |

NSN 7540-01-152-8070
Previous edition unusable

STANDARD FORM 30 (REV. 10-83)
Prescribed by GSA
FAR (48 CFR) 53.243

| CONTINUATION SHEET | REFERENCE NO. OF DOCUMENT BEING CONTINUED 70CDCR20D00000009/P00002 | PAGE 2 | OF 2 |
|---|---|---|---|

NAME OF OFFEROR OR CONTRACTOR
GEO GROUP INC THE

| ITEM NO. (A) | SUPPLIES/SERVICES (B) | QUANTITY (C) | UNIT (D) | UNIT PRICE (E) | AMOUNT (F) |
|---|---|---|---|---|---|
| | Period of Performance: 12/20/2019 to 12/19/2034<br><br>All other terms and conditions remain the same.<br><br>***If a DOL Wage Determination or CBA incorporation results in an increase to employee wages that is above the annual escalation already noted in the contract, the vendor must submit a request for equitable adjustment and provide sufficient documentation to the CO's satisfaction. No additional contractor employee wage adjustments will be paid by ICE if those increased wage amounts falls within/is less than the annual percentage escalation built into the CLIN. | | | | |

**AMENDMENT OF SOLICITATION/MODIFICATION OF CONTRACT**

1. CONTRACT ID CODE

PAGE OF PAGES: 1 of 2

2. AMENDMENT/MODIFICATION NO.: P00003

3. EFFECTIVE DATE: See Block 16C

4. REQUISITION/PURCHASE REQ. NO.: n/a

5. PROJECT NO. *(If applicable)*

6. ISSUED BY — CODE: ICE/DM/DC-LAGUNA

ICE/Detent Mngt/Detent Contract-LAG
Immigration and Customs Enforcement
Office of Acquisition Management
24000 Avila Road, Room 3104
Attn: [redacted] (949)425[redacted]
Laguna Niguel CA 92677

7. ADMINISTERED BY *(If other than Item 6)* — CODE

8. NAME AND ADDRESS OF CONTRACTOR *(No., street, county, State and ZIP Code)*

GEO GROUP INC THE
ATTN [redacted]
4955 TECHNOLOGY WAY
BOCA RATON FL 334313367

CODE: 6127064650000 — FACILITY CODE

(x) 9A. AMENDMENT OF SOLICITATION NO.

9B. DATED *(SEE ITEM 11)*

x 10A. MODIFICATION OF CONTRACT/ORDER NO.: 70CDCR20D00000009

10B. DATED *(SEE ITEM 13)*: 12/19/2019

**11. THIS ITEM ONLY APPLIES TO AMENDMENTS OF SOLICITATIONS**

☐ The above numbered solicitation is amended as set forth in Item 14. The hour and date specified for receipt of Offers ☐ is extended. ☐ is not extended.
Offers must acknowledge receipt of this amendment prior to the hour and date specified in the solicitation or as amended , by one of the following methods: (a) By completing Items 8 and 15, and returning ________ copies of the amendment; (b) By acknowledging receipt of this amendment on each copy of the offer submitted ; or (c) By separate letter or telegram which includes a reference to the solicitation and amendment numbers. FAILURE OF YOUR ACKNOWLEDGEMENT TO BE RECEIVED AT THE PLACE DESIGNATED FOR THE RECEIPT OF OFFERS PRIOR TO THE HOUR AND DATE SPECIFIED MAY RESULT IN REJECTION OF YOUR OFFER If by virtue of this amendment you desire to change an offer already submitted , such change may be made by telegram or letter, provided each telegram or letter makes reference to the solicitation and this amendment, and is received prior to the opening hour and date specified.

12. ACCOUNTING AND APPROPRIATION DATA *(If required)*
n/a

**13. THIS ITEM ONLY APPLIES TO MODIFICATION OF CONTRACTS/ORDERS. IT MODIFIES THE CONTRACT/ORDER NO. AS DESCRIBED IN ITEM 14.**

| CHECK ONE | |
|---|---|
| | A. THIS CHANGE ORDER IS ISSUED PURSUANT TO: *(Specify authority)* THE CHANGES SET FORTH IN ITEM 14 ARE MADE IN THE CONTRACT ORDER NO. IN ITEM 10A. |
| | B. THE ABOVE NUMBERED CONTRACT/ORDER IS MODIFIED TO REFLECT THE ADMINISTRATIVE CHANGES *(such as changes in paying office, appropriation date, etc.)* SET FORTH IN ITEM 14, PURSUANT TO THE AUTHORITY OF FAR 43.103(b). |
| | C. THIS SUPPLEMENTAL AGREEMENT IS ENTERED INTO PURSUANT TO AUTHORITY OF: |
| X | D. OTHER *(Specify type of modification and authority)* Bilateral - FAR 43.103 - Types of Contract Modifications (a) |

**E. IMPORTANT:** Contractor ☐ is not. ☒ is required to sign this document and return 1 copies to the issuing office.

14. DESCRIPTION OF AMENDMENT/MODIFICATION *(Organized by UCF section headings, including solicitation/contract subject matter where feasible.)*

DUNS Number: 612706465

Contracting Officer's Representative (COR): [redacted]
760-561[redacted]
Alternate COR: [redacted] 213-312[redacted]

The purpose of this modification is to add CLIN 0008 - Other Direct Costs (ODC) Reimbursement for detainees housed at Adelanto Detention Facility.

LIST OF CHANGES:
Reason for Modification: Other Administrative Action
Continued ...

Except as provided herein, all terms and conditions of the document referenced in Item 9 A or 10A, as heretofore changed, remains unchanged and in full force and effect.

15A. NAME AND TITLE OF SIGNER *(Type or print)*
[redacted] EVP - Contract Administration

16A. [redacted] ACTING OFFICER *(Type or print)*
TEL: 949-425[redacted] EMAIL: [redacted]

15B. CONTRACTOR/OFFER[redacted]
(Signature of pers[redacted]

15C. DATE SIGNED: 6/26/2020

16B. UNITED STATES OF AMERICA
[redacted]
*(Signature of Contracting Officer)*

16C. DATE SIGNED: 06/26/2020

NSN 7540-01-152-8070
Previous edition unusable

STANDARD FORM 30 (REV. 10-83)
Prescribed by GSA
FAR (48 CFR) 53.243

**CONTINUATION SHEET**

REFERENCE NO. OF DOCUMENT BEING CONTINUED: 70CDCR20D00000009/P00003

PAGE 2 OF 2

NAME OF OFFEROR OR CONTRACTOR: GEO GROUP INC THE

| ITEM NO. (A) | SUPPLIES/SERVICES (B) | QUANTITY (C) | UNIT (D) | UNIT PRICE (E) | AMOUNT (F) |
|---|---|---|---|---|---|
| | Amount for this Modification: [redacted] | | | | |
| | Period of Performance: 12/20/2019 to 12/19/2034 | | | | |
| | Add Item 0008 as follows: | | | | |
| 0008 | Other Direct Costs (ODC) Reimbursement--<br>This is an estimated amount<br>Obligated Amount: [redacted] | | | | [redacted] |
| | All IDIQ terms and conditions remain the same and flow down to the Task Orders. | | | | |

**AMENDMENT OF SOLICITATION/MODIFICATION OF CONTRACT**

1. CONTRACT ID CODE

PAGE OF PAGES: 1 of 2

2. AMENDMENT/MODIFICATION NO.: P00004

3. EFFECTIVE DATE: See Block 16C

4. REQUISITION/PURCHASE REQ. NO.: none

5. PROJECT NO. *(If applicable)*

6. ISSUED BY — CODE: ICE/DM/DC-LAGUNA

ICE/Detent Mngt/Detent Contract-LAG
Immigration and Customs Enforcement
Office of Acquisition Management
24000 Avila Road, [redacted]
Attn: [redacted], (949)425-[redacted]
Laguna Niguel CA 92677

7. ADMINISTERED BY *(If other than Item 6)* — CODE

8. NAME AND ADDRESS OF CONTRACTOR *(No., street, county, State and ZIP Code)*

GEO GROUP INC THE
ATTN [redacted]
4955 TECHNOLOGY WAY
BOCA RATON FL 334313367

CODE: 6127064650000

FACILITY CODE

(x) 9A. AMENDMENT OF SOLICITATION NO.

9B. DATED *(SEE ITEM 11)*

x 10A. MODIFICATION OF CONTRACT/ORDER NO.: 70CDCR20D00000009

10B. DATED *(SEE ITEM 13)*: 12/19/2019

**11. THIS ITEM ONLY APPLIES TO AMENDMENTS OF SOLICITATIONS**

☐ The above numbered solicitation is amended as set forth in Item 14. The hour and date specified for receipt of Offers ☐ is extended. ☐ is not extended.
Offers must acknowledge receipt of this amendment prior to the hour and date specified in the solicitation or as amended, by one of the following methods: (a) By completing Items 8 and 15, and returning ________ copies of the amendment; (b) By acknowledging receipt of this amendment on each copy of the offer submitted ; or (c) By separate letter or telegram which includes a reference to the solicitation and amendment numbers. FAILURE OF YOUR ACKNOWLEDGEMENT TO BE RECEIVED AT THE PLACE DESIGNATED FOR THE RECEIPT OF OFFERS PRIOR TO THE HOUR AND DATE SPECIFIED MAY RESULT IN REJECTION OF YOUR OFFER If by virtue of this amendment you desire to change an offer already submitted , such change may be made by telegram or letter, provided each telegram or letter makes reference to the solicitation and this amendment, and is received prior to the opening hour and date specified.

12. ACCOUNTING AND APPROPRIATION DATA *(If required)*
none

**13. THIS ITEM ONLY APPLIES TO MODIFICATION OF CONTRACTS/ORDERS. IT MODIFIES THE CONTRACT/ORDER NO. AS DESCRIBED IN ITEM 14.**

| CHECK ONE | |
|---|---|
| | A. THIS CHANGE ORDER IS ISSUED PURSUANT TO: *(Specify authority)* THE CHANGES SET FORTH IN ITEM 14 ARE MADE IN THE CONTRACT ORDER NO. IN ITEM 10A. |
| | B. THE ABOVE NUMBERED CONTRACT/ORDER IS MODIFIED TO REFLECT THE ADMINISTRATIVE CHANGES *(such as changes in paying office, appropriation date, etc.)* SET FORTH IN ITEM 14, PURSUANT TO THE AUTHORITY OF FAR 43.103(b). |
| | C. THIS SUPPLEMENTAL AGREEMENT IS ENTERED INTO PURSUANT TO AUTHORITY OF: |
| X | D. OTHER *(Specify type of modification and authority)* Bilateral - FAR 43.103 - Types of Contract Modifications (a) |

**E. IMPORTANT:** Contractor ☐ is not. ☒ is required to sign this document and return 1 copies to the issuing office.

14. DESCRIPTION OF AMENDMENT/MODIFICATION *(Organized by UCF section headings, including solicitation/contract subject matter where feasible.)*

DUNS Number: 612706465
Contracting Officer's Representative (COR): [redacted]
760-561-[redacted]
Alternate COR: [redacted] 213-312-[redacted]

This modification is to change CLIN 0002A - Desert View Detention Services Guaranteed Minimum to [redacted] beds effective 10/26/2020 in accordance with the GEO Group letter dated on September 25, 2020, see attached.

LIST OF CHANGES:
Continued ...

Except as provided herein, all terms and conditions of the document referenced in Item 9 A or 10A, as heretofore changed, remains unchanged and in full force and effect.

15A. NAME AND TITLE OF SIGNER *(Type or print)*: [redacted] Executive Vice President

16A. NAME AND TITLE OF CONTRACTING OFFICER *(Type or print)*: [redacted]
TEL: 949-425-[redacted] EMAIL: [redacted]

15B. CO[redacted]

15C. DATE SIGNED: 10/26/2020

16B. [redacted]

16C. DATE SIGNED

NSN 7540-01-152-8070
Previous edition unusable

STANDARD FORM 30 (REV. 10-83)
Prescribed by GSA
FAR (48 CFR) 53.243

**CONTINUATION SHEET**

REFERENCE NO. OF DOCUMENT BEING CONTINUED: 70CDCR20D00000009/P00004



NAME OF OFFEROR OR CONTRACTOR
GEO GROUP INC THE

| ITEM NO. (A) | SUPPLIES/SERVICES (B) | QUANTITY (C) | UNIT (D) | UNIT PRICE (E) | AMOUNT (F) |
|---|---|---|---|---|---|
| | Reason for Modification: Other Administrative Action<br>Total Amount for this Modification: [redacted]<br>Total Amount for this Award: [redacted]<br><br>Period of Performance: 12/20/2019 to 12/19/2034<br><br>All IDIQ terms and conditions remain the same and flow down to the Task Orders. | | | | |

**AMENDMENT OF SOLICITATION/MODIFICATION OF CONTRACT**

1. CONTRACT ID CODE

PAGE OF PAGES: 1 2

2. AMENDMENT/MODIFICATION NO.: P00006

3. EFFECTIVE DATE: See Block 16C

4. REQUISITION/PURCHASE REQ. NO.: N/A

5. PROJECT NO. *(If applicable)*

6. ISSUED BY — CODE: 70CDLG

DETENTION MANAGEMENT - LAGUNA
U.S. Immigration and Customs Enforcement
Office of Acquisition Management
24000 AVILA ROAD, [redacted]
Laguna Niguel CA 92677

7. ADMINISTERED BY *(If other than Item 6)* — CODE: ICE/DM/DC-LAGUNA

ICE/Detent Mngt/Detent Contract-LAG
Immigration and Customs Enforcement
Office of Acquisition Management
24000 Avila Road, [redacted]
Attn: <<Enter Contract Specialist>>
Laguna Niguel CA 92677

8. NAME AND ADDRESS OF CONTRACTOR *(No., street, county, State and ZIP Code)*

GEO GROUP INC THE
ATTN [redacted]
4955 TECHNOLOGY WAY
BOCA RATON FL 334313367

CODE: 6127064650000 — FACILITY CODE

(x) 9A. AMENDMENT OF SOLICITATION NO.

9B. DATED *(SEE ITEM 11)*

x 10A. MODIFICATION OF CONTRACT/ORDER NO.: 70CDCR20D00000009

10B. DATED *(SEE ITEM 13)*: 12/19/2019

**11. THIS ITEM ONLY APPLIES TO AMENDMENTS OF SOLICITATIONS**

☐ The above numbered solicitation is amended as set forth in Item 14. The hour and date specified for receipt of Offers ☐ is extended. ☐ is not extended.

Offers must acknowledge receipt of this amendment prior to the hour and date specified in the solicitation or as amended , by one of the following methods: (a) By completing Items 8 and 15, and returning ________ copies of the amendment; (b) By acknowledging receipt of this amendment on each copy of the offer submitted ; or (c) By separate letter or telegram which includes a reference to the solicitation and amendment numbers. FAILURE OF YOUR ACKNOWLEDGEMENT TO BE RECEIVED AT THE PLACE DESIGNATED FOR THE RECEIPT OF OFFERS PRIOR TO THE HOUR AND DATE SPECIFIED MAY RESULT IN REJECTION OF YOUR OFFER If by virtue of this amendment you desire to change an offer already submitted , such change may be made by telegram or letter, provided each telegram or letter makes reference to the solicitation and this amendment, and is received prior to the opening hour and date specified.

12. ACCOUNTING AND APPROPRIATION DATA *(If required)*
None

**13. THIS ITEM ONLY APPLIES TO MODIFICATION OF CONTRACTS/ORDERS. IT MODIFIES THE CONTRACT/ORDER NO. AS DESCRIBED IN ITEM 14.**

| CHECK ONE | |
|---|---|
| | A. THIS CHANGE ORDER IS ISSUED PURSUANT TO: *(Specify authority)* THE CHANGES SET FORTH IN ITEM 14 ARE MADE IN THE CONTRACT ORDER NO. IN ITEM 10A. |
| | B. THE ABOVE NUMBERED CONTRACT/ORDER IS MODIFIED TO REFLECT THE ADMINISTRATIVE CHANGES *(such as changes in paying office, appropriation date, etc.)* SET FORTH IN ITEM 14, PURSUANT TO THE AUTHORITY OF FAR 43.103(b). |
| | C. THIS SUPPLEMENTAL AGREEMENT IS ENTERED INTO PURSUANT TO AUTHORITY OF: |
| X | D. OTHER *(Specify type of modification and authority)* Bilateral FAR 43.103 Types of Contract mMdifications (a) |

**E. IMPORTANT:** Contractor ☐ is not. ☒ is required to sign this document and return 1 copies to the issuing office.

14. DESCRIPTION OF AMENDMENT/MODIFICATION *(Organized by UCF section headings, including solicitation/contract subject matter where feasible.)*

DUNS Number: 612706465
Contracting Officer's Representative (COR): [redacted] 760-561-[redacted]
Alternate COR: [redacted], 213-312-[redacted]

The purpose of this bilateral modification is update CLIN 0004 Adelanto Guaranteed Transportation Monthly Fee Rate for period of performance from 08/20/2019 rate at [redacted] in lieu terms agreed and established in P00004.

The new revised rate and attached staffing plan will remain effective until Desert View annex guaranteed beds re-negotiate.
Continued ...

Except as provided herein, all terms and conditions of the document referenced in Item 9 A or 10A, as heretofore changed, remains unchanged and in full force and effect.

15A. NAME AND TITLE OF SIGNER *(Type or print)*
[redacted] Executive Vice President

16A. NAME AND TITLE OF CONTRACTING OFFICER *(Type or print)*
[redacted]
TEL: 949-425[redacted] EMAIL: [redacted]

15B. CONTRACTOR/OFFEROR [redacted]
*(Signature of person authorized to sign)*

15C. DATE SIGNED: 2/17/2021

16B. UNITED STATES OF AMERICA [redacted]
*(Signature of Contracting Officer)*

16C. DATE SIGNED: 02/17/2021

| CONTINUATION SHEET | REFERENCE NO. OF DOCUMENT BEING CONTINUED | PAGE | OF |
|---|---|---|---|
| | 70CDCR20D00000009/P00006 | 2 | 2 |

NAME OF OFFEROR OR CONTRACTOR
GEO GROUP INC THE

| ITEM NO. (A) | SUPPLIES/SERVICES (B) | QUANTITY (C) | UNIT (D) | UNIT PRICE (E) | AMOUNT (F) |
|---|---|---|---|---|---|
| | LIST OF CHANGES:<br>Reason for Modification: Other Administrative Action<br>Total Amount for this Modification: [redacted]<br><br>Period of Performance: 12/20/2019 to 12/19/2034<br><br>Change Item 0004 to read as follows(amount shown is the total amount): | | | | |
| 0004 | Adelanto Guaranteed Transportation Monthly Fee<br><br>Monthly Rate [redacted]<br><br>Obligated Amount: [redacted]<br>Product/Service Code: S206<br>Product/Service Description: HOUSEKEEPING- GUARD<br><br>All IDIQ terms and conditions remain the same and flow down to the Task Orders. | | | | |