1  PUBLIC COUNSEL
2  REBECCA BROWN (SBN 345805)
   rbrown@publiccounsel.org
3  SOPHIA WRENCH (SBN 354416)
   swrench@publiccounsel.org
4  AMELIA PIAZZA (SBN 342473)
   apiazza@publiccounsel.org
5  VANESSA RAE YOUNG (SBN 352693)
6  vyoungviniegra@publiccounsel.org
7  ELIZABETH HERCULES-PAEZ (SBN 320944)
   eherculespaez@publiccounsel.org
8  610 South Ardmore Avenue
   Los Angeles, CA 90005
9  Tel: 213-385-2977
10

11 *Attorneys for Plaintiffs*
   Additional Counsel Listed on Following Page
12

13              UNITED STATES DISTRICT COURT
14              CENTRAL DISTRICT OF CALIFORNIA

15 L.T., SEVAK MESROBIAN, JOSE            Case No. 5:26-cv-00322-SSS-RAO
16 MAURO SALAZAR GARZA, AND J.M.,
   on behalf of themselves and all others  **DECLARATION OF ALTAF**
17 similarly situated; COALITION FOR       **SAADI, M.D.**
   HUMANE IMMIGRANT RIGHTS,
18
                                           **CLASS ACTION**
19                          Plaintiffs,
20           v.
21 U.S. IMMIGRATION AND CUSTOMS
   ENFORCEMENT; TODD M. LYONS,
22 Acting Director, U.S. Immigration and
   Customs Enforcement; JAIME RIOS, Acting
23 Director of Los Angeles Field Office,
   Enforcement and Removal Operations, U.S.
24 Immigration and Customs Enforcement; U.S.
   DEPARTMENT OF HOMELAND
25 SECURITY; KRISTI NOEM, Secretary,
26 U.S. Department of Homeland Security,
27
                           Defendants.
28

IMMIGRANT DEFENDERS LAW CENTER
ALVARO M. HUERTA (SBN 274787)
ahuerta@immdef.org
CARSON ADRIANNA SCOTT (SBN 337102)
cscott@immdef.org
ALISON STEFFEL (SBN 346370)
asteffel@immdef.org
634 South Spring Street, 10th Floor
Los Angeles, CA 90014
Tel: 213-634-0999

COALITION FOR HUMANE IMMIGRANT RIGHTS
CARL BERGQUIST (*pro hac vice*)
cbergquist@chirla.org
2351 Hempstead Road
Ottawa Hills, OH 43606
Tel: 310-279-6025

ADAM REESE (SBN 362898)
areese@chirla.org
2533 West Third Street, Suite 101
Los Angeles, CA 90057
Tel: 213-353-1333

WILLKIE FARR & GALLAGHER LLP
NICHOLAS REDDICK (SBN 288779)
nreddick@willkie.com
STEPHEN HENRICK (SBN 310539)
shenrick@willkie.com
ALYXANDRA VERNON (SBN 327699)
avernon@willkie.com
JACOB KARIM (SBN 340376)
jkarim@willkie.com
333 Bush Street, 34th Floor
San Francisco, CA 94104
Tel: 415-858-7400

*Attorneys for Plaintiffs*

DECLARATION OF ALTAF SAADI, M.D.
Case No. 5:26-cv-00322-SSS-RAO

## DECLARATION OF ALTAF SAADI, M.D.

I, Altaf Saadi, declare that:

1.    I have personal knowledge of the facts set forth below and, if called to testify, I could and would do so competently.

## I.    EDUCATION AND PROFESSIONAL EXPERIENCE

2.    I am a neurologist at Massachusetts General Hospital and Associate Professor of Neurology at Harvard Medical School. I am board certified in Neurology by the American Board of Psychiatry and Neurology and licensed in the states of Massachusetts, Maine, New Hampshire, Kansas, and Missouri. In my current role, I see patients at Massachusetts General Hospital (MGH) and at the MGH Chelsea Community Health Center.  I also serve as a hospitalist tele-neurology consultant and teach and supervise neurology residents. I have taught medical students at Harvard Medical School and the David Geffen School of Medicine at the University of California Los Angeles ("UCLA") and residents at different Harvard and UCLA residency training programs.

3.    I am a graduate of Harvard Medical School. I completed a medical internship in Internal Medicine at Massachusetts General Hospital in Boston, Massachusetts. I completed my residency in Neurology at the Harvard Mass General Brigham Neurology Residency Program in Boston, Massachusetts, where I was Chief Resident. I completed a two-year research fellowship in health services research with the National Clinician Scholars Program at UCLA, which included completing a master's degree in health policy and management at the UCLA Fielding School of Public Health.

4.    Since 2017, I have been a volunteer for Physicians for Human Rights' volunteer Asylum Network.  I have completed two special training courses in providing medical and psychological documentation for trauma and torture survivors seeking asylum.  Additionally, I previously served as volunteer faculty at the UCLA Human Rights Clinic at the School of Medicine. I co-designed and led an Applied

Learning in Advanced Asylum Medicine course, a 12-week curriculum to train other clinicians to conduct effective forensic medical evaluations. Currently, I serve as the Associate Director of the MGH Asylum Clinic. I have conducted extensive research on the health of immigrants. Overall, I have authored over 100 scholarly publications, with approximately 45 of those publications focused on the health and well-being of immigrants or forcibly displaced populations such as refugees or asylum seekers. Put together, I have both significant clinical and research expertise with immigrant and refugee populations, have submitted approximately 30 affidavits in Immigration Court and to the United States Citizenship and Immigration Services ("USCIS"), and have testified in Immigration Court approximately 15 times.

5.    I have also been asked to assess the medical and mental health conditions and treatment of individuals detained in the U.S. Immigration and Customs Enforcement's ("ICE") custody at facilities across the United States. I have been a medical expert with Human Rights First, Disability Rights California ("DRC"), National Immigrant Justice Center, and the American Civil Liberties Union of Southern California looking at problems relating to the provision of health care for people in ICE custody. This includes serving as a medical expert for DRC's 2019 report regarding conditions at Adelanto (hereinafter referred to as the "2019 DRC Report").[1] I also have prior experience investigating the health services and use of solitary confinement in ICE detention centers nationwide in connection with the National Immigrant Justice Center's June 2022 Complaint (hereinafter referred to as

---

[1] Disability Rights Cal., *There Is No Safety Here: The Dangers for People with Mental Illness and Other Disabilities in Immigration Detention at GEO Group's Adelanto ICE Processing Center* (Mar. 2019), https://www.disabilityrightsca.org/system/files/file-attachments/DRC_REPORT_ADELANTO-IMMIG_DETENTION_MARCH2019.pdf.

the "CRCL Complaint")[2] and my own independent, peer-reviewed research.

6.    In addition, I have participated in efforts to provide medical services in underserved communities domestically and internationally, including in Zambia, Tanzania, Navajo Medical Center in Shiprock, New Mexico, Boston Healthcare for the Homeless, and Médecins Sans Frontières. In addition to my expertise in neurology, I provided services to survivors of rape and sexual assault through the Boston Area Rape Crisis Center from June 2010 to June 2013, where I was a certified rape crisis counselor in Massachusetts.

II.    **MATERIALS CONSIDERED**

7.    In forming my opinions, I reviewed medical records that are in Plaintiffs' counsel's possession for two people, Mr. Mesrobian and Mr. Salazar Garza, who are detained at the Adelanto ICE Processing Center ("Adelanto"). I understand these records were previously maintained by Adelanto.

8.    I also considered investigations of the Adelanto facility performed by the California Department of Justice ("Cal DOJ") in November 2023 and Disability Rights California ("DRC") in June 2025. Both of these documents are publicly available.[3] I also relied on my prior experience investigating the health services and use of solitary confinement in ICE detention centers nationwide for the CRCL

---

[2] Letter from Nat'l Immigrant Justice Ctr. to Katherine Culliton-González, Officer for Civil Rights and Civil Liberties, U.S. Dep't of Homeland Sec. (June 2022), https://immigrantjustice.org/sites/default/files/content-type/press-release/documents/2022-06/CRCL-complaint-mental-health-care-immigration-detention_June-2022_public.pdf.

[3] See *"They Treat Us Like Dogs in Cages": Inside the Adelanto ICE Processing Center*, Disability Rights California (July 17, 2025), https://www.disabilityrightsca.org/drc-advocacy/investigations/inside-the-adelanto-ice-processing-center; *Immigration Detention in California A comprehensive Review with a Focus on Mental Health*, California Department of Justice (April 2025, rev. May 2025), https://oag.ca.gov/system/files/media/immigration-detention-2025.pdf.

DECLARATION OF ALTAF SAADI, M.D.
Case No. 5:26-cv-00322-SSS-RAO

Complaiant"),[4] my work for the 2019 DRC Report, and my own independent, peer-reviewed research on the health and wellbeing of detained immigrants.

9.     I also reviewed 21 declarations prepared by immigrants that are or were detained at Adelanto, which were prepared for filing in support of Plaintiffs' Motion for Preliminary Injunction.

10.    For purposes of forming my opinions, I have accepted the facts and accounts contained in these materials as true and accurate representations of the conditions at Adelanto and the experiences of the individuals detained there.  The overlapping deficiencies and patterns described by detained individuals, both current and former, have provided me with sufficient information to opine about health care delivery and medical conditions at Adelanto.

III.   **OPINIONS AND SUMMARY OF FINDINGS**

11.    In my medical opinion, it is not safe to be sick at Adelanto.  The health care delivery system at the facility is not adequate to care for detained individuals who have medical and mental health needs, including both the need for emergency medical services and preventative or chronic health services. Adelanto has a pattern of dismissing and mismanaging medical concerns voiced by detained people, resulting in a health care delivery system that operates outside accepted standards of care. As a result, detained individuals are subjected to substandard, negligent, and inadequate medical care, if medical care is provided at all.

12.    My opinions are as follows:

    a.  The medical intake and assessment processes at Adelanto are substandard. They fail to adequately or consistently screen detained

---

[4] Letter from Nat'l Immigrant Justice Ctr. to Katherine Culliton-González, Officer for Civil Rights and Civil Liberties, U.S. Dep't of Homeland Sec. (June 2022), https://immigrantjustice.org/sites/default/files/content-type/press-release/documents/2022-06/CRCL-complaint-mental-health-care-immigration-detention_June-2022_public.pdf.

DECLARATION OF ALTAF SAADI, M.D.
Case No. 5:26-cv-00322-SSS-RAO

individuals and to connect them with necessary health services when screenings reveal pertinent positive findings. This results in lack of critical information about medical history and delayed or absent referrals, increasing the risk of disease progression and potential transmission. Additionally, the lack of consistent privacy during intake undermines the collection of critical medical history information needed to ensure appropriate care.

b. Adelanto does not have a functioning sick call system to respond to detained individuals' requests for medical care, leaving them without a proper process for getting timely care.

c. Detained individuals with chronic medical issues that require ongoing care do not receive timely or adequate medical care or accommodations. This endangers their health.

d. Adelanto's system for administering prescription medication is dangerously ineffective, resulting in missed medications or inconsistent timing of medication administration.

e. Adelanto fails to provide detained individuals with adequate access to specialty care, risking complications and mismanagement of chronic or serious conditions.

f. Adelanto staff do not respond appropriately to medical emergencies.

g. Adelanto fails to adequately treat detained individuals' mental health. This includes subjecting them to conditions that actively worsen their health, such as placing them in medical/administrative segregation, which is essentially solitary confinement-like conditions.

h. The poor conditions at Adelanto cause and/or exacerbate detained individuals' physical and mental health issues, negatively impacting their health.

13. I reserve the right to supplement, amend, or otherwise modify the

- 5 -

opinions expressed herein should additional facts, evidence, or information become available. My opinions are not contingent upon any single fact, statement, or piece of evidence. Rather, they are grounded in the totality of the testimony, extensive documentary records I have reviewed, firsthand accounts I gathered as part of evaluations I conducted for the 2019 DRC Report, and my academic research. The consistency and volume of the accounts describing systemic deficiencies in medical care at Adelanto form the foundation of my conclusions.

## IV.    DETAILED FINDINGS

### A.    Adelanto's Medical Intake and Assessment Processes Are Substandard.

14.    Adelanto's medical intake screening process is ineffective and inconsistent. In order to serve the medical needs of a population of nearly two thousand individuals and ensure the health and safety of those confined in close quarters, it is necessary to conduct thorough initial medical screenings that are linked to appropriate follow-up care.

15.    Counsel has informed me that the Adelanto facility is required to follow the 2016 revision to the 2011 ICE Performance-Based National Detention Standards ("PBNDS") and the National Detainee Handbook ("NDH"). Counsel has also informed me that the GEO Group, who runs the Adelanto facility, has created a supplement to the NDH titled GEO's Revised Supplement to NDH ("GRS NDH"). I base my understanding of Adelanto's requirements based on these documents. I understand these documents will be concurrently filed with this declaration.

16.    Under the PBNDS, NDH, and GRS NDH, medical intake at Adelanto consists of two components: First, each detainee must receive a comprehensive medical, dental, and mental health intake screening as soon as possible, but no later than 12 hours after arrival at each detention facility. PBNDS § 4.3(II)(14) at p. 258 (*emphasis added*). As part of this initial intake, health care professionals must ask detainees about their "physical and mental health and medications." NDH at p. 8; see

also GRS NDH at p. 8.  This screening must also include questions designed to assess disability needs such as, "Do you have any difficulty with walking, standing, or climbing stairs?" and must inquire about assistive devices. PBNDS § 4.3, Appendix 4.3.A. These initial screenings shall be conducted in settings that respect detainees' privacy, PBNDS § 4.3(V)(J) at p. 267, and if a detainee does not speak or understand English, or cannot read or write English, an interpreter should be provided free of charge for medical and ICE or detention-related matters. NDH at p. 46.   Second, a more thorough medical and mental health assessment is done to review the intake assessment, review the first few days of stay in the facility, and to address any long-term medical management issues like chronic care needs. PBNDS § 4.3(II)(15) at p. 258. This comprehensive health assessment includes a physical examination and mental health screening by a qualified, licensed health care professional, and must be done no later than 14 days after a person enters into ICE custody. PBNDS § 4.3(II)(15) at p. 258 (*emphasis added*); see also NDH at p. 28; GRS NDH at p. 4, 8.

17.    These intake assessments are necessary to identify those who arrive with urgent medical needs so that their care can be addressed, to ensure that those with known medical and/or mental health conditions receive continued care, to determine if any housing or disability accommodations need to be implemented for the patient, and to prevent the spread of contagious diseases, such as tuberculosis. For continuity of care and to protect the health of those housed and those who work in the facility, it is essential that the initial screening take place at the time the person arrives at the facility before they enter the general population setting.

18.    Indeed, if during the initial screening, a detainee indicates they have a condition that requires urgent medical attention, like a contagious disease, a serious mental health issue, or a chronic illness, an immediate referral shall be initiated and the detainee shall receive a health assessment no later than two working days from the initial screening.  PBNDS § 4.3(V)(J) p. 266.

19.    Having reviewed the PBNDS standards and testimony of detained people,

1   it is clear to me that Adelanto does not follow the requirements laid out by the PBNDS
2   relating to medical intake and assessments.

3       20.   For example, A.A.A.A.'s declaration states that as part of her initial
4   screening, she was placed in a room with about five other women and a toilet that was
5   unclean and not private. A female officer then gave them all pregnancy tests and
6   ordered them to urinate in Styrofoam cups using the dirty, not-private toilet. After the
7   women urinated in these cups, the officer tested each and told them each
8   "congratulations, you're not pregnant" within earshot of each other. A.A.A.A. had to
9   translate for the other women with her. A.A.A.A. Decl. ¶¶10-13. The lack of privacy
10  during intake, such as what occurred here, compounded by having one patient
11  translate for another rather than using a medical interpreter, undermines the collection
12  of critical medical history information needed to ensure appropriate care.

13      21.   Further, during her initial intake, A.A.A.A. told the intake nurse about her
14  lupus, diabetes, and fibromyalgia and about the medications she takes. However, it
15  does not appear that that information was recorded, and, even though her conditions
16  required immediate referral and a more thorough health assessment, she did not have
17  a comprehensive medical exam within two days. A.A.A.A. Decl. ¶¶12, 21. As another
18  example, A.A. was publicly humiliated during their intake, with Adelanto staff
19  mocking them for using a walker and the intake nurse yelling at them and accusing
20  them of lying about their conditions. A.A. Decl. ¶10.

21      22.   Upon his arrival to Adelanto, Alton George Smith immediately informed
22  staff that he had suffered a toe injury after being assaulted during his arrest by ICE.
23  He did not receive a medical intake until about 10 days later, where he reiterated that
24  he had a toe injury. Smith Decl. ¶¶14-17. He did not receive medical treatment or
25  follow-up for three months, at which point an X-ray revealed that his toe was
26  fractured. Smith Decl. ¶¶17-19. This kind of delay in the intake and assessment
27  process constitutes substandard care. Failure or delays in diagnosing a broken toe can
28  lead to improper healing, chronic pain, long-term mobility issues, and other long-term

complications such as osteoarthritis.

23. Likewise, detained individuals are not adequately connected to accommodations if screened for disabilities or if they report functional limitations, as evidenced by people with obvious mobility issues or vision impairments being housed on top floors and assigned top bunks. Arnold Decl. ¶11; L.T. Decl. ¶10. This failure to identify disabilities or functional limitations and promptly provide accommodations interferes with the delivery of medical care and exposes some people to the risk of harm, including physical injury.

24. These practices are dangerous and leave detained individuals susceptible to serious harm. Failure to provide a private and confidential intake can result in an incomplete and inaccurate health screening and failure to identify detained individuals with urgent mental health crises. Failure to provide timely, necessary follow-up—particularly for conditions like diabetes, which require ongoing monitoring and sometimes treatment, such as insulin—could be deadly. Failure to identify and remedy infections during the initial screening, particularly open wound infections, can be a source of infection for other detained individuals and staff; proper screening and follow-up is critical to limit the spread of infection. And failure to screen for physical disabilities or functional limitations risks putting those already vulnerable to physical injury in more danger.

25. My opinion is further supported by investigations of Adelanto performed by the Cal DOJ and DRC, the agency designated under federal law to protect and advocate for the rights of Californians with disabilities. The latter found similar issues with Adelanto's intake process. The Cal DOJ found that only 83% of interviewees at Adelanto reported being asked about their mental health during intake at their facility, which does not meet the universal screening required by the PBNDS. Cal DOJ, Immigration Detention in California (2025) at p. 30. It was unclear whether questions pertaining to detained individuals' current mental health status are consistently asked during intake screenings or at any other times. Cal DOJ, Immigration Detention in

California (2025) at p. 30.

26.    In my prior experience investigating the health services and use of solitary confinement in ICE detention centers nationwide in connection with the CRCL Complaint, I found that initial evaluations of detained individuals typically lack thoroughness and are not followed with appropriate follow-up, leading to failure to provide appropriate treatment.

27.    **Summary of Opinion:**    The medical intake process at Adelanto is dangerous and ineffective.    Initial assessments are not confidential, timely, or thorough.    There is not adequate screening for detained people's disabilities, their disability needs, or functional limitations.    Initial assessments also fail to result in timely and accurate continuation of medications.    Lastly, follow-up care is not timely or thorough and does not result in appropriate treatment plans.

B.    **Adelanto Does Not Have a Functioning Sick Call System to Address Detained Individuals' Medical Needs.**

28.    Adelanto does not have an effective or consistent system to respond to the medical needs of detained individuals. In my opinion, in order to properly serve the medical needs of a population of nearly two thousand individuals, a facility must have an adequate system in place to effectively assess medical requests and triage needs.

29.    To ensure adequate delivery of medical care, the PBNDS require that detainees be able to request health services on a daily basis and receive timely follow-up.    See PBNDS § 4.3(II)(4) at p. 257. The NDH confirms detainees have "a right to receive necessary and appropriate health care free of charge while [they] are detained. [They] can ask for health care at any time, including when [they] are sick or injured, have a chronic health problem, need medical treatment, or take or need to start taking medications to keep [them] well." NDH at p. 28.

30.    The PBNDS further explain that each facility shall have a sick call procedure that allows detainees the unrestricted opportunity to freely request health care services (including mental health and dental services) provided by a physician or

other qualified medical staff in a clinical setting. See PBNDS § 4.3(V)(S) at pp. 271-272. To fulfil this requirement, the PBNDS require that regularly scheduled "sick call" times be established and communicated to detainees, and that there be an established procedure in place at all facilities to ensure that all sick call requests are received and triaged by appropriate medical personnel ***within 24 hours*** after a detainee submits the request. See PBNDS § 4.3(V)(S)(2-4) at p. 271 (*emphasis added*). The NDH does not meaningfully differ. See NDH at p. 28-29.

31. GEO's Revised Supplement to NDH confirms that a sick call should take place every day. See GRS NDH at p. 8. The GRS NDH specifically says that the medical request forms request will be reviewed by medical staff, and the detainee will be seen at the earliest available time. See GRS NDH at p. 8.

32. Based on the declarations I have reviewed, patients are not seen within a reasonable time of their sick-call submission. In fact, many sick-call submissions appear to go entirely unanswered at Adelanto.

33. Declarants report inadequate clinical staffing for them to be adequately treated and/or clinicians who only really attempt to provide care in emergency situations. Mesrobian Decl. ¶22; Ruiz-Escobar Decl. ¶18; Karamychev Decl. ¶¶14-16. Mr. Karamychev, for example, asked why it took two months for him to be seen and was told there are over 500 requests for medical care and only three people to process them, so medical requests are not reviewed for two to three weeks. Karamychev Decl. ¶24. Numerous detained individuals report that their medical requests, grievances, and KITEs,[5] go unanswered. J.M. Decl. ¶7; E.M. Decl. ¶9; A.A.A.A Decl. ¶15-16; L.T. Decl. ¶21; Karamychev Decl. ¶¶6, 22; Winfield Decl. ¶¶5, 10, 16-17, 20, 22-24; Fredrick Decl. ¶¶8-13; Ding Decl. ¶13; Flores Decl. ¶17.

34. Declarants also report that they fear retaliation for filling out requests for medical care. A.A.A.A. Decl. ¶36. This is dangerous as it denies detained individuals

---

[5] A KITE is a form for detainees to request medical services.

DECLARATION OF ALTAF SAADI, M.D.
Case No. 5:26-cv-00322-SSS-RAO

access to timely care and exposes them to worsening health conditions.

35.    In December 2025, Plaintiff Jose Mauro Salazar Garza fell very sick with a gastrointestinal illness. During this time, he was vomiting and going to the bathroom uncontrollably and could barely eat or drink or even stand up.  He had to crawl on the floor to the toilet bowl near his bed to vomit. Sometimes he couldn't even make it to the toilet, and vomited on the floor. After submitting requests and grievances, on the fourth or fifth day following the onset of his symptoms, he was finally transported to the medical unit to see the doctor. He was given juice, ordered a liquid diet, and sent back to his cell. The next day, he had to submit another grievance because at 7:30pm he still hadn't received his liquid diet for lunch or dinner.  Over the course of this ordeal, he lost almost 11 pounds. Salazar Garza Decl. ¶¶14-15.

36.    Elmer Manual Ruiz Escobar entered Adelanto with a throat infection. He received some cough and cold medication as well as some pills for the pain, but he has not had comprehensive treatment and it took him months to see a doctor, despite submitting three requests for medical treatment. As a result, he still has pain in his throat, has coughed up blood, and deals with congestion and headaches. Ruiz-Escobar Decl. ¶¶12-13. Given these persistent symptoms, a more comprehensive medical evaluation should have been provided.

37.    Declarant A.A.A.A. also witnessed a detained person's dental crown break and ooze blood and pus, causing her severe pain. Despite submitting a sick call request, experiencing facial swelling with continued oozing of pus and blood, it took 10 days for her to see a nurse. The nurse was only able to put in a request for her to see a dentist. The dental appointment was scheduled to occur two weeks later, but the appointment did not occur because she was not picked up for it. A.A.A.A. and the other detained individual put in numerous requests during this time. A.A.A.A. Decl. ¶36. This lack of effective care coordination led to an unnecessary prolongation of her symptoms.

38.    Andrei Karamychev described submitting several medical requests to

DECLARATION OF ALTAF SAADI, M.D.
Case No. 5:26-cv-00322-SSS-RAO

address a worsening infection involving his knee that began in September 2025. He noticed his knee becoming more swollen, turned purple, and he developed a fever. It took over a month for Mr. Karamychev to see a doctor. By that point, he required hospitalization and intravenous antibiotics. Karamychev Decl. ¶14-16. Earlier evaluation, including potential for diagnostic testing and/or early antibiotic therapy, can improve outcomes in management of infectious diseases and help prevent progression to more critical stages, thereby reducing the reliance on hospitalization and intravenous antibiotics.

39.    Plaintiff Mesrobian's shoulder was injured during his arrest, and he could not raise his arm above his shoulder on one side. Despite telling staff about the injury, he did not receive medical evaluation or care. This kind of injury should be evaluated and treated with physical therapy if necessary; failure to provide an evaluation and diagnose the issue can lead to issues with the healing process including resulting in persistent pain, weakness, and limited shoulder movements. Mesrobian Decl. ¶ 4.

40.    Josue Jeison Pereira-Amaya was diagnosed with a large cyst on the left side of their head with granuloma (a type of lesion involving chronic inflammation). Despite numerous conversations and requests, explaining their need for gauze and disinfectant to keep the cyst clean and dry, they were only given band-aids and told to use water and soap from the bathroom. They were told that no doctor was available. Mr. Pereira-Amaya. was eventually taken to the hospital where the cyst was removed, but both before and after the surgery, he was not given gauze or proper supplies to clean the wound despite losing what he perceived to be a notable amount of blood. His wound continued to bleed because of this, and his head even stuck to his pillow as a result. Pereira-Amaya Decl. ¶¶4-19. Adelanto's failure to provide Mr. Pereira-Amaya with gauze or wound cleaning supplies under these circumstances represents substandard care and indicates a disregard for detained individuals' health. Failing to provide proper aftercare risks infection, recurrence of the cyst, and improper healing.

41.    My opinion is further supported by the Cal DOJ and DRC reports

discussed above. The DRC report found that individuals consistently reported that staff failed to respond to requests for medical care, even making fun of patients or dismissing their symptoms, or declined to make such requests because Adelanto staff had failed to respond in the past. DRC, "They Treat Us Like Dogs in Cages" (2025) at p. 8. DRC interviewed one person who had a large, swollen, untreated lump near her wrist, reportedly sustained when she was taken into ICE custody 17 days prior. Although she requested medical attention, she had received no response as of DRC's visit. DRC, "They Treat Us Like Dogs in Cages" (2025) at p. 8.

42.    My findings above also conform with prior research and direct interviews I have done when investigating conditions. My previous research found that detained individuals face long delays in receiving both standard preventive, chronic, and emergency care from medical professionals at detention clinics. See Drs. Saadi & Recht Expert Affidavit, CRCL Complaint Appendix D ¶13; 2019 DRC Report at 21-22. As a result of inadequate care, many no longer request medical help anymore. See Drs. Saadi & Recht Expert Affidavit, CRCL Complaint Appendix D ¶¶13-14.

43.    **Summary of Opinion:**  Adelanto's sick call system is broken. Patients submit sick call slips and requests for medical care but are not scheduled for timely appointments with clinicians. It is not uncommon for sick call slips and requests for medical care to be ignored. This is harmful to patients as it impedes access to care and can worsen their medical conditions and potentially expose other detained individuals to infectious diseases.

## C.    Detained Individuals with Chronic Medical Conditions Do Not Receive Timely or Adequate Care or Accommodations.

44.    Adelanto fails to provide adequate medical care and necessary accommodations to those with chronic conditions. This constitutes a failure in medical care, as untreated chronic conditions can result in the progression and worsening of illnesses, complications, the development of secondary conditions, and reduced quality of life. It is essential that patients with chronic issues, particularly

those with poorly managed conditions, are seen regularly so their condition can be assessed, including a review of completed labs, continuation or adjustments to their medications as needed, and further ordering of diagnostic tests if appropriate. Patients who are new to a provider's care, or whose condition is not managed, may require more frequent visits while the provider establishes the patient's monitoring or treatment plan.

45.    The PBNDS require that detainees receive continuity of care from time of admission to time of transfer, release or removal. See PBNDS § 4.3(II)(5) at pp. 257-258. Detainees with chronic conditions are supposed to receive care and treatment, as needed, which includes the monitoring of medications, diagnostic testing and chronic care clinics. See PBNDS § 4.3(II)(12) at p. 258. The NDH confirms that detainees can request health care when they "have a chronic health problem, need medical treatment, or take or need to start taking medications to keep [them] well." NDH at p. 28.  When a detainee requires close medical supervision, including chronic and convalescent care, a written treatment plan, including access to health care and other care and supervision personnel, shall be developed and approved by the appropriate qualified licensed health care provider, in consultation with the patient, with periodic review. See PBNDS § 4.3(II)(8) at p. 258; PBNDS § 4.3(V)(W) at p. 273.

46.    Multiple declarations establish that detained individuals with chronic issues do not receive proper medical attention in general, nor when it comes to receiving necessary medications, specialty care, or accommodations.

47.    Plaintiff L.T. is a patient that has suffered a stroke and has diabetes, high blood pressure, high cholesterol, and a spinal tumor, among other issues.  These require regular monitoring, such as blood pressure monitoring, blood tests, or surveillance imaging in the case of the spinal tumor to ensure the tumor stays stable. For example, as part of his care, he previously received daily regular blood pressure readings. One reading was >180 mmHg (systolic blood pressure), which indicates

- 15 -

severe hypertension (or hypertensive urgency) and can be associated with a variety of acute, life-threatening complications. Elevated blood pressure readings in the range that he reported require more frequent monitoring, which he did not receive despite this being medically indicated. L.T. Decl. ¶6, 22.

48.    L.T. also requires a sleep apnea machine for obstructive sleep apnea. Adelanto's doctors have denied his request for a machine. L.T. Decl. ¶15. Untreated obstructive sleep apnea is independently associated with having another stroke or a heart attack.[6] There are multiple possible mechanisms for this, including accelerated atherosclerosis (which refers to gradual buildup of plaque inside arteries that can restrict blood flow), increased systemic inflammation, among others.

49.    L.T. had weakness on the right side of his body following a stroke, with subsequent mobility issues requiring a walker or cane due to instability and fatigue with longer distances. Despite informing staff of his mobility issues, he was initially placed in a cell on the second floor, and it took about two weeks before he was moved down to the first floor to accommodate his disability and reduce his risk of falls.  L.T. Decl. ¶¶9-10.

50.    Rodriguez-Arzola has diabetes and requested diabetic shoes but was told by Adelanto staff they had run out. She had significant swelling in her feet that made wearing regular shoes challenging. Rodriguez-Arzola Decl. ¶18. Diabetic shoes typically have greater depth, width, and adjustable closures to accommodate for swelling.

51.    Xiaoman Ding has a pituitary brain tumor, which requires regular monitoring, including surveillance imaging. She suffers from headaches, which may

---

[6] Drager LF, Polotsky VY, Lorenzi-Filho G. *Obstructive sleep apnea: an emerging risk factor for atherosclerosis.* Chest. 2011 Aug;140(2):534-542. doi: 10.1378/chest.10-2223. PMID: 21813534; PMCID: PMC3198492; Godoy J, Mellado P, Tapia J, Santín J. *Obstructive sleep apnea as an independent stroke risk factor: possible mechanisms.* Curr Mol Med. 2009 Mar;9(2):203-9. doi: 10.2174/156652409787581556. PMID: 19275628.

DECLARATION OF ALTAF SAADI, M.D.
Case No. 5:26-cv-00322-SSS-RAO

be related to the pituitary brain tumor. She was able to manage her conditions before being detained at Adelanto by taking weekly medications and occasional injections when needed. However, Ding received only Tylenol to manage the pain, which was not sufficient for managing her headaches.  In addition, Ding did not receive the specialty care she requested during her time at Adelanto for the pituitary brain tumor, despite a reported growth in her tumor. These lapses in her care, including escalating and untreated pain, ultimately resulted in a suicide attempt. Ding Decl. ¶¶14-19, 21, 26. She was also not provided timely or appropriate accommodation for her poor vision that was affecting her ability to get into the upper bunk she was assigned to sleep.

52.    Plaintiff Mesrobian was documented as testing positive for chronic late latent syphilis (note 10/17/2025) and received doxycycline 100 mg po BID. This treatment is contrary to standard care, according to both the Center for Disease Control and Prevention (CDC) and Los Angeles County guidelines, which recommend intramuscular injections of Benzathine penicillin.[7]  Blood tests are subsequently recommended to be repeated at certain intervals to assess for treatment failure, which was not done; another reflection of substandard chronic care management at Adelanto.

53.    In addition, Plaintiff Mesrobian suffers from epilepsy and has regular seizures. Mesrobian Decl. ¶¶ 13-27. When these occur, the staff are slow to respond and often take no action while he is seizing. On one occasion, a guard tried to hold his head down and restrain him. A proper response when someone has a seizure would look like turning them on their side to prevent aspiration and to maintain his airway

---

[7] Latent Syphilis, Ctrs. for Disease Control & Prevention, https://www.cdc.gov/std/treatment-guidelines/latent-syphilis.htm (last visited Mar. 3, 2026); L.A. Cnty. Dep't of Pub. Health, Acute Communicable Disease Control Manual: B-73 Syphilis (2019), http://publichealth.lacounty.gov/acd/procs/b73/DiseaseChapters/B73Syphilis.pdf.

(particularly as he had vomited with prior seizures), timing the seizure, and not restraining the person, as restraining a person during a seizure can increase the risk of injury.

54.    Plaintiff Mesrobian also had recurrent seizures at Adelanto without a change in his medication or receiving care from a neurologist to address the increasing seizure frequency despite medications.  For example, he had recurrent seizures while on levetiracetam 1,000 mg twice daily (brand name Keppra), without a change in this medication. Notably, there were several inconsistencies in his medical records that raise concern about the medical documentation in Adelanto that could adversely impact patient care.  For example, in one note dated 12/16/2025, under the "Subjective" it is documented that he takes "levetiracetam 500 mg tablets po TID" (which suggests a 1500 mg total daily dose), but in the same note in the "Plan" section it is written "levetiracetam 50 mg 3 tablets PO BID" (which suggest a 300 mg total daily dose), although notes on 12/12/2025, 12/11/2025, and 12/3/2025 all report levetiracetam 1,000 mg twice daily (suggesting a 2,000 mg total daily dose). Inaccurate medical documentation can lead to medication errors, incorrect medical decision-making, and jeopardize patient safety.

55.    The Cal DOJ and DRC reports further support my opinion discussed above.  Cal DOJ found that Adelanto did not have multidisciplinary treatment planning meetings, which are typical in carceral settings. The lack of multidisciplinary treatment planning indicates deficiencies in the coordination of care among the various health and custody staff to provide the most comprehensive and efficient care for detained individuals. Cal DOJ, Immigration Detention in California (2025) at p. 35.  The Cal DOJ's file review demonstrated that at least one patient with chronic conditions such as hepatitis C were only addressed to a limited extent, as health staff explained that most detained individuals are not at the facility long enough to receive the full, months-long regimen of medication. Cal DOJ, Immigration Detention in California (2025) at p. 42.  DRC interviewed another individual using a

- 18 -

prosthetic eye who was unable to clean the prosthesis to prevent infection. Although he requested medical attention, he received no response as of DRC's visit. DRC, "They Treat Us Like Dogs in Cages" (2025) at p. 8.

56.    **Summary of Opinion:**  Adelanto does not provide appropriate medical care to, or accommodations for, patients with chronic conditions and related disabilities or functional impairments. Detained individuals' accounts and their medical records indicate that people with serious medical conditions are not receiving appropriate, long-term care, including but not limited to necessary and appropriate medications.  This falls far below the acceptable standard of care and puts patients at risk of serious harm.

### D.    Adelanto's System for Administering Prescription Medication Is Dangerously Ineffective.

57.    At Adelanto, detained individuals lack consistent access to medication. The lack of a consistent and effective system for administering medication is concerning and places the health of detained individuals at risk. Medication continuity is essential to effective patient care and a critical component of a functional health-care system.  The risk associated with medication lapses depends on the medication prescribed, but some medications, such as insulin, blood thinners, antibiotics, seizure medications, and migraine medications, should not be skipped. Missing a scheduled dose can result in increased risk of medical complications.

58.    The PBNDS require that prescriptions and medications shall be ordered, dispensed and administered in a timely manner and as prescribed by a licensed health care professional. PBNDS § 4.3(II)(20) at p. 259.  They further require that all prescribed medications and medically necessary treatments shall be provided to detainees on schedule and without interruption, absent exigent circumstances. PBNDS § 4.3(V)(U)(4) at p. 273. The GRS NDH states: "Pill Calls are performed twice a day 7 days per week in each housing unit." GRS NDH at p. 8.

59.    Despite these standards, individuals detained at Adelanto do not have

- 19 -

access to an adequate and reliable system for receiving prescription medication.

60.    Examples include Plaintiff L.T., who suffered a stroke for which he was taking medication to manage his blood pressure and cholesterol.  Specifically, some of the medications he was taking before being detained were aspirin, hydrochlorothiazide, metoprolol, tamsulosin, and Mounjaro (tirzepatide). When he arrived at Adelanto, he was initially denied the Mounjaro. Roughly two months later, he was approved for the Mounjaro, but only for a four-week period. He received his last dose of that prescription around January 29, 2026, so he has now gone roughly four weeks without their medication. L.T. Decl.  ¶¶18-19. Mounjaro can help individuals with diabetes by lowering their blood sugar and supporting weight loss. It is dangerous and unacceptable if diabetes that was previously treated is left untreated without any medication. This can lead to complications like heart disease, kidney disease, diabetic neuropathy (nerve damage), diabetic retinopathy (vision loss), among others.

61.    Further, even when L.T. received his medications, Adelanto's provision was very inconsistent, which is also problematic. L.T. Decl. ¶20.  It is recommended to take medications at around the same time each day to maintain steady levels of the drug in the bloodstream for optimal therapeutic benefit.

62.    Olga Beatriz Rodriguez-Arzola also has diabetes and was taking Mounjaro, which can help manage diabetes by lowering blood sugar and supporting weight loss. She had been taking this prior to being detained. She told Adelanto staff that she has diabetes and needs this medication, yet she did not receive it. Her family even brought the medication to Adelanto so that she could receive the medication, yet it was not given to her, and it is not clear it was replaced with another medication to treat her diabetes, which would be the standard of care. Rodriguez-Arzola Decl.  ¶¶5-11.

63.    Plaintiff Mesrobian regularly misses doses of his levetiracetam (brand name Keppra) medications. Sometimes this would occur because he was not given

DECLARATION OF ALTAF SAADI, M.D.
Case No. 5:26-cv-00322-SSS-RAO

breakfast before medication administration, and he experiences side effects from taking the medication on an empty stomach. On other occasions, he did not receive doses because he was not woken up. Mesrobian tried to remedy the situation by seeking approval from Adelanto to self-administer the medication, so he can be sure to take it after he has food, but they refused this request.  Mesrobian Decl. ¶¶28-33. Given that he experiences side effects from levetiracetam, it was reasonable for him to try to take the medication with food and, as a medical matter, unreasonable for Adelanto staff to deny this request and jeopardize his ability to take the medication consistently to prevent seizures. Further, there were inconsistencies in his medical records regarding the dose of levetiracetam, which raises concern about medication errors.

64.    Many other declarants also report that detained individuals have legitimate issues with when prescriptions are delivered. A.A.A.A. Decl. ¶32 (noting how, on Christmas Eve, only some detainees received their medications).

65.    Philip Winfield requires antibiotics for an irregular skin condition as prescribed by his cancer specialist, but he has not received it. He also has a scalp disorder that causes lesions on his scalp. He has had inconsistent access to antibiotics and shampoo to treat this condition. Winfield Decl. ¶¶4, 9-10, 13-17.

66.    Xiaoman Ding has a pituitary brain tumor, which requires regular medical care.  She suffers from headaches, which may be related to the pituitary tumor. She was able to manage her conditions before being detained at Adelanto by taking weekly medications and occasional injections when needed. However, Ding received only Tylenol to manage the pain while at Adelanto, which was not adequate to manage her headaches. Adelanto nurses pressured Ding to take increasing amounts of Tylenol, causing her to take 17 Tylenol tablets in 3 days, rather than adjusting the treatment plan. Failure to adjust her treatment plan despite her pain not responding to Tylenol resulted in debilitating pain, worsening symptoms, and even a suicide attempt. Ding Decl. ¶¶15-17, 29.

- 21 -

67.    Saddaam Samaan Daoud Samaan takes Tamsulosin for his prostate issues. Daoud Samaan recently went two to three weeks without this medication. Samaan Decl. ¶¶11. Stopping tamsulosin can result in worsening urinary symptoms, including increased urinary frequency, urgency to urinate, nocturia (frequent nighttime urination) and, in severe cases, acute urinary retention.

68.    The Cal DOJ and DRC reports discussed above further support my opinion.  Disability Rights California reported that one person "needed to take diabetes medication twice per day but had only received it twice over the 10 days he had been detained-placing him at life-threatening risk of diabetic shock." DRC, "They Treat Us Like Dogs in Cages" (2025) at p. 7.  Other individuals reported insufficient access to medication to manage severe asthma and urinary conditions, or not having medications transferred from previous facilities to ensure continued treatment. DRC, "They Treat Us Like Dogs in Cages" (2025) at p. 5.  Cal DOJ's file review showed errors in prescribing lower doses of a drug upon intake than the detainee had previously received or needed. Cal DOJ, Immigration Detention in California (2025) at pp. 31-32.

69.    Cal DOJ's reporting on the pharmacy itself is particularly worrisome. In Adelanto, the pharmaceutical storage area was hot, and the refrigerator was broken. Cal DOJ, Immigration Detention in California (2025) at pp. 36.

70.    These examples also conform with research and investigations I've done previously for the CRCL Complaint and 2019 DRC Report. I found that there is a culture of cost-cutting that results in widespread negligence throughout ICE's facilities. It appears that medical decisions are often not consistent with evidence-based medical practices and the patient's best interest. In one California detention center, a man who had been thriving on schizophrenia medications had his medications abruptly stopped upon entering ICE custody. After a nearly two-week delay, an alternative medication was prescribed because it was less expensive. As a result, his mental health deteriorated, and he experienced worsening auditory

DECLARATION OF ALTAF SAADI, M.D.
Case No. 5:26-cv-00322-SSS-RAO

hallucinations and suicidal thoughts. He attempted suicide four times while in detention. Drs. Saadi & Recht Expert Affidavit, CRCL Complaint Appendix D ¶15. These same issues appear to be present at Adelanto. My investigation of Adelanto in 2019 also revealed several examples of deficient medication management practices. (2019 DRC Report at 2, 27-28).

71.    **Summary of Opinion**:    Adelanto does not consistently deliver medication to patients.  At times, medication is administered hours before it is safe to do so or after the appropriate medication window, if it is even distributed at all. Some patients experience multi-week lapses in medication. Adelanto's failure to consistently administer medications and adjust medications as needed is dangerous for patients, particularly those with serious medical conditions.

72.    At Adelanto, detained individuals lack consistent access to specialty care. This means individuals with complex, chronic, or acute conditions requiring specialized expertise are going untreated by specialists—endangering their health. Specialty care must be available to patients when needed, and it must be provided in accordance with the patient's acuity level as determined by the ordering provider. Adelanto does not adequately provide this specialty care.

73.    The PBNDS require that every facility shall directly or contractually provide its detainee population with specialty health care. See PBNDS § 4.3(V)(A)(5) at p. 260. The NDH states that "[i]f medically necessary, other services may include medications, lab or other diagnostic tests, x-rays, education and counseling, and regular appointments for serious medical conditions." NDH at p. 29.  The NDH further explains that a detainee who is determined to require health care beyond facility resources shall be transferred in a timely manner to an appropriate facility. To facilitate this requirement, the PBNDS require that the facilities maintain a written list of referral sources, including emergency and routine care, that shall be maintained and updated annually. See PBNDS § 4.3(II)(6) at p. 258.

74.    Adelanto does not appear to have a system for ensuring specialty referrals

DECLARATION OF ALTAF SAADI, M.D.
Case No. 5:26-cv-00322-SSS-RAO

occur.  People who need specialty services are left waiting for months when more timely attention is needed.  As a result of this, patients with serious and time-sensitive medical needs have been unable to obtain workup for possible tumors, infections, and other serious medical conditions.

75.    As one example, Jose Mauro Salazar Garza was transferred to Adelanto approximately four months after another detained person attacked him and bit off part of his finger, requiring partial amputation surgery.  Prior to coming to Adelanto, a follow-up appointment with an offsite specialist revealed that Mr. Salazar Garza's finger bone was so close to the tip of his finger that anything he touched would cause pain. After his transfer to Adelanto, an offsite doctor ordered an MRI in February 2025. Weeks later, a doctor at Adelanto informed him there was no record of the order. Mr. Salazar Garza followed up in April and was told the MRI was still in the process of being scheduled, despite Mr. Salazar Garza's regular complaints of severe pain. This severe and worsening pain could have signaled an early infection and warranted evaluation for one, at minimum by a clinician. He did not receive an MRI until July 2025, after the tip of his finger had become infected and burst while he was sleeping. Salazar Garza Decl. ¶¶5-11.

76.    Plaintiff J.M. has cardiac arrhythmia. In November 2025, he received a cardiac ultrasound and subsequently wore a heart monitor for several days.  About a month later, Adelanto staff cancelled his follow-up appointment with an offsite provider. Four months after his November appointment, J.M. still has not attended a follow-up appointment or received the  results of his cardiac ultrasound or heart monitoring. J.M. Decl. ¶¶5, 8-14. The failure to provide or explain results also represents substandard medical care—medical providers have an ethical obligation to explain test results to patients. The standard of care for relaying results to patients involves doing so in a manner that is timely, appropriate, and understandable.

77.    Declarant Jose Flores suffers from Charcot-Marie-Tooth disease, a condition that causes progressive nerve damage. The disease began in only one of his

feet. He was scheduled to have corrective surgery to repair damage caused by his disease, but he was detained before he could have that surgery. Now, the disease has progressed from one foot to the other and both of his hands and arms. He reports being in substantial pain that cannot be fully remedied by Tylenol. He did not use a wheelchair when he arrived at Adelanto, but his condition has worsened so much that he now needs a wheelchair; his need for the wheelchair began approximately three to four months after arriving at Adelanto. It is possible that this could have been prevented with the surgery, which can improve mobility. Adelanto staff have informed him they will not provide a way for him to get the required surgery. Flores Decl. ¶¶5-10.

78.    Phillip Winfield, who is 69 years old, has not been seen by multiple specialists he requires care from. He suffers from Dupuytren's contractures in both hands. It is so severe that he has lost full use of his fourth and fifth digits (pinky and ring fingers) on each hand. He was planning to get surgery to treat the condition before being detained, but the staff at Adelanto has told him that he will not be able to undergo the surgery while he is in their custody. His condition has been worsening since he arrived at Adelanto, resulting in inability to fully open the palm and negatively impacting his hand function. Mr. Winfield also has skin cancer on the right side of his face, but has not been able to see a specialist. Winfield Decl. ¶¶4, 8-12, 18-20. Regular skin cancer monitoring enables close observation of any changes, allowing for early intervention and prompt treatment if progression occurs.

79.    Also while at Adelanto, Julius Fredrick developed itchy bumps all over his body. The doctor allegedly submitted a request for Fredrick to see a dermatologist, but he never saw one. He now has black scars all over his body. Fredrick Decl. ¶15.

80.    As discussed above, Xiaoman Ding has a pituitary brain tumor, which requires regular medical care.  She also has headaches and vision issues. In addition to not receiving adequate medication to manage her headaches, Ding did not receive the specialty care she requested during her time at Adelanto. Her pain and vision

- 25 -

symptoms worsened, resulting in a suicide attempt. Ding also had an eye exam because of her vision changes, but she never received the results or further management of her persistent vision symptoms. Ding Decl. ¶¶17-19, 21, 26.

81.    Prior to his transfer to Adelanto, Saddaam Samaan Daoud Samaan had been treated since 2019 for an enlarged prostate and accompanying symptoms, including frequent urination. In January 2025, a doctor at Desert View Annex Immigration Detention Facility recommended that he see a specialist. It was not until around July 2025 that he finally saw a urologist. The urologist recommended a colonoscopy and bloodwork to screen for cancer. Approximately eight months later, Daoud Samaan still has not received these tests. Samaan Decl. ¶¶6-11. Screenings such as colonoscopies and blood work are important for detection and management of potential health issues, like cancer.

82.    **Summary of Opinion:**  Adelanto has no effective system for ensuring that patients receive medically necessary specialty care in a timely manner. Patients with serious medical conditions are not receiving timely, specialty care. This poses a significant risk to patients' health.

E.    **Adelanto Staff Fail to Respond Appropriately to Medical Emergencies.**

83.    At Adelanto, detained individuals experiencing medical emergencies do not receive timely or adequate care.  A medical emergency is defined as an acute injury or illness that poses an immediate risk to a person's life or long-term health. Signs of a medical emergency can include: severe shortness of breath; sudden decrease or loss in consciousness; sudden dizziness, weakness, or change in vision; chest pain or pressure lasting two minutes or more; sudden onset of severe abdominal pain; sudden inability to talk or move one side of the body; severe bleeding that will not stop; and severe or persistent vomiting.

84.    The PBNDS require 24-hour emergency medical and mental health services be available to all detainees.  PBNDS § 4.3(II)(9) at p. 258. The NDH

confirms that "[i]n a health emergency, [detainees] can get care right away." NDH at p. 29. Furthermore, the PBNDS require that each facility have a written emergency services plan for delivery of 24-hour emergency health care. This plan is supposed to be prepared in consultation with the facility's Clinical Medical Authority ("CMA") or the Health Services Administrator ("HSA"), and must include: an on-call physician, dentist, and mental health professional available 24 hours per day; a list of telephone numbers for local ambulances and hospital services available to all staff; an automatic external defibrillator (AED) maintained for use at each facility; and security procedures that ensure the immediate transfer of detainees for emergency medical care. PBNDS § 4.3(V)(T)(1) at p. 272. GEO's Revised Supplement to NDH similarly states: "Detainees experiencing severe pain or injury should report to any staff member immediately. Staff will notify the Medical Department of the emergency." GRS NDH at p. 9.

85. In practice, individuals detained at Adelanto receive delayed and inadequate emergency care. Multiple detained individuals explain that staff will only treat a situation as an emergency if a person collapses to the floor, because they pass out or faint, for instance. J.M Decl. ¶16; Fredrick Decl. ¶12. Another declarant expressed concern with Adelanto's nighttime emergency response capability, noting no doctors come to help when people fall down at night. Ruiz-Escobar Decl. ¶22.

86. Plaintiff Jose Mauro Salazar Garza was sleeping when the tip of his finger burst. He was in pain and could see blood and black pus coming out of his finger in a wormlike shape. When a guard finally arrived, he radioed for help, but nobody came to take Salazar Garza to the medical unit. He didn't even get bandages or supplies to clean the wound. It was more than a week before Salazar Garza was taken to the hospital. Salazar Garza Decl. ¶10-11.

87. Prior to being detained, Plaintiff Mesrobian was shot in the head and still has bullet fragments in his head. He suffers from seizures. Mesrobian reports that he usually has at least one relatively minor seizure episode and one major seizure episode

each month. He sometimes experiences two or three back-to-back. Since being detained at Adelanto, Mesrobian's seizures have increased in frequency. Mesrobian has been hospitalized five times in the last six months because of his seizures, but he never had to be hospitalized for his seizures prior to being detained. Mesrobian Decl. ¶¶9-10. Seizures are very dangerous for a number of reasons, including causing neuronal damage, respiratory arrest, or cardiac arrest if not promptly treated. When seizures are occurring, urgent medical assistance is imperative. Guards and medical staff have been slow to provide medical attention to Mesrobian when he is seizing. To counteract this, he has resorted to teaching the other detained individuals what to do when he has a seizure. During his seizures, he has even been verbally ridiculed by Adelanto staff. Mesrobian Decl. ¶¶14-15. Untreated seizures can result in seizures becoming more frequent and intense, physical injuries (e.g., from falls, bruises, broken bones due to loss of consciousness or uncontrolled movements), and even sudden death. People with uncontrolled seizures face a higher risk of Sudden Unexpected Death in Epilepsy (SUDEP). Failure to respond to Mesrobian's seizures places his health at risk.

88.    In August 2025, Mesrobian suffered a seizure during which Adelanto staff first spent about 30 minutes locking down the other inmates instead of urgently attending to him. Mesrobian Decl. ¶16. In January 2025, he suffered another seizure, during which it took about 25 minutes for the staff to give him oxygen. Guards also did not move him and place him on his side, resulting in him hitting his head on a metal frame of a bunk bed. Mesrobian Decl. ¶19. When he suffered a seizure in February 2025, his cellmates moved him into the hallway to expedite his medical care, but it still took 15 minutes for the Adelanto staff to transport him to the medical unit. Mesrobian Decl. ¶21. Plaintiff Jose Mauro Salazar Garza generally confirms Mesrobian's experience. Salazar Garza Decl. ¶18.

89.    As discussed above, Rodriguez-Arzola was hospitalized for four days because of worsening swelling and redness in her feet and legs. When she initially

reported the swelling she was taken to the medical infirmary, and they told her nothing was wrong. A few days later, she started vomiting and having diarrhea, all while her feet swelled more and more every day. Again the nurses took no action. After three more days, her feet, ankles, and calves were so swollen and red she could barely walk. After seven to ten more days, an Adelanto doctor finally agreed she should go to the hospital. It took 14-15 days from the time the issues started for her to be taken to the hospital. Rodriguez-Arzola should have been taken to the hospital sooner, at the absolute latest when she reported that her feet, ankles, and calves were so swollen and red she could barely walk. Instead, Adelanto waited another seven to ten days to take her to the hospital. Rodriguez-Arzola Decl. ¶¶5-12. The failure to provide her with prompt care likely contributed to her having difficulty walking for weeks. Rodriguez-Arzola Decl. ¶¶17-18.

90.    Fernando Lopez saw blood in his stool and experienced severe pain in his stomach that he rated a 9 out of 10. Lopez Decl. ¶¶ 15-19. Given his medical history of liver cirrhosis (meaning that his liver is scarred and permanently damaged) and known, life-threatening complications of liver cirrhosis, these symptoms should have resulted in prompt evaluation. However, he did not receive medical attention until he was so weak that he collapsed on the floor—about a week after he first alerted staff to his condition and need for medical care. He was then hospitalized and it turned out that he was bleeding internally. His hemoglobin (a protein found in red blood cells whose level is used to assess for anemia) was critically low, indicating life-threatening anemia and requiring blood transfusions. On another occasion, he was hospitalized after reporting pain from his hernia that was ignored for several days—he then required surgery. Lopez Decl. ¶¶ 24-30. His care reflects substandard treatment both in the management of chronic liver cirrhosis as well as in the provision of acute emergency care.

91.    Multiple detained individuals have witnessed extreme disregard for the urgency of such situations. For example, J.M. witnessed one of his cellmates collapse

DECLARATION OF ALTAF SAADI, M.D.
Case No. 5:26-cv-00322-SSS-RAO

and hit the cellmate's head on the ground.  The cellmate was bleeding from having hit his head on the ground, leading to blood pooling around his head. After the cellmates yelled to notify the guards, the guards slowly made their way over and one said, "Be happy, at least we come." J.M. Decl. ¶20. J.M. witnessed two similar instances as well in which the guards did not appear to act with the urgency called for by the situation. J.M. Decl. ¶¶22-23. Other detained individuals have witnessed similar situations. Gilbert Arnold Decl. ¶9; Salazar Garza Decl. ¶18. A.A.A.A. also witnessed one instance in which staff did act urgently, but they were unprepared to handle the situation. A.A.A.A. Decl. ¶¶32-34.

92.    This also conforms with research I have done previously for the CRCL Complaint. I found that detained individuals face long delays in receiving both standard preventive and emergency care from medical professionals at detention clinics. Drs. Saadi & Recht Expert Affidavit, CRCL Complaint Appendix D ¶13.

93.    For these reasons, it is my opinion that detained individuals do not have access to adequate emergency care at Adelanto. Failure to provide emergency care in a timely manner can result in disease progression, increased medical complications, and mortality.

### F. Adelanto Does Not Adequately Treat Detained Individuals' Mental Health and in Some Cases Worsens It by Imposing Medical/Administrative Segregation.

94.    At Adelanto, detained individuals' mental health is not treated in accordance with the standards required by the PBNDS, and staff actively worsen detained individuals' mental health by placing them in medical or administrative segregation.

#### 1. Adelanto Fails to Adequately Treat Detained Individuals' Mental Health

95.    The PBNDS require that any detained individual referred for mental health treatment shall receive an evaluation by a qualified health care provider no

later than 72 hours after the referral, or sooner if necessary. If the practitioner is not a mental health provider and further referral is necessary, the detainee will be evaluated by a mental health provider within the next business day.  PBNDS § 4.3(V)(O)(3) at pp. 269-70.

96.    Detained individuals at Adelanto lack adequate mental health treatment or services. The declarations I reviewed describe conditions that are very isolating, including lack of structured programming and social activities, sensory stimulation, and physical activity. Combined with the possibility of imminent deportation, I would expect these conditions to contribute to worsening mental health distress and feelings of helplessness. For those who have never been detained before, the sudden isolation can be debilitating. For those with preexisting mental diagnoses, the isolation can exacerbate their conditions. The punitive conditions the detained individuals are subject to have adverse effects on their mental health. Arnold Decl. ¶15; Karamychev Decl. ¶3; Aguilar Decl. ¶5; Mesrobian Decl. ¶7; Ding Decl. ¶¶32-35.  Xiaoman Ding describes how her mental health deteriorated so significantly while being held in Adelanto that she attempted to complete suicide and experienced depression somatization symptoms such as severe back pain, difficulty breathing, and trouble falling asleep. An Adelanto provider prescribed her antidepressants, but when she discussed the issues she was having with the medication and requested a different type of antidepressant, they responded by increasing her dose, causing her to feel drowsy.  Ding Decl. ¶¶26, 29-31.

97.    A.A.A.A. experienced a situation where another detained individual was about to jump over a ledge on the second floor down to the first floor, seemingly to self-harm. A nurse remarked that situations like this would lead to that detained person getting deported. What the nurse said made A.A.A.A. feel fearful that they could not ask for help or make complaints about the conditions without risking deportation. A.A.A.A. Decl. ¶31.

98.    Jorge Aguilar has suffered from mental illness since he was a teenager.

He has a history of suicide attempts, depression, and psychosis, which has led to him being diagnosed with multiple mental illnesses. When he first arrived at Adelanto, he told the Adelanto psychologist that he had previously been diagnosed with schizophrenia. However, the psychologist accused Aguilar of trying to game the system. Understandably, Aguilar has not felt safe talking to the psychologist since then. After crying before a judge, the judge ordered a competency exam for Aguilar, which found that he is incompetent to represent himself because of his mental illness. Aguilar Decl. ¶¶6-8.

99.    Plaintiff Salazar Garza reports that there is a man in his unit who "rarely talks and he spends most of his day walking in circles around the dayroom, staring off into space" and "has a lot of trouble with his personal hygiene." Salazar Garza Decl. ¶21. These symptoms are consistent with an altered mental status, which could indicate a mental disorder or cognitive deficit. Plaintiff Salazar Garza reports that other detained individuals have to encourage this individual to shower, to send his clothes for laundry, and to remove garbage and moldy food from his cell, because staff provide no support. (Id.)

100. My opinion is further supported by the Cal DOJ and DRC reports discussed above.  DRC reported that staff stated there were only three psychologists to serve the population of nearly 1,400 as of June 25, 2025. DRC, "They Treat Us Like Dogs in Cages" (2025) at p. 10.  DRC also interviewed one individual who described struggling with anxiety and panic attacks due to past traumatic events, including sexual assault and torture, that took place in his country of origin. Although he sought help from Adelanto staff for his mental health symptoms, he reported that he had not been evaluated yet, despite being held in detention for over three weeks. DRC, "They Treat Us Like Dogs in Cages" (2025) at p. 10. Other people DRC interviewed also reported difficulty obtaining access to mental health services. DRC, "They Treat Us Like Dogs in Cages" (2025) at p. 10. The Cal DOJ correctly pointed out that psychology literature consistently demonstrates that individuals held in

DECLARATION OF ALTAF SAADI, M.D.
Case No. 5:26-cv-00322-SSS-RAO

immigration detention experience negative mental health impacts, including depression, anxiety, and PTSD, which worsen with increased lengths of detention. Cal DOJ, Immigration Detention in California (2025) at p. 5. The Cal DOJ also discussed a study of detained asylum seekers, who reported extremely high rates of mental health issues, with 86% experiencing depression, 77% anxiety, and 50% PTSD. Cal DOJ, Immigration Detention in California (2025) at p. 13. The Cal DOJ also found that no facilities in California consistently offered adequate psychotherapy services for the mental health conditions most commonly observed in detainee populations in California. Cal DOJ, Immigration Detention in California (2025) at p. 6.

101. The Cal DOJ found that at least one Adelanto detained individual was not able to transfer to an inpatient bed at the local community hospital for mental health care and had to wait for weeks before transferring to a hospital located over 150 miles from the facility. Cal DOJ, Immigration Detention in California (2025) at p. 32.

102. Also, multiple individuals reported minimal opportunities to remain in contact with family and loved ones while in detention. DRC, "They Treat Us Like Dogs in Cages" (2025) at p. 14. Limiting access to family can exacerbate feelings of isolation, depression, and anxiety, particularly for people with disabilities. Studies, including my own peer-reviewed publications, show that immigration detention is associated with negative and harmful impacts on mental health. Detained individuals experience high rates of depression, anxiety, and post-traumatic stress disorder, increased likelihood of self-harm behavior, and negative changes in self-perception. All these conditions can worsen with increased lengths of time spent in facilities. Cal DOJ, Immigration Detention in California (2025) at p. 5. My own peer reviewed work confirms all of these findings by the Cal DOJ, and in particular, my research and investigation has found that detained immigrants have significantly higher likelihood of poor or fair self-rated health, mental illness, and PTSD with longer detention

- 33 -

DECLARATION OF ALTAF SAADI, M.D.
Case No. 5:26-cv-00322-SSS-RAO

duration.[8]

103.  This also conforms with research I have done previously for the CRCL Complaint. I found that untreated mental illness can aggravate comorbidities like diabetes and cardiovascular disease, compounding health issues for detainees who already face barriers to chronic care. Drs. Saadi & Recht Expert Affidavit, CRCL Complaint Appendix D ¶¶10. Also, I found that many detained individuals who need supportive psychotherapy do not receive it. Drs. Saadi & Recht Expert Affidavit, CRCL Complaint Appendix D ¶12. The same is true for Adelanto.

104. In 2021, I conducted a study on health outcomes among detained immigrants in California that was among the first to provide evidence that poor general and mental health outcomes are associated with experiences of the conditions of confinement in detention centers rather than solely attributable to pre-migratory trauma.[9]

105.  **Summary of Opinion:**  The provision of mental health care at Adelanto is inadequate; the facility's response to mental health crises or apparent illness falls below the standard of care and risks widespread suffering.

## 2.    Detained Individuals' Physical and Mental Health Is Worsened by Medical/Administrative Segregation

106.  Detained individuals at Adelanto are sometimes subject to use of medical

---

[8] Altaf Saadi, MD MSc  Caitlin Patler, PhD, Paola Langer, PhD*Duration in Immigration Detention and Health Harms,* JAMA Network Open. 2025;8(1):e2456164. doi:10.1001/jamanetworkopen.2024.56164 available at https://jamanetwork.com/journals/jamanetworkopen/fullarticle/2829506 ; Caitlin Patler, Altaf Saadi, Paola Langer, *The health-related experiences of detained immigrants with and without mental illness*, Journal of Migration and Health, Volume 11, 2025, 100302, ISSN 2666-6235 https://www.sciencedirect.com/science/article/pii/S2666623525000017.

[9] Altaf Saadi, Caitlin Patler, Maria-Elena De Trinidad Young, , . J Racial Ethn Health Disparities. 2022 Dec;9(6):2518-2532. doi: 10.1007/s40615-021-01187-1. Epub 2021 Nov 29. PMID: 34845673; PMCID: PMC8628823, available at https://pubmed.ncbi.nlm.nih.gov/34845673/

- 34 -

and/or administrative segregation, which worsens their mental health.

107. There are limited circumstances in which it is proper to segregate individuals from the population for medical reasons, but Adelanto far exceeds those, resulting in poor mental health outcomes. The PBNDS call for a specific area, separate from other housing areas, where detained people may be admitted for health observation and care under the supervision and direction of health care personnel. The PBNDS require that the following minimum standards are met: a physician at the facility or on call 24 hours per day; qualified health care personnel on duty 24 hours per day when patients are present; a staff member within sight or sound of all patients; and maintenance of a separate medical housing record distinct from the complete medical record. PBNDS § 4.3(V)(F)(3) at p. 265. The PBNDS explicitly state that "[m]edical isolation shall not be used as a punitive measure." PBNDS § 4.3(V)(O)(5) at p. 270; *see also* NDH at p. 17. Furthermore, such segregation shall only occur after a determination by a component mental health professional has taken place that shows the segregation shall not adversely affect the detainee's mental health. *See* PBNDS § 4.3(V)(AA)(12) at p. 277.

108. The medical segregation cell is dirty and not fit to hold people requiring medical attention. Detained individuals reported that it did not have soap or paper towels for them when they were held there. Mesrobian Decl. ¶26. They also reported that the blanket they were given there had bugs or mold on it. Mesrobian Decl. ¶27.

109. Physical health can also be negatively impacted by the use of medical and/or administrative segregation. On one occasion, after a seizure Mesrobian was held in a medical segregation cell for *3* days, despite his explanation to staff that it was not safe for him to be isolated given his risk of seizure recurrence. While in medical segregation, he suffered another seizure during which nobody attended to him. Mesrobian Decl. ¶27. Mesrobian told the staff that it was not safe for him to be isolated, and they eventually conceded he was correct. However, it was very unsafe for him to have been alone for those three days, especially given his risk of seizure

recurrence, and it served no justifiable medical purpose to have him isolated.

110. J.M. was given a heart monitor by doctors at a nearby hospital to wear for about a week. Upon J.M.'s return from the hospital, Adelanto staff placed him in medical solitary, as opposed to putting him back in his cell, based on their concern that other detained individuals would touch the monitor. J.M. reports feeling like this was done to punish him, and being in segregation caused him distress and harmed his mental health. After several days, J.M. was so depressed that he opted to stop wearing his heart monitor so that he could leave medical isolation. J.M. Decl. ¶¶8-10. His placement in medical segregation was therefore harmful to both his mental health as well as physical health, as he did not complete heart monitoring recommended for evaluation of his cardiac issues. I do not believe J.M. having a heart monitor was a sufficient basis to place J.M. in medical segregation. It is standard to release people into the community with heart monitors.

111. As discussed above, Ding dealt with numerous physical and mental health issues during her time in Adelanto. After a suicide attempt, the staff sent her to segregation. She reports that in her cell, there was only cold water so she could not take a shower, the toilet was dirty and gross, and she was given cold food and beans only. After this experience, she never told anyone that she had suicidal thoughts because she was afraid that she would be put into segregation again. Ding Decl. ¶¶26-29. This is consistent with findings from individuals I spoke with in Adelanto for the 2019 DRC report.

112. After his lawyer informed Adelanto staff that he was suicidal, Jorge Aguilar was put in administrative segregation, which he reported felt like solitary confinement and exacerbated his depression. He confirms that administrative segregation was not good for his mental health. Aguilar Decl. ¶¶9-10. Using solitary confinement-like conditions like administrative segregation as a response to mental health crises contradicts established clinical guidelines.

113. My opinion is further supported by the Cal DOJ and DRC reports

DECLARATION OF ALTAF SAADI, M.D.
Case No. 5:26-cv-00322-SSS-RAO

discussed above. I agree with the Cal DOJ that "solitary confinement deserves special focus due to its strong association with negative mental health outcomes, which can include PTSD, increased risk of self-harm and suicide, psychotic symptoms, lasting brain damage, and exacerbation of existing mental health conditions." Cal DOJ, Immigration Detention in California (2025) at p. 13. Cal DOJ interviewed detained individuals at other detention centers in California and confirmed their mental health materially worsened as a result of their time in medical segregation with one detainee describing it as "worse than prison." Cal DOJ, Immigration Detention in California (2025) at pp. 127-128.

114.  This also conforms with research I, along with other medical experts, did for the CRCL Complaint and have published in peer-reviewed literature. I found that many detention facilities use solitary confinement as punishment or to monitor individuals who experienced victimization or are mentally ill, despite its detrimental impact on physical and psychological well-being. Drs. Saadi & Recht Expert Affidavit, CRCL Complaint Appendix D ¶17. In one study, we found that nearly one in three participants without mental illness, and more than half of participants with mental illness, experienced solitary confinement during their time in ICE custody, with significantly greater probability of experiencing solitary confinement for those with mental illness versus those without.[10]  I found that individuals in detention centers are particularly afraid to disclose suicidal thoughts for fear of being put in solitary confinement. One individual at the Adelanto Detention Center sliced her wrists, requiring five days of hospitalization. Mental health staff wrote: "[Cristina] has been hesitant to tell myself and other providers about her cutting and how severe her [suicidal ideation] is because she doesn't want to be placed in a suicide smock

---

[10] Caitlin Patler, Altaf Saadi, Paola Langer, *The health-related experiences of detained immigrants with and without mental illness*, Journal of Migration and Health, Volume 11, 2025, 100302, ISSN 2666-6235 https://www.sciencedirect.com/science/article/pii/S2666623525000017.

DECLARATION OF ALTAF SAADI, M.D.
Case No. 5:26-cv-00322-SSS-RAO

and made to sit alone in a cell." Another detained individual at Adelanto stated, "I cannot ask for help because they will put me on suicide watch by myself and I get more depressed. It does not help. I don't trust them. So I suffer in silence." (2019 DRC Report at 13, 22-25.)

115. As part of my earlier evaluations, I have worked with individuals with mental illness who have experienced interruptions in their psychiatric medications, including being taken off some of their psychiatric medications entirely for a period of time, and subsequently placed into solitary confinement or segregation. Segregation and solitary confinement-like conditions is a known risk factor for both causing new mental illness as well as worsening pre-existing mental health conditions. I have evaluated multiple individuals, including those formerly held in Adelanto, whose mental state decompensated after being placed in solitary confinement-like conditions, including developing delusions, hallucinations, suicidality, and requiring offsite inpatient hospitalization. Notably, United Nations experts consider being held in solitary confinement placement 15 days or longer as torture.[11] Based on the significant scientific evidence of mental and physical effects of segregation, subjecting individuals with severe mental health conditions to segregation should be prohibited. If patients are so unstable as to not be safe in the general population, there should be consideration of transition to a higher intensity of psychiatric care at a specialized psychiatric facility, consistent with recommendations made by other experts. Dr. Weber Expert Affidavit, CRCL Complaint Appendix E

---

[11] Press Release, Off. of the U.N. High Comm'r for Hum. Rts., United States: Prolonged Solitary Confinement Amounts to Psychological Torture, Says UN Expert (Feb. 28, 2020), https://www.ohchr.org/en/press-releases/2020/02/united-states-prolonged-solitary-confinement-amounts-psychological-torture.

DECLARATION OF ALTAF SAADI, M.D.
Case No. 5:26-cv-00322-SSS-RAO

¶8.[12] This is confirmed by the work of Physicians for Human Rights.[13]

116. **Summary of Opinion:** Use of segregation worsens detained individuals' mental and physical health.  Its overuse at Adelanto negatively impacts detained individuals and worsens their conditions.

G.    **The Poor Conditions at Adelanto Cause and/or Exacerbate Physical and Mental Health Issues.**

117. Detained individuals are exposed to unhealthy hygienic and sleeping conditions, and do not receive sufficient clean water, nor adequate nutritious food. These conditions have detrimental effects on detained individuals' physical and mental health.

1.    **Poor Hygiene Can Contribute to or Cause Physical and Mental Health Issues**

118. The PBNDS task the facility administrator designee for environmental health as being responsible for developing and implementing policies, procedures and guidelines for the environmental health program that are intended to identify and eliminate or control as necessary, sources of injuries and modes of transmission of agents or vectors of communicable diseases. *See* PBNDS § 1.2(V)(A)(1) at p. 20. The PBNDS specifically require that "[e]nvironmental health conditions shall be maintained at a level that meets recognized standards of hygiene, including those from the: a. American Correctional Association; b. Occupational Safety and Health Administration; c. Environmental Protection Agency; d. Food and Drug Administration" and others. PBNDS 1.2 (V)(A)(1) at p. 20. They also require that

---

[12] *See also* Harvard Immigr. & Refugee Clinical Program, Peeler Immigr. Lab & Physicians for Hum. Rts., *Cruelty Campaign: Solitary Confinement in U.S. Immigration Detention* (Sept. 2025), https://phr.org/our-work/resources/cruelty-campaign-solitary-confinement-in-u-s-immigration-detention/.

[13] Christy Carnegie Fujio, JD, MA and Mike Corradini, JD, *Buried Alive: Solitary Confinement in the US Detention System,* Physicians for Hum. Rts.(Apr. 1, 2013), https://phr.org/our-work/resources/buried-alive-solitary-confinement-in-the-us-detention-system/.

DECLARATION OF ALTAF SAADI, M.D.
Case No. 5:26-cv-00322-SSS-RAO

"The facility administrator shall ensure that staff and detainees maintain a high standard of facility sanitation and general cleanliness" and specifically that:

    a. All horizontal surfaces shall be damp dusted daily with an approved germicidal solution used according to the manufacturer's directions.

    b. Windows, window frames and windowsills shall be cleaned on a weekly schedule.

    c. Furniture and fixtures shall be cleaned daily.

    d. Floors shall be mopped daily and when soiled, using the double-bucket mopping technique and with a hospital disinfectant-detergent solution mixed according to the manufacturer's directions.

    e. A clean mop head shall be used each time the floors are mopped.

    f. Waste containers must be lined with plastic bags and the liner shall be changed daily.

*See* PBNDS 1.2 (V)(A)(3) at p. 21; PBNDS 1.2 (V)(A)(7)(b) at p. 22.

119. Furthermore, the NDH actually requires that "[detainees] must be able to bathe regularly and keep [their] hair clean." NDH at 22. "ACA Expected Practice 4-ALDF-4B-09 requires a minimum ratio of one shower for every 12 detainees." PBNDS 4.5 (V)(E)(3) at p. 329.

120. It appears these requirements are not being followed. As discussed above, there was an outbreak of a type of staph infection called MRSA (Methicillin-resistant Staphylococcus aureus). At least 16 detained individuals contracted MRSA, and about 14 were hospitalized. Salazar Garza Decl. ¶13, EM Decl. at ¶18. At least one person died due to the outbreak. Ruiz-Escobar Decl. ¶19.

121. MRSA is known to cause outbreaks of skin and soft tissue infections in carceral settings, and it can be associated with morbidity and mortality especially in people who are immunocompromised, diabetic, older, or physically disabled. MRSA colonization (i.e., detection of MRSA on a nasal or rectal swab, which is asymptomatic and distinct from infection) does not require isolation or separation of

DECLARATION OF ALTAF SAADI, M.D.
Case No. 5:26-cv-00322-SSS-RAO

an incarcerated individual or special precautions. On the other hand, if MRSA infection is identified, the person should be isolated if they have purulent or open drainage. Failure to isolate infected individuals may have contributed to the outbreak at Adelanto.

122. The CDC provides guidance on the response to a MRSA outbreak in carceral settings, which would include isolation and prompt treatment of infection, consultation with specialty physicians, improved hygiene resources for those incarcerated, and special disinfectant and cleaning procedures.[14]  These procedures did not take place in Adelanto. Detained individuals report that even during the MRSA outbreak, Adelanto did a poor job of sanitizing the facility.  Ruiz-Escobar Decl.  ¶21. The poor hygiene at Adelanto very likely contributed to the outbreak.

123.  Numerous detained individuals have discussed persistent hygiene issues, several of which impact health. These include:

    a. **Showers and Personal Hygiene:**  Multiple detained individuals report that the showers themselves are very dirty and/or moldy Mesrobian Decl. ¶¶41, 51; Ruiz-Escobar Decl. ¶27; Flores Decl. ¶21; Fredrick Decl. ¶33; Ding Decl. ¶37; Arnold Decl.  ¶30-31. They report that the shower water itself is dirty, Mesrobian Decl. ¶42; Arnold Decl. ¶30, and that there aren't enough showers for the number of people and/or the showers don't work. Salazar Garza Decl.  ¶33; L.T. Decl. ¶¶12, 27; Fredrick Decl.  ¶32; Ding Decl. ¶37; Arnold Decl. ¶21. Once, some detained individuals went a week without hand soap, and another time, they went two days without paper towels, toilet paper, or sanitary pads. A.A.A.A. Decl. ¶44.

---

[14] *Management of Persons in Correctional Settings with Targeted MDROs, Ctrs. for Disease Control & Prevention*, Public Health https://www.cdc.gov/healthcare-associated-infections/php/preventing-mdros/correctional-facilities.html (last updated Sept. 16, 2025).

DECLARATION OF ALTAF SAADI, M.D.
Case No. 5:26-cv-00322-SSS-RAO

1    Lack of access to showers and hygiene products like soap can
2    contribute to the spread of disease.

3    b.  **Laundry:**  Detained individuals report that their laundry comes back
4        wet. L.T. Decl. ¶28; Mesrobian Decl. ¶66; Fredrick Decl. ¶30;
5        Arnold Decl. ¶33; Ruiz-Escobar Decl. ¶24; Winfield Decl. ¶31. They
6        also report that sometimes it comes back still dirty. L.T. Decl. ¶28;
7        Fredrick Decl. ¶30; Arnold Decl. ¶33; Ruiz-Escobar Decl. ¶24;
8        Winfield Decl. ¶31. The health complications of wet laundry can
9        include mold exposure and skin irritation or rashes.

10   c.  **Garbage removal:** Detained individuals report that the trash is
11       consistently overflowing or on the ground. Mesrobian Decl. ¶51;
12       Fredrick Decl.  ¶34; Karamychev Decl.  ¶35.

13   d.  **General sanitization of the facility:** After an unconscious woman
14       urinated on the floor, no separate mop was used to clean the urine,
15       and no additional cleaning products were used to clean the area.
16       A.A.A.A. Decl. ¶34. Detained individuals also report that there is
17       mold throughout the facility and common areas are not consistently
18       cleaned. Mesrobian Decl. ¶51; L.T. Decl. ¶23; J.M. Decl. ¶¶28, 34;
19       Salazar Garza Decl. ¶28; Flores Decl. ¶21; Fredrick Decl. ¶¶33-34,
20       50; A.A. Decl. ¶28; Arnold Decl. ¶¶ 13, 29; Karamychev Decl. ¶28;
21       Rodriguez-Arzola Decl. ¶28. Residual uncleaned human byproducts
22       like urine can contribute to the growth of bacteria. The presence of
23       mold is also especially concerning from a medical perspective
24       because it can cause respiratory issues.

25       124.  Multiple detained individuals report that the staff have not sufficiently
26   addressed the mold. L.T. Decl. ¶¶23-24; Smith Decl. ¶27; Rodriguez-Arzola Decl.
27   ¶28; A.A.A.A. Decl. ¶46; Salazar Garza Decl. ¶28.

28       125.  In addition to the MRSA outbreak, there was also an outbreak of

- 42 -

chickenpox in January 2026 in a particular unit. During the time that unit was suffering from the chickenpox outbreak, the Adelanto staff did not take additional measures to prevent further spread and address the outbreak. Fredrick Decl. ¶14.

126. Chickenpox is an infection caused by the varicella zoster virus. Varicella outbreaks can be extremely serious, particularly in settings with immigrant populations as most non-U.S.-born people do not get vaccinated against varicella and many do not get exposed to varicella. Adult exposure to primary varicella can result in severe disease. The CDC provides some information about response to varicella outbreaks and recommends consultation with public health authorities given the potential severity of infection.[15] There is no strict standard, but at a minimum, people with varicella lesions should have prompt testing to confirm that is the cause. When varicella is confirmed in a carceral setting, active case finding should occur, meaning that staff should screen people for early signs or symptoms of infection. People who have no history of primary varicella infection and unknown or no vaccination status should have serologic testing to evaluate for prior immunity and be offered vaccination. It is not clear whether these actions were taken at Adelanto.

127. My opinion is further supported by the Cal DOJ and DRC reports discussed above. Many people complained to the DRC about the lack of access to clean clothes. One individual wearing visibly soiled clothing told DRC that Adelanto had not provided him with clean clothes for 20 days. He reported that after showering, he puts on the same soiled clothing out of necessity. DRC, "They Treat Us Like Dogs in Cages" (2025) at p. 13. This can increase the risk of skin infections and skin issues.

128. This also conforms with research I've done previously for the CRCL Complaint.  I found that physical conditions in detention centers are harsh and inhumane. Facilities have extreme overcrowding, unsanitary conditions, inadequate

---

[15] *Varicella Outbreak Identification, Investigation, & Control*, Ctrs. for Disease Control & Prevention, https://www.cdc.gov/chickenpox/php/outbreak-control/index.html (last updated Apr. 24, 2024).

DECLARATION OF ALTAF SAADI, M.D.
Case No. 5:26-cv-00322-SSS-RAO

ventilation. These poor physical conditions result in health problems and further compound difficulties with physical and mental health. Drs. Saadi & Recht Expert Affidavit, CRCL Complaint Appendix D ¶10. These issues persist at Adelanto.

129. **Summary of Opinion:** Individuals detained at Adelanto are subjected to poor hygienic conditions that contribute to their physical and mental health issues and risks, such as potential spread of infectious diseases, exacerbation of pre-existing issues, and development of new illnesses.

## 2. Lack of Sufficient Clean Water and/or Nutritious Food Can Contribute to or Cause Physical and Mental Health Issues

130. The lack of clean water and nutritious food exacerbates detained individuals' physical and mental health issues.

131. The NDH and GRD NDH require detainees to be served three meals per day. *See* NDH at p. 18; GRS NDH at p. 16.

132. The NDH purports that "[t]he meals are nutritionally balanced, approved by a dietitian, served in a clean, safe place, and served with napkins and utensils." NDH at p. 18; *see also* GRS NDH at p. 16. The NDH also tells detainees that their "body needs lots of water to stay healthy. In hot weather, [they] sweat and lose water from your body. . . . Drink plenty of water during the day." NDH at pp. 27-28. GEO's Revised Supplement to NDH purports that all meals are served "in a clean and sanitary manner." GRS NDH at p. 16.

133. The PBNDS also specifically require that ***clean***, potable drinking water must be available ***throughout the facility***. PBNDS 1.2 (II)(13) at p. 19 (emphasis added).

134. Nearly all of the declarants say that the water is dirty, discolored, and/or smells. Mesrobian Decl. ¶¶40-42, 47-48, Salazar Garza Decl. ¶¶24; EM Decl. ¶¶26-28; Flores Decl. ¶18; Fredrick Decl. ¶¶39, 41; Ding Decl. ¶41; Gilbert Arnold Decl. ¶24; Karamychev Decl. ¶26; Samaan Decl. ¶18. In addition to the water itself being dirty, many declarants also have inconsistent, or insufficient access to the "drinking"

- 44 -

water. Mesrobian Decl. ¶¶47-49, 74-75; J.M. ¶¶26-27; Garza Decl. ¶24; Ruiz-Escobar Decl. ¶¶25-26; Flores Decl. ¶¶18-19; Fredrick Decl. ¶¶22, 39-42, 48, 51; Ding Decl. ¶41; E.M. Decl. ¶16; Rodriguez-Arzola Decl. ¶¶29.

135. A lack of clean drinking water can result in health problems, such as gastrointestinal issues, with medical complications varying according to the specific pathogens or chemicals in the unsafe water.

136. A number of declarants also report that they are underfed or do not receive enough food. Fredrick Decl. ¶¶48-52; Ding Decl. ¶39; Smith Decl. ¶¶22-23; J.M. Decl. ¶28; E.M. Decl. ¶14; Samaan Decl. ¶19. They also report that the food is often rotten or spoiled, and not nutritious. Fredrick Decl. ¶¶48-52; A.A Decl. ¶¶26; Ding Decl. ¶39; Smith Decl. ¶¶22-23; J.M. Decl. ¶28; E.M. Decl. ¶¶14-15; Winfield Decl. ¶25. As a result of this and the other conditions discussed above, many of the declarants are losing a substantial amount of weight. J.M. Decl. ¶28; Winfield Decl. ¶25; A.A. Decl. ¶27; Smith Decl. ¶23.

137. Inadequate nutrition can contribute to increased risk of developing chronic diseases and exacerbate existing chronic diseases like diabetes or high blood pressure. It can also impair the immune system, increasing the risk of contracting new infections and hindering the body's ability to combat existing infections.

138. Multiple detained individuals also report that the kitchen and/or eating areas are dirty. Mesrobian Decl. ¶56; Flores Decl. ¶ 20; Winfield Decl. 26.

139. My opinion is further supported by the Cal DOJ and DRC reports discussed above. Limited access to food was a recurring issue throughout DRC's monitoring tour. People consistently reported extreme delays in meal distribution. Most people interviewed between 1 p.m. and 4 p.m. reported that they had not received food since around 5 a.m. to 8 a.m. Many said that they feared they would not eat again until potentially 10 p.m. DRC, "They Treat Us Like Dogs in Cages" (2025) at p. 12. One individual reported experiencing significant weight loss in the 20 days since their arrival at Adelanto. For people with chronic medical conditions,

DECLARATION OF ALTAF SAADI, M.D.
Case No. 5:26-cv-00322-SSS-RAO

the harmful impact of inconsistent meals may be even more serious. DRC, "They Treat Us Like Dogs in Cages" (2025) at p. 12. One individual reported that he had diabetes and was unable to properly manage his blood sugar because he did not know when to expect meals. DRC met multiple people with diabetes facing similar challenges. DRC, "They Treat Us Like Dogs in Cages" (2025) at pp. 12-13. Many individuals shared that they are experiencing gastric issues due to poor food quality, including severe stomach cramping and pain. DRC, "They Treat Us Like Dogs in Cages" (2025) at p. 13.

140. DRC also received reports of limited access to water. Adelanto brings large water coolers into the housing units, but the individuals DRC spoke to expressed concern that there is not enough water for everyone and people are dehydrated. They also raised safety concerns about the water from sinks and drinking fountains, which they said appears cloudy and has an unusual taste. DRC, "They Treat Us Like Dogs in Cages" (2025) at p. 13.

141. This also conforms with research I've done previously for the CRCL Complaint. I found facilities lack access to clean drinking water, and nutritionally adequate food and that poor physical conditions result in health problems and further compound difficulties with mental health. Drs. Saadi & Recht Expert Affidavit, CRCL Complaint Appendix D ¶10.

142. **Summary of Opinion:** Individuals detained at Adelanto lack clean water and nutritious food, which places their health at risk and exacerbates existing physical and mental health issues.

### 3.  Poor Sleeping Conditions Can Contribute to or Cause Physical and Mental Health Issues

143. Sleep is very important for physical and mental health. Detained individuals' inability to get sufficient sleep can worsen their physical and mental health.

144. The NDH acknowledges that health guidance recommends trying to sleep

DECLARATION OF ALTAF SAADI, M.D.
Case No. 5:26-cv-00322-SSS-RAO

at least 8 to 10 hours a night. NDH at 27. To help facilitate detained individuals' need for sleep, the PBNDS require that "[a]dditional clothing shall be issued as necessary for changing weather conditions or as seasonally appropriate." PBNDS 4.5 (V)(B) at p. 328. Similarly "[s]taff shall ensure that sanitation, temperatures and humidity in hold rooms are maintained at acceptable and comfortable levels." PBNDS 2.6 (V)(D)(4) at p. 102.

145.  Multiple detained individuals report that they are cold at night and/or not given enough blankets/clothing to sleep comfortably at night. J.M. Decl ¶32; Rodriguez-Arzola Decl.  ¶32.

146.  Multiple detained individuals also report that the lights are on late at night, making it difficult to sleep. J.M. Decl. ¶33; Smith Decl. ¶28; Winfield Decl. ¶37. Detained individuals further report the mattresses are so thin that they cause back problems and hinder their ability to sleep.  A.A.A.A. Decl. ¶15; Rodriguez-Arzola Decl. ¶28; Winfield Decl. ¶36.  Collectively, these conditions contribute to difficulty falling and staying asleep, resulting in poor sleep quality and in some cases, sleep deprivation.

147.  This also conforms with research I've done previously as well as has been published in peer-reviewed literature. Poor sleep conditions can predispose to psychiatric illness such as depression and anxiety and exacerbate existing mental health issues.[16]  Sleep deprivation also contributes to cognitive dysfunction, thereby potentially reducing individuals' ability to participate in their legal cases and defend themselves. Drs. Saadi & Recht Expert Affidavit, CRCL Complaint Appendix D ¶11. These impediments to mental health are exacerbated for individuals in solitary confinement or segregation where lights can be left on 24 hours a day or individuals are frequently woken up throughout the night. In a peer-reviewed study I conducted

---

[16] Eliza L. Sutton,  *Psychiatric disorders and sleep issues,* Med Clin North Am. 2014 Sep;98(5):1123-43. doi: 10.1016/j.mcna.2014.06.009. Epub 2014 Jul 22. PMID: 25134876.

DECLARATION OF ALTAF SAADI, M.D.
Case No. 5:26-cv-00322-SSS-RAO

with my colleagues, sleep deprivation in immigration detention was significantly associated with a nearly three-fold greater odds of poorer overall health, a 2.5-fold greater odds of worse health in immigration detention, and nearly two-fold greater odds of higher stress when compared to those without sleep deprivation.[17]

148. **Summary of Opinion:** The poor sleeping conditions detained individuals are subject to, such as cold, light, and thin mattresses, serve only to further harm their physical and mental health.

V.    **CONCLUSION**

149. For these reasons, I conclude that the health care delivery system at Adelanto is not adequate to care for the individuals detained there. Many of them have experienced and/or continue to experience legitimate medical and mental health issues that are going untreated or undertreated. Adelanto has a non-functional sick call system, lacks adequate emergency medical service capabilities, and fails to provide sufficient chronic health services. Adelanto has a pattern of dismissing and mismanaging medical concerns voiced by detained people, resulting in a health care delivery system that operates outside accepted standards of care. As a result, detained individuals are subjected to substandard, negligent, and inadequate medical care, if medical care is provided at all. As a result of substandard, negligent, and inadequate medical care, detained people are exposed to pain (that could be managed), progression of chronic conditions (that could be prevented), unnecessary exposure to illness/infections posing risk of serious complications, and increased risk of morbidity and mortality.

_____

[17] *Id.*

DECLARATION OF ALTAF SAADI, M.D.
Case No. 5:26-cv-00322-SSS-RAO

1      I declare under penalty of perjury that the foregoing is true and correct.

2  Executed on March 6, 2026 in New York, New York.

Altaf Saadi, M.D.

DECLARATION OF ALTAF SAADI, M.D.
Case No. 5:26-cv-00322-SSS-RAO

# CURRICULUM VITAE

# ALTAF SAADI, MD MSc

**Education:**

| | | | |
|---|---|---|---|
| 08/2004-05/2008 | B.A. | Psychology, International Studies | Yale University |
| 08/2009-05/2013 | M.D. *cum laude* | Medicine | Harvard Medical School |
| 07/2017-09/2018 | M.Sc. | Health Policy and Management | University of California, Los Angeles |

**Postdoctoral Training:**

| | | | |
|---|---|---|---|
| 06/2013-06/2014 | Intern | Medicine | Massachusetts General Hospital |
| 06/2014-06/2017 | Resident | Neurology | Harvard Mass General Brigham Neurology Residency Program |
| 07/2017-07/2019 | Postdoctoral Fellow | Health Services Research | University of California, Los Angeles National Clinician Scholars Program |

**Faculty Academic Appointments:**

| | | | |
|---|---|---|---|
| 07/2018-08/2019 | Instructor | Medicine | University of California, Los Angeles |
| 09/2019-01/2022 | Instructor | Neurology | Harvard Medical School |
| 02/2022-02/2025 | Assistant Professor | Neurology | Harvard Medical School |
| 03/2025- | Associate Professor | Neurology | Harvard Medical School |

**Appointments at Hospitals/Affiliated Institutions:**

| | | | |
|---|---|---|---|
| 10/2017-06/2018 | Staff Neurologist | Neurology | Olive View-University of California Los Angeles Medical Center |
| 01/2019-04/2019 | Volunteer Neurologist | Neurology | Rancho Los Amigos National Rehabilitation Center |
| 09/2019- | Assistant in Neurology | Neurology | Massachusetts General Hospital |
| 12/2019- | Telemedicine Consultant | Medicine/Neurology | North Shore Medical Center |
| 9/2020- | | Medicine | Cooley Dickinson Hospital |
| 10/2023- | Telehealth Affiliate | Primary Care | Martha's Vineyard Hospital |
| 10/2023- | Telehealth Affiliate | Medicine | Nantucket Cottage Hospital |

**Other Professional Positions:**

| | | | |
|---|---|---|---|
| 07/2017- | Medical Expert | | Physicians for Human Rights Asylum Network |

**Major Administrative Leadership Positions:**

**Local**

| | | |
|---|---|---|
| 02/2020- | Associate Director, MGH Asylum Clinic | Massachusetts General Hospital |
| 10/2024- | Lecturer and Faculty Facilitator, Health Equity Data & Delivery Science Certificate Program | MGH Mongan Institute & MGH Institute of Health Professions |

| 1/2025- | Certificate Leader, Global and Community Neurology | MGB Neurology Residency Program |
| 1/2026- | Faculty Director of Office of Scholarly Engagement | Harvard Medical School |

**Committee Service:**
**Local**

| 09/2009-05/2013 | Financial Aid Committee | Harvard Medical School |
| 09/2010-03/2011 | Admissions Committee | Harvard Medical School, Subcommittee I |
| 01/2016-06/2017 | Residency Education Curriculum Committee | MGB Neurology Residency Program |
| 05/2016-06/2015 | Outpatient Medical Director Search Committee | MGH Department of Neurology |

**National**

| 01/2019-04/2020 | Beyond Flexner Alliance | Member, Research Committee |

**International**

| 11/2017-2021 | The Lancet | Member, Commission on Public Policies and Health |
| 05/2024- | The Lancet-Center for Humanitarian Health | Next Gen Scholar/Member, Commission on Health, Conflict and Displacement |

**Professional Societies:**

| 2014- | American Academy of Neurology | |
| | 2016-2017 | Member, Global Health Section Newsletter Editorial Board |
| | 2020- | Abstract Reviewer for annual meting |
| | 2021- | Diversity, Equity and Inclusion Subcommittee |
| | 2023- | Elected as Fellow of AAN |
| 2014- | American Neurological Association | |
| | 2018-2019 | Member, Junior Task Force Committee |
| | 2019, 2020 | Abstract Reviewer for annual meetings |
| | 2020-2022 | Member, Global Engagement Committee |
| 2018-2023 | American Public Health Association | |
| | 2020 | Moderator, Medical Care Committee Oral Session |
| | 2019-2023 | Abstract Reviewer for annual meeting |
| 2024- | Society of Refugee Health Providers | Research Evaluation and Ethics Committee |
| | | Abstract Reviewer for annual meeting |

**Grant Review Activities:**

| 2024 | Health Research Council of New Zealand | Ad Hoc Member |
| 2024 | Mass-ENVISION Alzheimer's Resource Center for Minority Aging Research (RCMAR) | Permanent Member |
| 2024 | International Neuropalliative Care Society Neuropalliative Care Research Summit | Ad Hoc Member |
| 2024 | Harvard University William F. Milton Fund | Ad Hoc Member |
| 2024 | Harvard Catalyst Pilots Program | Ad Hoc Member |
| 2024 | Social Psychology, Personality and Interpersonal Processes Study Section | NIH Ad Hoc Member |

| | | |
|---|---|---|
| 2024, 2025 | American Academy of Neurology Research Awards | Ad Hoc Member |

**Editorial Activities:**
- **Ad hoc Reviewer**

Academic Emergency Medicine
Academic Pediatrics
American Journal of Public Health
Annals of Neurology
Brain Injury
British Medical Journal (BMJ) Humanities
British Medical Journal (BMJ) Open
Health and Place
Health Equity
Health Services Research
Injury Epidemiology
JAMA Internal Medicine
JAMA Network Open
JAMA Neurology
Journal of Alzheimer's Disease
Journal of Evaluation in Clinical Practice
Journal of General Internal Medicine
Journal of Healthcare for the Poor and Underserved
Journal of Immigrant and Minority Health
Journal of Head Trauma Rehabilitation
Journal of Primary Care and Community Health
Journal of Neurotrauma
Journal of the National Medical Association
Journal of the Neurological Sciences
Medical Care
Medical Humanities
Nature Reviews Neurology
Neurohospitalist
Neurological Clinical Practice
New England Journal of Medicine
PLOS One
Progressive in Community Health Partnerships: Research, Education and Action
Psychological Trauma: Theory, Research, Practice and Policy
Social Science Medicine- Mental Health
The Lancet
The Lancet Neurology
The Lancet Regional Health Americas
Violence Against Women

**Honors and Prizes:**

| | | | |
|---|---|---|---|
| 2005 | J. Edward Meeker Prize | Yale University, English Department | Writing (Fiction) |
| 2005 -2009 | Rising Star Award Community Leadership Award Elders Prize Senior Leadership Award | Yale University, Asian American Cultural Center | Leadership |
| 2008 | Nakanishi Prize | Yale University | Leadership in enhancing race relations |

| 2008 | David Everett Chantler Award | Yale University | High moral character and purpose |
| 2008- 2009 | Woodridge Fellowship | Yale University | Leadership |
| 2012 | Dean's Community Service Award | Harvard Medical School | Community Service |
| 2012 | Ethics Fellow | Fellowship at Auschwitz for the Study of Medical Ethics | Ethics |
| 2016 | Palatucci Advocacy Leadership Forum | American Academy of Neurology | Leadership |
| 2017 | Enhanced Resident Leadership Program | American Academy of Neurology | Leadership |
| 2021 | Research Career Institute in Mental Health of Aging | National Institute of Mental Health | Research |

## Report of Funded and Unfunded Projects
**Past**

| 2010 | Perspective on Preventing Health and Breast Cancer Screening among Iraqi Refugee Women<br>MGH Stoeckle Center for Primary Care Innovation Grant<br>PI: Saadi, Mentor: Sanja Percac-Lima |
| 2016 | Providing neurologic care and teaching at University Teaching Hospital in Lusaka, Zambia<br>MGH Global and Community Health, Travel Grant<br>PI: Saadi, Mentor: Omar Siddiqi |
| 2017 | The role of social networks and depression on stroke outcomes in Dar es Salaam, Tanzania<br>Massachusetts Medical Society and Alliance Charitable Foundation Health Studies Travel Award<br>PI: Saadi, Mentor: Farrah Mateen |
| 2017-2019 | Gun Violence Prevention Pilot Grant<br>University of California, Los Angeles Fielding School of Public Health<br>Co-Investigator (PI: Kristen Choi) |
| 2018-2019 | Protecting and Welcoming Immigrants in the Healthcare Context<br>California Initiative for Health Equity & Action, Evidence to Action<br>PI |
| 2019-2020 | Clinicians' perspectives on the impact of immigration policies and immigration enforcement following the 2016 elections on immigrant patients<br>PI, in partnership with Physicians for Human Rights |
| 2020-2022 | Understanding (Mis)Trust, Health-Seeking and Help-Seeking among Immigrants<br>This study sought understand factors involved in perceptions of trust of healthcare institutions among immigrant populations of varying immigration status, and how these perceptions of trust evolved in the context of the COVID-19 pandemic.<br>PI, in partnership with Physicians for Human Rights |
| 2020-2021 | Rappaport Foundation MGH Research Scholar<br>PI |
| 2021-2022 | Community Context, Cognitive Impairment, and Differences across Racial/Ethnic Minorities and Immigrant Groups<br>MGH Center for Aging and Serious Illness Ki Sub Joung Pilot Award- PI |

| | | |
|---|---|---|
| 2021-2022 | Improving Communication Barriers among Patients with Limited English Proficiency and Neurological Illness (PI) MGH Equity Innovation Grant Program- PI | |
| 2021-2023 | Understanding Disparities among Patients with Limited English Proficiency and Neurologic Disease American Academy of Neurology Practice Research Scholarship- PI | |
| 2021-2023 | Reuniting Families: Can immigration prison decarceration due to the COVID-19 pandemic impact institutional trust and engagement among immigrant families? Russel Sage Foundation Co-PI (Other PI: C. Patler)– Direct Costs Requested | |
| 2022-2025 | Beyond Household Adverse Childhood Experiences: Applying Mixture Modeling to Investigate the Role of Community Adversity and Discrimination in Youth Neuropsychiatric Development National Institute of Minority Health and Health Disparities R21 Award (R21MD017499) Multi-PI (Other PI: Kristen Choi) | |
| 2022-2025 | Applied Learning Advanced Asylum Medicine Course Co-PI (Other PI: Matthew Gartland) Grodman Family Foundation | |
| 2021-2025 | Reuniting Families: Can immigration prison decarceration due to the COVID-19 pandemic improve household wellbeing? National Science Foundation Co-PI (Other PI: C. Patler) | |
| 2022-2025 | Understanding Trajectories of Cognitive, Affective, and Quality of Life Outcomes among Asylum-Seekers MGH Claflin Distinguished Scholars Award- PI | |
| 2023-2025 | A Trauma-Informed Cognitive Rehabilitation Intervention for Survivors of Intimate Partner Violence (IPV) Harvard Milton Award- PI | |
| 2024-2026 | Strengthening Community Engagement with Asylum Seekers in Boston SIREN Grant – Co-PI | |

**Current**

| | | |
|---|---|---|
| 2025-2028 | Beyond Barriers: Leveraging Community Expertise for Improved Neurological Health among U.S. Resettled Refugees National Institute of Neurological Disorders and Stroke R34 Award (R34NS139993)- PI | |
| 2022-2027 | A Culturally Adapted, Trauma-Informed Cognitive Rehabilitation Intervention for Asylum-Seekers and Refugees with Traumatic Brain Injury National Institute of Neurological Disorders and Stroke K23 Award (K23NS128164)- PI | |
| 2025-2026 | American Academy of Neurology Encoding Equity Grant- PI/Consultant 2025 Encoding Equity Alliance Specialty Society Grant Program | |
| 2026-2028 | INSPIRE- Integrating NeuroScience and Partnerships for Inclusive Research Engagement Dana Foundation- PI | |

## Report of Local Teaching and Training
**Teaching of Students in Courses:**

| | | |
|---|---|---|
| 06/2014 | Patient-Doctor II 2nd year medical students | HMS 3-hr session for neurology examination teaching |

5

| | | |
|---|---|---|
| 09/2015-10/2015 | Human Systems: Nervous System and Behavior<br>2nd year medical students | HMS<br>1.5-hr sessions per wk for 6 weeks |
| 08/2015 | Practice Mini-Clinical Evaluation Exercise (CEX)<br>3rd year medical students | HMS<br>3-hr session |
| 06/2016 | Mind, Brain, Behavior and Development<br>2nd year medical students | HMS<br>1-hr session for 2 weeks |
| 03/2018-05/2018 | Doctoring I (Substitute Instructor)<br>1st year medical students | David Geffen School of Medicine at UCLA<br>3-hr session for 3 weeks |
| 12/2019 | Health Advocacy II<br>2nd year medical students | HMS, Cambridge Integrated Clerkship<br>3-hr session |
| 07/2020-present | Mind Brain Behavior Course<br>1st year medical students | HMS<br>Yearly 1-hr lecture |
| 11/2022-present | Topics in Health and Human Rights<br>Master's in Bioethics students | HMS<br>Year 3-hour lecture |
| 10/2023<br>10/2024<br>10/2025 | Immigration as a Social Determinant of Health<br>4th year medical students | HMS<br>1-hour lecture |

**Formal Teaching of Residents, Clinical Fellows and Research Fellows (post-docs):**

| | | |
|---|---|---|
| 08/2015 | Neurology examination teaching<br>PGY Internal Medicine Residents | BWH<br>1-hour session for two sessions |
| 06/2016 | Arterial lines and lumbar puncture skills workshop<br>PGY2 Neurology Residents | BWH<br>40-minute session for five sessions |
| 11/2019 | Neurocysticercosis: A neglected "Great Imitator" | Harvard MGH-BWH Neurology Residency noon didactic<br>1-hour session |
| 12/2019 | Unconscious Bias in Medicine | Harvard MGH-BWH Neurology Residency discussion<br>1-hour session |
| 08/2020 | Health Equity and the Boston Context | Harvard MGH-BWH Neurology Residency noon didactic<br>1-hour session |
| 09/2020 | Immigration and Mental Health | MGH Psychiatry Residency Psychosomatics Lecture<br>1-hour session |
| 11/2020 | Immigration, Healthcare, and Health: In Boston and Beyond | Harvard MGH-BWH Neurology Residency noon didactic<br>1-hour session |
| 09/2021 | Morbidity and Mortality Conference | Harvard MGH-BWH Neurology Residency, fellows and faculty<br>1-hour case review and literature update |

6

| 02/2023 11/2023 | Health Equity and Disparities | Harvard MGB Neurology Residency noon didactic 1-hour session |
| 05/2025 | Neurological Care of Refugees and Other Forcibly Displaced Persons | Harvard MGB Neurology Residency noon didactic 1-hour session |

**Clinical Supervisory and Training Responsibilities:**

| 10/2018- 07/2019 | Ambulatory General Neurology Clinic Preceptor/ Olive View-UCLA Medical Center | Four hours per week, every other week |
| 10/2019- 09/2020 | Ambulatory Neurology Resident Clinic Preceptor/ Massachusetts General Hospital | Four hours per week, every other week |
| 10/2019- | Ambulatory Asylum Clinic Preceptor/ Massachusetts General Hospital | Six hours per week, every other week |
| 07/2021- | Ambulatory Comprehensive Neurology Clinic Preceptor/ Massachusetts General Hospital | Four hours per week, for five resident continuity clinics per year |

**Formal Teaching of Peers (e.g., CME and other continuing education courses):**
*No presentations below were sponsored by 3rd parties/outside entities*

| 2021 | Engaging Multifaceted Patients MGB Health Equity, Quality & Patient Experience (QPE), Education & Training |
| 2021 | Patient Experience Forum: Immigrant Health 101: Meeting the Needs of Immigrant Patients MGH/ MGPO Office of Patient Experience |
| 2023 | Emerging Topics: Immigrant Health in Reducing Racial Disparities in Health Care Harvard Online Certificate Course |

**Select Local Invited Presentations:**
*No presentations below were sponsored by 3rd parties/outside entities*

| 2017 | Racial Disparities in Access and Use of Neurologic Care/ Keeping Current Seminar Series Disparities Solution Center, MGH |
| 2019 | Protecting the rights of our immigrant patients Social Medicine Community Rounds, Cambridge Health Alliance |
| 2020 | Strategies for Ensuring Welcoming, Safe, and Equitable Health Care Environments for Immigrant Populations MGH Disparities Solution Center Leadership Institute Workshop |
| 2020 | Immigration Detention, Mass Hysterectomies, and Pattern of Medical Neglect/ invited panel presentation Harvard Law School Immigration Project |
| 2020 | Creating Immigrant Friendly Health Systems: A Review of Best and Local Practices/ Speaker MGH Center for Immigrant Health, Migration is Beautiful Campaign |
| 2021 | Latinx Immigrant Patient Experience / Panelist Latino Medical Student Association (LMSA), Harvard Medical School |
| 2021 | Strategies for Ensuring Welcoming, Safe, and Equitable Health Care Environments for Immigrant Populations MGH Disparities Solution Center Leadership Institute Workshop |

2021        Policing and the Brain: How Neuroscience Can Contribute to Police Reform/ invited panel presentation
            Harvard Law School Petrie-Flom Center, MGH Center for Law, Brain, and Behavior

2021        Meeting the neurological needs of refugees and asylum-seekers/ invited presentation
            MGH Department of Neurology, Stroke Research Meeting

2021        Trauma, Refugees, and Asylum Law / guest lecture
            Trauma, Refugees and Asylum Law Seminar, Harvard Law School

2021        Brain Injury in the Asylum Forensic Evaluation Context
            Harvard Student Human Rights Collaborative, Harvard Medical School

2022        Translating Health Disparities Research into Practice/Policy
            MGH Post-Baccalaureate Association Exploring Career Trajectories Speaker Series

2022        Providing Care to Immigrant Patients and Patients with Limited English Proficiency
            MGH Disparities Solution Center Leadership Institute Workshop

2022        Brain Injury, Competency, and the Asylum Process/ invited presentation
            Cambridge Health Alliance Global Health and Human Rights Seminar Series

2022        Forensic Medical Evaluations of Asylum-Seekers in a Time of Unprecedented Global Displacement and Migration/ Grand Rounds
            MGH Department of Social Services

2023        The Neuropsychiatric Health of Forcibly Displaced Populations: Naming Inequities and Moving to Action / Grand Rounds
            Department of Psychiatry, Beth Israel Deaconess Medical Center

2023        Neurology in Action: Caring for Forcibly Displaced Populations/ Grand Rounds
            Department of Neurology, Massachusetts General Hospital

2023        Strategies for Ensuring Welcoming, Safe, and Equitable Health Care Environments for Immigrant Populations
            MGH Disparities Solution Center Leadership Institute Workshop

2023        Migration and Cognition/ invited presentation for didactic lecture series
            Behavioral Neurology and Neuropsychiatry, Massachusetts General Hospital

2023        Immigrant Health/ invited panel presentation
            Equity and Social Justice Lecture Series, Harvard Medical School

2023        Neuropsychiatric Considerations Impacting Credibility Determination/ guest lecturer
            Facts and Lies Seminar, Harvard Law School

2024        Junior Faculty Career Development/ invited panel presentation
2025        Intern Retreat, Office of Graduate Medical Education, Massachusetts General Brigham

2024        Health in All Policies as a Health Equity Practice/ invited lecture
            Department of Neurology Center for Health Policy and Advocacy, Massachusetts General Hospital

2024        Applying Health Disparity Research to Medical Practice and Policy Creation
            MGH Post-Baccalaureate Association Exploring Career Trajectories Speaker Series

2024        Meds-Peds Case Files/ invited discussant
            Brigham and Women's Hospital/ Boston Children's Hospital/Boston Medical Center combined Med-Peds Program

2025        Neurocognitive Considerations when Assessing Credibility/ guest lecturer

| | |
|---|---|
| 2026 | Immigration and Refugee Advocacy: Seminar & Clinic, Harvard Law School |
| 2025 | Traumatic Brain/Head Injury among Refugees and Asylum Seekers/ invited speaker<br>Harvard Student Human Rights Collaborative, Harvard Medical School |
| 2025 | Immigrant Mental Health: The Quest for Safety, Belonging, and Opportunity/ invited panelist<br>13th Annual Public and Community Psychiatry Symposium at MGH |
| 2025 | Fulfilling Healthcare Institutional Responsibilities to Immigrant Patients / Grand Rounds<br>Boston Healthcare for the Homeless Program |
| 2025 | Immigrants, Refugees and Global Health/ invited speaker<br>Global Health Symposium, Massachusetts General Brigham Center of Excellence in Global and Community Health |
| 2025 | US Immigration Detention and Health Harms/ invited lecture<br>Global Health and Human Rights Seminar Series, Cambridge Health Alliance |
| 2025 | Immigrant Health, Public Policy, and Inequality in 2025: What Providers Need to Know/<br>Annual Haddad Health Policy, Law, and Ethics Medical Grand Rounds Lecture<br>Department of Medicine, Massachusetts General Hospital |

**Select Report of Regional, National and International Invited Teaching and Presentations**
*No presentations below were sponsored by 3rd parties/outside entities*

**Regional**

| | |
|---|---|
| 2011 | Perspectives on Preventive Health Care and Barriers to Breast Cancer Screening Among Iraqi Women Refugees (selected oral abstract)<br>Society of General Internal Medicine: New England Regional Convention |
| 2018 | Health Care Disparities in Neurology: Where We are & Where We Need to Go/ Grand Rounds<br>Department of Neurology, University of Iowa |
| 2018 | Social Determinants of Neurological Disease: The Path to Health Equity/ Grand Rounds<br>Department of Neurology, University of California Irvine |
| 2019 | Immigrant Access to Healthcare/ invited workshop presentation<br>Insure the Uninsured Project (ITUP) Annual Conference, Sacramento CA |
| 2019 | Powerful Women in Health/ Guest Lecture Panelist<br>Dean's Powerful Women Speaker Series, Mount Saint Mary's University |
| 2019 | Evidence Briefing: Policy & Practice Innovations to Protect & Improve Immigrant Health/ invited presentation<br>California Initiative for Health Equity and Action, California Latino Legislative Caucus, Sacramento CA |
| 2020 | Immigrant Health Inequities, COVID-19 & Opportunities for Action/ Guest Expert Lecture<br>City of Boston's COVID-19 Health Inequities Task Force |
| 2020 | Immigrant Health Inequities, COVID-19 and Opportunities for Action / invited presentation<br>Boston Mayor's Office for Immigrant Advancement, COVID-19 Health Inequities Task Force |
| 2020 | Building Toward Racial Justice and Equity in Health / invited panel presentation<br>Massachusetts Attorney General's Office |
| 2021 | Immigrant Friendly Health Systems: Advancing the Concept of "Immigration-Informed Care"/ Grand Rounds<br>Boston Health Care for the Homeless |

| 2022 | Neuropsychiatric Health of Refugees: Clinical and Policy Implications/ Ground Rounds Department of Psychiatry, Boston University Medical Center |
|---|---|
| 2023 | Brain Health and Mental Health/ Guest lecture in Health Equity and the Social Good course Rising Scholar Summer Program, Harvard College |
| 2023 | Everyone's Problem: Inequity in Diagnosis and Treatment/ invited lecture MGH Russel Museum |
| 2024 | Mental Health among Migrants/ invited panel presentation Immigrant Healthcare Symposium, Tufts University School of Medicine |
| 2024 | Brain Health Equity and the Influence of Social Determinants Across the Life Course/ Grand Rounds Department of Neurology, UMass Chan Medical School and UMass Memorial Medical Center |
| 2024 | Neurological Issues among Forcibly Displaced Persons/ Guest Lecture Learn Experience Advocate, Discover and Serve 2 (LEADS) Course, Boston University School of Medicine |

**National**

| 2017 | Neurologic care access and utilization patterns in the United States (selected oral abstract) Neuroepidemiology Platform Presentation, American Academy of Neurology Annual Meeting Boston, MA |
|---|---|
| 2017 | From Zambia to the Navajo Nation: Incorporating the "Local" in Global Neurology/ invited presentation American Neurological Association Annual Meeting San Diego, CA |
| 2018 | Current policies and the health of immigrants/ invited panel presentation Dean's Symposium on the Trump administration and the health of the public, Boston University School of Public Health Boston, MA |
| 2018 | Healthcare for Immigrants: Impact of Immigration Policy on Immigrant Health/ invited workshop presentation Physicians for a National Health Program Annual Meeting San Diego, CA |
| 2018 | How are Healthcare Facilities creating "sanctuary" "welcoming" "safe spaces" for Immigrant Patients? An exploratory, qualitative, multi-state study (selected oral abstract) National Clinician Scholars Program Annual Meeting Los Angeles, CA |
| 2018 | Health Equity Now for Immigrants, Migrants and Refugees (selected oral abstract) American Public Health Association Annual Meeting San Diego, CA |
| 2019 | Engaging Scientists in the Science and Religion Dialogue/ invited panel presentation American Association for the Advancement of Science (AAAS) Dialogue on Science, Ethics, and Religion (DoSER) program, University of Maryland-Baltimore Baltimore, MD |
| 2019 | Perceived barriers and facilities to implementing "Sanctuary" "Safe spaces" policies for Immigrants in the Healthcare Context: A qualitative, multi-state study (selected oral abstract) American Public Health Association Annual Meeting Philadelphia, PA |

2019     Increased acculturation enhances the negative impact of perceived discrimination on mental health (selected oral abstract)
American Public Health Association Annual Meeting
Philadelphia, PA

2020     Protecting Immigrants during the COVID-19 Pandemic/ invited panel presentation
Jewish Council for Public Affairs
New York, NY (Virtual)

2020     Symposium on Trauma-Informed Care for Immigrants/ invited presentation
University of California Davis Center for Reducing Health Disparities
Davis, CA (Virtual)

2020     Health Disparities and Parkinson's Disease: Understanding the Issue/ invited presentation
Davis Phinney Foundation for Parkinson's, Health Disparities Webinar Series
Louisville, CO (Virtual)

2020     Health Care Providers: How to Preserve Access to Care & Protect your Patients from Border Patrol and ICE Interference/ invited presentation
National Immigration Law Center, Physicians for Human Rights, and ACLU of Texas Border Rights Center Webinar Training
Houston, TX (Virtual)

2020     Global Health at Home: Underserved Populations in the U.S./ invited presentation
American Neurological Association Annual Meeting
Los Angeles, CA (Virtual)

2020     Caring and Advocating for Immigrant Patients / Chair and Panelist
The Compassion in Action Healthcare Annual Conference
Boston, MA (Virtual)

2020     The Physician Role in Caring for Refugee Populations Locally and Globally/ invited panel presentation
Johns Hopkins School of Medicine, Refugee Health Partnership Student Group
Baltimore, MD (Virtual)

2021     Immigrant Friendly Health Systems: Advancing the Concept of "Immigration-Informed Care"/ invited presentation
Protecting Immigrant Families Campaign, Research Working Group (Virtual)

2021     Health Disparities and Parkinson's Disease: The Role of Trust/ invited panel discussion
Davis Phinney Foundation for Parkinson's, Webinar Series
Louisville, CO (Virtual)

2021     Socioeconomic Consequences of Health Disparities (CME course) / invited presentation
Cleveland Clinic, Health Disparities 2021
Cleveland, OH (Virtual)

2021     Contextualizing the U.S. Immigration Detention within the U.S. Criminal Justice System/ guest lecture
Touro University California, Criminal Justice and Public Health Class (Virtual)

2021     Racial/Ethnic Health Disparities/ invited presentation
American Academy of Neurology Annual Meeting, Health Disparities Course (Virtual)

2021     Creating Immigrant-Friendly Health Systems
Urban Institute, Program on Immigrants and Immigration Brownbag Session
Washington, D.C. (Virtual)

2021     Neuropsychiatric Health of Refugees: Implications for Clinical Practice and Structural Policies/invited presentation

Refugee Health Symposium, UC San Diego Altman Clinical and Translational Research Institute, Center for Life Course and Vulnerable Population Research
San Diego, CA (Virtual)

2021    "You only leave home when home won't let you stay": Displaced Populations and their Neuropsychiatric Health/ Grand Rounds
Department of Neurology, Hartford HealthCare and University of Connecticut (Virtual)

2021    Cumulative Risk of Immigration Detention Conditions on Health Outcomes Among Detained Immigrants in California (selected oral abstract)
American Public Health Association Annual Meeting (Virtual)

2021    Neurological Health Disparities and the COVID-19 Pandemic/ invited presentation
American Neurological Association Annual Meeting, Health Services Special Interest Group Session (Virtual)

2021    Healthcare in ICE Detention/ invited presentation
University of Southern California Equity Research Institute Symposium (Virtual)

2021    Equity for Displaced Populations: Policy and Practice Imperatives/ Grand Rounds
Department of Medicine, Baylor College of Medicine (Virtual)

2022    The Neuropsychiatric Health of Refugees, Asylum Seekers and Forcibly Displaced People/ Ground Rounds
Department of Neurology, The University of Chicago Medicine (Virtual)

2022    Supporting Immigrants, Refugees and Asylum-Seekers / Grand Rounds
Department of Neurology, University of California Los Angeles (Virtual)

2022    Debunking "Excited Delirium"/ invited presentation
Physicians for Human Rights Webinar (Virtual)

2022    Contextualizing the U.S. Immigration Detention within the U.S. Criminal Justice System/ guest lecture
Touro University California, Criminal Justice and Public Health Class (Virtual)

2022    The Relationships Between Childhood Trauma, Brain Injury, and Neurobehavioral Symptoms Among Survivors of Intimate Partner Violence/ invited presentation
Partner-Inflicted Brain Injury Task Force Meeting, Pink Concussions (Virtual)

2022    Disparities in Neurologic Care and how to minimize them/ guest lecture
Department of Neurology, University of Missouri-Columbia (Virtual)

2022    Meeting the Neurologic Needs of Forcibly Displaced Populations/ Grand Rounds
Department of Neurology, Thomas Jefferson University

2023    Evidence of Disparities in Access to Care: Immigrants and Forcibly Displaced Persons/ invited presentation
National Academies of Sciences, Engineering, and Medicine Workshop Series on Addressing Health Disparities in CNS Disorders

2023    Social Determinants of Health, Health Equity, and Neurology/ invited presentation
American Academy of Neurology Annual Meeting

2023    Disparities in Care in Practice: The Current State and How to Advocate/ invited presentation
American Academy of Neurology Annual Meeting

2023    Neurology in Action: Caring for Forcibly Displaced Populations/ Grand Rounds
Department of Neurology, Mount Sinai Health System

2023    Im/Migrant Health and A Path Toward Health Equity/ invited lecture

Institute for Health Equity Research Health Equity Seminar Series, Mount Sinai Health System

2023    Disparities in Clinical Care: Access, Outcomes, and Best Practices/ invited presentation
American Neurological Association Annual Meeting

2023    Addressing Neuropsychiatric Health Concerns of Forcibly Displaced People/ Grand Rounds
Department of Neurology, University of Washington Seattle

2024    Neurological Health of Displaced Populations: Challenges and Opportunities / Grand Rounds
Department of Neurology, University of Pennsylvania

2024    Assessment and Treatment of Traumatic Brain/Head Injury in Survivors of Torture/ Webinar presentation
U.S. Department of Health & Human Services Office of Refugee Resettlement/ Heal Torture

2024    "These are people just like us": Displaced Populations and their Neurological Health / Grand Rounds
Department of Neurology, University of Texas-Austin Dell Medical School

2024    Understanding and Addressing Neurodisparities: A Call for Action / Grand Rounds
Department of Neurology, Saint Louis University School of Medicine

2024    Call to Action: Striving towards Health Equity in Neurology/ Grand Rounds
Department of Neurology, Temple University

2024    The Social Determinants of Brain Health/ invited presentation
American Academy of Neurology Annual Meeting

2024    Health Disparities and Their Effect on Brain Health/ Hot Topics Plenary Session
American Academy of Neurology Annual Meeting

2024    Examining Social Determinants of Health to Improve Brain Health Equity: Refugee Health as a Case Study/ Grand Rounds
Department of Neurology, University of Michigan

2024    Toward Health Equity: Addressing Social Determinants of Brain Health/Neurology Learning Series
Department of Neurology, VA Northern California Health Care System

2024    Social Determinants of Health in Neurology through the Lens of Refugee Experiences / Grand Rounds
Department of Neurology, Morehouse School of Medicine

2024    Supporting immigrants and refugees in our community as neurologists: A case for understanding and addressing the social drivers of health / Grand Rounds
Department of Neurology, Weill-Cornell Medicine

2024    Bending the Arc: The Path to Justice in Brain Health/ Grand Rounds
Department of Neurology, Oregon Health and Science University

2024    Lessons Learned from Excited Delirium/ invited speaker
National Academies of Sciences, Engineering, and Medicine Committee of Advancing the Field of Forensic Pathology: Lessons Learned from Death in Custody Investigations

2025    Health Care Institutions, Hippocratic Duty, and Immigration Enforcement/ invited panelist
Urban Institute and Georgetown Law School

2025    Advancing Equity in Neurology: A Call for Action/Grand Rounds
Department of Neurology, Saint Louis University School of Medicine

| | |
|---|---|
| 2025 | Immigration Detention & Enforcement in the Community: Multidisciplinary Perspectives/ invited speaker<br>Physicians for Human Rights National Student Conference, Boston, MA |
| 2025 | Brain Health in Displaced and Refugee Populations/ invited speaker<br>American Academy of Neurology Annual Meeting, San Diego, CA |
| 2025 | Meanings and Misunderstandings: Understanding Social Determinants of Health/ invited speaker<br>American Academy of Neurology Annual Meeting, San Diego, CA |
| 2025 | Access of Neurological Care: Innovations and Opportunities for Expanding Access/ invited speaker<br>American Academy of Neurology Annual Meeting, San Diego, CA |
| 2025 | Social Determinants of Brain Health/ Grand Rounds and Visiting Professorship<br>Department of Neurology, Mayo Clinic |
| 2025 | Health consequences of immigration detention: Neuropsychiatric sequelae<br>Asylum Medicine Training Initiative |
| 2025 | Bending the Arc: Understanding and Addressing the Social Drivers of Health/ Grand Rounds<br>Department of Neurology, Washington University in St. Louis |
| 2025 | Trauma Informed Neurological Care/Grand Rounds<br>Department of Neurology, University of California Irvine |
| 2025 | Building Trust: Privacy, Safety, and Documentation in Healthcare Practice/ Webinar<br>Immigrant Health Equity and Legal Partnerships (ImmHelp) and Everyone Belongs Here |
| 2025 | When Immigration Enforcement Comes to Our Hospitals and Schools: Considerations for Ethics and Policy/ Webinar<br>American Society for Bioethics and Humanities |
| 2025 | Turning Awareness into Action for Brain Health Equity/ Keynote Address<br>Northern New England Neurological Society Annual Meeting |
| 2025 | Addressing Social Drivers of Health in Neurology: Moving from Analysis to Action/ Grand Rounds<br>Department of Neurology Ohio State University Wexner Medical Center |
| 2025 | Immigration Detention/ Invited Class Lecture<br>Health and Incarceration Pathway Presentation, University of Rochester School of Medicine |
| 2025 | Beyond Biology: How Conditions Shape Stroke Outcomes<br>Neuroscience Summit, SSM Health, St. Louis, MO |

**International**

| | |
|---|---|
| 2018 | Medical-Forensic Examination for Asylum Seekers/ Webinar presentation<br>International Association of Forensic Nurses |
| 2020 | Anti-Immigrant Policy Climate and the need for "Sanctuary" or "Safe Spaces" in the Clinical Context/ Workshop<br>North American Refugee Health Conference |
| 2023 | Compare & Contrast: Facilitated Discussion on Opportunities and Challenges of Asylum Clinic Models/ Workshop presentation<br>North American Refugee Health Conference |
| 2023 | Addressing the Mental Health Harms of Immigration Detention/ Workshop presentation |

North American Refugee Health Conference

| | |
|---|---|
| 2023 | Migration, Trauma, and Health/ Keynote address<br>Alzheimer's Association International Conference Advancements: Toward Health Equity in Alzheimer's Disease and Related Dementias |
| 2024 | Health Equity Round Table/ Presentation and Panel discussion<br>International Neuropalliative Care Society Neuropalliative Care Research Summit NeuroCARES 2024 |
| 2024 | Lessons Learned from the Formation and Development of a U.S. Asylum Clinic Community Advisory Board (selected oral abstract)<br>North American Refugee Health Conference |
| 2025 | Trauma, Memory and Cognition among Asylum-seekers and Refugees: A Case-based Learning Workshop<br>International Refugee and Migration Health Conference |
| 2025 | Trauma, Memory and Cognition among Asylum-seekers and Refugees: A Case-based Learning Workshop<br>Crossroads Clinic, Women's College Hospital |
| 2025 | Bending the Arc: How Health Care Professionals Can Speak Up and Out for Change/ Keynote address<br>Neurocritical Care Society |

## Report of Clinical Activities and Innovations
**Current Licensure and Certification:**

| | |
|---|---|
| 2022- | Missouri Medical License |
| 2020- | Maine Medical License |
| 2020- | New Hampshire Medical License |
| 2019- | Massachusetts Medical License |
| 2017-2019 | California Medical License |
| 2017- | Certification, American Board of Psychiatry and Neurology |

**Practice Activities:**

| | | | |
|---|---|---|---|
| 2017-2018 | Ambulatory care | General Neurology, Olive View-UCLA Medical Center | One half-day session per week |
| 2019 | Ambulatory care | Stroke neurology, Rancho Los Amigos National Rehabilitation Center | One half-day session per month |
| 2019 | Ambulatory care | Movement Disorders, Rancho Los Amigos National Rehabilitation Center | One half-day session per two weeks |
| 2019- | Ambulatory Care | Division of Comprehensive Neurology, Massachusetts General Hospital and MGH Chelsea HealthCare Center | Two half-day sessions per week |

## Report of Education of Patients and Service to the Community
*No presentations below were sponsored by 3rd parties/outside entities*

**Activities**

| | |
|---|---|
| 10/2009-<br>03/2011 | Bridging the Gap Refugee Family Service Project, Harvard Medical School Co-coordinator and volunteer, aided refugee families in navigating healthcare and adjustment to resettlement, facilitated workshops for volunteers in area of refugee and immigrant health. |

| 10/2010-01/2013 | Boston Area Rape Crisis Center counselor, provided immediate crisis support and management to sexual assault survivors, later served in supervisory role for new counselors. |
|---|---|
| 06/2014-06/2017 | Boston Healthcare for the Homeless Coordinator and volunteer at monthly neurology clinic. |
| 04/2016 | Harvard Undergraduate Global Health Forum Global Health Challenge<br>Participated as a panelist and judge evaluating high school students' proposals for a global health challenge. |
| 04/2018 | American Academy of Neurology Brain Health Fair<br>Participated as a general neurologist answering lay community's neurology related questions. |
| 04/2018 | Human Rights First Report<br>Served as a subject matter expert on report of treatment of immigration detainees in Texas. |
| 08/2018 | Disability Rights California Investigative Report<br>Served as a subject matter expert for report on treatment of immigration detainees with mental and physical disabilities at Adelanto Processing Center. |
| 07/2020, 07/2024 | MGH Youth Neurology Education and Research Program<br>Research Mentor and Speaker for MGH Neurology INSPIRE series |
| 08/2020- | American Civil Liberties Union (ACLU) of Southern California<br>Served as volunteer medical consultant to review medical records of immigration detainees for medical vulnerability that could warrant release during the COVID-19 pandemic |
| 03/2022 | Physicians for Human Rights Report<br>Served as co-author and researcher for report titled, ""Excited Delirium" and Deaths in Police Custody" |
| 05/2022 | National Immigrant Justice Center Civil Rights and Civil Liberties (CRCL) Report<br>Served as a subject matter expert for CRCL complaint on the systemic mistreatment of immigration detainees with mental health issues across U.S. detention centers. Presented findings in a Congressional Briefing sponsored by Representative Joaquin Castro's office. |
| 04/2023 | STAT News<br>Speaker for STAT News "Breakout Stars in Science!" virtual event |
| 09/2023 | United Nations Association of Greater Boston<br>Speaker for UN Perspective Series in honor of UN International Peace Day, titled "Peace, Justice, and Strong Institutions through the lens of Migration and Displacement" |
| 1/2024 | Physicians for Human Rights Expert Opinion, "Unleashed Brutality: An Expert Medical Opinion on the Health Harms from California Police Attack Dogs"<br>Served as lead author and subject matter expert for report on medical harms of police canine bites, in partnership with American Civil Liberties Union (ACLU) of Southern California |
| 3/2025 | National Immigration Law Center and Physicians for Human Rights Report, "*Health Care and U.S. Immigration Enforcement: What Providers Should Know*"<br>Served as a subject matter expert on this report providing guidance to clinicians and hospital administrators on how to ensure the rights of patients and providers are upheld in health facilities |

**Selected Educational Material for Patients and the Lay Community:**
*Books, monographs, articles and presentations in other media*

| 04/2012 | What Med Students Learn from Sticking with their Patients | Author | Boston NPR CommonHealth Blog |
|---|---|---|---|

| 02/2018 | Larry Nassar isn't the only doctor accused of molesting patients. We need to do more to stop it | Author | STAT News Opinion |
| 02/2018 | Detention Facilities Display Dangerous Trend of Delayed and Inadequate Care | Author | Physicians for Human Rights Blog |
| 02/2019 | Immigrants are suffering in detention. They need adequate healthcare now | Author | Los Angeles Times Opinion |
| 07/2020 | Police keep using 'excited delirium' to justify brutality. It's junk science. | Co-Author | The Washington Post |
| 07/2021 | Refugee Awareness Month: An Opportunity for Neurologists to Consider the Health of Displaced Populations | Author | Neurology Without Borders Blog |
| 05/2022 | A 'City on Fire': How Miami shaped a disputed diagnosis used to justify deaths in police custody. Bonus Episode: Two Physicians on Excited Delirium | Co-Author | STAT Color Code Podcast Series |
| 03/2023 | Dispatches from the Frontiers of Medicine (A Discussion on Health disparities, Misdiagnosis, and Racism within and outside neurology) | Author | Proto Podcast Series |
| 04/2024 | Guiding Principles for Writing About Immigrants and Immigrant Health | Co-Author | Public Health Post |
| 04/2024 | Social Determinants of Brain Health | Author | American Academy of Neurology TV |
| 05/2024 | Innocent Californians have been mauled by police dogs. Weak legislation doesn't fix issue. | Co-Author | The Sacramento Bee |

**Recognition:**

| 05/2017 | Publicity on Huffington Post Opinion about discrimination in the workplace | AAMC News |
| 06/2017 | Publicity on Neurology manuscript on disparities in neurologic care | Reuters, Salon, Medscape, MedPage Today, Neurology Today |
| 2017-2019 | Publicity on JAMA Viewpoint on "Sanctuary Hospitals" | The Christian Science Monitor, Healthline.com, Boston NPR, Capital Public Radio, Psychiatry Advisor, The American Journal of Managed Care (online) |
| 2018 | Publicity on STAT News Opinion about sexual assault in the medical profession | Radio Health Journal |
| 2018-2019 | Publicity on work with immigration detention centers | The Atlantic, Huffington Post, Pacific Standard Magazine, Business Insider, Denver Westword |
| 2020 | Publicity on Washington Post Op-Ed about excited delirium | Fox9 News (TV), WGBH (Boston Public Radio) |
| 2020 | Publicity on MA Attorney General Health Equity report and launch panel | Boston Globe, WBUR, Boston Herald, MassLive, Telegram.com, State House News |
| 2020 | Publicity on JAMA Neurology Viewpoint about carotid restraints | Medscape Neurology, WGBH All Thing Considered (Boston Public Radio), Mic.com, The New York Times |
| 2020 | STAT Wunderkind – For early-career scientists doing groundbreaking word | Boston Globe/STAT News |
| 2021 | Publicity on health disparities work within neurology | Profiled in Lancet Neurology "In Context-Lifeline," April issue 20(40): 260. |
| 2021 | 40 Under 40 Leaders in Health – For thought leaders in reducing health disparities | National Minority Quality Forum |
| 2021 | Academy of Women Achievers Sylvia Ferrell-Jones Award – For rising, young professional woman of color leader | YW Boston |
| 2022 | Publicity on Physicians for Human Rights report about excited delirium | CNN, NBC, NBCLx, MedPage Today, WHMP "Afternoon Buzz" Radio Show, Atlanta Black Star, The Star Tribune |

| 2023 | Bernard Lown Award for Social Responsibility- National award for bold leadership social justice or other humanitarian efforts | The Lown Institute |
| 2023 | Publicity on Physicians for Human Rights report about police attack dogs | LA Times, Sacramento Bee |

## Report of Scholarship
**Peer-Reviewed Scholarship in print or other media:**

### Research Investigations

1. Jamal M, Yoon E, **Saadi A**, Sy T, Hashemzadeh M, Trends in the Utilization of Endoscopic Retrograde Cholangiopancreatography (ERCP) in the United States. American Journal of Gastroenterology. 2007 May; 102(5): 966-75. Epub 2007 Mar 23. PMID: 17319932.

2. Harburger, LL, Pechenino, A, **Saadi, A**, Frick, KM, Post-training Progesterone dose-dependently enhances object, but not spatial, memory consolidation. Behavioural Brain Research. 2008 Dec 12; 194(2): 174-80. PMID: 18687366.

3. Haruburger, LL, **Saadi, A**, and Frick, KM, Dose-dependent effects of post-training estradiol plus progesterone treatment on object memory consolidation and hippocampus ERK activation in young ovariectomized mice. Neuroscience. 2009 April 21; 160(1): 6-12. PMID: 19223011.

4. *Saadi, A*, Bond, BE, Percac-Lima S. Perspectives on Preventive Health Care and Barriers to Breast Cancer Screening Among Iraqi Women Refugees. Journal of Immigrant and Minority Health. 2012 Aug; 14(4): 633-63. PMID: 21901446.

5. *Saadi A*, Bond, BE, Percac-Lima S. Bosnian, Somali, and Iraqi refugee women speak: A comparative study of refugee health beliefs on preventive health and breast cancer screening. Women's Health Issues. 2015 Sep-Oct; 25(5): 501-8. PMID: 26219676.

6. **Saadi A**, Patenaude B, Nirola D, Deki S, Tshering L, Clark S, Schaull L, Sorets T, Fink G, Mateen F, Quality of life in epilepsy in Bhutan. Seizure. 2016 July; 39: 44-8. PMID: 27257785.

7. **Saadi A**, Petanaude B, Mateen F, Quality of life in Epilepsy-31 inventory (QOLIE-31) Scores: A Global Comparison. Epilepsy & Behavior. 2016 Dec; 65: 13-17. PMID: 27838562.

8. **Saadi A**, Himmelstein DU, Woolhandler S, Mejia NI, Racial disparities in neurologic health care access and utilization in the United States. Neurology. 2017 Jun 13;88(24):2268-2275. Epub 2017 May 17. PMID: 28515272.
   - Selected as article for American Board of Psychiatry and Neurology Maintenance of Certification article-based assessment activity.

9. **Saadi A**, Okeng'o K, Biseko M, Shayo A, Mmbando T, Grundy S, Xu, A, Parker, R, Wibecan L, Iyer G, Onesmo P, Kapina B, Regenhardt R, Mateen FJ. Post-Stroke Social Networks, Depressive Symptoms, and Disability in Tanzania: A Prospective Study. International Journal of Stroke. 2018 Jan 01; 1747493018772788. PMID: 29676225.

10. Kim G**, Sanchez Molina U**, **Saadi A**. Inclusion of Immigration Status in Medical Records. American Medical Association Journal of Ethics. 2019 Jan; 21(1): E8-16. doi: 10.1001/amajethics.2019.8. **mentee*
    - Selected as article for journal-based CME credit.

11. Regenhardt RW, Biseko MR, Shayo AF, Mmbando TN, Grundy SJ, Xu A, **Saadi A**, Wibecan L, Kharal GA, Parker R, Klein JP, Mateen FJ, Okeng'o K. Opportunities for intervention: stroke treatments, disability and mortality in urban Tanzania. International Journal of Quality Health Care. 2019 Jun 1; 31(5):385-392. PMID: 30165650.

12. **Saadi A**, Kim AY, Menkin JA, Carrillo CA, Reyes CE, Sarkisian CA. Mistrust of Researchers Correlates with Stroke Knowledge among Minority Seniors in a Community Intervention Trial. Journal of Stroke and Cerebrovascular Disease. 2020 Jan; 29(1):104466. PMID: 31734125.

13. **Saadi A**, Sanchez Molina U**, Franco-Vasquez A**, Inkelas M, Ryan G. Health System Efforts to Mitigate Risks for Immigrant Patients: A Qualitative Study. JAMA Network Open. 2020. Apr 01; 3(4):e203028. PMID: 32301990. ***mentee*
   *Editorial Comment. The Case for Research-Informed Immigrant Health Policies Within Health   Care Systems. JAMA Network Open. 2020; 3(4):e203022. doi:10.1001/jamanetworkopen.2020.3022.*

14. **Saadi A**, Ponce NA. Worse Mental Health Among More Acculturated and Younger Immigrants Experiencing Discrimination: California Health Interview Survey, 2015-2016. Journal of General Internal Medicine. 2020 May; 35(5): 1419-1426. Epub 2019 Nov 1. PMID:31677103.

15. **Saadi A**, Choi KR, Takada S, Zimmerman FJ. The impact of gun violence restraining order laws in the U.S. and firearm suicide among older adults: a longitudinal state-level analysis, 2012-2016. BMC Public Health. 2020 April 07; 20(1):334. doi: 10.1186/s12889-020-08462-6. PMID: 32252702.

16. Choi KR, **Saadi A**, Takada S, Easterlin MC, Buchbinder LS, Johnson DC, Zimmerman FJ. Longitudinal Associations Between Healthcare Resources, Policy, and Firearm-Related Suicide and Homicide from 2012 to 2016. Journal of General Internal Medicine. 2020 July; 35(7): 2043-2049. Epub 2020 Jan 2. PMID: 31898128.

17. **Saadi A**, Cruz-Gonzalez M, Hwang A, Cohen L, Alegria M. Associations between Trauma, Sleep and Cognitive Impairment among Latino and Asian Older Adults. Journal of the American Geriatrics Society. 2021 April; 69(4):1019-1026. Epub 2021 Jan 5. PMID: 33399223.

18. Rodriguez JA. **Saadi A**, Samal L, Schwamm LH, Bates DW. Disparities in Telehealth Use among Patients with Limited English Proficiency in California. Health Affairs. Health Affairs (Millwood). Mar 2021; 40(3): 487-495. PMID: 33646862.

19. Patler C, **Saadi A**. Risk of Poor Outcomes with COVID-19 Among U.S. Detained Immigrants: A Cross-Sectional Study. Journal of Immigrant and Minority Health. 2021 Aug; 23(4): 863-866. Epub 2021 Mar 04. PMID: 33661415.

20. **Saadi A**, Bannon S, Watson E, Vranceanu AM. Racial and Ethnic Disparities Associated with Traumatic Brain Injury Across the Continuum of Care: A Narrative Review and Directions for Future Research. Journal of Racial and Ethnic Health Disparities. 2021 Mar 17. Epub ahead of print. PMID: 33733427.

21. **Saadi A**, Hampton K, Vassimon de Assis M, Mishori R, Habbach H, Haar RJ. Associations between memory loss and trauma in US asylum seekers: A retrospective review of medico-legal affidavits. PLOS One. 2021 Mar 23; 16(3):e0247033. doi: 10.1371/journal.pone.0247033. eCollection 2021. PMID: 33755695.

22. **Saadi A**, Sanchez Molina U**, Franco-Vasquez A**, Inkelas M, Ryan G. Barriers and Facilitators to Implementation of Health System Interventions Aiming to Welcome and Protect Immigrant patients: A Qualitative Study. Journal of General Internal Medicine. 2021 Oct; 36(10): 3071-3079. Epub 2021 May 13. PMID: 33987786. ***mentee*

23. Samuels EA, Orr L, White EB, **Saadi A**, Padela AI, Westerhaus M, Bhatt AD, Agrawal P, Wang D, Gonsalves G. Health Care Utilization Before and After the "Muslim Ban" Executive Order Among People Born in Muslim-Majority Countries and Living in the US. JAMA Network Open. 2021 Jul 01; 4(7):e2118216. PMID: 34328502.
   - Editorial Comment. Anti-immigrant Rhetoric and Policy as Manifestations of Structural Racism—   Implications for Advancing Health Equity. JAMA Network Open. 2021; 4(7):e2118299. doi:10.1001/jamanetworkopen.2021.18299.

24. Cuneo CN, Huselton KE, Praschan NC, **Saadi A**, Gartland MG. What Counts As 'Safe?': Exposure To Trauma And Violence Among Asylum Seekers From The Northern Triangle. Health Affairs (Millwood). 2021 Jul; 40(7):1135-1144. PMID: 34228513.

25. **Saadi A**, Taleghani S**, Hampton K, Heisler M. Clinicians' Perspectives on the Impacts of Post-2016 Immigration Enforcement on Immigrant Health and Health Care Use. Journal of Health Care for the Poor and Underserved. 2021; 32(4): 1778-1797. PMID: 34803043 ***mentee*

26. Takada S, Choi KR, Natsui S, **Saadi A**, Buchbinder L, Easterlin M, Zimmerman FJ. Firearm Laws and the Network of Firearm Movement among US States. BMC Public Health. BMC Public Health. 2021 Oct 7; 21(1): 1803. doi: 10.1186/s12889-021-11772-y. PMID: 34620159.

27. **Saadi A**, Patler C, Young ME. Cumulative Risk of Immigration Prison Conditions on Health Outcomes among Detained Immigrants in California. Journal of Racial and Ethnic Health Disparities. 2021 Nov 29; 1-15. Epub ahead of print. PMID: 34845673.

28. Patler C, **Saadi A**, Young ME. Release from US Immigration Detention May Improve Physical and Psychological Stress and Health: Results from a Two-Wave Panel Study in California. SSM- Mental Health. 2021 Dec (1): 100035. doi: 10.1016/j.ssmmh.2021.100035.

29. **Saadi A,** Chibnik L, Valera E. Examining the Association between Childhood Trauma, Brain Injury, and Neurobehavioral Symptoms among Survivors of Intimate-Partner Violence, Journal of Head Trauma Rehabilitation. 2022 Jan-Feb 01; 37(1): 24-33. PMID: 34985031.

30. Al-Rousan T, AlHeresh R, **El-Sabrout** H, Young M, Benmarhnia T, Han BH, Alshawabkeh L. Risk of Cardiovascular Disease and its Risk Factors Among Refugees and Asylum Seekers: Systematic Review and Meta-analysis. International Journal of Cardiology Cardiovascular Risk and Prevention. 2022 Mar; 12:200126. PMID 35199106.

31. Bakhshaie J, Penn TM, Doorley J, Pham TV, Greenberg J, Bannon S, **Saadi A**, Vranceanu AM. Psychosocial Predictors of Chronic Musculoskeletal Pain Outcomes and their Contextual Determinants Among Black Individuals: A Narrative Review. Journal of Pain. 2022 May 27. PMID: 35644442.

32. Tang JT, **Saadi A**, Dunn EC, Choi K. Concordance in child-parent reporting of social victimization experiences in the Adolescent Brain Cognitive Development (ABCD) study. Academic Pediatrics. 2022 Sep 28. PMID: 36182088.

33. Parvez A, Percac-Lima S, **Saadi A**. The Presence and Profile of Neurological Conditions and Associated Psychiatric Comorbidities in U.S. Resettled Refugees: A Retrospective Single Center Study. Journal of Immigrant and Minority Health. Journal of Immigrant and Minority Health. 2022 Oct 17. Online ahead of print. PMID: 36251204.

34. Young MEDT, Chen L, Sudhinaraset M, **Saadi A**, Kietzman K, Wallace S. Cumulative experiences of immigration enforcement policy and the physical and mental health outcomes of Asian and Latinx immigrants in the United States. International Migration Review. 2022 Nov 4. Online ahead of print. doi: 10.1177/01979183221126726

35. Young MEDT, Tafolla S, **Saadi A**, Sudhinaraset M, Chen L, Pourat N. Beyond "chilling effects": Asian and Latinx immigrants' experiences with enforcement and barriers to health care. Medical Care. 2023 Mar 20. PMID: 36939228

36. Baskaran A, Marogi E, Bitar R, Attarian Hrayr, **Saadi A.** Improving Sleep Health Among Refugees: A Systematic Review. Neurology: Clinical Practice. 2023 Apr; 13(2):e200139. PMID: 36936393.

37. **Saadi A**, Taleghani S, Dillard A, Ryan G, Heilemann MS, Eisenman D. A Qualitative Study of Nursing Experiences with Racial, Ethnic and Religious Discrimination in the Workplace. American Journal of Nursing. 2023 May 1; 123(5): 24-34. PMID: 37021974.

38. **Saadi A,** Williams J, Parvez A, Vranceanu AM, Alegria M. Head Trauma in Refugees and Asylum Seekers: A Systematic Review. Neurology. 2023 May 23; 100(21): e2155-e2169. Epub 2023 Apr 5. PMID: 37019660.

39. **Saadi A**, Morales B, Chen L, Sudhinaraset M. Understanding the function of social capital among Mexican and Chinese immigrants in Southern California: A qualitative study. SSM- Qualitative Research in Health. 2023 June 2023, 100247. doi.org/10.1016/j.ssmqr.2023.100247

40. **Saadi A**, Choi KR, Khan TF, Tang JT, Iverson GL. Examining the Association between Adverse Childhood Experiences and Lifetime History of Head or Neck Injury and Concussion in Children from the United States. Journal of Head Trauma Rehabilitation. 2023 Aug 14. PMID: 37582185.

41. Cook NE, Gaudet CE, Kissinger-Knox A, Liu BC, Hunger AA, Norman MA, **Saadi A**, Iverson GL. Race, Ethnicity, and Clinical Outcome Following Sport-Related Concussion: A Systematic Review. Frontiers in Neurology. 2023; 14:1110539. PMID: 37388549

42. Galvin C**, Yang W, **Saadi A.** Evaluation of Crowd-Sourced Fundraising to Cover Health Care Costs for Neurological Conditions in the U.S. JAMA Neurology. 2023 09 01; 80(9):1000-1002. PMID: 37459060 **Mentee

43. **Saadi A**, Ray VE, Police Violence in Health Care Settings in US Media Coverage. JAMA Network Open 2023; 6(11):e2342998. doi:10.1001/jamanetworkopen.2023.42998. PMID: 37955898.

44. Kaur M, Bridi L, Kaki D, Albahsahli B, Bencheikh N, **Saadi A**, Bandoli G, Anderson CAM, Sideman AB, Al-Rousan T, The State of Funding for Refugee Health Research from the National Institutes of Health between 2000-2020. JAMA Network Open. 2024 Jan 02; 7(1):e2350837. PMID: 38198139

45. Snyder SA**, Kuan KE**, Velasco MG, **Saadi A**. Order Keepers or Immigration Agents? Latine Immigrant Views of Law Enforcement in Healthcare Settings. Journal of General Internal Medicine. 2024 May 2. Epub Ahead of Print. Doi.org/10.1007/s11606-024-08767-x. PMID: 38698296 **Mentee

46. Jahan N**, Velasco MG, Vranceanu A, Alegria A, **Saadi A**. Clinician Perspectives and Care of Traumatic Brain Injury among Asylum Seekers and Refugees. Disability and Rehabilitation, 2024 Jun 3;1-10. Epub Ahead of Print. doi: 10.1080/09638288.2024.2356014. PMID: 38831593 **Mentee

47. **Saadi A**, Asfour J**, Vassimon De Assis M, Wilson T, Haar RJ, Heisler M. Head Injury and Associated Sequelae in Individuals Seeking Asylum in the United States: A Retrospective Mixed-Methods Review of Medico-Legal Affidavits. Brain Sciences. 2024 June 14; 14(6), 599; https://doi.org/10.3390/brainsci14060599 **Mentee

48. Cook NE, Kissinger-Knox A, Iverson IA, Stephenson K, Norman MA, Hunter AA, **Saadi A**, Iverson GL. Social Determinants of Health and Health Equity in the Treatment and Rehabilitation of Sport-related Concussion: A Content Analysis of Intervention Research and Call-To-Action, Journal of Neurotrauma. 2024 Jul 13. doi: 10.1089/neu.2023.0550. Online ahead of print. PMID: 38753708

49. Choi KR, Bravo L, La Charite J, Cardona E, Eliott T, Floyd James K, Wisk LE, Dunn EC, **Saadi A.** Associations between positive childhood experiences (PCEs), discrimination, and internalizing/externalizing in pre-adolescents. Academic Pediatrics. 2024 Jul 14:S1876-2859(24)00275-4. doi: 10.1016/j.acap.2024.07.006. Online ahead of print. PMID: 39004299

50. Siddiq H, Choi KR, Jackson N, **Saadi A**, Gelberg L, Ponce N, Takada S. Determinants to tele-mental health services utilization among California adults: Do immigration-related factors matter? Journal of Immigrant and Minority Health. 2024 Sep 05. (2024). doi:10.1007/s10903-024-01628-z. PMID: 39235551.

51. Hossain A, Abdul Baten R, **Saadi A**, Rana J, Rahman T, Alameddine M. Quality of life after five years of displacement among Rohingya refugees: A Cross-Sectional Study Comparing Adults with and without Chronic Illnesses. JAMA Network Open. 2024 Sep 17;7(9):e2433809. doi: 10.1001/jamanetworkopen.2024.33809. PMID: 39287945

52. Tzelios C**, Velasco M, **Saadi A**. Latine immigrant perspectives on trust of clinical research. Hispanic Health Care International. 2024;0(0). doi:10.1177/15404153241286745. PMID: 39360372. **Mentee

53. **Saadi A,** Abdul Baten R, Alegria M, Himmelstein D, Woolhandler S. Disparate Use of Diagnostic Modalities for Patients with Limited English Proficiency and Neurological Disorders. Neurology Clinical Practice. 2025 Apr; 15(2):e200417. PMID: 39810913.

54. **Saadi A**, Patler C, Langer P. Duration in Immigration Detention and Health Harms. JAMA Network Open. 2025 Jan 02; 8(1):e2456164. PMID: 39853977.

55. Patler C, **Saadi A**, Langer P. The health-related experiences of detained immigrants with and without mental illness. Journal of Migration and Health. 2025; 11:100302. PMID: 39877138.

56. Sherman Rosa S, Nadal R, **Saadi A**. Research Letter: Assessing Traumatic Brain Injury in Refugees: Feasibility, Usability, and Prevalence Insights from a U.S.-based Clinical Sample. Journal of Head Trauma Rehabilitation. 2025 Jan 27. PMID: 39874279.

57. Iverson GL, Maietta JE, **Saadi A**, Cook NE, Social Determinants of Health and Lifetime History of Parent-Reported Concussion in School-Aged Children and Adolescents in the United States. Neurotrauma Reports. 2025 Feb 3; 6(1): 20-31. DOI:10.1089/neur.2024.0083.

58. Choi KR, Dunn EC, Comulada WS, **Saadi A.** Latent Class Analysis of Household and Community Adversity Among Pre-Adolescent Youth in the United States. Child Psychiatry Hum Dev. 2025 Jul 22. PMID: 40694209.

59. **Saadi A**, Cruz-Gonzalez M, Zhang L, Alegría M. Mental health service use among individuals with traumatic brain injury: Exploring the role of social support, employment, and insurance. J Psychosom Res. 2025 Aug; 195:112195. PMID: 40602128.

60. Thapa K, **Saadi A**. Perceived Discrimination Among Refugees in the USA: Determinants and Associations with Healthcare Utilization and Self-rated Health. J Gen Intern Med. 2025 Aug 12. PMID: 40794367

61. Sabbah L, E Morris J, G Velasco M, **Saadi A**. "I'm Sorry, I Can't Hire You because of That": Examining the Role of Employment and Exclusion on Health and Well-Being among U.S. Asylum Seekers. J Immigr Minor Health. 2025 Sep 05. PMID: 40911263.

62. Thapa K, Sabbah L, AlHeresh R, **Saadi A**. Associations between refugee camp living and duration lived in refugee camps with health outcomes: A cross-sectional analysis of the Annual Survey of Refugees, 2021-2022. PLoS One. 2025; 20(12):e0327608. PMID: 41359626.

63. Valera EM, Sanghvi I, Sitto SR, Chua J, **Saadi A**, Theadom A. "I Can Remember Thinking, Like Almost Wishing, That the Injuries Would Have Been Worse, Because Then I Wouldn't Be Questioned": A Qualitative Study on Women's Experience of Accessing Healthcare for Intimate Partner Violence-Related Brain Injury. Healthcare. 2026; 14(2):165. https://doi.org/10.3390/healthcare14020165

64. Bharil S, Haque D, Velasco MG, **Saadi A**. Caring for neurology patients across language differences: a qualitative comparison of interpreter, clinician, patient, and caregiver perspectives. Equity Neuroscience. 2026; 2(1):https://doi.org/10.1016/j.neur

65. Bin Abdul Baten R, Thapa K, **Saadi A**. Access to Care and Self-Rated Health Status: Comparison of Rural and Urban Immigrants in the US. J Immigr Minor Health. 2026 Jan 13. PMID: 41528690.

66. Young MT, Tafolla S, **Saadi A.** Recent Exclusionary Immigration Policy Experiences are Associated with Worse Asian and Latino Immigrant Health. J Immigr Minor Health. 2026 Feb 11. PMID: 41670867.

**Other peer-reviewed scholarship**

1. **Saadi, A** and Rajashekara, S. Intramedullary Spinal Neurosarcoidosis: A Case Report. Radiology Case Reports. 2012; 7(4): 739. eCollection 2012. PMID: 27330596.

2. **Saadi A**, Schmahmann J, Tacrolimus neurotoxicity presenting as an isolated brainstem lesion. Neurology. 2016. Mar 15; 86(11): e109-11. PMID: 26976521.

3. **Saadi A**, McCray B, Ensrud E, Prasad S. Tongue infarction due to giant cell arteritis. Practical Neurology. 2016 Jan 5; 16(3): 231. PMID: 26733724.

4. Miskin DP, **Saadi A**, Chikoya L, Sloane JA, Koralnik IJ, Siddiqi OK. Challenges in the diagnosis and treatment of CNS demyelinating disorders in Zambia. Multiple Sclerosis Journal Experimental, Translational and Clinical. 2016. July 4; 2: 2055217316657117. eCollection 2016 Jan-Dec. PMID: 28607733.

5.  **Saadi A**, Mateen F. Teleneurology in humanitarian crises: Lessons from the Médecins Sans Frontières experience. Neurology. 2017. July 18; 89(3): e16-e19. PMID: 28716879.

6.  Bank A*, **Saadi A***, McKee K, Lyons JL, Mejia NI. Creation of a diversity and inclusion certificate program for neurology residents. Neurology. 2017 Sep 19; 89(12): e146-e148. PMID: 28923892. *Co-first Author*

7.  **Saadi A**, Ahmed S, Katz MH. Making a Case for Sanctuary Hospitals. Journal of the American Medical Association. 2017 Dec 5; 318(21):2079-2080. PMID: 29049516
    - In the top 5% of all research outputs scored by Altmetric

8.  Crotty GF, McKee K, **Saadi A**, Young AC, Solomon IH, Lyons JL. Clinical pathologic case report: A 70-year-old man with inflammatory cerebral amyloid angiopathy causing headache, cognitive impairment, and aphasia. Journal of Clinical Neuroscience. 2018 Mar; 49:71-75. Epub 2017 Dec 14. PMID: 29248380.

9.  Ferenczi EA*, **Saadi A***, Bhattacharyya S, Berkowitz A. Glioblastoma arising within sites of encephalomalacia from vascular brain injury: two cases and a review of the literature. Journal of Clinical Neuroscience. 2018 Apr; 50: 110-115. PMID: 29422364 *Co-first Author*

10. **Saadi A**, Klein JP. Bow Hunter's Syndrome. The Neurohospitalist. 2018 Jul; 8(3): 160. Epub 2017 Sep 27. PMID: 29977450.

11. **Saadi A,** Ferenczi E, Reda H. Spinal decompression sickness in an experienced scuba diver: a case report and review of literature. The Neurohospitalist. 2019 Oct; 9(4): 235-238. Epub 2019 Feb 14. PMID: 31534615.

12. **Saadi A,** Payne A. Ethics: United States Immigrant Detention and the Role of Nurses: A Call for Action against Human Rights Violations. OJIN: The Online Journal of Issues in Nursing. 2019 July 5; 24(3). Doi: 10.3912/OJIN.Vol24No03EthCol01.

13. **Saadi A**, Cheffers ML, Taira B, Trotzky-Sirr R, Parmar P, Samra S, Morrison JL, Shah S, Schneberk TW. Building Immigration-Informed, Cross-Sector Coalitions: Findings from the Los Angeles County Health Equity for Immigrants Summit. Health Equity. 2019 Aug 23; 3(1): 431-435. eCollection 2019. PMID: 31448353.

14. **Saadi A**, Young ME, Patler C, Estrada JL, Venters H. Understanding US Immigration Detention: Affirming Rights and Addressing Social-Structural Determinants of Health. Health and Human Rights Journal. 2020 June; 22(1): 187-197. PMID: 32669800.

15. Berkman JM**, Rosenthal JA, **Saadi A**. Carotid Physiology and Neck Restraints in Law Enforcement: Why Neurologists need to make their voices heard. JAMA Neurology. 2021 Mar 1; 78(3):267-268. Epub 2020 Dec 28. PMID 33369628. **mentee*
    - Led to AAN Position Statement on the Use of Neck Restraints in Law Enforcement.

16. Woolhandler S, Himmelstein DU, Ahmed S, Bailey Z, Bassett MT, Bird M, Bor J, Bor D, Carrasquillo O, Chowkwanyun M, Dickman SL, Fisher S, Gaffney A, Galea S, Gottfried RN, Grumbach K, Guyatt G, Hansen H, Landrigan PJ, Lighty M, McKee M, McCormick D, McGregor A, Mirza R, Morris JE, Mukherjee JS, Nestle M, Prine L, **Saadi A**, Schiff D, Shaprio M, Tesema L, Venkataramani A. Public policy and health in the Trump Era. Lancet 2021 Feb 20; 397(10275):705-753. Epub 2021 Feb 11. PMID: 33581802.

17. **Saadi A**, Anand P, Kimball SL. Traumatic brain injury and forensic evaluations: Three case studies of U.S. asylum-seekers. Journal of Forensic and Legal Medicine. 2021 Mar 11; 79:102139. PMID: 33740607.

18. Franco-Vasquez A, Lemus S, Castillo K, Isaac M, **Saadi A**. Integration of Waiting Room 'Know Your Rights' Education into Medical Care of Immigrant Patients in a Federally Qualified Health Center: A Case Study. Health Equity. 2022 Jan 17; 6(1):13-20. doi: 10.1089/heq.2020.0145.

19. **Saadi A**, Medizabal A, Mejia N. Teleneurology and Health Disparities. Seminars in Neurology. 2022 May 02; 42(1): 60-66. PMID: 35576930.

20. Robbins NM, Charleston L, **Saadi A**, Thayer Z, Codrington WU, Landry A, Bernat JL, Hamilton R. Black Patients Matter in Neurology: Race, Racism, and Race-Based Neurodisparities. Neurology. 2022 07 19; 99(3):106-114. PMID: 35851551.

21. Mateen FJ, Hanafi I, Birbeck GL, **Saadi A**, Schmutzhard E, Wilmshurst JM, Silsbee H, Jones LK. Neurologic Care of Forcibly Displaced Persons: Emerging Issues in Neurology. Neurology. 2023 Mar 01. PMID: 36859408.

22. Pepe C, **Saadi A**, Molina RL. Reproductive Justice in the U.S. Immigration Detention System. Obstetrics & Gynecology 2023 10 01; 142(4):804-808. PMID: 37734088.

23. Diaz C, Nwadiuko J, **Saadi A**, Patler C. Advancing Research To Address The Health Impacts Of Structural Racism In US Immigration Prisons. Health Affairs (Millwood). 2023 10; 42(10):1448-1455. PMID: 37782876.

24. **Saadi A**, Marzoughi M, Kimball SL. Guiding Principles for Writing About Immigrants and Immigrant Health. Journal of Immigrant and Minority Health. 2023 Nov 04. PMID: 37924437.

25. **Saadi A**, Prabhu M, Snyder SA, Daboul L, Mateen F. Neurological Care in Refugees and Other Forcibly Displaced Persons. Seminars in Neurology. 2024 Mar 18. DOI: 10.1055/s-0044-1782495.

26. **Saadi A**, Platt RE, Danaher F, Zhen-Duan J. Partnering with Immigrant Patients and Families to Move Beyond Cultural Competence: Role for Clinicians and Health Care Organizations. Academic Pediatrics. 2024 Jul;24(5S):6-15. doi: 10.1016/j.acap.2023.06.016. PMID: 38991806

27. Kuczewski M, **Saadi A**. Medicine Must Plan to Protect Immigrant Patients. JAMA Internal Medicine. 2024 Oct 28. PMID: 39466266. *Co-First Authors*

28. Khanna A, Govil M, Ayele N, **Saadi A**. Disparities in Delirium Across the Continuum of Care and Associations with Social Determinants of Health. Seminar in Neurology. 2024 Dec; 44(6):752-761. PMID: 39209285

29. Green A, Emery E, Shadid O, Gartland M*, **Saadi A***. Applied Learning in Advanced Asylum Medicine: Piloting Experiential Learning in Forensic Medical Evaluations. Journal of Immigrant and Minority Health. 2025 Feb; 27(1):171-176. PMID: 39503833. *Co-Senior Authors*

30. Arteaga Argumedo A, Uechi MT, Gartland MG*, **Saadi A***. Embedding Health-Related Social Needs Screening and Resource Navigation in a U.S. Forensic Asylum Clinic: A Pilot Intervention. Journal of Primary Care & Community Health. 2025. PMID: 40525398

31. Creutzfeldt CJ, Bogetz J, Candrian C, Colborn KL, Crooms RC, Fehnel CR, Fleisher JE, Hasnain-Wynia R, Hopfgarten M, Hwang DY, Kluger BM, Leeper HE, Lemmon ME, Muehlschlegel S, Ritchie CS, **Saadi A**, Sumrall M, Treat L, Vranceanu AM, Zahuranec DB. Proceedings of the First Neuropalliative Care Research Summit (NeuroCARES). J Pain Symptom Manage. 2025 Aug 26. PMID: 40876664.

32. Suarez JA, Harrison DS, **Saadi A***, McFaline-Figueroa JR*. Simulation-Based Education to Promote Health Equity Skills in Neurology Residents. Neurology Education. 2025 Sep 3. Curriculum Resource Report:       https://www.neurology.org/media/blog-post/simulation-based-education-promote-health-equity-skills-neurology-residents *Co-Senior Authors*

33. Budhu JA, Mejia NI, **Saadi A**. Health disparities in neurology. Nat Rev Neurol. 2025 Sep 10. PMID: 40931141.

**Scholarship without named authorship**

1. **Physicians for Human Rights Asylum Policy Working Group**\*. Re-Imagining The Asylum System: Recommendations from Asylum Medicine Experts. Health Affairs Forefront. 2021 May 12. Doi: 10.1377/forefront.20210510.133971. (\*Member of the Forensic Asylum Evaluation Expert Group)

2. Hampton K, Mishori R, **Forensic Asylum Evaluation Expert Group\*.** What constitutes a high-quality, comprehensive medico-legal asylum affidavit in the United States immigration context? A multi-sectoral consensus-building modified Delphi. Journal of Forensic and Legal Medicine. 2023 May; 96:102513. doi:10.1016/j.jflm.2023.102513. Epub 2023 Apr 8. PMID: 37104900 (\*Member of the Forensic Asylum Evaluation Expert Group)

**Non-peer reviewed scholarship in print or other media:**

**Reviews, chapters, monographs and editorials**

1. **Saadi, A**, Mateen, F. The Internationalization of the American Academy of Neurology. Neurology. 2015 Feb 24; 84(4): 856-8. PMID: 25713111.

2. **Saadi A**, Lyons J. "Section 5: Infectious Disease." In Neurology Evidence: The Practice-Changing Studies, 1st edition. Ed by Brizzi K, Batra A, Salinas J, and Wang N. Philadelphia, PA: Wolters Kluwer, 2017. 114-125. Print.

3. **Saadi A**, McKee M. Hospitals as places of sanctuary. British Medical Journal. 2018 May 17; 361:k2178. PMID: 29773571.

4. Padela AI, Padela M, **Saadi A**, "Muslim Resident Cases," In Diversity and Inclusion in Quality Patient Care: Case Compendium. Ed by Martin M, Heron S, Moreno-Walton L, Strickland M, Springer, Cham, 2019.

5. Patler C, **Saadi A**, Panah HY. Immigration detention, COVID-19, and opportunities for action. UC Davis Global Migration Center, Physicians for Human Rights, and Immigrant Defense Advocates, Policy Brief, April 2020.

6. **Saadi A.** The Silence and Sorrow of Miscarriage. Journal of the American Medical Association. 2020 Sep 08; 324(10):941-942. PMID: 32897349.

7. **Saadi A**, Rodriguez JA. Addressing Privacy Concerns Central To Success of Telehealth Use Among Undocumented Immigrants. Health Affairs Forefront. 2020 Nov 23. Doi: 10.1377/forefront.20201118.621497

8. **Saadi A**, Al-Rousan T, AlHeresh R. Refugee Mental Health-An Urgent Call for Research and Action. JAMA Network Open. 2021 Mar 01; 4(3):e212543. PMID: 33724386.

9. **Saadi A**, Naples-Mitchell J, da Silva Bhatia B, Heisler M. End the use of "excited delirium" as a cause of death in policy custody. Lancet. 2022 03 12; 399(10329):1028-1030. PMID: 35247310.

10. Platt R, **Saadi A**, "Immigrant Health," In Health for Everyone: A Guide to Politically and Socially Progressive Healthcare. Ed by Berger Z, Rowman & Littlefield Publishers, 2022.

11. Patler C, **Saadi A**, Arulanantham A. Looking Back: Decarcerating Immigration Prisons as a Tool for Improved Health. American Journal of Public Health 2023 July 1; 113(7): 732-735. PMID: 37053530.

12. Berkman J\*\*, Budhu J, Torres J, **Saadi A**, "Chapter 1: Definitions and Descriptions," In Achieving Equity in Neurological Practice. Ed by Ovbiagele B, Correa DJ, Thomas R, Charleston L, and Lewis S, Springer Nature, Springer, 2024. **\*\*Mentee**

13. Budhu J, Naples-Mitchell J, da Silva Bhatia B, **Saadi A**. "Police misconduct and the pseudoscience behind the excited delirium defense," In Neuroscience in Criminal Justice Systems: The Positive Impact of Neurojustice. Ed by Berryessa C, Routledge, In Press.

14. Nigam M\*\*, **Saadi A**. "NeuroBytes: Social Determinants of Brain Health," American Academy of Neurology Online Learning Programs, In Production. **\*\*Mentee**

25

**Letters to the Editor**

1. **Saadi A**, Ahmed S, Katz MH. Medical care for undocumented immigrants-Reply. Journal of the American Medical Association. 2018 Apr 24; 319(16): 1727-1728. PMID: 29710157

2. **Saadi A,** Tesema L. Privatisation of immigration detention facilities. Lancet. 2019. Jun 8; 393(10188):2299. Epub 2019 May 20. PMID: 31122666.

3. Morris JE, **Saadi A**. The Biden administration's unfulfilled promise of humane border policies. Lancet. 2022 05 28; 399(10340):2013. PMID: 35644152.

**Professional educational materials or reports, in print or other media**

1. Hirsh D, Jackson A, **Saadi A**, Dalrymple J, Chang B, Krupat E, Cockrill B, "Getting Back up Again," Harvard Medical School Professional Development Week 3 OSCE case, 2016-

2. **Saadi A**, Acute and Chronic Epilepsy case-base discussions, Botswana National Medical Internship Training curriculum, 07/2016-

3. **Saadi A**, Hemorrhagic and Ischemic Stroke case-base discussions, Botswana National Medical Internship Training curriculum, 07/2016-

4. **Saadi A**, Black patients missing out on stroke treatment: About stroke and its treatments. Neurology. 2018 Jan; 90(5): e444-e446. PMID: 29378932.

5. **Saadi A**, Khoury M, Dietiker C, Mass A, Jacquemet N, Kuhn T. Module 8: Traumatic Brain Injury. In Emery E., DeFries T. (2022). Asylum Medicine Training Initiative: Asylum Medicine Introductory Curriculum. 2022. Panopto. https://pro.panopto.com/Panopto/Pages/Viewer.aspx?tid=9009e2b9-7ae6-4b7b-91e0-aed80111c48e.

6. **Saadi A**, Hayat N, Krishnamurthy S, Cooper, A, Nolen L, Gillette-Pierce K, Calac A, Essien UR, Fields NF, Lopez-Carmen VA, Onuoha C, Watkins A, Williams J, Tsai J, Ogunwole M, Khazanchi R. "Episode 21: Antiracist Healthcare for Immigrant and Refugee Populations " The Clinical Problem Solvers Podcast – Antiracism in Medicine Series. https://clinicalproblemsolving.com/antiracism-in-medicine/. April 25, 2023

**Abstracts, Poster Presentations and Exhibits Presented at Professional Meetings**

1. Young ME, Wallace SP, Rodriguez M, Pourat N, Guzman-Ruis I, **Saadi A.** A comparison of Latino and Asian immigrants' experiences of exclusion in work, school, and communities: Findings from the RIGHTS Survey. American Public Health Association Annual Meeting, November 2019 [selected oral abstract presented by Maria-Elena Young, co-author]

2. Morales B, **Saadi A**, Guzman I. Experiences of language discrimination and coping strategies of Mexican and Chinese-origin immigrants in healthcare and across multiple socioecological levels. American Public Health Association Annual Meeting, October 2021

3. Soriano-Cruz S**, Velasco M, Nadal R, Topalli S, Asfour J**, **Saadi A**, Living in limbo: The Deleterious Effects of Uncertainty on U.S. Asylum Seeker Health and Wellbeing, Poster Presentation at North American Refugee Health Conference, August 2024, Minneapolis, MN. **Mentee

4. **Saadi A**, Kannan K**, Choi K, Discrimination, Adverse Childhood Experiences, and Cognitive Function Among Youth, American Neurological Association Annual Meeting, September 2024, Orlando FL. **Mentee*

5. **Saadi A**, Thapa K, Patler C, Children's health following release of a family member from immigration detention, American Public Health Association Annual Meeting, November 2025, Washington D.C. [selected oral abstract]

6. Thapa K, **Saadi A**, Prevalence of concussion among children and adolescents in the United States, American Public Health Association Annual Meeting, November 2025, Washington D.C. [selected oral abstract]