PUBLIC COUNSEL
REBECCA BROWN (SBN 345805)
rbrown@publiccounsel.org
SOPHIA WRENCH (SBN 354416)
swrench@publiccounsel.org
AMELIA PIAZZA (SBN 342473)
apiazza@publiccounsel.org
VANESSA RAE YOUNG (SBN 352693)
vyoungviniegra@publiccounsel.org
ELIZABETH HERCULES-PAEZ (SBN 320944)
eherculespaez@publiccounsel.org
610 South Ardmore Avenue
Los Angeles, CA 90005
Tel: 213-385-2977

*Attorneys for Plaintiffs*
Additional Counsel Listed on Following Page

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| L.T., SEVAK MESROBIAN, JOSE MAURO SALAZAR GARZA, AND J.M., on behalf of themselves and all others similarly situated; COALITION FOR HUMANE IMMIGRANT RIGHTS,<br><br>Plaintiffs,<br><br>v.<br><br>U.S. IMMIGRATION AND CUSTOMS ENFORCEMENT; TODD M. LYONS, Acting Director, U.S. Immigration and Customs Enforcement; JAIME RIOS, Acting Director of Los Angeles Field Office, Enforcement and Removal Operations, U.S. Immigration and Customs Enforcement; U.S. DEPARTMENT OF HOMELAND SECURITY; KRISTI NOEM, Secretary, U.S. Department of Homeland Security,<br><br>Defendants. | Case No. 5:26-cv-00322-SSS-RAO<br><br>**DECLARATION OF NICOLÁS THOMPSON-LLERAS IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION**<br><br>**CLASS ACTION** |

IMMIGRANT DEFENDERS LAW CENTER
ALVARO M. HUERTA (SBN 274787)
ahuerta@immdef.org
CARSON ADRIANNA SCOTT (SBN 337102)
cscott@immdef.org
ALISON STEFFEL (SBN 346370)
asteffel@immdef.org
634 S. Spring Street, 10th Floor
Los Angeles, CA 90014
Tel: 213-634-0999

COALITION FOR HUMANE IMMIGRANT RIGHTS
CARL BERGQUIST (*pro hac vice*)
cbergquist@chirla.org
2351 Hempstead Road
Ottawa Hills, OH 43606
Tel: 310-279-6025

ADAM REESE (SBN 362898)
areese@chirla.org
2533 West Third Street, Suite 101
Los Angeles, CA 90057
Tel: 213-353-1333

WILLKIE FARR & GALLAGHER LLP
NICHOLAS REDDICK (SBN 288779)
nreddick@willkie.com
STEPHEN HENRICK (SBN 310539)
shenrick@willkie.com
ALYXANDRA VERNON (SBN 327699)
avernon@willkie.com
JACOB KARIM (SBN 340376)
jkarim@willkie.com
333 Bush Street, 34th Floor
San Francisco, CA 94104
Tel: 415-858-7400

*Attorneys for Plaintiffs*

# DECLARATION OF NICOLÁS THOMPSON-LLERAS

I, Nicolás Thompson-Lleras, declare that:

1. I, Nicolás Thompson-Lleras, make this declaration based on personal knowledge and a review of records related to my position as a Staff Attorney for the Coalition for Humane Immigrant Rights ("CHIRLA"). I make the following statements on behalf of myself in my capacity as a Staff Attorney for CHIRLA. If called to testify, I could and would do so competently.

2. I am an attorney admitted to practice in the State of Illinois, State Bar Number 6346605. I am also qualified to practice in front of the Executive Office of Immigration Review.

3. I am currently employed as a staff attorney in the Removal Defense Unit ("RDU") for CHIRLA.

4. As a removal defense attorney, my responsibilities include full-scope representation of people in immigration removal proceedings, including both their substantive removal case and their bond proceedings. I represent people on both the detained and non-detained docket. In addition to my work directly representing individuals, I also conduct intakes and assist with rapid response efforts and community education.

5. I regularly go to Adelanto to meet with detained clients or conduct screening intakes with prospective clients to determine whether CHIRLA can represent them or to pass along their intake information to partner organizations who may be able to do so. I have been to Adelanto over ten times in the last year. I have spoken with about 20-25 individuals detained there. I have also spoken with at least a dozen people who are or have been detained at Adelanto over the phone.

## I. Clients Described Oppressive Conditions at Adelanto.

6. As an attorney, I have witnessed how people detained at Adelanto are suffering there. Almost every detained person I have spoken to at Adelanto has complained of the conditions. I have heard many identify the same deficiencies in

material conditions and the way they are treated by the guards. These recurring complaints are clustered around a certain set of common problems, including issues with: (1) poor food; (2) unclean water; (3) aggressive behavior from guards; and (4) a pervasive lack of medical care.

7. Around ten of the detained individuals I have spoken to have raised concerns about the food they are served. They report that the food is of poor quality, sometimes rotten or stale. They further report that nutrition is inadequate, the meal times are erratic, portions are small, many have gotten sick from the food, and many are often hungry. Some are forced to supplement their diet by purchasing additional food through the commissary. Others are too poor to do so. People who require a controlled diet, such as those who have diabetes, report that there has been a lack of accommodations for their diet.

8. The detained individuals I have spoken with have also regularly expressed concern about the quality of water they are given to drink as well as the water from the faucet. The drinking water is provided in jugs once or twice a day and rationed among the units. People report that the water in the jugs smells and has a strange color. They are also concerned that the faucet water is not potable. Detained individuals will drink it only out of desperation.

9. People have also reported that the guards can be aggressive and retaliatory. The guards sometimes threaten, demean, and punish detained people arbitrarily. Sometimes individuals are sent to solitary for no apparent reason or a minimal one. One individual was sexually harassed by other detainees and attempted to make a report. The guards told him he was not allowed to talk to the police about this.

10. I have also heard of people getting punished for looking out for each other. One individual told me that a fellow detained person had been threatened with solitary confinement by Adelanto guards for attempting to give up his lower bunk to

an older gentleman who could not reach the high bunk that the facility had assigned him.

11. I have heard that visitation procedures have been restricted and grown more arbitrary over time. It is my understanding that families can only see their loved ones during a specific window of time based on where their loved one is housed. Some of my clients' families struggle to keep up with the changes or inconvenient time slots and so are forced to visit their detained loved one less often. The effect of not being able to see family takes a toll on detained individuals' resilience and desire to fight their claim.

**II. Adelanto Routinely Fails to Provide Medical Care.**

12. I have also seen my actual and prospective clients endure pervasive medical neglect at Adelanto. This reality diverts our resources and has impacted my ability to represent my current clients and to potentially take on others.

13. In my position, I regularly review our internal log of people who have called seeking help. Dozens of detained individuals or their loved ones call on a weekly basis. I estimate that at least a dozen people or their loved ones call every week to report that they have a serious condition or illness and are experiencing medical neglect.

14. I have heard of people experiencing a range of continuity of care issues at Adelanto. Individuals in all sorts of postures and with a variety of medical conditions report consistent problems with Adelanto failing to manage their care. Some were detained and initially taken to a hospital for acute medical needs, then to Adelanto, where they are not receiving adequate follow-up care. Others with preexisting conditions that require managed care are not receiving such care at Adelanto. And people who have suffered urgent medical issues while at Adelanto and have been hospitalized are not receiving the proper aftercare they require.

15. For instance, if a hospital's discharge orders say a detainee needs to have access to low bunk or accessibility features, those accommodations will sometimes

not be respected. Prescriptions are inconsistently filled at Adelanto, leading to dangerous lapses. If people have follow up appointments with a specialist, ICE will sometimes not take them outside of the facility for those appointments.

16. One of my clients was taking metformin to manage his diabetes. He had been detained with a pack of metformin tablets in his pockets. When he arrived at Adelanto, he asked the guards to give him back his medicine since so much time had passed since he had last taken it. This client told me that when the metformin was finally returned, each individual pill had been smashed in its packaging, leaving behind a useless powder.

17. The provision of care within the facility is also abysmal. People who develop injuries or illnesses go ignored. They are told to fill out a so-called “kite,” or a message directed to the facility. The staff ignore their kite requests for medical care. Even if the guards do pass along messages, the transmitted requests do not always result in action or care. I have also heard of people with particular medical needs being isolated in some kind of medical segregation unit for having special medical requirements.

18. One of my clients has been experiencing chronic tooth pain. He was told that he could not get dental care because the facility’s official policy is that only people who have been there for more than six months can see a dentist. He recently hit the six-month mark and has yet to receive his promised treatment.

19. On at least three occasions, I have personally had to make complaints on behalf of my clients with the ICE officers and Adelanto staff to request that they provide medical evaluations and care when my client’s medical needs have become dire and/or when Adelanto has failed to heed their requests for care. In several cases, it was only after I intervened that my clients got care. Were it not for me intervening, I worry they would not get care. I feel a moral obligation to do everything within my power to lessen the suffering of my clients. If that means that I have to spend additional time advocating for their basic medical care, I will do it even if it

necessarily diverts me from my actual job duties. Adelanto's negligence in the face of clear human suffering forces my hand.

20. Because I have seen people more than once over the course of their detention, I have witnessed people's health decline. I have observed them lose weight and their complexion turn white or sallow-faced. I have also seen visible signs of illness, including sores and rashes. When I have returned to see those individuals, I have seen that they continue to have sores or rashes. One client had inflamed red sacs of fluid on his arms that I saw grow worse over the course of several visits.

21. Adelanto's official medical care procedures and capabilities are obscure and we do not have a lot of accessible information about our client's health and wellbeing. I am not notified if my client is taken to the hospital. Neither is their family. I only find out after the fact from my client's families, not from Adelanto itself.

**III. Being Detained at Adelanto Coerces People into Accepting Deportation**

22. I have also witnessed people suffer from a policy of induced despair. I have talked to people who enter Adelanto feeling positively about their case, but slowly lose all hope as they suffer day after day of mistreatment. People are traumatized and shocked by their detention there. Many do not understand why they are there. Most understand detention to be an indication of criminality or deviance and are confused about being placed in that category when they have never committed a crime. The detained people I speak with tell me they have never been in detention before and say, I am not this type of person, by which they mean a criminal. People do not understand why they are being detained for their immigration case. My clients see detention as punishment, and there is a significant psychological trauma associated with arbitrary punishment and confinement at Adelanto. The conditions at Adelanto are so bad that they are certainly suggestive of an intent to punish. It feels like the logic of the facility is to drive people to such a state of hopelessness that they give up regardless of their possibilities of release or the strength of their claim for relief in immigration court.

23. I have heard people say that they were considering agreeing to their own deportation—whether through voluntary departure, a stipulated removal order, or abandoning their appeal if they already had a removal order lodged against them—because they did not want to have to endure being at Adelanto. Voluntary departure and self-deportation are often on people's minds. It is a function of the perceived hopelessness of their case and the indignity they are suffering.

24. Many people seem to know that being detained at Adelanto is a horrific experience. The fear spills over the walls and reaches people on the outside. My clients watch the news and learn about what detention at Adelanto means. My non-detained clients are terrified of the prospect of being detained at Adelanto, so much so that they wonder whether the risk of being detained at their court hearing outweighs the risk of being detained for having missed the hearing. The possibility of detention at Adelanto scares them and serves as a warning—some are so scared of that possibility that they start to consider voluntary departure or self-deportation preemptively, even if their asylum claims or other claims for relief are strong and meritorious.

25. Then there are the people actually detained there who cannot handle it and feel sick and desperate. Many of these people have some form of pending applications for relief, such as asylum claims or U visas. Because of wait times and their rational sense that judges are restricting access to bond, however, may worry that they do not have a future here. They think it is better to abandon their legal claim than to have to continue to suffer while detained at Adelanto. The fact that some people are considering accepting their own deportation and in some cases would rather risk torture or death in their countries of origin rather than risk detention at Adelanto is striking.

26. One individual was detained after working under his car speaking Spanish. He is an elderly gentleman with diabetes as well as other chronic pulmonary and cardiological health conditions. During his arrest, he was dragged across concrete

by ICE agents. At the temporary holding facility in Los Angeles, B-18, he suffered some kind of medical emergency and was taken to the hospital. I visited him at the hospital; CHIRLA was interested in representing him in his removal and bond proceedings.

27. As soon as he was taken to Adelanto, everything changed. His family and brother did not want him to stay there. They felt hopeless about the situation and thought it would be better if he was deported and got treatment in another country—even if the treatment quality was worse—rather than stay at Adelanto. We later learned that he no longer wanted to fight his case and intended to take voluntary departure. He did not think he could endure detention as an elderly man with health issues. Because he did not want to fight his case, CHIRLA could not take on his representation.

## IV. The Conditions at Adelanto Impact My Representation and Strain CHIRLA's Ability to Provide Services

28. The conditions at Adelanto and pervasive lack of medical care have placed an additional burden on attorneys representing individuals detained there and on CHIRLA as an organization more generally. The pervasive medical neglect increases the volume of our calls and slows down our ability to screen prospective clients—because our staff has to spend more time on medical issues, we can spend less time screening someone's legal claims. We do not have the staff to be responding to all the calls for help with medical issues. And those suffering from inadequate medical care are typically harder to screen for relief; they may be distracted and not well enough to participate in a conversation.

29. We have had to develop discrete reporting mechanisms for priority cases, many of which are individuals with medical concerns as a result of not getting care. This potentially delays release for others who have been detained longer as we try to help people with the most dire issues. It is a significant diversion of resources because

we need to take down more details and, on occasion, intervene by using our authority as attorneys to persuade Adelanto to take our clients' medical claims seriously.

30. The conditions at Adelanto have also affected my representation of current clients. I have to constantly monitor my clients' health. I cannot represent people who are dead or incapacitated. As clients get sicker, their health becomes their number one priority; this shifts their attention and energy and focus to their own survival, and their immigration case becomes a second-order need. The time I spend investigating their health and advocating on their behalf is time I am not spending on their removal case or on someone else's case. The scope of my representation has come to include making complaints on their behalf for medical care, relaying critical information between the person detained and their family, and keeping track of violations of their rights. These circumstances make my job harder. Screening and representing people who are declining due to the conditions at Adelanto slows down my ability to represent them. I should not have to spend time begging Adelanto to provide my client's basic medical care. In the context of the hundreds of calls we are fielding, the opportunity cost of any diversion is enormous.

I declare under penalty of perjury that the foregoing is true and correct. Executed on March 4, 2026 in Los Angeles, California.

Nicolás Thompson-Lleras