ROB BONTA
Attorney General of California
MICHAEL L. NEWMAN
Senior Assistant Attorney General
VILMA PALMA-SOLANA
Supervising Deputy Attorney General
ALEX E. FLORES
Deputy Attorney General
State Bar No. 303552
 300 South Spring Street, Suite 1702
 Los Angeles, CA  90013-1230
 Telephone:  (213) 269-6049
 E-mail:  alex.flores@doj.ca.gov
*Attorneys for the State of California*

IN THE UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

EASTERN DIVISION – RIVERSIDE

| | |
|---|---|
| L.T., SEVAK MESROBIAN, JOSE MAURO SALAZAR GARZA, AND J.M., on behalf of themselves and all others similarly situated; COALITION FOR HUMANE IMMIGRANT RIGHTS,<br><br>                                        Plaintiffs,<br><br>           v.<br><br>U.S. IMMIGRATION AND CUSTOMS ENFORCEMENT; TODD M. LYONS, Acting Director, U.S. Immigration and Customs Enforcement; JAIME RIOS, Acting Director of Los Angeles Field Office, Enforcement and Removal Operations, U.S. Immigration and Customs Enforcement; U.S. DEPARTMENT OF HOMELAND SECURITY; KRISTY NOEM, Secretary, U.S. Department of Homeland Security,<br><br>                                        Defendants. | Case No. 5:26-cv-00322-SSS-RAO<br><br>**[PROPOSED] BRIEF OF AMICUS CURIAE THE STATE OF CALIFORNIA, BY AND THROUGH ROB BONTA, ATTORNEY GENERAL, IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION**<br><br>Date:           April 10, 2026<br>Time:           2:00 pm<br>Courtroom:   2<br>Judge:          Hon. Sunshine Sykes<br>Action Filed: Jan. 26, 2026 |

[Proposed] Amicus Curiae Brief in Support of Plaintiffs' Motion for Preliminary Injunction (5:26-cv-00322-SSS-RAO)

# TABLE OF CONTENTS

**Page**

Introduction ................................................................................................................ 1

Interest of Amicus Curiae ........................................................................................ 2

Background ................................................................................................................. 3

Argument .................................................................................................................... 4

    I.    As Demonstrated by Amicus Curiae's Four Reports, the Conditions Complained of by Plaintiffs have been Present At Adelanto for Years. ................................................................................ 4

        A.    Prior Issues Related to Medical Care ......................................... 5

        B.    Prior Issues Related to Mental Health Care ............................. 6

        C.    Prior Issues Related to Use of Force ......................................... 8

        D.    Prior Issues Related to Due Process ......................................... 8

    II.    Amicus Curiae's Findings and Observations During Its Most Recent Visit to Adelanto in July 2025 Echo the Issues Raised in Plaintiffs' Motion. ............................................................................. 9

        A.    Insufficient Detention Staff for the Overwhelming Increase in Population .......................................................... 9

        B.    Insufficient Healthcare Staff for the Overwhelming Increase in Population .......................................................... 10

        C.    Amicus Curiae Found Concerning Health Care Issues ........... 11

        D.    Issues Related to Food and Water ........................................... 13

        E.    Issues with Adelanto's Use of Force and Pepper Spray ........... 14

        F.    Reported Concerns Related to Housing Conditions ................ 15

        G.    Issues Related to Due Process .................................................. 16

    III.    Deaths of Three Men Held at Adelanto. ........................................ 17

    IV.    ICE's Security Classification Adversely Impacts Conditions of Confinement. ....................................................................... 18

    V.    The Public Interest Favors a Preliminary Injunction Because ICE's Conditions of Confinement Will Continue to Inflict Serious and Irreparable Harms on Individuals Detained at Adelanto. .......................................................................... 20

Conclusion ............................................................................................................... 21

# TABLE OF AUTHORITIES

**Page**

CASES

*Golden Gate Rest. Ass'n v. City & Cnty. of S.F.*
512 F.3d 1112 (9th Cir. 2008)..................................................................4

*L.T. et al., v. ICE, et al.*
5:26-cv-00322, Dkt. 1..............................................................................21

*Miller-Wohl C. v. Comm'r of Lab. & Indus. State of Mont.*
694 F.2d 203 (9th Cir. 1982).....................................................................2

*N.G.V. Gaming Ltd. v. Upstream Point Molate, LLC*
355 F.Supp.2d 1061 (N.D. Cal. 2005).......................................................2

*Rivera Martinez v. GEO Group*
(C.D.Cal. Jan. 30, 2020, No. 5:18-cv-01125) ECF No. 205 .....................14

*Rivera Martinez v. GEO Group*
(C.D.Cal., May 25, 2018, No. 5:18-cv-01125) ECF No. 1 ........................14

*Roman v. Wolf*
No. EDCV 20-00768 TJH, 2020 WL 5797918 (C.D. Cal., Sept. 29, 2020).........................................................................................................6

*Roman v. Wolf*
No. EDCV 20-00768 TJH (PVCX), Dkt. No. 2636 (C.D. Cal. Dec. 23, 2024).......................................................................................................10

*Roman v. Wolf*
No. EDCV 20-00768 TJH (PVCX), Dkt. No. 2670 (C.D. Cal. Jan. 24, 2025).......................................................................................................10

*Roman v. Wolf*
No. EDCV 20-00768 TJH (PVCX), Dkt. No. 2704 (C.D. Cal. June 2, 2025).........................................................................................................10

*Roman v. Wolf*
No. EDCV 20-00768 TJH (PVCX), Dkt. No. 914 (C.D. Cal. Jan. 11, 2021).........................................................................................................6

**TABLE OF AUTHORITIES**
**(continued)**

Page

*Sonoma Falls Developers, L.L.C. v. Nev. Gold & Casinos, Inc.*
272 F.Supp.2d 919 (N.D. Cal. 2023)......................................................................2

*Stormans, Inc. v. Selecky*
586 F.3d 1109 (9th Cir. 2009).................................................................................4

*Stuhlbarg Int'l Sales Co. v. John D. Brush & Co.*
240 F.3d 832 (9th Cir. 2001)...................................................................................4

*Torres v. U.S. Dep't of Homeland Sec.*
(C.D. Cal., Oct. 16, 2025. No. 5:18-cv-02604-JGBSHKx), Dk. 233 .................9

*Torres v. U.S. Dep't of Homeland Sec.*
(C.D. Cal., Apr. 24, 2020, No. 5:18-cv-2604-JGBSHKx) 2020 WL
3124305 ....................................................................................................................9

*United States v. California*
921 F.3d 865 (9th Cir. 2019)...................................................................................2

*Washington v. United States Food & Drug Admin.*
668 F. Supp. 3d 1125 (E.D. Wash.) .......................................................................4

*Winter v. Nat. Res. Def. Council*
555 U.S. 7 (2008) ....................................................................................................4

**STATUTES**

Cal. Gov't Code
§ 12532 .....................................................................................................................3
§ 12532(a)..............................................................................................................2, 3
§ 12532(b)(1)(A)-(B)............................................................................................2, 3
§ 12532(b)(2) .........................................................................................................2, 3

California Assembly Bill 103, 2017-2018 Reg. Sess. (Cal. 2017)......................1, 4

**OTHER AUTHORITIES**

Araceli Martinez Ortega, *Mexican Immigrant Dies in ICE Jail in
Adelanto*, La Opinion (Mar. 1, 2026)..................................................................18

**TABLE OF AUTHORITIES**
**(continued)**

**Page**

Caitlin Patler & Gabriela Gonzalez, *Compounded Vulnerability: The Consequences of Immigration Detention for Institutional Attachment and System Avoidance in Mixed-Immigration-Status Families*, Oxford University Press (Dec. 2020) .................................................................20

The Cal. Coal. For Universal Representation, *California's Due Process Crisis: Access to Legal Counsel for Detained Immigrants* (June 2016) ................................................................................................................3

Cal. Dep't of Just., *Immigration Detention in California: A Comprehensive Review with a Focus on Mental Health* (Apr. 2025) ...4, 7, 8, 11

Cal. Dep't of Just., *Immigration Detention in California: A Review of Detention Facilities' Response to COVID-19 as of Fall 2021* (July 2022) .................................................................................................4, 6

Cal. Dep't of Just., *Immigration Detention in California* (Feb. 2019) ..................4, 5

Cal. Dep't of Just., *Immigration Detention in California* (Jan. 2021)..............*passim*

Clara Long et al., *Code Red: The Fatal Consequences of Dangerously Substandard Medical Care in Immigration Detention*, Human Rights Watch (Jun. 20, 2018) ..............................................................................3

Gabrielle LaMarr LeMee, *ICE Wants to Expand Detention Capacity in California. This New Facility Will Be the Largest in the State*, Los Angeles Times (June 19, 2025) ..................................................................3

Izzy Ramirez, *Ten Days After Adelanto Internment, This Beloved Grandfather Died in Custody*, L.A. Taco (Nov. 4, 2025) .................................17

Karma Dickerson and Jonathan Lloyd, *Timeline: How Immigration Enforcement Operations Unfolded in Los Angeles*, NBC4 Los Angeles (updated July 7, 2025) ........................................................................1

Marc Cota-Robles, *Westlake Man Dies While in ICE Custody at Adelanto Detention Center, LA Councilmember Says*, ABC7 News (Mar. 3, 2026) ...........................................................................................18

**TABLE OF AUTHORITIES**
**(continued)**

**Page**

Mathew Miranda, *California ICE Detention Doubles in One Year. One center surges from 3 to 1,800*, The Sacramento Bee (Feb. 6, 2026)..............3, 10

Myriam Vidal Valero, *U.S. Immigration Policy: Mental Health Impacts of Increased Detentions and Deportations*, American Psychological Association (Sept. 2025) ......................................................................20

Rebecca Plevin, *Asylum-Seekers Allegedly Pepper-Sprayed at Adelanto Detention Center Settle with GEO Group*, Palm Spring Desert Sun (Feb. 6, 2020)........................................................................14

Ruben Vives and Jenny Jarvie, *A Former DACA Recipient Died in ICE Custody. Did Officials Ignore His pleas for Help?*, L.A. Times (Sept. 24, 2025) ......................................................................17

*Settlement Protects Access to Counsel and Phone Calls in Immigration Detention*, Immigrant Defenders Law Center (Aug. 22, 2025) ..........................9

Taylor S. Mitchell, *ICE Denies Wrongdoing in Death of Man in California Immigration Facility*, Huffington Post (Mar. 4, 2026)....................18

U.S. Immigr. & Customs Enf't, *FOIA Reports: List of Deaths in ICE Custody: Data from Oct. 1, 2003 to June 5, 2017*, 1-17 ..................................3, 5

U.S. Immigr. & Customs Enf't, Office of Detention Oversight, *Inspection 2025-001-082: Adelanto ICE Processing Center, Adelanto, California* (Sept. 16-18, 2025)............................................10

U.S. Immigr. & Customs Enf't., *Detainee Death Notifications* (Mar. 4, 2026)........................................................................18

U.S. Immigr. & Customs Enf't, *Detainee Death Report: Ayala Uribe, Ismael*..............................................................................17

U.S. Immigr. & Customs Enf't, *Detainee Death Report: Garcia Aviles, Gabriel*............................................................................17

U.S. Immigr. & Customs Enf't, *Performance-Based National Detention Standards 2011* ..............................................................*passim*

**INTRODUCTION**

The Adelanto ICE Processing Center (Adelanto) was overwhelmed as it went from holding seven individuals in November 2023 to detaining 1,570 people on July 8, 2025. Most newly arrived individuals came in as part of an unprecedented and surreal period for California which started in early June 2025 when the federal government conducted raids across Los Angeles; detained hundreds of immigrants at work; arrested protestors; and using the federalized National Guard and the Marines, turned the streets of Los Angeles into a battlefield.[1]

The California Attorney General's office reviews civil immigration detention facilities across the state, including Adelanto, pursuant to California Assembly Bill 103 (AB 103). A.B. 103, 2017-2018 Reg. Sess. (Cal. 2017). By virtue of this statutory mandate to review and report on conditions of confinement, how those conditions affect due process, and the standard of care afforded at immigration detention facilities, the Attorney General's office is intimately familiar with the conditions at Adelanto.

During its latest review on July 8-9, 2025, the Attorney General's office found, among other things, a facility that was overwhelmed with the rapid population increase; insufficient staffing; failures to attend to urgent medical needs, to care for individuals with chronic conditions, and to ensure specialty care referrals; and use of force concerns. The Attorney General's office also heard many reports from individuals about a lack of access to medical care; issues with water and improperly cooked food; issues with housing conditions; and the unavailability of phones for prolonged periods, which may impact detained individuals' due process rights by limiting their ability to communicate with counsel. While the Attorney General's office has previously reported on these issues, there is an added

---

[1] Karma Dickerson and Jonathan Lloyd, *Timeline: How Immigration Enforcement Operations Unfolded in Los Angeles*, NBC4 Los Angeles (updated July 7, 2025), https://tinyurl.com/5n87wfwc.

urgency because three men detained at Adelanto died between September 2025 and February 2026.

Based on its experience and the ongoing deaths, Amicus Curiae believes that without court intervention and preliminary relief, the conditions complained of by Plaintiffs will continue to exist unabated.

## INTEREST OF AMICUS CURIAE

The State of California, by and through Rob Bonta, Attorney General (Amicus Curiae) has strong interests in this litigation. First, Amicus Curiae has an interest in the health and safety of persons held in detention within the State. *United States v. California*, 921 F.3d 865, 884-885 (9th Cir. 2019).

Second, Amicus Curiae is statutorily mandated to review and report on conditions of confinement within immigration detention facilities. Cal. Gov't Code § 12532(a), (b)(1)(A)-(B), (b)(2). Based on this work, Amicus Curiae is uniquely positioned to provide valuable information and perspective to this Court, beyond what attorneys from the parties can provide. *N.G.V. Gaming Ltd. v. Upstream Point Molate, LLC*, 355 F.Supp.2d 1061, 1067 (N.D. Cal. 2005) (internal quotation marks and citation omitted); *Sonoma Falls Developers, L.L.C. v. Nev. Gold & Casinos, Inc.*, 272 F.Supp.2d 919, 925 (N.D. Cal. 2023) (internal quotation marks and citations omitted). Amicus Curiae is also in the position to assist this Court in a case of general public interest by providing the Court with unique factual findings beyond what the parties can provide. *Miller-Wohl C. v. Comm'r of Lab. & Indus. State of Mont.*, 694 F.2d 203, 204 (9th Cir. 1982).

Third, Amicus Curiae also has a strong interest in ensuring that federal agencies refrain from actions that—like those at issue in this matter—are unconstitutional, discriminatory, and arbitrary and capricious. Since many of Amicus Curiae's residents are being held at Adelanto, Amicus Curiae has a strong interest in ensuring federal agencies' treatment of those within the State of

California is constitutional considering the increased immigration enforcement and detention.[2]

## BACKGROUND

In fiscal year 2017, "more people died in immigration detention . . . than in any year since 2009," due to conditions "linked to dangerously inadequate medical care."[3] Three of those deaths occurred at Adelanto.[4] Following increased immigration enforcement during the first Trump Administration, years-long troubling conditions inside the facilities,[5] including deaths at Adelanto,[6] the California Legislature enacted AB 103, codified as California Government Code Section 12532.

AB 103 requires the California Attorney General to review and report on "the conditions of confinement" and "of the standard of care and due process provided" to detained individuals held at "private locked detention facilities in which noncitizens are being housed or detained for purposes of civil immigration proceedings in California." Cal. Gov't Code, § 12532(a), (b)(1)(A)-(B), (b)(2). Through AB 103, Amicus Curiae is responsible for bringing transparency to the health and safety of those detained in the seven privately-operated civil immigration detention facilities in the state, including Adelanto and its next-door facility, Desert View Annex.

---

[2] Gabrielle LaMarr LeMee, *ICE Wants to Expand Detention Capacity in California. This New Facility Will Be the Largest in the State*, Los Angeles Times (June 19, 2025), https://tinyurl.com/2t6w3y2u (estimating that with the addition of the newly opened California City detention facility in late-August 2025, the state's capacity to hold immigrants will increase by 36 precent, "bringing the count of available beds to 9,700."); Mathew Miranda, *California ICE Detention Doubles in One Year. One center surges from 3 to 1,800*, The Sacramento Bee (Feb. 6, 2026), https://tinyurl.com/4hbnfw72 (reporting that over 6,400 people are being held each day throughout California's immigration detention facilities, which is more than double the average from one year ago).

[3] Clara Long et al., *Code Red: The Fatal Consequences of Dangerously Substandard Medical Care in Immigration Detention*, Human Rights Watch (Jun. 20, 2018), https://tinyurl.com/2mryey8w.

[4] *Id.*; U.S. Immigr. & Customs Enf't, *FOIA Reports: List of Deaths in ICE Custody: Data from Oct. 1, 2003 to June 5, 2017*, 1-17, https://tinyurl.com/2hfrry9r.

[5] The Cal. Coal. For Universal Representation, *California's Due Process Crisis: Access to Legal Counsel for Detained Immigrants* (June 2016), https://tinyurl.com/mvpfctze.

[6] U.S. Immigr. & Customs Enf't, *supra*, note 4, at 1.

[Proposed] Amicus Curiae Brief in Support of Plaintiffs' Motion for Preliminary Injunction (5:26-cv-00322-SSS-RAO)

Since the passage of AB 103, Amicus Curiae, together with civil immigration detention and healthcare experts, has inspected Adelanto five times (in 2018, 2019, 2021, 2023, and 2025); published four reports detailing its findings; and is in the process of publishing a fifth report.[7]

## ARGUMENT

Amicus Curiae files this brief in support of Plaintiffs' motion for preliminary injunction focusing on one of the four factors at issue: whether preliminary relief is in the public interest. *Winter v. Nat. Res. Def. Council*, 555 U.S. 7, 20 (2008); *Stuhlbarg Int'l Sales Co. v. John D. Brush & Co.*, 240 F.3d 832, 839 n.7 (9th Cir. 2001) (standard for temporary restraining order is the same for preliminary injunction). The public interest is particularly relevant where the impact of the dispute reaches beyond the parties and carries the potential for public consequences. *Stormans, Inc. v. Selecky*, 586 F.3d 1109, 1139 (9th Cir. 2009); *Golden Gate Rest. Ass'n v. City & Cnty. of S.F.*, 512 F.3d 1112, 1126–27 (9th Cir. 2008). Third-party harms relevant to the public interest analysis include, among others, public health harms. *Washington v. United States Food & Drug Admin.*, 668 F. Supp. 3d 1125, 1142 (E.D. Wash.), *opinion clarified*, 669 F.Supp.3d 1057 (E.D. Wash. 2023) (concluding that public interest favored injunctive relief "[b]ased on the public health and administrative considerations at issue in this case.").

## I. AS DEMONSTRATED BY AMICUS CURIAE'S FOUR REPORTS, THE CONDITIONS COMPLAINED OF BY PLAINTIFFS HAVE BEEN PRESENT AT ADELANTO FOR YEARS.

The conditions discussed throughout Plaintiffs' motion for preliminary injunction echo the conditions of confinement observed and reported in Amicus

---

[7] *See* Cal. Dep't of Just., *Immigration Detention in California* (Feb. 2019), https://tinyurl.com/5cedp2xn; Cal. Dep't of Just., *Immigration Detention in California* (Jan. 2021), https://tinyurl.com/bddhswt2; Cal. Dep't of Just., *Immigration Detention in California: A Review of Detention Facilities' Response to COVID-19 as of Fall 2021* (July 2022), https://tinyurl.com/fdaf49jk; Cal. Dep't of Just., *Immigration Detention in California: A Comprehensive Review with a Focus on Mental Health* (Apr. 2025), https://tinyurl.com/4hn9v7h4.

Curiae's past four AB 103 reports. Throughout its prior reports, Amicus Curiae documented Adelanto's failures in its provision of medical and mental health care, and conditions of confinement; and how those conditions affect due process.

From its first report published in February 2019, Amicus Curiae raised several concerns related to reports of Adelanto's failure to adhere to U.S. Immigration and Custom Enforcement's (ICE) Performance-Based National Detention Standards (PBNDS).[8] These concerns were echoed by federal government oversight reports[9] and lawsuits filed in 2017 and 2018.[10] For example, on September 27, 2018, a report by the U.S. Department of Homeland Security's (DHS) Office of the Inspector General (OIG) addressed three deaths and six unsuccessful suicide attempts at Adelanto during federal fiscal year 2017.[11] The three 2017 deaths occurred between March and May, there were also two deaths in 2015, and one death in 2012.[12] In Adelanto's February 2019 National Commission on Correctional Health Care accreditation audit, it was found that at intake, those with major diagnoses were not adequately processed, resulting in nursing staff failing to take follow-up baseline blood sugar levels for two diabetics.[13]

### A.   Prior Issues Related to Medical Care

In its 2021 report, when Adelanto had a population count similar to its present count, Amicus Curiae found several issues related to the provision of health care.[14] Amicus Curiae found incomplete health care records and compromised patient confidentiality caused by staff including medical and mental health history details in custody detention files.[15] Amicus Curiae also found inadequate care for chronic

---

[8] *See* Cal. Dep't of Just. (Feb. 2019), *supra*, note 7, at i-iv, 121-128.
[9] *Id.* at 21-23.
[10] *Id.* at 23.
[11] *Id.*
[12] *See* Long, *supra*, note 3; see also U.S. Immigr. & Customs Enf't, *supra* note 4, at 1, 3, 5.
[13] Cal. Dep't of Just. (Feb. 2019), *supra*, note 7, at 54.
[14] Cal. Dep't of Just., (Jan. 2021), *supra*, note 7, at 51-61.
[15] *Id*. at 52-53.

illnesses.[16] For example, chronic care was managed by a registered nurse; however registered nurses are not adequately trained to manage the complexities of chronic disease and a nursing model that oversees chronic healthcare patients long-term is not in accordance with good medical practice.[17] Further, care was not documented within the rest of the patients' medical records in Adelanto's electronic records system, creating two different records systems.[18] The 2021 report also found delayed care and inadequate continuity of care.[19]

Amicus Curiae's July 2022 report focused on challenges and responses by facilities to the COVID-19 pandemic.[20] During its November 12, 2021 inspection, Amicus Curiae found Adelanto with a population of less than five percent of its past population, after suspending intake in September 2021 as a result of an injunction in a lawsuit seeking relief from dangerous COVID-19-related conditions inside Adelanto.[21] As a result of Adelanto's population decrease and other court orders, some COVID-19-related precautions such as social distancing;[22] facility-wide testing practices;[23] and vaccination rates[24] were generally accomplished at Adelanto. However, in other issues such as twice-daily temperature and system checks of high-risk individuals, Adelanto was not fully compliant.[25]

### B.   Prior Issues Related to Mental Health Care

In its 2021 report Amicus Curiae found that while approximately 20 percent of the population received mental health services, Adelanto was understaffed,

---

[16] *Id*. at 34, 52-53.
[17] *Id*. at 52, 53.
[18] *Id*. at 52, 53.
[19] *Id*. at 53-54.
[20] *See* Cal. Dep't of Just., (July 2022), *supra*, note 7, at 1-3.
[21] *Id*. at 10, 13, 27; *see also Roman v. Wolf*, No. EDCV 20-00768 TJH (PVCX), 2020 WL 5797918 (C.D. Cal., Sept. 29, 2020), *aff'd in part, vacated in part, remanded to*, 977 F.3d 935 (9th Cir. 2020); *and* Amended Adelanto Population Reduction Order, *Roman v. Wolf*, No. EDCV 20-00768 TJH (PVCX), Dkt. No. 914 (C.D. Cal. Jan. 11, 2021).
[22] Cal. Dep't of Just., (July 2022), *supra*, note 7, at 27.
[23] *Id*. at 33
[24] *Id*. at 37.
[25] *Id*. at 35.

offered no meaningful therapy services, and provided delayed care.[26] Further, the 2021 report found failures to adequately review individuals in restricted housing,[27] and in handling individuals placed in suicide watch, among other issues.[28] Relatedly, a significant number of individuals with mental health conditions were found to be placed in restricted housing where their conditions worsened.[29] Amicus Curiae further determined that understaffing was a barrier to accessing mental health services.[30]

Amicus Curiae's fourth report, published in April 2025, focused primarily on the provision of mental health care.[31] The 2025 report was based on a November 2023 inspection which found Adelanto with a dramatically reduced population as a result of further court actions related to COVID-19; with the facility housing only seven individuals.[32] In the 2025 report, Amicus Curiae found that, with seven detained persons and approximately 30 healthcare staff, Adelanto was overall providing adequate mental health and medical care.[33]

Even then, Amicus Curiae identified several issues, like conflicting diagnoses provided by mental health staff and prescriptions that did not match diagnoses, throughout Adelanto and its annex Desert View, which operate together and share staff.[34] Amicus Curiae also found that mental health staff sometimes demonstrated inconsistencies in record-keeping and in care and psychotherapy sessions.[35] It was also concerning that detention staff failed to consult with medical and mental health staff, and to consider an individual's mental health condition, before calculated uses

---

[26] Cal. Dep't of Just., (Jan. 2021), *supra*, note 7, at 34, 54, 57-60.
[27] *Id.* at 54.
[28] *Id.* at 58.
[29] *Id.* at 60.
[30] *Id.* at 61.
[31] *See* Cal. Dep't of Just., (Apr. 2025), *supra*, note 7, at 4-8. **Error! Hyperlink reference not valid.**
[32] *Id.* at 26.
[33] *Id.* at 33, 40.
[34] *Id.* at 37.
[35] *Id.* at 37, 38.

of force and before placing a person into disciplinary segregation.[36]

Importantly, Amicus Curiae's medical, mental health, and detention experts all noted that if the population dramatically increased, as it now has, the staffing levels seen in November 2023 would be far below those necessary to provide adequate care.[37]

### C.    Prior Issues Related to Use of Force

In its 2021 report Amicus Curiae found concerning use of force instances related to mental health. Amicus Curiae's mental health expert identified a total of seven use of force incidents out of 37 that involved individuals in mental health crisis.[38] In one instance, a person attempted to hang himself while on suicide watch and officers used pepper spray to contain him.[39] The 2021 report also found instances where individuals were disciplined when they attempted to commit suicide by hanging.[40] One was written up for destruction of facility property for tearing a sheet to fashion a noose, and another for assaulting a detention officer during the struggle to cut him down.[41] In its 2025 report, Amicus Curiae identified an instance where medical staff communicated a recommendation to avoid using chemical agents during a use of force incident at Adelanto, but detention staff still used a chemical spray.[42]

### D.    Prior Issues Related to Due Process

In its 2021 report, Amicus Curiae reported that Adelanto failed to comply with the PBNDS' requirement that facilities maintain up-to-date law library materials, leaving individuals at Adelanto facing significant barriers to obtaining the materials and assistance they needed for their immigration cases.[43] For example, legal

---

[36] *Id.* at 48.
[37] *Id.* at 33.
[38] Cal. Dep't of Just., (Jan. 2021), *supra*, note 7, at 46.
[39] *Id.*
[40] *Id.* at 47.
[41] *Id.*
[42] Cal. Dep't of Just., (Apr. 2025), *supra*, note 7, at 48.
[43] Cal. Dep't of Just., (Jan. 2021), *supra*, note 7, at 50-51.

materials found in Adelanto's law libraries as of August 7, 2019, including court cases, were significantly outdated with the most recent materials dated November 2017.[44] Attorneys who were surveyed for the 2021 report explained that the conditions under which they were able to communicate with their clients limited their ability to represent clients at Adelanto.[45] Issues with attorney-client communication led to a 2020 preliminary injunction,[46] eventually leading to a settlement agreement establishing free confidential legal calls, including outside regular telephone hours; and allowing individuals at Adelanto to make unrecorded, unmonitored phone calls from their housing units.[47]

**II.    AMICUS CURIAE'S FINDINGS AND OBSERVATIONS DURING ITS MOST RECENT VISIT TO ADELANTO IN JULY 2025 ECHO THE ISSUES RAISED IN PLAINTIFFS' MOTION.**

Amicus Curiae inspected Adelanto on July 8-9, 2025, about one month after the COVID-related injunction ended on June 2, 2025, and weeks after ICE began terrorizing the streets of Southern California and detaining many of its residents. Below is a summary of some of Amicus Curiae's findings related to detention and medical staffing, medical care, water and food, use of force, living conditions, and due process. These findings echo the issues raised by Plaintiffs and will be discussed in more detail in Amicus Curiae's upcoming report.

**A.    Insufficient Detention Staff for the Overwhelming Increase in Population**

The PBNDS require staffing levels at each facility that ensure sufficient supervision for those detained.[48] Amicus Curiae's immigration detention expert

---

[44] *Id.* at 50.

[45] *Id*. at 49.

[46] *Torres v. U.S. Dep't of Homeland Sec.*, (C.D. Cal., Apr. 24, 2020, No. 5:18-cv-2604-JGBSHKx) 2020 WL 3124305, at *1.

[47] *Torres v. U.S. Dep't of Homeland Sec.*, (C.D. Cal., Oct. 16, 2025. No. 5:18-cv-02604-JGBSHKx), Dk. 233 (Order); *see also Settlement Protects Access to Counsel and Phone Calls in Immigration Detention*, Immigrant Defenders Law Center (Aug. 22, 2025), https://tinyurl.com/4a9mc8hk.

[48] U.S. Immigr. & Customs Enf't, *Performance-Based National Detention Standards 2011* (PBNDS), https://tinyurl.com/mw4we3ty, 2.4 Facility Security and Control, Part V, § E, p. 82; PBNDS, 2.11 Sexual Abuse and Assault Prevention and Intervention, Part IV, § E, p. 151.

found that detention staffing levels were inadequate to meet the needs of the surge of individuals housed at Adelanto as of July 8, 2025. Despite Adelanto's failure to provide Amicus Curiae with requested documentation regarding staffing, interviews with both facility staff and those detained painted a concerning picture.[49]

During the July 2025 inspection, Adelanto appeared overwhelmed by the number of individuals it was housing. Adelanto went from holding seven individuals during Amicus Curiae's November 2023 inspection, to 475 before the COVID-related injunction ended on June 2, 2025, to detaining 1,570 persons on July 8, 2025, plus 517 at Desert View Annex.[50] In staff interviews, facility staff stated they were caught off guard by the number of new admittees during the surge in immigration arrests in June 2025. Individuals at both Adelanto and Desert View frequently attributed issues with food, recreation time, and grievances to insufficient staffing at the facilities. Individuals also reported that they did not see an increase in detention officers in conjunction with the population increase in the first weeks of June 2025.

## B. Insufficient Healthcare Staff for the Overwhelming Increase in Population

Amicus Curiae's medical expert also found that medical staffing levels were inadequate to meet the needs of the population surge at Adelanto as of July 8, 2025. Despite Adelanto's failure to provide Amicus Curiae with requested documentation

---

[49] Amicus Curiae also reviewed a federal oversight report published two months after the State's visit, that provided insight as to the staffing at Adelanto. *See* U.S. Immigr. & Customs Enf't, Office of Detention Oversight, *Inspection 2025-001-082: Adelanto ICE Processing Center, Adelanto, California* (Sept. 16-18, 2025), https://tinyurl.com/ODOAdelantoSept2025.

[50] Parties reached a settlement agreement in late-2024 and following preliminary approval of the settlement, the court ordered a temporary lift of the ban on new intakes on January 24, 2025, allowing Adelanto to house up to 475 people. *Roman v. Wolf*, No. EDCV 20-00768 TJH (PVCX), Dkt. No. 2636 (C.D. Cal. Dec. 23, 2024) (settlement agreement and release); *see Roman v. Wolf*, No. EDCV 20-00768 TJH (PVCX), Dkt. No. 2670 (C.D. Cal. Jan. 24, 2025) (temporarily lifting ban on new intakes at Adelanto, pending final approval of the settlement agreement). The final approval of the settlement agreement was granted on June 2, 2025, allowing Adelanto to once again house up to 1,950 people. *Roman v. Wolf*, No. EDCV 20-00768 TJH (PVCX), Dkt. No. 2704 (C.D. Cal. June 2, 2025). *See also*, Miranda, *supra*, note 2 (explaining that ICE reported a daily average of three persons held at Adelanto in January 2025, and that in January 2026, it reported a daily average of 1,800).

[Proposed] Amicus Curiae Brief in Support of Plaintiffs' Motion for Preliminary Injunction (5:26-cv-00322-SSS-RAO)

regarding medical staffing, interviews with facility staff and detained individuals, and file review, revealed serious concerns. Like detention staff, medical staff also explained they were caught off guard by the escalation in population.

When Amicus Curiae inspected the facility in 2019 (and Desert View Annex was not open), it determined that healthcare "staffing was lean for the size of the facility" that then housed 1,683 individuals.[51] In the 2023 inspection, Adelanto reported having a medical director, a clinical physician, and Advanced Practitioner Providers for seven people plus Desert View Annex.[52] Amicus Curiae learned during the July 2025 inspection that Adelanto had a medical director, one full-time physician, one part-time physician, and three full-time and one part-time (on an as-needed basis) Advanced Practitioner Providers. Given the facility's population increase, and the fact that healthcare staff also serve Desert View Annex, Amicus Curiae was concerned about medical staffing levels. A concern which worsened by Adelanto's inability to produce assurances that staffing levels had been increased to correspond with the increase in population.

## C.    Amicus Curiae Found Concerning Health Care Issues

Amicus Curiae's medical expert reviewed medical files and identified several instances of individuals with serious medical issues who did not receive timely emergency care. For example, one person reported that they were vomiting blood and received a referral for immediate care by the triage nurse but was not treated by any medical staff until they saw a physician one-and-a-half weeks later. Another individual requested medical care for chest pain, was promptly attended to by a nurse, but did not receive follow up care by a practitioner or physician. This individual was next attended to by medical staff 17 days later for neurological symptoms and was then transferred to a hospital.

Based on file review, the medical expert found several instances where

---

[51] Cal. Dep't of Just., (Jan. 2021), *supra*, note 7, at 51.
[52] Cal. Dep't of Just., (Apr. 2025), *supra*, note 7, at 40.

individuals were provided referrals to outside care for necessary specialized treatment but never received the treatment. This is despite the PBNDS' requirement that every facility shall directly or contractually provide its population with specialty health care.[53] One individual was referred for ophthalmology care three weeks prior to Amicus Curiae's visit and had still not been seen. Another person had not been seen for a scheduled three-month follow-up from a neurosurgery visit four months prior to Amicus Curiae's visit. And an individual with an infectious disease only received a referral for consultation 24 days after arrival to Adelanto, while another individual with the same infectious disease never received such a referral.

Generally, reviewed medical files did not contain notes recording the steps taken by medical staff to refer individuals to outside care. As a result, it was difficult to determine whether the steps taken by Adelanto to ensure referrals for outside care were timely completed, creating a risk that an individual's medical condition worsened while waiting for a response from outside medical providers.

Discharge planning was also of concern. Despite the PBNDS' requirement that facilities provide detailed transfer summaries, medication, and referrals to community-based providers as medically appropriate,[54] medical staff interviewed indicated that medical records were only provided upon request and were unable to confirm that all individuals released or transferred received a required copy of their medical records.

Detained individuals expressed many concerns related to medical care. Very few of these individuals reported receiving the necessary medical screening within 12 hours of arrival, or receiving the comprehensive health assessment within 14 days, as required under the PBNDS.[55] Additionally, several individuals reported

---

[53] PBNDS, *supra*, note 48, 4.3 Medical Care, Part V, § A, p. 260.
[54] PBNDS, *supra*, note 48, 4.3 Medical Care, Part V, § BB, pp. 278-279.
[55] PBNDS, *supra*, note 48, 4.3 Medical Care, Part V, § J, p. 266 (12-hour requirement for the initial medical assessment); PBNDS, *supra*, note 48, 4.3 Medical Care, Part V, § M, p. 268
(continued…)

they only received their necessary medications after excessive delays, despite the PBNDS requirement.[56] Individuals also reported that they were unable to access requested medical appointments and did not receive necessary and timely medical treatment, even for emergency medical care. For example, of those individuals who reported requesting medical services, only a few reported they received the help they needed. One individual explained that despite reporting flu-like symptoms of the same kind as experienced by others in their housing unit, they did not receive treatment until they started coughing up blood.

The issues related to medical care are particularly concerning in light of the three men who died between September 2025 and February 2026 while being detained at Adelanto.

### D.    Issues Related to Food and Water

Despite the requirements under the PBNDS regarding the preparation and presentation of food, and expectations that those detained must be "provided nutritionally balanced diets" and "sufficient space and time . . . to eat meals in a relatively relaxed, unregimented atmosphere,"[57] Amicus Curiae found issues with water and received reports of issues with food.

Despite the PBNDS' requirement that clean, potable drinking water must be available at all times,[58] individuals reported to Amicus Curiae that drinking water is murky and dirty. During its tour of Adelanto, Amicus Curiae observed for itself murky water coming out of the drinking water tap in the women's housing unit.

Almost every person interviewed complained about the quality of the food. Individuals at Adelanto explained that before June 2025, their meals were provided at the dining halls, but after the surge in detentions, they ate in their housing area

(14-day requirement for a comprehensive health assessment).

[56] PBNDS, *supra*, note 48, 4.3 Medical Care, Part V, § U, p. 273.
[57] PBNDS, *supra*, note 48, 4.1 Food Service, Part II, p. 228; *see also* Part V, § D-F, p. 232-237.
[58] PBNDS, *supra*, note 48, 4.1 Food Service, Part V, § D, p. 232.

where food frequently arrived cold, undercooked, or rotten. These individuals also reported irregular mealtimes, forcing them to choose between eating and outdoor time. Individuals further explained that meals can arrive after bedtime or during population counts, and that sometimes, they had to use the same spoon for weeks. While Amicus Curiae could not verify these accounts, this was a common theme across housing units.

### E.    Issues with Adelanto's Use of Force and Pepper Spray

Amicus Curiae reviewed records of use of force incidents at Adelanto and found a significant use of pepper spray. Eight of the 11 reported use of force incidents at Adelanto between January 1 and July 7, 2025, occurred in the month of June, after the increase in population. Facility staff used pepper spray in six of the reported incidents. One person reported that while individuals were awaiting the intake process, they complained and asked to be moved to a housing unit. In response, a detention officer pepper sprayed them, filling a room which contained about 50 people. The individuals reported rashes for weeks after the incident. While this incident is concerning on its own, it is especially noteworthy because Adelanto has been sued in the past for pepper spraying people as a control measure in enclosed areas.[59] Although Amicus Curiae could not definitively confirm that this incident occurred in the manner described, a use of force incident report prepared by Adelanto at around the same time described to Amicus Curiae, specified that facility staff deployed pepper spray to subdue multiple individuals in the dining room. This report however, blamed the incident on an individual striking a detention officer in a struggle over a pallet of food.

Like in prior inspections, two of the use of force incidents involved detained

---

[59] *Rivera Martinez v. GEO Group* (C.D.Cal., May 25, 2018, No. 5:18-cv-01125) ECF No. 1 (complaint). The suit, filed by eight individuals detained at Adelanto settled in January 2020. *See Rivera Martinez v. GEO Group* (C.D.Cal. Jan. 30, 2020, No. 5:18-cv-01125) ECF No. 205 (Notice of Conditional Settlement); *see also* Rebecca Plevin, *Asylum-Seekers Allegedly Pepper-Sprayed at Adelanto Detention Center Settle with GEO Group*, Palm Spring Desert Sun (Feb. 6, 2020), https://tinyurl.com/yc6tsvwf.

individuals who appeared to be experiencing mental health episodes. In one incident, facility officers used calculated force to remove a person from Adelanto and transport him to an outside mental health facility. Detention officers used pepper spray on him and did not report summoning or consulting mental health staff before or during the incident. The PBNDS mandate that detention officers consult with appropriate medical or mental health staff prior to a calculated use of force on a person with special needs, which includes those with mental health conditions, that may impair their ability to understand their situation.[60]

In the other incident, an individual consumed a handful of unidentified pills and ignored officers' commands to stop. Detention officers used pepper spray on this person, placed them in mechanical restraints, and transferred them to the medical unit. The PBNDS mandate that restraints for medical or mental health purposes may be authorized only by the facility's designated Clinical Medical Authority or initiated by qualified medical personnel with an authorization soon after the restraint.[61] The incident report did not indicate that mental health or medical personnel were consulted or utilized in the restraint of this individual.

### F.    Reported Concerns Related to Housing Conditions

Despite the PBNDS' requirement to provide for basic necessities, like the provision and replacement of clothing,[62] Amicus Curiae received many reports indicating that Adelanto failed to meet this standard. Those housed at Adelanto and Desert View Annex before June 2, 2025, reported that conditions worsened after the population surged. Individuals who arrived during or after the influx reported receiving only one pair of underwear and one uniform–versus the "at least two" required.[63] Individuals also reported not receiving new or laundered clothes for weeks and having to handwash their own clothing. Several individuals explained

---

[60] PBNDS, *supra*, note 48, 2.15 Use of Force and Restraints, Part V, § F, p. 205.
[61] PBNDS, *supra*, note 48, 4.3 Medical Care, Part V, § Y, p. 275.
[62] PBNDS, *supra*, note 48, 4.5 Personal Hygiene, Part V, § B, p. 328; Part V, § H, p. 330.
[63] PBNDS, *supra*, note 48, 4.5 Personal Hygiene, Part V, § B, p. 328.

they wore borrowed shoes to their interviews with Amicus Curiae because their own shoes had fallen apart and not been replaced.

The PBNDS require that facility staff must ensure that staff and detained individuals maintain a high standard of facility sanitation and general cleanliness, which includes daily dusting, mopping and trash disposal; but that those detained in the facility are only required to maintain their immediate living areas by making the bed, stacking loose papers and keeping the floor around their spaces neat.[64] During the July 2025 inspection, Adelanto did not have a detainee volunteer work program, and individuals were responsible for cleaning their housing units. The July 2025 inspection occurred about one month after the influx in population and several weeks after Amicus Curiae requested access. Thus, while Amicus Curiae was unable to assess for itself the conditions of the facility during that time, several individuals painted a grim picture. Many individuals across housing units reported that only days before Amicus Curiae's inspection, Adelanto was extremely dirty, with bags of trash piled up in the hallways, dirty surfaces in the housing units and bathrooms, and hallways and tables covered in dirt and debris.

### G.    Issues Related to Due Process

Amicus Curiae received reports of serious concerns with individuals' ability to access phones for personal and legal calls. Many individuals reported that phone calls are limited to only a few minutes, that there are not enough phones, and that many of them do not work. Individuals also reported that phones are shut off at random times throughout the day. During Amicus Curiae's tour of Adelanto, several individuals reported that phones in their housing unit do not work all morning from Monday through Thursday, and all day on Fridays. Facility staff confirmed that phones are shut off whenever a person is being removed from the facility–although they reported that such shutdowns happen for shorter periods of

---

[64] PBNDS, *supra*, note 48, 1.2 Environmental Health and Safety, Part V, § A, p. 21.

time. This is the same practice Amicus Curiae reported on in its 2021 report.[65] Amicus Curiae remains concerned that this policy impedes detained individuals' ability to contact family and legal representatives.

**III.   DEATHS OF THREE MEN HELD AT ADELANTO.**

While most individuals arrived during the month before Amicus Curiae's inspection, and their medical and detention files did not contain much information, everything indicated Adelanto was a ticking timebomb. Unfortunately, following Amicus Curiae's July 2025 inspection, three deaths occurred inside Adelanto.

On September 22, 2025, Ismael Ayala Uribe died at the age of 39, after one month of detention at Adelanto.[66] According to his family, Mr. Ayala was relatively healthy when he entered the facility, but about two weeks after arriving, he reported feeling sick with a cough and fever.[67] Days later, he was rushed to the facility medical center in a wheelchair after "shaking and complaining of pain in his rear."[68] The media reported that while this condition was characterized as life-threatening by facility staff, nevertheless, an hour and a half later, he was cleared to return to his housing unit after receiving medication.[69] ICE reported that Mr. Ayala died in an external hospital three days later, after a transfer for surgery for an abscess.[70]

On October 23, 2025, Gabriel Garcia Aviles died, at the age of 54, about a week after entering detention in Adelanto.[71] Despite ICE's determination that he died of natural causes and alcohol withdrawal, Mr. Garcia-Aviles' family stated he

---

[65] Cal. Dep't of Just., (Jan. 2021), *supra*, note 7, at 43.

[66] U.S. Immigr. & Customs Enf't, *Detainee Death Report: Ayala Uribe, Ismael*, https://tinyurl.com/cfprfzfm.

[67] Ruben Vives and Jenny Jarvie, *A Former DACA Recipient Died in ICE Custody. Did Officials Ignore His pleas for Help?*, L.A. Times (Sept. 24, 2025), https://tinyurl.com/LATUribeAyala.

[68] *Id.* at note 66.

[69] *Id.* at 67.

[70] *Id.* at note 66.

[71] U.S. Immigr. & Customs Enf't, *Detainee Death Report: Garcia Aviles, Gabriel*, https://tinyurl.com/5a66tymy.

was healthy prior to his detention, and reported that when they visited him at the hospital shortly before his death, he was intubated, and had blood on his forehead and lips, broken teeth, a cut on his tongue, and bruising on his body.[72]

On February 27, 2026, Alberto Gutierrez Reyes died, at the age of 48, about seven weeks after being detained in Adelanto.[73] According to ICE, he "reported no significant concerns" upon an initial medical exam, and only "reported feeling faint" on February 25, after which he was transferred to an outside hospital.[74] However, his family reported personally witnessing his skin and eyes appearing yellow as he complained of feeling unwell,[75] and they stated Adelanto knew of his diabetes and high cholesterol.[76] According to family and counsel, Mr. Gutierrez Reyes began feeling sick on February 18, 2026, and repeatedly asked for medical attention from Adelanto, filing several medical requests–yet no medical assistance was provided.[77] On February 24, 2026, the last time he spoke to his family, he reported still feeling unwell and hoped he would get to see a doctor soon.[78] His family never heard from him again, and was only informed of his death from another person detained at Adelanto.[79]

## IV. ICE'S SECURITY CLASSIFICATION ADVERSELY IMPACTS CONDITIONS OF CONFINEMENT.

Throughout the years inspecting civil immigration detention facilities, Amicus Curiae has interviewed many individuals across facilities who were transferred to ICE custody following a prison sentence, and the 2021 report specifically focused

---

[72] *Id.*; Izzy Ramirez, *Ten Days After Adelanto Internment, This Beloved Grandfather Died in Custody*, L.A. Taco (Nov. 4, 2025), https://lataco.com/second-death-adelanto-custody.

[73] U.S. Immigr. & Customs Enf't., *Detainee Death Notifications* (Mar. 4, 2026), https://tinyurl.com/5bxraezj.

[74] *Id.*

[75] Taylor S. Mitchell, *ICE Denies Wrongdoing in Death of Man in California Immigration Facility*, Huffington Post (Mar. 4, 2026), https://tinyurl.com/3sy3ucde.

[76] Marc Cota-Robles, *Westlake Man Dies While in ICE Custody at Adelanto Detention Center, LA Councilmember Says*, ABC7 News (Mar. 3, 2026), https://tinyurl.com/3ujtp644.

[77] Araceli Martinez Ortega, *Mexican Immigrant Dies in ICE Jail in Adelanto*, La Opinion (Mar. 1, 2026), https://tinyurl.com/4x9d5fjf (translated, original version appeared in Spanish).

[78] *Id.*

[79] *Id.*

[Proposed] Amicus Curiae Brief in Support of Plaintiffs' Motion for Preliminary Injunction (5:26-cv-00322-SSS-RAO)

on this issue.[80] Many of these individuals lamented having less freedoms in private civil immigration facilities than in prison. At ICE facilities individuals are classified based on criminal history as low, medium-low, medium-high, or high.[81] Amicus Curiae is aware of cases where those charged with "illegal entry" or "illegal reentry" into the U.S., receive a medium or even a medium-high custody classification based on entry offenses alone.[82] Unlike correctional systems where incarcerated people can lower their custody scores over time with good behavior, the scores of those held in civil immigration custody tend to remain constant or increase due to disciplinary action, unless the person conducting the classification analysis makes a scoring error and the error is corrected.[83]

In its 2021 report, Amicus Curiae's immigration detention expert reviewed the file of someone previously incarcerated for a serious crime who–through good behavior–was classified at the lowest custody level in prison, allowed to participate in firefighting crew in the community, and received a work release assignment with minimal supervision.[84] Upon this person's release and subsequent detention by ICE, they were placed in high custody based on their original sentence, which severely limited their movement in the facility despite continued good behavior.[85] These practices are similar across facilities, including at Adelanto.

During the July 2025 inspection, Amicus Curiae was concerned that poor maintenance of records contributed to misclassification and other issues at Adelanto. For example, Amicus Curiae requested to review a sampling of custody files that included classification records. However, several of the files reviewed were incomplete and missing classification records. Additionally, during Amicus

---

[80] Cal. Dep't of Just., (Jan. 2021), *supra*, note 7, at 19-24.
[81] *Id*. at 19.
[82] *Id*.
[83] *Id*. at 20.
[84] *Id*. at 21.
[85] *Id*.

Curiae's review, facility staff were printing records and appeared to be assembling files, suggesting that records were not already maintained.

## V. THE PUBLIC INTEREST FAVORS A PRELIMINARY INJUNCTION BECAUSE ICE'S CONDITIONS OF CONFINEMENT WILL CONTINUE TO INFLICT SERIOUS AND IRREPARABLE HARMS ON INDIVIDUALS DETAINED AT ADELANTO.

Based on Amicus Curiae's experience, the issues challenged by Plaintiffs continue unabated and are likely to continue without an injunction. The public interest favors a preliminary injunction to protect public health and prevent exposure to inadequate medical care and the conditions described above, and to prevent further deaths at Adelanto.

The public interest weighs in favor of injunctive relief based on the public health harms caused by defendants. Issues like delayed or poor-quality care and inadequate nutrition, all contribute to the declining health and well-being of those within immigration detention.[86] As explained above, Amicus Curiae has observed and documented these and several other issues inside Adelanto. Without injunctive relief, these conditions will likely worsen and may contribute to new mental health diagnoses.[87]

Mental health impacts of immigration detention extend beyond those inside detention, to their families.[88] Detention of a family member, especially if they are the breadwinner, causes a chain reaction which jeopardizes other family members' basic needs like food and housing, affects academic performance, and increases mistrust and avoidance of critical public services like law enforcement, and seeking public benefits and emergency or necessary medical services.[89] Family members

---

[86] Myriam Vidal Valero, *U.S. Immigration Policy: Mental Health Impacts of Increased Detentions and Deportations*, American Psychological Association (Sept. 2025), https://tinyurl.com/c3k2bar6.

[87] *Id.*

[88] *Id.*

[89] *Id.*; *see also* Caitlin Patler & Gabriela Gonzalez, *Compounded Vulnerability: The Consequences of Immigration Detention for Institutional Attachment and System Avoidance in Mixed-Immigration-Status Families*, Oxford University Press (Dec. 2020), https://tinyurl.com/2ufz5xvh.

also experience heightened levels of stress, anxiety, and depression; and for children, worry for their loved-ones and an inability to self-regulate.[90] Since many of those detained, and their families, are residents of California, these ill-effects reverberate statewide through education, public engagement, and even costs related to mental health services.

As Plaintiffs argue, oversight by the federal government will not resolve these issues.[91] Despite complaints from individuals held at Adelanto, journalists, community members, members of Congress, and Amicus Curiae's own reporting, Adelanto continues facing significant issues with the treatment of individuals it detains for civil immigration.

## CONCLUSION

Based on Amicus Curiae's unique experience through its statutory mandate under AB 103, the public interest factor favors the issuance of a preliminary injunction.

Dated:  March 18, 2026

Respectfully submitted,

ROB BONTA
*Attorney General*
*State of California*
MICHAEL L. NEWMAN
*Senior Assistant Attorney General*
VILMA PALMA-SOLANA
*Supervising Deputy Attorney General*

*s/ Alex E. Flores*
ALEX E. FLORES
*Deputy Attorney General*

*Attorneys for the State of California*

---

[90] *Id.*
[91] *L.T. et al., v. ICE, et al.*, 5:26-cv-00322, Dkt. 1 (Complaint for Injunctive and Declaratory Relief) at ¶¶ 131-138; Dkt. 34 (Motion for Preliminary Injunction) at 7-8, 18-22.

**CERTIFICATE OF COMPLIANCE**

The undersigned, counsel of record for <u>State of California, by and through Rob Bonta, Attorney General (Amicus Curiae)</u>, certifies that this brief contains 6,677 words, which complies with the word limit of L.R. 11-6.1.

Dated:  March 18, 2026                         Respectfully submitted,

<u>s/ Alex E. Flores</u>
ALEX E. FLORES
Deputy Attorney General

Attorney for the State of California