TODD BLANCHE
Deputy Attorney General
BILAL A. ESSAYLI
First Assistant United States Attorney
DAVID M. HARRIS
Assistant United States Attorney
Chief, Civil Division
DANIEL A. BECK
Assistant United States Attorney
Chief, Complex and Defensive Litigation Section
PUSHKAL MISHRA (Cal. Bar No. 298695)
Special Assistant United States Attorney
        Federal Building, Suite 7516
        300 North Los Angeles Street
        Los Angeles, California 90012
        Telephone: (714) 338-3503
        E-mail: pushkal.mishra@usdoj.gov

Attorneys for Defendants

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| L.T., *et al*.,<br><br>             Plaintiffs,<br><br>      v.<br><br>U.S. IMMIGRATION AND CUSTOMS ENFORCEMENT (ICE), *et al*.,<br><br>             Defendants. | No. 5:26-cv-00322-SSS-RAO<br><br>**DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION**<br><br>[Declaration of Assistant Field Office Director Rosa Quevedo filed concurrently]<br><br>Hearing Date:  April 10, 2026<br>Hearing Time:  2:00 p.m.<br>Courtroom:     2<br><br>Honorable Sunshine Suzanne Sykes<br>United States District Judge |

# **TABLE OF CONTENTS**

DESCRIPTION                                                                                         PAGE

I.    INTRODUCTION ................................................................................................1

II.   BACKGROUND ................................................................................................2

III.  LEGAL STANDARD........................................................................................3

IV.   ARGUMENT .....................................................................................................4

    A.    Plaintiffs Fail to Show a Likelihood of Success on the Merits....................4

        1.    Plaintiffs lack standing for prospective injunctive relief against the government for claims directed at alleged failures by GEO ........4

        2.    CHIRLA lacks organizational standing............................................10

        3.    Plaintiffs fail on their Fifth Amendment claims...............................11

        4.    Plaintiffs fail on their Rehabilitation Act claim ...............................15

        5.    Plaintiffs fail on their APA claim.....................................................17

    B.    Plaintiffs Fail to Show Irreparable Harm...................................................20

    C.    The Balance of the Equities and Public Interest Favors Defendants..........20

    D.    Plaintiffs Improperly Seek a Sweeping Injunction....................................21

V.    CONCLUSION................................................................................................22

# TABLE OF AUTHORITIES

**Page(s)**

**Federal Cases**

*Allen v. Wright*,
468 U.S. 737, 757 (1984) ................................................................ 8, 9

*A.S.M. v. Warden, Stewart Cnty. Det. Ctr.*,
467 F. Supp. 3d 1341 (M.D. Ga. 2020) ........................................... 17

*Am.-Arab Anti-Discrimination Comm. v. Ashcroft*,
241 F. Supp. 2d 1111 (C.D. Cal. 2003) ........................................... 20

*U.S. Army Corps of Engineers v. Hawkes Co.*,
578 U.S. 590 (2016) ........................................................................ 17

*Bell v. Wolfish*,
441 U.S. 520 (1979) ....................................... 1, 2, 7, 11-12, 14, 18, 21

*Blackie's House of Beef, Inc. v. Castillo*,
659 F.2d 1211 (D.C. Cir. 1981) ...................................................... 21

*Bryant v. Madigan*,
84 F.3d 246 (7th Cir. 1996) ............................................................. 16

*Castle v. Eurofresh, Inc.*,
731 F.3d 901 (9th Cir. 2013) ........................................................... 15

*C.G.B. v. Wolf*,
464 F. Supp. 3d 174 (D.D.C. 2020) ................................................. 17

*Corner Post, Inc. v. Bd. of Governors of Fed. Rsrv. Sys.*,
603 U.S. 799 (2024) ........................................................................ 17

*Dep't of Homeland Sec. v. Regents of the Univ. of California*,
591 U.S. 1 (2020) ............................................................................ 20

*E. Bay Sanctuary Covenant v. Barr*,
934 F.3d 1026 (9th Cir. 2019) ......................................................... 9

*United States v. Fifty-Three (53) Eclectus Parrots*,
685 F.2d 1131 (9th Cir. 1982) ......................................................... 18

*F.C.C. v. Fox Television Stations, Inc.*,
556 U.S. 502 (2009) ........................................................................ 19, 20

i

*Farris v. Seabrook*,
    677 F.3d 858 (9th Cir. 2012) ........................................................................ 3

*FDA v. All. for Hippocratic Med.*,
    602 U.S. 367 (2024) .............................................................................. 10, 11

*Fraihat v. U.S. Immigr. & Customs Enf't*,
    16 F.4th 613 (9th Cir. 2021) ................................. 1, 2, 4, 7, 11, 12, 13, 18

*Garcia v. Google, Inc.*,
    786 F.3d 733 (9th Cir. 2015) .................................................................. 3, 4

*Geo Grp., Inc. v. Newsom*,
    15 F.4th 919 (9th Cir. 2021) ...................................................................... 6

*Geo Grp., Inc. v. Newsom*,
    50 F.4th 745 (9th Cir. 2022) (en banc) ........................................... 6, 7, 18

*Gill v. Whitford*,
    585 U.S. 48 (2018) ................................................................................ 10, 22

*Go Leasing, Inc. v. Nat'l Transp. Safety Bd.*,
    800 F.2d 1514 (9th Cir. 1986) .................................................................. 18

*Gordon v. Cnty. of Orange*,
    888 F.3d 1118 (9th Cir. 2018) ............................................................. 12, 14

*Grubbs v. Bradley*,
    552 F. Supp. 1052 (M.D. Tenn. 1982) ..................................................... 17

*Heckler v. Chaney*,
    470 U.S. 821 (1985) ............................................................................ 18, 19

*Hodgers-Durgin v. de la Vina*,
    199 F.3d 1037 (9th Cir. 1999) ................................................................ 4, 6

*Hope v. Warden York Cnty. Prison*,
    972 F.3d 310 (3d Cir. 2020) ..................................................................... 14

*Hunt v. Wash. State Apple Advert. Comm'n*,
    432 U.S. 333 (1977) .................................................................................. 10

*Johnson v. District of Columbia*,
    248 F.R.D. 46 (D.D.C. 2008) ..................................................................... 4

*Jones v. Blanas*,
    393 F.3d 918 (9th Cir. 2004) ............................................................... 13, 14

ii

*Kingsley v. Hendrickson*,
   576 U.S. 389 (2015) .................................................................................... 12

*Logue v. United States*,
   412 U.S. 521 (1973) ...................................................................................... 9

*Lovell v. Chandler*,
   303 F.3d 1039 (9th Cir. 2002) .................................................................... 16

*Lujan v. Defenders of Wildlife*,
   504 U.S. 555 (1992) ................................................................................. 5, 8

*Madsen v. Women's Health Ctr., Inc.*,
   512 U.S. 753 (1994) ............................................................................... 9, 22

*Minneci v. Pollard*,
   565 U.S. 118 (2012) ...................................................................................... 8

*Motor Vehicle Manufacturers Ass'n v. State Farm Mut. Auto. Ins. Co.*,
   463 U.S. 29 (1983) ...................................................................................... 20

*Murthy v. Missouri*,
   603 U.S. 43 (2024) ...................................................................................... 10

*N.L.R.B. v. Express Pub. Co.*,
   312 U.S. 426 (1941) ............................................................................... 9, 22

*Ohio Forestry Assn., Inc. v. Sierra Club*,
   523 U.S. 726 (1998) .................................................................................... 10

*O'Shea v. Littleton*,
   414 U.S. 488 (1974) ...................................................................................... 4

*Pell v. Procunier*,
   417 U.S. 817 (1974) .................................................................................... 14

*Peralta v. Dillard*,
   744 F.3d 1076 (9th Cir. 2014) .................................................................... 12

*Pierce v. District of Columbia*,
   128 F. Supp. 3d 250 (D.D.C. 2015) ............................................................ 15

*Procunier v. Martinez*,
   416 U.S. 396 (1974).................................................................................... 21

*Rodriguez Diaz v. Garland*,
   53 F.4th 1189 (9th Cir. 2022) ..................................................................... 22

*Rumsfeld v. Padilla,*
    542 U.S. 426 (2004) .................................................................................. 7, 8

*Simmons v. Navajo County, Ariz.,*
    609 F.3d 1011 (2010) ................................................................................. 16

*Trump v. CASA, Inc.,*
    606 U.S. 831 (2025) .................................................................................... 22

*Trump v. New York,*
    592 U.S. 125 (2020) ................................................................................ 5, 10

*Turner v. Safley,*
    482 U.S. 78 (1987) ...................................................................................... 21

*U.S. Dep't of Transp. v. Paralyzed Veterans of Am.,*
    477 U.S. 597 (1986) .................................................................................... 15

*United States v. New Mexico,*
    455 U.S. 720 (1982) ...................................................................................... 7

*United States v. Orleans,*
    425 U.S. 807 (1976) ...................................................................................... 9

*United States v. Texas,*
    599 U.S. 670 (2023) .................................................................................... 19

*Whitmore v. Arkansas,*
    495 U.S. 149 (1990) .................................................................................... 10

*Wilson v. Seiter,*
    501 U.S. 294 (1991).................................................................................. 12, 14

*Winter v. NRDC,*
    555 U.S. 7 (2008) ..................................................................................... 3, 21

*Xirum v. U.S. Immigr. & Customs Enf't,*
    2023 WL 2683112 (S.D. Ind. Mar. 29, 2023) ............................................ 5

*Xirum v. U.S. Immigr. & Customs Enf't,*
    2024 WL 3718145 (S.D. Ind. Aug. 8, 2024) ............................................ 19

**Federal Statutes**

5 U.S.C. § 553 ................................................................................................ 18

6 U.S.C. § 205 .................................................................................................. 6

iv

8 U.S.C. § 1103 ............................................................................................. 5

8 U.S.C. § 1231 ................................................................................... 19, 21-22

29 U.S.C. § 794 ................................................................................... 2, 3, 15

**Other**

8 C.F.R. § 235.3(e) ................................................................................. 5, 18

## I.    INTRODUCTION

Plaintiffs laud ICE's rigorous civil detention standard—PBNDS—as the gold standard "[d]esigned to 'transform the immigration detention system . . . .'" They rely on it to criticize the alleged failures of ICE's federal contractor—The GEO Group, which owns, operates, and administers the Adelanto detention facility—to live up to that transformational standard. But federal contractors are not federal instrumentalities. And GEO is not a defendant in this action. Yet Plaintiffs want this Court to direct a sweeping injunction at ICE, the same governmental entity that created the detention standard, for alleged actions or omissions by GEO. Through this maneuver, Plaintiffs essentially seek to rewrite the federal contract between ICE and GEO with sweeping terms that would turn the contractual provisions between the two parties into broad mandatory injunctive relief ordered and supervised by the Court and administered day-to-day by unelected "Independent Monitors" outside the Executive Branch. The Court should reject that plan.

Neither the law nor the facts supports a judicial intervention of that magnitude in an area where the role of the judiciary has historically been relatively limited by design. "[T]he operation of our correctional facilities is peculiarly the province of the Legislative and Executive Branches of our Government, not the Judicial." *Fraihat v. U.S. Immigr. & Customs Enf't*, 16 F.4th 613, 643 (9th Cir. 2021) (quoting *Bell v. Wolfish*, 441 U.S. 520, 548 (1979)). In *Wolfish*, a case involving pre-trial detainees, the Supreme Court emphasized that "[t]here must be a 'mutual accommodation between institutional needs and objectives and the provisions of the Constitution that are of general application,'" and that "[t]his principle applies equally to pretrial detainees and convicted prisoners." 441 U.S. at 546. Indeed, "even when an institutional restriction infringes a specific constitutional guarantee . . . , the practice must be evaluated in the light of the central objective of prison administration, safeguarding institutional security." *Id.* at 547. Aptly recognizing that "problems that arise in the day-to-day operation of a corrections facility are not susceptible of easy solutions," the Supreme Court has therefore long required that "[p]rison administrators . . . be accorded wide-ranging deference in the

1

adoption and execution of policies and practices that in their judgment are needed to preserve internal order and discipline and to maintain institutional security." *Id.*

The preliminary injunction motion standards that govern Plaintiffs' sweeping demands here "reflect[] not only the all-embracing relief they [seek] but the core principle, grounded in the separation of powers, that far-reaching intrusion into matters initially committed to a coordinate Branch [of government] requires a commensurately high showing sufficient to warrant such a significant exercise of judicial power." *Fraihat*, 16 F.4th at 619. In that regard, Plaintiffs do "not make the showing required to justify the extraordinary relief they request[] . . . ." *Id.* As discussed at a general level below, the Adelanto facility has been inspected in detail and—far from Plaintiffs meeting the extremely high standard required to show punitive intent or deliberate indifference—has done well in its inspections relative to conditions, including medical care and attention. Plaintiffs demand more, but that is not the constitutional standard. Simply put, far from meeting any requisite intent, the Adelanto facility operates at a level significantly higher than the constitutional standard. To the extent there are isolated issues, those would reflect day-to-day operational issues that are within the province of GEO, not of Defendants.

The Rehabilitation Act claim is likewise misdirected at Defendants although they are the *grantor* of the federal funds—not the recipient. The APA claim similarly lacks any cognizable basis: For an auditor to issue a "Good" rating for Adelanto is not a final agency action under the APA, and, regardless of Plaintiffs' desire to contest the assessments made in that regard, is backed up by a fulsome explanation and evidence that may not be reversed under the demanding standard of review applicable to APA claims.

The motion for a preliminary injunction should therefore be denied.

## II.    BACKGROUND

Plaintiffs—L.T., J.M., Sevak Mesrobian, and Jose Mauro Salazar-Garza (collectively, "Individual Plaintiffs"); and Coalition for Humane Immigrants Rights ("CHIRLA")—have sued the following Defendants: U.S. Department of Homeland Security ("DHS"); Kristi Noem, DHS's Secretary; DHS's component agency U.S.

2

Immigration and Customs Enforcement ("ICE"); Todd Lyons, ICE's Acting Director; and Jaime Rios, Acting Director of ICE's Enforcement and Removal Operations ("ERO")'s Los Angeles Field Office. *See generally* Compl. ¶¶ 14-23, ECF No. 1. Plaintiffs allege as follows: Claims 1 and 2—violation of the Fifth Amendment Right to Due Process as to all Plaintiffs, alleging punitive conditions of confinement and deliberate indifference to the medical needs of detainees, respectively; Claim 3—violation of Section 504 of the Rehabilitation Act, 29 U.S.C. § 794, alleging disability discrimination; and Claim 4—violation of Administrative Procedure Act (APA), alleging an arbitrary and capricious and unlawful agency action by awarding Adelanto a "good" rating and violating PBNDS. *Id.* ¶¶ 152-92; *see also* Mot. for Prelim. Inj. ("Motion"), ECF No. 34.

## III.   LEGAL STANDARD

Preliminary injunctions are an "extraordinary remedy never awarded as of right." *Winter v. NRDC*, 555 U.S. 7, 24 (2008). "A plaintiff seeking a preliminary injunction must show that: (1) she is likely to succeed on the merits, (2) she is likely to suffer irreparable harm in the absence of preliminary relief, (3) the balance of equities tips in her favor, and (4) an injunction is in the public interest." *Farris v. Seabrook*, 677 F.3d 858, 864 (9th Cir. 2012) (citing *Winter*, 555 U.S. at 20).

Moreover, when a plaintiff is requesting a mandatory injunction, the burden is "doubly demanding" because then the plaintiff "must establish that the law and facts *clearly favor* her position, not simply that she is likely to succeed" on the merits. *Garcia v. Google, Inc.*, 786 F.3d 733, 740 (9th Cir. 2015). A mandatory injunction "orders a responsible party to 'take action.'" *Id.* This heightened standard is necessary because a mandatory injunction "goes well beyond simply maintaining the status quo *pendente lite* and is particularly disfavored." *Id.* (cleaned up).

That is particularly true where, as here, a preliminary injunction motion is filed, without an advance meet and confer, after the moving party spends many weeks drafting its complaint and supporting papers for the motion, while the opposing party is given only a comparatively brief time to gather opposing evidence and respond to the filing. *See also*

3

*Fraihat*, 16 F.4th at 619 (making clear that where plaintiffs ask for "a sweeping injunction," the standards that govern their broad request reflect "the core principle, grounded in the separation of powers, that far-reaching intrusion into matters initially committed to a coordinate Branch requires a commensurately high showing sufficient to warrant such a significant exercise of judicial power").

## IV.    ARGUMENT

Plaintiffs fail to meet the "high showing . . . required to justify the extraordinary relief" of a mandatory preliminary injunction. *Id.*; *Garcia*, 786 F.3d at 740. The analysis here focuses on the named Plaintiffs that are the actual moving parties, and not unnamed members of a broadly defined putative class.[1]

### A.    Plaintiffs Fail to Show a Likelihood of Success on the Merits

#### 1.    Plaintiffs lack standing for prospective injunctive relief against the government for claims directed at alleged failures by GEO

Plaintiffs conspicuously chose not to sue GEO for alleged inadequate detention conditions and/or health care at its facility. Instead, they ask this Court to prospectively enjoin Defendants so as to operate, administer, and maintain the Adelanto facility differently on a day-to-day basis—although Defendants do not do so.

---

[1] Indeed, in a proposed class action seeking prospective equitable judicial remedy, **named plaintiffs** must show justiciability. *Hodgers-Durgin* is illustrative: Where two motorists stopped once by Border Patrol agents over a ten-year period sought classwide declaratory and injunctive relief challenging alleged systemic or pattern-and-practice constitutional violations, the Ninth Circuit held that named plaintiffs lacked a real and immediate threat of future harm and speculative future injuries to them or unnamed class members could not support classwide equitable relief, stating as follows: "Because we find that the named plaintiffs have not alleged sufficient injury to entitle them to equitable relief, we need not reach the question whether the class that plaintiffs seek to represent was properly certified." *Hodgers-Durgin v. de la Vina*, 199 F.3d 1037, 1045 (9th Cir. 1999); *see also id.* ("Any injury unnamed members of this proposed class may have suffered is simply irrelevant to the question whether the named plaintiffs are entitled to the injunctive relief they seek."); *id.* at 1044 (making clear that "equitable judicial remedy" includes "declaratory relief"); *see also O'Shea v. Littleton*, 414 U.S. 488, 494 (1974) ("[I]f none of the named plaintiffs purporting to represent a class establishes the requisite of a case or controversy with the defendants, none may seek relief on behalf of himself or any other member of the class."); *Johnson v. District of Columbia*, 248 F.R.D. 46, 56 (D.D.C. 2008) (declining to certify Rule 23(b)(2) classes where plaintiffs lack standing to seek "prospective injunctive relief").

That disjunction presents a foundational barrier to relief. Because GEO owns and operates Adelanto, Plaintiffs cannot enforce, oversee, and/or rewrite the terms of ICE's contract with GEO so as to operate and govern the facility differently through a judicial process, especially where, as here, Congress has vested plenary power into ICE in this area. *See infra*; *cf. Xirum v. U.S. Immigr. & Customs Enf't*, No. 22-00801, 2023 WL 2683112, at *2, *19, *21 (S.D. Ind. Mar. 29, 2023) (finding that as to 8 U.S.C. § 1103(a)(11) and the terms of the detention arrangement between ICE and county, "[t]he INA restricts both the purpose of the detention contracts and the use of federal funds paid under the contracts" and that the statute "does not function to benefit detainees," and further that the "[p]laintiffs lack[ed] standing to enforce" the detention contract).

After all, "[a] foundational principle of Article III is that 'an actual controversy must exist not only at the time the complaint is filed, but through all stages of the litigation.'" *Trump v. New York*, 592 U.S. 125, 131 (2020). "Two related doctrines of justiciability—each originating in the case-or-controversy requirement of Article III"—standing and ripeness—must be satisfied before the case can be adjudicated on the merits. *Id*. at 131, 134. "First, a plaintiff must demonstrate standing, including 'an injury that is concrete, particularized, and imminent rather than conjectural or hypothetical.'" *Id.* at 131 (cleaned up). That injury must be (1) "fairly traceable to the ***challenged action of the defendant***, and not the result of the independent action of some third party not before the court" and (2) "the injury will be 'redressed by a favorable decision'" by the court. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992) (emphasis added). If a plaintiff fails at either step of the inquiry, the court cannot reach the merits of the dispute. *Trump v. New York*, 592 U.S. at 131, 134. "Second, the case must be ripe—not dependent on contingent future events that may not occur as anticipated, or indeed may not occur at all." *Id.* at 131 (cleaned up). "In suits seeking both declaratory and injunctive relief against a defendant's continuing practices, the ripeness requirement serves the same function in limiting declaratory relief as the imminent-harm requirement serves in limiting injunctive relief." *Hodgers-Durgin*, 199 F.3d at 1044.

Start with the ***traceability*** aspect of the standing inquiry: Plaintiffs' dispute is centered around GEO, not Defendants, however they may frame, label, or disguise their claims. *See, e.g.*, Motion at 2-7. But Congress has relegated plenary power to ICE to "arrange for appropriate places of detention" for non-citizens. *See* 8 U.S.C. § 1231(g)(1); *Geo Grp., Inc. v. Newsom*, 50 F.4th 745, 751 (9th Cir. 2022) (en banc) ("Section 1231(g)(1) gives both 'responsibility' and 'broad discretion' to the [DHS] Secretary 'to choose the place of detention for deportable aliens.'"); *accord Geo Grp., Inc. v. Newsom*, 15 F.4th 919, 930 n.4 (9th Cir. 2021), *reh'g en banc granted on other grounds, opinion vacated on other grounds*, 31 F.4th 1109 (9th Cir. 2022), and *on reh'g en banc,* 50 F.4th 745. That "broad power and discretion," it is "clear and manifest," includes "the right to contract with private companies to operate detention facilities." *Geo Grp.*, 15 F.4th at 935 (quoting *Wyeth v. Levine*, 555 U.S. 555, 565 (2009)). In accordance with that plenary power, ICE contracts with GEO—"one of the largest for-profit prison corporations in the country—to run and manage" the Adelanto detention center. Compl. ¶¶ 19, 24. The Ninth Circuit has recognized the same: "ICE contracts out its detention responsibilities to . . . private contractors, who run facilities" they own, including relying "exclusively on privately owned and operated facilities," such as facilities run by GEO. *Geo Grp.*, 50 F.4th at 751-52. ICE avers so too. *See, e.g.*, Decl. of Rosa Quevedo ("Quevedo Decl.") ¶¶ 3-15.[2]

Plaintiffs allege that GEO is an "agent" of ICE, but then promptly acknowledge that the two are contractually bound. Compl. ¶¶ 19, 24-26. Per that contract, GEO provides, among other things, "detention" and "medical services." *Id*. ¶ 24 n.11. Their contract "mandates compliance with the PBNDS," *id.* ¶ 28, which Plaintiffs repeatedly reference to try to show violations of the PBNDS standards at Adelanto. *See, e.g.*, Motion at 3, 14, 19-22; *compare* Compl. ¶ 28 (alleging that "ICE[]" contractually mandates GEO's compliance with the PBNDS), *with id.* ¶ 29 (alleging that "*Defendants* have consistently

---

[2] For that reason, Plaintiffs are mistaken that "ICE operates . . . all operations, services, and activities provided to individuals detained at Adelanto . . . ." Compl. ¶ 173. That false premise undergirds at least claims 1 through 3 in this action.

failed to comply with the PBNDS" because "Adelanto has long been plagued by substandard conditions, medical neglect, and abuse" (emphasis added)), *and* Motion at 19 (stating that the "PBNDS are contractually binding terms that *Defendants* are not following" (emphasis added)). In fact, their Proposed Order, setting forth the terms of a preliminary injunction, demands generalized compliance with PBNDS as a broad injunctive term. *See* Pls.' Proposed Order at 6-9, ECF No. 34-1.[3]

But it is well-established that "[p]rivate contractors do not stand on the same footing as the federal government . . . ." *Geo Grp.*, 50 F.4th at 750. Indeed, the Supreme Court has explained that federal contractors are not "so assimilated by the Government as to become one of its constituent parts," *United States v. New Mexico*, 455 U.S. 720, 736-38 (1982), quoting, among other authorities, *United States v. Boyd*, 378 U.S. 39, 46 (1964), where it distinguished the situation from that where the government "reserved such control over the activities and financial gain" of a federal contractor that the contractor "could properly be called a 'servant' of the United States in agency terms. *Cf. Rumsfeld v. Padilla*, 542 U.S. 426, 439 (2004) (rejecting the "legal reality of control" theory and making clear that

---

[3] Congress contemplates independent oversight to ensure compliance with detention standards: It created "a position of Immigration Detention Ombudsman," who "shall be independent of [DHS] agencies and officers and shall report directly to the Secretary." 6 U.S.C. § 205(a); *see also id.* ("The Ombudsman shall be a senior official with a background in civil rights enforcement, civil detention care and custody, and immigration law."). That Ombudsman has "unfettered access to any location within each . . . detention facility," *id.* § 205(c), and the authority to "[c]onduct unannounced inspections of detention facilities holding individuals in federal immigration custody, including . . . privately-owned or operated facilities . . . ." *id.* § 205(b)(3). It further ordered the OIDO to "[e]stablish and administer an independent, neutral, and confidential process to receive, investigate, resolve, and provide redress . . . for cases in which Department officers or other personnel, or contracted, subcontracted, or cooperating entity personnel, are found to have engaged in misconduct or violated the rights of individuals in immigration detention. *Id.* § 205(b)(1). This includes direct "assistance to individuals affected by . . . violations of . . . detention standards . . . ." *Id.* § 205(b)(5).

Plaintiffs are not content with that Congressional scheme. So they now propose to replace that legislative scheme—enacted by an elected branch of the government—with one they propose, as supervised by the Judicial Branch. *See* Proposed Order at 9-10 (requesting the Court to "appoint two qualified, independent, third-party monitors . . . to aid the Court in ensuring adequate plans are developed and in monitoring implementation of this Order."). That is facially improper. *Fraihat*, 16 F.4th at 643 ("[T]he operation of our correctional facilities is peculiarly the province of the Legislative and Executive Branches of our Government, not the Judicial." (quoting *Wolfish*, 441 U.S. at 548)).

the immediate custodian or the warden of the detention facility exercises "*day-to-day control* over [detainee's] physical custody" (emphasis added)).

To be sure, ICE routinely inspects Adelanto through its Office of Detention Oversight ("ODO") to help ensure GEO's compliance with PBNDS. *See* Quevedo Decl., Ex. 4 ("2025 Inspection Report") at 3; *see also id.* at 4 ("ODO conducts the following annual and biennial oversight inspections of ICE detention facilities to assess and rate each facility's compliance with *their contractually obligated detention standards . . . .*" (emphasis added)). The 2025 Inspection Report is based on the most recent inspection "from September 16 to 18, 2025," and notes, among other things, at the outset that GEO—not the government—"provides food services and medical care" at Adelanto. *Id*. It further emphasizes that "[t]he facility was accredited by the National Commission on Correctional Health Care in June 2022 and American Correctional Association in January 2023." *Id.*

During the inspection, "ODO interviewed 34 detainees" and "[m]ost detainees reported satisfaction with facility services." *Id.* at 6. It further "followed up on the concerns raised by detainees who expressed dissatisfaction with facility services and determined that facility staff had made every effort to resolve those issues." *Id.* ODO then found that "the facility's overall compliance with PBNDS 2011 (Revised 2016) has trended downward" and took down the "Facility Rating" down a notch from "Superior" to "Good." *Id.* at 6-7. That ODO did not find any deficiencies at Adelanto on account of 26 out of 29 standards—including and especially with respect to emergency plans; disciplinary system; food service; medical care; and disability identification assessment, and accommodation, *id.* at 5-7, further undercut any suggestion that *Defendants* caused any injury to Plaintiffs.

Plaintiffs have failed to show that their injury is "fairly traceable to the challenged action of the *defendant*, and not the result of the independent action of some third party not before the court," as the Supreme Court puts it, *Lujan*, 504 U.S. at 560-61 (emphasis added) (cleaned up); *Allen v. Wright*, 468 U.S. 737, 757 (1984) ("[R]espondents' second claim of injury cannot support standing because the injury alleged is not fairly traceable

to the Government conduct respondents challenge as unlawful.");[4] *cf. Minneci v. Pollard*, 565 U.S. 118, 125-26 (2012) (holding, even with damages remedy at issue, that when detainees are held in private facilities, their primary recourse is against the private entity); *see also N.L.R.B. v. Express Pub. Co.*, 312 U.S. 426, 435-36 (1941) ("[The Supreme] Court will strike from an injunction decree restraints upon the commission of unlawful acts which are thus dissociated from those which a defendant has committed.").[5]

Next, as to **_redressability_**, the Supreme Court has been clear on the point of remedy law relevant here that an "injunction must be couched in the narrowest terms that will accomplish its pinpointed objective." *Madsen v. Women's Health Ctr., Inc.*, 512 U.S. 753, 754 (1994). The Ninth Circuit has held the same: "An injunction must be 'narrowly tailored to remedy the specific harm *shown*.'" *E. Bay Sanctuary Covenant v. Barr*, 934 F.3d 1026, 1029 (9th Cir. 2019) (quoting *City & County of San Francisco v. Trump*, 897 F.3d 1225, 1244 (9th Cir. 2018)) (emphasis added).

Here, Plaintiffs have not "*shown*" that Defendants have harmed them, as opposed to GEO, the entity they have not filed suit against, that actually owns and operates the facility. *See supra* (discussing that injury alleged here is not "fairly traceable" to

[4] *Id.* at 753 n.19 (characterizing "fairly traceable" and "redressability" as "two facets of a single causation requirement").

[5] *Logue v. United States*, 412 U.S. 521 (1973), is illustrative. There, the Supreme Court held that employees of a county jail that housed federal prisoners pursuant to a contract with the Federal Bureau of Prisons were not federal employees or employees of a federal agency; thus, the United States was not liable for the acts of the county jail. *Id.* at 527-30. Although the contract required the county jail to comply with Bureau of Prisons' rules and regulations prescribing standards of treatment, and although the United States reserved rights of inspection to enter the jail to determine its compliance with the contract, the contract did not authorize the United States to physically supervise the day-to-day conduct of jail's employees. *Id.*; *see also United States v. Orleans*, 425 U.S. 807, 814 (1976) ("A critical element in distinguishing an agency from a contractor is the power of the Federal Government 'to control the detailed physical performance of the contractor.'" (quoting *Logue*, 412 U.S. at 528)). So too here. *Orleans*, 425 U.S. at 815-16 ("Billions of dollars of federal money are spent each year on projects performed by people and institutions which contract with the Government. These contractors act for and are paid by the United States. They are responsible to the United States for compliance with the specifications of a contract or grant, but they are largely free to select the means of its implementation. . . . Similarly, by contract, the Government may fix specific and precise conditions to implement federal objectives. Although such regulations are aimed at assuring compliance with goals, the regulations do not convert the acts of entrepreneurs . . . into federal governmental acts." (footnotes omitted)).

government-Defendants). Any mandatory injunction may thus not be indiscriminately directed toward Defendants, nor vaguely directed at requiring standards to be enforced in the abstract. "This fits the rule that a 'remedy must of course be limited to the inadequacy that produced the injury in fact that the plaintiff has established.'" *Gill v. Whitford*, 585 U.S. 48, 50, 66 (2018) (quoting *Lewis v. Casey*, 518 U.S. 343, 357 (1996)).

With respect to **<u>ripeness</u>**: Plaintiffs suffer no ongoing concrete harm. *See, e.g.*, Motion at 15 (acknowledging that Mesrobian received oxygen and emergency medical attention, just not on his timeline); *id.* (admitting that Salazar-Garza "receive[d] care"); *id.* at 15-16 (J.M. conceding that the "guards responded"); Quevedo Decl. ¶¶ 20-25, 34-35. Defendants do not require Plaintiffs "to do anything or to refrain from doing anything." *Ohio Forestry Assn., Inc. v. Sierra Club*, 523 U.S. 726, 733 (1998); *Whitmore v. Arkansas*, 495 U.S. 149, 158 (1990) ("Each of these cases demonstrates what we have said many times before and reiterate today: Allegations of possible future injury do not satisfy the requirements of Art. III. A threatened injury must be 'certainly impending' to constitute injury in fact."). None of the named Plaintiffs have shown any concrete, imminent plan by the *government-Defendants* to injure them—that too unlawfully. As such, "this case is riddled with contingencies and speculation" as to their asserted risk of future injury by Defendants, which "impede judicial review." *Trump v. New York*, 592 U.S. at 131.

2.   <u>CHIRLA lacks organizational standing</u>

Organizations may sue for themselves if they satisfy the three elements of standing that apply to individuals. *FDA v. All. for Hippocratic Med.*, 602 U.S. 367, 393-94 (2024). They may sue on their members' behalf when their members "would otherwise have standing to sue in their own right," the interests they "seek[] to protect are germane" to their purpose, and "neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." *Hunt v. Wash. State Apple Advert. Comm'n*, 432 U.S. 333, 343 (1977). "At the preliminary injunction stage," Plaintiffs "must make a 'clear showing'" that they are "'likely' to establish each element of standing." *Murthy v. Missouri*, 603 U.S. 43, 58 (2024) (citation omitted).

10

Here, CHIRLA purports to sue for itself and for its members, alleging that its provision of legal services to detained individuals has been diffusely impacted by Defendants' policies and practices. Compl. ¶ 18. But its asserted proof of this relies on a resource-diversion theory of standing. *See, e.g.*, ECF No. 34-6 ¶ 31 (averring "expend[ing] more of its resources"); ECF No. 34-8 ¶¶ 29-30 (averring "diversion of resources" and that "[i]n the context of the hundreds of calls . . . , the opportunity cost of any diversion is enormous"). But organizations generally cannot "demonstrate standing" by arguing a policy has "impaired" their "ability to provide services and achieve their organizational missions." *Hippocratic Med.*, 602 U.S. at 394.

The injuries CHIRLA alleges here are of the same nature as those considered and rejected by the Supreme Court in *Hippocratic Med.*, where a group of medical associations claimed to have organizational standing to challenge the FDA's relaxed regulatory requirements for mifepristone, providing easier access to the abortion drug. *Id*. at 372-73, 394. The medical associations claimed standing because they incurred costs to oppose the FDA's actions, including conducting studies to "better inform their members and the public about mifepristone's risks," and causing them to "expend considerable time, energy, and resources drafting citizen petitions to FDA, as well as engaging in public advocacy and public education, causing the association to expend resources to the detriment of other spending priorities." *Id.* at 394 (cleaned up). The Supreme Court held that the associations could "not spend [their] way into standing simply by expending money to gather information and advocate against the defendant's action." *Id.* So too here: CHIRLA's expenditure of resources to assist its members does not confer generalized standing to represent all detainees in all claims they might bring. *See also supra* § IV.A.1.

3.    Plaintiffs fail on their Fifth Amendment claims

As to claim 1, Plaintiffs must show that their conditions of confinement are punitive in purpose and effect. *Fraihat*, 16 F.4th at 647 (quoting *Wolfish*, 441 U.S. at 535; *Jones v. Blanas*, 393 F.3d 918, 933 (9th Cir. 2004)); Motion at 8 (agreeing that "the conditions of

. . . confinement must be 'nonpunitive in purpose and effect'").[6] That analytical inquiry turns on "intent." *Peralta v. Dillard*, 744 F.3d 1076, 1084 (9th Cir. 2014) ("An 'intent requirement is either implicit in the word 'punishment' or is not; it cannot be alternately required and ignored as policy considerations might dictate. The Supreme Court has told us that it is.'" (quoting *Wilson v. Seiter*, 501 U.S. 294, 301-02 (1991)); *see also Wolfish*, 441 U.S. at 539 ("Courts must be mindful that these inquiries spring from constitutional requirements and that judicial answers to them must reflect that fact rather than a court's idea of how best to operate a detention facility."). As to claim 2, Plaintiffs must establish deliberate indifference, which requires a "substantial showing." *Fraihat*, 16 F.4th at 636. That in turn requires them to show that Defendants' conduct was "objectively unreasonable"—i.e., show "reckless disregard." *Id.* (quoting *Gordon v. Cnty. of Orange*, 888 F.3d 1118, 1125 (9th Cir. 2018)). That "standard is a formidable one": "Neither 'mere lack of due care,' nor 'an inadvertent failure to provide adequate medical care,' nor even 'medical malpractice,' without more, is sufficient to meet this standard." *Id.* (cleaned up).[7]

Plaintiffs fail both tests. They first reference hearsay statements and/or declarations by non-parties to attribute the requisite intent to government-Defendants. *See, e.g.*, Motion at 12-13; *see also id.* at 9-17 (referencing non-party declarations). That is irrelevant to the specific, day-to-day operations at Adelanto, which, Plaintiffs admit, is executed by GEO.

---

[6] Plaintiffs incorrectly claim that *Jones* presumption applies here, comparing Adelanto to California prisons. *See* Motion § IV.A.1.a. The Ninth Circuit has more recently emphasized that that presumption does not extend to "the context of federal immigration detainees . . . in which different government interests are at stake . . . ." *Fraihat*, 16 F.4th at 648; *see also id.* at 648-49 (limiting *Jones* to its facts where the Ninth Circuit "compared that detainee's conditions of confinement to those of the general jail population at the same facility in which the plaintiff was housed" and criticizing reliance "on a far more monumental comparison: all ICE detention facilities against (presumably) all prisons housing criminal detainees"); *id.* at 649 ("That comparison is unavailing. There is . . . no support in our cases for applying *Jones*'s presumption about comparative 'conditions' of confinement to the government's continued *ability* to confine persons pursuant to lawful authority, as here.").

[7] *See also Kingsley v. Hendrickson*, 576 U.S. 389, 399-400 (2015) (holding that "the use of an objective standard adequately protects an officer who acts in good faith," and that when considering the objective reasonableness of a particular condition, courts "must take account of the legitimate interests in managing a jail" and exercise "deference to policies and practices needed to maintain order and institutional security").

12

Compl. ¶¶ 19, 24; Motion at 2. Plaintiffs in effect concede that Defendants require GEO to "exercise authority over detainees 'in the most humane manner possible,' not use 'retaliatory' disciplinary action, and provide timely medical care; hot, nutritious, and sanitary meals; potable water; outdoor recreation time; soap; and clean clothing, bedding, and linens." Motion at 2; Compl. ¶ 24 ("Defendant ICE contracts with GEO to run Adelanto and detain immigrants there, including the Individual Plaintiffs."); *id.* ¶ 28 ("Defendant ICE's Adelanto contract with GEO mandates compliance with the PBNDS."). That cuts heavily against any notion of punitive intent or deliberate indifference on part of government-Defendants. *See, e.g.*, *Fraihat*, 16 F.4th at 637 (rejecting the possibility that the plaintiffs could show deliberate indifference because ICE "took steps to address COVID-19," irrespective of whether the steps were effective). "Absent a showing of an expressed intent to punish *on the part of detention facility officials*, that determination [regarding punitive intent] generally will turn on whether an alternative purpose to which the restriction may rationally be connected is assignable for it, and whether it appears excessive in relation to the alternative purpose assigned to it." *Wolfish*, 441 U.S. at 538-39 (emphasis added) (cleaned up). Plaintiffs fail to show punitive intent or deliberate indifference here as to the "detention facility officials." *Id.*

So, Plaintiffs then argue that no legitimate interests justify the alleged deficiencies in conditions at Adelanto. Motion at 12-13. But detention itself and the alleged deficient conditions of detention are different issues. Defendants have a legitimate, non-punitive government interest in detention to ensure a detainee's presence at trial and for removal, Quevedo Decl. ¶ 5, which in turn is facilitated by maintaining jail security and most critically *effective management of a detention facility*, *see, e.g.*, *Wolfish*, 441 U.S. at 540. Those interests weigh heavily in favor of Defendants, especially against the backdrop of each Individual Plaintiff's criminal history here. *See, e.g.*, Quevedo Decl. ¶¶ 19, 29, 33 n.4, 37 (L.T.: "a danger and a flight risk"; J.M.: criminal history "severe," "extensive," and "reflective of disregard for the safety of others"; Mesrobian: "lengthy criminal history," "career criminal"; and Salazar-Garza: "a danger to the community," "failure to

13

sufficiently rehabilitate"); *see generally id.* ¶¶ 18-71 (detailing the government interests).

That is also a fact-heavy inquiry, not amenable to resolution at the pleading stage and even before Defendants have had a chance to fully investigate the allegations. *See Jones*, 393 F.3d at 935. Plaintiffs have thus far impaired that inquiry. *See, e.g.*, ECF No. 42 (arguing improper service of motion papers). Whether government's conduct was "objectively unreasonable" "will necessarily turn on the facts and circumstances of *each particular case.*" *Gordon*, 888 F.3d at 1125 (emphasis added) (cleaned up). In any event, the existence of—rather than the compliance with—ICE's transformational standard (as well as ICE's routine inspections to identify and rectify GEO's non-compliance) shows lack of punitive intent or deliberate indifference on ICE's part. Plaintiffs also acknowledge that they received care, just not on their preferred timeline. *See, e.g.*, Motion at 15-16.

Plaintiffs also argue that less harsh detention conditions would be generally preferable, advocating for various preferred conditions. *Id.* at 14. But that ambition is not a deliberate indifference standard; the Constitution does not require managing detention facilities to a litigant's preferred external standards. The argument fails to recognize that "only those deprivations denying 'the minimal civilized measure of life's necessities' . . . are sufficiently grave to form the basis" for a constitutional violation. *Wilson*, 501 U.S. at 299. To that end, *Hope v. Warden York Cnty. Prison*, 972 F.3d 310 (3d Cir. 2020) is also illustrative. There, the court rejected the argument that the existence of alternatives to detention rendered the government's choice to rely on detention punitive. *Id*. at 328-29 (citing *Demore v. Kim*, 538 U.S. 510, 531 (2003); *Wong Wing v. United States*, 163 U.S. 228, 235 (1896)). The argument also makes plain that Plaintiffs—like the district court there—reductively discount "the legitimate objectives and difficulties of managing a detention facility . . . ." *Id.* at 326; *see also Wolfish*, 441 U.S. at 547-48 (admonishing on that count and requiring wide-ranging deference); *Pell v. Procunier*, 417 U.S. 817, 827 (1974) (same). Plaintiffs' effort to substitute their own preferred facility management approach is improper and inconsistent with the Fifth Amendment.

14

### 4.    Plaintiffs fail on their Rehabilitation Act claim

Plaintiffs argue that Defendants have failed to reasonably accommodate them under the Rehabilitation Act. *See* Motion at 17-18. But Congress intended to strictly limit the scope of the Rehabilitation Act solely "to those who actually 'receive' federal financial assistance because it sought to impose § 504 coverage as a form of contractual cost of the recipient's agreement to accept the federal funds." *U.S. Dep't of Transp. v. Paralyzed Veterans of Am.*, 477 U.S. 597, 605 (1986). So only "those who affirmatively choose to receive federal aid may be held liable under the RA," *Castle v. Eurofresh, Inc.*, 731 F.3d 901, 908 (9th Cir. 2013), "as a *quid pro quo* for the receipt of federal funds," *Paralyzed Veterans*, 477 U.S. at 605 ("Congress apparently determined that it would require contractors and grantees to bear the costs . . . as a *quid pro quo* for the receipt of federal funds."). Plaintiffs have conspicuously not sued the actual grantee of the federal contract here—GEO. Instead, they argue that ICE, as the ***grantor*** of the federal contract, should "be held liable under the RA." *Castle*, 731 F.3d at 908. That has no basis in law.[8]

The claim is also not supported in fact either; to the contrary, it is facially defective. To succeed Plaintiffs must show that they were discriminated against "***solely*** by reason of [their] disability." 29 U.S.C. § 794(a) (emphasis added). They have failed to do so. Indeed, Plaintiffs do not identify any program, service, or activity at Adelanto from which they were putatively excluded *solely* because of their disability. Instead, they largely repackage generalized complaints about detention conditions and medical care, and suggest these complaints amount to Rehabilitation Act claims as well. *See, e.g.*, Motion at 17-18. But the Rehabilitation Act does not constitutionalize general conditions of confinement or medical malpractice claims. Plaintiffs' scattershot allegations themselves confirm that the very supposed deficiencies they complain of—such as excessive wait times or deficient

---

[8] Plaintiffs' reliance on *Pierce v. District of Columbia*, 128 F. Supp. 3d 250, 272 (D.D.C. 2015) fail. There, plaintiff directed his Rehabilitation Act claim against the District of Columbia because he alleged that "prison officials in the District of Columbia violated his right to be free from unlawful disability discrimination . . . ." *Id.* at 253. That is why the court found there that the District had an affirmative duty to evaluate his accommodation requires and failed to do so. *Id.* at 268-69.

intake procedures—would affect the detainees generally, rather than being targeted at specific individuals (especially, the Individual Plaintiffs) solely on account of their having disabilities. *See, e.g.*, Compl. ¶¶ 5, 75; Motion at 7, 18; Quevedo Decl. ¶¶ 26-28, 35, 72.

Plaintiffs therefore fail to carry their burden to show that the alleged shortcomings occurred because of action directed at their disability, rather than because of ordinary operational or medical decision-making in a detention facility. Courts routinely reject such claims, explaining that the law only prohibits discrimination directed at a disability, not inadequate treatment for a disability. *Simmons v. Navajo County, Ariz.*, 609 F.3d 1011, 1022 (2010) ("The ADA prohibits discrimination because of disability, not inadequate treatment for disability."); *Lovell v. Chandler*, 303 F.3d 1039, 1052 (9th Cir. 2002) (characterizing the elements of ADA and RA claims as "[s]imilar[]"); *accord Bryant v. Madigan*, 84 F.3d 246, 249 (7th Cir.1996) ("[T]he Act would not be violated by a prison's simply failing to attend to the medical needs of its disabled prisoners. . . . The ADA does not create a remedy for medical malpractice.").

In any event, to the extent Plaintiffs might even remotely direct their allegations against Defendants, ICE already requires that disability accommodations be provided. *See* Quevedo Decl. ¶ 13 (PBNDS) § 4.8 (entitled "Disability Identification, Assessment, and Accommodation," requiring that "the facility shall comply with Section 504 of the Rehabilitation Act" and "provide detainees with disabilities an equal opportunity to access, participate in, or benefit from the facility's programs, services, and activities").

Finally, the record shows that ICE inspected and did not find any deficiencies at Adelanto as to "[d]isability [i]dentification, [a]ssessment, and [a]ccomodation." 2025 Inspection Report at 5. The existence of such disability policies and related inspection refute Plaintiffs' assertion that *Defendants* discriminated against Plaintiffs **solely** on account of their **disability**. Plaintiffs' Complaint, as a whole, appears to allege the opposite—that rather than such specific discriminatory intent having been directed at a perceived subclass and then depriving them of disability accommodation, Defendants have allegedly not provided adequate medical care *generally* at the facility. That does not

16

support a valid Rehabilitation Act claim.

     5.    <u>Plaintiffs fail on their APA claim</u>

     *a.*    *Adelanto's inspection rating is not a final agency action*

Judicial review under the APA "is available only for 'final agency action.'" *Corner Post, Inc. v. Bd. of Governors of Fed. Rsrv. Sys.*, 603 U.S. 799, 808 (2024). The Supreme Court has articulated "two conditions that generally must be satisfied for agency action to be 'final' under the APA." *U.S. Army Corps of Engineers v. Hawkes Co.*, 578 U.S. 590, 597 (2016) (citing *Bennett v. Spear*, 520 U.S. 154 (1997)). "First, the action must mark the consummation of the agency's decision-making process—it must not be of a merely tentative or interlocutory nature." *Id.* (quoting *Bennett*, 520 U.S. at 177). "Second, the action must be one by which rights or obligations have been determined, or from which legal consequences will flow." *Id.* (quoting *Bennett*, 520 U.S. at 177-78).

Plaintiffs again confuse and conflate GEO's performance of the PBNDS-related contract provisions with Defendants' responsibilities and actions. *See* Motion at 19-22 (arguing that "PBNDS are contractually binding terms that Defendants are not following," improperly directly that argument at ICE). That argument fails. *See supra* § IV.A.1 (arguing that Plaintiffs' alleged harms are not fairly traceable to Defendants).[9]

---

[9] To be sure, PBNDS is not a set of legally enforceable agency rules, let alone one that binds the government. *Cf. Grubbs v. Bradley*, 552 F. Supp. 1052, 1124 (M.D. Tenn. 1982) ("[W]hile guidelines of professional organizations such as the American Correctional Association [ACA] represent desirable goals for penal institutions, neither they nor the opinions of experts can be regarded as establishing constitutional minima."); *cf.* Motion at 2 (equating ACA with PBNDS). They do not impose obligation on the agency, but rather a private party—GEO—that too because GEO contractually agreed to be bound by them. The *Accardi* doctrine thus also has no application here.

*Accardi* should in fact be prudentially limited to its facts—the invalidation of a deportation order where a formal regulation implicating procedural due process was violated—because the principle has no application to alleged violation of a contractual provision and/or a performance standard. *See, e.g., C.G.B. v. Wolf*, 464 F. Supp. 3d 174, 226 (D.D.C. 2020) ("[I]t is far from clear that the [Pandemic Response Requirements] are the type of rules or regulations that can be enforced through the *Accardi* doctrine. Plaintiffs contend that ICE is 'in violation of the Fifth Amendment Due Process Clause by depriving detainees the rights guaranteed under the COVID-19 regulations enacted by ICE.' But agency regulations do not create *substantive* due process rights. *Accardi* is rooted instead in notions of *procedural* due process." (citation omitted)); *A.S.M. v. Warden, Stewart Cnty. Det. Ctr.*, 467 F. Supp. 3d 1341, 1352, 1357 (M.D. Ga. 2020) (emphasizing that "at its
*(footnote cont'd on next page)*

Plaintiffs also ignore the settled principle that for APA claims courts must consider whether a decision has traditionally been committed to agency discretion. *Heckler v. Chaney*, 470 U.S. 821, 832 (1985). Discretionary decisions, in particular, naturally and traditionally involve considerable agency discretion. *See, e.g., Fraihat*, 16 F.4th at 643 ("[T]he operation of our correctional facilities is peculiarly the province of the Legislative and Executive Branches of our Government, not the Judicial."); *Geo Grp.*, 50 F.4th at 751 ("Section 1231(g)(1) gives both 'responsibility' and 'broad discretion' to the Secretary 'to choose the place of detention for deportable aliens.'"). ICE has not acted to constrain that broad discretion. *Go Leasing, Inc. v. Nat'l Transp. Safety Bd.*, 800 F.2d 1514, 1523 (9th Cir. 1986) ("[T]he Administrator need not promulgate rules constraining his discretion as to when to employ a particular statutory enforcement action.").

Congress has also not limited the agency's exercise of its discretionary power here "either by setting substantive priorities, or by otherwise circumscribing [the] agency's power" to conduct immigration enforcement actions, including (relevant here) detention at a place of its choosing. *Cf. Heckler*, 470 U.S. at 833. To the contrary, Congress has acted to vest the Executive Branch with broad authority to arrange for places of detention, including "consider[ing] the availability . . . of any existing prison, jail, detention center, or other comparable facility suitable for such use." 8 U.S.C. § 1231(g)(1)(2). Put another way, Congress has thus not provided any "law to apply" as to agency's standards for detention of non-citizens. *Id.* at 830-31.[10] Enforcement of or compliance with PBNDS,

core, *Accardi* involved procedural due process" and rested on "the unremarkable principle that 'regulations with the force and effect of law supplement the bare bones of the statute'" (quoting *Accardi*, 347 U.S. at 265) (cleaned up)); *id.* at 1353 (finding no support for the proposition "that an executive branch agency's operational policy relating to conditions of confinement for its detainees is the type of regulation contemplated by *Accardi* to support a due process violation").

[10] *Xirum v. U.S. Immigr. & Customs Enf't*, No. 22-00801, 2024 WL 3718145, at *7-8 (S.D. Ind. Aug. 8, 2024) is illustrative: There, where plaintiffs alleged ICE's abdication of detention-related enforcement authority, arguing that the detention center should have received two consecutive failed performance evaluations, the court dismissed the claim as barred from APA review under *Heckler* because there is no law to apply: "Congress has provided no guidelines, or law to apply, to constrain ICE's enforcement or application of overall performance evaluations. Therefore, without a meaningful standard to apply, the

*(footnote cont'd on next page)*

including inspecting and/or rating detention centers, is thus committed to agency discretion and is not reviewable under the APA.

> b.  The "Good" rating of the Adelanto facility is not arbitrary and capricious in any event

Plaintiffs argue next that the "Good" rating of the PBNDS-related inspection at the Adelanto facility is arbitrary and capricious, unhappy with the possibility that somebody might disagree with their own assessment. *See* Motion at 20-22. But if Plaintiffs are aggrieved because Adelanto's rating did not evolve from "Superior" in 2024 (*see* 2025 Inspection Report at 8) to something other than "Good," the law is clear that when an agency changes policy, it need only "show that there are good reasons for the new policy," not that the new policy is the best or only choice, and "that the agency *believes* it to be better . . . ." *F.C.C. v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009).

In any event, the "Good" rating by the ODO followed from interviews of "34 detainees" in which "[m]ost detainees reported satisfaction with facility services." 2025 Inspection Rating at 6. Moreover, that ODO found that "the facility's overall compliance with PBNDS 2011 (Revised 2016) has trended downward" and took down the "Facility Rating" down a notch from "Superior" to "Good," "followed up on the concerns raised by detainees who expressed dissatisfaction with facility services," *id.* at 6-7, shows that the lower-"Good" rating was not arbitrary or capricious or unlawful, and to the contrary was rationally related to the findings on the ground at Adelanto. This satisfies the requirement under *Fox* that an agency articulated a rational justification of its new "policy"—here, a change (a downgrade, in fact) of facility ratings.

ODO further tied the change in rating to legitimate factors—such as increased number of deficiencies. *Id.* at 7. To be sure, those factors fall squarely within agency

---

Court is forced to conclude that the decisions are committed exclusively to agency discretion and the presumption against non-reviewability is left unrebutted." That requires a "complicated balancing" of "many factors," uniquely within ICE's expertise. *United States v. Texas*, 599 U.S. 670, 680 (2023) ("[T]he Executive Branch must balance many factors when devising *arrest* and prosecution *policies*." (emphases added).

expertise, and courts recognize them as appropriate bases for policy change. *Motor Vehicle Manufacturers Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 42-43 (1983) (recognizing that agency must consider "the relevant factors," including feasibility and cost, and provide a rational explanation). The Supreme Court has emphasized that under arbitrary-and-capricious review, the court's role is "narrow" and it "is not to substitute its judgment for that of the agency." *Dep't of Homeland Sec. v. Regents of the Univ. of California*, 591 U.S. 1, 16 (2020). Yet, that is what Plaintiffs seek here—for this Court to take issue with and then substitute its judgment for that of the agency. The question is merely whether the agency "articulate[d] a satisfactory explanation for its action," showing "a rational connection between the facts found and the choice made." *State Farm*, 463 U.S. at 43. That ICE easily does here, satisfying *Fox* and *Regents*.

### B.      Plaintiffs Fail to Show Irreparable Harm

Plaintiffs merely point back to the alleged "deprivation of constitutional rights," lack of medical care in detention facilities, and failure to accommodate disabilities. Motion at 22. But they fail to carry their evidentiary burden. *See supra* § IV.A. To the extent they complain solely on account of their continued detention at Adelanto, that detention necessarily follows from the current immigration laws. "[L]egal consequence[s] under the law," cannot be "shown to constitute an irreparable injury." *Am.-Arab Anti-Discrimination Comm. v. Ashcroft*, 241 F. Supp. 2d 1111, 1113-14 (C.D. Cal. 2003).

### C.      The Balance of the Equities and Public Interest Favors Defendants

The final two preliminary injunction factors, the public interest and the balance of the equities, also weigh against granting the Motion. Plaintiffs cannot establish an injury sufficient to confer Article III standing, let alone the much higher standard of an irreparable injury required for a preliminary injunction. *See, e.g.*, *Winter*, 555 U.S. at 21-22 (stating that the moving party must establish that irreparable harm is "*likely* in the absence of an injunction" and not merely a "possibility"). An injunction restraining the plenary power vested in ICE to arrange for places of detention, by contrast, would compromise the government and the public's "significant" interest "in enforcement of the

immigration laws." *Blackie's House of Beef, Inc. v. Castillo*, 659 F.2d 1211, 1221 (D.C. Cir. 1981) (collecting cases).

Problems related to detention are "complex and intractable" that "require expertise, comprehensive planning, and the commitment of resources, all of which are peculiarly within the province of the legislative and executive branches of government." *Procunier v. Martinez*, 416 U.S. 396, 404-05 (1974); *Wolfish*, 441 U.S. at 548 (similar). "[C]ourts," by contrast, "are ill equipped to deal with the increasingly urgent problems of [detention] administration and reform." *Id.* at 405. Running a detention center "is an inordinately difficult undertaking that requires expertise, planning, and the commitment of resources, all of which are peculiarly within the province of the legislative and executive branches of government." *Turner v. Safley*, 482 U.S. 78, 84-85 (1987). That formidable task falls to those branches, and "separation of powers concerns counsel a policy of judicial restraint" and "deference to the appropriate [detention center] authorities." *Id.* at 85; *see also* 8 U.S.C. § 1231(g)(1)-(2) (vesting the Executive Branch with broad authority to arrange for places of detention, including "consider[ing] the availability . . . of any existing prison, jail, detention center, or other comparable facility suitable for such use").

### D.   Plaintiffs Improperly Seek a Sweeping Injunction

The Supreme Court recently clarified that district courts lack authority to issue orders "broader than necessary to provide complete relief to each plaintiff with standing to sue." *Trump v. CASA, Inc.*, 606 U.S. 831, 839-41, 859-61 (2025). And so any injunction "must be tailored to redress the plaintiff's particular injury," *Gill v. Whitford*, 585 U.S. 48, 73 (2018), and "injunctive relief should be no more burdensome to the defendant than necessary to provide complete relief to the plaintiffs," *Madsen v. Women's Health Ctr., Inc.*, 512 U.S. 753, 765 (1994) (citation omitted). Moreover, to enjoin a party wholesale to "follow the law" or a very broad set of standards is not permissible as injunctive relief, especially where, as here, any claimed injury is not fairly traceable to government-Defendants. *See, e.g., Express Pub.*, 312 U.S. at 435 ("[T]he mere fact that a court has found that a defendant has committed an act in violation of a statute does not justify an

21

injunction broadly to obey the statute . . . .').

Yet Plaintiffs ask this Court to very broadly enjoin and/or restrict the plenary power vested in ICE to arrange for places of detention as to an innumerable number of unnamed non-parties not before the Court on account of alleged due process violations. Due process is a flexible concept, varies on a case-by-case basis, and is thus inherently party specific. *See, e.g.*, *Rodriguez Diaz v. Garland*, 53 F.4th 1189, 1213 (9th Cir. 2022) (noting that "the Due Process Clause does not mandate procedures that reduce the risk of erroneous deprivation to zero" and that "[d]ue process is a flexible concept that varies with the particular situation"). Thus, there is no valid reason for an injunction to extend to non-parties here, even indirectly through CHIRLA as to its alleged members.

Given the foregoing, the Court should reject the terms of Plaintiffs' overbroad proposal for mandatory injunctive relief that would require Defendants to take over the daily management of a federal contract from a private contractor—and to ensure specific performance of the contractual provisions. *See, e.g.*, Pls.' Proposed Order at 6-9 (emphasis added), ECF No. 34-1. That broad-based proposal would also immerse this Court in the day-to-day supervision over Adelanto, effectively overriding the Executive Branch's broad discretion over "arrang[ing] for appropriate places of detention for [non-citizens] detained pending removal or a decision on removal" under 8 U.S.C. § 1231(g).

Because the requested injunction is a "forward-looking" remedy designed to compel action, it would have to be directed at the party with the physical and administrative power to perform under the terms of that injunction, not Defendants. For that, Plaintiffs would have to direct their litigation against that proper party, not against the Executive Branch.

## V.   CONCLUSION

Defendants respectfully request that the Court deny the motion.

Respectfully submitted,

Dated: March 30, 2026

TODD BLANCHE
Deputy Attorney General
BILAL A. ESSAYLI
First Assistant United States Attorney
DAVID M. HARRIS
Assistant United States Attorney
Chief, Civil Division
DANIEL A. BECK
Assistant United States Attorney
Chief, Complex and Defensive Litigation Section

/s/ Pushkal Mishra
PUSHKAL MISHRA
Special Assistant United States Attorney

Attorneys for Defendants

## CERTIFICATE OF COMPLIANCE WITH L.R. 11-6.2

The undersigned, counsel of record for Defendants, certifies that the memorandum of points and authorities contains 6,953 words, which complies with the word limit of Local Rule 11-6.1.

Dated: March 30, 2026

/s/ Pushkal Mishra
PUSHKAL MISHRA

23