**DECLARATION OF ROSA QUEVEDO**

I, ROSA QUEVEDO, do hereby declare and state the following:

1. I am currently employed with the U.S. Department of Homeland Security (DHS), U.S. Immigration and Customs Enforcement (ICE), as an Assistant Field Office Director (AFOD) for Enforcement and Removal Operations (ERO). ICE/ERO at Adelanto is responsible for managing the immigration cases of detained individuals. I have held this position since July 2025. I have been employed by DHS since October 26, 2009, and I have been assigned to the Adelanto ICE Processing Center (APC) in Adelanto, California, since October 2015. I am informed and knowledgeable to testify to the topics described below.

2. As an AFOD, I oversee the detained docket for the aliens who are detained at APC in Adelanto, California. I have worked in various other positions within DHS since February 2010. Prior to becoming an AFOD, I was an Immigration and Enforcement Agent, Deportation Officer, and Supervisory Detention and Deportation Officer. In this capacity I regularly work alongside ICE's Office of Principal Legal Advisor (OPLA).

3. In addition, ICE/ERO has a secondary responsibility to observe, identify, and notify the various contractors or sub-contractors of any perceived deficiencies and to maintain quality assurance in adherence to their responsibility under Performance-Based National Detention Standards 2011 (Revised December 2016) and amendments thereof (PBNDS). *See* Operations Manual ICE Performance-Based National Detention Standards https://www.ice.gov/detention-standards/2011(last accessed March 30, 2026). GEO Group, Inc. (GEO Group) owns and operates the detention facility and land at the Adelanto ICE Processing Center. My primary responsibilities include immigration case management for those detained at APC and general overall responsibility for ICE interests, including monitoring of adherence to PBNDS.

4. Conditions of detention at the APC are governed by the PBNDS. The PBNDS reflects ICE's ongoing effort to tailor the conditions of immigration detention to its unique purpose while maintaining a safe and secure detention environment for detainees and staff.

5. ICE is charged with removing aliens who lack lawful immigration status in the United States. Detention is an important and necessary part of immigration enforcement. Detained aliens who are in exclusion, deportation, or removal proceedings under the Immigration and Nationality Act are detained at Service Processing Centers or other detention locations under the authority of ICE, as are aliens who are pending appeals, results from the Board of Immigration Appeals, or aliens with administrative final orders of removal who are being processed for removal to their native countries. ICE detains people to secure their presence for both immigration proceedings and their removal, with a special focus on those who represent a risk to public safety, or for whom detention is mandatory by law.

6. One contracting measure to acquire detention services, as applicable to APC, is via an Indefinite Delivery/Indefinite Quantity (IDIQ) Contract, between ICE and GEO Group (APC Contract). *See* APC Contract, a true and accurate copy attached hereto as Exhibit 1. The APC is currently operated entirely by GEO Group pursuant to a contract signed with ICE in 2019. The purpose of the APC Contract is for GEO Group to provide, "detention, transportation and medical services in the Los Angeles area of responsibility at Adelanto Detention Facility and the Desert View Modified Community Correctional Facility in accordance with the Performance Work Statement for this contract." Ex. 1 at 2, BOX 20. The Performance Work Statement (PWS) provides a detailed list of the "Covered Services" as: 1) bed space; 2) basic needs; 3) unit of service and financial liability; 4) interpretive/translation services; 5) transport and transportation services; 6) staff services; and 7) medical services. *See* PWS Addendum 1, a true and accurate copy attached hereto as Exhibit 2.

7. The APC Contract between the GEO Group and ICE does not reserve to ICE any direct control of any part of the contracted work and only provides that ICE "will conduct periodic inspections of the facility to assure compliance with" ICE standards. *See* Requirement D PWS Addendum, a true and accurate copy attached hereto as Exhibit 3. The APC Contract allows for ERO's presence in the facility. *Id.* The APC Contract is a

performance-based contract, which is a results-oriented method of contracting focused on outputs, quality, and outcomes. Performance-based contracts do not designate nor control how a contractor is to perform the work but rather establish the expected outcomes and results. It is then the responsibility of the contractor as to how it will fulfill it obligations under the contract. ICE through its Office of Professional Responsibility (OPR), Office of Detention Oversight (ODO) conducts periodic and routine inspections of APC. The APC is also subject to annual and *ad hoc* inspections from a variety of Federal government entities to include: ERO's Custody Management Division - Detention Monitoring Unit, ICE Office of POPR, and DHS Office of the Inspector General (OIG). If PBNDS deficiencies are identified during these inspections, they are addressed through the implementation of a Uniform Corrective Action Plan (UCAP).

8. When ODO inspects APC to ensure compliance with the PBNDS, it generates a report that is sent to GEO Group to aid in its compliance. *See* Inspection 2025-001-082 Report dated September 16-18, 2025, a true and accurate copy attached hereto as Exhibit 4; *See* GEO Group Inspection Report Findings and Corrective Action (2026 GEO Group Corrective Action), a true and accurate copy attached hereto as Exhibit 5. That report provides that "ODO conducts the following annual and biennial oversight inspections of ICE detention facilities to assess and rate each facility's compliance with their contractually obligated detention standards . . . ." *Id.* The 2025 Inspection Report is based on the most recent inspection "from September 16 to 18, 2025," and states that GEO Group—not the government—"provides food services and medical care" at APC. *Id.* Additionally, "[t]he facility [was]accredited by the National Commission on Correctional Health Care in June 2022 and American Correctional Association in January 2023." *Id.*

9. The results of the ODO's inspection of the APC in September of 2025 found the facility was compliant in 26 out of 29 standards. The six deficiencies identified by ODO are among the three standards of custody classification, funds and personal property, and the grievance system. *See* Ex. 5. On January 30, 2026, ERO notified GEO Group in writing of all inspection deficiencies identified. *Id.* GEO Group independently decided on

the necessary corrective action and completed the same. Grievance system deficiencies did not find any outstanding grievances from any named Plaintiff or Declarant herein, but found procedural GEO Group grievance response time issues. *Id.* In addition, I meet with GEO Group staff every Wednesday of each week to ensure GEO Group is aware of any new or outstanding detainee grievances or complaints.

10. During the annual inspection a random sampling of at least 25 grievances is drawn from GEO Group for confidential review by ODO inspectors. Once interviews are scheduled ODO is able to review complaints and/or grievances to facilitate face-to-face individual, detainee interviews. These interviews are confidential, providing detainees with the opportunity to speak candidly with the knowledge and understanding that interviews have no bearing or impact on their immigration proceedings. ODO inspectors also inform detention interviewees that they are conducting an inspection independent and apart from the APC and GEO Group staff. ODO inspectors dress in formal business attire when on-site at the facility and when conducting interviews with detainees, reinforcing their distinction from GEO Group staff.

11. During its 2025 inspection, "ODO interviewed 34 detainees" and "[m]ost detainees reported satisfaction with facility services." *Id.* at 6. ODO's 2025 inspection "followed up on the concerns raised by detainees who expressed dissatisfaction with facility services and determined that [GEO Group] staff had made every effort to resolve those issues." *Id.* Most detainees interviewed during the inspection reported no complaints of abuse or medical issues. *Id.* ODO's process emphasizes ongoing oversight and corrective action. ODO recommended that ERO Los Angeles continue to monitor the deficiencies identified and the corrective action taken by GEO Group to resolve those deficiencies in accordance with contractual obligations. *Id.*

12. The ODO report does not constitute a final action taken by ICE; rather, it is part of an ongoing assessment, reevaluation, and oversight process to address any deficiencies noted by the inspection. The facility remains subject to further review, including unannounced as well as scheduled inspections. The GEO Group's operations

will be evaluated as scheduled to ensure contract compliance as well as detainee well-being. Remedies and corrective action plans are implemented by GEO Group and reasonable accommodations are addressed through GEO Group's procedures. This ongoing oversight framework ensures that any identified issues are tracked for correction, and that facility operations are continually reassessed for GEO Group compliance and improvement. *See* Ex. 4.

13. Although not all encompassing, ICE's guidance to GEO Group at APC, pursuant to the PBNDS provides detention guidelines and standards for: 1) environmental health and safety for facility cleanliness and sanitation, safe water, special needs, and communication assistance for detainees with disabilities and language barriers; 2) detainee Safety; 3) general housekeeping; 4) certification of facility water supply; 5) inspections; 6) medical operations and awaiting medical; 7) hold rooms in detention facilities and holding periods; 8) controlled populations; 9) addressing detainees needs and disabilities, physical conditions, and wheelchair access; 10) staff-detainee communication to include receiving written questions from detainees to include grievances and concerns; 11) detainee handbook; 12) record keeping and file control; 13) hotline information; 14) use of force, prohibited forms of punishment, restraints, disciplinary system, and reporting; 15) medical staff evaluations, care, and hygiene; and 16) disability identification, assessment, and accommodation. *See* PBNDS https://www.ice.gov/detention-standards/2011 (last accessed March 30, 2026) at 19 - 414.

14. Under the Detention Services Contract between GEO Group and ICE, GEO Group assumed and agreed, without limitation, to perform the Detention Services obligations and responsibilities as set forth in the APC Contract. *See* Ex. 1. GEO Group retains sole responsibility "for providing all health care services" to detainees. *Id.* GEO Group is responsible for the coordination of any public health services needed for detainees. Upon information and belief, the City of Adelanto Water Department, in partnership with PERC Water Corporation (PERC), provides comprehensive water and wastewater services to all residents and businesses in the City of Adelanto, California.

Upon information and belief, water used at APC only comes water services managed by PERC and the City of Adelanto. *See* City of Adelanto Water and Sewer Services, https://adelantoca.gov/services/water_sewer/index.php (last accessed March 19, 2026). The City of Adelanto publishes consumer confidence reports annually on the quality of drinking water tested at a number of locations in the city. There has not been a contamination violation in any of the Consumer Confidence Reports I have reviewed. *See* City of Adelanto Consumer Confidence Reports 2021 to 2024, https://adelantoca.gov/services/water_sewer/consumer_confidence_reports.php (last accessed March 25, 2026). Additionally, water quality is an inspection point in ODO's inspection process and no deficiencies were noted. Practically everyone at APC, including me, drinks the same water provided by PERC. I am not aware of any report finding the drinking water unsafe, and there is none in the complaint or the motion for a preliminary injunction.

15. GEO Group acknowledged, accepted, and agreed to the scope of the limitations upon the authority, duties, and responsibilities of ICE and the City under the APC Contract, and GEO provides the facility, management, personnel, and services for 24-hour supervision of detainees in ICE custody at the APC. *See* Ex. 3. In assuming the obligations and responsibilities from ICE, GEO Group expressly agreed that their performance of the obligations and responsibilities as set forth in the APC Contract, would be subject to and in full accordance with the terms and conditions set forth therein, including the most current additions of the PBNDS. *See* Ex. 1. GEO Group is mandated to provide detainees with nutritious, varied meals, in a sanitary manner, and is also responsible for identifying, developing, and managing the ". . . food service program policy, procedures, and practices," at APC. *See* Section C Performance Work Statement Detention Services (California-Wide) (October 25, 2019) Section VIII, a true and accurate copy attached hereto as Exhibit 6.

16. Detainees may choose to purchase food at the commissary. Purchased food can be heated with microwave units that are available in each residential wing area. In

order to purchase items from the commissary, detainees must deposit money into their account or have someone else deposit money into their account.

17. Pursuant to the contract, GEO Group is required to maintain records regarding the detainee's detention as well as records related to its performance of the contract. GEO Group must provide those records to ICE upon the agency's request. As such, I have requested and reviewed the relevant records related to the allegations set forth in Plaintiff's Motion for Preliminary Injunction and related exhibits. *See* Ex. 6.

18. I have reviewed the A files for the named plaintiffs, telehealth records, as well as their medical and detainee records provided by GEO. In reviewing the detainee files, three of the four named plaintiffs never filed a complaint or grievance related to their allegations.

**L.T.**

19. L.T.[1], a citizen and national of Mexico with a criminal history and multiple convictions in the United States, was detained in November 2025 and is presently at APC. Attached as Ex. 7 is a true and correct copy of his Notice to Appear. L.T. entered the United States with inspection entry or parole on or around October 13, 1989. On November 16, 2025, he was moved to APC detention center. On December 31, 2025, he was given a bond hearing in the Immigration Court, which denied bond finding that he "is both a danger and a flight risk," based on prior criminal convictions and is pending removal proceedings. Ex. 8 (a true and correct copy of the Bond Order).

**Alleged Inadequate Medical Care and Treatment**

20. Specialized medical treatment provided by GEO Group is ongoing, and L.T. has scheduled appointments and treatment by GEO Group medical. *See* also, para. 21 - 25. Defendant's Response to Inadequate Medical Care below.

21. L.T. affirms that GEO Group has provided medical service to monitor the abdominal aneurysm and spinal tumor by ordering an abdominal ultrasound in January

---

[1] L.T. is referred to in the Plaintiff's Complaint using initials and a motion to proceed under pseudonym has been granted.

2026. On follow-up there were no additional complaints, and L.T. was advised by GEO Group medical to request sick call and was advised of the process in the event any physical ailment arose. L.T. has an MRI scheduled in the next month that was scheduled as urgent.

22. L.T. has been referred to GEO Group medical for specialty appointments, and those referrals have been pending awaiting a physician's availability.

23. L.T.'s medical records show that his diabetes is currently being treated with a different medication, however. Though MOUNJARO was considered by his clinicians, it was determined that it would not adequately control his diabetes. Further, L.T. was prescribed metoprolol.

24. L.T. has been provided pick-up times for medications as administered by GEO Group and to date it appears L.T. has not missed any of his distribution times and regularly accepts prescribed medications. Medications are not being withheld, rather L.T. is receiving his prescribed medications, but it is up to the patient, L.T., to self-administer their medicine(s).

25. L.T. has regularly scheduled appointments and has been informed that should there be a medical concern or issue, sick call is available. However, L.T. desires to schedule blood pressure readings on his own timeline, which may fall outside of his regularly scheduled appointments or treatment. However, the GEO medical staff monitors his vital signs pursuant to the PBNDS standards of care.

**Accommodation**

26. L.T. was provided with accommodation for a lower bunk bed by GEO. Recently, when ERO personnel arrived at APC for a site visit, L.T. allegedly had a slip and fall and appeared to require medical attention. When GEO medical staff initiated care and began to evaluate L.T. for C.P.R., he immediately stated he was uninjured and got up off the ground without assistance.

27. It is unclear what reasonable accommodation L.T. is requesting, and as far as I am aware, he has no pending reasonable accommodation requests. The microwave is a general use item accessible to all detainees on a first-come basis. Microwave use is

intended as a privilege for detainees to share in order to preheat meals purchased from the commissary.

28. Pursuant to safety and security procedures, detached chairs are not authorized within the shower area. The APC showers are in a community-use area accessible to all detainees on a first-come basis. However, there are disability benches in all of the APC shower stalls. However, there is also no prolonged delay for shower access use or benches at APC as alleged by L.T.

**J.M.**

29. J.M.[2], a citizen and national of Mexico with multiple serious criminal convictions in the United States, was detained in March 2025 and has undergone immigration proceedings and is before the Board of Immigration Appeals (BIA) pending appeal. Ex. 9 (a true and correct copy of his Notice to Appear) On June 4, 2025, he was moved into the APC detention center. On May 13, 2025, and September 22, 2025, he was given bond hearings at the Immigration Court, which denied[3] bond characterizing his criminal history as "severe," "extensive," and "reflective of disregard for the safety of others." Ex. 10 (a true and correct copy of the September 2025 Bond Order); *see also* Ex. 11 (a true and correct copy of the May 2025 Bond Order). In June 2025, he was ordered removed. Ex. 12 (a true and correct copy of the Removal Order).

30. ERO did not receive any "medical issue" grievances from J.M., but if it had, ERO would have provided those requests to GEO's medical unit since it provides the health care to detainees at APC. J.M. was able to obtain appointments at APC for blood work and a heart ultrasound at Arrowhead Regional Medical.

31. Pursuant to safety and security protocols, a best practice is detention facilities

---

[2] J.M. is referred to in the Plaintiff's Complaint using initials to protect their identity, and a motion to proceed under pseudonym has been granted.

[3] An immigration judge found J.M. not eligible for any relief sought under the Immigration and Nationality Act due to four previous convictions for driving under the influence of alcohol. J.M. appealed that order to the Board of Immigration Appeals and his appeal is pending.

ordering detainees to return to their rooms to enable GEO Group's medical personnel to render emergency medical care. Without knowing specifics as to the date or people involved with this incident, I cannot evaluate it further. Further, see below at ¶ 94 for comments related to emergency medical care.

32. All water distributed at APC, even in water jugs, which GEO Group provides at the request of detainees, comes from the City of Adelanto. As noted above, I have not reviewed any report from the City of Adelanto finding the drinking water unsafe, and I drink the water myself at the facility. *See*, Para. 65, below

**Mesrobian**

33. Named Plaintiff Sevak Mesrobian (MESROBIAN)[4] is a native and citizen of Iran who is subject to a final order of removal from the United States. MESROBIAN has extensive criminal history and multiple convictions in the United States that include robbery and larceny, as well as pending criminal charges for multiple felonies to include possession of firearms by convicted felon, hit-and-run, dangerous drugs, extortion, and parole violation), before he was detained and transferred to Adelanto in July 2025. MESROBIAN currently has a final order of removal. Ex. 13 (a true and correct copy of his final removal order).

**Alleged Inadequate Medical Care and Treatment**

34. GEO Group staff have remained with MESROBIAN each time he requires medical care or treatment and responds to MESROBIAN immediately and stayed at his bedside from the outset of a 911 call until EMS arrives to transport him to the hospital.

---

[4] On February 19, 2026, another court in this District denied Mesrobian's motion for preliminary injunction and a temporary restraining order, finding that he "fails to discuss, or even acknowledge [his] lengthy criminal history," "fails to demonstrate that the continued detention of a career criminal such as [him] does not meet the criteria for preventative detention based on dangerousness," "has failed to demonstrate why the appropriate injunctive relief for the lack of proper medical care requires his release from ICE detention rather than relief that is more narrowly tailored in scope," and finally that "he has not met his burden of establishing a likelihood of success, or raised serious questions going to the merits, [or] on his claims . . . ." *Mesrobian Szvak v. Warden, APC DVA Complex et al*. 5:25-CV-02629-JFW-MAA5:25-CV-02629-JFW-MAA (filed September 9, 2025). ECF No. 23 at 5.

Medical treatment is not being withheld, rather MESROBIAN is able to pick up his prescribed medications via GEO's medication distribution times, but it is up to the patient to self-administer their medicine(s). Since arriving at APC MESROBIAN has refused doses of prescribed seizure medication. GEO Group medical staff has struggled to get MESROBIAN to take his seizure medication as prescribed resulting in more seizures. GEO Group physicians have also taken time to provide MESROBIAN medical consultations and education specific to his non-compliance with taking his prescribed seizure medication, Levetiracetam. GEO Group has not neglected or mistreated MESROBIAN to my knowledge and have rendered medical care appropriately and in a timely manner, which often time has required him to be transported to a local hospital after calling 911. Further, ODO inspectors found no evidence of abuse or medical issues associated with MESROBIAN or any other detainees. *See*, Para. 55, below.

**Accommodation**

35. Regarding MESROBIAN's claims related to the grievance process, I have reviewed both grievances that he filed. Both grievances were filed on October 22, 2025. First, he complained that the WiFi was not working. At the time, there was a WiFi outage and is currently under repair. Second, he complained that he wanted to go outside into the large yard. GEO Group responded by letter stating that the large yard was under repair as well. Today, Wifi is now working, and detainees now use the large yard.

**<u>Salazar Garza</u>**

36. Named Plaintiff Jose Mauro Salazar Garza (GARZA) is a native and citizen of Mexico. On January 10, 1997, a Court convicted GARZA of transportation of methamphetamine and sentenced him to two years in prison. Subsequently, an immigration judge ordered GARZA removed from the United States on May 25, 1999, at El Centro, California. GARZA then illegally re-entered the United States at an unknown time and place.

37. GARZA, a 51-year-old male citizen and national of Mexico with a criminal history and multiple convictions in the United States (e.g., for assault, manufacturing of

controlled substance, drug trafficking), was detained in July 2023 and transferred to Adelanto in September 2025. He has a final order of removal. Ex. 14 (a true and correct copy of his final removal order). The Ninth Circuit stayed his removal. *Salazar-Garza v. Bondi*, No. 24-06288, (9th Cir. Oct. 16, 2024). He has had numerous bond hearings, most recently in November 2025. Ex. 15 (a true and correct copy of that Bond Order). That Bond Order refers back to the Bond Order from the March 2024 bond hearing, during which the Immigration Court found that "DHS met its burden to establish by clear and convincing evidence that the applicant's release would pose a danger to the community and such a significant flight risk that no amount of bond and/or alternatives to detention would be appropriate." Ex. 16 (a true and correct copy of that Bond Order). On Nov. 12, 2025, another court in this District denied his habeas petition, relying on the Report and Recommendation that in turn noted that the Immigration Court found that his "criminal record and his failure to sufficiently rehabilitate contributed to his flight risk and also noted [his] unlawful reentry to the United States after he was removed in 1999." *Salazar-Garza v. Semaia*, No. 25-05324, ECF No. 12 at (C.D. Cal. Oct. 3, 2025), report and recommendation adopted, ECF No. 14 (C.D. Cal. Nov. 12, 2025). Geo Group records indicate he was in administrative segregation for 14 days (not 30) following an investigation for disruptive behavior. Geo Group discourages fighting in detention and administrative detention and uses administrative segregation to monitor individuals and their behavior for an extended period of time. A true and accurate copy of the record of the administrative segregation proceeding, and subsequent observations is attached as Ex. 17.

38. Upon illegally re-entering the United States without inspection, admission, or parole GARZA restarted trafficking narcotics in violation of American law. On October 21, 2021, a Court convicted GARZA of possession with intent to distribute narcotics and sentenced him to 60 months in prison. The present removal proceeding began on August 9, 2023, when DHS sought to reinstate GARZA's prior removal order. An Immigration Judge denied GARZA's request for relief under the convention against torture and ordered

GARZA removed. GARZA appealed that order to the Board of Immigration Appeals and his appeal is pending.

**A.A.**

39. Named Declarant A.A.[5] has resided in the U.S. and was seeking a green card when she was interviewed and taken into custody at a USCIS Field Office. A.A. was transferred to APC East in December 2025 and as of March 2026, continues to remain there.

40. All the remaining allegations are addressed below in the categories of alleged punitive conditions.

**A.A.A.A.**

41. Named Declarant A.A.A.A.[6] arrived in the U.S. as a child and has resided in the U.S. with family to include two adult children born in the U.S. A.A.A.A. was detained at APC between September 19, 2025, to January 12, 2026. At the time of A.A.A.A.'s green card interview, ICE detained the Plaintiff at the San Bernardino USCIS office.

42. All the remaining allegations are addressed below in the categories of alleged punitive conditions.

**A.K.**

43. Named Declarant A.K..7 arrived in the U.S. in November 2022. On February 21, 2026, A.K. was detained by ICE officers due to having two outstanding felony charges: 1) Domestic Violence on February 6, 2025; 2) Aggravated Assault on November 21, 2026. A.K. was housed at APC East from February 24 to 26, 2026, and released from custody on February 26, 2026.

44. A.K.'s declaration identifies a list of medical conditions they had existing

---

[5] A.A. is referred to in the Plaintiff's Complaint using initials, and a motion to proceed under pseudonym has been granted.

[6] A.A.A.A. is referred to in the Plaintiff's Complaint using initials, and a motion to proceed under pseudonym has been granted.

[7] A.K. is referred to in the Plaintiff's Motion for Preliminary Injunction using initials, and a motion to proceed under pseudonym has been granted.

prior to detention: pregnancy, back pain, UTI, psychological conditions including anxiety and panic attacks.

45. A.K. was seen by the medical department on February 24, 2026, and after she was confirmed pregnant, she was recommended for early release and then released on February 26, 2026. According to GEO medical, she arrived with her medications and received approval to continue taking them.

**E.M.**

46. Named Declarant E.M.[8], arrived in the U.S. in 2024 seeking asylum after leaving Guatemala and filing a CBP One application. E.M. was detained at APC in August 2025 after being picked up by agents in the parking lot of Home Depot in Los Angeles, California.

47. E.M. was seen by GEO Group Medical staff at RN sick call on December 12, 2025, and January 3, 2026, regarding his back pain, as well as seen by a medical doctor line visit on December 31, 2025. Additionally, he was seen by medical three times (10/6/25, 10/8/25, 3/2/26) regarding dental pain and five times (9/5/25, 9/27/25, 12/13/25, 1/31/26, 3/19/26) to be prescribed medication for various ailments. All the remaining allegations are addressed below in the categories of alleged punitive conditions.

**ALLEGED PUNITIVE CONDITIONS:**

**Alleged Inedible/Insufficient Quantities of Food and/or Unsanitary Cooking/Meal Delivery Practices.**

48. The Plaintiffs and their declarants have alleged and contended that there are deficiencies in the food being provided at APC.

49. GEO Group is required to provide detainees with nutritious, varied meals, in a sanitary manner, and is also responsible for identifying, developing, and managing the ". . . food service program policy, procedures, and practices," at APC. *See California Wide PWS, Section VIII*. APC maintains a substantial kitchen facility that serves

[8] E.M. is referred to in the Plaintiff's Motion for Preliminary Injunction using initials, and a motion to proceed under pseudonym has been granted.

hundreds of meals daily. GEO Group is responsible all operating conditions in the kitchen to include, "[a]ll food service preparation resources (appliances, freezers, food preparation tables, [and] coolers . . . [.]" Id. Breakfast and dinner are normally served on trolleys to detainees in their respective wing areas. Lunch is served in a cafeteria. There are numerous meal options to accommodate a large number of dietary requirements and preferences. For instance, there are eight diabetic options offered daily. In addition, sack meals are required to be provided for detainees absent from any meal, in route or departing APC, and for detainees who need to take their medication with food. *Id*. Further, one of GEO's deliverable requirements is to deliver a menu for approval with IHSC standards for caloric intake.

**Alleged Undrinkable/Dirty Water and/or Lack of Sufficient Quantities of Water**.

50. The Plaintiffs have alleged and contended that the water at APC is undrinkable and not available in sufficient quantities.

51. Defendant responds the City of Adelanto Water Department in coordination with PERC, supports comprehensive water and wastewater services to APC. All APC water services are provided by PERC and the City to GEO Group at APC. *See* City of Adelanto Water and Sewer Services, https://adelantoca.gov/services/water_sewer/index.php (last visited Mar. 19, 2026). There are no reported contamination violations at APC in accordance with all Consumer Confidence Reports from 2021 to 2024 that I have reviewed. *See* City of Adelanto Consumer Confidence Reports 2021 to 2024, https://adelantoca.gov/services/water_sewer/consumer_confidence_reports.php (last visited Mar. 25, 2026). Additionally, water quality is an inspection point in ODO's inspection process and no deficiencies were noted. Practically everyone at APC, including me, drinks the same water provided by PERC.

52. I am not aware of any report finding the drinking water unsafe, and there is no report cited in the complaint or the motion for a preliminary injunction establishing

that the water is unsuitable for consumption. I am aware of the GEO Group process for transporting drinking water, in containers and adding ice, which was previously implemented to provide detainees ice water, and cold water on very hot days. However, after detainees were directed to not open the containers, they have sometimes ignored this requirement by continuing to retrieve ice individually with their bare hands potentially contaminating the water. GEO Group water containers are a courtesy for all detainees, and prior to and after use of containers GEO Group cleans each container.

**Alleged Lack of Serviceable, Temperature-Appropriate Clothing, Linens, and/or Mattresses (Including Unhygienic Laundry)**.

53. Laundry is done six days each week. All pants, 3x of each, in winter sweaters are also available upon request.

54. GEO Group is contractually obligated to follow detention standards as follows: 1. Each facility shall maintain an inventory of clothing, bedding, linens, towels and personal hygiene items that is sufficient to meet the needs of detainees; 2. Each detainee shall have suitable, clean bedding, linens, blankets and towels; 3. Each detainee shall have sufficient clean clothing that is properly fitted; climatically suitable, durable and presentable; 4. Detainees shall be held accountable for clothing, bedding, linens and towels assigned to them. PBNDS 4.5(II).

**Allegations of no Privacy Screens for Toilets or Showers and Other Complaints**.

55. The Plaintiffs have alleged that there are no privacy screens in place for toilets and showers.

56. Due to safety and security concerns, the toilets in the dorm rooms do not have walls or doors but the door to the dorm room has a window to provide visibility into each room. Additionally, the showers are "locker room" style where there are three cinderblock walls with the open wall facing a wall opposite a walking corridor, however, there are no curtains or doors because visibility is necessary for safety and security reasons. Additionally, there are vents in the shower stalls to allow moisture out. At times, detainees have been caught clogging the vents with soap and/or toilet paper, in

violation of policy, which causes mildew to form due to the high levels of moisture. The shower stalls are cleaned every day.

**Visitation Policy: Alleged Arbitrary Time Limits and Bans on Holding Hands/Parents Holding Children.**

57. Plaintiffs have complained generally about the Geo Group visitation policy.

58. Defendant responds Pursuant to PBNDS 5.7(II)(4) Facilities are encouraged to provide opportunities for both contact and non-contact visitation with approved visitors during both day and evening hours. Additionally, Section 6 states, the number of visitors a detainee may receive and the length of visits shall be limited only by reasonable constraints of space, scheduling, staff availability, safety, security and good order, also size of population. Generally, visits should be for the maximum period practicable but not less than one hour with special consideration given to family circumstances and individuals who have traveled long distances. Due to conduct policy violations, some detainees are not allowed contact visits due to safety and security concerns. Attached as Exhibit __ is a true and correct copy of Memorandum RE: Temporary Suspension of Contact Visits – Pending Investigation. The visitation standards are set by GEO Group in order to permit authorized visits and to accommodate all detainees at APC.

**Complaints of Disruptive Counts During the Day**.

59. GEO is contractually obligated to perform population counts pursuant to PBNDS 2.8 which states that counts should be performed at a *minimum* every eight hours. (emphasis added) Further, "[w]hen making night counts, officers shall use flashlights judiciously, but with sufficient light to make a positive identification of a living body. The officer must not count a detainee based on a part or parts of clothing, hair, shoes, or the appearance of a human form. PBNDS 2011 (Revised December 2016) 2.8(V)(A)(2)(d). Performing counts pursuant to established standards can result in disruptions to the daily and nightly activities of the detainee population, however, because they are an integral part of safety and security for the detainee population and

the population at large, they are necessary.

**Complaints of Lack of Detainee Access to Outdoor Space**.

60. Plaintiffs complain they have not been given enough outdoor space to access.

61. GEO is contractually obligated to provide recreation in accordance with PBNDS 5.4. APC has a large outdoor recreation area with a soccer field and basketball court. Additionally, there is large indoor recreation area with basketball court. There was an attempted escape incident which required modification of the perimeter fence and consequently a closure of the outdoor recreation area during construction activities. The claims alleging lack of access to outdoor spaces reflect an isolated incident that required some temporary construction at APC by GEO Group for purposes of security and safety, and there is no supporting evidence that this was punitive.

**Allegations of no Educational, Religious, or Recreational Programming**.

62. Plaintiffs allege and complain of a lack of educational, religious, and recreational programs at the APC.

63. PBNDS 5.4(V)(F) requires educational classes or speakers, a Chaplain on site, MHU has classes for AA, NA, Anger management, mental health education classes, beyond trauma, Seeking Safety, substance abuse disorder, and Stages of Changes.

**Alleged Sub-standard Medical Intake**.

64. PBNDS 4.3 sets forth standards of medical treatment in detention facilities. https://www.ice.gov/doclib/detention-standards/2011/4-3.pdf. Initial physical health and pregnancy screenings are completed shortly after arrival into the facility. There are specific provisions for care of outpatient medical issues, emergency procedures, dental care, and psychological care. There is no specific timeline for delivery of specialized care such as ophthalmology, orthopedics, or other medical specialties. Rather, PBNDS 4.3 permits detainees to initiate the process for seeking specialized care, and request follow-ups at a reasonable time interval.

///

**Alleged Lack of a Functioning Sick Call System.**

65. Medical response and request forms are available 24 hours per day and seven days a week. There are different levels of response based on the need and seriousness of the detainee and triage. In addition, there is a "code blue" procedure for immediate, emergency care. *See also* PBNDS 4.3(V)(S) and (T).

**Alleged Ineffective Prescription Medication Administration.**

66. GEO is contractually obligated to provide pharmaceutical management pursuant to PBNDS 4.3(V)(G).

**Alleged Lack of Specialty Care/ Failure to Appropriately Treat Chronic Conditions.**

67. In addition to GEO's contractual obligations, IHCS provides funding for specialty care that is not available at APC. When this type of care is required, detainees in coordination with GEO Group are required to go through the specialty care provider regarding acceptance of the patient and scheduling/providing the care. GEO Group has and continues to schedule specialty care appointments offsite and transports and coordinates with local providers outside of APC.

**Alleged Lack of Appropriate Response to Medical Emergencies/Urgent Issues.**

68. PBNDS 4.3(V)(T) provides the standards to which GEO Group is obligated to provide emergency medical care. These standards are detailed and comprehensive in their requirements. There is a protocol that detainees are requested to return to their quarters in order to permit GEO Group or first responders to access a detainee with a medical emergency and render assistance or to triage before transport to a local hospital. This is not to imply that people need to be moved out of the way because of overcrowding. According to the California Attorney General, APC has 1940 beds for detainees and there are an additional 750 beds in the Desert View Annex. immigration-detention-2025.pdf. On March 14, 2026, APC had 1521 beds used and the Desert View Annex had 478 beds used, well under the rated population for each building.

///

**Medical/Administrative Segregation Worsens Mental Health and Retaliatory Use of Restrictive Housing and Unreasonable Conditions of Confinement.**

69. PBNDS 4.3(V)(C)(4) and 4.3(V)(AA) provide for the standards for segregating detainees for medical purposes. Section AA states in relevant part, "[s]egregation shall only be for medical reasons that are documented in the medical record and may not be used for punitive purposes. Such segregation shall only occur after a determination by a component mental health professional has taken place that shows the segregation shall not adversely affect the detainee's mental health. Additionally, PBNDS 2.2 provides the standards for the custody classification system and the resulting housing determinations, including segregated housing units. The purpose and scope of custody classification system is to "protect[] detainees, staff, contractors, volunteers and the community from harm, and contributes to orderly facility operations, by requiring a formal classification process for managing and separating detainees based on verifiable and documented data."

70. GEO Group is contractually obligated to adhere to PBNDS 2.14 which provides the standards regarding special management units including segregating certain detainees from the general population to protect detainees, staff, contractors, volunteers, and the community from harm. Attached as Exhibit is a true and correct copy of PBNDS 2.14

71. I am aware of instances where detainees are required to get prolonged medical care or specialty care by GEO Group that requires being housed at a specific location within the medical facility. This is required to occur where GEO Group staff may administer and oversee medical treatment within APC rather than within any specific detainee quarters. There is no supporting evidence that this was punitive nature or in retaliation to any specific detainee. For example, where care is essential for the welfare of a detainee it is not carried out amongst the entire APC area similar to care and oversight provided in a hospital.

///

**Disability Discrimination**

72. As discussed above in Paragraph 14, p. 6, lines 11-28, GEO has a contractual obligation to comply with detention standards which are aligned with the RA and Section 504 and the Americans with Disabilities Act of 1990, and to comply with federal, state, and local laws or regulations for reasonable accommodations and persons with disabilities. Disability Rights for California does visits for compliance also.

**Facility conditions/Living at Adelanto Among Mold, Unsanitary Conditions, Maintenance, and Poor Infrastructure.**

73. GEO is contractually obligated to maintain all ACA and PBNDS standards regarding facility condition and maintenance as well as maintaining all requisite permits, licenses, and certificates of occupancy. I am not aware of Geo Group either missing or having permits, licenses, and certificates of occupancy revoked. I am aware of the detainee claims alleging mold within the facility. On more than one occasion, specific to the shower areas, there has been condensation in those same areas where detainees intentionally block the ventilation areas, which causes moisture to build up. However, I am unaware of any evidence of mold in or around the APC facility as alleged. GEO Group, not ICE, is in charge of the day-to-day cleaning operations and repairs. I am also unaware of any violation(s) raised in the most recent 2025 ODO inspection. I am unaware of any evidence of broken or damaged windows or those windows being open to the point of permitting rain to enter the APC to the extent that mold forms or bedding becomes wet.

74. This declaration is based upon my personal and professional knowledge, information obtained from other ICE employees, as well as other information available in various records and record systems maintained by DHS. I provided this declaration based on the best of my knowledge, information, belief, and reasonable inquiry from the above captioned case.

///

///

///

75. I declare under the penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on March 30, 2026, in Adelanto, CA.

ROSA M QUEVEDO
Digitally signed by ROSA M QUEVEDO
Date: 2026.03.30 21:10:24 -07'00'

Rosa Quevedo
Assistant Field Office Director