**OLLIN LAW**

Salomon Zavala, Esq. (Bar No. 243424)

Pascual Torres, Esq. (Bar No. 331290)

Email: *szavala@ollinlaw.org*

811 W. 7th Street, Suite 1200

Los Angeles, CA 90017

Telephone: (213) 413-0144

*Attorney for Clínica Victimológica de Análisis a Violaciones a Derechos Humanos (Victimology Clinic for the Analysis of Human Rights Violations) of the University of Guadalajara*

IN THE UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

EASTERN DIVISION – RIVERSIDE

| | |
|---|---|
| L.T., SEVAK MESROBIAN, JOSE MAURO SALAZAR GARZA, AND J.M., on behalf of themselves and all others similarly situated; COALITION FOR HUMANE IMMIGRANT RIGHTS,<br><br>Plaintiffs,<br><br>v.<br><br>U.S. IMMIGRATION AND CUSTOMS ENFORCEMENT; TODD M. LYONS, Acting Director, U.S. Immigration and Customs Enforcement; JAIME RIOS, Acting Director of Los Angeles Field Office, Enforcement and Removal Operations, U.S. Immigration and Customs Enforcement; U.S. DEPARTMENT OF HOMELAND SECURITY; KRISTI NOEM, Secretary, U.S. Department of Homeland Security,<br><br>Defendants. | CASE NO. 5:26-cv-00322-SSS-RAO<br><br>**(PROPOSED) BRIEF OF AMICUS CURIAE IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION**<br><br>Date:        April 28, 2026<br>Time:        10:00 a.m.<br>Judge:       Hon. Sunshine Sykes |

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ……………………………………………....iii

I.    INTRODUCTION …………………………………………………....1

II.   INTEREST OF AMICUS CURIAE ………………………………….…2

III.  ARGUMENT …………………………………………………………2

    A. A Philosophical Framework ……………………………………….2

    B. The State Has a Heightened Duty of Care Towards Individuals in Custody ……………………………………………………………3

    C. Harm Occurring in Custody Gives Rise to a Presumption of State Responsibility ………………………………………………..4

    D. Civil Immigration Detention Must Not Be Punitive in Nature …………6

    E. International Standards Applicable to Civil Immigration Detention …...7

    F. Victimological Perspective on Structural Negligence/Violence ………..8

    G. Comparative International Standards ……………………………….9

    H. International Responsibility of the United States ……………………...10

    I. Persons with Disabilities in Detention ……………………………...12

    J. Conditions of Detention that Constitute Cruel, Inhumane or Degrading Treatment and Reach the Threshold of Torture ……………13

    K. Harm to Family Members and Life Project …………………………...17

    L. Application to the Present Situation …………………………………...18

IV.   CONCLUSION ……………………………………………………...23

# TABLE OF AUTHORITIES

*Neira Alegría et al. v. Peru*,
    Judgment, Inter-Am. Ct. H.R. (ser. C) No. 20 (Jan. 19, 1995)…………………. 4

*Almonacid Arellano et al. v. Chile*,
    Judgment, Inter-Am. Ct. H.R. (ser. C) No. 154 (Sept. 26, 2006)…………….. 11

*Montero Aranguren et al. (Detention Center of Catia) v. Venezuela*,
    Judgment, Inter-Am. Ct. H.R. (ser. C) No. 150 (July 5, 2006)…………………. 4

*Bell v. Wolfish*,
    441 U.S. 520 (1979) ………………………………………………….. 13

*Cantoral-Benavides v. Peru*,
    Judgment, Inter-Am. Ct. H.R. (ser. C) No. 69 (Aug. 18, 2000)……………… 14

*Castillo Petruzzi et al. v. Peru*,
    Judgment, Inter-Am. Ct. H.R. (ser. C) No. 52 (May. 30, 1999)……………… 17

*Chinchilla Sandoval et al. v. Guatemala*,
    Judgment, Inter-Am. Ct. H.R. (ser. C) No. 312 (Feb. 29, 2016)……………… 6

*Estelle v. Gamble*,
    429 U.S. 97 (1976)…………………………………………………… 13

*Farmer v. Brennan*,
    511 U.S. 825 (1994)…………………………………………………… 13

*Furlan and Family v. Argentina*,
    Judgment, Inter-Am. Ct. H.R. (ser. C) No. 246 (Aug. 31, 2012)……………. 17

*Gelman v. Uruguay*,
    Judgment, Inter-Am. Ct. H.R. (ser. C) No. 221 (Feb. 24, 2011)……………… 16

*Hope v. Pelzer,*
    536 U.S. 730 (2002) …………………………………………………15

*Juvenile Reeducation Institute v. Paraguay*,
    Judgment, Inter-Am. Ct. H.R. (ser. C) No. 112 (Sept. 2, 2004) ……………… 16

*Vélez Loor v. Panama*,
    Judgment, Inter-Am. Ct. H.R. (ser. C) No. 218 (Nov. 23, 2010)…………….. 15

*Luiza Melinho and G.C.A. v. Brazil,*
    Case No. 13.021 Inter-Am. Ct. H.R. (pending)……………..……………… 2

*James Terry Roach & Jay Pinkerton v. United States*,
    Case 9647, Inter-Am. Comm'n H.R., Report No. 3/87,

iii

OEA/Ser.L/V/II.71, doc. 9 rev. 1 (1987)……………………………………... 10

*Velásquez Rodríguez v. Honduras*,
    Judgment, Inter-Am. Ct. H.R. (ser. C) No. 4 (July 29, 1988)………..……… 5

*Suárez Rosero v. Ecuador*,
    Judgment, Inter-Am. Ct. H.R. (ser. C) No. 35 (Nov. 12, 1997)……..……… 16

*Loayza Tamayo v. Peru*,
    Judgment, Inter-Am. Ct. H.R. (ser. C) No. 33 (Sept. 17, 1997)……………….. 5

*Pacheco Teruel et al. v. Honduras*,
    Judgment, Inter-Am. Ct. H.R. (ser. C) No. 241 (Apr. 27, 2012)……..……… 17

*Tibi v. Ecuador*,
    Judgment, Inter-Am. Ct. H.R. (ser. C) No. 114 (Sept. 7, 2004)……………….. 5

**Statutes/Const.**

Rehabilitation Act of 1973, 29 U.S.C. § 701 et seq……………………………………...12

U.S. Const. amend. V …………………………………………………………………..17

**Other Authorities**

American Convention on Human Rights,
    Nov. 22, 1969, 1144 U.N.T.S. 123. ……………………………………………….5

American Declaration of the Rights and Duties of Man,
    O.A.S. Res. XXX, adopted Apr. 1948. …………………………………………10

Body of Principles for the Protection of All Persons under Any
    Form of Detention or Imprisonment,
    G.A. Res. 43/173, U.N. Doc. A/RES/43/173 (Dec. 9, 1988) …………………….9

Convention on the Rights of Persons with Disabilities,
    Dec. 13, 2006, 2515 U.N.T.S. 3. ……………………………………………….12

International Covenant on Civil and Political Rights,
    Dec. 16, 1966, 999 U.N.T.S. 171 ……………………………………………..11

Convention Against Torture and Other Cruel, Inhuman or Degrading
    Treatment or Punishment,
    Dec. 10, 1984, 1465 U.N.T.S. 85 …………………………………………… 11

Standard Minimum Rules for the Treatment of Prisoners,
    (the Nelson Mandela Rules), G.A. Res. 70/175,
    U.N. Doc. A/RES/70/175 (Dec. 17, 2015). …………………………………….9

BRIEF OF AMICUS CURIAE
CASE NO. 5:26-cv-00322-SSS-RAO

## I. INTRODUCTION

On January 26, 2026, a Complaint for Injunctive and Declaratory Relief was filed in this case seeking to end the illegal and inhumane conditions facing detainees at Adelanto ICE Processing Center "Adelanto" (hereinafter the "Complaint"). Dkt. 1. The Complaint was followed by a Motion for Preliminary Injunction which seeks an order directing the Defendants to remedy the conditions described within the Complaint. Dkt. 34. This brief is written in support of the Motion for Preliminary Injunction.

The Complaint describes a pervasive pattern of delayed and denied medical care, unsafe and degrading conditions, and prolonged isolation, circumstances that, taken together, undermine the dignity and well-being of those in custody. These harms are not limited to immediate physical suffering; rather, they profoundly disrupt detainees' ability to maintain autonomy, pursue personal and family life projects, and sustain meaningful relationships with their loved ones.

In examining the Complaint, this brief situates the alleged violations within both domestic and comparative international law, drawing on inter-American jurisprudence to highlight the physical, psychological, and relational dimensions of the harm. Through this lens, the brief demonstrates that the ongoing, avoidable suffering described in the Complaint constitutes not only an infringement on the rights of detainees but also a serious disruption to their families and future prospects. This comprehensive analysis underscores the full scope of the harm alleged and frames the legal and moral obligations at stake.

The provided analysis of the depth and breadth of these alleged harms allows for a nuanced understanding of how structural neglect at The Adelanto ICE Processing Center (Adelanto) results in severe injuries to liberty interests protected by the U.S. Constitution, specifically, rights to constitutionally adequate medical care, reasonable safety, and freedom from punitive conditions in civil detention. Importantly, this

BRIEF OF AMICUS CURIAE
CASE NO. 5:26-cv-00322-SSS-RAO

approach also illuminates the significant relational impact on family life and close relationships, extending the scope of harm beyond the individual to their families.

## II. INTEREST OF AMICUS CURIAE

The Victimology Clinic for the Analysis of Human Rights Violations at the University of Guadalajara, a public university in Mexico, is an academic and research-based legal clinic dedicated to the study and documentation of human rights violations, with particular emphasis on structural violence, state responsibility, and access to justice.

The Clinic has participated in strategic human rights litigation, including the preparation of amicus curiae briefs before the inter-American human rights system in cases such as *Luiza Melinho and G.C.A. v. Brazil,* Case No. 13.021, Inter-Am. Ct. H.R. (pending), which is currently pending before the Inter-American Court of Human Rights.

In those interventions, the Clinic has addressed issues related to state responsibility in custodial settings, patterns of structural violence, and the application of international human rights standards to vulnerable populations.

Amicus submits this brief on a pro bono basis for academic purposes to assist the Court by providing a comparative and international human rights framework applicable to custodial contexts, which will be instructive in evaluating the constitutional claims raised in this case.

## III. ARGUMENT

**A.    A Philosophical Framework**

In the immigration detention context of this case, there is not only a deprivation of liberty, but a deeper transformation in the individual's effective status: the migrant is progressively treated as a "non-person." This condition does not imply the formal disappearance of rights, but rather their material hollowing. The individual remains legally recognized, yet in practice is managed as if lacking agency, voice, and value

BRIEF OF AMICUS CURIAE
CASE NO. 5:26-cv-00322-SSS-RAO

equivalent to that of other persons protected by the legal order. This displacement marks the beginning of a process of structural dehumanization. Such dehumanization does not operate primarily through exceptional acts of violence, but through ordinary mechanisms: systematic omissions, institutional negligence, and living conditions incompatible with human dignity. In this context, harm does not appear as an accident, but as a foreseeable result of the system's operation. This phenomenon may be understood as a political ontology of harm: a set of structural conditions that implicitly determine which lives are effectively protected and which may be exposed to deterioration, suffering, and even death without triggering adequate institutional responses.

Within this framework, the core of the problem lies in the fact that the detention system produces "disposable" subjects; individuals whose physical integrity and lives cease to function as effective limits on State action or omission. These are bodies that, in practical terms, do not matter sufficiently to trigger timely mechanisms of protection. This form of disposability is not necessarily declared, but manifests through the repetition of failures: delayed or nonexistent medical care, omissions in the face of known risks, and persistent unsanitary conditions. The recurrence of these practices reveals a normalization of discrimination, in which the unequal valuation of life becomes normalized within institutional operations. When such conditions result in serious harm or death in custody, the issue transcends the administrative sphere. What is at stake is the system's compatibility with the fundamental principle that every person, regardless of immigration status, must be treated as a full rights-bearing person whose life constitutes an inviolable limit on the power of the State.

**B.      The State Has a Heightened Duty of Care Towards Individuals in Custody**

When the State deprives a person of liberty, it assumes a special position as guarantor with respect to that person's rights. This principle has been consistently recognized in international human rights jurisprudence. The Inter-American Court of

BRIEF OF AMICUS CURIAE
CASE NO. 5:26-cv-00322-SSS-RAO

Human Rights has held that, the State, as the entity responsible for detention facilities, is in a special position of guarantor with respect to persons deprived of liberty. (*Neira Alegría et al. v. Peru,* Judgment Inter-Am. Ct. H.R. (ser. C) No. 20, ¶ 60 (Jan. 19, 1995).

This duty arises from the total control exercised by the State over detained individuals, who are unable to meet their own basic needs. Accordingly, the State must ensure conditions compatible with human dignity, including access to adequate medical care, hygiene, food, and safety.

## C.    Harm Occurring in Custody Gives Rise to a Presumption of State Responsibility

International human rights law establishes that when harm occurs while a person is in State custody, the burden of proof shifts to the State. The Inter-American Court has stated, when a person is in the custody of state authorities, the State has the obligation to guarantee that person's rights, and to "ensure that the manner and method of any deprivation of liberty to not exceed the unavoidable level of suffering inherent in detention…" (*Montero Aranguren et al. (Detention Center of Catia) v. Venezuela*, Judgment, Inter-Am. Ct. H.R. (ser. C) No. 150, ¶ 86-87 (July 5, 2006)).

The Inter-American Court of Human Rights has repeatedly held that any harm suffered in custody engages State responsibility unless the State provides a satisfactory and convincing explanation. This principle gives rise to a presumption of responsibility in cases of preventable harm or death. When a detained person experiences deterioration in health, suffers serious injury, or dies while under State control, the burden of proof shifts to the State, which must demonstrate that it complied with its obligations and that the harm is not attributable to its conduct or omissions. This presumption is particularly strong in situations involving: lack of timely or adequate medical care; failure to monitor known medical conditions; exposure to unsanitary or unsafe environments; and structural deficiencies in detention infrastructure. In these contexts, omissions by State authorities are not neutral and

instead constitute legally relevant failures that may give rise to responsibility at both the constitutional and international levels.

This principle reflects a broader evidentiary rule: the State is presumed responsible for harm occurring in custody, unless proven otherwise. The justification lies in the asymmetry of power and information inherent in detention contexts, wherein detained persons are entirely under the control of State agents and lack the ability to independently document or prevent abuses. In *Velásquez Rodríguez v. Honduras,* Judgment, Inter-Am. Ct. H.R. (ser. C) No. 4, ¶¶ 166-177 (July 29, 1988), the Court articulated a foundational doctrine of international responsibility, establishing that the State must prevent, investigate, and account for violations occurring under its authority. This duty is heightened in custodial contexts, where the risk of abuse, negligence, and mistreatment is significantly greater.

Similarly, in *Tibi v. Ecuador,* Judgment, Inter-Am. Ct. H.R. (ser. C) No. 114, ¶¶ 95-157 (Sept. 7, 2004), the Court emphasized that any use of force, mistreatment, or deterioration of health in detention must be strictly justified by the State. The absence of such justification gives rise to a presumption of a violation of the right to personal integrity under Article 5 of the American Convention on Human Rights, Nov. 22, 1969, 1144 U.N.T.S. 123. The Court has also clarified that inadequate detention conditions, including lack of medical care, unsanitary environments, and exposure to suffering, may constitute cruel, inhumane, or degrading treatment, even in the absence of direct physical violence. In *Loayza Tamayo v. Peru*, Judgment, Inter-Am. Ct. H.R. (ser. C) No. 33 (Sept. 17, 1997), the Court recognized that psychological suffering and detention conditions may reach the threshold of prohibited treatment. Taken together, this jurisprudence establishes three fundamental principles: (1) presumption of responsibility: harm suffered in custody is attributable to the State absent an adequate explanation; (2) reversal of the burden of proof: the State must demonstrate due diligence and absence of responsibility; and (3) expanded concept of ill-treatment:

BRIEF OF AMICUS CURIAE
CASE NO. 5:26-cv-00322-SSS-RAO

detention conditions themselves may constitute violations when they generate suffering or health risks. These principles are directly applicable to the present case. When detained individuals are subjected to deficient medical care, unsanitary conditions, or structural negligence, and harm results, the State has the obligation to justify its conduct. In the absence of such justification, international human rights law supports the conclusion that the State has breached its duty of care and violated fundamental rights.

**D.      Civil Immigration Detention Must Not Be Punitive in Nature**

Immigration detention in the United States is civil in nature, not criminal. Accordingly, conditions of detention must not amount to punishment. International standards reinforce this principle by requiring that any deprivation of liberty be strictly necessary and proportionate, and that detained persons be treated with respect for their inherent dignity. Conditions that generate unnecessary suffering, whether due to lack of medical care, exposure to unsanitary environments, or deprivation of basic necessities, transform civil detention into a punitive regime. Such conditions are incompatible with the non-punitive purpose of immigration detention and raise serious constitutional concerns.

In *Chinchilla Sandoval et al. v. Guatemala*, Judgment, Inter-Am. Ct. H.R. (ser. C) No. 312 (Feb. 29, 2016), the Inter-American Court established that States have a heightened duty of care toward persons deprived of liberty, particularly when they have preexisting medical conditions. The Court determined that Ms. Chinchilla, who suffered from diabetes and other serious conditions, did not receive adequate medical care while in detention, which led to the progressive deterioration of her health and her death. The Court held that, the State, as guarantor of the rights of persons deprived of liberty, has the duty to ensure conditions of detention compatible with human dignity, including access to adequate medical care." (*Chinchilla Sandoval et al. v. Guatemala, No. 312*, ¶¶ 166-171). It further emphasized that the State must: actively monitor

- 6 -

health; ensure continuity of treatment; and prevent foreseeable deterioration. Failure to comply with these obligations engages the State's international responsibility.

## E.  International Standards Applicable to Civil Immigration Detention

Civil immigration detention, as a non-punitive administrative measure, is governed by a set of international human rights standards that impose strict limits on the conditions under which individuals may be deprived of liberty. These standards require that detention conditions be compatible with human dignity and strictly proportionate to a legitimate administrative objective.

The Inter-American Court of Human Rights has consistently held that any form of deprivation of liberty places individuals in a situation of heightened vulnerability, thereby triggering enhanced obligations on the part of the State. In *Neira Alegría et al. v. Peru*, the Court established that persons deprived of liberty are under the complete control of the State, which must ensure conditions compatible with their inherent dignity. This principle was further developed in *Montero Aranguren et al. (Catia Detention Center) v. Venezuela*, where the Court emphasized that States must not only refrain from violating rights, but must actively ensure conditions that prevent harm. The Court underscored that State responsibility includes preventing foreseeable risks arising from detention conditions, including those related to health, sanitation, and overcrowding.

In contexts where serious harm or death occurs in custody, international jurisprudence establishes that the State has a particularly stringent duty to account for the circumstances. The lack of adequate medical care, the failure to respond to known health risks, or the failure to ensure minimum sanitary conditions may constitute violations of the rights to life and personal integrity.

Accordingly, international human rights law provides a clear framework: civil detention must not only be lawful, but also humane, non-punitive, and protective of the physical and mental integrity of detained individuals.

**F.    Victimological Perspective on Structural Negligence/Violence**

From a victimological perspective, detention environments characterized by systemic deficiencies generate patterns of harm that cannot be reduced to isolated incidents. Structural negligence operates as a mechanism through which vulnerability is intensified and normalized, particularly among individuals with preexisting medical conditions.

In these contexts, detained persons exist in conditions of dependency that amplify the impact of institutional failures. When medical care is delayed, denied, or provided inadequately, the resulting harm is not merely accidental, but emerges from a broader context of structural omission. This perspective is especially relevant in cases involving medically vulnerable individuals. Those suffering from chronic illnesses, disabilities, or acute health conditions face heightened risks when detention facilities lack adequate medical infrastructure or fail to respond promptly to symptoms. Structural negligence manifests through: recurring delays in medical care; inadequate diagnosis and treatment; lack of access to specialized care; and deficient sanitary conditions that exacerbate illness. The combination of inadequate medical care, unsanitary conditions, and deprivation of basic needs constitutes a form of systemic violence that violates fundamental rights. International law requires not only abstention from rights violations, but also the prevention of conditions that generate harm. Failure to correct structural deficiencies constitutes a breach of this obligation.

This finding is further strengthened through a contextual analysis that situates documented omissions within broader dynamics of control, exclusion, and selectivity in immigration detention. Inter-American standards have emphasized that, when facts occur within environments of structural violence, their assessment must not be fragmented into isolated incidents but rather understood in light of institutional patterns and their differentiated impact on historically marginalized groups. Under this framework, the accumulation of medical omissions, degrading conditions, and

inadequate responses to risk may also be understood as part of a broader context of repressive violence with racialized effects, reinforcing the need to examine these practices in their structural dimension rather than as merely administrative failures.

These conditions create an environment of cumulative risk in which harm becomes foreseeable and, in many cases, preventable. Failure to address these patterns transforms detention into a space where vulnerability is systematically produced and reproduced. From this perspective, the harm experienced by detained individuals must be understood as the result of institutional dynamics, rather than individual misfortune. This shift in analytical approach is essential for assessing responsibility and understanding the broader implications of detention practices. The State's obligation extends beyond correcting material conditions of detention; it also includes ensuring objective accountability mechanisms and eradicating discriminatory patterns that contribute to the continuation of harm and systemic violence.

## G.    Comparative International Standards

Comparative international human rights frameworks reinforce the principle that immigration detention must remain strictly non-punitive and subject to heightened safeguards. The United Nations, through instruments such as the Standard Minimum Rules for the Treatment of Prisoners (the Nelson Mandela Rules), G.A. Res. 70/175, U.N. Doc. A/RES/70/175 (Dec. 17, 2015) and the Body of Principles for the Protection of All Persons under Any Form of Detention or Imprisonment, G.A. Res. 43/173, U.N. Doc. A/RES/43/173 (Dec. 9, 1988), establishes that all persons deprived of liberty must be treated with humanity and with respect for their dignity. Although these standards were developed in the context of criminal detention, they are even more demanding in the context of civil immigration detention, where the justification for deprivation of liberty is administrative rather than punitive.

International bodies have emphasized that: detention must not result in conditions that amount to punishment; States must guarantee access to medical care

equivalent to that available in the community; special attention must be given to persons in situations of vulnerability; and conditions of detention must not create or aggravate health risks. Within the inter-American system, conditions that generate suffering beyond what is strictly necessary for administrative purposes are considered incompatible with human rights obligations. Taken together, these standards establish a clear principle: immigration detention cannot be used as a deterrence mechanism through the infliction of suffering.

**H.    International Responsibility of the United States**

Although the United States has not ratified the American Convention on Human Rights nor accepted the jurisdiction of the Inter-American Court of Human Rights, it remains bound by international human rights obligations within the inter-American system. As a Member State of the Organization of American States (OAS), the United States is subject to the American Declaration of the Rights and Duties of Man, O.A.S. Res. XXX, adopted Apr. 1948. The Inter-American Commission on Human Rights has consistently held that this Declaration constitutes a source of binding international obligations for all OAS Member States.

In cases such as *James Terry Roach & Jay Pinkerton v. United States*, Case 9647, Inter-Am. Comm'n H.R., Report No. 3/87, OEA/Ser.L/V/II.71, doc. 9 rev. 1 (1987), the Commission determined that the American Declaration of the Rights and Duties of Man imposes binding obligations, including the protection of the rights to life, personal integrity, and humane treatment in detention contexts. Accordingly, the United States has the obligation to ensure that persons deprived of liberty are treated with dignity and that their physical and mental integrity is protected. Jurisprudence of the Inter-American Court, while not binding, constitutes relevant persuasive authority for interpreting the scope of human rights obligations within the inter-American system. The Court's jurisprudence provides a coherent and authoritative framework for understanding State duties in custodial contexts.

BRIEF OF AMICUS CURIAE
CASE NO. 5:26-cv-00322-SSS-RAO

In the context of the present case, which concerns alleged harms arising from conditions of confinement in immigration detention, and the United States' corresponding international obligations to protect individuals deprived of liberty, domestic courts play a fundamental role in interpreting domestic law in a manner consistent with international human rights commitments. The Inter-American Court has developed the doctrine of conventionality control, establishing that domestic authorities must ensure that internal norms are compatible with international standards. (*Almonacid Arellano v. Chile*, Judgment, Inter-Am. Ct. H.R. (ser. C) No. 154 (Sept. 26, 2006)). Although this doctrine is not binding on the United States, it reflects a general principle of international law: the duty to interpret and apply domestic law in good faith in accordance with international obligations. This principle is reinforced by the doctrine of *pacta sunt servanda*, which requires States to comply in good faith with their international commitments.

Additionally, the United States is bound by universal human rights instruments, such as the International Covenant on Civil and Political Rights, Dec. 16, 1966, 999 U.N.T.S. 171., and the Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment, Dec. 10, 1984, 1465 U.N.T.S. 85., which prohibit torture and cruel, inhumane, or degrading treatment, and impose obligations to ensure the safety and well-being of persons in custody. Taken together, these sources establish that the United States bears international responsibility to ensure that detention conditions do not expose individuals to harm, and that any failure to prevent or adequately respond to such harm may constitute a violation of its international obligations.

Considering these same standards, the State's international responsibility also includes the adoption of measures aimed at preventing similar violations from recurring. In inter-American jurisprudence, guarantees of non-repetition occupy a central role where harm arises from structural patterns or persistent institutional

- 11 -

failures. Under this logic, and even where such developments operate here as comparative reference, their relevance is clear: where detention conditions reveal systemic risks to life, health, and personal integrity, a human rights–compliant State response requires effective structural prevention measures aimed at interrupting the continuity of harm and dismantling the conditions that enable its reproduction.

Inter-American standards also recognize the right to the truth as a relevant consideration for judicial interpretation of serious violations in custodial contexts. This right has been understood as the right of victims, their families, and, in certain circumstances, society, to know clearly what occurred, the circumstances of the events, and the corresponding responsibilities through State mechanisms of clarification. This standard, which here operates as an interpretive guide derived from international law, reinforces the appropriateness of a judicial approach that does not trivialize opacity in the face of harm, serious health deterioration, or deaths in custody, and that recognizes the legal value of fact-finding and access to the right to the truth as a central component of protection against State abuse.

## I.    Persons with Disabilities in Detention

The allegations in this case raise particularly serious concerns regarding persons with disabilities, who face heightened vulnerability in custodial settings. U.S. law, through the Rehabilitation Act of 1973, 29 U.S.C. § 701 et seq., prohibits discrimination on the basis of disability and requires reasonable accommodations. International law reinforces these obligations, particularly the International Covenant on Civil and Political Rights, which requires humane treatment.

Likewise, the Convention on the Rights of Persons with Disabilities, Dec. 13, 2006, 2515 U.N.T.S. 3., although not ratified by the United States, establishes relevant standards such as accessibility, reasonable accommodations, and protection against degrading treatment. The lack of medical care, accessibility, or adequate support may

constitute cruel, inhumane, or degrading treatment. These risks are exacerbated when disability intersects with migration status, poverty, or language barriers.

Where persons with disabilities are held in detention and face compounded risks arising from inadequate medical care, inaccessibility, language barriers, or other structural vulnerabilities, inter-American standards are useful in clarifying that, in custodial contexts, the concurrence of factors that increase exposure to harm triggers a heightened duty of due diligence. This implies that authorities must more strictly tailor their monitoring, protection, and response measures to foreseeable needs related to health, accessibility, and support, particularly where omissions may result in serious deterioration for individuals whose autonomy is already severely restricted by detention.

## J. Conditions of Detention that Constitute Cruel, Inhumane or Degrading Treatment and Reach the Threshold of Torture

The detention conditions described within the Complaint are not simple administrative errors but show a systemic pattern incompatible with human dignity. According to U.S. constitutional standards, these conditions are considered impermissible punishment and "deliberate indifference" to medical and basic needs. Internationally, they may be classified as cruel, inhumane, or degrading treatment, and sometimes even torture.

To clarify matters for the Court, a matrix aligns facts from the Complaint with relevant U.S. legal standards and international human rights classifications. This matrix argues that conditions found unconstitutional under *Bell v. Wolfish*, 441 U.S. 520 (1979) and as deliberate indifference to health under *Farmer v. Brennan,* 511 U.S. 825 (1994) and *Estelle v. Gamble*, 429 U.S. 97 (1976), also match conduct described as cruel, inhumane, or degrading treatment in international law. Although "torture" is not commonly used in U.S. constitutional detention analysis, federal standards regarding punitive conditions and medical care align closely with international requirements for protecting personal integrity and dignity.

- 13 -

As a party to the *Convention Against Torture*, the United States must prevent torture and cruel treatment. Although not fully self-executing domestically, the *Convention's* principles guide constitutional protections, particularly in custody. Both U.S. and international law prohibit conditions that cause unnecessary suffering or harm under State custody. Accordingly, the reported conditions at Adelanto Detention Center are reviewed to assess their compliance with U.S. constitutional and international human rights standards.

The Complaint outlines a recurring pattern of basic rights violations, including denial of medical care, unsanitary conditions, insufficient water and food, use of isolation for control, and restricted family contact. This consistent neglect, under U.S. constitutional law, amounts to "deliberate indifference" and punitive treatment, contrary to the civil purpose of immigration detention as defined by Supreme Court cases like *Estelle v. Gamble*, *Farmer v. Brennan*, and *Bell v. Wolfish*.

International law, especially the Inter-American Court of Human Rights, defines these acts as cruel, inhumane, or degrading treatment, sometimes even torture by omission, when severe suffering is foreseeable and under State control. The matrix below summarizes both constitutional and international perspectives, highlighting their alignment:

**Table 1 – Structural Conditions and**
**Legal Characterization Matrix of Correspondence**
**Between Facts, Constitutional Standards, and International Legal Characterization**

| Fact (Complaint) | Specific Evidence | Applicable U.S. Standard | U.S. Legal Characterization | International Equivalent (UN/OAS) | Applicable International Jurisprudence |
|---|---|---|---|---|---|
| Systemic denial of medical care | Infections, unattended seizures, unmonitored arrhythmia | Deliberate Indifference | Violation of the Due Process Clause | Cruel, inhumane, or degrading treatment | *Tibi v. Ecuador* (lack of medical care as inhumane treatment) |

- 14 -

| Severe delays in medical care | Prolonged waits with deterioration of health | *Estelle v. Gamble, Farmer v. Brennan* | Gross constitutional negligence | Cruel treatment | *Cantoral-Benavides v. Peru* Judgment, Inter-Am. Ct. H.R. (ser. C) No. 69 (Aug. 18, 2000) (suffering due to State omission) |
|---|---|---|---|---|---|
| Lack of essential medications | Epilepsy without medication, uncontrolled diabetes | *Estelle v. Gamble* | Deprivation of basic medical care | Inhumane treatment | *Chinchilla Sandoval v. Guatemala* (heightened duty in health care) |
| Deaths in custody due to negligence | Documented fatalities | *Farmer v. Brennan* | Severe violation of bodily integrity | Torture by omission (potential) | *Neira Alegría v. Peru* (death in custody = State responsibility) |
| Coercive medical isolation | Cardiac monitoring conditioned on isolation | *Bell v. Wolfish* | Punitive condition | Degrading treatment | *Velásquez Rodríguez v. Honduras* (total control → heightened duty) |
| Solitary confinement as retaliation | Hunger strike → isolation | *Hope v. Pelzer,* 536 U.S. 730 (2002) | Arbitrary punishment | Cruel and inhumane treatment | *Montero Aranguren v. Venezuela* (detention conditions as inhumane treatment) |
| Lack of potable water | Contaminated and rationed water | *Farmer v. Brennan* (basic needs) | Deprivation of basic necessities | Inhumane treatment | *Vélez Loor v. Panama,* Judgment, Inter-Am. Ct. H.R. (ser. C) No. 218 (Nov. 23, 2010) (undignified conditions in immigration detention) |

- 15 -

BRIEF OF AMICUS CURIAE
CASE NO. 5:26-cv-00322-SSS-RAO

| Insufficient or unsafe food | Hunger, spoiled food | *Estelle v. Gamble* | Unconstitutional conditions | Degrading treatment | *Juvenile Reeducation Institute v. Paraguay,* Judgment, Inter-Am. Ct. H.R. (ser. C) No. 112 (Sept. 2, 2004) (undignified conditions = inhumane treatment) |
|---|---|---|---|---|---|
| Exposure to disease and mold | Infections, outbreaks, unsanitary conditions | *Farmer v. Brennan* (known risk) | Tolerated substantial risk | Cruel treatment | *Suárez Rosero v. Ecuador,* Judgment, Inter-Am. Ct. H.R. (ser. C) No. 35 (Nov. 12, 1997) (unsanitary conditions violate integrity) |
| Use of toxic chemicals | Documented physical harm | *Farmer v, Brennan* + State knowledge | Deliberate indifference | Cruel/ treatment possible torture | *Loayza Tamayo v. Peru* (physical and psychological suffering) |
| Deprivation of family contact | Restricted visitation, isolation | Due Process Clause | Interference with family integrity | Degrading treatment | *Gelman v. Uruguay,* Judgment, Inter-Am. Ct. H.R. (ser. C) No. 221 (Feb. 24, 2011) (impact on family and life project) |
| Coercion for self-deportation | Pressure through inhumane conditions | *Bell v. Wolfish* (covert punishment) | Punitive use of system | Psychological torture (potential) | *Cantoral-Benavides v. Peru* (coercion and suffering as method) |

BRIEF OF AMICUS CURIAE
CASE NO. 5:26-cv-00322-SSS-RAO

| Exposure to extreme cold | Lack of blankets, low temperatures | *Farmer v. Brennan* | Inhumane condition | Cruel treatment | *Castillo Petruzzi et al. v. Peru,* Judgment, Inter-Am. Ct. H.R. (ser. C) No. 52 (May 30, 1999) (undignified detention conditions) |
|---|---|---|---|---|---|
| Overcrowding and undignified conditions | Sleeping on floors, overcrowded cells | *Bell v. Wolfish* | Punitive condition | Degrading treatment | *Pacheco Teruel et al. v. Honduras,* Judgment, Inter-Am. Ct. H.R. (ser. C) No. 241 (Apr. 27, 2012) (material conditions violate dignity) |
| Denial of disability accommodations | Lack of accessibility, neglect | Rehabilitation Act | Discrimination + harm | Aggravated inhumane treatment | *Furlan and Family v. Argentina,* Judgment, Inter-Am. Ct. H.R. (ser. C) No. 246 (Aug. 31, 2012) (heightened protection for disability) |

## K.    Harm to Family Members and Life Project

The harms alleged in this case are not limited to the individuals directly detained. They also reveal plausible impacts on emotional and family stability, associated with persistent uncertainty, risk to physical and mental integrity, and medical deterioration under custody. Under the United States Constitution, the Due Process Clause of the Fifth Amendment protects against punishment without due process, arbitrary conditions, and inhumane treatment in civil custody. The harms produced by the challenged conditions must not be understood solely as episodes of physical suffering or medical deterioration, but as State interferences capable of

BRIEF OF AMICUS CURIAE
CASE NO. 5:26-cv-00322-SSS-RAO

disrupting fundamental interests in liberty, bodily integrity, and family life in a context of immigration detention that is, by definition, civil and non-punitive.

International law reinforces this interpretation. Within the inter-American system, the notion of *life project* recognizes that human rights violations may profoundly affect a person's ability to develop their existence under conditions of dignity, autonomy, and life trajectory. Beyond immediate physical harm, the damage also encompasses the severe frustration of reasonable expectations of personal, familial, and social development when these are altered by arbitrary State action or omission. Inter-American jurisprudence has established that such harm arises when State violence or omission produces persistent physical and psychological harm, loss of autonomy, weakening of intimate bonds, and forced interruption of the course of life.

## L.    Application to the Present Situation

The Complaint describes an environment in which medical care is delayed, denied, or conditioned in a manner incompatible with human dignity; an environment in which isolation, lack of treatment, uncertainty, and prolonged exposure to degrading conditions substantially alter the existence of detained persons. To that extent, the harm alleged here interrupts the continuity of life, destabilizes individuals' practical identity, and drastically reduces their ability to sustain personal and family projects under minimum conditions of safety and predictability.

This conclusion is particularly clear in the individual cases described in the Complaint. With respect to L.T., the record reflects severe sequelae from a cerebrovascular event, significant mobility impairments, and a spinal tumor that continues to go without adequate treatment at Adelanto. In his case, the harm manifests in the progressive loss of autonomy, the risk of irreversible deterioration, and the impossibility of sustaining an existence minimally compatible with rehabilitation, self-care, and self-determination. The injury thus reaches the right to non-punitive

BRIEF OF AMICUS CURIAE
CASE NO. 5:26-cv-00322-SSS-RAO

conditions in civil detention, access to constitutionally adequate medical care, and the liberty interests protected by the Substantive Due Process Clause against State-tolerated physical deterioration.

The same is true with respect to Sevak Mesrobian. The Complaint documents epilepsy, the consistent lack of medication, seizures without adequate care, a fall resulting in a head injury after being forced to walk on his own to the medical unit, confinement in a medical cell where he again experienced seizures without assistance, and hospitalization in critical condition. These facts describe a life placed under constant risk, marked by loss of bodily control, radical uncertainty regarding continuity of treatment, and the constant threat of severe deterioration or death. In inter-American terms, this goes beyond episodic suffering, as it compromises the very course of his life by placing him in a condition of vulnerability incompatible with any reasonable expectation of autonomous development.

In the case of José Mauro Salazar Garza, the Complaint describes untreated infections, prolonged delays in the provision of antibiotics, an abscess that ruptured while he was asleep, a subsequent staph infection that received hospital care only after his arm was already swollen and discolored, and a persistent fear of new infections based on his experience at Adelanto. A relevant important fact reflected in the Complaint is that he is the father of six children, the youngest being eleven years old. This combination clearly reveals the relational dimension of the harm. The impact extends to his ability to fulfill basic family roles, sustain meaningful relationships, and envision a life trajectory not dominated by pain, functional deterioration, and fear. From the perspective of the life project, the harm here manifests as a severe disruption of the victim's personal and family development, produced by persistent institutional omission in a custodial context.

With respect to J.M., the Complaint indicates that he suffers from cardiac arrhythmia, that an outside specialist ordered the use of a cardiac monitor, and that

BRIEF OF AMICUS CURIAE
CASE NO. 5:26-cv-00322-SSS-RAO

Adelanto staff conditioned such monitoring on placement in medical isolation. After several days in segregation, J.M. declined the monitor in order to leave the cell. He was later transferred to a follow-up hospital appointment that had been canceled by Adelanto staff, with no subsequent rescheduling. Based on his experience and observations within the facility, the Complaint states that he lives with a constant fear of experiencing a cardiac episode without receiving timely assistance. The harm thus translates into a life structured around uncertainty, coercion, and the inability to access stable treatment without being subjected to degrading isolation. This forced mode of existence constitutes a substantive alteration of his life trajectory.

These cases show that detained individuals experience harm that is not only physical but also deeply relational. The Complaint cites a persistent fear of death, worsening health, lack of treatment, isolation, loss of autonomy, and erosion of basic living conditions, all resulting from institutional neglect. According to the inter-American system, this constitutes a forced disruption of life caused by systemic State negligence over detainees.

Family members can also be considered victims under inter-American law when State actions cause them suffering, such as distress, uncertainty, or helplessness, even if they are not direct victims. International human rights standards recognize that non-economic harm can affect both individuals in custody and their relatives. The Complaint provides evidence of harm to both individuals in custody and their relatives, noting limited family contact at Adelanto, problems with communication devices, and extended periods of isolation for detainees. These issues cause prolonged separation, anxiety, and hinder meaningful family relationships, which may constitute serious interference with family life and psychological harm under international legal standards.

The analysis shows that detention harms individuals throughout their lives and negatively affects their families. For detainees, this includes violations of liberty,

- 20 -

medical rights, and protection from punitive civil detention under U.S. law. Families experience disruption, emotional strain, and instability due to separation, limited communication, and the risk of severe harm or death in custody.

These harms are worsened by their structural nature; the Complaint details a pattern of poor medical care, unsanitary conditions, inadequate food and water, extreme cold, isolation, and material pressure under civil detention. These persistent conditions cause physical decline, fear, dependence, and weakened family ties, resulting in systemic violence that limits life paths and future opportunities. The State's ongoing neglect and degrading treatment force individuals into deterioration, uncertainty, and coercion.

The inter-American standard provides the Court with an analytical framework for understanding the depth of the harm alleged. The concept of life project allows for a more precise articulation of what, in U.S. constitutional terms, may be understood as a severe injury to liberty interests protected by the Substantive Due Process Clause, including access to constitutionally adequate medical care, reasonable safety while in government custody, and freedom from punitive conditions in civil detention; in its relational dimension, it also highlights the severe impact of these conditions on family life and close relationships. Viewed in this manner, the structural negligence alleged at Adelanto unjustly and arbitrarily reconfigures detainees' lives, compromises their life projects, and extends its effects to their closest family relationships. The below exhibit demonstrates patterns of structural harm, their impact on life projects, and the corresponding legal obligations across domestic and international frameworks.

**Table 2 - Victim Harm and Life Project Impact**
**Analysis Comparative Matrix of Victim Harm, Evidence, and Multilevel Legal Violations**
**(U.S., Inter-American, and International Systems)**

| Victim | Proven Fact (Complaint) | Specific Evidence | Type of Impact on Life Project | Violated Right (U.S.) | Inter-American System | UN System |
|---|---|---|---|---|---|---|
| L.T. | Lack of medical care for serious conditions (paralysis, tumor, aneurysm) | Omission of treatment, lack of monitoring, absence of rehabilitation | Loss of future autonomy, risk of total disability, irreversible deterioration | Due Process Clause (Fifth Amendment, Rehabilitation Act | Life Project – *Loayza Tamayo v. Peru* | ICCPR Art. 10 (humane treatment), CRPD |
| Salazar Garza | Untreated infections, delayed surgery, prolonged pain | Repeated medical omission, functional loss of hand | Disruption of family role (father of six), permanent physical deterioration | Due Process + right to personal integrity | *Cantoral-Benavides v. Peru* | ICCPR Arts. 7 and 10 |
| Mesrobian | Epilepsy without medication, untreated seizures | Recurrent crises, medical isolation, risk of death | Life under constant risk, loss of bodily control and autonomy | Due Process Clause | *Tibi v. Ecuador* | ICCPR and CAT |
| J.M. | Arrhythmia without monitoring, cancellation of medical appointments | Denial of follow-up care, coercive isolation | Life structured by constant uncertainty, anticipatory anxiety of death | Due Process Clause | *Velásquez Rodríguez v. Honduras* | ICCPR Art. 6 (right to life) |

| Family Members | Restricted visitation, limited communication, migration-related fear | Separation, financial costs, inability to maintain contact | Breakdown of family unit, emotional harm, persistent uncertainty | Right to family integrity (Fifth Amendment) | Extended life project (family dimension) | ICCPR Arts. 17 and 23 |
|---|---|---|---|---|---|---|
| Collective | Structural conditions (hunger, contaminated water, isolation, coercion) | Documented systemic pattern | Destruction of life trajectories, pressure toward selfdeportation | Due Process Clause | Structural violence | CAT and ICCPR |

**Abbreviations:**

**ICCPR.** International Covenant on Civil and Political Rights (1966). A binding treaty that protects fundamental rights such as life, personal integrity, and human dignity.

**CAT.** Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment (1984). Prohibits torture and ill-treatment under any circumstances.

**CRPD.** Convention on the Rights of Persons with Disabilities (2006). Establishes heightened obligations of protection for persons with disabilities.

## IV. CONCLUSION

Accordingly, Amicus submits that the challenged conditions of confinement at Adelanto constitute "deliberate indifference" and unconstitutional punitive conditions under U.S. law. These conditions fall within the category of cruel, inhumane, or degrading treatment under international law; and in certain circumstances, reach the threshold of torture under international human rights law, by omission of the State, given the severity of the suffering, its systematic nature, and its use as a mechanism of control. This normative convergence demonstrates that there is no contradiction between United States constitutional law and international human rights law, but rather a shared core of protection that prohibits the State, under any form of custody, from subjecting individuals to conditions that compromise their health, integrity, and dignity.

- 23 -

Accordingly, international standards constitute a relevant and persuasive framework for this Court to evaluate the constitutionality of the challenged conditions and to determine the appropriateness of granting injunctive relief. Moreover, the analysis of this case requires recognition that the documented violations do not operate in isolation, but rather at the intersection of multiple factors of vulnerability. Detained individuals are simultaneously affected by their immigration status, health conditions or disabilities, economic limitations, and structural isolation, which intensifies the impact of the harm.

The evolution of U.S. law itself has revealed the limitations of a non-intersectional approach of analyzing the harms at issue here, while international law has advanced in recognizing these complex forms of harm. In this context, the challenged conditions of detention not only violate individual rights, but also reproduce and deepen structures of multiple exclusion, generating aggravated harms that operate cumulatively, relationally, and structurally, affecting both detained individuals and their family units. In custodial settings, where the State exercises total control over individuals' lives, these harms acquire a particularly severe dimension: dignity ceases to function as an effective guarantee and instead becomes contingent upon State action or omission.

Allowing the continuation of these conditions would be tantamount to tolerating a detention regime that is materially punitive and incompatible with both the Constitution and the State's international obligations. For the foregoing reasons, the University of Guadalajara, by and through undersigned counsel, respectfully requests this Honorable Court's grant the Plaintiffs' Motion for Preliminary Injunction.

Dated: April 21st 2026              Respectfully submitted,

                                    /s/ Salomon Zavala
                                    Salomon Zavala

- 24 -
BRIEF OF AMICUS CURIAE
CASE NO. 5:26-cv-00322-SSS-RAO

Attorney for Clínica Victimológica de Análisis a Violaciones a Derechos Humanos (Victimology Clinic for the Analysis of Human Rights Violations) of the University of Guadalajara

BRIEF OF AMICUS CURIAE
CASE NO. 5:26-cv-00322-SSS-RAO

**CERTIFICATE OF SERVICE**

I hereby certify that on April 21, 2026, I caused the above document and its attachments to be electronically filed with the Clerk of Court using CM/ECF, which will send electronic notification of such filing to all registered counsel.

*/s/ Salomon Zavala*
Salomon Zavala

**CERTIFICATE OF COMPLIANCE**

The undersigned, counsel of record for the University of Guadalajara, certifies that this brief contains 6,552 words, which complies with the word limit of L.R. 11-6.1.

Dated: April 21, 2026

*/s/ Salomon Zavala*
Salomon Zavala

BRIEF OF AMICUS CURIAE
CASE NO. 5:26-cv-00322-SSS-RAO