PUBLIC COUNSEL
REBECCA BROWN (SBN 345805)
rbrown@publiccounsel.org
SOPHIA WRENCH (SBN 354416)
swrench@publiccounsel.org
AMELIA PIAZZA (SBN 342473)
apiazza@publiccounsel.org
ELIZABETH HERCULES-PAEZ (SBN 320944)
eherculespaez@publiccounsel.org
610 South Ardmore Avenue
Los Angeles, CA 90005
Tel: 213-385-2977

*Attorneys for Plaintiffs*
Additional Counsel Listed on Following Page

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| L.T., SEVAK MESROBIAN, JOSE MAURO SALAZAR GARZA, AND J.M., on behalf of themselves and all others similarly situated; COALITION FOR HUMANE IMMIGRANT RIGHTS,<br><br>Plaintiffs,<br><br>v.<br><br>U.S. IMMIGRATION AND CUSTOMS ENFORCEMENT; TODD M. LYONS, Acting Director, U.S. Immigration and Customs Enforcement; JAIME RIOS, Acting Director of Los Angeles Field Office, Enforcement and Removal Operations, U.S. Immigration and Customs Enforcement; U.S. DEPARTMENT OF HOMELAND SECURITY; MARKWAYNE MULLIN, Secretary, U.S. Department of Homeland Security,<br><br>Defendants. | Case No. 5:26-cv-00322-SSS-SPx<br><br>**FIRST AMENDED COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF**<br><br>**CLASS ACTION**<br><br>**Ctrm:** 2, 2nd Floor<br>3470 12th Street<br>Riverside, CA 92501<br>Hon. Sunshine Sykes |

IMMIGRANT DEFENDERS LAW CENTER
ALVARO M. HUERTA (SBN 274787)
ahuerta@immdef.org
CARSON ADRIANNA SCOTT (SBN 337102)
cscott@immdef.org
ALISON STEFFEL (SBN 346370)
asteffel@immdef.org
634 S. Spring Street, 10th Floor
Los Angeles, CA 90014
Tel: 213-634-0999

COALITION FOR HUMANE IMMIGRANT RIGHTS
CARL BERGQUIST (*pro hac vice*)
cbergquist@chirla.org
2351 Hempstead Road
Ottawa Hills, OH 43606
Tel: 310-279-6025

ADAM REESE (SBN 362898)
areese@chirla.org
2533 West Third Street, Suite 101
Los Angeles, CA 90057
Tel: 213-353-1333

WILLKIE FARR & GALLAGHER LLP
NICHOLAS REDDICK (SBN 288779)
nreddick@willkie.com
STEPHEN HENRICK (SBN 310539)
shenrick@willkie.com
ALYXANDRA VERNON (SBN 327699)
avernon@willkie.com
JACOB KARIM (SBN 340376)
jkarim@willkie.com
333 Bush Street, 34th Floor
San Francisco, CA 94104
Tel: 415-858-7400

*Attorneys for Plaintiffs*

## INTRODUCTION

1. Since the federal government launched its sweeping dragnet of immigration raids in the Central District of California, it has apprehended thousands of people and detained them for days, weeks, or months in inhumane conditions. Individuals are often first taken to a temporary holding facility in downtown Los Angeles and then transported to a for-profit detention complex in the middle of the Mojave Desert where they are mistreated and denied basic human dignity. At the Adelanto ICE Processing Center ("Adelanto"), detained individuals face dangerous conditions and pervasive abuses—disease and illness are rampant, mold grows on the walls, and detained individuals are denied sufficient food, clean drinking water, proper medical care, and disability accommodations. This lawsuit seeks to end the inhumane and illegal conditions faced by immigrants detained at Adelanto—one of the largest immigration detention centers in the United States.

2. The government's abuses at Adelanto are a core part of its broader scheme to harass, intimidate, punish, and deport immigrants. Defendants target immigrants at a breakneck pace, through a vicious pipeline of incarceration and oppression—first, by racially profiling them and aggressively seizing them off the street[1]—then, by imprisoning them in a squalid, cramped temporary holding facility known as B-18, located in the basement of a federal building in downtown Los Angeles[2]—and finally, by transferring them to Adelanto, where they are left to endure intolerable conditions as they await their immigration case—or agree to deportation. These abusive

[1] *See Vasquez Perdomo v. Noem*, 790 F. Supp. 3d 850, 886-87 (C.D. Cal. 2025), *appeal dismissed sub nom. Perdomo v. Noem*, No. 25-4312, 2025 WL 4053187 (9th Cir. Nov. 21, 2025) (describing one such seizure); *id.* at 889-91, 897 (finding plaintiffs were likely to succeed in demonstrating the government had a pattern of seizing people without reasonable suspicion based on "[a]pparent race or ethnicity; [s]peaking Spanish or speaking English with an accent; [p]resence at a particular location, or occupation . . . [or] [t]ype of work done").

[2] *Id.* at 867 (noting that "[i]ndividuals taken to B-18 are being kept in small, windowless rooms with dozens or more other detainees in cramped quarters[,]" "are also routinely deprived of food, and some have not even been given water other than what comes out of the combined sink and toilet in the group detention room").

practices seek to force detained immigrants to surrender important statutory and constitutional rights and send a message to other immigrants to "self-deport." Defendants' actions at Adelanto are part of a policy and practice that seeks to degrade, dehumanize, and demonize immigrants, stripping them of dignity in the process.

3. The government's decision to abruptly repopulate Adelanto—which has long been the subject of investigation and condemnation for its unsafe conditions—has only intensified the urgent need to protect the health and safety of detained immigrants. The number of individuals detained at Adelanto swelled rapidly throughout 2025, surging from three individuals to nearly two thousand.[3] As of April, 2026, about 1,800 people continue to be held at Adelanto.[4] As the population has quickly swelled, conditions have rapidly deteriorated.

4. As the government began detaining thousands of immigrants at Adelanto in June 2025, a longtime Adelanto detention center staff member warned that the surge was "dangerous" because the facility lacked experienced staff, was generally understaffed, and was "cutting way too many corners."[5] When the state agency authorized to inspect detention facilities visited Adelanto that month, it warned that detained individuals faced "alarming" conditions and that detained individuals with disabilities were being subjected to "abuse and neglect."[6] Detained individuals described being treated like "dogs in cages."[7]

---

[3] *Ice Detention Trends*, Vera (April 2, 2026), https://www.vera.org/ice-detention-trends.

[4] *Adelanto ICE Facility: Data Shows Staggering Solitary Confinement Numbers*, LAist (April 3, 2026), https://laist.com/brief/news/politics/adelanto-solitary-confinement-data.

[5] Jenny Jarvie & Nathan Solis, *Moldy Food, Dirty Towels: Critics Warn of Inhumane Conditions at California's Largest Detention Center*, L.A. Times (June 20, 2025), https://www.latimes.com/california/story/2025-06-20/unsanitary-overcrowded-and-inhumane-red-flags-raised-about-conditions-in-adelanto-detention-center.

[6] *"They Treat Us Like Dogs in Cages": Inside the Adelanto ICE Processing Center*, Disability Rights California (July 17, 2025), https://www.disabilityrightsca.org/drc-advocacy/investigations/inside-the-adelanto-ice-processing-center [hereinafter *They Treat Us Like Dogs in Cages*].

[7] *Id.*

5. In choosing to apprehend and confine thousands of immigrants at Adelanto, Defendants assumed legal responsibility for the lives and well-being of those in their custody—yet have knowingly failed to provide for detained individuals' basic needs and have instead deliberately harmed and endangered their health. Detained individuals are routinely denied necessary medical care and disability accommodations, and face unsanitary conditions without access to adequate food and clean drinking water.

6. Countless detained individuals have suffered medical issues with limited access to proper care. One detained individual had the top of his finger bitten off and developed an infection that went untreated. Another has inconsistent access to his epilepsy medication and regularly experiences seizures that receive delayed medical attention or none at all. Detained individuals with disabilities are left to fend for themselves. Elderly detained individuals with mobility issues are forced to sleep on top bunks despite their difficulty climbing up ladders.

7. Detained individuals routinely request medical care and other basic needs, but are consistently ignored by Adelanto staff, or told that their issue is not serious enough to warrant medical attention. Even if they eventually see a medical professional, the medical care is dangerously substandard. In 2025, at least two detained individuals who suffered medical emergencies died under circumstances that raise serious questions about the provision of adequate medical care and conditions at Adelanto.[8] In the first four months of 2026, two more individuals detained at Adelanto died.[9]

---

[8] *See* Meg James, *Deaths in ICE custody raise serious questions, lawmakers say*, L.A. Times (Nov. 22, 2025), https://www.latimes.com/california/story/2025-11-22/ice-custody-deaths-raise-congress-member-questions-ismael-ayala-uribe.

[9] See Casey Tolan et al., *How understaffing and DHS policy drives rising deaths in ICE detention centers*, CNN (May 15, 2026), https://www.cnn.com/2026/05/15/us/ice-immigration-detention-centers-medical-care-deaths-invs-vis (describing a pattern of rising fatalities in ICE custody across the country—many of which appear to be related to "substandard treatment by at-times understaffed medical teams dealing with escalating detainee populations.").

8. The facility is also unsanitary, posing serious health risks. Mold grows on bathroom and dormitory walls. Individuals across various dormitories contracted an infectious skin disease called a staph infection—and more than a dozen detained individuals were hospitalized. Another unit recently experienced an outbreak of chicken pox. Detained individuals are forced to clean the bathrooms themselves. The kitchens are filthy and serve insufficient—and sometimes spoiled—food. People go hungry. The tap water is discolored and tastes odd, raising serious concerns about its potability. The "drinking" water provided in coolers often appears dirty and regularly runs out for hours at a time. Rooms are kept cold, and detained individuals are provided only a thin blanket if they are provided one at all. Some detained individuals protest the conditions and speak out, but are met with retaliation or punishment.

9. Nearly two thousand people suffer in these conditions on a daily basis and, as the government continues to detain and deport immigrants at record levels, thousands more risk the same fate. The punitive conditions of confinement, inadequate medical care, and failure to accommodate people with disabilities must be remedied before more people are harmed or even die at Adelanto.

10. Plaintiffs are four individuals ("Plaintiffs" or "Individual Plaintiffs") who seek to represent a class of all people who are or will be detained at Adelanto, and the Coalition for Humane Immigrant Rights ("CHIRLA"), an organization that defends and advocates on behalf of and with immigrants ("Organizational Plaintiff"). They ask this Court to end the unlawful and unconstitutional conditions at Adelanto, prohibit Defendants from violating their civil, constitutional, and human rights, and require Defendants to provide lawfully adequate conditions. In other words, they ask to be treated like human beings.

## JURISDICTION AND VENUE

11. This Court has jurisdiction pursuant to 28 U.S.C. § 1331 because this action arises under federal law, including the United States Constitution and the Rehabilitation Act, 29 U.S.C. § 794. This Court also has jurisdiction over this action

pursuant to 28 U.S.C. § 1346 because the United States is a defendant. Defendants do not have sovereign immunity for purposes of this action. *See* 5 U.S.C. § 702.

12. An actual controversy exists between the parties within the meaning of 28 U.S.C. § 2201(a), and this Court may grant declaratory relief, injunctive relief, and other appropriate relief pursuant to 28 U.S.C. §§ 2201–02 and the Court's inherent equitable powers.

13. Venue properly lies in the Central District of California pursuant to 28 U.S.C. § 1391(e)(1). All Defendants are agencies, or officers of agencies, of the United States, and at least one Defendant resides in this District. In addition, because Plaintiffs are detained at Adelanto ICE Processing Center in this District, where Defendants' unlawful actions have caused and will continue to cause harm unless enjoined, a substantial part of the events giving rise to the claims have occurred and continue to occur in this District.

## PARTIES

### *Individual Plaintiffs*

14. **Plaintiff L.T.**[10] is a resident of Santa Ana, California. He has lived in California since 1989. Mr. L.T. was born in 1964. On November 14, 2025, he was arrested by Defendant ICE in Santa Ana, California. He has been at Adelanto since November 18, 2025. Mr. L.T. suffers from serious medical and mobility issues that continue to go unaddressed and untreated at Adelanto. He was paralyzed on the right side of his body due to a stroke he had approximately three years ago and he continues to have serious mobility issues as a result. At Adelanto, he has been denied physical therapy and cortisol shots, causing his body to stiffen. He has been placed in an upstairs unit, made to walk in chains which caused a fall, and has been denied a shower chair. Mr. L.T. also has a stomach aneurysm and a tumor on his spine, and he worries about their progression without treatment.

---

[10] This Court previously granted L.T. leave to proceed under pseudonym. *See* ECF 28.

15. **Plaintiff Sevak Mesrobian** is a resident of Glendale, California, who came to the United States in approximately 1990. He was arrested by Defendant ICE in Glendale while running errands for his mother. He was taken to Adelanto on July 24, 2025, where he has been since. He suffers from epilepsy and seizures for which he requires prescription medication. Adelanto staff do not consistently provide the medication Mr. Mesrobian needs to control his seizures. When he has seizures, he either does not receive medical attention or receives delayed and deficient care. He was once made to walk to the infirmary on his own after suffering a seizure and fell and hit his head. On another occasion, after experiencing a seizure, Mr. Mesrobian was locked by himself in a medical holding cell, where he suffered another seizure with no medical assistance. While hospitalized and in critical condition due to seizures, he always has his arm and leg handcuffed to the bed for the duration of his hospital stay, including for up to five days in one instance. Since the filing of the first complaint in January 2026, Mr. Mesrobian continues to experience inconsistent access to his epilepsy medication and has been hospitalized at least two more times for seizure episodes.

16. **Plaintiff Jose Mauro Salazar Garza** is a resident of California who has lived in the United States since 1981. He has six children in the United States, the youngest of whom is eleven. Mr. Salazar Garza has been detained at Adelanto since January 2025, and he serves as the Christian preacher in his unit. Mr. Salazar Garza was previously detained at Desert View Annex ("DVA") and, in August 2024, another detainee bit off part of his right pinky finger. When Mr. Salazar Garza was transferred to Adelanto in January 2025, his right hand was swollen and painful from what he suspected was an infection. His infected finger eventually burst while he was sleeping. Later, when Mr. Salazar Garza contracted a staph infection on his arm and hip, Adelanto staff waited multiple days until his entire arm was swollen and discolored to transport him to the hospital for surgery. In the past several months, Mr. Salazar Garza's hand has started to feel the way it did in early 2024, with pain at

the amputation site and a tingling sensation up and down his arm. Given his past experiences at Adelanto, Mr. Salazar Garza fears repeated infections with delayed access to medical care. He has also been waiting for months for a bunionectomy and orthopedic shoes to relieve chronic pain in his feet.

17. **Plaintiff J.M.**[11] is a resident of Moreno Valley, California, who has lived in the United States since 2005. Mr. J.M. was detained by Defendant ICE in March 2025. He was initially taken to DVA and then transferred to Adelanto in June 2025, where he was detained until he was released on April 28, 2026.[12] Mr. J.M. suffers from cardiac arrhythmia. In November 2025, he was taken outside of Adelanto for a heart ultrasound, and the cardiologist ordered him to wear a heart monitor. When he returned, Adelanto staff only allowed Mr. J.M. to wear the heart monitor if he stayed in isolated medical segregation. After spending about five days alone in the medical cell, Mr. J.M. could no longer tolerate the isolation, and he elected to return to his regular cell without his heart monitor. In December 2025, he was scheduled for a follow up appointment at an outside hospital to learn the results of the heart monitoring. He was transported to the hospital, but when he arrived, he was informed by the hospital staff that Adelanto staff had cancelled the appointment. He never learned the results of the heart monitoring and was never rebooked for another appointment. Based on his own experience and what he has witnessed, while in detention, Mr. J.M. constantly feared that if he suffered a cardiac episode, he would not receive timely medical assistance, if he received any medical assistance at all. Although he has been released, the government has redetained other individuals it has released, including a named plaintiff in *Vasquez Perdomo v. Noem*, 148 F.4th 656

[11] This Court previously granted J.M. leave to proceed under pseudonym. *See* ECF 28.

[12] J.M. was detained at Adelanto at the time the original complaint was filed. *See* ECF 1 ¶ 17.

(9th Cir. 2025).[13] If Mr. J.M. were to be redetained, he would again be subject to inhumane conditions and at risk of nonresponsive and/or inadequate medical care.

***Organizational Plaintiff***

18. **Plaintiff Coalition for Humane Immigrant Rights ("CHIRLA")** is a nonprofit organization with its principal place of business in Los Angeles, California. CHIRLA was founded in 1986 to advance the human and civil rights of immigrants and refugees. Since then, CHIRLA has become one of the largest and most effective advocates for immigrant rights, organizing, educating and defending immigrants and refugees in the streets, in the courts, and in the halls of power. CHIRLA brings this suit both on behalf of its members, *see Vasquez Perdomo*, 148 F.4th at 676 (concluding CHIRLA had associational standing), and on behalf of itself, *see Immigrant Defs. L. Ctr. v. Noem*, 145 F.4th 972, 987-89 (9th Cir. 2025) (concluding similar legal service provider had organizational standing).

19. As a membership organization, CHIRLA serves approximately 50,000 members across California, including both U.S. citizens and noncitizens of varying immigration status. Most members are low-income. Many members are day laborers, car wash workers, street vendors, and domestic workers. CHIRLA's membership is predominantly Latino but includes people from around the world. CHIRLA has members in every county in the District. As part of CHIRLA's mission to promote civic engagement and lively democratic debate, CHIRLA educates its membership as well as the broader community through know-your-rights programming, workshops, social media, and educational literature about a variety of social services and benefits, including immigration law, financial literacy, workers' rights, and civic engagement. CHIRLA's members plan local advocacy campaigns,

[13] *See* Brittny Mejia, *Federal judge orders release of Pasadena man who is plaintiff in lawsuit against immigration raids*, L.A. Times (Apr. 23, 2026), https://www.latimes.com/california/story/2026-04-23/federal-court-orders-release-of-lawsuit-plaintiff.

share information, and discuss issues that affect them, their families, and their local communities.

20. CHIRLA brings suit on behalf of its members—including those already detained at Adelanto and those at risk of being detained. Multiple CHIRLA members have faced medical neglect and lived through inhumane conditions while detained at Adelanto. At least one CHIRLA member is currently detained at Adelanto. Other CHIRLA members risk similar mistreatment. Because many CHIRLA members are immigrants, many members are at risk of being detained at Adelanto in these conditions.

21. In addition to being a membership organization, CHIRLA also brings this suit because its provision of legal services has been impaired by Defendants' actions. CHIRLA provides pro bono legal services to members and clients in removal proceedings, including numerous clients who are or have been detained at Adelanto. CHIRLA staff first conduct intakes to screen prospective clients for representation eligibility. CHIRLA then either chooses to represent the individuals in removal or other proceedings or refers them to other providers. Additionally, CHIRLA coordinates the Los Angeles Rapid Response Network ("LARRN"), whose purpose is to assist community members in the wake of immigration enforcement actions. CHIRLA operates a hotline where individuals impacted by immigration enforcement seeking support can request referrals for immigration lawyers and other support services through the LARRN.

22. CHIRLA's core business activities, including its provision of legal services to detained individuals, have been impacted by Defendants' policies and practices challenged herein. In the last year, CHIRLA has received hundreds of phone calls requesting assistance for people detained at Adelanto. As a result of the pervasive medical neglect at Adelanto, people are no longer just calling about representation in immigration proceedings—they are often seeking help with complex medical issues and access to healthcare, including prescription medications.

CHIRLA's hotline operators now spend additional time on intakes to record information about medical issues, meaning they spend less time screening a potential client's legal claims, spend more time on intakes overall, and conduct fewer intakes and referrals than they would otherwise be able to.

23. Pervasive medical neglect at Adelanto has also made it more difficult to prepare a client's removal defense. CHIRLA's legal staff cannot represent people who are dead, so responding to their clients' medical needs becomes a necessary part of representing them in their immigration cases. It takes longer to prepare a client's removal defense because CHIRLA's legal staff must take on additional work and devote additional time to addressing medical needs. In addition, when a client's health is declining, attorney meetings become more taxing on the client, hindering CHIRLA's representation.

24. The representation CHIRLA staff provide, and CHIRLA's ability to retain clients, has also been impacted because many individuals who initially wanted to challenge their arrest and detention have grown desperate under inhumane conditions and are either considering abandoning their claims for relief and agreeing to "self-deport," or have already done so. CHIRLA has lost prospective clients who have given up on asserting their claims because the conditions at Adelanto are so dire. If CHIRLA's clients—actual and prospective—feel pressured into giving up their claims before CHIRLA attorneys get a chance to defend them, CHIRLA cannot properly serve them. It also means that CHIRLA's attorneys prepare cases that are never adjudicated, wasting limited resources.

25. CHIRLA's activities—imperative to an organization that seeks due process and fair treatment for its members and clients—have thus been impaired by Defendants' actions. Because of the barriers to its work imposed by Defendants' policies and practices, CHIRLA would need to hire additional staff, requiring it to conduct additional fundraising in order to support its core business activities and long-standing mission, and/ or divert existing staff resources away from other projects.

***Defendants***

26. **Defendant Immigration and Customs Enforcement ("ICE")** is a component agency of the U.S. Department of Homeland Security. Defendant ICE is responsible for the criminal and civil enforcement of immigration laws, including the detention and removal of immigrants. Defendant ICE is responsible for ensuring immigrants are kept in conditions that comply with the Constitution and the law. Defendant ICE has contracted with the GEO Group, Inc. ("GEO")—one of the largest for-profit prison corporations in the country—to run and manage the Adelanto ICE Processing Center. GEO facility administration, staff, and other personnel at Adelanto are agents of Defendant ICE. Defendant ICE is an agency within the meaning of 5 U.S.C. § 551(1).

27. **Defendant Todd Lyons** is the Acting Director of ICE and the current senior official performing the duties of the Director of ICE. Defendant Lyons is responsible for Defendant ICE's policies, practices, and procedures, including those relating to the detention of immigrants and the conditions under which they are held. Defendant Lyons is a legal custodian of Plaintiffs and the members of the putative class. He is sued in his official capacity.

28. **Defendant Jaime Rios** is the Acting Director of ICE's Los Angeles Field Office, Enforcement and Removal Operations, which is the ICE Field Office with jurisdiction and responsibility over Adelanto. Defendant Rios is responsible for Defendant ICE's policies, practices, and procedures, including those relating to the detention of immigrants and conditions under which they are being held. Defendant Rios is a legal custodian of Plaintiffs and members of the putative class. He is sued in his official capacity.

29. **Defendant Department of Homeland Security ("DHS")** is a federal executive agency responsible for, among other things, enforcing federal immigration laws and overseeing immigration to the United States. Defendant DHS is a legal

custodian of Plaintiffs and members of the putative class. Defendant DHS is an agency within the meaning of 5 U.S.C. § 551(1).

30. **Defendant Markwayne Mullin** is the Secretary of DHS. Defendant Mullin is responsible for administering and enforcing the nation's immigration laws pursuant to 8 U.S.C. § 1103(a). In this role, he oversees component agencies, including Defendant ICE and U.S. Customs and Border Protection ("CBP"). Defendant Mullin is sued in his official capacity.

## FACTUAL ALLEGATIONS

### A. Adelanto is a for-profit prison complex with a history of abuse, neglect and unsafe conditions.

31. A former state prison, Adelanto is a sprawling detention complex located in the Mojave Desert in San Bernardino County.[14] For over a decade, Adelanto has often functioned as the primary long-term immigration detention center in the Central District. It has the capacity to detain 1,940 people,[15] making it the largest immigration detention facility in the Central District and one of the largest in the country.[16]

32. The facility is owned by one of the largest for-profit prison and detention companies in the U.S., GEO.[17] Defendant ICE contracts with GEO to run Adelanto

---

[14] Sarah Tory, *'If you don't want us, tell us to go back' The making of a California prison town*, High Country News (May 15, 2017), https://www.hcn.org/issues/49-8/how-adelanto-came-to-host-californias-biggest-immigration-detention-facility/ (noting Adelanto was a state prison for twenty years).

[15] *Adelanto ICE Processing Center*, The GEO Group., https://www.geogroup.com/facilities/adelanto-ice-processing-center/ (last visited Jan. 25, 2026).

[16] *See Detention Facilities Average Daily Population*, Transactional Recs. Access Clearinghouse (TRAC), (Apr. 2, 2026) https://tracreports.org/immigration/detentionstats/facilities.html [hereinafter *TRAC Report*].

[17] *Id.* (discussing ownership); Lauren-Brooke Eisen, *Private Prison Companies' Enormous Windfall: Who Stands to Gain as ICE Expands*, Brennan Ctr. for Just. (Oct. 1, 2025), https://www.brennancenter.org/our-work/analysis-opinion/private-prison-companies-enormous-windfall-who-stands-gain-ice-expands (noting GEO is one of the two largest private prison companies in the United States).

and detain immigrants there, including the Individual Plaintiffs.[18] GEO purchased the former prison in 2010 for $28 million,[19] and Defendants opened the facility as an immigration detention center in 2011.[20] Since then, detained individuals, advocates, and government entities charged with oversight have repeatedly raised concerns about substandard conditions.

33. Adelanto consists of two buildings that house detained individuals: East and West.

[18] *See Contract No. 70CDCR20D00000009 between the GEO Grp., Inc. and U.S. Immigr. & Customs Enf't* 2 (Oct. 16, 2019), https://www.ice.gov/doclib/foia/detFacContracts/70CDCR20D00000009_org_AdelantoDetFac_AdelantoCA.pdf [hereinafter *2019 Adelanto Contract*] ("establish[ing] detention, transportation and medical services in the Los Angeles Area of Responsibility at Adelanto Detention Facility and the Desert View Modified Community Correctional Facility"); *Modification P00018 to Contract No. 70CDCR20D00000009 between the GEO Grp., Inc. and U.S. Immigr. & Customs Enf't* 2 (Dec. 19, 2019), https://www.ice.gov/doclib/foia/detFacContracts/70CDCR20D00000009_P00018-19_AdelantoDetFac_AdelantoCA.pdf.

[19] *Natasha Lindstrom, GEO Group finalizes $28 million purchase of Adelanto prison*, Victorville Daily Press (June 7, 2010). https://www.vvdailypress.com/story/news/2010/06/07/geo-group-finalizes-28-million/37086482007/.

[20] *Immigration Detention in California: A Comprehensive Review with a Focus on Mental Health*, Cal. Dep't of Just., 26 (2025), https://oag.ca.gov/system/files/media/immigration-detention-2025.pdf. [hereinafter *Immigration Detention in California*].




*(Aerial screenshot taken from Google Maps)*

34. Though not the subject of this lawsuit, the compound also includes an additional ICE detention center known as the Desert View Annex ("DVA").[21] Adelanto and DVA "share most of the same staff," including "[m]ost of the administrative, executive, medical, and mental health staff" and "essentially operate together[.]"[22] Detained individuals are often transferred between them.

35. The current contract between Defendant ICE and GEO, signed in 2019, provides GEO over two billion dollars to operate the Adelanto and DVA facilities for five years, for over $400 million a year.[23] GEO makes an estimated $85 million

---

[21] Rebecca Plevin, *Adelanto approves GEO plan to expand capacity at detention center*, Victorville Daily Press (Feb. 20, 2020), https://www.vvdailypress.com/story/news/local/delanto/2020/02/20/adelanto-approves-geo-plan-to/62935425007/.

[22] *Immigration Detention in California*, *supra* note 20, at 26, 28.

[23] *2019 Adelanto Contract*, *supra* note 18, at 1, 5; McKenna Mobley, *Extension granted for Adelanto ICE Center to remain open until December, possibly longer*, Victorville Daily Press (Oct. 22, 2024),

annually on its Adelanto contract with Defendant ICE, and expects to profit an additional $31 million annually with the detention center operating at full capacity.[24] In 2024, ICE exercised its option to extend the contract for five years, until 2029.[25]

36. Adelanto is subject to ICE's 2011 Performance-Based National Detention Standards ("PBNDS").[26] ICE's Adelanto contract with GEO mandates compliance with the PBNDS and the American Correctional Association Standards ("ACAS").[27]

37. Yet Defendants have consistently failed to comply with the PBNDS—Adelanto has long been plagued by substandard conditions, medical neglect, and abuse.[28]

---

https://www.vvdailypress.com/story/news/2024/10/22/adelanto-immigration-customs-enforcement-ice-detention-center-to-remain-open-california/75780811007/.

[24] Pablo E. Paez, *The GEO Group Announces Funding Extension for Adelanto ICE Processing Center Contract*, The GEO Group., (May 20, 2024), https://investors.geogroup.com/news-releases/news-release-details/geo-group-announces-funding-extension-adelanto-ice-processing; Pablo E. Paez, *The GEO Group Reports Second Quarter 2025 Results and Announces $300 Million Share Repurchase Program*, The GEO Group., (Aug. 6, 2025), https://investors.geogroup.com/news-releases/news-release-details/geo-group-reports-second-quarter-2025-results-and-announces-300.

[25] Pablo E. Paez, *The GEO Group Announces Exercise of Five-Year Option Period for Adelanto ICE Processing Center Contract*, The GEO Group, (Oct. 4, 2024), https://investors.geogroup.com/news-releases/news-release-details/geo-group-announces-exercise-five-year-option-period-adelanto.

[26] *See* U.S. Immigr. & Customs Enf't, *Performance-Based National Detention Standards* (2011) [hereinafter *PBNDS*], https://www.ice.gov/doclib/detention-standards/2011/pbnds2011r2016.pdf. "These standards, and a successive revision in 2016, codified changes resulting from federal laws, DHS regulations, and ICE policies that had been established since the 2008 standards." U.S. Government Accountability Office, *DHS Should Define Goals and Measures to Assess Facility Inspection Programs* (May 2025).

[27] *2019 Adelanto Contract, supra* note 18, at 2 ("All services shall be furnished in compliance with the following regulations/policies/standards: 2011 Performance Based National Detention Standards (PBNDS 2011) as revised in DEC 2016[;] American Correctional Association (ACA) Standards").

[28] *See, e.g.*, Jarvie & Solis, *supra* note 5 ("Adelanto has for years been the focus of complaints from detainees, attorneys and state and federal inspectors about inadequate medical care, overly restrictive segregation and lax mental health services."); Andrea Castillo, *Immigrants detained at Adelanto staged a peaceful protest. Guards in riot gear pepper-sprayed them*, L.A. Times (June 26, 2020), https://www.latimes.com/california/story/2020-06-26/immigrants-detained-at-adelanto-staged-a-peaceful-protest-guards-in-riot-gear-pepper-sprayed-them; *Inside the Adelanto detention facility: Troubled history, vows for reform*, LAist (Oct. 11, 2016),

38. State and federal entities have repeatedly documented and warned of serious conditions issues.[29] In 2015, the DHS Office for Civil Rights and Civil Liberties ("CRCL"), charged with investigating civil rights complaints,[30] visited Adelanto and warned that medical leadership "was not competent and that negligent medical care was occurring as a result."[31]

39. In 2017, the same office determined that "the medical care at Adelanto was seriously deficient and did not meet the 2011 PBNDS" and the refusal to hire competent medical leadership and correct this "critical failure" "more likely than not . . . led to the inadequate detainee medical care that contributed to medical injuries, including bone deformities and detainee deaths, and continue[d] to pose a risk to the safety of other detainees[.]"[32]

40. In 2018, CRCL found that Adelanto placed an "alarming" number of detained individuals with serious mental illness in solitary confinement and isolated many for "shockingly" long periods of time.[33] The report recommended that "at-risk

---

https://laist.com/shows/take-two/inside-the-adelanto-detention-facility-troubled-history-vows-for-reform (documenting Adelanto's troubled history from 2011–15); Christina Fialho & Victoria Mena, *Abuse in Adelanto: An Investigation into a California Town's Immigration Jail*, Det. Watch Network, 4, 12 (Oct. 2015), https://www.detentionwatchnetwork.org/sites/default/files/reports/CIVIC%20DWN%20Adelanto%20Report.pdf (reporting deficient food, hygiene, and medical care).

[29] *See, e.g.*, *Immigration Detention in California*, *supra* note 20, at 26, 28 (identifying concerns at Adelanto "that the number of health staff vacancies and the need to manage existing staff across two facilities may impact care").

[30] *See Civil Rights and Civil Liberties Results and Reports*, U.S. Dep't of Homeland Sec., https://www.dhs.gov/reports-office-civil-rights-and-civil-liberties (last visited Jan. 25, 2026).

[31] *Corrections Expert's Report on Adelanto Correctional Facility*, Dep't of Homeland Sec. Off. for C.R. & C.L., 25 (Nov. 16, 2017), https://embed.documentcloud.org/documents/6278922-HQ-Part2-Copy/?mode=text&embed=1.

[32] *Id.*; *see also* Tom Dreisbach, *Despite Findings Of 'Negligent' Care, ICE To Expand Troubled Calif. Detention Center*, NPR (Jan. 15, 2020), https://www.npr.org/2020/01/15/794660949/despite-findings-of-negligent-care-ice-to-expand-troubled-calif-detention-center.

[33] *CRCL Report*, *supra* note 31, at 35; *see also* Nick Schwellenbach, *Confidential Report Warned ICE of "Inhumane" Use of Solitary Confinement*, Project on Gov't Oversight (Sept. 12, 2019), https://www.pogo.org/investigates/confidential-report-warned-ice-of-inhumane-use-of-solitary-confinement.

detainees . . . immediately be removed from the facility and transferred to other facilities with well-functioning medical programs."[34]

41. The DHS Office of Inspector General later found "serious violations" at the facility "relating to safety, detainee rights, medical care."[35] The Office concluded that Adelanto failed to provide access to adequate medical and mental health care, presented rampant suicide hazards, and relied on improper and overly restrictive use of solitary confinement for disciplinary purposes.[36] These findings were rejected by Adelanto leadership, and no corrective action was taken.[37]

42. That same year, Disability Rights California ("DRC"), the state agency charged with protecting people with disabilities,[38] toured Adelanto and after multi-day inspections, issued a sixty-four-page report detailing conditions of abuse for people with disabilities and mental health issues. Detained individuals were "subjected to punitive, prison-like conditions" that "result[ed] in the abuse and

---

[34] *CRCL Report, supra* note 31, at 33; Veronica Venture, Deputy Officer & Dana Salvano-Dunn, Compliance Branch Dir., Dep't of Homeland Sec. Off. for C.R. & C.L., *Memorandum to Matthew Albence Re: Adelanto Corr. Facility Complaint Nos. 17-03-ICE-0103, 16-06-ICE-0627, 17-07-ICE-0456, 17-08-ICE-0299, 17-09-ICE-0356, 17-09-ICE-0407, 17-09-ICE-0366, and 17-10-ICE-0401* (Apr. 25, 2018), https://www.documentcloud.org/documents/6331345-CRCL-Adelanto-Docs-Part-1/?mode=document&q=shockingly#document/p49.

[35] Dept. Homeland Sec. Off. Inspector Gen., *Management Alert—Issues Requiring Action at the Adelanto ICE Processing Center in Adelanto, California* 0, 2 (Sept. 27, 2018), https://www.oig.dhs.gov/sites/default/files/assets/2018-10/OIG-18-86-Sep18.pdf.

[36] *Id.* at 2-11.

[37] U.S. House of Representatives, Comm. on Homeland Sec., Majority Staff, *ICE Detention Facilities: Failing to Meet Basic Standards of Care* 11 (Sept. 21, 2020), https://democrats-homeland.house.gov/imo/media/doc/Homeland%20ICE%20facility%20staff%20report.pdf ("The Committee visited Adelanto as part of its review in 2019 and was met with resistance when asking about these findings. When pressed, Adelanto leadership continued to reject CRCL's findings that health care leadership put detainees at risk and did not believe that fundamental or systematic change was necessary.").

[38] Disability Rights California is the California agency "designated under federal law to protect and advocate for the rights of Californians with disabilities." *About Us*, Disability Rts. Cal., https://www.disabilityrightsca.org/about-us (last visited Jan. 25, 2026); *see* 29 U.S.C. § 794e (providing for state protection agencies to "protect the legal and human rights of individuals with disabilities"); Cal. Welf. & Inst. Code § 4902(b)(1) (authorizing the protection and advocacy agency to "[i]nvestigate any incident of alleged abuse or neglect of any person with a disability").

neglect of people with disabilities[.]"[39] DRC concluded that Adelanto had an "inadequate mental health care and medical care system[,]" failed to comply with disability laws and Defendant ICE's detention standards, and underreported suicide attempts.[40]

43. During the COVID-19 pandemic, after detained individuals reported that use of a toxic cleaning chemical was causing them to experience "headaches, nausea, nosebleeds, fainting, eye irritation, skin irritation, and breathing issues[,]" the U.S. Environmental Protection Agency investigated[41] and issued a warning to GEO about its use of a registered pesticide "in a manner inconsistent with its labeling."[42] A court ultimately required the government to "immediately" "stop the use of a toxic and noxious chemical that is harming Adelanto's detainees[.]" *Roman v. Wolf*, No. EDCV 20-00768 TJH (PVCX), 2020 WL 5797918, at *5 (C.D. Cal. Sept. 29, 2020), *aff'd in part, vacated in part, remanded*, 977 F.3d 935 (9th Cir. 2020).[43]

44. The same court also ruled that the government's "callous disregard of its detainees' constitutional right to reasonable safety" during the pandemic merited an injunction ordering a drastic reduction in the number of people detained at Adelanto.

---

[39] Aaron J. Fischer, Pilar Gonzalez & Richard Diaz, *There Is No Safety Here: The Dangers for People with Mental Illness and Other Disabilities in Immigration Detention at GEO Group's Adelanto ICE Processing Center,* Disability Rts. Cal., 2–4 (Mar. 2019), https://www.disabilityrightsca.org/system/files/file-attachments/DRC_REPORT_ADELANTO-IMMIG_DETENTION_MARCH2019.pdf [hereinafter *No Safety Here*].

[40] *Id*. at 2-3.

[41] U.S. Env't Prot. Agency, *Inspection Report* 2 (July 29, 2020), https://earthjustice.org/wp-content/uploads/final_inspection_report_1.pdf.

[42] U.S. Env't Prot. Agency, *Notice of Warning* 3 (Mar. 2, 2021), https://earthjustice.org/wp-content/uploads/now_geo_final_1.pdf; *see also Private Prison Company Poisoned Immigrants at Adelanto for A Decade*, Earthjustice (Mar. 22, 2021), https://earthjustice.org/press/2021/private-prison-company-poisoned-immigrants-at-adelanto-for-a-decade.

[43] *See also* Jaclyn Diaz, *GEO Group sickened ICE detainees with hazardous chemicals for months, a lawsuit says*, NPR (Mar. 25, 2023), https://www.npr.org/2023/03/25/1165890634/geo-group-lawsuit-adelanto-ice-detainees-chemical-exposure; *Ligaya Ronduen, et al. v. The Geo Group, Inc., et al.*, 5:23-cv-00481, Dkt. 491 (C.D. Cal. Dec. 16, 2025) (denying defendants' summary judgment motion and ordering case alleging negligence, premises liability, concealment, and misrepresentation over GEO's use of chemical to proceed to trial).

*Roman v. Wolf*, No. EDCV 20-00768 TJH (PVCX), 2020 WL 1952656, at *8, 12 (C.D. Cal. Apr. 23, 2020), *aff'd in part, vacated in part sub nom. Hernandez Roman v. Wolf*, 829 F. App'x 165 (9th Cir. 2020), *and supplemented*, 2020 WL 5797918 (C.D. Cal. Sept. 29, 2020). The court found inadequate COVID-19 testing and quarantining procedures, a lack of access to hand sanitizer, gloves, and masks, and a lack of routine disinfecting, and accordingly concluded that "class members face[d] irreparable harm to their constitutional rights and health[.]" *Id.* The Ninth Circuit largely affirmed the injunction, agreeing that "the Government likely failed to meet its constitutional duty to provide reasonably safe conditions to Plaintiffs," and that its "inadequate response reflected a reckless disregard for detainee safety[.]" *Roman v. Wolf*, 977 F.3d 935, 943 (9th Cir. 2020).

45. Given Adelanto's infamous history of medical neglect and unsafe conditions, there have been various efforts to close the facility.[44] Members of Congress sent letters to Defendants ICE and DHS seeking closure of the facility in 2015, 2023, and 2024,[45] and it was reportedly on the brink of closure in late 2023, with the government only renewing its contract for a few months at a time.[46]

---

[44] For instance, the Shut Down Adelanto Coalition, a collective of over twenty immigrants' rights organizations in the Inland Empire and surrounding areas, has documented conditions abuses at Adelanto and DVA and advocated for the just closure of these facilities. *See Shut Down Adelanto*, Inland Coal. for Immigr. J. https://ic4ij.org/issues/shut-down-adelanto (last visited Jan. 25, 2026); *About Us*, Shut Down Adelanto, https://shutdownadelanto.org/; Inland Coal. for Immigr. J., *Shut Down Adelanto Conditions and Updates Report* (Nov. 2023).

[45] *See Letter from Members of Congress to Director Saldaña, Inspector General Horowitz, and Inspector General Roth* (July 14, 2015), https://embed.documentcloud.org/documents/2165708-adelanto-letter/; *Letter from Members of Congress to Secretary Mayorkas* (Dec. 18, 2023), https://chu.house.gov/sites/evo-subsites/chu.house.gov/files/evo-media-document/12_21_23_final-letter-to-dhs-urging-closure-of-adelanto-ice-detention-facility-version-4-12-21-2023-02-50-pm.pdf; *Letter from Members of Congress to Secretary Mayorkas and Secretary Garland* (Sept. 26, 2024), https://chu.house.gov/sites/evo-subsites/chu.house.gov/files/evo-media-document/Letter%20to%20DHS%20and%20DOJ%20Urging%20Closure%20of%20Adelanto%20ICE%20Processing%20Center.pdf.

[46] *See* Andrea Castillo, *One of California's largest ICE detention centers could close. Staff urge Biden to keep it open*, L.A. Times (Dec. 19, 2023), https://www.latimes.com/politics/story/2023-12-19/adelanto-immigration-detention-facility-potential-closure; Andrea Castillo, *Once on the brink of closure, Adelanto*

46. Adelanto held fewer than a dozen detained individuals at a time between 2020 and early 2025.[47] During this time, Defendant ICE continued to pay GEO for a guaranteed minimum of 640 beds.[48] After the court approved a settlement lifting restrictions on new intakes at Adelanto on June 11, 2025, *Roman*, 5:20-cv-00768-TJH-PVC Dkt. 2708, Defendants began immediate full intake.[49] Adelanto went from holding approximately 153 detained individuals to over 1,200 within a week.[50]

**B. Defendants Control the Policies and Practices at Adelanto.**

47. As the entity deciding to detain people at Adelanto, the federal government is legally responsible for conditions there. The Immigration and Nationality Act envisions that federal immigration officials will "arrange for appropriate places of detention[,]" 8 U.S.C. § 1231(g)(1), and work with states and localities to establish "acceptable conditions of confinement[.]" 8 U.S.C. § 1103 (a)(11)(B).[51] As a practical matter, Defendants have extensive control over conditions at Adelanto and the power and authority to immediately remedy inhumane conditions.

---

*facility will resume detaining immigrants*, L.A. Times (Jan. 29, 2025), https://www.latimes.com/california/story/2025-01-29/adelanto-immigration-facility-to-resume-housing-migrants; *see also Immigration Detention in California*, *supra* note 20, at 26 (describing six-month contract extensions).

[47] Mobley, *Adelanto ICE Processing Center started the year with three detainees. Now, there are 1,200*, Victorville Daily Press (June 17, 2025), https://www.vvdailypress.com/story/news/local/2025/06/17/adelanto-ice-processing-center-now-at-1200-detainees/84246496007/.

[48] *Immigration Detention in California*, *supra* note 20, at 26.

[49] *See The GEO Group Provides Update on Recent Court Settlement Allowing for Immediate Full Intake at Company-Owned 1,940-Bed Adelanto ICE Processing Center in California*, The Geo Group. (June 10, 2025), https://investors.geogroup.com/news-releases/news-release-details/geo-group-provides-update-recent-court-settlement-allowing; Mobley, *Adelanto ICE Processing Center started the year with three detainees. Now, there are 1,200*; *ICE Detention Trends*, Vera Inst. Just., https://www.vera.org/ice-detention-trends (showing over a thousand detainees on June 10, 2025).

[50] *TRAC Report, supra* note 16 (reporting 153 detainees at Adelanto on June 9, 2025); *Jarvie & Solis, supra* note 5 (reporting 1,218 on June 18, 2025). Estimates of the number of detained individuals around June 2025 vary. *Compare ICE Detention Trends*, Vera Inst. Just., https://www.vera.org/ice-detention-trends *with TRAC Report, supra* note 16.

[51] *See* Alina Das, *The Law and Lawlessness of U.S. Immigration Detention*, 138 Harv. L. Rev. 1186, 1195 (2025) (noting that "the legislative and regulatory history suggests that these provisions were intended to . . . direct the Agency to protect the rights of people in detention").

ICE is responsible for setting the policies that govern detention conditions at Adelanto and has done so, largely through the PBNDS.[52] ICE ultimately directs and controls every material aspect of the Adelanto facility's operations, and GEO performs services at ICE's direction and under ICE's published standards.

48. GEO confirms this relationship, identifying its "Client" as ICE and stating that all services are "provided in accordance with standards required [by] ICE" and performed "on behalf of U.S. Immigration and Customs Enforcement."[53]

49. ICE ERO "has primary responsibility for overseeing the compliance of ICE detention facilities with applicable detention standards."[54] As such, ICE ERO is responsible for overseeing GEO's "performance and adherence to all contract requirements."[55] ICE Field Office Directors "are responsible for managing detention operations in their geographic area."[56] ICE ERO's Los Angeles office is responsible for identifying deficiencies and corrective action at Adelanto.[57]

50. Defendants have ICE staff onsite at Adelanto, including staff responsible for monitoring detention conditions and compliance with detention standards on an ongoing basis and reviewing detainee grievances weekly.[58] "ICE ERO also

---

[52] *See PBNDS.*

[53] See GEO Group, Adelanto ICE Processing Center, https://www.geogroup.com/facilities/adelanto-ice-processing-center/

[54] United States Government Accountability Office, *ICE Needs to Strengthen Oversight of Informed Consent for Medical Care* (Oct. 2022), https://www.gao.gov/assets/730/723449.pdf; Dept. Homeland Sec. Off. Inspector Gen., Concerns about ICE Detainee Treatment and Care at Detention Facilities, (Dec. 11, 2017). https://www.oig.dhs.gov/sites/default/files/assets/2017-12/OIG-18-32-Dec17.pdf ("ERO staff are responsible for monitoring conditions of confinement at these Facilities.").

[55] *Letter from The GEO Group to Senator Warren* at 48 (Feb. 27, 2019), https://wearegeo.com/wp-content/uploads/2019/04/GEO-Full-Response-to-U.S.-Senator-Elizabeth-Warren-Letter.pdf.

[56] Dept. Homeland Sec. Off. Inspector Gen., ICE's Inspections and Monitoring of Detention Facilities Do Not Lead to Sustained Compliance or Systemic Improvements, (June 26, 2018). https://www.oig.dhs.gov/sites/default/files/assets/2018-06/OIG-18-67-Jun18.pdf

[57] ECF 54-1 at ¶¶ 11-12; ECF 54-2 at ECF 47.

[58] ECF 54-1 at ¶ 9; ECF 54-2 at ECF 21, 62; *see also* Ryanne Mena, *What it's like to visit the ICE detention center in Adelanto*, The Sun (Nov. 6, 2025) ("Asked specific questions about detainees' conditions inside Adelanto, a GEO Group spokesperson

permanently assigns an independent Detention Services Manager ("DSM") whose sole responsibility is to ensure contractor and ICE staff compliance with all ICE detention policy, procedures and national detention standards."[59] This ICE employee, also known as a Detention Standards Compliance Officer, "routinely maintain[s] a… presence at facilities to conduct ongoing compliance reviews and assist the facility in developing and monitoring corrective actions to ensure compliance"[60] and "conduct[s] daily scheduled and unscheduled audits and reviews of contractor performance."[61] Once this ICE employee identifies deficiencies and proposes

---

said . . . 'In all instances, our support services are monitored by ICE, including by on-site agency personnel, and other organizations within the Department of Homeland Security to ensure compliance with ICE's detention standards and contract requirements regarding the treatment and services ICE detainees receive. In the event issues are identified, we quickly resolve all of ICE's concerns as required by ICE's Quality Assurance Surveillance Plan.'"); Leticia Juarez, Federal lawsuit alleges inhumane conditions at Adelanto ICE Processing Center, (Jan. 27, 2026). https://abc7.com/post/federal-lawsuit-alleges-poor-conditions-adelanto-ice-processing-center/18480494/ (same); Julia Barajas & Elly Yu, 'Being here breaks people': Inside solitary confinement at Adelanto, (May 12, 2026). https://laist.com/news/politics/solitary-confinement-adelanto-immigrant-detention-center-lawsuit-break (similar).

[59] *Letter from The GEO Group to Senator Warren* at 48 (Feb. 27, 2019), https://wearegeo.com/wp-content/uploads/2019/04/GEO-Full-Response-to-U.S.-Senator-Elizabeth-Warren-Letter.pdf; *see also* https://www.ice.gov/detain/facility-inspections ("To ensure compliance with each contract's terms and conditions and the applicable detention standards, … ICE ERO Detention Service Managers (DSMs) and Detention Standards Compliance Officers (DSCOs) monitor detention conditions through daily on-site compliance reviews to identify deficiencies, areas of concern, contract and facility issues, and to facilitate corrective actions.").

[60] U.S. Gov't Accountability Off., GAO-21-414, *ICE Efforts to Address COVID-19 in Detention Facilities* (June 2021), https://www.gao.gov/assets/gao-21-414.pdf.

[61] *Letter from The GEO Group to Senator Warren* at 48 (Feb. 27, 2019), https://wearegeo.com/wp-content/uploads/2019/04/GEO-Full-Response-to-U.S.-Senator-Elizabeth-Warren-Letter.pdf; see also U.S. Gov't Accountability Off., GAO-23-105196, *ICE Needs to Strengthen Oversight of Informed Consent for Medical Care at 27* (Oct. 2022), https://www.gao.gov/assets/730/723449.pdf. (noting ongoing monitoring occurs "daily, monthly, and quarterly"); *see also Dept. Homeland Sec. Off. Inspector Gen., ICE's Inspections and Monitoring of Detention Facilities Do Not Lead to Sustained Compliance or Systemic Improvements*, (June 26, 2018). https://www.oig.dhs.gov/sites/default/files/assets/2018-06/OIG-18-67-Jun18.pdf ("In the facilities they monitor, DSMs provide a needed service for ICE ERO Custody Management by assessing compliance with standards nearly daily or weekly.").

corrective action, implementing "corrective actions are a[n] [ICE] field office responsibility."[62]

51. In 2019, there were 55 full-time ICE staff with offices at Adelanto.[63] Adelanto was built to have space for approximately 158 ICE ERO employees onsite, including three Detention Standards Compliance Officers.[64]

52. In addition, ICE assigns an ICE Immigration Health Services Corp ("IHSC") employee to oversee the medical services provided at the facility, including by conducting site visits and "reviewing a sample of medical files to assess facilities' compliance with clinical standards for medical care."[65] IHSC is responsible for "ensur[ing] that the medical care meets detention standards."[66]

53. ICE also has control over staffing plans at Adelanto. Facility staffing occurs according to a "Government-approved Contractor Staffing Plan" and any changes must be approved by the ICE Contracting Officer responsible for administering ICE's Adelanto contract with GEO.[67] The ICE Contracting Officer's Representative is notified of vacant positions at Adelanto on a monthly basis.[68]

---

[62] Dept. Homeland Sec. Off. Inspector Gen., *ICE's Inspections and Monitoring of Detention Facilities Do Not Lead to Sustained Compliance or Systemic Improvements*, (June 26, 2018). https://www.oig.dhs.gov/sites/default/files/assets/2018-06/OIG-18-67-Jun18.pdf

[63] *Letter from The GEO Group to Senator Warren* at 48 (Feb. 27, 2019), https://wearegeo.com/wp-content/uploads/2019/04/GEO-Full-Response-to-U.S.-Senator-Elizabeth-Warren-Letter.pdf; *see also U.S. Gov't Accountability Off., GAO-23-105196*, ICE Needs to Strengthen Oversight of Informed Consent for Medical Care (Oct. 2022), https://www.gao.gov/assets/730/723449.pdf (organizational chart demonstrating that ICE has several divisions and units devoted to compliance).

[64] ECF 54-2 at ECF 21.

[65] *Letter from The GEO Group to Senator Warren* at 48 (Feb. 27, 2019), https://wearegeo.com/wp-content/uploads/2019/04/GEO-Full-Response-to-U.S.-Senator-Elizabeth-Warren-Letter.pdf; U.S. Gov't Accountability Off., GAO-23-105196 at 3 *ICE Needs to Strengthen Oversight of Informed Consent for Medical Care* (Oct. 2022), https://www.gao.gov/assets/730/723449.pdf; ECF 54-2 at ECF 22, 32, 63.

[66] U.S. Gov't Accountability Off., GAO-25-107580, *DHS Should Define Goals and Measures to Assess Facility Inspection Programs* (May 2025), https://www.gao.gov/assets/880/877950.pdf.

[67] ECF 54-2 at ECF 17-18, 61.

[68] *Id.*

54. DHS itself has identified at least two forms of control it has to correct deficiencies at a facility like Adelanto: through the inspection process and the quality assurance tools in facilities contracts.[69] It has also concluded that ICE fails to use either tool and that "ICE does not adequately hold detention facility contractors accountable for not meeting performance standards."[70]

55. ICE conducts routine and congressionally mandated inspections of facilities like Adelanto,[71] yet does not consistently enforce compliance with detention standards through the inspection process.[72] Assessing how effective ICE's inspections are in ensuring compliance with detention standards, the DHS Office of the Inspector General ("OIG") previously reported that "ICE does not adequately follow up on identified deficiencies or consistently hold facilities accountable for correcting them, which further diminishes the usefulness of inspections."[73] DHS OIG further concluded that: "[A]ll [contracted] and ODO inspections are scheduled in advance and announced to the facilities, which, according to ICE field staff, allows

---

[69] Dept. Homeland Sec. Off. Inspector Gen., *ICE Does Not Fully Use Contracting Tools to Hold Detention Facility Contractors Accountable for Failing to Meet Performance Standards,* (Jan. 29, 2019), https://www.oig.dhs.gov/sites/default/files/assets/2019-02/OIG-19-18-Jan19.pdf.

[70] Dept. Homeland Sec. Off. Inspector Gen., *ICE Does Not Fully Use Contracting Tools to Hold Detention Facility Contractors Accountable for Failing to Meet Performance Standards,* (Jan. 29, 2019), https://www.oig.dhs.gov/sites/default/files/assets/2019-02/OIG-19-18-Jan19.pdf.

[71] ECF 54-1 at ¶¶ 7-9, 11; U.S. Gov't Accountability Off., GAO-25-107580, *DHS Should Define Goals and Measures to Assess Facility Inspection Programs,* at 8-9 (May 2025) https://www.gao.gov/assets/880/877950.pdf (describing multiple kinds of DHS inspections, including those conducted by DHS OIG, ODO, DSM, and IHSC); Dept. Homeland Sec. Off. Inspector Gen., *ICE Does Not Fully Use Contracting Tools to Hold Detention Facility Contractors Accountable for Failing to Meet Performance Standards,* at 6 (Jan. 29, 2019), https://www.oig.dhs.gov/sites/default/files/assets/2019-02/OIG-19-18-Jan19.pdf (discussing various inspection processes).

[72] Dept. Homeland Sec. Off. Inspector Gen., *ICE's Inspections and Monitoring of Detention Facilities Do Not Lead to Sustained Compliance or Systemic Improvements*, (June 26, 2018). https://www.oig.dhs.gov/sites/default/files/assets/2018-06/OIG-18-67-Jun18.pdf.

[73] Dept. Homeland Sec. Off. Inspector Gen., *ICE's Inspections and Monitoring of Detention Facilities Do Not Lead to Sustained Compliance or Systemic Improvements*, (June 26, 2018). https://www.oig.dhs.gov/sites/default/files/assets/2018-06/OIG-18-67-Jun18.pdf.

facility management to temporarily modify practices to 'pass' an inspection."[74] When DHS OIG conducted an unannounced inspection at Adelanto and found nooses in cells, improper segregation, and inadequate medical care, it directed its recommendation to ICE—not GEO—reflecting Defendants' understanding that ICE has the power to correct conditions and make changes. DHS OIG stated: "ICE must ensure the Adelanto Center complies with detention standards" and that "[m]itigation and resolution of these issues require ICE's immediate attention and increased engagement with the center and its operations."[75]

56. DHS OIG concluded that ICE similarly fails to use its contractual tools to ensure compliance.[76] For each facility, ICE's Contracting Officer Representative administers the contract by "reviewing monthly reports provided by the contractor, staffing plans, approving new hires, review and audit invoices, issuing contract discrepancies reports and reviewing and accepting contractor submitted corrective action plans (CAPS)."[77] The Contracting Officer Representative also "oversee[s] the day-to-day management of each contract facility" and is "responsible for ensuring the contractor complies with the terms of the contract."[78]

[74] Dept. Homeland Sec. Off. Inspector Gen., *ICE's Inspections and Monitoring of Detention Facilities Do Not Lead to Sustained Compliance or Systemic Improvements*, (June 26, 2018). https://www.oig.dhs.gov/sites/default/files/assets/2018-06/OIG-18-67-Jun18.pdf.

[75] Dept. Homeland Sec. Off. Inspector Gen., *Management Alert—Issues Requiring Action at the Adelanto ICE Processing Center in Adelanto, California*, (Sept. 27, 2018), https://www.oig.dhs.gov/sites/default/files/assets/Mga/2018/oig-18-86-sep18.pdf.

[76] Dept. Homeland Sec. Off. Inspector Gen., *ICE's Inspections and Monitoring of Detention Facilities Do Not Lead to Sustained Compliance or Systemic Improvements OIG-18-67*, (June 26, 2018) . https://www.oig.dhs.gov/sites/default/files/assets/2018-06/OIG-18-67-Jun18.pdf.

[77] *Letter from The GEO Group to Senator Warren* at 48 (Feb. 27, 2019), https://wearegeo.com/wp-content/uploads/2019/04/GEO-Full-Response-to-U.S.-Senator-Elizabeth-Warren-Letter.pdf.

[78] Dept. Homeland Sec. Off. Inspector Gen.,, *ICE Does Not Fully Use Contracting Tools to Hold Detention Facility Contractors Accountable for Failing to Meet Performance Standards,* at 5 (Jan. 29, 2019), https://www.oig.dhs.gov/sites/default/files/assets/2019-02/OIG-19-18-Jan19.pdf.

57. If a contractor fails to comply, ICE has the power to engage in informal resolution, issue a Discrepancy Report documenting deficiencies, require a corrective action plan, withhold payment, or impose financial penalties.[79] Yet it has rarely imposed financial penalties on its contractors. It did so only twice in a three-year period, "despite documenting thousands of instances of the facilities' failures to comply with detention standards."[80] "Instead of holding facilities accountable through financial penalties, ICE issued waivers to facilities with deficient conditions, seeking to exempt them from complying with certain standards."[81] Beyond contractual remedies, the government has the power get a new contractor or administer detention itself.[82] When Adelanto was subject to a period of intense public

[79] ECF 54-2 at ECF 51-55 (GEO responding to ICE's identification of deficiencies with corrective action plan); Dept. Homeland Sec. Off. Inspector Gen., *ICE Does Not Fully Use Contracting Tools to Hold Detention Facility Contractors Accountable for Failing to Meet Performance Standards,* at 6, (Jan. 29, 2019), https://www.oig.dhs.gov/sites/default/files/assets/2019-02/OIG-19-18-Jan19.pdf ("If the facility is not compliant, a Discrepancy Report may include a recommendation for financial penalties, such as a deduction in or withholding of ICE payment to the contractor").

[80] Dept. Homeland Sec. Off. Inspector Gen., *ICE Does Not Fully Use Contracting Tools to Hold Detention Facility Contractors Accountable for Failing to Meet Performance Standards,*(Jan. 29, 2019), https://www.oig.dhs.gov/sites/default/files/assets/2019-02/OIG-19-18-Jan19.pdf.

[81] Dept. Homeland Sec. Off. Inspector Gen., *ICE Does Not Fully Use Contracting Tools to Hold Detention Facility Contractors Accountable for Failing to Meet Performance Standards,* (Jan. 29, 2019), https://www.oig.dhs.gov/sites/default/files/assets/2019-02/OIG-19-18-Jan19.pdf.

[82] *See* Ryan J. Foley & Michael Biesecker, *ICE replaces contractor at largest detention camp after scrutiny of living conditions*, AP News (March 13, 2026), https://apnews.com/article/ice-detention-facility-camp-east-montana-conditions-contract-c7d369ed5fcbe19d87868b9b337f5211; Brittany Gibson, *ICE targets Plan B after backlash to mega-jails plan*, Axios (May 7, 2026), https://www.axios.com/2026/05/07/ice-immigrant-detention-private-contractors; *ICE Detention Reengineering Initiative*, https://www.governor.nh.gov/sites/g/files/ehbemt971/files/media/media_document/merrimack-nh-detention-reengineering-initiative-final.pdf (indicating ICE intends to purchase ten existing facilities where it operates).

scrutiny, ICE renewed the contract for only six-month periods at a time.[83] More recently, ICE has been in discussions with GEO to purchase GEO facilities.[84]

58. In sum, Defendants exercise pervasive operational control over Adelanto: they set the standards, employ on-site personnel to enforce them, approve staffing plans, adjudicate complaints about GEO staff, have inspection and contractual processes through which they could order remedial action, and have authority to enforce, extend, modify, or terminate the contract. ICE is not a passive purchaser of bed space—it is the entity that dictates and controls the conditions of confinement at Adelanto and bears responsibility for the treatment of every person detained there.

### C. As thousands are detained at Adelanto, detainees are subject to punitive conditions and medical neglect.

59. After the government launched sweeping immigration raids in June 2025, it began detaining the thousands of people it apprehended throughout the Central District, transferring many of them initially to B-18 and then to Adelanto for long-term detention.

60. Reports of unsafe and abusive conditions at Adelanto immediately surfaced.[85] Detained individuals were "forced to sleep on the floors of common areas without blankets and pillows."[86] Others "spent days in the facility before they were provided with clean clothes and underwear."[87] A longtime Adelanto staff member

---

[83] *Immigration Detention in California*, *supra* note 20, at 26 (describing six-month contract extensions).

[84] *See* Brittany Gibson, *ICE targets Plan B after backlash to mega-jails plan*, Axios (May 7, 2026), https://www.axios.com/2026/05/07/ice-immigrant-detention-private-contractors; *ICE Detention Reengineering Initiative*, https://www.governor.nh.gov/sites/g/files/ehbemt971/files/media/media_document/merrimack-nh-detention-reengineering-initiative-final.pdf (indicating ICE intends to purchase ten existing facilities where it operates); Ryan J. Foley & Michael Biesecker, *ICE replaces contractor at largest detention camp after scrutiny of living conditions*, AP News (March 13, 2026), https://apnews.com/article/ice-detention-facility-camp-east-montana-conditions-contract-c7d369ed5fcbe19d87868b9b337f5211.

[85] *See, e.g.*, Jarvie & Solis, *supra* note 5.

[86] *Id.*

[87] *Id.*

warned that the population surge was "dangerous[,]" as they "have no staffing for this and not enough experienced staff[,]" are "cutting way too many corners, and it affects the safety of everybody in there."[88]

61. After five members of Congress gained access to Adelanto on June 17, 2025, they reported that "[w]hat [they] saw and heard at Adelanto" was "disturbing" and "confirmed [their] worst fears" about "[a]larming reports of inhumane conditions and lack of access to legal counsel[.]"[89] "[D]etainees told [them] that they have gone days without changing their clothes, and they have been unable to use the telephone to call their families or a legal representative."[90] "Some detainees told lawmakers they were held inside Adelanto for 10 days without a change of clothes, underwear or towels."[91]

62. Days later, when DRC inspected Adelanto to investigate reports of abuse and neglect, it concluded—as it had before—that conditions were "alarming" and "that ICE and GEO Group are subjecting people with disabilities to abuse and neglect."[92]

63. DRC identified urgent health and safety concerns and widespread rights violations, including: "(1) inadequate access to medical treatment, such as life-saving medication and wound care, and exposure to widespread respiratory illnesses; (2) inadequate access to food and water, including extreme delays in meal distribution, provision of food that results in significant health issues, and a shortage of drinking water; (3) inadequate access to clean clothes, with many remaining in soiled clothing for long periods of time; and (4) minimal opportunities to contact family."[93]

---

[88] *Id.*
[89] *Reps. Chu, Sánchez, Takano, Kamlager-Dove, and Rivas Successfully Gain Access to Adelanto ICE Facility, Demanding Accountability and Answers*, U.S. Congresswoman Judy Chu (June 17, 2025), https://chu.house.gov/media-center/press-releases/reps-chu-sanchez-takano-kamlager-dove-and-rivas-successfully-gain.
[90] *Id.*
[91] Jarvie & Solis, *supra* note 5.
[92] *They Treat Us Like Dogs in Cages, supra* note 6.
[93] *Id.*

64. In the fall of 2025, Ismael Ayala-Uribe and Gabriel Garcia Aviles—two individuals detained at Adelanto—suffered medical emergencies and died within weeks of one another after reportedly being denied proper treatment.[94] Following these deaths, forty-three members of Congress sent a letter to then-ICE Secretary Noem and Defendant Lyons expressing concern that the deaths "raise serious questions about ICE's ability to comply with basic detention standards, medical care protocols, and notification requirements, and underscore a pattern of gross negligence that demands immediate accountability."[95] In 2026, two more individuals at Adelanto died while in ICE custody: Alberto Gutierrez-Reyes, who had diabetes and high cholesterol, and José Guadalupe Ramos-Solano who had diabetes, hypertension, and hyperlipidemia.[96]

65. Despite the fact that detained individuals, advocates, journalists, and government entities have long sounded the alarm about poor conditions and deficient medical care, Defendants continued to detain more and more people at Adelanto. By November 2025, there were 1,786 people detained at Adelanto.[97]

---

[94] *See* James, *supra* note 8.

[95] *Letter from Members of Congress to Secretary Noem and Acting Director Lyons*, (Nov. 21, 2025), https://min.house.gov/sites/evo-subsites/min.house.gov/files/evo-media-document/11.21.25-dhs-detainee-deaths-oversight-letter.pdf [hereinafter *Nov. 2025 Congressional Letter*]; see also Rep. Judy Chu, Rep. *Chu Leads 31 Members Demanding Accountability Following Death of ICE Detainee* (Oct. 16, 2025), https://chu.house.gov/media-center/press-releases/rep-chu-leads-31-members-demandingaccountability-following-death-39.

[96] Coral Murphy Marcos, *Family of detainee who died under ICE custody says he was denied medical care*, The Guardian (Mar. 6, 2026), https://www.theguardian.com/us-news/2026/mar/06/detainee-died-ice-custody-california; Roque Planas, *José Guadalupe Ramos, a Mexican national, dies in ICE detention in LA*, The Guardian (Mar. 30, 2026), https://www.theguardian.com/us-news/2026/mar/30/mexican-man-dies-ice-detention-los-angeles.

[97] *See TRAC Report, supra* note 16. Even Defendant ICE's internal inspection department noted the influx of detainees may have contributed to declining compliance with federal detention standards. *See* U.S. Immigr. & Customs Enf't Off. Prof. Resp., *Adelanto ICE Processing Center Inspection 2025-001-082* (Sept. 2025) ("In January 2025, a federal judge lifted a COVID era intake ban, and the facility reopened in June 2025, going from approximately 400 detainees to 1800 overnight. The sudden influx may have contributed to the rise in deficiencies.").

66. The massive influx of people at Adelanto has intensified the urgency of concerns about the health and safety of detained individuals. Among other dire issues, Defendants subject the nearly two thousand detained individuals at Adelanto to: (1) inadequate medical care; (2) a lack of reasonable accommodations; and (3) punitive conditions that are worse than prison, including being forced to spend hours locked in small cells, in unsanitary conditions, without access to clean drinking water and sufficient food, stuck with a futile grievance process, and subjected to coercive and retaliatory practices.

**1. <u>Medical Care at Adelanto is Grossly Inadequate and Dangerous</u>**

67. Defendants fail to provide adequate medical care as required by law and by their own policies, subjecting numerous detained individuals to shocking levels of medical neglect and a deliberate indifference that exposes people in their custody to risk of serious illness and even death.[98]

68. Civil immigration detainees are entitled to adequate medical care. *Doe v. Kelly*, 878 F.3d 710, 722 (9th Cir. 2017). Facilities must "provide a system of ready access to adequate medical care[,]" in which patients can alert medical staff to their problems and staff are competent enough to diagnose and treat those problems or refer patients to others who can. *Hoptowit v. Ray*, 682 F.2d 1237, 1253 (9th Cir. 1982).

69. The very nature of detention is harmful to human health, and detained immigrants are likely to have health conditions requiring care.[99] Yet Defendants do

[98] *PBNDS, supra* note 26, at 257-59 (providing standards for medical care, including "access to appropriate and necessary medical, dental and mental health care, including emergency services" "provided by a sufficient number of appropriately trained and qualified personnel").

[99] See Caitlin Patler et al., The health-related experiences of detained immigrants with and without mental illness, 11 J. Migration & Health (2025), https://doi.org/10.1016/j.jmh.2025.100302 (evaluating health dangers of immigrant detention); Altaf Saadi et al., Duration in Immigration Detention and Health Harms, JAMA Network (2025), https://jamanetwork.com/journals/jamanetworkopen/fullarticle/2829506 (same); Patler & Saadi, Risk of Poor Outcomes with COVID-19 Among U.S. Detained Immigrants: A Cross-Sectional Study, J. Immigr. Minority Health 23, 863–866 (2021), https://doi.org/10.1007/s10903-021-01173-z ("Among 529 detained

not have proper, functioning systems for providing medical care at Adelanto. Specifically, they lack the following systems, all of which are required by law: (1) a medical intake screening process to identify emergencies, contagious diseases, and other health and medication needs at the outset;[100] (2) a sick call system for evaluating, triaging, and responding to detainees who are sick and request care;[101] (3) a proper system for responding to emergencies promptly;[102] (4) a proper system for providing consistent access to prescription medication;[103] and (5) sufficient competent staff to administer these systems, respond to medical needs, and properly diagnose and treat medical issues.[104]

70. Under their own standards, Defendants are required to provide, among other forms of care, "access to a continuum of health care services, including screening, prevention, health education, diagnosis and treatment," "[t]wenty-four hour emergency medical and mental health services[,]" and treatment, monitoring, and care for those with chronic conditions.[105] They are also required to comply with

immigrants, 42.5% had at least one chronic health condition; 15.5% had multiple chronic conditions.").

[100] Proper intake screening as a component of constitutionally adequate medical care is well-established. *Pablo Sequen v. Albarran*, 810 F. Supp. 3d 1084, 1131 (N.D. Cal. 2025) (citing *Doe v. Kelly*, 878 F.3d 710, 722–23 (9th Cir. 2017)) ("the Ninth Circuit has repeatedly held that detainees must . . . receive medical intakes"); *Madrid v. Gomez*, 889 F. Supp. 1146, 1204-05 (N.D. Cal. 1995) (intake screening).

[101] Detention facilities must "provide a system of ready access to adequate medical care." *Hoptowit v. Ray*, 682 F.2d 1237, 1253 (9th Cir. 1982).

[102] "[T]he [facility] must provide an adequate system for responding to emergencies." *Hoptowit*, 682 F.2d at 1253. "If outside facilities are too remote or too inaccessible to handle emergencies promptly and adequately, then the prison must provide adequate facilities and staff to handle emergencies within the prison." *Id.*

[103] Constitutionally adequate medical care includes the right to access needed medication. *Pablo Sequen*, 810 F. Supp. 3d at 1131 (N.D. Cal. 2025); *Lopez v. Smith*, 203 F.3d 1122, 1132 (9th Cir. 2000); *Coleman*, 912 F. Supp. at 1309–10.

[104] "Access to the medical staff has no meaning if the medical staff is not competent to deal with the prisoners' problems. The medical staff must be competent to examine prisoners and diagnose illnesses." *Hoptowit*, 682 F.2d at 1253. *See also Ruiz v. ICE*, No. 3:25-CV-09757-MMC, 2026 WL 851980, at *7 (N.D. Cal. Mar. 27, 2026) (ordering adequate and qualified staff); *Plata v. Schwarzenegger*, 2005 WL 2932253, at *5–12 (N.D. Cal. Oct. 3, 2005) (same); *Madrid*, 889 F. Supp. at 1257 (same); *Jensen v. Shinn*, 609 F. Supp. 3d 789, 865 (D. Ariz. 2022) (same).

[105] *PBNDS*, *supra* note 26, at 257–59.

"Centers for Disease Control and Prevention (CDC) guidelines for the prevention and control of infectious and communicable diseases."[106]

a. Lack of Medical Intake Screening Process

71. Defendants lack a proper, functioning, and comprehensive medical intake screening process. The lack of screening and adequate treatment at Adelanto has resulted in several outbreaks of contagious diseases among detained individuals. In the fall of 2025, several detained individuals contracted staph infections. Defendants did not provide disinfectants during the staph outbreak. About fifteen individuals were hospitalized. Mr. Salazar Garza was among those hospitalized. Despite his repeated complaints of swelling in his arm, Adelanto staff waited three days—until his entire arm was swollen and discolored—before transporting him to the hospital for surgery. While he was recovering from the infection, he remained handcuffed to his hospital bed for nearly a week.

72. In December 2025, another unit was quarantined due to an outbreak of chickenpox. Many people are constantly sick with some sort of virus; they have wet coughs and what sounds like persistent sinus infections, but often go without medicine. Defendants' failure to implement proper screening and sanitation measures to prevent and contain disease, coupled with their failure to adequately address and treat outbreaks when they do happen, jeopardize the health of all detained individuals.

b. Lack of Timely and Ongoing Medical Care

73. Defendants lack a functioning system at Adelanto whereby detainees can submit requests for medical attention and Defendants will provide timely medical care, including urgent care, specialty care, and treatment for chronic medical conditions. As a direct result of Defendants' failure to implement a functioning system, there is a pervasive lack of medical treatment at Adelanto, with detained individuals waiting days, weeks, or months for time-sensitive medical treatment.

[106] *Id.*

74. According to Defendants' own policies, detained individuals are supposed to be "able to request health services on a daily basis" and "receive timely follow up."[107] Detained individuals are told to fill out a request form, in writing or via a tablet. However, these requests are sometimes not available on paper, or staff do not come by to pick them up for several days. And given that units of about eighty detained individuals share two tablets, there can be a long wait to get access to the tablets.

75. Even if medical care is provided, because Adelanto lacks an adequate medical system and sufficient competent staff, such care often occurs only after a long delay, and the quality of care is inadequate. For instance, Plaintiff J.M. suffers from cardiac arrhythmia, and after an off-site cardiologist recommended he wear a monitor for his heart, staff at Adelanto required him to stay in medical solitary if he wanted to use it. After about five days alone, he could not take the isolation anymore and asked to be returned to his cell without completing the full heart monitor observation the doctor had recommended.

76. In December 2025, Plaintiff Salazar Garza became ill with a fever and was vomiting, at times feeling too weak to stand and even slipping in and out of consciousness. For four days, and despite repeated requests that he be taken to the medical unit, he stayed in his four-man cell, vomiting into the toilet by his bed at all hours of the day and night. When he was finally transported to the medical unit, he was prescribed a special diet that was not available for another two days. By the time he recovered from the illness, he had lost eleven pounds.

77. Another detained individual had rectal pain and constipation that was so intense he had difficulty standing or using the bathroom—yet it was months before they gave him a painkiller stronger than Tylenol, and nearly half a year before he had

[107] *PBNDS, supra* note 26, at 257.

a colonoscopy. When he complained about his pain, which he described as eight or nine out of ten, one of the guards in his unit threatened to pepper spray him.

78. Plaintiff L.T.'s spinal tumor was diagnosed approximately three months prior to his detention. Because the tumor is next to a spinal nerve, he was told that if it grows and is left untreated, it has the potential to cause a rapid onset of serious, debilitating effects, including complete loss of control in his lower body and bowels. He also has an abdominal aneurysm that requires monitoring. Although he was recently taken for a stomach and spinal ultrasound at Adelanto, he has not received the results and worries that the tumor or aneurysm could be worsening without treatment and proper monitoring via CT scans.

79. While Plaintiff Salazar Garza was at DVA, a detained individual experiencing a psychiatric episode bit off part of his finger. When he was transferred to Adelanto months later, his hand was so swollen and painful that he found it difficult to tie his shoes and brush his teeth. For months, medical staff at Adelanto did not address what turned out to be a severe infection, and one night while Mr. Salazar Garza was sleeping, the end of his finger burst, expelling black pus. He notified a guard, but he was not brought to the medical unit, or even given materials to clean and bandage the wound. It was days before medical staff provided antibiotics, and even longer before he was transported to the local hospital for treatment. Plaintiff Salazar Garza still experiences a changed sensation in his hand, as well as tingling down his hand and forearm, and he fears repeat infections.

c. Lack of System for Responding to Emergencies Promptly

80. Defendants lack a proper system for promptly responding to medical emergencies and routinely fail to do so—and when they do, the care they provide is often substandard.

81. When detained individuals faint or collapse it often takes a long time for the medical team to respond, if they respond at all—even where people are bleeding or have urinated themselves. Detained individuals report that people faint often.

82. On one occasion, Plaintiff Mesrobian, who suffers from epilepsy, experienced a seizure and hit his head. Instead of providing immediate care, staff locked him in a medical holding tank with no medical supervision. By the time medical staff came to check on him, he was having another epileptic episode.

83. On another occasion, after having a seizure, Plaintiff Mesrobian was taken to the medical segregation unit for three days, which he described as feeling like solitary confinement. At one point during his isolation, he had a seizure due to his epilepsy.

84. During the first or second week of January 2026, Plaintiff Mesrobian was again hospitalized for seizures. The seizure began while he was lying on his bed. Guards then dragged him off of his bed and onto the floor where he remained for three to five minutes, hitting his head on the bunks while he seized. For about twenty-five minutes, he was not administered oxygen and by the time the Emergency Medical Technicians from the hospital arrived, he was turning purple from lack of oxygen. When he regained consciousness, his mouth was sore from having bitten his tongue. He was taken to the hospital and brought back to Adelanto the same day. The next morning, he had another seizure and was hospitalized for five days.

85. On multiple occasions, detained individuals who have experienced acute medical issues have been removed from the unit and never returned.

d. <u>Lack of System for Consistently Administering Medication</u>

86. Defendants also lack a proper, functioning system for providing consistent, timely access to prescription medication. Defendants routinely fail to provide detained individuals with the medication they need to manage their medical conditions.[108] One detained individual who has high blood pressure and diabetes was not given consistent access to her medication and was hospitalized several times.[109]

[108] *They Treat Us Like Dogs in Cages, supra* note 6.

[109] George B. Sánchez-Tello, *After ICE arrests come health scares for the detained*, CalMatters (Dec. 2, 2025), https://calmatters.org/commentary/2025/12/ice-health-scares-for-detained/.

Another "reported that he needed to take diabetes medication twice per day but had only received it twice over the ten days he had been detained."[110] Mr. Mesrobian has sometimes missed his anti-seizure medication because he is asked to take his pills before he has been given food to take with the medication, and he suffers serious side effects like vertigo, nausea, and abdominal pain if he takes the medication on an empty stomach. Because his medication is most effective when taken regularly, missed doses put Plaintiff Mesrobian at increased risk of life-threatening seizures.

87. Plaintiff L.T. has high blood pressure and diabetes and needs numerous medications each day—yet he often receives his medications at the wrong times. While he is supposed to receive the medications twice a day, his evening dose is often delayed and he will not receive it until midnight or the next day. In addition, although he was previously receiving physical therapy and cortisol shots in his spine to help with pain management and recovery from his stroke, since being detained, he has not received physical therapy or cortisol shots and is not being rehabilitated from his stroke.

e. <u>Lack of Sufficient Competent Staff</u>

88. Adelanto suffers from staffing shortages impacting the medical and mental health care that Defendants are required to provide under the Constitution and their own standards. In June 2025, Adelanto staff reported that there were only three psychologists for a population of nearly 1,400, and admitted that "the facility was not adequately staffed to respond to the sudden surge."[111] During a July 2025 inspection, the State of California learned that to serve a population of over two thousand, Adelanto had only five full-time and two part-time medical staff: one medical director, one full-time physician, one part-time physician, and three full-time and one part-time (on an as-needed basis) Advanced Practitioner Providers (meaning Nurse Practitioners and Physician Assistants). ECF 44-1 at 10–11. These staff also serve

[110] *They Treat Us Like Dogs in Cages, supra* note 6.
[111] *They Treat Us Like Dogs in Cages, supra* note 6.

DVA. *Id.* California's immigration detention expert and medical expert found that detention staffing levels were inadequate to meet the needs of the surge of individuals housed at Adelanto as of July 8, 2025. *Id.* at 9–10. In response to the state's request, Adelanto was unable to "to produce assurances that staffing levels had been increased to correspond with the increase in population." *Id.* at 11. The lack of staffing places the health and lives of detained individuals at Adelanto at serious risk.

f. <u>The Lack of Medical Care Systems Endangers All Detainees</u>

89. Defendants' failure to provide medical care can have fatal consequences. On September 22, 2025, 39-year-old Ismael Ayala-Uribe died after receiving deficient medical care at Adelanto. Staff were aware that he was having a medical emergency and flagged his condition as potentially life-threatening. But after being seen by Adelanto's internal medical team, he was taken back to his cell. He was not transported to the hospital until three days later, where he died.[112]

90. Just a month later, 56-year-old Gabriel Garcia-Aviles died after being detained at Adelanto for only about a week.[113] His cause of death remains unclear.

91. In 2026, two more detained individuals died. Forty-eight-year-old Alberto Gutierrez Reyes died in late February 2026 after he was denied medical care.[114] At the end of March 2026, 52-year-old José Guadalupe Ramos-Solano, who

---

[112] *See* James, *supra* note 8; U.S. Immigr. & Customs Enf't, Detainee Death Report: AYALA Uribe, Ismael (2025), https://www.ice.gov/doclib/foia/reports/ddrIsmaelUribeAyala.pdf [hereinafter Death Report]; Wendy Fry & Jeanne Kuang, *California gave counties power to inspect ICE detention centers. They're not using it*, L.A. Times (Oct. 3, 2025), https://www.latimes.com/california/story/2025-10-03/california-gave-counties-power-to-inspect-ice-detention-centers-theyre-not-using-it.

[113] James, *supra* note 8; Izzy Ramirez, *Ten Days After Adelanto Internment, This Beloved Grandfather Died In Custody*, L.A. Taco (Nov. 4, 2025), https://lataco.com/second-death-adelanto-custody.

[114] Coral Murphy Marcos, *Family of detainee who died under ICE custody says he was denied medical care*, The Guardian (Mar. 6, 2026), https://www.theguardian.com/us-news/2026/mar/06/detainee-died-ice-custody-california.

suffered from diabetes, hypertension, and hyperlipidemia, was found unresponsive in his bed and pronounced dead.[115]

92. As a result of the lack of systems for healthcare provision and inadequate staffing, the Individual Plaintiffs and the putative class suffer ongoing and imminent harm. Individuals who have ongoing medical issues have not received treatment. And those who are not currently suffering from a medical issue are endangered by the lack of functioning systems and risk harm daily—the lack of a proper medical screening process, for instance, means that any individual could be subjected to a contagious disease, and any individual could experience a sudden injury or illness requiring timely emergency care.[116] *See Parsons v. Ryan*, 754 F.3d 657, 679 (9th Cir. 2014) (citing *Brown v. Plata*, 563 U.S. 493, 531 (2011)) ("[I]nadequate health care in a prison system endangers every inmate.").

93. This case is not about Defendants' failure to provide medical care to any one individual on any one occasion—it is about Defendants' failure to implement proper, functioning systems to provide constitutionally adequate medical care.[117] *See Brown*, 563 U.S. at 506. Plaintiffs allege systemwide deficiencies in the provision of medical and mental health care that, taken as a whole, subject sick and mentally ill prisoners in California to 'substantial risk of serious harm' and cause the delivery of care in the prisons to fall below the evolving standards of decency that mark the progress of a maturing society."); *Parsons*, 754 F.3d at 673, 690 (affirming the district court's finding that "the problems identified in the provision of health care are not

---

[115] Roque Planas, *José Guadalupe Ramos, a Mexican national, dies in ICE detention in LA*, The Guardian (Mar. 30, 2026), https://www.theguardian.com/us-news/2026/mar/30/mexican-man-dies-ice-detention-los-angeles.

[116] As discussed above, there have been staph and chickenpox outbreaks that have been poorly contained.

[117] Issues with the medical care system at Adelanto may be attributable in part to ICE's months-long failure to pay outside medical providers for detainee care. *See* https://www.cbsnews.com/atlanta/news/ice-stopped-paying-for-detainee-medical-care-as-population-surged/.

merely isolated instances but, rather, examples of systemic deficiencies that expose all inmates to a substantial risk of serious harm.").

**2. Defendants Fail to Identify Disabilities and Provide Reasonable Accommodations to Disabled Detained Individuals**

94. Under Defendants' own standards, Defendants are required to "act affirmatively to prevent disability discrimination."[118] This includes identifying obvious disabilities and providing reasonable accommodations to those who request assistance with their disability.[119]

95. Under the Rehabilitation Act, Defendants have an affirmative duty to "assess the potential accommodation needs of [detainees]" and provide reasonable accommodations. *Pierce v. District of Columbia*, 128 F. Supp. 3d 250, 272 (D.D.C. 2015); *Updike v. Multnomah Cnty.*, 870 F.3d 939, 949 (9th Cir. 2017) (citations omitted) ("Title II and § 504 include an affirmative obligation for public entities to make benefits, services, and programs accessible to people with disabilities.").

96. According to DRC, the state agency responsible for protecting people with disabilities, "[s]everal individuals with disabilities reported that they were not being afforded reasonable accommodations."[120] It urged Defendants "to immediately address these issues and prevent further abuse and neglect of people with disabilities."[121]

97. Since the agency's inspection in June, Defendants have persisted in failing to properly identify disabilities and provide accommodations. Mr. Mesrobian has been left alone on multiple occasions despite his risk of seizures, leaving him to

[118] *See PBNDS, supra* note 26, at 344–45.
[119] *Id.* at 348 ("[I]t is incumbent upon facility staff to identify detainees with impairments that are open, obvious, and apparent. Identification of detainees with potential disabilities (i.e., impairments that are open, obvious, and apparent) may occur through medical or intake screenings, or through direct observation. Staff should be particularly vigilant for impairments that affect a detainee's mobility or ability to communicate.").
[120] *They Treat Us Like Dogs in Cages, supra* note 6.
[121] *Id.*

suffer seizures without any assistance. Elderly detained individuals with mobility issues are made to sleep on top bunks despite having obvious difficulty climbing up a ladder. One elderly detained individual has fallen from the top bunk several times. Although detained individuals have raised this issue with Adelanto staff, Defendants have made no effort to accommodate these individuals or to help detained individuals with obvious mobility issues.

98. Mr. L.T., who has speech and mobility limitations resulting from a stroke about three years ago, reports that there is no help for people like him—he has several disabilities for which Defendants have failed to provide reasonable accommodations and assistance. Although Mr. L.T. explained his mobility issues when he first entered Adelanto, staff initially placed him on the second floor, requiring him to climb stairs to get to his cell. When he is taken out of the facility—for example, to go to court or medical appointments—he is handcuffed and unable to use his cane, and his feet are sometimes chained. Once, while being transported in chains, he fell and scraped himself, and he worries about falling again.

99. In addition, due to his disability, Mr. L.T. can only shower in the one shower that has a bench. When that shower is broken, staff forbid him from bringing a plastic chair to a different shower.

100. Mr. L.T. also suffers from sleep apnea, a serious sleep disorder where he does not get enough oxygen to his brain while he sleeps. Mr. L.T. requested a sleep apnea machine when he initially arrived at Adelanto because without it, he is at a higher risk for heart attack and stroke. Again, the initial doctor he saw during his intake said that it was a good idea for him to be issued a sleep apnea machine, but a "higher up" doctor said that due to protocol, he could not receive one.

101. Due to his bunion, for which he is awaiting surgery, Mr. Salazar Garza requires orthopedic shoes to alleviate pain in his foot and leg when he stands and walks. He received a pair of orthopedic shoes at DVA, but by the time he was moved

to Adelanto, the shoes were worn with holes. Despite his repeated requests, staff at Adelanto have still not provided replacement orthopedic shoes.

102. Another detained individual who arrived at Adelanto at the beginning of December had two slipped disks in his spine, causing constant pain even while sitting and lying down. The pain was often so severe he could not sleep. When he requested an additional mattress to help with the pain, he was denied. Before detention, he was managing his pain and other health conditions with several medications, all of which were discontinued when he arrived at Adelanto.

103. Defendants also fail to accommodate mental health disabilities. In Mr. Salazar Garza's unit, there is a detained individual who speaks very rarely and has difficulty maintaining basic hygiene, but Adelanto staff do not provide regular support. Mr. Salazar Garza and other people in his unit have taken it upon themselves to assist this individual with keeping his bunk area clean—including clearing out accumulated trash and moldy food. On another occasion, the guards brought an individual who was visibly experiencing mental health issues to a new unit, and rather than offering support to the individual, said to the other detained individuals: "have fun."

**3. <u>Defendants Subject Detained Individuals to Punitive Conditions</u>**

104. The individuals detained at Adelanto are awaiting civil immigration proceedings. *See Zadvydas v. Davis*, 533 U.S. 678, 690 (2001) (characterizing immigration detention as civil detention). Yet Defendants subject them to punitive conditions which are similar—and in many respects worse, and more restrictive—than those in state or federal prison. The conditions are thus presumptively unconstitutional. *See Jones v. Blanas*, 393 F.3d 918, 932 (9th Cir. 2004).

105. Defendants have suggested that the purpose of detention is in part to punish immigrant detained individuals.[122] Defendant ICE has emphasized that

---

[122] *See, e.g.*, U.S. Dep't of Homeland Sec., *DHS Announces Nationwide and International Ad Campaign Warning Illegal Aliens to Self-Deport and Stay Out* (Feb.

immigrants who do not self-deport will be detained and may spend several months in detention.[123] Defendant ICE's website warns: "If ICE arrests you because you didn't turn yourself in, the agency will detain and remove you — and you may have to spend several months in detention while you're awaiting removal."[124] Another fact sheet reads: "If you don't self-deport, it's not a matter of if ICE finds you. It's a matter of when. . . . ICE will put you in a detention facility. Some people remain in detention for months."[125]

106. Many detained individuals previously incarcerated in state or federal facilities find that being detained at Adelanto is worse than being in prison. Conditions at Adelanto evince not only blatant disregard for detained individuals and their health, but an intention to punish them. The restrictions imposed on detained individuals severely curtail their freedom and amount to punishment: detained individuals are locked in their cells overnight and multiple times each day, constantly surrounded by armed guards, forced to wear prison-like uniforms, have no privacy when they use the toilet or shower, and spend very little time outdoors. They are housed in unsanitary conditions, deprived of sufficient food and clean drinking water, and denied medical care and disability accommodations. The oppressive restrictions on their autonomy, arbitrary rules, and constant monitoring result in needless discipline, confiscation of their limited possessions, and excessive use of solitary confinement. Defendants pressure detained individuals to agree to deportation and retaliate against detained individuals who speak up about conditions.

---

17, 2025), https://www.dhs.gov/news/2025/02/17/dhs-announces-ad-campaign-warning-illegal-aliens-self-deport-and-stay-out; U.S. Dep't of Homeland Sec., *CBP Home: Assistance to Voluntarily Deport*, https://www.dhs.gov/cbphome (noting ICE will deprioritize detaining those who intend to self-deport).

[123] *See* U.S. Immigr. & Customs Enf't, *Self-Deportation* (July 16, 2025), https://www.ice.gov/self-deportation.

[124] *Id.*

[125] U.S. Immigr. & Customs Enf't, *Self-Deportation Fact Sheet* (2025). https://www.ice.gov/doclib/selfDeportation/selfDeportationFactSheet.pdf.

107. Under these circumstances, Defendants' deliberate indifference to detained individuals' basic needs, their imposition of substandard, inhumane conditions, and their use of retaliatory practices amount to punitive conditions.

a. <u>Detained Individuals Are Confined to Their Cells for Hours, Without Sufficient Access to the Outdoors</u>

108. Individuals detained at Adelanto live in cells that house up to eight people. They are issued one mattress, one sheet and one blanket—all of which are thin. The toilet in the cell, just feet from the beds, does not have a privacy curtain.



*An eight-bed cell at Adelanto West. The facility issues mattresses to individuals to place on top of the blue metal bed frames.*[126]

109. During the day, detained individuals can generally leave their cells to spend time in a communal dayroom, where the only furniture is metal tables and seats bolted to the floor.

110. When detained people leave the dayroom—for example, to walk to lunch in the cafeteria—they must walk in a single file accompanied by guards.

---

126 *They Treat Us Like Dogs in Cages*, *supra* note 6.

111. Every day is punctuated by a series of headcounts, where detainees are locked in their cells for at least an hour—often longer—while staff make rounds. Headcounts at Adelanto are more frequent than those in prison. Detained individuals are locked in their cells for a headcount between three and five times each day, for example at 7:30 a.m., 11:00 a.m., 6:30 p.m., 11:00 p.m., and 1:00 a.m. After the last count at 1:00 a.m., detained individuals are locked in their cells until morning.

112. During a headcount, detained individuals cannot leave their cells to get drinking water, take a shower, make a phone call, or get food. On information and belief, additional lockdowns on top of the headcounts can sometimes take place up to three times per week. By contrast, California's prison system requires only two headcounts during waking hours.[127] Detained individuals who have served time in state prison confirmed that state facilities typically perform headcounts only twice per day, and that they take less than an hour to complete.

113. Unlike at state and federal prisons where there is often access to an outdoor yard for multiple hours a day—even several times a day—at Adelanto, detained individuals can only access the outdoor yard for one hour per day.[128] Even a few years ago, detained individuals at Adelanto reportedly had access to the yard for four hours a day.[129] Detained individuals feel claustrophobic and hopeless due to the minimal yard time. Compounding this deprivation, while people in state or federal prison can participate in jobs and programs, there are no in-person programs at Adelanto.

114. Defendants also often arbitrarily cancel access to the outdoors. After someone allegedly attempted to escape the yard in the fall of 2025, detained

---

[127] *See* Cal. Dep't Corr. & Rehab. (CDCR), Department Operations Manual, § 52020.4.1 Frequency of Counts (requiring two "positive counts" of each incarcerated person during waking hours).

[128] Detainees are otherwise given limited access to a "mini-yard," a small area that is open above but enclosed by tall concrete walls.

[129] Kelsey Brugger, *Among the Detainees at Adelanto*, Santa Barbara Indep. (Aug. 24, 2017), https://www.independent.com/2017/08/24/among-detainees-adelanto/.

individuals at Adelanto West were not permitted to use the yard for six weeks. Staff claimed the reason they could not go outside was because there was ongoing construction. Detained individuals saw no construction vehicles during that time. When they were finally allowed to go back outside, the only difference the detained individuals observed was barbed wire on top of the yard. Several detained individuals felt that being deprived of yard access for so long felt like unwarranted punishment for something they did not do. More than once, yard has been cancelled because there is insufficient staff.

b. Defendants Fail to Provide Clean Drinking Water and Adequate Food and Nutrition

115. Defendants deprive detained individuals of basic needs. Detained individuals have "safety concerns about the water from sinks and drinking fountains," which they described was "cloudy and has an unusual taste."[130] Others have remarked that it tastes like chlorine or Clorox.[131] More recently, detained individuals have noticed the tap water is sometimes brown in color and tastes foul. On information and belief, the sink water is not consistently potable.

116. Adelanto staff are aware of problems with the tap water, as they supply the jugs of water in the dayroom for detained people to drink. But the water jugs themselves are often dirty—littered with dirt, residue, hair, sand, bugs, or even mold. When detained individuals raise questions about the potability of the water and cleanliness of the jugs, staff will sometimes clean the jugs for a few days, but after that, the jugs inevitably wind up dirty again.

117. In addition, detained individuals have limited access to drinking water, in violation of the PBNDS.[132] Drinking water runs out frequently. At Adelanto East, for instance, a unit of approximately 114 people receives one ten-gallon container of

---

[130] *They Treat Us Like Dogs in Cages, supra* note 6.
[131] Jarvie & Solis, *supra* note 5.
[132] *See PBNDS, supra* note 26, at 232 ("Clean, potable drinking water must be available.").

water twice a day. This means that each detained individual is only able to drink about one large glass of water per day, a fraction of recommended daily intake. They sometimes go four or five hours without receiving water and are left thirsty in the desert heat. Guards complain that detained individuals ask for water too often.

118. While in medical observation, Plaintiff J.M. asked for water and a nurse responded that she could not give him water because she was busy. After two hours with no response from the nurse, he asked again and was again denied water. The nurse responded: "Don't start with your bullshit, there is water in the sink," indicating he should drink from the unfiltered tap water.

119. In November 2025, several detained individuals in one unit experienced itchiness across their bodies—even in their scalp. After three or four days, Plaintiff Mesrobian took a clear plastic bottle and held it under the shower and saw that the water in the showers was brown. After letting the guards know, it took four days for staff to fix the issue. Only after the water was resolved did their skin condition begin to clear up.

120. Detained individuals regularly do not receive enough food, and the food they do receive is inadequate and insufficiently nutritious, in violation of Defendants' own policies.[133] For instance, detained individuals might receive a small carton of milk with a scoop of cereal for breakfast, a small sandwich for lunch, and handful-sized portions of rice and lentils for dinner. Other typical offerings include powdered egg, rice, dry or broken tortillas, and baloney. Many detained individuals go hungry. Mr. J.M. lost approximately fifteen pounds at Adelanto.

[133] *See PBNDS, supra* note 26, at 228 (requiring the provision of "a nutritionally balanced diet," including special diets for religious accommodation); *id.* at 234 ("A registered dietitian shall conduct a complete nutritional analysis that meets U.S. Recommended Daily Allowances (RDA), at least yearly, of every master-cycle menu planned by the FSA. The dietitian must certify menus before they are incorporated into the food service program. If necessary, the FSA shall modify the menu in response to the nutritional analysis to ensure nutritional adequacy.").

121. The food at Adelanto is sometimes uncooked or spoiled. Detained individuals were once served "foul-smelling" lettuce. The fruit is sometimes rotten, and the tuna and chicken are sometimes sour, causing stomachaches and diarrhea.

122. Although some detained individuals supplement their diets by purchasing additional food at the commissary, some detained individuals cannot afford this. Detained individuals who have served time in state or federal prison reported that prison food is cleaner and there is more variety.

123. The food that detained individuals receive is often mixed together. For instance, staff will serve detained individuals rice and beans on top of cake and salad, rather than beside the other items. This feels unnecessary and disrespectful to many detained people. For detained individuals with food allergies or religious dietary needs, mixing foods raises additional complications.

124. Kitchen staff at times do not wear masks when preparing and serving food, in violation of Defendants' own policies.[134] Detained individuals have seen rodent excrement in the kitchen, and flies, bugs, and dirty food in the cafeteria.

125. On several occasions, detained individuals have gotten food poisoning from the food, particularly items such as spoiled tuna or chicken. When detained individuals have reported concerns about food poisoning, staff have responded skeptically—and concerns about food quality and safety have gone unaddressed.

c. Defendants House Detained Individuals in Unsanitary Conditions and Fail to Maintain the Facility

126. Detained individuals are subjected to unsanitary conditions, and Defendants fail to adequately maintain the facility and its infrastructure. Detained individuals have seen mold and fungus growing on the bathroom walls and in their dormitories. The walls in Plaintiff L.T.'s unit were often wet, and black-colored mold

[134] *PBNDS, supra* note 26, at 228 (providing that meals shall be "presented in a sanitary and hygienic food service operation" that complies with "governmental health and safety codes" and protects detainees and staff from illness).

grows on the walls in more than one unit. Recently, facility staff painted over the black mold, but did not change any other conditions of the unit that make the walls moist, nor did they treat the walls for mold. When detained individuals put up towels or cardboard to protect themselves from the mold, guards confiscate these items, so detained individuals must sleep next to the mold.

127. Adelanto staff do not clean the facility regularly. Detained individuals must therefore clean their own bathrooms and showers. The bathrooms in the units do not contain trash cans and detained individuals were told by the guards that they are not allowed to have one. This has led to trash piling up in the restrooms.

128. The detained individuals who contracted staph infections believe they contracted the infection from the showers because they were not properly cleaned. Since then, another unit was quarantined because there was an outbreak of chickenpox, and another unit complained of an outbreak of mold.

129. There are showers that only have scalding hot water. For four months, detained individuals in one unit only had two working showers for eighty people. For the past several months, detained individuals have often had to take cold showers because hot water runs out. Shower stalls do not have curtains, meaning detained individuals shower in full view of one another and staff.

130. Detained individuals do not have consistent access to clean clothing. When detained individuals send items out for laundry, their clothes are frequently returned still wet, dirty, or with stains on them. Other times, their items are not returned at all. Defendants allow detained individuals to exchange clothing, but these items sometimes are dirty or have stains on them. In one case, an item in the purportedly clean exchange pile had blood stains from another detained individual.

131. The mattresses are thin and worn, leaking white dust, and are rarely replaced. The mattresses are so thin they cause bruising and back pain for some detained individuals. Detained individuals reported that the mattresses are of better quality in prison than at Adelanto.

132. On information and belief, the medical holding tank for detained individuals awaiting medical treatment is kept in poor condition. There is a toilet and soap dispenser in the tank, but no soap is provided to wash one's hands, and the toilet is filthy. The room is often dirty. On one occasion, Mr. Salazar Garza had to help staff clean up blood and other bodily fluids in the medical unit.

133. The facility is often so cold that the sheet and thin blanket each detained person has to sleep with is insufficient to keep them warm. In the women's section, they once ran out of blankets for four days.

134. In the room where detained people are brought prior to their court hearings, the temperature is extremely cold, and detained individuals are often forced to wait there for hours at a time, with no apparent justification.

d. Detained Individuals Are Separated From Their Loved Ones and Subject to Restrictive Visitation Policies

135. Separation from their families has been difficult for many detained individuals, and detained individuals feel that the rules governing visits are punitive. Given the government's campaign targeting immigrants, the immigrant families of those detained are often afraid to visit them at Adelanto. When families do visit, it is for one hour and detained individuals are often only allowed one short hug and kiss at the beginning of the visit. This is especially painful for detained parents whose children do not understand why they are unable to hug their parents. When one detained individual picked up his child, a guard threatened to write him up and take away visitation privileges. By contrast, in the state prison system, incarcerated individuals are allowed to hold their children.[135] Detained individuals and visitors are also not allowed to go to the restroom during a visit, otherwise their visit is subject to

[135] Cal. Dep't Corr. & Rehab., *In-Person Visiting Frequently Asked Questions*, https://www.cdcr.ca.gov/visitors/get-help/in-person-visiting-frequently-asked-questions/ (last visited Jan. 25, 2026) [hereinafter Cal. Corr. FAQ].

being suspended or cancelled. Detained individuals have shared that this feels cruel to them and their families who have travelled many hours to visit them.

136. Detained individuals also experience issues with communicating with family, lawyers, and their community. Unlike in state prison where detained individuals have their own handheld tablet for communication,[136] at Adelanto, there are few tablets split among all of the detained individuals in the unit, and detained individuals must compete to get time to speak to their loved ones.

137. Detained individuals must also pay to make phone calls or send text messages to communicate with their loved ones. A video call can cost around $0.21 per minute, meaning it costs $6 for one thirty-minute video call. These costs add up for detained individuals, the majority of whom are low-income, and are not able to earn money while in detention. The charge to contact family unnecessarily limits many detained individuals' contact with the outside world and negatively affects their mental health. Additionally, the tablets are sometimes broken or unavailable: for three or four days after Christmas in 2025, none of the phones or tablets were working and so none of the detained individuals were able to contact their families or attorneys. By contrast, in state prison, incarcerated people are allowed phone calls free of charge and fifteen minutes of free video calls from their tablet every two weeks.[137]

e. Defendants Ignore Detained Individuals' Grievances

138. According to Defendants' own standards relating to grievances, "[d]etainees shall be able to file formal grievances, including medical grievances, and shall receive written responses, including the basis for the decision, in a timely manner."[138] The PBNDS also require "three levels of formal grievance review" and

---

[136] Kate Wolffe, *Almost all people incarcerated in California now have free tablets*, CapRadio (July 19, 2023), https://www.capradio.org/articles/2023/07/19/almost-all-people-incarcerated-in-california-now-have-free-tablets/#:~:text=Since%20August%202021%2C%20California's%20Department,people%20incarcerated%20across%20the%20state.
[137] *Cal. Corr. FAQ, supra* note 139.
[138] *PBNDS, supra* note 26, at 414.

that "[e]ach facility shall maintain a detained individual grievance log that shall be subject to regular inspection by the Field Office Director and ICE headquarters staff."[139] Upon information and belief, Defendants do not follow the Grievance System guidelines required by the PBNDS.

139. Defendants fail to meet these standards. Adelanto's grievance process is slow and often futile. During a September 2025 inspection, the ICE Office of Detention Oversight ("ODO") noted issues with the grievance process and compliance with federal detention standards at Adelanto, noting that in several cases staff "did not provide a decision within five days of receipt of the appeal[,]" "did not note the outcome of the adjudication[,]" and "did not forward the grievance nor support documentation to the facility administrator[.]"[140]

140. Detained individuals routinely wait more than a month for a response after filing a grievance. When detained individuals complain about substandard conditions, medical issues, or misconduct, the underlying issues go unresolved even if staff do eventually follow up. In some cases, staff have pressured detained individuals into withdrawing their grievances in order to receive help. When Mr. Mesrobian submitted a grievance about issues receiving his medication, a staff member told him they would informally resolve the problem if he withdrew his grievance. Hoping that his access to medication would improve, Mr. Mesrobian agreed to sign a blank piece of paper without being given the chance to read the grievance withdrawal form. His issues regarding receiving his medications have continued.

---

[139] *Id.* at 417, 419.
[140] ICE Off. Pro. Resp., Off. Det. Oversight, *Adelanto ICE Processing Center Inspection 2025-001-082* 6 (Sept. 2025), https://www.ice.gov/doclib/foia/odo-compliance-inspections/AdelantoProcessingCenterAdelantoCA-September-16-18-2025.pdf [hereinafter *September 2025 Report*].

141. There is a TV that is supposed to broadcast Know Your Rights information for detained individuals, including the facility's policies, but that TV has been turned off permanently.

f. Defendants Punish Detained Individuals through Excessive Use of Solitary Confinement

142. According to ICE's own data, there were 76 people placed in solitary at Adelanto for one or more days during March 2026, and 72 during February 2026.[141]

143. Solitary confinement at Adelanto is more restrictive than in state prison, and feels deeply isolating. While in solitary confinement, detained individuals cannot leave their cell all day, except for one hour to get water, heat up food, make a phone call, shower, or do anything else outside of their cell.

144. Detained individuals are allowed to take only one sixteen-ounce cup of water into their solitary cell. They do not have time to clean their cells themselves during their one hour outside their cell, so the cells are rarely cleaned and remain dirty. They cannot receive visits from their families. While in the solitary yard, which is the size of one cell and pictured below, they are unable to eat, drink water, or use the bathroom.

[141] U.S. Immigr. & Customs Enf't, *ICE Detention Statistics FY 2026 YTD* (Apr. 9, 2026), available at https://www.ice.gov/detain/detention-management.




*Concrete, fenced-in recreation area for disciplinary segregation unit*[142]

145. By contrast, the state prison system allows people who have been placed in solitary for violent assault to spend at least twenty hours outside of their cells each week, including ten hours of outdoor recreation.[143] Those incarcerated in state prison have access to reading materials, can make regular telephone calls, can have visits with loved ones, and can participate in educational and other services.[144]

146. Solitary confinement is frequently used to punish detained individuals who speak out about conditions at Adelanto.

147. In April 2025, several detained individuals went on hunger strike seeking changes to conditions at Adelanto. The strikers sought, among other demands, clean drinking water, properly cooked and better quality food, proper medical care, access to recreational supplies, increased visitation hours and more family contact during visits, healthy items in the commissary, and overall humane treatment. Defendants never responded to their demands, and instead, the guards took many of the hunger strikers to solitary confinement in retaliation for their protest. Mr. Salazar Garza was

[142] *No Safety Here, supra* note 39, at 30.
[143] Cal. Code Regs. Tit. 15, § 3348(i).
[144] Cal. Code Regs. Tit. 15, § 3348(j)1–(l), (g).

among those who went on hunger strike and was taken to solitary for about fifteen to twenty days. This instance of retaliation— like all other instances in which staff have retaliated against detained individuals who speak out or raise issues—violated Defendants' own standards.[145]

148. On another occasion, when a detained individual asked a guard to use more respectful language toward him, he was ridiculed, written up and given the middle finger by a guard who shouted, "Who the fuck do you think you are?" The detained individual was then placed in solitary confinement for twenty-five days.

149. One detained individual was taken to solitary for speaking up about the showers being broken. Being sent to solitary after speaking up about poor conditions of confinement negatively affects detained people's mental health because it feels like they are being punished for simply asking to be treated with dignity.

150. On or around Friday, May 15, 2026, approximately twenty detained individuals at Adelanto began another hunger strike seeking to remedy the poor conditions.[146] The stated impetus for the strike was the mishandling of the four recent deaths at Adelanto, ongoing lack of response to urgent medical needs, smaller portions of food, rising commissary costs, and retaliation and suppression for speaking out about these conditions.[147] Detained individuals fear the same retaliatory practices in response to their hunger strike that previous strikers faced: being sent to solitary confinement, loss of access to the commissary, and withholding access to tablets to contact loved ones.[148]

---

[145] *See PBNDS, supra* note 26, at 215–16 ("No staff member shall harass, discipline, punish or otherwise retaliate against any detainee for filing a complaint or grievance. . . . Disciplinary action may not be capricious or retaliatory[.]"); *id.* at 414 ("No detainee shall be harassed, disciplined, punished or otherwise retaliated against for filing a complaint or grievance.").

[146] Ryanne Mena, *Adelanto ICE detainees launch hunger strike to demand improved conditions*, The San Bernardino Sun (May 20, 2026), https://www.sbsun.com/2026/05/20/adelanto-ice-detainees-launch-hunger-strike-to-demand-improved-conditions/.

[147] *Id.*

[148] *Id.*

g. Defendants Use Coercive and Retaliatory Practices

151. Defendants subject detained individuals to various coercive and retaliatory practices that—both in isolation and coupled with the other unsanitary and abusive conditions detained individuals must endure—constitute punitive conditions of confinement.

152. Upon information and belief, detained individuals at Adelanto are routinely pressured by Defendants to "self-deport" via voluntary departure—the implication being that if they do not, they will be subject to prolonged detention with little hope of being reunited with the outside world. Detained individuals have been pressured into signing documents.[149] In the context of the conditions individuals must endure at Adelanto, pressuring detained individuals to accept voluntary departure is coercive and deprives them of knowingly and voluntarily exercising their rights.

153. Upon information and belief, some detained individuals have agreed to voluntary departure in part because they could no longer endure the conditions at Adelanto.

154. In addition, Adelanto staff punish large groups of detained individuals for the actions of a few.[150] If there is a fight or other incident in the unit, the whole unit will sometimes be locked up for prolonged periods of time. On one occasion, after a fight broke out among a few detained individuals in the unit, all thirty individuals present where the fight occurred were pepper sprayed. Then, all eighty men in the unit were locked down for twenty-four hours—a response that felt to detained individuals like a form of punishment. Because they were unable to shower after the incident, several detained individuals experienced coughing, intense eye irritation,

---

[149] Jarvie & Solis, *supra* note 5.

[150] *See PBNDS*, *supra* note 26, at 216 ("Staff may not impose or allow imposition of the following sanctions: corporal punishment; deprivation of food services, to include use of Nutraloaf or "food loaf"; deprivation of clothing, bedding or items of personal hygiene; deprivation of correspondence privileges; deprivation of legal access and legal materials; or deprivation of indoor or outdoor recreation, unless such activity would create a documented unsafe condition within the facility.").

and even difficulty breathing. During the twenty-four hour lockdown, detained individuals were unable to leave their cells, eat food, get water, or shower.

155. Staff also regularly confiscate detained people's possessions beyond what was issued to them when they first arrived, including any products or clothing that they legally purchased at the commissary with their own money.

**D. Despite the blatantly inhumane conditions at Adelanto, Defendant ICE has failed to make changes to comply with its own detention standards.**

156. Notwithstanding the current conditions at Adelanto, Defendant ICE has failed to remedy the situation and comply with the Constitution and its own detention standards. In fact, it has failed to adequately inspect the facility and most recently awarded it a "good" rating.

157. Congress has mandated oversight of immigration detention facilities.[151] The Office of Detention Oversight ("ODO"), housed within ICE, is responsible for conducting compliance inspections at ICE detention facilities in which noncitizens are housed for periods in excess of 72 hours and which have an average daily population of 10 or more noncitizens—which includes Adelanto.[152] These inspections assess compliance with the PBNDS, among other things. Following each inspection, ODO provides ICE leadership with a Compliance Inspection Final Report citing deficiencies, areas of concern, corrective actions, or best practices. The Final Report is intended to "assist [ICE's Enforcement and Removal Operations division] in developing and initiating a uniform corrective action plan" and "provide senior executives with an independent assessment of facility operations."[153]

---

[151] https://www.ice.gov/foia/odo-facility-inspections

[152] U.S. Immigr. & Customs Enf't, *Office of Detention Oversight Inspections: Fiscal Year 2021 Report to Congress* 2 (Mar. 23, 2022), https://www.dhs.gov/sites/default/files/2022-05/ICE%20-%20Office%20of%20Detention%20Oversight%20Inspections.pdf.

[153] *September 2025 Report*, *supra* note 144, at 4.

158. Pursuant to its mandate, ODO should focus inspections on a core set of standards significant to a noncitizen's life, health, and safety, and should conduct a thorough, line-by-line assessment of each core standard.[154]

159. Congress specifically appropriates funds for these annual inspections. In response to a 2018 DHS Office of Inspector General ("OIG") review of ICE's detention inspection programs, Congress appropriated a budget enhancement of approximately $6.9 million in fiscal year ("FY") 2019 for ODO to increase annual inspections.[155] Congress intended this expenditure to be used to ensure ODO engaged in rigorous and independent oversight of ICE facilities.[156]

160. Congress also required that Defendant ICE's expenditure of federal detention funds to ICE detention facilities be discontinued "if the two most recent overall performance evaluations received by the contracted facility are less than 'adequate' or the equivalent median score in any subsequent performance evaluation system." Further Consolidated Appropriations Act, 2024, Pub. L. No. 118-47, div. C, tit. II, § 213.

161. ODO inspected Adelanto on September 16–18, 2025. Despite repeated complaints of substandard medical care and inhumane conditions from detained individuals, journalists, community advocates, and members of Congress, *see supra*

[154] *Id.* at 1.
[155] *Id.* at 2.
[156] In 2019, Congress also created the Office of the Immigration Detention Ombudsman ("OIDO") within DHS, which is independent of ICE and charged with independent complaint review and detention oversight. 6 U.S.C. § 205(b). More specifically, OIDO was established to conduct "unannounced inspections of detention facilities"; "[p]rovid[e] assistance to individuals affected by potential misconduct, excessive force, or violations of law or detention standards"; and "mak[e] recommendations to address concerns or violations of contract terms identified in reviews, audits, investigations, or detainee interviews regarding immigration detention facilities and services[.]" 6 U.S.C. § 205(b); *see* Consolidated Appropriations Act of 2021, Pub. L. No. 116-260, Div. F, Tit. II, § 215(b) (Dec. 27, 2020), 134 Stat. 1457. Defendants recently shut down OIDO. *See* https://www.npr.org/2026/05/07/g-s1-120834/trump-immigration-detention-ombudsman-shutdown.

*Section A*, Adelanto received a "good" rating, with no medical care deficiencies found.[157]

162. This is remarkable given the California Department of Justice noted serious issues with the way Adelanto addressed mental-health medical care.[158] Rightly, congressional letters have raised questions about "ICE's negligence in adhering to basic medical standards."[159] By the time the inspection report was released, there had been two deaths at Adelanto within the span of a month.[160]

## CLASS ALLEGATIONS

163. Plaintiffs L.T., Sevak Mesrobian, Jose Mauro Salazar Garza, and J.M. bring this action pursuant to Rules 23(a), 23(b)(1), and 23(b)(2) of the Federal Rules of Civil Procedure, on behalf of themselves and all other people who are similarly situated.

164. *The Class*. As to the First and Second Claims (Punitive Conditions and Deliberate Indifference), the individual Plaintiffs seek to represent a class of all people who are now, or who in the future will be, detained at Adelanto ICE Processing Center and in the legal custody of U.S. Immigration and Customs Enforcement ("the Class").

165. *The Disability Subclass*. As to the Third Claim (Rehabilitation Act), Plaintiffs L.T., Sevak Mesrobian, and Jose Mauro Salazar Garza ("Subclass Plaintiffs" or "Subclass Representatives") also seek to represent a subclass consisting of all people who have disabilities within the meaning of the Rehabilitation Act and are now, or in the future will be, detained at Adelanto ICE Processing Center and in the legal custody of U.S. Immigration and Customs Enforcement ("the Subclass").

[157] *September 2025 Report, supra* note 144, at 9.

[158] *See generally*, Cal. Dep't of Just., Off. of Cmty. Awareness, Response & Engagement, *CARE Community Briefing: Immigration Detention Facilities Report* (May 22, 2025), https://oag.ca.gov/system/files/media/care-comm-briefing-slides-052225.pdf.

[159] *Nov. 2025 Congressional Letter, supra* note 96.

[160] *James, supra* note 8; see also *Death Report, supra* note 116.

166. *Numerosity*. The proposed Class and Subclass satisfy the requirements of Rule 23(a)(1) because they are so numerous that joinder of all members is impracticable. There are currently over 1,700 people detained at Adelanto.[161] On information and belief, at least fifty of these individuals have disabilities.[162]

167. Joinder may also be impossible given the inherently transitory nature of a putative Class and Subclass of detained individuals awaiting their civil immigration proceedings. Plaintiffs and putative Class and Subclass members may be released from custody, transferred to other detention centers, or deported from the United States. The population of detained individuals at Adelanto thus changes on a regular basis. Joinder is also impracticable because many putative Class and Subclass members do not speak English well, and most are unable to bring individual litigation because they lack sufficient resources.

168. The Plaintiff Class and Subclass members are identifiable using records maintained in the ordinary course of business by Defendants.

169. *Commonality*. The Class and Subclass meet the commonality requirements of Federal Rule of Civil Procedure 23(a)(2) because all class members are subject to Defendants' common policies or practices with respect to the punitive conditions of confinement at Adelanto and the systemic lack of access to adequate medical care.

170. Moreover, there are numerous questions of law and fact common to the proposed Class and Subclass. Such questions include, but are not limited to:

---

[161] As of November 2025, there were 1,786 people detained at Adelanto. *See TRAC Report, supra* note 16.

[162] The precise size of the Subclass is difficult to determine given that Defendants do not publish data on disability needs. Research suggests that nearly half of detained immigrants have chronic conditions, many of which may constitute disabilities. *See* Patler & Saadi, *supra* note 100 at 863-66. A 2019 report found that "considerable number of Adelanto detainees [had] mental health needs and other disabilities," estimating that at least 15% of Adelanto's population had mental health disabilities and that "many more" had "physical, sensory, and other types of disabilities, as well as with acute and chronic medical needs." *No Safety Here, supra* note 39, at 12.

a. Whether the conditions at Adelanto are unnecessarily restrictive and/or punitive such that they violate the Fifth Amendment; and

b. Whether Defendants' failure to provide adequate medical and mental health care to people detained at Adelanto creates a risk of harm that violates the Fifth Amendment.

171. As to the Subclass, there are also common questions of law and fact, including but not limited to:

a. Whether Defendants have inadequate systems to identify and assess the disability needs of people detained at Adelanto, such that they violate Section 504 of the Rehabilitation Act;

b. Whether Defendants fail to ensure that people with disabilities receive the accommodations and services they require, such that they violate Section 504 of the Rehabilitation Act; and

c. Whether Defendants have a policy or practice of failing to respond to requests for disability accommodations made by Plaintiffs and members of the Subclass.

172. *Typicality*. The proposed Class and Subclass meet the typicality requirement of Federal Rule of Civil Procedure 23(a)(3) because the claims of the representative Plaintiffs are typical of the claims of the Class and Subclass as a whole. All individual Plaintiffs, like other putative Class members, are or have been detained at Adelanto and have suffered the same punitive conditions of confinement and lack of access to medical care, as described above. Among other issues, Class members have been subjected to inadequate medical care, a lack of clean drinking water, insufficient food, and unsanitary conditions. Plaintiffs' claims are typical of those of the Class because they are, or have been, detained at Adelanto and have been subjected to punitive conditions of confinement and inadequate medical care. Subclass Plaintiffs, like other Subclass members, have disabilities requiring

accommodation. Subclass Plaintiffs' claims are typical because they are detained at Adelanto, have disabilities, and have not received proper accommodations.

173. *Adequacy of Representation*. The proposed Class and Subclass meet the adequacy requirements of Federal Rule of Civil Procedure 23(a)(4). Plaintiffs seek the same relief as the other members of the putative Class—namely, a declaration that Defendants' policies and practices violate the Fifth Amendment and an order enjoining Defendants from subjecting detained individuals to unconstitutional and inhumane conditions. Subclass members similarly seek declaratory and injunctive relief, under the Rehabilitation Act, to remedy the disability discrimination they have experienced. Plaintiffs have no interests that are adverse to the Class as a whole. The proposed Class and Subclass are represented by counsel from Public Counsel, Immigrant Defenders Law Center, the Coalition for Humane Immigrant Rights, and the law firm of Willkie Farr & Gallagher LLP. Counsel has extensive experience litigating class action lawsuits and other complex cases in federal court, including civil rights lawsuits on behalf of detained immigrants.

174. Finally, the proposed Class and Subclass satisfy Federal Rule of Civil Procedure 23(b)(2) because Defendants have acted on grounds generally applicable to the whole Class and Subclass by subjecting them to Defendants' policies, practices, actions, and omissions that form the basis of this complaint. All policies are required to be monitored by a central figure, Defendant ICE, and Defendant ICE is charged with promulgating, disseminating, and enforcing its standard policies applicable to the class as a whole. The injunctive and declaratory relief sought is appropriate and will apply to all members of the class.

175. In the alternative, the Class and Subclass also qualify for certification under Rules 23(b)(1)(A) and 23(b)(1)(B) of the Federal Rules of Civil Procedure.

## CAUSES OF ACTION

### COUNT ONE
### PUNITIVE CONDITIONS OF CONFINEMENT
### Violation of the Fifth Amendment Right to Due Process
### (All Plaintiffs)

176. Plaintiffs repeat, re-allege, and incorporate by reference each and every allegation in the preceding paragraphs as if fully set forth herein.

177. Under the Due Process Clause of the Fifth Amendment to the U.S. Constitution, the government must provide for the "basic human needs" of the people it confines, including their "food, clothing, shelter, medical care, and reasonable safety." *See DeShaney v. Winnebago Cnty. Dep't of Soc. Servs.*, 489 U.S. 189, 200 (1989) (first citing *Estelle v. Gamble*, 429 U.S. 97, 103–04 (1976); then citing *Youngberg v. Romeo*, 457 U.S. 307, 315–16 (1982)); *id.* at 199–200 ("[W]hen the State takes a person into its custody and holds him there against his will, the Constitution imposes upon it a corresponding duty to assume some responsibility for his safety and general well-being.").

178. This Constitutional duty cannot be delegated. *West v. Atkins*, 487 U.S. 42, 56 (1988).

179. Because immigration detention is civil detention, *see Zadvydas v. Davis*, 533 U.S. 678, 690 (2001), the government cannot subject detained immigrants to punitive conditions of confinement, that is, conditions that are "express[ly] inten[ded] to punish," not rationally related to a "legitimate governmental objective," or excessive to that objective. *Bell v. Wolfish*, 441 U.S. 520, 538 (1979) (quoting *Kennedy v. Mendoza-Martinez*, 372 U.S. 144, 168–69 (1963)).

180. The conditions at Adelanto amount to punishment. Defendants have failed to provide basic necessities like sufficient food, clean drinking water, adequate sanitation, and medical care. Defendants have also enacted restrictive and unnecessary limitations on detained individuals' access to the outdoors, bodily

privacy, and visitation with loved ones, and retaliated against those who speak up about conditions.

181. These conditions are well-known to Defendants. They have been publicly documented in countless news publications and reports filed by numerous inspection entities. Concerns have been sent directly to Defendants through detained individuals' written grievances and letters from members of Congress.

182. There is no legitimate government objective to which these conditions may rationally be connected. Depriving people of basic human necessities like potable drinking water, proper medical care, food, and the outdoors, and caging them in unsanitary units where illness and disease are rampant, while they await their civil immigration proceedings, bears no reasonable relationship to any conceivable, legitimate goal of civil detention. These conditions are intended to punish immigrants *because they are immigrants*.

183. Defendants have made several public statements indicating that the purpose of their detention campaign is to punish—demonstrating that these conditions are not reasonably related to any legitimate governmental objective. As one court noted: "Statements from senior officials suggest that harsh conditions of confinement are a deliberate feature of the enforcement program intended to induce self-deportation and to deter illegal immigration." *See Mercado v. Noem*, 800 F.Supp.3d 526, 575–76 (S.D.N.Y. 2025). "Retribution and deterrence are not legitimate nonpunitive governmental objectives." *Wolfish*, 441 U.S. at 539, n. 20.

184. In addition to Defendants' public statements, the abusive and retaliatory behavior of guards and staff, who fail to respond to medical emergencies and retaliate against those who speak up, evinces an intention to punish. *See Mercado*, 800 F.Supp.3d at 576 ("[A]busive and demeaning behavior by guards supports an inference that detention facility officials have an express intent to punish.").

185. Taken together, Defendants' public statements, Adelanto staff's behavior toward detained individuals, and the extreme nature of the conditions themselves indicate that conditions are punitive.

186. In addition, a civil detainee is entitled to 'more considerate treatment' than his criminally detained counterparts, and conditions "identical to, similar to, or more restrictive than, those in which [] criminal counterparts are held" are presumed to be punitive. *Jones v. Blanas*, 393 F.3d 918, 932 (9th Cir. 2004).

187. Because Plaintiffs and the proposed Class have experienced conditions substantially worse than conditions in state and federal prison, conditions at Adelanto should be presumed to be punitive.

188. Defendants' actions have caused—and continue to cause—Plaintiff and the putative Class members to suffer irreparable injury in the form of deprivation of their fundamental rights, along with a range of physical, psychological, and emotional harms. Defendants' ongoing violations of the Fifth Amendment deprive detained individuals of their rights and coerce some detained individuals into accepting voluntary departure. These violations also directly harm CHIRLA's provision of legal services to detained individuals. As a result of the violations, the formation and maintenance of the attorney-client relationships with detainees, including at least one CHIRLA member, suffer continual and ongoing harm.

189. Plaintiffs and the putative Class members are entitled to injunctive relief to avoid any further injury.

**COUNT TWO**
**INADEQUATE MEDICAL CARE**
**Violation of the Fifth Amendment Right to Due Process**
**(All Plaintiffs)**

190. Plaintiffs repeat, re-allege, and incorporate by reference each and every allegation in the preceding paragraphs as if fully set forth herein.

191. The government may not exhibit "deliberate indifference to [a person's] serious medical needs[.]" *Gamble*, 429 U.S. at 104.

192. Defendants have deprived, and continue to deprive, Individual Plaintiffs, CHIRLA's prospective and current clients, at least one CHIRLA member, as well as Class members detained at Adelanto, of adequate and necessary health care by, among other actions:

a. Failing to provide a medical intake screening process to identify emergencies, contagious diseases, and other health and medication needs;
b. Failing to institute a system of ready access to medical care, including specialty care and treatment for chronic medical conditions;
c. Failing to administer a proper system for responding to medical emergencies promptly;
d. Failing to provide a proper, functioning system for providing consistent and timely access to needed prescription medication;
e. Failing to provide sufficient competent staff to administer these systems, respond to medical and mental health care needs, and properly diagnose and treat medical issues.

193. Defendants have been deliberately indifferent to these conditions, the constitutional rights they are violating, and the risk of harm they cause to Plaintiffs and the thousands of other detained individuals at Adelanto.

194. Defendants have made the decision to detain Plaintiffs and the Class under conditions that exposed them to a significant risk of serious harm. Although any reasonable official would appreciate the high degree of risk involved in failing to provide proper medical care and contain the spread of disease at a facility housing nearly two thousand people, Defendants have not taken reasonable available measures to abate this risk. In so doing, Defendants have exposed Plaintiffs and the Class to a significant risk of serious harm and violated their rights under the Due Process Clause of the Fifth Amendment.

**COUNT THREE**
**DISABILITY DISCRIMINATION**
**Violation of Section 504 of the Rehabilitation Act, 29 U.S.C. § 794**
**(Plaintiffs L.T., Sevak Mesrobian, and Jose Mauro Salazar Garza, on behalf of the Disability Subclass)**

195. Plaintiffs repeat, re-allege, and incorporate by reference each and every allegation in the preceding paragraphs as if fully set forth herein.

196. At all times relevant to this action, Defendants are executive agencies within the meaning of Section 504 of the Rehabilitation Act, 29 U.S.C. § 794(a). As such, they are required to comply with the provisions of Section 504.

197. Defendant ICE operates a civil immigration detention program at the Adelanto ICE Processing Center, which constitutes a "program or activity" within the meaning of Section 504 of the Rehabilitation Act, 29 U.S.C. § 794(b). This program includes all operations, services, and activities provided to individuals detained at Adelanto, including but not limited to: medical and mental health care; housing and living accommodations; food services; access to outdoor recreation and common areas; visitation and communication with family and counsel; and grievance and disciplinary processes.

198. Defendants are required to reasonably accommodate detained individuals with disabilities, to provide them with auxiliary aids and services, and to ensure effective communication, so they can avail themselves of and participate in all programs and activities offered at Adelanto.

199. Defendants are directly responsible for their deficient monitoring and oversight practices and policies that deny detained individuals with disabilities their right to be free from discrimination.

200. As described above, Defendants have failed to ensure reasonable accommodations for Plaintiff L.T. and members of the Subclass, including providing them with assistance for mobility needs, auxiliary aids and services, and effective communication.

201. Defendants must also comply with regulations promulgated by DHS implementing Section 504. *See* 6 C.F.R. Part 15. Adelanto is in violation of many of these regulations, including without limitation by:

a. Denying members of the Subclass "the opportunity to participate in or benefit from the aid, benefit, or service." 6 C.F.R. § 15.30(b)(1)(i).

b. Affording members of the Subclass with "an opportunity to participate in or benefit from the aid, benefit, or service that is not equal to that afforded others." 6 C.F.R. § 15.30(b)(1)(ii).

c. Providing members of the Subclass "with an aid, benefit, or service that is not as effective in affording equal opportunity to obtain the same result, to gain the same benefit, or to reach the same level of achievement as that provided to others." 6 C.F.R. § 15.30(b)(1)(iii).

d. Providing members of the Subclass with "different or separate aid, benefits or services . . . than is provided to others unless such action is necessary to provide qualified individuals with a disability with aid, benefits or services that are as effective as those provided to others." 6 C.F.R. § 15.30(b)(1)(iv).

e. Otherwise denying members of the Subclass "the enjoyment of any right, privilege, advantage, or opportunity enjoyed by others receiving the aid, benefit, or service." 6 C.F.R. § 15.30(b)(1)(vi).

f. Using "criteria or methods of administration," "directly or through contractual or other arrangements," "the purpose or effect of which" is to subject members of the Subclass to "discrimination on the basis of disability." 6 C.F.R. § 15.30(b)(4), (b)(4)(i).

g. Using "criteria or methods of administration," "directly or through contractual or other arrangements," "the purpose or effect of which" is to "[d]efeat or substantially impair accomplishment of the objectives of a program or activity with respect to" the members of the Subclass. 6 C.F.R. § 15.30(b)(4)(ii).

h. Failing to "administer programs and activities in the most integrated setting appropriate to the needs of" members of the Subclass. 6 C.F.R. § 15.30(d).

i. Failing to conduct an adequate self-evaluation to identify modifications to policies and practices at Adelanto needed to ensure the programs and services at such facilities are readily accessible to and usable by detained individuals with disabilities, and to provide opportunity for input from the disability community in this process. 6 C.F.R. § 15.10; *see generally* 6 C.F.R. § 15.1 et seq.

202. Plaintiffs L.T., Mesrobian, Salazar Garza and the members of the Subclass they represent are qualified individuals with disabilities as defined in the Rehabilitation Act.

203. Because of Defendants' systemic policy and practice of failing to adequately monitor, oversee, and administer Adelanto, members of the Subclass are subject to continuing and recurring violations of Section 504.

204. As a result, Defendants fail to reasonably accommodate members of the Subclass, afford them equal access to detention center activities, programs, and services for which they are otherwise qualified, and otherwise discriminate against the Subclass on the basis of disability.

**COUNT FOUR**
**ARBITRARY AND CAPRICIOUS & UNLAWFUL AGENCY ACTION**
**Violation of Administrative Procedure Act 5, U.S.C. § 706(2)**
**(All Plaintiffs)**

205. Plaintiffs repeat, re-allege, and incorporate by reference each and every allegation in the preceding paragraphs as if fully set forth herein.

206. The APA authorizes this Court to hold unlawful and set aside agency action that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law; contrary to constitutional right, power, privilege, or immunity; [or] in excess of statutory jurisdiction, authority, or limitations[.]" 5 U.S.C. § 706(2).

207. "[A]gencies must follow a regulation if they promulgate one." *Cmty. Legal Servs. in E. Palo Alto v. United States Dep't of Health & Hum. Servs.*, 780 F.Supp.3d 897 (citing *Nat'l Ass'n of Home Builders v. Norton*, 340 F.3d 835, 852 (9th Cir. 2003)). Indeed, an agency's failure to follow its own rules is contrary to law. *Doe v. Noem*, 778 F.Supp.3d 1151, 1160–61 (W.D. Wash. 2025) ("It is contrary to law for an agency to disregard its own regulations and policies.").

208. This principle—often referred to as the *Accardi* doctrine—applies not only to formal agency rules and regulations (such as those codified in the Code of Federal Regulations), but also to informal internal agency rules. *See Morton v. Ruiz*, 415 U.S. 199, 235 (1974) (applying *Accardi* to internal IRS manual); *Alcaraz v. INS*, 384 F.3d 1150, 1162 (9th Cir. 2004) (observing that "courts have recognized that the so-called Accardi doctrine extends beyond formal regulations" and collecting cases).

209. Defendant ICE has issued standards governing immigration detention—the PBNDS. Defendants are thus required to comply with the PBNDS standards at Adelanto and DVA.

210. Defendants have failed to enforce the PBNDS at Adelanto. Although Defendant ICE monitors Adelanto to ensure compliance with detention standards and contract requirements, Defendants have failed to follow their own policies and standards governing detention.

211. First, the decision to repopulate Adelanto in early June 2025 was arbitrary, capricious, an abuse of discretion, and not in accordance with law as it is contrary to Defendant ICE's "own internal operating procedures,'" i.e., the PBNDS. *Church of Scientology of Cal. v. United States*, 920 F.2d 1481, 1487 (9th Cir. 1990) (citing *United States ex. rel. Accardi v. Shaughnessy*, 347 U.S. 260, 268 (1954)).

212. Defendants made the decision to rapidly increase the number of people detained at Adelanto despite the obvious risks posed by a massive influx of people when the facility lacked experienced staff or adequate medical care. In deciding to approve a massive influx of detainees at the beginning of June 2025, Defendants knew

that the strain on Adelanto's capacity meant they would not be able to comply with the PBNDS. Despite this, they decided to forego compliance with their own standards—risking the health and safety of all detainees. It was highly foreseeable that Defendants' decision to rapidly increase the number of people detained Adelanto in June 2025 would only compound the facility's inability to provide adequate medical care. Defendants knew or should have known that the strain on Adelanto's capacity meant they would not be able to comply with the PBNDS.

213. Second, by performing an inadequate investigation of Adelanto, awarding Adelanto a "good" rating, and permitting the facility to continue to operate without requiring remediation of the unconstitutional conditions, Defendant ICE acted contrary to constitutional rights and in excess of its statutory authority, in violation of the APA. Defendants seemingly conducted a check-the-box inspection that was not of the caliber mandated by Congress. The decision to provide Adelanto a "good" rating—and not require remediation of the glaring human rights violations—has allowed Adelanto to operate with numerous unconstitutional health and safety violations in a manner that violates the APA.

214. Plainly, the PBNDS require ICE to ensure Adelanto is an environment that protects the safety, rights, and health of detained individuals. As alleged, Adelanto is not such an environment, making ICE's review of the facility inadequate and its decision to pass the facility an abuse of discretion and contrary to law.

215. As alleged, the conditions at Adelanto have caused Plaintiffs and the class to suffer ongoing violations of their Fifth Amendment rights. Defendant ICE's decision to not require any remediation of the Adelanto facility—permitting these conditions to continue and deteriorate—is contrary to constitutional rights and in violation of 5 U.S.C. § 706(2)(B). It is also in excess of Defendant ICE's statutory authority—Congress has required ICE to conduct inspections to ensure detention facilities are safe and protecting the rights and health of detained individuals. Defendant ICE's inspection failed to do this, in violation of 5 U.S.C. § 706(2)(C).

216. Defendants have decided not to comply with the PBNDS by failing to address widespread conditions issues. Defendants' actions are arbitrary and capricious, an abuse of discretion, contrary to law, contrary to constitutional rights, and in excess of statutory authority. This Court should hold unlawful and set aside these actions.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs pray that this Court grant the following relief::

1. Certify this action as a class action pursuant to Federal Rule of Civil Procedure 23(b)(2);

2. Declare that the conditions of confinement imposed by Defendants at Adelanto violate the Fifth Amendment of the United States Constitution;

3. Declare that Defendants have failed to ensure reasonable accommodations for detained people with disabilities, in violation of Section 504 of the Rehabilitation Act**;**

4. Declare that the conditions of confinement imposed by Defendants at Adelanto are arbitrary and capricious, an abuse of discretion, and contrary to law, in violation of the APA;

5. Preliminarily and permanently enjoin Defendants from further violations of Plaintiffs' rights, from engaging in the unlawful conduct complained of herein, and from imposing punitive conditions of confinement and denying Plaintiffs' medical care;

6. Set aside Defendants' unlawful decision not to comply with their own detention standards and require them to do so;

7. Enter judgment for Plaintiffs and the putative Class and against Defendants;

8. Enjoin Defendants from removing any Individual Plaintiff currently in Defendants' custody during the pendency of this litigation;

9. Preliminarily and permanently enjoin Defendants and their agents from taking retaliatory actions against Plaintiffs and other named participants in this litigation based on their participation in this action;

10. Award Plaintiffs reasonable attorneys' fees and costs, under the Equal Access to Justice Act, 28 U.S.C. § 2412, and any other basis justified under law; and

11. Enter such other relief as the Court deems just and proper.

**DEMAND FOR JURY TRIAL**

Plaintiffs demand a trial by jury on all claims and issues for which a jury trial is available.

Dated: May 22, 2026

Respectfully Submitted,

WILLKIE FARR & GALLAGHER LLP

By: */s/ Nicholas Reddick*
Nicholas Reddick
Stephen Henrick
Alyxandra Vernon
Jacob Karim

PUBLIC COUNSEL

By: */s/ Rebecca Brown*
Rebecca Brown
Sophia Wrench
Amelia Piazza
Elizabeth Hercules-Paez

IMMIGRANT DEFENDER LAW CENTER

By: */s/ Alvaro M. Huerta*
Alvaro M. Huerta
Carson Adrianna Scott
Alison Steffel

COALITION FOR HUMANE IMMIGRANT RIGHTS

By: */s/ Carl Bergquist*
Carl Bergquist
Adam Reese