PUBLIC COUNSEL
REBECCA BROWN (SBN 345805)
rbrown@publiccounsel.org
SOPHIA WRENCH (SBN 354416)
swrench@publiccounsel.org
AMELIA PIAZZA (SBN 342473)
apiazza@publiccounsel.org
VANESSA RAE YOUNG (SBN 352693)
vyoungviniegra@publiccounsel.org
ELIZABETH HERCULES-PAEZ (SBN 320944)
eherculespaez@publiccounsel.org
610 South Ardmore Avenue
Los Angeles, CA 90005
Tel: 213-385-2977

*Attorneys for Plaintiffs*
Additional Counsel Listed on Following Page

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

L.T., SEVAK MESROBIAN, JOSE MAURO SALAZAR GARZA, AND J.M., on behalf of themselves and all others similarly situated; COALITION FOR HUMANE IMMIGRANT RIGHTS,

Plaintiffs,

v.

U.S. IMMIGRATION AND CUSTOMS ENFORCEMENT; TODD M. LYONS, Acting Director, U.S. Immigration and Customs Enforcement; JAIME RIOS, Acting Director of Los Angeles Field Office, Enforcement and Removal Operations, U.S. Immigration and Customs Enforcement; U.S. DEPARTMENT OF HOMELAND SECURITY; KRISTI NOEM, Secretary, U.S. Department of Homeland Security,

Defendants.

Case No. 5:26-cv-00322-SSS-RAO

**DECLARATION OF ANGELICA SALAS IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION**

**CLASS ACTION**

IMMIGRANT DEFENDERS LAW CENTER
ALVARO M. HUERTA (SBN 274787)
ahuerta@immdef.org
CARSON ADRIANNA SCOTT (SBN 337102)
cscott@immdef.org
ALISON STEFFEL (SBN 346370)
asteffel@immdef.org
634 S. Spring Street, 10th Floor
Los Angeles, CA 90014
Tel: 213-634-0999

COALITION FOR HUMANE IMMIGRANT RIGHTS
CARL BERGQUIST (*pro hac vice*)
cbergquist@chirla.org
2351 Hempstead Road
Ottawa Hills, OH 43606
Tel: 310-279-6025

ADAM REESE (SBN 362898)
areese@chirla.org
2533 West Third Street, Suite 101
Los Angeles, CA 90057
Tel: 213-353-1333

WILLKIE FARR & GALLAGHER LLP
NICHOLAS REDDICK (SBN 288779)
nreddick@willkie.com
STEPHEN HENRICK (SBN 310539)
shenrick@willkie.com
ALYXANDRA VERNON (SBN 327699)
avernon@willkie.com
JACOB KARIM (SBN 340376)
jkarim@willkie.com
333 Bush Street, 34th Floor
San Francisco, CA 94104
Tel: 415-858-7400

*Attorneys for Plaintiffs*

## DECLARATION OF ANGELICA SALAS

I, Angelica Salas, make the following statements on behalf of myself and the Coalition for Humane Immigrant Rights. I declare under penalty of perjury that the following statement is true and correct pursuant to 28 U.S.C. § 1746.

1. I am the Executive Director of the Coalition for Humane Immigrant Rights ("CHIRLA"). I have held this position since 1999. In this capacity, I oversee all of CHIRLA's programs and am responsible for strategic planning and CHIRLA's annual budget.

2. CHIRLA is a nonprofit organization headquartered in Los Angeles, California, with an additional ten offices throughout California and an office in Washington, D.C. CHIRLA was founded in 1986 with the mission to advance the human and civil rights of immigrants and refugees and ensure immigrant communities are fully integrated into our society with full rights and access to resources.

3. Today, CHIRLA is the largest statewide immigrant rights organization in California, with 19 unique departments and about 185 staff members who provide a range of services to hundreds of thousands of Californians each year. For example, over the last three years, CHIRLA's education programs have reached over 836,000 people through more than 3,800 events and other services. CHIRLA's legal department has assisted over 24,000 people with direct services and legal education.

4. CHIRLA is a membership organization, with approximately 52,000 members across California and elsewhere. Our membership is diverse, and includes U.S. citizens, non-U.S. citizens with lawful status, and non-U.S. citizens without lawful status. Many of our members belong to mixed-status families—that is, families consisting of individuals with a variety of statuses including birthright citizenship, naturalized citizenship, green cards, Temporary Protected Status, other temporary statuses, individuals without status, and others. Most of our members are low-income. Many of our members are day laborers, car wash workers, street vendors, and domestic workers. CHIRLA's membership is predominantly Latino but includes

people from around the world. CHIRLA educates its membership as well as our broader community through Know-Your-Rights trainings, workshops, social media, and educational literature about a variety of social services, immigration law, financial literacy, workers' rights, access to education, and civic engagement.

5. Some of CHIRLA's members pay annual dues to the organization, and those dues help to fund the organization's operations. The fee for an individual membership starts at $25. Families may become members for $60, and those who want to support at a higher level can become community supporters for $100. Other CHIRLA members' fees can be waived because of their indigent financial situation. CHIRLA members are members by virtue of their voluntary participation in the organization's meetings, programs, and policy campaigns, and/ or by virtue of paying membership fees.

6. CHIRLA has a range of programs and initiatives geared towards supporting immigrant communities, including but not limited to: (1) Organizing & Leadership Development; (2) Policy & Advocacy; (3) Civic Engagement & Political Empowerment; (4) Immigration and Worker Legal Services; (5) Community Education & Outreach; and (6) Humanitarian Response and Migrant Assistance.

7. CHIRLA seeks to protect the constitutional and statutory rights of its immigrant members, including those detained by federal immigration agencies.

8. Two CHIRLA members are currently detained at Adelanto. Because many CHIRLA members are immigrants, many members are at risk of being detained and taken to Adelanto.

9. There is overlap between our membership and the clients that our legal services program serves. Some members join CHIRLA first as members and then become legal services clients due to need, while others are clients before they become members.

10. CHIRLA's members regularly meet with each other in regional committees. Committee meetings can range from a small handful of people to

hundreds. In addition, CHIRLA's student members hold regional statewide conference calls and meetings throughout the year. During these meetings, CHIRLA's members plan local advocacy campaigns, share information, and discuss issues that affect them, their families, and their local communities. Information from these meetings is reported to CHIRLA's leadership and used to guide CHIRLA's programmatic agenda.

11. CHIRLA also holds quarterly membership gatherings at which core leaders discuss issues they are seeing in their communities and set priorities for the organization.

12. Finally, CHIRLA members volunteer their time at events put on by the organization. They help with set up and clean up, especially at large events.

13. In addition to being a membership organization, CHIRLA also provides support and legal services to immigrants. CHIRLA's programs also include a hotline where individuals—including members, clients, and community members—can call with questions. The assistance hotline that CHIRLA operates fields on average over 17,000 calls per year. Given CHIRLA's deep community ties and longstanding legal services programs, CHIRLA is often a first point of contact for individuals seeking direct assistance as well as accurate information about recent policy changes impacting immigrants.

14. Since 2006, CHIRLA has coordinated the Los Angeles Raids Rapid Response Network ("LARRN"), a coalition of immigrant rights organizations, legal service providers, private attorneys, and unions. LARRN's primary mission is to assist community members in the wake of immigration enforcement actions such as the one described below.

15. CHIRLA has established a system for receiving information about detained people, and we have staff who work to help secure the release of individuals from immigrant detention, many of whom are at Adelanto. In the last year, CHIRLA has received hundreds of phone calls about people detained.

16. CHIRLA's legal department provides direct services to people experiencing immigration issues. The Removal Defense Unit ("RDU") serves both non-detained and detained individuals. CHIRLA's removal defense attorneys and accredited representatives serve clients detained at Adelanto and regularly visit current or prospective clients there. CHIRLA has several clients currently detained at Adelanto, and regularly communicates with and serves people detained there.

**I. CHIRLA Members Have Experienced Severe Medical Neglect and Other Inhumane Conditions While Detailed at Adelanto.**

17. One CHIRLA member was arrested and detained at Adelanto after nearly 20 years in the United States. In October 2025, he was violently arrested at work by masked, armed immigration agents who, as best he could tell amidst the chaos, were dressed in civilian clothing. He arrived at Adelanto that same month and was detained there for 40 days. His incarceration put a significant strain on his family, as he had been their primary breadwinner and they suddenly had to make ends meet without his regular income. This was particularly difficult for the family because his daughter, who lives with him, has cancer and was relying on him for help caring for her own son and daughter—his two grandchildren. The CHIRLA member's daughter also relied on her father for help navigating her cancer treatment. In the first several weeks of this member being detained at Adelanto, she missed a medical appointment because he was not available to drive her there.

18. After his arrest by ICE, this member was taken to B-18, the temporary holding facility in Los Angeles. He spent about 24 hours there. His daughter brought him his diabetes medication, Metformin. Before he had an opportunity to take the medicine on a full stomach, the staff confiscated this supply of Metformin. Therefore, he was unable to take Metformin at B-18. This caused him significant distress: without the medication, he began experiencing diabetes symptoms that made him very physically uncomfortable. As he was in this state of distress, staff or officials at B-18 used a combination of intimidation tactics and lies to pressure him into signing

a voluntary departure form. He signed the form, but he would not have signed it if he had not been in distress, not been intimidated, and not been lied to.

19. He was then taken to Adelanto ICE Processing Center ("Adelanto"). While being processed into the facility, he told staff twice that he is diabetic and needs Metformin. However, it was four or five days at Adelanto before the medical staff there started giving him Metformin. Moreover, when they did start giving him medication, they gave it to him at random times, rather than at a consistent time each day. He normally takes Metformin with Lisinopril and Januvia around 9:00 a.m. and again with Pravastatin after dinner, but the staff at Adelanto did not allow him to follow this timetable. He believes that this irregular provision of medicine contributed to the worsening of his diabetic symptoms while he was detained, culminating in his hospitalization. Moreover, the staff would sometimes test his blood sugar levels shortly after he had eaten, likely causing the test to return an incorrect result, because diabetic blood tests are meant to be taken on an empty stomach.

20. Before he was detained, his doctor told him that he had to carefully control his diet in order to keep his blood sugar levels within a healthy range. If his blood sugar levels went outside this range, she said, it could have disastrous consequences for his health, including death or severe kidney damage that would require him to use dialysis for the rest of his life. Once he was at Adelanto, he repeatedly informed the staff that he needed medically appropriate food in order to manage his diabetes. However, the staff never meaningfully obliged these requests. Instead, they gave him the same food that they gave all the other detainees, occasionally giving him an extra apple but nothing more. Very little of this food met his dietary needs, and so he was forced to choose between eating very small amounts of food and eating full servings of food that could seriously damage his health. He chose the option of eating very little—to slowly starve rather than slowly poison himself. As a result, he was hungry almost all the time, frequently low on energy, and although he weighed only 156 pounds when he entered detention, he lost 16 pounds

before getting out. Months later, he is still trying to gain back that weight. He also believes that his lack of access to sufficient quantities of food made his Metformin less effective in treating his diabetes, as Metformin must be consumed after a meal. While detained, this member told CHIRLA attorneys that if he must die of diabetes, he at least wanted to spend his final days surrounded by his family, not stuck far away from them at Adelanto.

21. This member also suffered some kind of medical episode at Adelanto. Within a week of arriving, he woke up feeling very ill. He believed he was experiencing symptoms of his diabetes, which was going largely untreated at that time. He felt as if he needed to vomit, so he tried to walk to the bathroom, but he fainted and landed on the floor. He then grabbed hold of a bottom bunk in order to hoist himself up, but in doing so he hit his head on the upper bunk and completely lost consciousness. Adelanto staff examined him and determined that his sodium levels were dangerously low, so the next day they took him to a hospital, where he stayed for two nights. While hospitalized, one of his legs was chained to his hospital bed. The chain had to be removed in order for him to use the bathroom. Once he was released from the hospital, staff took him back to Adelanto, where he was to be detained for several more weeks. This member's decline in health while detained at Adelanto was so serious that he and his family considered the possibility of him accepting deportation simply so he could get out of Adelanto and once again manage his illness.

22. In addition to the medical neglect this member experienced at Adelanto, he also experienced other forms of poor conditions. He said that many guards treated him and other detainees very badly, screaming at them and treating them "not as human beings, but as criminals."

23. He also experienced what he felt was guards trying to turn detainees against each other. Adelanto staff gave this member and the detainees housed with him blue clothes to wear. The facility provided certain other detainees with orange

clothing, to indicate that they had some criminal or other questionable history. A color classification system like this is known to us and part of ICE procedure. Guards at the facility told this member that there is no telling what would happen if he encountered an orange-clad detainee around the bathroom, seemingly implying that these orange-clad detainees might attack him. However, he later interacted with an orange-clad detainee and the interaction was positive, causing him to question the guards' narrative.

24. This member said that staff normally served breakfast at 5:00 a.m. or 5:30 a.m., too early for him and many other detainees to build up an appetite. However, he said that the staff would not let them take food items or milk out of the dining area to consume once they were actually hungry.

25. He also found it very difficult to sleep. At night, staff would leave the lights on until 11:30 p.m. Once the lights were shut off, some detainees who were confined in the same room as him would pace around the room and talk, making it hard for him to fall asleep and stay asleep. Even after being released, the psychological impact of his detention was so intense that months later, he continues to struggle to fall asleep, staying awake into the early hours of the morning, and frequently waking up at 5:00 a.m. or 6:00 a.m. He tries to make up for this lost sleep by sleeping during the day, but he cannot.

26. A second CHIRLA member was detained at Adelanto for over eight months, beginning in August 2025. Within days of arriving, he had fillings fall out of two of his teeth. This caused him severe pain. He asked the in-house dentist to fix these two teeth but she refused, telling him that only detainees who have been at Adelanto for six months are entitled to dental procedures, and that he would have to wait since at that time he was a recent arrival. Instead of giving him the medical attention he was asking for, staff only gave him ibuprofen to address his pain. However, ibuprofen was not strong enough to relieve his pain. One time, he noticed that some Ibuprofen tablets the staff had given him were past their expiration date.

And although this member stayed well past the six month mark, the dental staff never gave him the replacement fillings that they said he would be eligible for. Throughout his stay, he was also unable to secure a medical appointment for a neck and back injury that he suffered when immigration agents violently arrested him. He never got an X-ray for this injury. During many of the days that he was detained, this injury caused him debilitating pain. Now out of custody, he continues to suffer from pain due to this injury. Once, a friend of his was very ill and some detainees asked a guard to make a call to get the man medical care. The guard responded by screaming at them and telling them that they do not send people to the doctor unless they have fainted. The guard stated that because the man had not lost consciousness, they would not call a doctor for him.

27. This member also had to drink water that was brought to him and his fellow detainees in containers that were black with dirt. Once, this member, a monolingual Spanish speaker, had a friend ask a guard if the guard would eat the food that was provided to the detainees, to which the guard responded in the negative, stating that it is food for dogs. Moreover, on two occasions when that member was meeting with CHIRLA attorneys, Adelanto staff opened the door and cut short the meeting, preventing the member and attorneys from discussing all the matters that the attorneys had planned to discuss with him. This member reports experiencing episodes of fear since leaving Adelanto, being in a bad state psychologically, and being afraid to leave the house. He says his fear of leaving the house stems from the trauma he experienced at Adelanto. He is also still malnourished after his stay there, and sometimes experiences dizziness as a result.

28. A third CHIRLA member was previously detained at Adelanto. Staff there served her spoiled chicken that smelled bad. They served her undercooked food, including beans that were not cooked sufficiently. They served her hotdogs that were uncooked or barely cooked. They also served her patties that tasted like plastic to her. She experienced gastrointestinal illness at Adelanto, which she believes was triggered

by eating the food there. Initially she was submitting kites asking for medical care, but after not receiving any response, she gave up on sending kites to request medical care. She reports that lights in her unit were not shut off until 11:30 pm.

29. A fourth CHIRLA member, who is currently detained at Adelanto, has had blood drawn twice for testing but has never received any results from those tests. He frequently experiences gastrointestinal illness as a result of eating the food, which often is not properly cooked and sometimes smells bad. He has been served spoiled food on numerous occasions and he has lost count of the number of times the food at Adelanto has sickened him. Symptoms of his food related illnesses have included headaches, vomiting, and diarrhea. He says that when chicken is served, it is frequently undercooked and he can see blood in it. He also says that beans are frequently served undercooked. He often buys food with money on his commissary account because that food is less likely to be spoiled than the food which is provided at meal times. Additionally, he reports that the food is served in small quantities and is not nutritious—it is of low quality even when it is not spoiled or undercooked. Some days he has gone five or six hours at a time without water, because staff does not always deliver additional water when detainees finish drinking the previous portion that they delivered.

30. This member reported that at times, all or nearly all of the detainees in a particular unit will come down with a communicable disease, but in some cases the sick individuals are not given any kind of medical treatment for the illness, and the only medical interventions they receive are painkillers such as Tylenol or Ibuprofen. He has also witnessed staff shouting at detainees, insulting them and hurling profanities at them. Once, he was feeling sick and asked a staff member if he could see a doctor, to which the staff member responded, "Get the f--- out of my face." That staff member, who used the actual expletive, did not call the medical staff as he had requested.

31. CHIRLA members have thus faced medical neglect and lived through inhumane conditions while detained at Adelanto. As the government continues to detain more people, other members are at risk of being detained at Adelanto in these conditions.

32. These conditions are punitive. There is no reason to treat human beings in such a miserable and degrading way unless the actual purpose of the mistreatment is to cause them harm.

**II. CHIRLA's Provision of Legal Services to People Detained at Adelanto Has Been Impaired by the Conditions There.**

33. The conditions at Adelanto have adversely impacted CHIRLA's provision of legal services and frustrated its mission to achieve a just society fully inclusive of immigrants.

34. CHIRLA on average receives dozens of calls per day about people seeking legal services. Many are calling on behalf of loved ones detained at Adelanto, and these callers often describe the medical issues and neglect their loved ones are facing in detention. For example, many callers have told CHIRLA they are worried about their detained family member getting access to medication.

35. As a result of the conditions at Adelanto, CHIRLA expends more of its resources seeking to address the medical needs of its members and clients than it did before the government's recent mass detention campaign began. Our hotline operators often need to spend additional time on intakes to record information about medical issues that people are experiencing at Adelanto, something which would normally be outside the scope of their work.

36. As a result of these detention conditions, CHIRLA's removal defense attorneys must now spend time investigating the medical neglect and other problems that their clients experience, and advocate for their clients around those issues. This is work that they take on in addition to their regular representation duties, and it takes up time that they would otherwise be spending on their clients' removal defense. Our

removal defense attorneys take on these additional tasks because they worry that if they do not advocate for their clients' medical needs, their clients will not receive needed medical care. In some cases, they worry that clients will die if they do not receive timely medical care. When this happens, the priority becomes making sure the person stays alive, even if that means putting the person's case somewhat on the back burner.

37. These conditions also impact our removal defense attorneys' ability to represent their clients in other ways. It takes longer to prepare a client's removal defense case when their health is declining, because attorney meetings become more taxing on the client and their focus shifts from their immigration case to their health problems. CHIRLA attorneys also spend significantly more time communicating with clients' family members about the clients' health. And CHIRLA attorneys have spoken to many individuals who initially wanted to fight their case, but who grew so desperate under the detention conditions at Adelanto that they were either considering abandoning or actually decided to abandon their claims for relief and accept voluntary departure. Many of these people have built lives in the U.S. and have started families here, but they are so concerned by the way their health has deteriorated at Adelanto—some of them even fear dying there—that they give up on their fight to stay in this country. In other words, these individuals are being forced to choose between being healthy and living with their families—an impossible choice. Needless to say, when a prospective client gives up on asserting their claims, CHIRLA can no longer represent them and get them the desired relief. This frustrates our mission of serving immigrant communities and impairs our ability to provide legal services. If our clients—actual and prospective—feel pressured into giving up their claims before we get a chance to defend them, we cannot properly serve them. In these ways, the poor conditions and lack of medical care at Adelanto have substantially impacted our attorneys' ability to provide quality representation. The conditions have also led to a strain on our

resources, as our attorneys must devote time to addressing detained members' and clients' non-legal needs.

38. Moreover, members of the Policy Department and the Impact Litigation team have on numerous occasions had to interrupt their ordinary work in order to urgently seek help for detainees who are at risk of grave harm. Our policy and litigation staff do not routinely take such steps. Rather, it is something our team has to do nowadays when they fear that a detainee may die or suffer a life-changing medical event if that detainee does not quickly receive proper medical care. Sometimes our Impact Litigation team must also respond to financial emergencies, such as when a breadwinner is detained and the loss of their income puts their family at risk of becoming homeless. To keep track of all the people that our Impact Litigation Team has identified who have this high level of need, the team has prepared a special tracker. This tracker keeps our staff focused on helping these individuals, ensuring that we provide them whatever help we are able to offer. This help takes many forms, including asking elected officials to quickly advocate for detainees' release, identifying legal service providers to represent detainees on short notice, and helping detainees' families locate badly needed resources for which they are eligible. We have secured the assistance of at least four Members of Congress in seeking a detainee's release, with some of those officials stepping up to advocate for more than one detainee. In the past, Policy and Litigation staff would occasionally help CHIRLA clients locate needed resources. However, these client-facing tasks were always considered low priority. More important tasks that are central to these teams' core goals include meeting with government officials, drafting court filings ahead of looming deadlines, and working with external allies to advance bills through California's state legislature. These are the kinds of tasks that our Policy and Litigation staff have been putting on the backburner as they pivot to address detainees' most urgent needs. Furthermore, our Policy and Litigation staff often enlist the help of our Membership Department staff when clients need non-legal forms of

support. When that happens, our membership and other staff must spend time providing special assistance to these clients. Under normal circumstances, they would have spent this time providing other planned services to CHIRLA members and clients, rather than seeking ad hoc solutions to urgent problems that have arisen due to a person's detention in a place with bad conditions.

39. Apart from the tracker mentioned above, our Humanitarian Department and our Policy Department have collaborated to build a different tracker, which tracks individuals experiencing serious medical issues at Adelanto and other immigrant detention facilities. This tracker helps us maintain a sense of who is in government detention and what kind of needs they have. CHIRLA staff use this tracker to identify people who we need to reach out to, and our staff also share data from the tracker with partner organizations so that they can attempt to contact and help these individuals. Once we become aware of the harm that these individuals are suffering we cannot ignore it, even if our organizational responsibilities, in line with our goals and workplans, lie elsewhere.

I declare under penalty of perjury that the foregoing is true and correct. Executed on June 1, 2026 in Los Angeles, California.



Angelica Salas