PUBLIC COUNSEL
REBECCA BROWN (SBN 345805)
rbrown@publiccounsel.org
SOPHIA WRENCH (SBN 354416)
swrench@publiccounsel.org
AMELIA PIAZZA (SBN 342473)
apiazza@publiccounsel.org
ELIZABETH HERCULES-PAEZ (SBN 320944)
eherculespaez@publiccounsel.org
610 South Ardmore Avenue
Los Angeles, CA 90005
Tel: 213-385-2977

*Attorneys for Plaintiffs*
Additional Counsel Listed on Following Page

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| L.T., SEVAK MESROBIAN, JOSE MAURO SALAZAR GARZA, AND J.M., on behalf of themselves and all others similarly situated; COALITION FOR HUMANE IMMIGRANT RIGHTS,<br>Plaintiffs,<br>v.<br>U.S. IMMIGRATION AND CUSTOMS ENFORCEMENT; TODD M. LYONS, Acting Director, U.S. Immigration and Customs Enforcement; JAIME RIOS, Acting Director of Los Angeles Field Office, Enforcement and Removal Operations, U.S. Immigration and Customs Enforcement; U.S. DEPARTMENT OF HOMELAND SECURITY; KRISTI NOEM, Secretary, U.S. Department of Homeland Security,<br>Defendants. | Case No. 5:26-cv-00322-SSS-SPx<br><br>**DECLARATION OF SARALYN OLSON-WAGNER IN SUPPORT OF PLAINTIFFS' RENEWED MOTION FOR PRELIMINARY INJUNCTION**<br><br>**CLASS ACTION** |

IMMIGRANT DEFENDERS LAW CENTER
ALVARO M. HUERTA (SBN 274787)
ahuerta@immdef.org
CARSON ADRIANNA SCOTT (SBN 337102)
cscott@immdef.org
ALISON STEFFEL (SBN 346370)
asteffel@immdef.org
634 S. Spring Street, 10th Floor
Los Angeles, CA 90014
Tel: 213-634-0999

COALITION FOR HUMANE IMMIGRANT RIGHTS
CARL BERGQUIST (*pro hac vice*)
cbergquist@chirla.org
2351 Hempstead Road
Ottawa Hills, OH 43606
Tel: 310-279-6025

ADAM REESE (SBN 362898)
areese@chirla.org
2533 West Third Street, Suite 101
Los Angeles, CA 90057
Tel: 213-353-1333

WILLKIE FARR & GALLAGHER LLP
NICHOLAS REDDICK (SBN 288779)
nreddick@willkie.com
STEPHEN HENRICK (SBN 310539)
shenrick@willkie.com
ALYXANDRA VERNON (SBN 327699)
avernon@willkie.com
JACOB KARIM (SBN 340376)
jkarim@willkie.com
333 Bush Street, 34th Floor
San Francisco, CA 94104
Tel: 415-858-7400

*Attorneys for Plaintiffs*

**DECLARATION OF SARALYN OLSON-WAGNER IN SUPPORT OF PLAINTIFFS' RENEWED MOTION FOR PRELIMINARY INJUNCTION**

I, Saralyn Olson-Wagner, hereby declare as follows:

1. I, Saralyn Olson-Wagner, make this declaration based on personal knowledge and a review of records related to my position as a Legal Fellow for the Coalition for Humane Immigrant Rights ("CHIRLA"). I make the following statements on behalf of myself in my capacity as a Legal Fellow for CHIRLA. If called to testify, I could and would do so competently.

2. I am an attorney admitted to practice in the State of Oklahoma, State Bar Number 35428. I am registered to practice in front of the Executive Office of Immigration Review.

3. I am currently employed as a legal fellow with the Removal Defense Unit ("RDU") for CHIRLA.

4. As a removal defense attorney, my responsibilities include full-scope representation of people in immigration removal proceedings, including both their substantive removal case and their bond proceedings. I represent people on both the detained and non-detained docket. In addition to my work directly representing individuals, I also conduct intakes and assist with rapid response efforts and community education.

5. I regularly go to Adelanto to meet with detained clients or conduct screening intakes with prospective clients to determine whether CHIRLA can represent them or to pass along their intake information to partner organizations who may be able to do so. I have been to Adelanto roughly 8 times since starting this position as a legal fellow at CHIRLA. I have conducted in-person intakes and meetings with about 30-40 individuals detained there. I have also spoken on the phone with at least 5-10 people who are or have been detained at Adelanto.

## I. Clients Describe Oppressive Conditions at Adelanto

6. As an attorney, I have witnessed how people detained at Adelanto are suffering there. Almost every detained person I have spoken to at Adelanto has complained of the conditions. I have heard many identify the same deficiencies in material conditions and the way they are treated by the guards. These recurring complaints are clustered around a certain set of common problems, including issues with: (1) poor food; (2) unclean water; (3) aggressive behavior from guards; and (4) a pervasive lack of medical care.

7. Many of the detained individuals I have spoken to have raised concerns about the food they are served. They report that the food is of poor quality, is sometimes rotten or stale, is lacking in nutritional value, is served in small portions, that meal times are erratic, many have gotten sick from the food, and many are often hungry. Many detainees are forced to supplement their diet by purchasing additional food through the commissary in order to avoid going hungry. Others are too poor to do so. People who require a controlled diet, such as those who have diabetes, report that there has been a lack of accommodations for their dietary needs. Additionally, people detained at Adelanto have told me that the drinking water looks and tastes really bad. And regarding medical care, over half of the people I have spoken to said they needed medical care and/ or medication that they were not receiving. For example, one man was bitten on the finger by a spider in the showers at Adelanto roughly two weeks before I saw him. During our meeting, he showed me his finger, which was discolored and swollen. It looked possibly infected. He said that he did not get sufficient medical attention when he requested it. I also met with a woman who was experiencing serious illness and becoming very weak. She had to use a walker, though she was not very old and not disabled. She was unable to keep down any food. I do not remember her exact medical condition, but I think it was diabetes. She told me that she was about to give up on trying to fight her case because she was

desperate to get out of Adelanto so that she could receive the medical attention she needed.

**II. The Conditions at Adelanto Impact My Representation and Strain CHIRLA's Ability to Provide Services**

8. The conditions at Adelanto, including pervasive lack of medical care, have placed an additional burden on attorneys representing individuals detained there and on CHIRLA as an organization more generally. The pervasive medical neglect increases the volume of our calls and slows down our ability to screen prospective clients—because our staff has to spend more time discussing medical issues and other conditions issues, we have less time to spend working to ascertain what legal claims might be available to detained individuals. We don't have the staff to respond to all the calls for help with medical issues. And those suffering from inadequate medical care are typically harder to screen for relief, as they may be distracted and not well enough to participate in a conversation.

9. We have had to develop discrete reporting mechanisms for priority cases, many of which are individuals with medical concerns as a result of not getting care. This potentially delays release for others who have been detained longer as we try to help people with the most dire medical issues. It is a significant diversion of resources because we need to take down more details and, on occasion, we must intervene by using our authority as attorneys to persuade Adelanto ICE Deportation Officers to take our clients' medical claims seriously.

10. The conditions at Adelanto have also affected my representation of clients. I have to constantly monitor my clients' health. I can't represent people who are dead, and it would be difficult to represent clients who are incapacitated. As clients get sicker, their health becomes their number one priority; this shifts their attention and energy and focus to their own survival, and their immigration case becomes a second-order need. The time I spend investigating their health and advocating on their behalf is time I am not spending on their immigration case or on someone else's case.

The scope of my representation has come to include making complaints on their behalf for medical care, relaying critical information between the person detained and their family, and keeping track of violations of their rights. These circumstances make my job harder. Screening and representing people who are declining due to the conditions at Adelanto slows down my ability to represent them. I should not have to spend time trying to get Adelanto to provide my clients with basic medical care. In the context of the hundreds of calls we are fielding, the opportunity cost of any diversion is significant.

11. One of my clients, who is currently detained at Adelanto, has reported to me that his access to needed psychiatric medication has been irregular at times. Furthermore, he repeatedly makes requests for appointments with psychological and psychiatric professionals at the facility, but those healthcare providers only meet with him a small fraction of the times that he requests meetings with them. As a result of the lack of care, he is often distracted and lethargic, including during our meetings together. He has also expressed that the facility's use of bright lights at night, and its failure to provide a quiet sleeping environment, have regularly prevented him from getting enough sleep. In this state of lethargy and sleep deprivation, he is less focused than he would otherwise be, and we often cover less material during our meetings than I would expect us to be able to cover if he were well-rested and in a state of good mental health. This impedes my ability to get needed information from him in a timely manner during our time-limited meetings, which in turn impedes me being able to represent him as well as I could if he were kept in conditions that did not diminish his focus in this way.

12. As a result of his lethargy and sleep deprivation, I must frequently save important items for a future meeting because we run out of time to cover critical topics. As a result, I must spend additional time on his case, reducing the amount of time I can spend on other matters related to his case and on other clients' cases. This happens despite my efforts to limit myself to covering an amount of material that

should be manageable within the time constraints imposed by the facility. Due in part to his weariness and lethargy, I have had to schedule a follow-up appointment with him to cover material necessary to the representation.

13. Another client, who I and another RDU attorney jointly represented, and who was recently released from Adelanto, was in significant physical pain during most of his detention at Adelanto, including during many of our legal meetings. This pain stemmed from an injury he sustained when he was violently arrested by immigration agents. Throughout his stay, Adelanto's medical staff did not grant him an appointment to have this injury examined and treated. His pain interfered with our team's ability to communicate efficiently with him. His distraction as a result of being in pain also meant that our team had to spend more time interacting with him in order to get information from him that we needed to work effectively on his case. His distracted state also made it take longer to explain to him developments in his case in a way that he could grasp, and made it take longer for him to make decisions about how to proceed with his case.

14. For example, at one point, he had a bond hearing but was denied bond, and, with his emotional state aggravated by his physical pain, he was so upset and demoralized about the denial that he stated that he was prepared to give up on his immigration case entirely and accept deportation. At the time, he expressed a sense of hopelessness about his case, indicating that he could no longer tolerate the conditions in the detention facility, which he stated were inhumane. Later, however, with more time to think through the implications of giving up on his case, he reversed course and decided to keep fighting. Delays like this impede representation. Another factor that he found demoralizing was that guards would sometimes falsely state to a detainee that they were going to be released and should pack up their possessions. After the detainee had packed up their things, the guard who had made the statement would then laugh at the detainee and indicate that they were not going to be released that day, and that the news of their impending release had in fact been a "joke." This

brand of "humor" appeared to our client to be sadistic, and it further demoralized him and sometimes caused him to temporarily lose motivation to fight his case. All of this indecisiveness on this client's part added to the amount of time our team needed to spend interacting with him. This extra time spent on client interactions pulled our team away from working on the substantive aspects of his case, pulled us away from working to secure his release, and pulled us away from working on other clients' cases.

15. When conducting intakes with prospective clients, most people are fixated on the problems they are experiencing in the moment, particularly lack of nutritious food, small food portions, lack of access to proper medical care, always feeling cold, and poor treatment by staff. They often steer the conversation towards these topics, so that these topics end up filling up a significant portion of the limited time I have to conduct the intake. Frequently, our time together runs out before I can ask all the questions I must ask to understand whether or not I can take them on as a client. Determining whether or not I can represent someone includes understanding what kinds of relief they may be eligible for. Other times, I manage to ask all the relevant questions, but given how much time we spend discussing the conditions of their detention, I must rush through questions that are meant to help me understand the details of a person's case. This prevents me from getting all the information I need to effectively represent the person. And in some cases, it prevents me from being able to assess what kind of relief the person may be eligible for, which, again, prevents me from understanding whether or not I can take the person on as a client.

16. In some cases, I have found that a detainee's non-detained relatives are so distraught over their loved one's detention at Adelanto that they become distracted and struggle to provide me important information and documents in a timely manner. This further hinders my efforts to provide legal services to the detained client. While it can be difficult to disentangle the stress arising from their knowledge that their loved one is being exposed to bad conditions at Adelanto from the stress of that person

being detained at all, it is clear that the stress impacts them and makes them less effective in working with me.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed on May 29, 2026 in Los Angeles, California.

Saralyn Olson-Wagner

Saralyn Olson-Wagner