# EXHIBIT 1

ROB BONTA
Attorney General of California
MICHAEL L. NEWMAN
Senior Assistant Attorney General
VILMA PALMA-SOLANA
Supervising Deputy Attorney General
ALEX E. FLORES
Deputy Attorney General
State Bar No. 303552
  300 South Spring Street, Suite 1702
  Los Angeles, CA  90013-1230
  Telephone:  (213) 269-6049
  E-mail:  alex.flores@doj.ca.gov
*Attorneys for the State of California*

## IN THE UNITED STATES DISTRICT COURT

## FOR THE CENTRAL DISTRICT OF CALIFORNIA

## EASTERN DIVISION – RIVERSIDE

| | |
|---|---|
| L.T., SEVAK MESROBIAN, JOSE MAURO SALAZAR GARZA, AND J.M., on behalf of themselves and all others similarly situated; COALITION FOR HUMANE IMMIGRANT RIGHTS,<br><br>                                        Plaintiffs,<br><br>                    v.<br><br>U.S. IMMIGRATION AND CUSTOMS ENFORCEMENT; TODD M. LYONS, Acting Director, U.S. Immigration and Customs Enforcement; JAIME RIOS, Acting Director of Los Angeles Field Office, Enforcement and Removal Operations, U.S. Immigration and Customs Enforcement; U.S. DEPARTMENT OF HOMELAND SECURITY; KRISTY NOEM, Secretary, U.S. Department of Homeland Security,<br><br>                                        Defendants. | Case No. 5:26-cv-00322-SSS-SP<br><br>**[PROPOSED] BRIEF OF AMICUS CURIAE THE STATE OF CALIFORNIA, BY AND THROUGH ROB BONTA, ATTORNEY GENERAL, IN SUPPORT OF PLAINTIFFS' RENEWED MOTION FOR PRELIMINARY INJUNCTION**<br><br>Date:          July 10, 2026<br>Time:          2:00 pm<br>Courtroom:  2<br>Judge:         Hon. Sunshine Sykes<br>Action Filed: June 10, 2026 |

# TABLE OF CONTENTS

**Page**

Introduction...................................................................................................1

Interest of Amicus Curiae ............................................................................2

Background....................................................................................................3

Argument ......................................................................................................4

    I.     As Demonstrated Through Amicus Curiae's Previous Four Reports, the Conditions Complained of By Plaintiffs Have Been Present At Adelanto For Years. ........................................................4

        A.   *Prior Issues Related to Medical Care* .......................................5

        B.   *Prior Issues Related to Mental Health Care* ............................6

        C.   *Prior Issues Related to Use of Force* .......................................8

        D.   *Prior Issues Related to Due Process* ........................................8

    II.    Amicus Curiae's Most Recent Findings and Observations in its May 2026 Report Echo the Issues Raised in Plaintiffs' Renewed Motion. ...................................................................................................9

        A.   *Insufficient Detention Staff for the Overwhelming Increase in Population*...............................................................9

        B.   *Insufficient Healthcare Staff for the Overwhelming Increase in Population*.............................................................10

        C.   *Amicus Curiae Found Concerning Health Care Issues* ..........11

        D.   *Issues Related to Food and Water*..........................................13

        E.   *Issues with Adelanto's Use of Force and Pepper Spray* ..........14

        F.   *Reported Concerns Related to Housing Conditions*.................16

        G.   *Issues Related to Due Process*.................................................17

    III.   Deaths of Four Men Held at Adelanto.................................................17

    IV.   Concerns Over Recordkeeping. .........................................................20

    V.    The Public Interest Favors a Preliminary Injunction Because ICE's Conditions of Confinement Will Continue to Inflict Serious and Irreparable Harms on Individuals Detained At Adelanto. ............................................................................................20

Conclusion ...................................................................................................21

# TABLE OF AUTHORITIES

**Page**

CASES

*Golden Gate Rest. Ass'n v. City & Cnty. of S.F.*
  512 F.3d 1112 (9th Cir. 2008) ........................................................................4

*L.T. et al., v. ICE, et al.*
  5:26-cv-00322, Dkt. 74 ................................................................................21

*Miller-Wohl C. v. Comm'r of Lab. & Indus. State of Mont.*
  694 F.2d 203 (9th Cir. 1982) ..........................................................................2

*N.G.V. Gaming Ltd. v. Upstream Point Molate, LLC*
  355 F.Supp.2d 1061 (N.D. Cal. 2005) ..............................................................2

*Rivera Martinez v. GEO Group*
  (C.D.Cal., May 25, 2018, No. 5:18-cv-01125) ECF No. 1 ...............................15

*Roman v. Wolf*
  No. EDCV 20-00768 TJH, 2020 WL 5797918 (C.D. Cal., Sept. 29,
  2020) .............................................................................................................6

*Sonoma Falls Developers, L.L.C. v. Nev. Gold & Casinos, Inc.*
  272 F.Supp.2d 919 (N.D. Cal. 2023) ................................................................2

*Stormans, Inc. v. Selecky*
  586 F.3d 1109 (9th Cir. 2009) ..........................................................................4

*Stuhlbarg Int'l Sales Co. v. John D. Brush & Co.*
  240 F.3d 832 (9th Cir. 2001) ............................................................................4

*Torres v. U.S. Dep't of Homeland Sec.*
  (C.D. Cal., Apr. 24, 2020, No. 5:18-cv-2604-JGBSHKx) 2020 WL
  3124305 .........................................................................................................9

*Torres v. U.S. Dep't of Homeland Sec.*
  (C.D. Cal., Oct. 16, 2025. No. 5:18-cv-02604-JGBSHKx) ................................9

*United States v. California*
  921 F.3d 865 (9th Cir. 2019) ............................................................................2

**TABLE OF AUTHORITIES**
**(continued)**

**Page**

*Washington v. United States Food & Drug Admin.*
    668 F. Supp. 3d 1125 (E.D. Wash.) ........................................................................4

*Winter v. Nat. Res. Def. Council*
    555 U.S. 7 (2008) ....................................................................................................4

**STATUTES**

Cal. Gov't Code § 12532...........................................................................................3

Cal. Gov't Code § 12532(a), (b)(1)(A)-(B), (b)(2) ................................................2, 3

California Assembly Bill 103 (AB 103), 2017-2018 Reg. Sess. (Cal.
    2017)....................................................................................................................1, 4

**OTHER AUTHORITIES**

Araceli Martinez Ortega, *Mexican Immigrant Dies in ICE Jail in
    Adelanto*, La Opinion (Mar. 1, 2026) ....................................................................19

Caitlin Patler & Gabriela Gonzalez, *Compounded Vulnerability: The
    Consequences of Immigration Detention for Institutional
    Attachment and System Avoidance in Mixed-Immigration-Status
    Families*, Oxford University Press (Dec. 2020)......................................................21

The Cal. Coal. For Universal Representation, *California's Due Process
    Crisis: Access to Legal Counsel for Detained Immigrants* (June
    2016).........................................................................................................................3

Cal. Dep't of Just., *Immigration Detention in California: A
    Comprehensive Review with a Focus on Mental Health* (Apr. 2025) ........*passim*

Cal. Dep't of Just., *Immigration Detention in California: A Review of
    Conditions of Confinement* (May 2026)...............................................*passim*

Cal. Dep't of Just., *Immigration Detention in California: A Review of
    Detention Facilities' Response to COVID-19 as of Fall 2021* (July
    2022)......................................................................................................................4, 6

Cal. Dep't of Just., *Immigration Detention in California* (Feb. 2019) .................4, 5

# TABLE OF AUTHORITIES
## (continued)

**Page**

Cal. Dep't of Just., *Immigration Detention in California* (Jan. 2021)..............*passim*

Clara Long et al., *Code Red: The Fatal Consequences of Dangerously
    Substandard Medical Care in Immigration Detention*, Human
    Rights Watch (Jun. 20, 2018) ........................................................................ 3, 5

Izzy Ramirez, *Ten Days After Adelanto Internment, This Beloved
    Grandfather Died in Custody*, L.A. Taco (Nov. 4, 2025) ................................. 18

Karma Dickerson and Jonathan Lloyd, *Timeline: How Immigration
    Enforcement Operations Unfolded in Los Angeles*, NBC4 Los
    Angeles (updated July 7, 2025) ......................................................................... 1

Marc Cota-Robles, *Westlake Man Dies While in ICE Custody at
    Adelanto Detention Center, LA Councilmember Says*, ABC7 News
    (Mar. 3, 2026) ................................................................................................. 19

Mathew Miranda, *California ICE Detention Doubles in One Year. One
    center surges from 3 to 1,800*, The Sacramento Bee (Feb. 6, 2026).............. 3, 10

Myriam Vidal Valero, *U.S. Immigration Policy: Mental Health
    Impacts of Increased Detentions and Deportations*, American
    Psychological Association (Sept. 2025) ........................................................ 20, 21

Patrick Terpstra, *ICE Detainee Died From COVID-19, Autopsy Shows*,
    Scripps News (May 2026) ................................................................................ 20

Rebecca Plevin, *Asylum-Seekers Allegedly Pepper-Sprayed at
    Adelanto Detention Center Settle with GEO Group*, Palm Spring
    Desert Sun (Feb. 6, 2020) ............................................................................... 15

Ruben Vives and Jenny Jarvie, *A Former DACA Recipient Died in ICE
    Custody. Did Officials Ignore His pleas for Help?*, L.A. Times
    (Sept. 24, 2025) .............................................................................................. 18

*Settlement Protects Access to Counsel and Phone Calls in Immigration
    Detention*, Immigrant Defenders Law Center (Aug. 22, 2025) .......................... 9

Taylor S. Mitchell, *ICE Denies Wrongdoing in Death of Man in
    California Immigration Facility*, Huffington Post (Mar. 4, 2026).................... 19

**TABLE OF AUTHORITIES**
**(continued)**

**Page**

U.S. Immigr. & Customs Enf't, *FOIA Reports: List of Deaths in ICE Custody: Data from Oct. 1, 2003 to June 5, 2017*, 1-17 ................................. 3, 5

U.S. Immigr. & Customs Enf't, Office of Detention Oversight, *Inspection 2025-001-082: Adelanto ICE Processing Center, Adelanto, California* (Sept. 16-18, 2025) .......................................................... 10

U.S. Immigr. & Customs Enf't., *Detainee Death Notifications* (Mar. 4, 2026) ..................................................................................................... 19

U.S. Immigr. & Customs Enf't., *Detainee Death Notifications* (Mar. 30, 2026) ................................................................................................ 19

U.S. Immigr. & Customs Enf't, *Detainee Death Report: Ayala Uribe, Ismael* .................................................................................................... 18

U.S. Immigr. & Customs Enf't, *Detainee Death Report: Garcia Aviles, Gabriel* ................................................................................................... 18

U.S. Immigr. & Customs Enf't, *Performance-Based National Detention Standards 2011* ....................................................................... *passim*

## INTRODUCTION

The Adelanto ICE Processing Center (Adelanto) was overwhelmed as it went from holding seven individuals in November 2023 to detaining 1,570 people on July 8, 2025.[1] Most newly arrived individuals came in as part of an unprecedented and surreal period for California which started in early June 2025[2] when the federal government conducted raids across Los Angeles; detained hundreds of immigrants at work; arrested protestors; and using the federalized National Guard and the Marines, turned the streets of Los Angeles into a battlefield.[3]

The California Attorney General's office reviews civil immigration detention facilities across the state, including Adelanto, pursuant to California Assembly Bill 103 (AB 103), 2017-2018 Reg. Sess. (Cal. 2017). By virtue of this statutory mandate to review and report on conditions of confinement, how those conditions affect due process, and the standard of care afforded at immigration detention facilities, the Attorney General's office is intimately familiar with the conditions at Adelanto.

During its latest review on July 8-9, 2025, the Attorney General's office found, among other things, a facility that was overwhelmed with the rapid population increase; insufficient staffing; failures to attend to urgent medical needs, to care for individuals with chronic conditions, and to ensure specialty care referrals; and use of force concerns.[4] The Attorney General's office also heard many reports from individuals about a lack of access to medical care; issues with water and improperly cooked food; issues with housing conditions; and the unavailability of phones for prolonged periods, which may impact due process

---

[1] Cal. Dep't of Just., *Immigration Detention in California: A Review of Conditions of Confinement* (May 2026), at 32-33, 36-37, https://tinyurl.com/3h682y63.
[2] *Id*. at 37.
[3] Karma Dickerson and Jonathan Lloyd, *Timeline: How Immigration Enforcement Operations Unfolded in Los Angeles*, NBC4 Los Angeles (updated July 7, 2025), https://tinyurl.com/5n87wfwc.
[4] *See* Cal. Dep't of Just. (May 2026), *supra*, note 1, at 36-37, 45-46, 49-52.

rights by limiting detained individuals' ability to communicate with counsel.[5]

While the Attorney General's office has previously reported on these issues, its latest report published on May 15, 2026, shines a light on the urgency given the four deaths at Adelanto between September 2025 and March 2026.[6]

Based on its experience and the ongoing deaths, Amicus Curiae believes that without court intervention and preliminary relief, the conditions complained of by Plaintiffs will continue to exist unabated.

## INTEREST OF AMICUS CURIAE

The State of California, by and through Rob Bonta, Attorney General (Amicus Curiae) has strong interests in this litigation. First, Amicus Curiae has an interest in the health and safety of persons held in detention within the State. *United States v. California*, 921 F.3d 865, 884-885 (9th Cir. 2019).

Second, Amicus Curiae is statutorily mandated to review and report on conditions of confinement within immigration detention facilities. Cal. Gov't Code § 12532(a), (b)(1)(A)-(B), (b)(2). Based on this work, Amicus Curiae is uniquely positioned to provide valuable information and perspective to this Court, beyond what attorneys from the parties can provide. *N.G.V. Gaming Ltd. v. Upstream Point Molate, LLC*, 355 F.Supp.2d 1061, 1067 (N.D. Cal. 2005) (internal quotation marks and citation omitted); *Sonoma Falls Developers, L.L.C. v. Nev. Gold & Casinos, Inc.*, 272 F.Supp.2d 919, 925 (N.D. Cal. 2023) (internal quotation marks and citations omitted). Amicus Curiae is also able to assist this Court, in a case of general public interest by providing the Court with unique factual findings beyond what the parties can provide. *Miller-Wohl C. v. Comm'r of Lab. & Indus. State of Mont.*, 694 F.2d 203, 204 (9th Cir. 1982).

Third, Amicus Curiae has a strong interest in ensuring that federal agencies refrain from actions that—like those at issue in this matter—are unconstitutional,

---

[5] *Id*. at 42-44, 44-45, 47, 49, 50-52.
[6] *Id*. at 54.

discriminatory, and arbitrary and capricious. Since many of Amicus Curiae's residents are being held at Adelanto, Amicus Curiae has a strong interest in ensuring federal agencies' treatment of those within the State of California is constitutional considering the increased immigration enforcement and detention.[7]

## BACKGROUND

In fiscal year 2017, "more people died in immigration detention . . . than in any year since 2009," due to conditions "linked to dangerously inadequate medical care."[8] Three of those deaths occurred at Adelanto.[9] Following increased immigration enforcement during the first Trump Administration, years-long troubling conditions inside the facilities,[10] including deaths at Adelanto,[11] the California Legislature enacted AB 103, codified as California Government Code Section 12532.

AB 103 requires the California Attorney General to review and report on "the conditions of confinement" and "of the standard of care and due process provided" to detained individuals held at "private locked detention facilities in which noncitizens are being housed or detained for purposes of civil immigration proceedings in California." Cal. Gov't Code, § 12532(a), (b)(1)(A)-(B), (b)(2). Through AB 103, Amicus Curiae is responsible for bringing transparency to the health and safety of those detained in the eight privately-operated civil immigration detention facilities in the state, including Adelanto and its next-door facility, Desert View Annex.

---

[7] Mathew Miranda, *California ICE Detention Doubles in One Year. One center surges from 3 to 1,800*, The Sacramento Bee (Feb. 6, 2026), https://tinyurl.com/4hbnfw72 (reporting that over 6,400 people are being held each day throughout California's immigration detention facilities, which is more than double the average from one year ago).

[8] Clara Long et al., *Code Red: The Fatal Consequences of Dangerously Substandard Medical Care in Immigration Detention*, Human Rights Watch (Jun. 20, 2018), https://tinyurl.com/2mryey8w.

[9] *Id.*; U.S. Immigr. & Customs Enf't, *FOIA Reports: List of Deaths in ICE Custody: Data from Oct. 1, 2003 to June 5, 2017*, 1-17, https://tinyurl.com/2hfrry9r.

[10] The Cal. Coal. For Universal Representation, *California's Due Process Crisis: Access to Legal Counsel for Detained Immigrants* (June 2016), https://tinyurl.com/mvpfctze.

[11] U.S. Immigr. & Customs Enf't, *supra*, note 9, at 1.

Since the passage of AB 103, Amicus Curiae, together with civil immigration detention and healthcare experts, has inspected Adelanto five times (in 2018, 2019, 2021, 2023, and 2025) and published five reports detailing its findings.[12] An excerpt of Amicus Curiae's fifth report published in May 2026 discussing the findings about Adelanto is attached to this brief as **Exhibit A**.

## ARGUMENT

Amicus Curiae files this brief in support of Plaintiffs' renewed motion for preliminary injunction focusing on one of the four factors at issue: whether preliminary relief is in the public interest. *Winter v. Nat. Res. Def. Council*, 555 U.S. 7, 20 (2008); *Stuhlbarg Int'l Sales Co. v. John D. Brush & Co.*, 240 F.3d 832, 839 n.7 (9th Cir. 2001) (standard for temporary restraining order is the same for preliminary injunction). The public interest is particularly relevant where the impact of the dispute reaches beyond the parties and carries the potential for public consequences. *Stormans, Inc. v. Selecky*, 586 F.3d 1109, 1139 (9th Cir. 2009); *Golden Gate Rest. Ass'n v. City & Cnty. of S.F.*, 512 F.3d 1112, 1126–27 (9th Cir. 2008). Third-party harms relevant to the public interest analysis include, among others, public health harms. *Washington v. United States Food & Drug Admin.*, 668 F. Supp. 3d 1125, 1142 (E.D. Wash.), *opinion clarified*, 669 F.Supp.3d 1057 (E.D. Wash. 2023) (concluding that public interest favored injunctive relief "[b]ased on the public health and administrative considerations at issue in this case.").

**I.     AS DEMONSTRATED THROUGH AMICUS CURIAE'S PREVIOUS FOUR REPORTS, THE CONDITIONS COMPLAINED OF BY PLAINTIFFS HAVE BEEN PRESENT AT ADELANTO FOR YEARS.**

The conditions discussed throughout Plaintiffs' renewed motion for

---

[12] *See* Cal. Dep't of Just., *Immigration Detention in California* (Feb. 2019), https://tinyurl.com/5cedp2xn; Cal. Dep't of Just., *Immigration Detention in California* (Jan. 2021), https://tinyurl.com/bddhswt2; Cal. Dep't of Just., *Immigration Detention in California: A Review of Detention Facilities' Response to COVID-19 as of Fall 2021* (July 2022), https://tinyurl.com/fdaf49jk; Cal. Dep't of Just., *Immigration Detention in California: A Comprehensive Review with a Focus on Mental Health* (Apr. 2025), https://tinyurl.com/4hn9v7h4; Cal. Dep't of Just. (May 2026), *supra*, note 1.

preliminary injunction echo the conditions of confinement observed and reported in Amicus Curiae's first four AB 103 reports. Throughout those reports, Amicus Curiae documented Adelanto's failures in its provision of medical and mental health care, and conditions of confinement; and how those conditions affect due process.

From its first report published in February 2019, Amicus Curiae raised several concerns related to reports of Adelanto's failure to adhere to U.S. Immigration and Custom Enforcement's (ICE) Performance-Based National Detention Standards (PBNDS).[13] These concerns were echoed by federal government oversight reports[14] and lawsuits filed in 2017 and 2018.[15] For example, on September 27, 2018, a report by the U.S. Department of Homeland Security's (DHS) Office of the Inspector General (OIG) addressed three deaths and six suicide attempts at Adelanto during federal fiscal year 2017.[16] There were three deaths between March and May 2017, two deaths in 2015, and one death in 2012.[17] In Adelanto's February 2019 National Commission on Correctional Health Care accreditation audit, it was found that at intake, those with major diagnoses were not adequately processed, resulting in nursing staff failing to take follow-up baseline blood sugar levels for two diabetics.[18]

## A.    *Prior Issues Related to Medical Care*

In its 2021 report, when Adelanto had a population count similar to its present count, Amicus Curiae found several issues related to the provision of health care.[19] Amicus Curiae found incomplete health care records and compromised patient confidentiality caused by staff including medical and mental health history details

---

[13] *See* Cal. Dep't of Just. (Feb. 2019), *supra*, note 12, at i-iv, 121-128.
[14] *Id.* at 21-23.
[15] *Id.* at 23.
[16] *Id.*
[17] *See* Long, *supra*, note 8; *see also* U.S. Immigr. & Customs Enf't, *supra*, note 9, at 1, 3, 5.
[18] Cal. Dep't of Just. (Feb. 2019), *supra*, note 12, at 54.
[19] Cal. Dep't of Just., (Jan. 2021), *supra*, note 12, at 51-61.

in custody detention files.[20] Amicus Curiae also found inadequate care for chronic illnesses.[21] For example, chronic care was managed by a registered nurse; however registered nurses are not adequately trained to manage the complexities of chronic disease and a nursing model that oversees chronic healthcare patients long-term is not in accordance with good medical practice.[22] Further, care was not documented within the rest of the patients' medical records in Adelanto's electronic records system, creating two different records systems.[23] The 2021 report also found delayed care and inadequate continuity of care.[24]

Amicus Curiae's July 2022 report focused on challenges and responses by facilities to the COVID-19 pandemic.[25] During its November 12, 2021 inspection, Amicus Curiae found Adelanto with a population of less than five percent of its past population, after suspending intake in September 2021 as a result of an injunction in a lawsuit seeking relief from dangerous COVID-19-related conditions inside Adelanto.[26] Due to Adelanto's population decrease and other court orders, some COVID-19-related precautions such as social distancing;[27] facility-wide testing practices;[28] and vaccination rates[29] were generally accomplished at Adelanto. However, in other issues such as twice-daily temperature and system checks of high-risk individuals, Adelanto was not fully compliant.[30]

---

[20] *Id.* at 52-53.
[21] *Id.* at 34, 52-53.
[22] *Id.* at 52, 53.
[23] *Id.* at 52, 53.
[24] *Id.* at 53-54.
[25] *See* Cal. Dep't of Just., (July 2022), *supra*, note 12, at 1-3.
[26] *Id.* at 10, 13, 27; *see also Roman v. Wolf*, No. EDCV 20-00768 TJH (PVCX), 2020 WL 5797918 (C.D. Cal., Sept. 29, 2020), *aff'd in part*, *vacated in part*, *remanded to*, 977 F.3d 935 (9th Cir. 2020); *and* Amended Adelanto Population Reduction Order, *Roman v. Wolf*, No. EDCV 20-00768 TJH (PVCX), Dkt. No. 914 (C.D. Cal. Jan. 11, 2021).
[27] Cal. Dep't of Just., (July 2022), *supra*, note 12, at 27.
[28] *Id.* at 33
[29] *Id.* at 37.
[30] *Id.* at 35.

[Proposed] Amicus Brief in Support of Plaintiffs' Renewed Motion for Preliminary Injunction
(5:26-cv-00322-SSS-SP)

## B.    *Prior Issues Related to Mental Health Care*

Amicus Curiae's 2021 report found that while approximately 20% of the population received mental health services, Adelanto was medically understaffed, offered no meaningful therapy services, and provided delayed care.[31] Further, the 2021 report found failures to adequately review individuals in restricted housing,[32] and in handling individuals placed in suicide watch, among other issues.[33] Relatedly, a significant number of individuals with mental health conditions were found to be placed in restricted housing where their conditions worsened.[34] Amicus Curiae further determined that understaffing was a barrier to accessing mental health services.[35]

Amicus Curiae's fourth report, published in April 2025, focused primarily on the provision of mental health care.[36] The 2025 report was based on a November 2023 inspection which found Adelanto with a dramatically reduced population as a result of further court actions related to COVID-19; with the facility housing only seven individuals.[37] In the 2025 report, Amicus Curiae found that, with seven detained persons and approximately 30 healthcare staff, Adelanto was overall providing adequate mental health and medical care.[38]

Even then, Amicus Curiae identified several issues, like conflicting diagnoses provided by mental health staff and prescriptions that did not match diagnoses, throughout Adelanto and its annex Desert View, which operate together and share staff.[39] Amicus Curiae also found that mental health staff sometimes demonstrated inconsistencies in record-keeping and in care and psychotherapy sessions.[40] Also

---

[31] Cal. Dep't of Just., (Jan. 2021), *supra*, note 12, at 34, 54, 57-60.
[32] *Id*. at 54.
[33] *Id*. at 58.
[34] *Id*. at 60.
[35] *Id*. at 61.
[36] *See* Cal. Dep't of Just., (Apr. 2025), *supra*, note 12, at 4-8.
[37] *Id*. at 26.
[38] *Id*. at 33, 40.
[39] *Id*. at 37.
[40] *Id*. at 37, 38.

concerning was that detention staff failed to consult with medical and mental health staff, and to consider an individual's mental health condition, before calculated uses of force and before placing a person into disciplinary segregation.[41]

Importantly, Amicus Curiae's medical, mental health, and detention experts all noted that if the population dramatically increased, as it now has, the staffing levels seen in November 2023 would be far below those necessary to provide adequate care.[42]

### C.   *Prior Issues Related to Use of Force*

Amicus Curiae's 2021 report found concerning use of force instances related to mental health. Amicus Curiae's mental health expert identified a total of seven use of force incidents out of 37 that involved individuals in mental health crisis.[43] In one instance, a person attempted to hang himself while on suicide watch and officers used pepper spray to contain him.[44] There were also instances where individuals were disciplined when they attempted to commit suicide by hanging.[45] One was written up for destruction of facility property for tearing a sheet to fashion a noose, and another for assaulting a detention officer during the struggle to cut him down.[46] In its 2025 report, Amicus Curiae identified an instance where medical staff communicated a recommendation to avoid using chemical agents during a use of force incident, but Adelanto detention staff still used a chemical spray.[47]

### D.   *Prior Issues Related to Due Process*

Amicus Curiae's 2021 report found that Adelanto failed to comply with the PBNDS' requirement that facilities maintain up-to-date law library materials, leaving individuals at Adelanto facing significant barriers to obtaining the materials

---

[41] *Id.* at 48.
[42] *Id.* at 33.
[43] Cal. Dep't of Just., (Jan. 2021), *supra*, note 12, at 46.
[44] *Id.*
[45] *Id.* at 47.
[46] *Id.*
[47] Cal. Dep't of Just., (Apr. 2025), *supra*, note 12, at 48.

and assistance they needed for their immigration cases.[48] For example, legal materials found in Adelanto's law libraries as of August 7, 2019, including court cases, were significantly outdated with the most recent materials dated November 2017.[49] Attorneys who were surveyed for the 2021 report explained that the conditions under which they were able to communicate with their clients limited their ability to represent clients at Adelanto.[50] Issues with attorney-client communication led to a 2020 preliminary injunction,[51] then to a settlement agreement establishing free confidential legal calls, including outside regular telephone hours; and allowing individuals at Adelanto to make unrecorded, unmonitored phone calls from their housing units.[52]

## II.   AMICUS CURIAE'S MOST RECENT FINDINGS AND OBSERVATIONS IN ITS MAY 2026 REPORT ECHO THE ISSUES RAISED IN PLAINTIFFS' RENEWED MOTION.

Amicus Curiae inspected Adelanto on July 8-9, 2025, about one month after the COVID-related injunction ended on June 2, 2025, and weeks after ICE began terrorizing the streets of Southern California and detaining many of its residents.[53] Amicus Curiae's May 2026 report, an excerpt of which is attached as **Exhibit A**, includes findings related to detention and medical staffing, medical care, water and food, use of force, living conditions, and due process. These findings echo the issues raised by Plaintiffs and are discussed in detail below.

### A.   *Insufficient Detention Staff for the Overwhelming Increase in Population*

The PBNDS require staffing levels at each facility that ensure sufficient

---

[48] Cal. Dep't of Just., (Jan. 2021), *supra*, note 12, at 50-51.
[49] *Id.* at 50.
[50] *Id.* at 49.
[51] *Torres v. United States Dep't of Homeland Sec.*, (C.D. Cal., Apr. 24, 2020, No. 5:18-cv-2604-JGBSHKx) 2020 WL 3124305, at *1.
[52] *Torres v. U.S. Dep't of Homeland Sec.*, (C.D. Cal., Oct. 16, 2025. No. 5:18-cv-02604-JGBSHKx), Dk. 233 (Order); *see also Settlement Protects Access to Counsel and Phone Calls in Immigration Detention*, Immigrant Defenders Law Center (Aug. 22, 2025), https://tinyurl.com/4a9mc8hk.
[53] *See* Cal. Dep't of Just. (May 2026), *supra*, note 1, at 35.

supervision for those detained.[54] The May 2026 report found that detention staffing levels were inadequate to meet the needs of the surge of individuals at Adelanto as of July 8, 2025.[55]

During the July 2025 inspection, Adelanto appeared overwhelmed by the number of individuals it was housing.[56] Adelanto went from holding seven individuals during Amicus Curiae's November 2023 inspection, to 475 before the COVID-related injunction ended on June 2, 2025, to detaining 1,570 persons on July 8, 2025, plus 517 at Desert View Annex.[57] Facility staff reported being caught off guard by the number of new admittees, as they were short-staffed during the surge in immigration arrests in June 2025.[58] Individuals at both Adelanto and Desert View Annex frequently attributed issues with food and water, recreation time, and grievances to insufficient staffing at the facilities.[59] Individuals also reported that they did not see an increase in detention officers in conjunction with the population increase in the first weeks of June 2025.[60]

## B. *Insufficient Healthcare Staff for the Overwhelming Increase in Population*

Amicus Curiae's medical expert found that medical staffing levels were inadequate to meet the needs of the population surge at Adelanto as of July 8, 2025.[61] Amicus Curiae's interviews with facility staff and detained individuals, and

---

[54] U.S. Immigr. & Customs Enf't, *Performance-Based National Detention Standards 2011* (PBNDS), https://tinyurl.com/mw4we3ty, 2.4 Facility Security and Control, Part V, § E, p. 82; PBNDS, 2.11 Sexual Abuse and Assault Prevention and Intervention, Part IV, § E, p. 151.

[55] Cal. Dep't of Just. (May 2026), *supra*, note 1, at 45-46; *see also* U.S. Immigr. & Customs Enf't, Office of Detention Oversight, *Inspection 2025-001-082: Adelanto ICE Processing Center, Adelanto, California* (Sept. 16-18, 2025), https://tinyurl.com/ODOAdelantoSept2025 (a federal oversight report reviewed by the State and published two months after the State's visit, that provided insight as to the staffing at Adelanto).

[56] Cal. Dep't of Just. (May 2026), *supra*, note 1, at 32.

[57] *Id*. at 32, 36-37; *see also*, Miranda, *supra*, note 7 (explaining that ICE reported a daily average of three persons held at Adelanto in January 2025, and that in January 2026, it reported a daily average of 1,800).

[58] *See* Cal. Dep't of Just. (May 2026), *supra*, note 1, at 46.

[59] *See id*. at 39-40, 42-44, 45-46.

[60] *Id*. at 46.

[61] *Id*. at 49-50, 52-53.

file review, revealed serious concerns.[62] Like detention staff, medical staff also explained they were caught off guard by the escalation in population.[63] Inadequate staffing and an influx of detainees also led to a chaotic intake environment, with detainees reporting waiting days and even weeks before receiving security classification and housing assignment – and in many cases not receiving medical screenings.[64]

When Amicus Curiae inspected the facility in 2019 (and Desert View Annex was not open), it determined that healthcare "staffing was lean for the size of the facility" that then housed 1,683 individuals.[65] In the 2023 inspection, Adelanto reported having a medical director, a clinical physician, and Advanced Practitioner Providers for seven people plus Desert View Annex.[66] Amicus Curiae learned during the July 2025 inspection that Adelanto had a medical director, one full-time physician, one part-time physician, and three full-time and one part-time (on an as-needed basis) Advanced Practitioner Providers.[67] Given Adelanto's population increase, and the fact that healthcare staff also serve Desert View Annex, Amicus Curiae was concerned about medical staffing levels.[68] A concern which worsened by Adelanto's inability to produce assurances that staffing levels had been increased to correspond with the increase in population.[69]

### C.   *Amicus Curiae Found Concerning Health Care Issues*

Amicus Curiae's medical expert reviewed medical files and identified several instances of individuals with serious medical issues who did not receive timely emergency care.[70] For example, one person reported that they were vomiting blood and received a referral for immediate care by the triage nurse but was not treated by

---

[62] *Id.* at 52-53.
[63] *Id.* at 52.
[64] *Id.* at 39.
[65] Cal. Dep't of Just., (Jan. 2021), *supra*, note 12, at 51.
[66] Cal. Dep't of Just., (Apr. 2025), *supra*, note 12, at 40.
[67] *Id.* at 52-53.
[68] *Id.*
[69] *Id.*
[70] *Id.* at 50.

any medical staff until they saw a physician one-and-a-half weeks later.[71] Another individual requested medical care for chest pain, was promptly attended to by a nurse, but did not receive follow up care by a practitioner or physician.[72] This individual was next attended to by medical staff 17 days later for neurological symptoms and was then transferred to a hospital.[73]

Based on file review, the medical expert found several instances where individuals were provided referrals to outside care for necessary specialized treatment but never received the treatment.[74] This is despite the PBNDS' requirement that every facility shall directly or contractually provide its population with specialty health care.[75] One individual was referred for ophthalmology care three weeks prior to Amicus Curiae's visit and had still not been seen.[76] Another person had not been seen for a scheduled three-month follow-up from a neurosurgery visit four months prior to Amicus Curiae's visit.[77] And an individual with an infectious disease only received a referral for consultation 24 days after arrival to Adelanto, while another individual with the same infectious disease never received such a referral.[78]

Generally, reviewed medical files did not contain notes recording the steps taken by medical staff to refer individuals to outside care.[79] As a result, it was difficult to determine whether the steps taken by Adelanto to ensure referrals for outside care were timely completed, creating a risk that an individual's medical condition worsened while waiting for a response from outside medical providers.[80]

Discharge planning was also of concern. Despite the PBNDS' requirement

---

[71] *Id.* at 51.
[72] *Id.*
[73] *Id.*
[74] *Id.* at 52.
[75] PBNDS, *supra*, note 54, 4.3 Medical Care, Part V, § A, p. 260.
[76] Cal. Dep't of Just., (May 2026), *supra*, note 1, at 52.
[77] *Id.*
[78] *Id.*
[79] *Id.*
[80] *Id.*

that facilities provide detailed transfer summaries, medication, and referrals to community-based providers as medically appropriate,[81] medical staff interviewed indicated that medical records were only provided if requested.[82]

Detained individuals expressed other concerns related to medical care. Only 17% of individuals interviewed by Amicus Curiae reported they received all three components (screenings of medical, dental, and mental health) within 12 hours.[83] Additionally, several individuals reported not receiving their necessary medications, or only receiving them after excessive delays of one week to one month, despite the PBNDS requirement.[84] Individuals also reported that they were unable to access requested medical appointments and did not receive necessary and timely medical treatment, even for emergency medical care.[85] For example, of the 22 individuals who reported requesting medical services, only four reported receiving the help they needed.[86] Within a sampling of medical files, Amicus Curiae's medical expert identified three cases of detainees with serious medical issues that did not receive timely emergency care.[87]

The issues related to medical care are particularly concerning considering the four men who died between September 2025 and March 2026, while detained at Adelanto.[88]

### D.   *Issues Related to Food and Water*

Despite PBNDS requirements for the preparation and presentation of food, and expectations that detained individuals must be "provided nutritionally balanced diets" and "sufficient space and time . . . to eat meals in a relatively relaxed,

---

[81] PBNDS, *supra*, note 54, 4.3 Medical Care, Part V, § BB, pp. 278-279.
[82] Cal. Dep't of Just., (May 2026), *supra*, note 1, at 52.
[83] *Id*. at 42; PBNDS, *supra*, note 54, 4.3 Medical Care, Part V, § J, p. 266 (12-hour requirement for the initial medical assessment)
[84] PBNDS, *supra*, note 54, 4.3 Medical Care, Part V, § U, p. 273 (requiring prescriptions must be provided on schedule and without interruption, absent exigent circumstances); *see also* Cal. Dep't of Just., (May 2026), *supra*, note 1, at 50.
[85] Cal. Dep't of Just., (May 2026), *supra*, note 1, at 50-51.
[86] *Id*. at 51.
[87] *Id*.
[88] *Id*. at 54.

unregimented atmosphere,"[89] Amicus Curiae found issues with water and received reports of issues with food.[90]

Despite the PBNDS requirement that clean, potable drinking water must be available at all times,[91] individuals reported to Amicus Curiae that drinking water is murky and dirty.[92] During its tour of Adelanto, Amicus Curiae observed for itself murky water coming out of the drinking water tap in the women's housing unit.[93]

Almost every person interviewed complained about the quality of the food.[94] Individuals at Adelanto explained that before June 2025, their meals were provided at the dining halls, but after the surge in detentions, they ate in their housing area where food frequently arrived cold, undercooked, or rotten.[95] These individuals also reported irregular mealtimes, forcing them to choose between eating and outdoor time.[96] Individuals further explained that meals can arrive after bedtime or during population counts, and that sometimes, they had to use the same spoon for weeks.[97] While Amicus Curiae could not verify these accounts, this was a common theme across housing units.[98]

### E.   Issues with Adelanto's Use of Force and Pepper Spray

Amicus Curiae reviewed records of use of force incidents at Adelanto and found a significant use of pepper spray.[99] Eight of the 11 reported use of force incidents at Adelanto between January 1 and July 7, 2025, occurred in June 2025, after the increase in population.[100] Facility staff used pepper spray in six of these

---

[89] PBNDS, *supra*, note 54, 4.1 Food Service, Part II, p. 228; *see also* Part V, § D-F, p. 232-237.
[90] Cal. Dep't of Just., (May 2026), *supra*, note 1, at 42-44.
[91] PBNDS, *supra*, note 54, 4.1 Food Service, Part V, § D, p. 232.
[92] Cal. Dep't of Just., (May 2026), *supra*, note 1, at 43.
[93] *Id.*
[94] *Id.*
[95] *Id.* at 42-43.
[96] *Id.* at 42.
[97] *Id.*
[98] *Id.* at 42-43.
[99] *Id.* at 46.
[100] *Id.*

incidents.[101] One person reported that while waiting in the dining hall for intake, without blankets or pillows, a detention officer pepper sprayed individuals in response to complaints – filling a room which contained about 50 people.[102] Individuals reported eye irritation and skin rashes for weeks after the incident.[103] While this incident is concerning on its own, it is especially noteworthy because Adelanto has been sued in the past for pepper spraying people as a control measure in enclosed areas.[104] Although Amicus Curiae could not definitively confirm the incident occurred in the manner described, a use of force incident report prepared by Adelanto at around the same time stated facility staff deployed pepper spray to subdue multiple individuals in the dining room.[105] This report however, blamed the incident on an individual striking a detention officer in a struggle over food.[106]

Like in prior inspections, two of the use of force incidents involved detained individuals who appeared to be experiencing mental health episodes.[107] In one incident, facility officers used calculated force to remove a person from Adelanto and transport him to an outside mental health facility.[108] Detention officers used pepper spray on him and did not report summoning or consulting mental health staff before or during the incident.[109] The PBNDS mandate that detention officers consult with appropriate medical or mental health staff prior to a calculated use of force on a person with special needs, which includes those with mental health conditions, that may impair their ability to understand their situation.[110]

---

[101] *Id.*

[102] *Id.* at 40.

[103] *Id.*

[104] *Rivera Martinez v. GEO Group* (C.D.Cal., May 25, 2018, No. 5:18-cv-01125) ECF No. 1 (complaint). The suit, filed by eight individuals detained at Adelanto settled in January 2020. *See Rivera Martinez v. GEO Group* (C.D.Cal. Jan. 30, 2020, No. 5:18-cv-01125) ECF No. 205 (Notice of Conditional Settlement); *see also* Rebecca Plevin, *Asylum-Seekers Allegedly Pepper-Sprayed at Adelanto Detention Center Settle with GEO Group*, Palm Spring Desert Sun (Feb. 6, 2020), https://tinyurl.com/yc6tsvwf.

[105] Cal. Dep't of Just., (May 2026), *supra*, note 1, at 40.

[106] *Id.*

[107] *Id.* at 46.

[108] *Id.*

[109] *Id.*

[110] PBNDS, *supra*, note 54, 2.15 Use of Force and Restraints, Part V, § F, p. 205.

In the other incident, an individual consumed a handful of unidentified pills and ignored officers' commands to stop.[111] Detention officers used pepper spray on this person, placed them in mechanical restraints, and transferred them to the medical unit.[112] The PBNDS mandate that restraints for medical or mental health purposes may be authorized only by the facility's designated Clinical Medical Authority or initiated by qualified medical personnel with an authorization soon after the restraint.[113] The incident report did not indicate that mental health or medical personnel were consulted or utilized in the restraint of this individual.[114]

### F.   *Reported Concerns Related to Housing Conditions*

Despite the PBNDS' requirement to provide basic necessities, like the provision and replacement of clothing,[115] Amicus Curiae received many reports indicating that Adelanto failed to meet this standard. Those housed at Adelanto and Desert View Annex before June 2, 2025, reported that conditions worsened after the population surged.[116]

Individuals who arrived during or after the influx reported receiving only one pair of underwear and one uniform–versus the "at least two" required.[117] Individuals also reported not receiving new or laundered clothes for weeks and having to handwash their own clothing.[118] Several individuals explained they wore borrowed shoes to their interviews with Amicus Curiae because their own shoes had fallen apart and not been replaced.[119]

The PBNDS require that facility staff must ensure that staff and detained individuals maintain a high standard of facility sanitation and general cleanliness, which includes daily dusting, mopping and trash disposal; but that those detained in

---

[111] Cal. Dep't of Just., (May 2026), *supra*, note 1, at 46.
[112] *Id.*
[113] PBNDS, *supra*, note 54, 4.3 Medical Care, Part V, § Y, p. 275.
[114] Cal. Dep't of Just., (May 2026), *supra*, note 1, at 46.
[115] PBNDS, *supra*, note 54, 4.5 Personal Hygiene, Part V, § B, p. 328; Part V, § H, p. 330.
[116] Cal. Dep't of Just., (May 2026), *supra*, note 1, at 44.
[117] PBNDS, *supra*, note 54, 4.5 Personal Hygiene, Part V, § B, p. 328.
[118] Cal. Dep't of Just., (May 2026), *supra*, note 1, at 45.
[119] *Id.*

the facility are only required to maintain their immediate living areas by making the bed, stacking loose papers and keeping the floor around their spaces neat.[120] The July 2025 inspection occurred about one month after the influx in population and several weeks after Amicus Curiae requested access.[121] Thus, while Amicus Curiae was unable to assess for itself the conditions of the facility during that time, several individuals painted a grim picture. Many individuals across housing units reported that only days before Amicus Curiae's inspection, Adelanto was extremely dirty, with bags of trash piled up in the hallways, dirty surfaces in the housing units and bathrooms, and hallways and tables covered in dirt and debris.[122]

### G.   *Issues Related to Due Process*

Amicus Curiae received reports of serious concerns with individuals' ability to access phones for personal and legal calls.[123] Many individuals reported that phone calls are limited to only a few minutes, that there are not enough phones, and that many of them do not work.[124] Individuals also reported that phones are shut off at random times throughout the day.[125] During Amicus Curiae's tour of Adelanto, several individuals reported that phones in their housing unit do not work all morning from Monday through Thursday, and all day on Fridays.[126] Amicus Curiae, in response to complaints within one unit that their phones did not work, picked up several phones and confirmed that they were not working.[127]

Facility staff confirmed that phones are shut off throughout the facility whenever individuals are departing.[128] This is the same practice Amicus Curiae reported on in its 2021 report.[129] Amicus Curiae remains concerned that this policy

---

[120] PBNDS, *supra*, note 54, 1.2 Environmental Health and Safety, Part V, § A, p. 21.
[121] Cal. Dep't of Just., (May 2026), *supra*, note 1, at 44.
[122] *Id.*
[123] *Id.* at 47.
[124] *Id.*
[125] *Id.*
[126] *Id.*
[127] *Id.*
[128] *Id.*
[129] Cal. Dep't of Just., (Jan. 2021), *supra*, note 12, at 43.

[Proposed] Amicus Brief in Support of Plaintiffs' Renewed Motion for Preliminary Injunction
(5:26-cv-00322-SSS-SP)

impedes detained individuals' ability to contact family and legal representatives.

## III.  DEATHS OF FOUR MEN HELD AT ADELANTO.

While most individuals arrived during the month before Amicus Curiae's inspection, and their medical and detention files did not contain much information, everything indicated Adelanto was a ticking timebomb. Unfortunately, following Amicus Curiae's July 2025 inspection, four deaths occurred inside Adelanto.[130]

On September 22, 2025, Ismael Ayala Uribe died at the age of 39, after one month of detention at Adelanto.[131] According to his family, Mr. Ayala was relatively healthy upon entering the facility, but about two weeks after arriving, he reported feeling sick with a cough and fever.[132] Days later, he was rushed to the facility medical center in a wheelchair after "shaking and complaining of pain in his rear."[133] The media reported that while this condition was characterized as life-threatening by facility staff, nevertheless, an hour and a half later, he was cleared to return to his housing unit after receiving medication.[134] ICE reported that Mr. Ayala died in an external hospital three days later, after a transfer for surgery for an abscess.[135]

On October 23, 2025, Gabriel Garcia Aviles died, at the age of 54, about a week after entering detention in Adelanto.[136] Despite ICE's determination that he died of natural causes and alcohol withdrawal, Mr. Garcia-Aviles' family stated he was healthy prior to his detention, and reported that when they visited him at the

---

[130] Cal. Dep't of Just., (May 2026), *supra*, note 1, at 54.

[131] Cal. Dep't of Just., (May 2026), *supra*, note 1, at 54; *see also* U.S. Immigr. & Customs Enf't, *Detainee Death Report: Ayala Uribe, Ismael*, https://tinyurl.com/cfprfzfm.

[132] Cal. Dep't of Just., (May 2026), *supra*, note 1, at 54; *see also* Ruben Vives and Jenny Jarvie, *A Former DACA Recipient Died in ICE Custody. Did Officials Ignore His pleas for Help?*, L.A. Times (Sept. 24, 2025), https://tinyurl.com/LATUribeAyala.

[133] Cal. Dep't of Just., (May 2026), *supra*, note 1, at 54; *see also* Vives et al, *supra*, note 135.

[134] Vives et al, *supra*, note 135.

[135] *Detainee Death Report: Ayala*, *supra*, note 134.

[136] Cal. Dep't of Just., (May 2026), *supra*, note 1, at 54; *see also* U.S. Immigr. & Customs Enf't, *Detainee Death Report: Garcia Aviles, Gabriel*, https://tinyurl.com/5a66tymy.

hospital shortly before his death, he was intubated, and had blood on his forehead and lips, broken teeth, a cut on his tongue, and bruising on his body.[137]

On February 27, 2026, Alberto Gutierrez Reyes died, at the age of 48, about seven weeks after being detained in Adelanto.[138] According to ICE, he "reported no significant concerns" upon an initial medical exam, and only "reported feeling faint" on February 25, after which he was transferred to an outside hospital.[139] However, his family reported personally witnessing his skin and eyes appearing yellow as he complained of feeling unwell,[140] and they stated Adelanto knew of his diabetes and high cholesterol.[141] According to family and counsel, Mr. Gutierrez Reyes began feeling sick on February 18, 2026, and repeatedly asked for medical attention from Adelanto, filing several medical requests–yet no medical assistance was provided.[142] On February 24, 2026, the last time he spoke to his family, he reported still feeling unwell and hoped he would get to see a doctor soon.[143] His family never heard from him again, and was only informed of his death from another person detained at Adelanto.[144]

On March 25, 2026, Jose Guadalupe Ramos-Solano died at the age of 36.[145] ICE reported that facility staff discovered Mr. Ramos-Solano unconscious and unresponsive and immediately initiated life-saving procedures and transported him

---

[137] Cal. Dep't of Just., (May 2026), *supra*, note 1, at 54; *see also Detainee Death Report: Garcia Aviles*, *supra*, note 139; *and* Izzy Ramirez, *Ten Days After Adelanto Internment, This Beloved Grandfather Died in Custody*, L.A. Taco (Nov. 4, 2025), https://lataco.com/second-death-adelanto-custody.

[138] Cal. Dep't of Just., (May 2026), *supra*, note 1, at 54; *see also* U.S. Immigr. & Customs Enf't., *Detainee Death Notifications* (Mar. 4, 2026), https://tinyurl.com/5bxraezj.

[139] *Detainee Death Notifications*, *supra*, note 138.

[140] Taylor S. Mitchell*, ICE Denies Wrongdoing in Death of Man in California Immigration Facility*, Huffington Post (Mar. 4, 2026), https://tinyurl.com/3sy3ucde.

[141] Marc Cota-Robles, *Westlake Man Dies While in ICE Custody at Adelanto Detention Center, LA Councilmember Says*, ABC7 News (Mar. 3, 2026), https://tinyurl.com/3ujtp644.

[142] Araceli Martinez Ortega, *Mexican Immigrant Dies in ICE Jail in Adelanto*, La Opinion (Mar. 1, 2026), https://tinyurl.com/4x9d5fjf (translated, original version appeared in Spanish).

[143] *Id.*

[144] *Id.*

[145] Cal. Dep't of Just., (May 2026), *supra*, note 1, at 54.

to Victor Valley Global Medical Center in Victorville, California.[146] However, Amicus Curiae received a report that at least one detainee heard Mr. Ramos-Solano say he was overheating and experiencing difficulty breathing; this report indicated that facility staff knew about Mr. Ramos Solano's distress and prevented other detainees from assisting him and that medical staff did not take action until he was already unresponsive.[147] After Amicus Curiae published its 2026 report, the media reported that Mr. Ramos-Solano died from complications of COVID-19.[148]

## IV. CONCERNS OVER RECORDKEEPING.

During its July 2025 inspection, Amicus Curiae was concerned that poor maintenance of records contributed to several issues at Adelanto. For example, Amicus Curiae requested a sampling of custody files that included classification records.[149] However, several of the files reviewed were incomplete and missing classification records.[150] Additionally, during Amicus Curiae's review, facility staff were printing records and appeared to be assembling files, suggesting that records were not already maintained.[151]

## V. THE PUBLIC INTEREST FAVORS A PRELIMINARY INJUNCTION BECAUSE ICE'S CONDITIONS OF CONFINEMENT WILL CONTINUE TO INFLICT SERIOUS AND IRREPARABLE HARMS ON INDIVIDUALS DETAINED AT ADELANTO.

Based on Amicus Curiae's experience, the issues challenged by Plaintiffs continue unabated and are likely to continue without an injunction. The public interest favors a preliminary injunction to protect public health and prevent exposure to inadequate medical care and the conditions described above, and to prevent further deaths at Adelanto.

---

[146] *Id.*; *see also* U.S. Immigr. & Customs Enf't., *Detainee Death Notifications* (Mar. 30, 2026), https://tinyurl.com/5yn5m7vh.
[147] Cal. Dep't of Just., (May 2026), *supra*, note 1, at 54.
[148] Patrick Terpstra, *ICE Detainee Died From COVID-19, Autopsy Shows*, Scripps News (May 2026), https://tinyurl.com/59r3vf9f.
[149] Cal. Dep't of Just., (May 2026), *supra*, note 1, at 41.
[150] *Id.*
[151] *Id.*

The public interest weighs in favor of injunctive relief based on the public health harms caused by defendants. Issues like delayed or poor-quality care and inadequate nutrition all contribute to the declining health and well-being of those in immigration detention.[152] As explained above, Amicus Curiae has observed and documented these and several other issues inside Adelanto. Without injunctive relief, these conditions will likely worsen and may contribute to new mental health diagnoses.[153]

Mental health impacts of immigration detention extend beyond those inside detention, to their families.[154] Detention of a family member, especially if they are the breadwinner, causes a chain reaction which jeopardizes other family members' basic needs like food and housing, affects academic performance, and increases mistrust and avoidance of critical public services like law enforcement, and seeking public benefits and emergency or necessary medical services.[155] Family members also experience heightened levels of stress, anxiety, and depression; and for children, worry for their loved-ones and an inability to self-regulate.[156] Since many of those detained, and their families, are residents of California, these ill-effects reverberate statewide through education, public engagement, and even costs related to mental health services.

As Plaintiffs argue, oversight by the federal government will not resolve these issues.[157] Despite complaints from individuals held at Adelanto, journalists, community members, members of Congress, and Amicus Curiae's own reporting,

[152] Myriam Vidal Valero, *U.S. Immigration Policy: Mental Health Impacts of Increased Detentions and Deportations*, American Psychological Association (Sept. 2025), https://tinyurl.com/c3k2bar6.
[153] *Id.*
[154] *Id.*
[155] *Id.*; *see also* Caitlin Patler & Gabriela Gonzalez, *Compounded Vulnerability: The Consequences of Immigration Detention for Institutional Attachment and System Avoidance in Mixed-Immigration-Status Families*, Oxford University Press (Dec. 2020), https://tinyurl.com/2ufz5xvh.
[156] *Id.*
[157] *L.T. et al., v. ICE, et al.*, 5:26-cv-00322, Dkt. 74 (First Amended Complaint for Injunctive and Declaratory Relief) at ¶¶ 156-161; Dkt. 77 (Renewed Motion for Preliminary Injunction) at 5, 16.

Adelanto continues facing significant issues with the treatment of individuals it detains for civil immigration.

## CONCLUSION

Based on Amicus Curiae's unique experience through its statutory mandate under AB 103, the public interest factor favors the issuance of a preliminary injunction.

Dated: June 10, 2026                          Respectfully submitted,

ROB BONTA
*Attorney General*
*State of California*
MICHAEL L. NEWMAN
*Senior Assistant Attorney General*
VILMA PALMA-SOLANA
*Supervising Deputy Attorney General*

<u>s/ Alex E. Flores</u>
ALEX E. FLORES
*Deputy Attorney General*

*Attorneys for the State of California*

**CERTIFICATE OF COMPLIANCE**

The undersigned, counsel of record for State of California, by and through Rob Bonta, Attorney General (Amicus Curiae), certifies that this brief contains 6, 775 words, which complies with the word limit of L.R. 11-6.1.

Dated: June 10, 2026                               Respectfully submitted,

                                                   *s/ Alex E. Flores*
                                                   ALEX E. FLORES
                                                   Deputy Attorney General

                                                   Attorney for the State of California

# EXHIBIT A



CALIFORNIA

# DEPARTMENT OF JUSTICE

# Immigration Detention in California

## A Review of Conditions of Confinement

### 2026

# Immigration Detention Facility Review Team

**Rob Bonta**
Attorney General

| | |
|---|---|
| Michael L. Newman | Senior Assistant Attorney General |
| Vilma Palma-Solana | Supervising Deputy Attorney General |
| Tiffany Jantz, Ph.D | Director, Department of Justice Research Services |
| Kelly M. Burns, Psy.D. | Deputy Attorney General |
| Emilia P. E. Morris | Deputy Attorney General |
| Roselyn Cantu | Deputy Attorney General |
| Alex Flores | Deputy Attorney General |
| Newton Knowles | Deputy Attorney General |
| Trinidad Ocampo | Deputy Attorney General |
| Deylin Thrift-Viveros | Deputy Attorney General |
| Erandi Zamora-Graziano | Deputy Attorney General |
| Alyssa Zhang | Deputy Attorney General |
| Cristina Gutierrez | Senior Legal Analyst |
| Jewel Boyd | Analyst II |
| Anna Rick | Analyst II |
| Myrna Cintron-Valentin, Ph.D. | Senior Research Supervisor, Department of Justice Research Services |
| Chloe Willis, Ph.D. | Senior Research Associate, Department of Justice Research Services |
| Ryan Hutchings, Ph.D. | Senior Research Associate, Department of Justice Research Services |

**Consultant Experts**

| | |
|---|---|
| Dr. Lisa Anderson | Medical Expert |
| Dr. Dora Schriro | Immigration Detention Expert |

# Table of Contents

1.  **Executive Summary** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

2.  **Glossary of Terms** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

3.  **Introduction** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

4.  **Standards Applicable to Civil Immigration Detention Facilities and Recent Policy Changes** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

5.  **Methodology** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

6.  **Detained Populations** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

7.  **Adelanto ICE Processing Center & Desert View Annex** . . . . . . . . . . . . . . . . . . . 32

8.  **Golden State Annex** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 55

9.  **Mesa Verde ICE Processing Center** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 76

10. **Imperial Regional Detention Facility** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 96

11. **Otay Mesa Detention Center** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 117

12. **California City Detention Facility** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 143

13. **Conclusion** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 168

**List of Figures** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 169

**List of Tables** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 172

**Appendix: All Countries of Origin** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 173

# 1.   Executive Summary

Enacted in response to growing concerns for the health and safety of people in civil immigration detention, Assembly Bill 103 (2017) (AB 103) requires the California Department of Justice (Cal DOJ) to review and report on civil immigration detention facilities operating within the State of California. This mandate has been a critical source of transparency for the public and policymakers regarding conditions in these facilities across California. Cal DOJ has previously issued four reports on conditions in immigration detention facilities in California in 2019, 2021, 2022, and 2025, identifying and documenting substandard and inhumane conditions that fail to meet U.S. Immigration and Customs Enforcement's (ICE) own applicable standards.

In 2025, Cal DOJ found that many of these conditions worsened as the current administration's mass deportation campaign led to overcrowding and strained resources at new and existing facilities. Tragically, there were six deaths of detained individuals between September 2025 and March 2026, four at the Adelanto ICE Processing Center and two at the Imperial Regional Detention Center—the highest number since Cal DOJ started conducting AB 103 reviews. These deaths raise serious concerns about these facilities' ability to safely detain a growing detainee population and highlight the need for greater accountability and oversight.

For its fifth report, Cal DOJ inspected all seven facilities active in 2025 in California operating pursuant to contracts with ICE, including the newly opened California City Detention Facility:

1.  Adelanto ICE Processing Center (Adelanto) operated by The GEO Group, Inc. (GEO Group) in Adelanto;

2.  Desert View Annex (Desert View) operated by GEO Group in Adelanto;

3.  Golden State Annex (Golden State) operated by GEO Group in McFarland;

4.  Mesa Verde ICE Processing Facility (Mesa Verde) operated by GEO Group in Bakersfield;

5.  Imperial Regional Detention Facility (Imperial) operated by Management & Training Corporation (MTC) in Calexico;

6.  Otay Mesa Detention Center (Otay Mesa) operated by CoreCivic in San Diego; and

7.  California City Detention Facility (Cal City) operated by CoreCivic in California City.



**Immigration Detention Facilities in California**

Most of these facilities are located in remote parts of the state that are difficult for family members and attorneys to access. An eighth facility, Central Valley Annex, began to hold ICE detainees in April 2026 as Cal DOJ was finalizing publication of this report. This report does not include a review of conditions at Central Valley Annex.

Since Cal DOJ's 2023 inspections, there has been an unprecedented surge of the population in civil immigration detention facilities within the state, which grew approximately 162% from 2,303 detainees at the time of Cal DOJ's 2023 site visits to 6,028 at the time of site visits in 2025. This population growth included a notable increase of about 379% in the number of female detainees, from 170 at the time of Cal DOJ's 2023 site visits to 815 as of the 2025 visits. Notably, many of these individuals had no criminal history and were classified as low security, a significant divergence from our 2023 findings.

**Table 1** shows for each facility Cal DOJ visited: the maximum number of beds for ICE detainees; the contractual guaranteed minimum number of beds for which ICE has agreed to pay regardless of the actual detainee count; and for Cal DOJ's 2023 and 2025 visits, the date of Cal DOJ's visit, the detainee count on the date of Cal DOJ's 2023 and 2025 visits based on roster data provided by the facility, and the average length of stay (LOS) in days for the detained population on the day of Cal DOJ's 2023 and 2025 visits based on rosters provided by the facilities.

### Table 1. Facility Capacity and Population Data 2023-2025

| Facility | Max. ICE Bed Capacity | Guaranteed Minimum Beds | Cal DOJ 2023 Visit | | | Cal DOJ 2025 Visit | | |
|---|---|---|---|---|---|---|---|---|
| | | | Date[1] | Detainee Count | Avg. LOS (days) | Date | Detainee Count | Avg. LOS (days) |
| Adelanto | 1,940 | 640 | 11/14/23 | 7 | 1,492 | 7/7/25 | 1,570 | 38.6 |
| Desert View Annex | 750 | 480 | 11/14/23 | 417 | 68.4 | 7/7/25 | 517 | 64.1 |
| Golden State Annex | 700 | 560 | 5/2/23 | 159 | 183 | 9/23/25 | 569 | 82.8 |
| Mesa Verde | 400 | 400 | 5/1/23 | 41 | 254.7 | 9/25/25 | 370 | 29.2 |
| Imperial | 704 | 640 | 6/13/23 | 492 | 61.7 | 10/2/25 | 627 | 133.7 |
| Otay Mesa | 1,142 | 750 | 9/19/23 | 1,187 | 58.9 | 10/6/25 | 1,433[2] | 126.5 |
| Cal City | 2,560 | Unknown[3] | N/A | N/A | N/A | 11/19/25 | 942 | 45.6 |

Cal DOJ's inspections focused on emerging dangerous conditions resulting from surging detainee populations, including around conditions of confinement and access to medical care.[4] Cal DOJ staff — with support from a team of correctional and health care experts — toured each facility, reviewed and analyzed logs, policies, detainee records, and other documentation, and interviewed detention staff and detained individuals across the seven detention facilities. These inspections demonstrated that civil immigration detention facilities in California are failing to meet applicable federal detention standards given the significant influx of detainees, creating worsening conditions to the detriment of detainees' health and constitutional rights.

---

1    The dates for 2023 and 2025 represent the date each roster was created by each facility. In some instances, the date the roster was created was one or two days before Cal DOJ's site visit. Imperial's 2025 roster was generated four days before our site visit.
2    The facility appears to be housing more ICE detainees than they are contractually obligated to, as discussed in the Housing Units section of the Otay Mesa chapter herein. Otay Mesa has additional capacity in which it normally holds individuals detained by the U.S. Marshals Service; however detainees also reported that cots were added in housing units during population surges.
3    The guaranteed minimum number of beds in Cal City's contract with ICE is not publicly available.
4    This report is based on Cal DOJ's inspections as indicated herein and publicly available facts and information available as of early 2026.

ICE has established two sets of detention standards: (1) the Performance-Based National Detention Standards 2011 (as amended in 2016) (PBNDS), which state that "[b]ecause ICE exercises significant authority when it detains people, ICE must do so in the most humane manner possible with a focus on providing sound conditions and care,"[5] and apply to all facilities reviewed in this report except Cal City; and (2) the National Detention Standards (2025) (NDS), which are designed to "ensure that detainees are treated humanely; protected from harm; provided appropriate medical and mental health care; and receive the rights and protections to which they are entitled,"[6] and which contractually apply to Cal City.

**Cal DOJ identified multiple violations of ICE's detention standards (both PBNDS and NDS) relating to conditions of confinement and basic medical health care at all seven active facilities in 2025.** As the detained population increased in 2025, most facilities' intake processes and other operations were overwhelmed and violated numerous detention standards. Cal DOJ found declining conditions for detainees who were experiencing inadequate medical care, delay in medical treatment, overcrowding, inadequate food, excessive use of force by detention facility guards, and inadequate clothing, violating standards such as those guaranteeing nutritious meals, an adequate environment, reasonable uses of force, and adequate medical care.[7] Detainee health has been a persistent area of concern for Cal DOJ, with the last two reports focusing on mental health and COVID-19 response, and medical care lapses are ongoing. PBNDS 4.3 and NDS 4.3 require that each facility must provide "medically necessary and appropriate medical, dental and mental health care and pharmaceutical services."[8]

Cal DOJ's review of conditions of confinement, how those conditions affect due process, and the standard of care available to detainees at the seven facilities, identified the following key findings, which are presented in the order Cal DOJ visited the facilities:

At **Adelanto and Desert View**, which are next to each other and share staff, Cal DOJ found:

- Adelanto, and to a lesser extent, Desert View, were overwhelmed by the rapid increase of detainees brought to the facilities in June and the first week of July 2025. Adelanto went from having seven detainees during Cal DOJ's November 2023 site visit to 1,570 detainees during Cal DOJ's most recent site visit on July 8, 2025. Desert View's detainee population increased from 417 to 517 during the same period, an approximately 24% increase.[9]

- After Cal DOJ's site visit, Cal DOJ learned of four deaths of detainees held at Adelanto allegedly associated with substandard medical care.

- Medical and detention staffing levels failed to meet the needs of the surge of detainees housed at both facilities. In interviews conducted by Cal DOJ's staff during the July 2025 site visit, detainees reported that they were unable to access requested medical appointments and did not receive necessary and timely medical treatment, even for emergency medical care.

- The staff at Adelanto failed to timely and consistently conduct the medical, dental, and mental health screening that the PBNDS require at detainee intake.

---

5    See ICE, Performance-Based National Detention Standards 2011 (rev. Dec. 2016), Preface, p. i  <https://www.ice.gov/doclib/detention-standards/2011/pbnds2011r2016.pdf> (as of Apr. 1, 2026) [hereafter ICE, PBNDS 2011].

6    ICE, National Detention Standards (rev. 2025), Foreward, p. 2 <https://www.ice.gov/doclib/detention-standards/2025/nds2025.pdf> (as of May 13, 2026) [hereafter ICE, NDS 2025]. The NDS purportedly streamline and condense certain requirements, eliminate redundant standards, and reduce the burden on ICE's local law enforcement partners. They also were amended in 2025 to align with the Executive Order, "Defending Women from Gender Ideology Extremism and Restoring Biological Truth to The Federal Government" issued on January 20, 2025, discussed in the Standards Applicable to Civil Immigration Detention Facilities and Recent Policy Changes chapter.

7    ICE, PBNDS 2011, Part 1.2 Environmental Health and Safety; Part 2.5 Use of Force and Restraints; Part 4.1 Food Service; Part 4.3 Medical Care.

8    ICE, PBNDS 2011, Part 4.3 Medical Care, Part V, § A, p. 260; ICE, NDS 2025, Part 4.3 Medical Care, Part II, § A, p. 112.

9    The percentage increase of Adelanto's population is a less meaningful figure given that the facility was closed to new intakes for an extended period.

- The facility failed to consistently provide detainees with chronic and acute medical conditions with necessary referrals for follow-up medical care within the facility and to outside medical providers, as also required by the PBNDS.

- Detainees reported that the facilities were serving undercooked food at inconsistent times, occasionally conflicting with detainees' scheduled recreation times. Detainees also reported that the facility provided insufficient drinking water.

- Facility records and detainee reports reflected uses of force that included concerning uses of pepper spray.

At **Golden State**, Cal DOJ found:

- Since Cal DOJ's last site visit in May 2023, the population at the facility increased from 159 detainees to 569 detainees, an approximately 258% increase. The facility's total capacity is 700 detainees.

- Detainees reported low quality and insufficient portions of food.

- Some detainees experienced lengthy periods of segregation in the restricted housing unit, including periods of 100 to over 200 days. The PBNDS recommend that such periods generally not exceed 30 days.

- The facility had language access deficiencies. Its language line offered access to only seven languages and the facility relied on detainees to interpret for other detainees even though ICE expressly prohibits this practice. The detainee handbook, which includes facility rules and procedures that detainees must understand and follow, was only available in English and Spanish at the time of Cal DOJ's visit.

- Detainees appeared not to understand facility rules and procedures due to inadequate orientation. Detainees consequently did not understand how the facility worked and did not understand different options for submitting requests, such as on tablets.

- Uses of force were appropriately reviewed by supervisors, who showed willingness to acknowledge when a use of force was not warranted and to take remedial action.

- Medical care provided to detainees was delayed in many instances. The facility had not increased staffing in response to population growth and was not equipped to handle the increased population. Particular areas of concern include continuity of care for detainees arriving at the facility with existing medical needs, and consistency of referrals to needed specialty care.

At **Mesa Verde**, Cal DOJ found:

- The facility experienced a tremendous population surge since Cal DOJ's last site visit in May 2023; the population increased from 41 detainees to 370 detainees (around 802%). The facility is again housing female detainees, which was not the case at the time of Cal DOJ's previous review.

- Detainees reported a chaotic, overcrowded, overwhelming, and unsanitary intake process.

- Detainees reported low quality and insufficient portions of food, and poor access to clean drinking water. Detainees reported that food was served late, tasted bad, consisted primarily of beans and bread, and for some detainees, upset their stomachs and caused diarrhea. The PBNDS require that facilities provide appetizing meals that meet detainees' nutritional needs.

- Medical care delays, including specialty care and referrals, were widespread and appeared to be caused by delays in approvals by ICE Health Service Corps and cancelled or dropped referrals due to transfers between facilities.

- Mental health and female reproductive health intake assessments did not occur and/or did not meet the timelines mandated by the relevant sections of the PBNDS.

- The facility lacked a proper quality assurance process to identify and improve problems in health care operations.

At **Imperial**, Cal DOJ found:

- The detainee population increased since Cal DOJ's last visit in June 2023 from 492 to 627, an approximately 27% increase. The facility is again housing female detainees, which had occurred in the past but was not the case at the time of Cal DOJ's 2023 review.

- Health care staffing has improved compared to Cal DOJ's site visit in 2023. Imperial has a high sick call volume but draws on stable and experienced senior nursing staff and an increased number of as-needed nursing staff available. At present the staff seems able to respond promptly to requests.

- However, in September 2025 and January 2026, two detainee deaths occurred reportedly due to seizure and heart issues.

- Detainees reported delays or problems obtaining referrals for specialists and getting care for chronic conditions such as diabetes and liver conditions as the PBNDS require.

- File review revealed two cases of detainees receiving mental health care who experienced extended stays in restrictive housing of over 200 days. Cal DOJ observed similar occurrences in the 2023 inspection.

- In their interviews with Cal DOJ, detainees in general reported that they had better living conditions at Imperial as compared to other facilities.

At **Otay Mesa**, Cal DOJ found:

- Overcrowding was a significant issue. The facility's population was 1,433 when Cal DOJ visited in October 2025, as compared with 1,187 at the time of Cal DOJ's 2023 visit, an approximately 21% increase. The facility has experienced multiple temporary population surges in which additional detainees are packed into housing bays on cots or "boats." Detainees reported surges resulted in prolonged intake experiences under poor conditions. The PBNDS provide that under most circumstances, facilities should not hold a greater number of detainees in a room or cell than its stated capacity.

- Overcrowding impacted the cleanliness of the units and put additional strain on resources. For example, in at least some of the housing units, the number of available toilets per detainee was insufficient and did not comply with PBNDS. Due to the high volume of people in each unit, detainees reported that the toilet and shower facilities were often dirty.

- Detainees reported poor quality and insufficient portions of food, both during intake surges and in general.

- Otay Mesa had improved medical staffing since Cal DOJ's 2023 site visits. However, medical recordkeeping was disorganized and violated PBNDS requirements, resulting in lapses in basic care. For example, referrals for essential specialty medical care are inadequately tracked and as a result do not always occur.

- Otay Mesa is the only facility in California with a policy and practice to strip search detainees after each non-legal contact visit. Detainees reported that this practice has an overwhelming negative impact on the mental health and dignity of detainees.

- San Diego County funds a commendable Attorney of the Day program at Otay Mesa, through which unrepresented detainees can obtain legal advice.

At **Cal City**, Cal DOJ found:

- The facility opened prematurely and was not ready to accept detainees. Cal City was inadequately staffed, including detention staff and healthcare staff, in violation of NDS. Lack of staffing negatively impacted facility operations.

- One impact of insufficient staffing was that Cal City did not allow detainees to have contact visits, that is, visits in the same physical space allowing for physical touch or easy shared viewing of documents, as the NDS encourage. This policy negatively impacts detainees' ability to maintain normal parenting or other familial relationships.

- Detainees reported that Cal City was being run like a prison as opposed to a civil detention facility even though the majority of detainees were classified as low security.[10] Detainees spent unnecessarily long periods locked down in their cells for excessive headcounts by facility staff, who did not uniformly have clear written orders describing the duties of their positions, and who reportedly yelled at detainees excessively.

- The NDS require the facility to maintain appropriate temperatures. However, detainees described experiencing extremely cold temperatures, with leaks during rainy periods, and that weather-appropriate clothing was substandard. Detainees, especially older detainees, reported suffering and detainees wept when describing these conditions. To protect themselves from the cold, detainees modified socks to improvise sleeves and covered air vents in their cells with sheets of paper. They reported being written up when they did so.

- Healthcare infrastructure and systems at this new facility were inadequate and some intakes were conducted in a vacant housing pod. Comprehensive intake medical assessments were not consistently completed within National Detention Standard time frames or were dropped altogether.

- Cal DOJ observed crisis-level health care understaffing. For example, there was only one physician providing care, and no backup physician consistently available to provide coverage when the single physician was unavailable. Health care records and detainee interviews also revealed multiple instances of failures to give detainees access to outside specialists.

---

10    See *Jones v. Blanas* (9th Cir. 2004) 393 F.3d 918, 931-935 (civil detainees may not be housed in punitive conditions).

- Mental health staffing and systems appeared superior to other medical resources available at Cal City, although the facility opened before mental health staff were fully onboarded. The Health Services Administrator appeared to be making an effort to improve care.

- Detainees reported inadequate food quantities and needing to purchase additional food at the commissary to fulfill nutritional needs.

- Recreation and outdoor access were not adequate, and female detainees were provided less access to both recreation and outdoor areas than male detainees.

- For detainees who had been held at different facilities, Cal DOJ received repeated detainee reports that conditions were consistently worse at Cal City than other facilities where they had been housed.

Cal DOJ also heard countless stories from detainees—and experts observed in facility records—that transfers, which are bringing many detainees into facilities within California and causing significant movement between facilities in the state, are adversely affecting detainees' conditions of confinement and the quality of medical and mental health care that they receive at facilities located in California. The impact of transfers on detainees' due process rights has been documented through court filings in which attorneys seek to prevent the transfer of their clients so that they are able to maintain contact and adequately represent their clients.[11] Detainees also lamented losing personal items and commissary monetary balances as they were moved from facility to facility. Access to healthcare became more difficult as detainees were moved; Cal DOJ's medical expert found lapses in healthcare, particularly in referrals to outside care because detainees are required to restart the referral process after being transferred.

Against this alarming backdrop, in addition to its regular AB 103 reporting, Cal DOJ has written directly to the federal government and detention facility operators to share information consistent with what is contained in this report and Cal DOJ's previous reports with the intention of enabling their use of this information to make necessary improvements that recognize both their legal and contractual obligations as well as the safety, health, and dignity of those in their custody.[12] This report shares Cal DOJ's findings at these facilities in greater detail exposing the desperate need for corrective action. We call on the operators of each of the immigration detention facilities in California to take these findings as an opportunity to make necessary improvements and follow ICE's own detention standards, and we call on the federal government to engage in effective oversight to make sure the operators comply with these obligations and uphold detainees' civil rights.

---

11    Cheney, *How ICE Defies Judges' Orders to Release Detainees, Step by Step*, Politico (Feb. 10, 2026) <https://www.politico.com/news/2026/02/10/ice-immigration-detention-court-orders-00771727> (as of Mar. 19, 2026).

12    See, e.g., Attorney General Rob Bonta, letter to Hon. Alejandro Mayorkas, Dec. 3, 2024, on file with Cal DOJ. See also Rob Bonta, letter to Hon. Kristi Noem, Dec. 19, 2025 <https://oag.ca.gov/system/files/attachments/press-docs/2025.12.19%20-%20CA%20AGO%20Letter%20to%20DHS%20re%20California%20City%20Detention%20Facility.pdf> (as of Mar. 19, 2026).

# 2.   Glossary of Terms

| | |
|---|---|
| AB 103 | California Assembly Bill 103 (2017) |
| Cal DOJ | California Department of Justice |
| DHS | U.S. Department of Homeland Security |
| DON | Director of Nursing |
| ERO | ICE Enforcement and Removal Operations |
| FFY | Federal Fiscal Year |
| FTE | Full-time Equivalent |
| HSA | Health Services Administrator |
| ICE | U.S. Immigration and Customs Enforcement |
| IGSA | Intergovernmental Service Agreement |
| IHSC | ICE Health Service Corps |
| INA | Immigration and Nationality Act |
| LOP | Legal Orientation Program |
| LOS | Length of (Detention) Stay |
| LVN | Licensed Vocational Nurse |
| NDS | National Detention Standards (2025) |
| ODO | ICE Office of Detention Oversight |
| OIDO | DHS Office of the Immigration Detention Ombudsman |
| PBNDS | Performance-Based National Detention Standards (2011, rev. 2016) |
| PREA | Prison Rape Elimination Act |
| RHU | Restrictive Housing Unit |
| USMS | U.S. Marshals Service |



# 3. Introduction

U.S. Immigration and Customs Enforcement (ICE) detains immigrants in publicly and privately operated facilities throughout the United States, including private detention facilities in California, for purposes of civil immigration proceedings. In 2017, the California State Legislature enacted Assembly Bill 103 (AB 103), codified at Government Code section 12532, in response to growing concerns about the health and safety of people that the federal government detains pending civil immigration proceedings.[13] These included concerns regarding housing people in disciplinary or administrative segregation, the quality and accessibility of health care, suicide risk, and access to counsel. AB 103 requires the Attorney General to review and report on the conditions of confinement, the standard of care, and how conditions of confinement affect due process rights at locked civil immigration detention facilities through July 1, 2027.[14] AB 103 is designed to bring increased transparency about the conditions in the facilities where immigrants are detained. The California Department of Justice (Cal DOJ) has issued four reports since 2019 pursuant to AB 103.

For this fifth report, Cal DOJ staff supported by a team of experts reviewed each of the seven civil immigration detention facilities in operation in the state, all of which are privately operated. This report provides members of the public and policymakers with information about the living conditions of people in civil immigration detention facilities in California. It focuses on how the influx of detainee populations in 2025 has impacted conditions of confinement including intake processing, detainees' access to food and water, housing conditions, detainee safety, detention staffing levels, contact with attorneys and family, and how these conditions impact due process rights. The report also addresses detainees' access to health care, including the adequacy of medical staffing levels, quality of services, referrals to needed outside care, and the impact of the growing population on the provision of care.

This report contains 13 sections: **Section 1** is the Executive Summary; **Section 2** is the Glossary of Terms; **Section 3** is this Introduction; **Section 4** covers Standards Applicable to Civil Immigration Detention Facilities and some recent federal policy changes impacting conditions of confinement; **Section 5** covers the Methodology and data analysis used; and **Section 6** discusses Detained Populations, including the recent changes to the release on bond policy, and relevant demographic data. **Sections 7-12** cover each facility, including Adelanto and the connected Desert View Annex, Golden State, Mesa Verde, Imperial, Otay Mesa, and California City, respectively, and a brief conclusion comprises **Section 13**.

At the time of Cal DOJ's site visits to these seven facilities, there were 6,028 detained individuals from over 120 countries. The most represented countries were Mexico, India, Guatemala, El Salvador, China, Russia, Cuba, Colombia, Venezuela, and Honduras. Many of these individuals are California residents and many others are relatives of California residents. The transparency afforded through information

---

13      Immigrant Legal Resource Center, *California's New Budget Adopts Groundbreaking Changes Concerning Immigration Detention* (June 15, 2017) <https://www.ilrc.org/sites/default/files/pressrelease_dndsb87-v2.pdf> (as of Mar. 19, 2026); Ulloa, *California Lawmakers Attempt to Increase Oversight and Restrictions on the Detention of Immigrants*, L.A. Times (June 17, 2017) <https://www.latimes.com/politics/la-pol-ca-immigrant-detention-centers-oversight-20170617-story.html> (as of Mar. 19, 2026); see also California Coalition for Universal Representation, *California's Due Process Crisis: Access to Legal Counsel for Detained Immigrants* (June 2016) pp. 8-9 <https://www.nilc.org/wp-content/uploads/2016/06/access-to-counsel-Calif-coalition-report-2016-06.pdf> (as of Mar. 4, 2026); Long et al., *Code Red: The Fatal Consequences of Dangerously Substandard Medical Care in Immigration Detention*, Human Rights Watch (June 20, 2018) <https://www.hrw.org/report/2018/06/20/code-red/fatal-consequences-dangerously-substandard-medical-care-immigration> (as of Mar. 19, 2026); Linthicum, *Citing Neglect, Lawmakers Urge Halt to Migrant Detention Center Expansion*, L.A. Times (July 14, 2015) <https://www.latimes.com/local/lanow/la-me-ln-adelanto-immigrant-detention-20150713-story.html> (as of Mar. 19, 2026) (including link to July 2015 congressional letter to ICE about Adelanto detention facility conditions and inadequate medical care and detainee deaths).

14      AB 103 also directs the Attorney General's office to review circumstances surrounding the apprehension and transfer of detainees. Gov. Code, § 12532, subd. (b)(1)(C). However, following litigation brought by the federal government to challenge AB 103, the Ninth Circuit held that the United States was likely to succeed on its claim that this provision violated the law. *United States v. California* (9th Cir. 2019) 921 F.3d 865, 870, cert. den. (2020) 141 S.Ct. 124.

in this report is critical for understanding the health and welfare of every person in California, including people who are detained.

## *Contracts and New Facilities*

When Cal DOJ published its last AB 103 report in April 2025, ICE was operating six immigration detention facilities in California. As of this report's publication, there are eight facilities operating in California, seven of which are reviewed for this report. CoreCivic opened the seventh facility, Cal City, on August 27, 2025, with a capacity of 2,560 beds.[15] The facility opened after ICE issued a sole source justification and approval notice in March 2025 to allow CoreCivic to use a facility it already owned in California City for civil immigration detention purposes.[16]

While finalizing its current report, Cal DOJ became aware that an eighth facility, Central Valley Annex, began to receive ICE detainees in April 2026.[17] The Central Valley Annex, a former state prison with a bed capacity of 700, was added to GEO Group's Mesa Verde contract along with Golden State Annex on December 19, 2019.[18] Since then GEO Group had used Central Valley Annex to hold federal inmates through a contract with the U.S. Marshal Service.[19]

Reports suggest ICE may seek to open additional facilities beyond Cal City and Central Valley Annex. In August 2024, the U.S. Department of Homeland Security (DHS) issued a Request for Information for facilities that could be used for detention in ICE's San Francisco Enforcement and Removal Operations (ERO) Field Office's jurisdiction, which includes the Central Valley and Northern California regions.[20] In September 2024, GEO Group submitted a proposal to use its McFarland Detention Center—which would be its third facility in McFarland—to further expand ICE's available detention space in Kern County, but further action on this proposal has not yet been publicly reported.[21] There also have been reports that the Trump Administration is considering (or has considered) other locations in California to hold civil immigration detainees including the Federal Correctional Institution at Dublin and even a military base.[22]

---

15    Hendricks, *California's Newest Immigration Facility is Also its Biggest. Is it Operating Legally?*, KQED (Sept. 4, 2025) <https://www.kqed.org/news/12054544/californias-newest-immigration-facility-is-also-its-biggest-is-it-operating-legallyhttps://tinyurl.com/2uwsxx9e> (as of Mar. 19, 2026); Black, *Trump Admin Spends Millions to Reopen Private California Prison*, SFGate (Sept. 9, 2025) <https://www.sfgate.com/centralcalifornia/article/trump-admin-reopen-private-california-prison-21037836.php> (as of Mar. 19, 2026).
16    ICE, *Class Urgent and Compelling Justification for Multiple Detention Facilities Supporting ICE* (Mar. 7, 2025) <https://sam.gov/opp/e9aa4c41a123404fbfa22773026cdc99/view#description> (as of Mar. 19, 2026).
17    Wendy Fry, *ICE Quietly Opens Another Detention Center in a Former California Prison*, Cal Matters (Apr. 23, 2026) <https://calmatters.org/justice/2026/04/new-ice-detention-center-mcfarland/> (as of Apr. 24, 2026).
18    Rebeca Pelvin, *ICE Signs Long-Term Contracts Worth Billions for Private Detention Centers, Dodging New State Law*, The Desert Sun (Dec. 20, 2019) <https://www.desertsun.com/story/news/2019/12/20/ice-signs-long-term-contracts-private-detention-centers-two-weeks-ahead-state-law/2713910001/> (as of Appr. 23, 2026); see also GEO Group, Inc., *Mesa Verde, Central Valley, Golden State – Current ICE Contract*, signed Dec. 19, 2019.
19    GEO Group, Inc., *Locations: Central Valley Annex* <https://www.geogroup.com/facilities/central-valley-annex/> (as of Apr. 23, 2026) (listing the U.S. Marshals Service as the client for CVA, with a 700-bed capacity).
20    DHS, *ICE West Coast Multi-State RFI* (Aug. 14, 2024) <https://sam.gov/opp/b062f46b8208474f807af0a75e0d320f/view> (as of Mar. 19, 2026).
21    *ACLU FOIA Litigation Reveals Information About Plans to Expand ICE Detention Facilities Nationwide*, ACLU (April 11, 2025) <https://www.aclu.org/press-releases/aclu-foia-litigation-reveals-information-about-plans-to-expand-ice-detention-facilities-nationwide> (as of Mar. 19, 2026).
22    Gokhale, *Alameda County Supes Oppose Reopening FCI Dublin as Detention Center, Prison*, NBC News (Apr. 8, 2026) <https://www.nbcbayarea.com/news/local/alameda-county-vote-fci-dublin/4065568> (as of Apr. 10, 2026); Hendricks, *Trump Administration's Plans for ICE Detention on Bay Area Military Base Are on Hold*, KQED (Sept. 12, 2025) <https://www.kqed.org/news/12055651/trump-administrations-plans-for-ice-detention-on-bay-area-military-base-are-on-hold> (as of Apr. 10, 2026).

# 4.   Standards Applicable to Civil Immigration Detention Facilities and Recent Policy Changes

## Key Confinement Condition Issues Detained Immigrant Individuals Face

In its prior reports, Cal DOJ identified significant concerns and deficiencies related to immigration detainees' conditions of confinement. Cal DOJ's 2023 and 2025 reports focused on healthcare in particular, with the 2023 report highlighting the detention facilities' response to the COVID-19 pandemic and the 2025 report exploring detainee access to mental health care and the interaction between mental health and the experience of detention generally. This 2026 report looks closer at how rapid growth in the detention population in California has impacted detainees' conditions of confinement.

## Applicable Standards Related to Conditions of Confinement

Immigration detention facilities must operate in accordance with applicable standards, which are generally specified in contracts between ICE and facility operators. Such standards include constitutional requirements, federal and state law requirements, federal detention standards,[23] and applicable professional standards. Indeed, the contracts for these facilities and/or the contractual standards applicable to these facilities (PBNDS or NDS) include language requiring them to follow applicable federal, state, and local laws. In reviewing the facilities' conditions of confinement, Cal DOJ considered all relevant applicable standards.

The United States Supreme Court has held that when the government takes a person into custody, it must provide for that person's "basic human needs—*e.g.*, food, clothing, shelter, medical care, and reasonable safety" and, separately, that medical professionals in custodial settings may be held liable for decisions that constitute a "substantial departure from accepted professional judgment, practice, or standards."[24] The Ninth Circuit has found that civil detainees may not be housed in punitive conditions.[25]

All but one of the immigration detention facilities presently operating in California are bound by ICE's Performance-Based National Detention Standards (PBNDS), issued in 2011 with revisions in 2016.[26] Cal City is bound by ICE's National Detention Standards (NDS), issued in 2000 with revisions in 2025.[27] ICE has contractual authority to enforce its detention standards and has previously faced criticism for its failure to do so.[28]

Below is a summary of key elements of the PBNDS and NDS that apply to conditions of confinement, related to the following topics: 1) food and water, 2) housing conditions, 3) the intake process, 4) access to and continuity of healthcare, 5) legal and family visitation, and 6) detainee safety. Cal DOJ also notes recent policy changes related to legal orientation programs, services for transgender people, and claims processing for third-party providers that are impacting conditions of confinement.

---

23    ICE's Office of Detention Oversight (ODO), part of the Office of Professional Responsibility, conducts detention facility inspections for the federal government and reports on compliance with federal detention standards. See ICE, *ODO Facility Inspections* <https://www.ice.gov/foia/odo-facility-inspections> (as of Apr. 16, 2026); see also American Immigration Council, *Oversight of Immigration Detention: An Overview* (May 16, 2022) <https://www.ice.gov/foia/odo-facility-inspections> (as of Apr. 16, 2026).

24    *DeShaney v. Winnebago County Dept. of Social Services* (1989) 489 U.S. 189, 199-200; *Youngberg v. Romeo* (1982) 457 U.S. 307, 323.

25    *Jones v. Blanas* (9th Cir. 2004) 393 F.3d 918, 931-935; but see *Matherly v. Andrews* (4th Cir. 2017) 859 F.3d 264, 276 (declining to follow *Jones*).

26    ICE FY24 Detention Statistics (Oct. 2024), *supra*; ICE, PBNDS 2011.

27    ICE, NDS 2025.

28    See, e.g., U.S. House of Representatives, Committee on Homeland Security, Majority Staff Report*, ICE Detention Facilities: Failing to Meet Basic Standards of Care* (Sept. 21, 2020) <https://democrats-homeland.house.gov/imo/media/doc/Homeland%20ICE%20facility%20staff%20report.pdf> (as of Apr. 16, 2026).

## Standards Related to Food and Water

PBNDS 4.1 and NDS 4.1 require that clean, potable drinking water is available to detainees at all times.[29] PBNDS 4.1 and NDS 4.1 also both require that detainees receive three meals per day, and that no more than 14 hours elapse between dinner and breakfast.[30] Both sets of standards also require that all food shall be properly prepared, washed, cooked or thawed, and stored for consumption.[31] PBNDS 4.1 and NDS 4.1 require that all food service employees are responsible for maintaining a high level of sanitation in the food service department.[32] This includes, but is not limited to, personal cleanliness and hygiene; sanitary methods of preparing; storing and serving food; and the sanitary operation, care and maintenance of equipment and facility.[33]

PBNDS 4.1 and NDS 4.1 also require that all facilities shall provide detainees requesting a religious diet a reasonable and equitable opportunity to observe their religious dietary practice.[34] Similarly, PBNDS 4.1 requires that detainees with certain conditions, including chronic, temporary, medical, dental, or psychological, shall be prescribed special diets as appropriate and be made available to the detainee by the next business day.[35] NDS 4.1 similarly requires that if a detainee is prescribed a medical diet, their medical diet takes precedence over the common-fare diet.[36]

## Standards Related to Housing Conditions

PBNDS 1.2 and NDS 1.1 require that the facility cleanliness and sanitation shall be maintained at the highest level, in compliance with all applicable federal, state and local safety and sanitation laws and fire safety codes.[37] With regard to standards on cleaning frequency, PBNDS 1.2 places responsibility on the facility for developing and implementing policies, procedures, and guidelines to eliminate or control sources of injuries and modes of transmission of agents or vectors of communicable diseases.[38] This includes maintaining a high standard of facility sanitation and general cleanliness, performing monthly inspections to identify and eradicate rodents, insects, or other vermin, and collecting and removing garbage and refuse at least daily from common areas.[39] PBNDS 1.2 requires that garbage and hazardous waste disposal shall comply with applicable government regulations.[40] NDS 1.1 requires the same standards and requires that the facility ensure appropriate temperatures, lighting, noise levels, and living space.[41]

Detention standards also ensure detainees receive appropriate clothing. PBNDS 4.5 requires a facility to issue at least two sets of uniforms, including two pairs of socks, two pairs of underwear, and one pair of shoes per detainee.[42] NDS 4.4 similarly requires that at no cost to the detainee, all new detainees shall be issued clean, indoor/outdoor, temperature-appropriate, presentable clothing during intake and issued additional clothing as necessary for changing weather conditions or as seasonally appropriate.[43]

---

29    ICE, PBNDS 2011, Part 4.1 Food Service, Part V, § D, p. 232; ICE, NDS 2025, Part 4.1 Food Service, Part II, § C, p. 98.
30    *Ibid.*
31    ICE, PBNDS 2011, Part 4.1 Food Service, Part V, § F, pp. 234-237; ICE, NDS 2025, Part 4.1 Food Service, Part II, § E, p. 100.
32    ICE, PBNDS 2011, Part 4.1 Food Service, Part V, § J, pp. 243-245; ICE, NDS 2025, Part 4.1 Food Service, Part II, § I, pp. 103-105.
33    *Ibid.*
34    ICE, PBNDS 2011, Part 4.1 Food Service, Part V, § G, pp. 237-238; ICE, NDS 2025, Part 4.1 Food Service, Part II, § F, pp. 100-102.
35    ICE, PBNDS 2011, Part 4.1 Food Service, Part V, § H, p. 241.
36    ICE, NDS 2025, Part 4.1 Food Service, Part II, § G, p. 102.
37    ICE, PBNDS 2011, Part 1.2 Environmental Health and Safety, Part V, § A, pp. 20-21; ICE, NDS 2025, Part 1.1 Environmental Health and Safety, Part I, p. 1.
38    ICE, PBNDS 2011, Part 1.2 Environmental Health and Safety, Part V, § A, pp. 20-21.
39    *Id.* at pp. 21-22.
40    *Id.* at p. 22.
41    ICE, NDS 2025, Part 1.1 Environmental Health and Security, Part II, § I, pp. 6-8.
42    ICE, PBNDS 2011, Part 4.5 Personal Hygiene, Part V, § B, p. 328.
43    ICE, NDS 2025, Part 4.4 Personal Hygiene, Part II, § B, p. 127.

PBNDS 5.4 requires that, if outdoor recreation is available at the facility, each detainee have access to at least one hour a day, seven days a week, at a reasonable time of day, and receive a schedule of available recreation times.[44] Standards differ for detainees who are housed with the general population and those who are placed in restrictive housing. PBNDS 5.4 requires that detainees in general population shall have access to outside recreation at least four hours a day, seven days a week, weather and scheduling permitted.[45] PBNDS 5.4 requires that detainees in restricted housing units must be offered at least one hour a day, seven times a week if under administrative custody, and at least one hour a day, five times per week if under disciplinary custody.[46] NDS 5.2 includes at least one hour per day, five days per week for detainees in general population and restricted housing units, with the alternative of six or more hours per day, at least four days per week for general population.[47]

## Standards Related to the Intake Process

PBNDS 2.1 and NDS 2.1 require detention facilities to implement an orderly process for the intake and reception of newly arrived detainees.[48] PBNDS 2.1 and NDS 4.3 require that each detainee be medically screened upon arrival,[49] and that medical and mental health screenings including questions about acute or emergent medical conditions and suicide risk occur "as soon as possible, but no later than 12 hours after arrival."[50] Although ICE recently increased the requirement to 72 hours for ICE holding facilities, the 12-hour intake requirement remains in effect for immigration detention facilities including all seven facilities reviewed for this report.[51] NDS 2.5 requires that the rooms holding detainees while they move through the intake process are of appropriate size per detainee and offer appropriate seating, ventilation, and access to water and facilities, like toilets and showers.[52]

At intake, the detention facility must record a detainee's basic personal information as well as conduct a criminal history check, and a medical, dental, and mental health screening.[53] The facility must also assign detainees a security classification and a housing unit and provide clothing and personal hygiene items.[54] Security classification levels generally determine a detainee's housing assignment and are intended to protect detainees from harm by assigning detainees with similar backgrounds and criminal histories in the same housing unit.[55]

PBNDS 2.1 and NDS 2.1 require that all detention facilities provide an orientation and handbook to each detainee.[56] The orientation handbook at facilities subject to PBNDS must include details about the days and hours a detainee may contact the ICE Enforcement and Removal Operations (ERO) staff.[57]

---

44    ICE, PBNDS 2011, Part 5.4 Recreation, Part II, p. 370.
45    *Id*. at Part V, § B, p. 371.
46    *Id*. at Part II, p. 370.
47    ICE, NDS 2025, Part 5.2 Recreation, Part II, §§ A-D, pp. 152-153.
48    ICE, PBNDS 2011, Part 2.1 Admission and Release, Part II, pp. 49-50; ICE, NDS 2025, Part 2.1 Admission and Release, Part I, Part II, § A, p. 18.
49    ICE, PBNDS 2011, Part 2.1 Admission and Release, Part V, § B, pp. 51-53; ICE, NDS 2025, Part 4.3 Medical Care, Part II, §§ A, B, D, E, pp. 112-114.
50    ICE, PBNDS 2011, Part 4.3 Medical Care, Part V, § J, pp. 266-268; Part 4.6 Significant Self-Harm and Suicide Prevention and Intervention, Part V, § B, p. 333; ICE, NDS 2025, Part 4.3 Medical Care, Part II, §§ A, D, pp. 112-113.
51    ICE, *Memorandum for All ERO Field Office Directors, Nationwide Hold Room Waiver* (June 24, 2025) <https://iptp-production.s3.amazonaws.com/media/documents/2025.06.24_ICE_-_Nationwide_Hold_Room_Waiver.pdf> (as of Mar. 19, 2026); Immigration Policy Tracking Project, *ICE Waives 12-hour Holding Cell Limit, Allowing Detainees to be Held for 72 Hours* (June 24, 2025) <https://immpolicytracking.org/policies/ice-waives-the-12-hour-holding-cell-limit-allowing-detainees-to-be-held-for-72-hours> (as of Mar. 19, 2026).
52    ICE, NDS 2025, Part 2.5 Hold Rooms in Detention Facilities, Part II, § A, p. 31.
53    ICE, PBNDS 2011, Part 2.1 Admission and Release, Part V, § B, p. 51; Part 2.2 Custody Classification System, Part V, § D, p. 63; Part 4.3 Medical Care, Part V, § J, pp. 266-268.
54    ICE, PBNDS 2011, Part 2.1 Admission and Release, Part V, § D, p. 53; Part 2.2 Custody Classification System, Part V, § D, p. 63.
55    ICE, PBNDS, Part 2.2 Custody Classification System, Part I, p. 60, Part V, §§ D-G, pp. 63-65; ICE, NDS 2025, Part 2.2 Custody Classification System, Part I–Part II, §§ A-E, pp. 21-22.
56    ICE, PBNDS 2011, Part 2.1 Admission and Release, Part V, §§ F-G, pp. 55-57; ICE, NDS 2025, Part 2.1 Admission and Release, Part II, §§ H-I, pp. 19-20.
57    ICE, PBNDS 2011, Part 2.1 Admission and Release, Part V, § F, pp. 55-56.

PBNDS 2.1 requires a facility

to provide a translator or access to interpreter services if a detainee does not understand English or Spanish; NDS 2.1 requires similar standards for language access.[58]

## Standards Related to Access to and Continuity of Health Care

The PBNDS and NDS address basic standards of confinement and medical health care. PBNDS 4.3 and NDS 4.3 require that each facility must provide "medically necessary and appropriate medical, dental and mental health care and pharmaceutical services."[59] These services include "comprehensive, routine and preventive health care, as medically indicated," emergency care, specialty health care, timely responses to medical complaints, and hospitalization as needed within the local community."[60] The PBNDS and NDS further lay out that mental health programs must include crisis intervention, referrals for evaluations, diagnosis and treatment by a competent mental health professional, and suicide prevention.[61]

Both the PBNDS and the NDS include standards to ensure facilities identify detainee medical needs in a timely fashion and provide responsive care according to professional standards. PBNDS 4.3 and NDS 4.3 both require that a comprehensive medical and mental health assessment occur within 14 days of arrival unless more immediate attention is required.[62]

For ongoing care during detention, the PBNDS and NDS require a procedure that allows detainees unrestricted opportunities to freely request medical and mental health services.[63] This procedure requires clear written policies and regularly scheduled sick call times that are communicated to detainees.[64] Per PBNDS 4.3 and NDS 4.3, medical personnel must receive and triage all sick call requests within 24 hours after a detainee submits the request, but in urgent situations, medical personnel must be notified immediately.[65] PBNDS 4.3 and NDS 4.3 require a physician be present at the facility or on call for emergency care.[66] A provider must evaluate detainees referred for mental health treatment within 72 hours, and PBNDS requires that each evaluation must consider any history of suicide attempts, illicit drug or alcohol use, or past mental health treatment.[67]

The PBNDS and NDS also include provisions for reasonable accommodations for detainees with disabilities, including cognitive disabilities.[68] PBNDS 4.1 and NDS 4.3 require that medical request slips must be provided in English and in the languages most commonly used by detainees at the facility; for detainees who do not speak these languages, the facility must provide services to assist the detainee to complete the request.[69]

---

58   *Id.* at §§ F-G, pp. 55-57; ICE, NDS 2025, Part 2.1 Admission and Release, Part II, § A, p. 18.
59   ICE, PBNDS 2011, Part 4.3 Medical Care, Part V, § A, p. 260; ICE, NDS 2025, Part 4.3 Medical Care, Part II, § A, p. 112.
60   Id.
61   ICE, PBNDS 2011, Part 4.3 Medical Care, Part V, § O, pp. 269-270; ICE, NDS 2025, Part 4.3 Medical Care, Part II, § S, p. 122.
62   ICE, PBNDS 2011, Part 4.3 Medical Care, Part V, § M, p. 268; ICE, NDS 2025, Part 4.3 Medical Care, Part II, §§ A, B, E, pp. 112-114.
63   ICE, PBNDS 2011, Part 4.3 Medical Care, Part V, § S, pp. 271-272; ICE, NDS 2025, Part 4.3 Medical Care, Part II, § I, pp. 115-116.
64   *Id*.
65   ICE, PBNDS 2011, Part 4.3 Medical Care, Part V, § S, p. 271; ICE, NDS 2025, Part 4.3 Medical Care, Part II, § I, p. 116.
66   ICE, PBNDS 2011, 4.3 Medical Care, Part V, § T, p. 272; ICE, NDS 2025, Part 4.3 Medical Care, Part II, §§ J-K, p. 116.
67   ICE, PBNDS 2011, Part 4.3 Medical Care, Part V, § O, pp. 269-270; ICE, NDS 2025, Part 4.3 Medical Care, Part II, § T, p. 124.
68   ICE, PBNDS 2011, Part 4.8 Disability Identification, Assessment, and Accommodation, Part II, pp. 344-345, Part V, §§ A-F, pp. 347-352; ICE, NDS 2025, Part 4.7 Disability Identification, Assessment, and Accommodation, Part II, § F, pp. 141-143.
69   ICE, PBNDS 2011, Part 4.3 Medical Care, Part V, § S, pp. 271-72; ICE, NDS 2025, Part 4.3 Medical Care, Part II, §§ G, I, pp. 115-116.

PBNDS 4.3 and NDS 4.3 require that, upon transfer between ICE facilities or release or removal from ICE custody, detainees are provided medication, referrals to community-based providers as medically appropriate, and a detailed medical care summary.[70]

## Standards Related to Legal and Family Visitation

Standards also ensure that detainees can maintain connections to their family and support networks outside of the facility, and to legal assistance. Regarding contact with friends and family, PBNDS 5.6 and NDS 5.4 require that detainees have reasonable and equitable access to reasonably priced telephone services.[71] PBNDS 5.7 and NDS 5.5 require each facility to establish written visiting procedures, including a schedule and hours of visitation, and make them available to the public.[72]

PBNDS 5.6 and NDS 5.4 also require that detainees and their legal counsel shall be able communicate effectively with each other, and the facility must ensure their privacy regarding legal matters.[73] PBNDS 5.7 and NDS 5.5 require that detainees be allowed to meet privately with current or prospective legal representation and their legal assistants for a legal visitation.[74] Legal visits may not be terminated for routine official counts under PBNDS and NDS.[75] Legal visits also shall be permitted seven days a week, including holidays, for a minimum of eight hours per day on regular business days, and a minimum of four hours per day on weekends and holidays.[76] PBNDS 6.3 and NDS 6.5 require that when requested and where resources permit, facilities shall provide detainees meaningful access to law libraries, legal materials, and related materials on a regular schedule and no less than 15 hours per week under PBNDS, and five hours per week under NDS.[77]

## Standards Related to Detainee Safety

The PBNDS and NDS include provisions governing uses of force at facilities, prohibiting some uses of force and requiring training, recordkeeping, and reporting of permissible uses of force from detention officers on detainees.[78] PBNDS 2.15 and NDS 2.8 mandate that detention officers consult with appropriate medical or mental health staff prior to a calculated use of force involving a detainee with special needs, which include detainees with mental health conditions, that may impair their ability to understand their situation.[79]

PBNDS 6.2 and NDS 6.2 also require detainees have the ability to file formal or informal grievances and receive a timely resolution and require the facility to keep accurate records of filed grievances and resolutions in a grievance log and detainee detention file.[80] Facility grievance procedures and correspondence shall be communicated to the detainee in a language or manner the detainee can understand.[81]

---

70    ICE, PBNDS 2011, 4.3 Medical Care, Part V, §§ Z, BB, pp. 276, 278-279; ICE, NDS 2025, Part 4.3 Medical Care, Part II, § Q, pp. 120-21.
71    ICE, PBNDS 2011, Part 5.6 Telephone Access, Part V, § A, p. 386; ICE, NDS 2025, Part 5.4 Telephone Access, Part II, § A, p. 158.
72    ICE, PBNDS 2011, Part 5.7 Visitation, Part V, §§ A-B, pp. 393-394; ICE, NDS 2025, Part 5.5 Visitation, Part V, §§ A-G, pp. 163-167.
73    ICE, PBNDS 2011, Part 5.6 Telephone Access, Part V, § F, p. 389; ICE, NDS 2025, Part 5.4 Telephone Access, Part II, §§ J-K, p. 161.
74    ICE, PBNDS 2011, Part 5.7 Visitation, Part V, § J, p. 398; ICE, NDS 2025, Part 5.5 Visitation, Part I, p. 163, Part V, § G, p. 166.
75    ICE, PBNDS 2011, Part 5.7 Visitation, Part V, § J, p. 398; ICE, NDS 2025, Part 5.5 Visitation, Part V, § G, p. 168.
76    ICE, PBNDS 2011, Part 5.7 Visitation, Part V, § J, p. 398; ICE, NDS 2025, Part 5.5 Visitation, Part V, § G, p. 166.
77    ICE, PBNDS 2011, Part 6.3 Law Libraries and Legal Materials, Part II, p. 21, Part V, §§ A, C-G, I-K, pp. 422-427; ICE, NDS 2025, Part 6.3 Law Libraries and Legal Materials, Part II, §§ A-L, pp. 185-188.
78    ICE, PBNDS 2011, Part 2.15 Use of Force and Restraints, Part V, pp. 201-213; ICE, NDS 2025, Part 2.8 Use of Force and Restraints, Part I-II, pp. 44-52.
79    ICE, PBNDS 2011, Part 2.15 Use of Force and Restraints, Part V, § I, p. 206; ICE, NDS 2025, Part 2.8 Use of Force and Restraints, Part II, § B, p. 45.
80    ICE, PBNDS 2011, Part 6.2 Grievance System, Part II, pp. 414-415; ICE, NDS 2025, Part 6.2 Grievance System, Parts I-II, pp. 182-184.
81    ICE, PBNDS, Part 6.2 Grievance System, Part V, Part §§ A-B, pp. 415-416; ICE, NDS 2025, Part 6.2 Grievance System,

## *Policy Changes Impacting Conditions of Confinement*

The Trump Administration has enacted several policy changes since January 2025 that have impacted conditions of confinement for detainees. This section discusses: 1) cancelled legal orientation programs, 2) removing services for transgender people, and 3) claims processing for third-party providers.

### Legal Orientation Programs (LOPs)

Legal Orientation Programs (LOPs) are federally funded programs that provide people in removal proceedings with information about their rights and the immigration process. LOPs are critical in providing immigrants with essential information about their rights as many immigrants are unrepresented. On January 20, 2025, President Trump signed Executive Order 14159, which among other things ordered immediate review of all agreements providing federal funding to non-governmental organizations supporting or providing services to immigrants.[82] Following this Executive Order, the U.S. Justice Department instructed nonprofits on January 22, 2025, to stop work immediately on LOPs.[83] On January 31, 2025, a coalition of nonprofit groups filed a lawsuit challenging the order and sought to restore immediate access to LOPs.[84] In response, on April 10, 2025, President Trump terminated funding for LOPs and other programs providing due process protections for immigrants.[85] The U.S. District Court of D.C. denied the plaintiffs' request for a preliminary injunction and granted partial summary judgement for the government on July 6, 2025.[86] On July 14, 2025, plaintiffs appealed the case to the D.C. Circuit Court; oral arguments were held on October 14, 2025, and the case remains pending.[87] Meanwhile, fewer detained individuals have access to basic information about their legal rights while the mass deportation of individuals is on the rise in California.

### Protections for Transgender People

Federal prison and jail standards, which also cover civil immigration detention facilities, were created to keep transgender, intersex, and gender-nonconforming people safe from sexual violence and harassment. However, on January 20, 2025, President Trump issued Executive Order 14168 requiring federal inmates, including individuals in civil immigration detention, to be placed in facilities based on their sex assigned at birth instead of their gender identity.[88] In response to this directive, the Trump Administration has rolled back a number of protections and data-tracking mechanisms for transgender people. On February 4, 2025, ICE began excluding congressionally-mandated data on transgender people in immigration detention from its biweekly statistical reports.[89] ICE also removed its 2015 Transgender Care Memorandum from its website and amended at least three contracts with detention facilities, including facilities in Florida and New York and one county jail holding detainees in Michigan, to remove transgender care requirements.[90]

Part II, §§ A, H, pp. 182, 184.

82    Exec. Order No. 14159, *Protecting the American People Against Invasion*, 90 Fed. Reg. 8443, 8447 (Jan. 20, 2025).

83    *Amica Ctr. for Immigrant Rights v. U.S. DOJ* (D.D.C. Jan. 31, 2025, No. 1:25-cv-00298) ECF No. 1, at p. 36.

84    *Amica Ctr. for Immigrant Rights v. U.S. DOJ* (D.D.C. Jan. 31, 2025, No. 1:25-cv-00298) ECF No. 1.

85    *Amica Ctr. for Immigrant Rights v. U.S. DOJ* (D.D.C. July 6, 2025, No. 1:25-cv-00298) 2025 WL 1852762, at *4.

86    *Id.* at *1.

87    *Amica Ctr. for Immigrant Rights v. U.S. DOJ* (D.D.C. July 14, 2025, No. 1:25-cv-00298) ECF No. 85; *Amica Ctr. for Immigrant Rights v. U.S. DOJ* (D.C. Cir. Oct. 14, 2025, No. 25-5254) ECF No. 2140010.

88    Exec. Order No. 14168, *Defending Women from Gender Ideology Extremism and Restoring Biological Truth to the Federal Government*, 90 Fed. Reg. 8615, 8616-8617 (Jan. 20, 2025); Vera Institute of Justice, *ICE is Excluding Data on Transgender People in Detention* (June 30, 2025) <https://www.vera.org/news/ice-is-excluding-data-on-transgender-people-in-detention> (as of Mar. 19, 2026).

89    Vera Institute of Justice, *ICE is Excluding Data on Transgender People in Detention* (June 30, 2025) <https://www.vera.org/news/ice-is-excluding-data-on-transgender-people-in-detention> (as of Mar. 19, 2026).

90    *Id.*; Sledge, *ICE is Erasing Rules that Protect Trans Immigrants*, The Intercept (Mar. 27, 2025) < https:/theintercept.com/2025/03/27/ice-trans-immigrant-detainees> (as of Mar. 19, 2026); ICE, *Memorandum, Further Guidance Regarding the Care of Transgender Detainees* (June 19, 2015) <https://web.archive.org/web/20250203042149/http:/www.ice.gov/sites/default/files/documents/Document/2015/TransgenderCareMemorandum.pdf> (as of Feb. 24, 2026).

## Claims Processing for Third-Party Providers

Facility health providers refer detainees to third-party providers for care that the facility cannot provide. ICE reportedly has not paid any third-party providers for medical care for detainees since October 3, 2025.[91] At that time, ICE terminated its processing of all ICE Health Service Corps (IHSC) managed care claims, which the Veterans Affairs Financial Services Center (VAFSC) had been processing.[92] IHSC reportedly has found a new claims processing third-party administrator, Accentra Health, and while IHSC initially estimated that claims processing would resume April 30, 2026, the administrator is now estimating that claims processing will resume during the second quarter of calendar year 2026.[93] This interruption, even if temporary, has caused widespread disruption in the provision of appropriate medical care at facilities in California.

---

91    Legum, *ICE has Stopped Paying for Detainee Medical Treatment*, Popular Information (Jan. 20, 2026) <https://popular. info/p/ice-has-stopped-paying-for-detainee> (as of Mar. 6, 2026); ICE, *IHSC-Managed Care, Important Notifications* (Mar. 2, 2026) <https://www.ice.gov/detain/ice-health-service-corps/ihs-managed-care> (as of Mar. 19, 2026).
92    *Id.*
93    Compare ICE, *IHSC-Managed Care, Important Notifications* (Jan. 13, 2026) <https://www.ice.gov/detain/ice-health-service-corps/ihs-managed-care> (as of April 27, 2026); Acentra Health, *ICE Health Service Corps-Frequently Asked Questions* <https://ihsc-dhs.acentra.com/faq/> (as of April 27, 2026).



# 5. Methodology

The findings presented in this report are the result of a multi-faceted methodology and extensive data analysis. Cal DOJ's review includes researching publicly available information; obtaining and reviewing documents from facility operators for all seven facilities reviewed for this report; consulting with subject matter experts about health care and immigration detention standards; and conducting focused, two-day visits to each facility to inspect and review files and to interview staff and immigration detainees. In addition to subject matter experts, Cal DOJ's review team consisted of attorneys, staff, and law clerks from the Civil Rights Enforcement Section, and a senior research associate from Cal DOJ's Research Services Branch.

## Review of Publicly Available Information

In preparing the report, Cal DOJ consulted relevant publicly available government and nongovernmental entity reports, news articles, and legal filings related to the facilities.

## Consultation with Experts

Cal DOJ retained one medical expert (Dr. Lisa Anderson) and one immigration detention expert (Dr. Dora Schriro) to assist in the reviews contained in this report. Since AB 103 does not impose substantive requirements on the facilities, the experts evaluated the seven facilities reviewed for this report in accordance with best practices and in consultation with the PBNDS, NDS, and professional and industry standards.

## Site Visits

Cal DOJ's review process targeted three AB 103 focus areas: conditions of confinement, the standard of care, and how conditions of confinement affect due process for individuals detained in immigration detention facilities in California. The review for each facility consisted of an assessment of: (1) requested documentation including rosters and logs;[94] (2) facility tours; (3) on-site records review; and (4) interviews with facility staff and detainees.

### Document Review

Cal DOJ requested preliminary documentation from all seven facilities reviewed for this report prior to each site visit and reviewed additional documentation onsite. As detailed throughout this report, not all facilities provided the requested information, and some failed to provide complete information. Cal DOJ summarized the data collected, and prepared tables and charts included throughout this report. Cal DOJ's retained experts also conducted reviews of detainee records (detention files and health care records) onsite during each site visit based on their subject matter expertise.

### Staff Interviews

Cal DOJ and its experts interviewed facility leaders such as facility administrators and health care services administrators, and mid-level rank and file staff who either had expertise in particular functions—such as intake and classification—or who had significant detainee contact. Although most facility operators required that facility counsel be present for interviews, Cal DOJ advised staff that their participation was voluntary, that they would not be named in Cal DOJ's report, and that they would not be subject to retaliation for participating in the interviews.

---

94    Each facility maintains records differently, as reflected in different sections of this report.

## Detainee Interviews

Cal DOJ interviewed 194 detainees across the seven reviewed detention facilities. The detainees participated in interviews led by Cal DOJ staff consisting of questions pertaining to their own background and to facility conditions in the following areas: (i) due process and visitation; (ii) intake; (iii) medical, mental health, and dental care; (iv) access to food and water; (v) conditions of housing; and (vi) detainee and staff relations.

Cal DOJ generally identified detainees for interviews based on their presence on interview sign-up sheets placed in housing units before the date of Cal DOJ's visit and/or detainee rosters provided by each facility. Cal DOJ chose individuals from these two sources by selecting a sampling of detainees covering different housing units with a range of arrival dates and lengths of stay, countries of origin, languages spoken, custody levels, and usage of health care services. All interviewed detainees provided verbal consent to be interviewed by Cal DOJ following an initial explanation regarding the purpose of the review and why they were being interviewed.

Interview spaces and privacy levels varied by facility. At Mesa Verde and Golden State, interviews were conducted through a plexiglass barrier, requiring detainees and Cal DOJ staff to speak and listen to each other through an attached telephone that was not always operable or via an opening in the plexiglass. Interviews at Adelanto, Desert View, Imperial, Otay Mesa, and Cal City took place in an individual and private setting in the facilities' attorney visitation rooms, dining halls, and designated conference rooms or offices, and with Cal DOJ staff and detainees present in the same room.

Cal DOJ interviewed detainees in their preferred language. The languages used during the interviews included: Arabic, Armenian, English, French, Garre, Haitian-Creole, Hindi, Korean, Lao, Mandarin, Nepali, Pashto, Persian, Portuguese, Punjabi, Russian, Sign Language, Spanish, Turkish, Urdu, and Vietnamese. Overall, the detainees with whom Cal DOJ spoke came from 49 different countries, with the greatest number of interviewees coming from Mexico, India, Russia, China, Colombia, Venezuela, El Salvador, Guatemala, Afghanistan, Belize, Iran, and Turkey. For a full list of all countries of origin for all detainees across all seven facilities reviewed in 2025, please see **Figure 6** in the *Detained Populations* section and **Table 22** in the **Appendix** to this report.

Cal DOJ analyzed the data obtained from each of the methods described and the results were integrated into the discussion of each of the topics that are the focus of this report. The retained experts analyzed the data obtained from file review and the interviews they conducted, and Cal DOJ integrated those findings into the reviews of the facilities.

# 6.  Detained Populations

The number of civil immigration detainees has drastically increased since Cal DOJ's last report. This section provides an overview of the federal government's refusal to release detainees on bond, which has significantly increased the number of those detained, and of related litigation. The second part discusses demographic information about the detainees who were held at the seven facilities across California at the time when Cal DOJ inspected them in July through November of 2025.

### i.  Expansion of Detention Through the Elimination of Bond

The Immigration and Nationality Act (INA) granted the U.S. Attorney General authority to arrest and detain noncitizens who immigration officials allege may be subject to removal from the United States and hold them in custody while a decision on whether they may be ordered removed is pending.[95] For nearly 30 years, both ICE and the Board of Immigration Appeals interpreted the immigration statute as authorizing release of persons who had previously entered the United States without inspection through bond.

The Trump Administration and Board of Immigration Appeals changed that interpretation to reduce the availability of bond and increase mandatory detention. This change has been met with numerous lawsuits and habeas corpus petitions nationwide. Pursuant to Executive Orders issued by President Trump in January 2025 laying out a roadmap for the expansion of civil immigration detention,[96] ICE began to restrict officers' discretion in using bond or other forms of conditional release.[97] In addition, the Laken Riley Act became law on January 29, 2025, adding new criminal convictions to the list of those that trigger mandatory detention.[98] For the first time, under this act, detention was mandated based on arrest alone, regardless of whether the arrest resulted in criminal charges or convictions.[99] Simultaneously, critical federal oversight offices within DHS were shuttered.[100]

The Board of Immigration Appeals has also issued decisions resulting in reduced availability of bond for detained immigrants. In May 2025, the Board of Immigration Appeals decided *Matter of Q. Li*,[101] ruling that those released by Border Patrol after crossing the border are subject to mandatory detention and may not seek release on bond. As a result, when the Trump Administration began the policy of "re-arresting"[102] migrants who had been released on bond years earlier and had spent years living inside the United States, they were unable to seek release on bond.[103] Then in August 2025, the Board of Immigration Appeals in *Matter of Yajure Hurtado* adopted the Trump Administration's interpretation and made immigrants categorically ineligible for bond because they crossed the border

---

95    8 U.S.C. § 1226. Under the Homeland Security Act of 2002, which created the Department of Homeland Security (DHS), these responsibilities were transferred to the Secretary of DHS. 6 U.S.C. §§ 542, 557.

96    Exec. Order 14159, 90 Fed. Reg. 8443 (Jan. 20, 2005); Exec. Order No. 14165, 90 Fed. Reg. 8467 (Jan. 20, 2025); Exec. Order 14169, 90 Fed. Reg. 8619 (Jan. 20, 2025).

97    Shaw, *Trump's ICE Limits Illegal Immigrant Releases Amid Moves to Shake Off Biden "Hangover"*, Fox News (Feb. 6, 2025) <https://www.foxnews.com/politics/trumps-ice-limits-illegal-immigrant-releases-amid-moves-shake-off-biden-hangover> (as of Feb. 11, 2026).

98    See 8 U.S.C. § 1226(c).

99    *Id*.

100   Economic Policy Inst., *Trump Administration Closes Three DHS Offices Focused on Civil Rights and Oversight* (Apr. 3, 2025) <https://www.epi.org/policywatch/trump-administration-closes-three-dhs-offices-focused-on-civil-rights-and-oversight/> (as of Apr. 10, 2025).

101   *Matter of Q. Li*, 26 I&N Dec. 66 (BIA 2025).

102   In May 2025, ICE began the policy of "re-arresting", meaning taking into custody people who had previously been encountered either by ICE or by CBP, and had been released and permitted to attend court hearings outside of detention. These individuals were arrested as they attended immigration court hearings and check-ins with ICE. Am. Immi. Council, *Immigration Detention Expansion in Trump's Second Term* (Jan. 2026) at pp. 16-17, <https://www.americanimmigrationcouncil.org/wp-content/uploads/2026/01/immigration-detention-report.pdf> (as of Mar. 19, 2026).

103   *Id*. at p. 22 (citing Clinic Legal, *What Is Going on at the BIA? Is a Release From Detention at the Border Considered Parole or Not?* (June 26, 2025) <https://www.cliniclegal.org/resources/what-going-bia-release-detention-border-considered-parole-or-not> (as of Mar. 24, 2026)).

without inspection, overturning nearly 30 years of precedent.[104] Previously, undocumented immigrants arrested within the country were eligible for bond regardless of their manner of entry. Now millions of undocumented immigrants are subject to mandatory detention.[105]

Numerous challenges to the Trump Administration's new interpretation of the availability of bond have emerged throughout the country, through a nationwide class action, multiple regional class actions, and hundreds of individual habeas petitions.[106] In *Bautista v. Santacruz Jr.*, a California district court granted partial summary judgement to a group of individuals detained by ICE without a bond hearing and ordered individualized bond hearings for plaintiffs.[107] The court also vacated *Matter of Yajure Hurtado* as contrary to law under the Administrative Procedure Act.[108] At the time of this report's publication, the ruling is on appeal at the Ninth Circuit, and is currently stayed pending the federal government's appeal of the class certification and of the lower court order vacating *Matter of Yajure Hurtado*.[109]

In part as a result of the change in interpretation of the availability of bond, the average number of individuals held each day in civil immigration detention facilities across California has more than doubled over the past year.[110]

### ii.  Detainee Demographics Snapshot

Facilities provided various information about the active detainee population, including demographic characteristics, in rosters sent to Cal DOJ shortly before site visits. Facilities varied in what information they provided, but rosters generally included detainee sex, age, security classification, arrival date, and country of origin. The following sections present analyses of key information based on these rosters. Specifically, these snapshots summarize information about active detainees including sex, security classification, length of stay, and country of origin as assessed by Cal DOJ.

**Table 2** provides the count of detainees by facility at the time of Cal DOJ's site visits, the date when each detainee roster was generated, and the detainee arrival date range for all active detainees at the time of the site visits.

---

104  *Matter of Yajure Hurtado*, 29 I&N Dec. 216 (BIA 2025); Am. Immi. Law. Assn., *ICE Memo: Interim Guidance Regarding Detention Authority for Applications for Admission* (July 8, 2025) <https://www.aila.org/library/ice-memo-interim-guidance-regarding-detention-authority-for-applications-for-admission> (as of Apr. 10, 2026).

105  Am. Immi. Council, *Detention Expansion in Trump's Second Term* (Jan. 2026) <https://www.americanimmigrationcouncil.org/wp-content/uploads/2026/01/immigration-detention-report.pdf> p. 23 (as of Mar. 26, 2026).

106  *Id.* at p. 22 (explaining that while "[o]ver 300 federal judges, appointed by every living president, have weighed in on the government's interpretation; just 14 have ruled in favor of it.").

107  *Bautista v. Santacruz Jr*. (C.D.Cal. Nov. 20, 2025, No. 5:25-cv-01873-SSS-BFM) ECF No. 81; *Bautista v. Santacruz Jr*. (C.D.Cal. Nov. 25, 2025, No. 5:25-cv-01873-SSS-BFM) ECF No. 84.

108  *Bautista v. Santacruz Jr*. (C.D.Cal. Feb. 18, 2025, No. 5:25-cv-01873-SSS-BFM) ECF No. 116.

109  *Bautista v. DHS* (9th Cir. Mar. 31, 2026, No. 26-1044, Dkt. 17). Other circuits have also addressed this issue. See, e.g., *Cunha v. Freden* (2nd Cir. Apr. 28, 2026, No. 25-3141); *Buenrostro-Mendez v. Bondi* (5th Cir. 2026) 166 F.4th 494; *Herrera-Avila v. Bondi* (8th Cir. Mar. 25, 2026, No. 25-3248).

110  Miranda, *California ICE Detention Doubles in One Year. One Center Surges From 3 to 1,800*, The Sacramento Bee (Feb. 6, 2026) <https://www.sacbee.com/news/california/article314596167.html> (as of Feb. 12, 2026) (showing that as of January 2026, 6,412 beds of the approximately 8,500 available in California are filled, up from roughly 3,000 in January 2025).

*Table 2. Count of Detainees by Facility and Date Span of Data Provided by Facilities*

| Detention Facility | Count of Detainees | Date Roster was Generated | Detainee Arrival Date Range |
|---|---|---|---|
| Adelanto | 1,570 | July 7, 2025 | March 16, 2020 to July 7, 2025 |
| Desert View | 517 | July 7, 2025 | April 26, 2024 to June 21, 2025 |
| Golden State | 569 | September 23, 2025 | May 5, 2022 to September 22, 2025 |
| Mesa Verde | 370 | September 25, 2025 | June 10, 2025 to September 25, 2025 |
| Imperial | 627 | October 2, 2025 | November 14, 2023 to October 2, 2025 |
| Otay Mesa | 1,433 | October 6, 2025 | June 12, 2024 to October 5, 2025 |
| Cal City | 942 | November 19, 2025 | August 27, 2025 to November 19, 2025 |

## Detainee Sex

All facilities provided information about detainee sex. Some facilities used the term "gender" to describe this category, but "sex" appears to be a more suitable characterization given the use of sex terminology (e.g. female/male vs. woman/man) throughout records. We use "sex" throughout this report to describe this characteristic. Facilities did not provide information about gender identity (e.g. woman, man, nonbinary) or trans status (e.g. cisgender, transgender)[111] in the rosters.

**Table 3** shows the detainee population, by sex, throughout all facilities on the dates of Cal DOJ's site visits. Two individuals at Mesa Verde were classified as "IN", which Cal DOJ assumes is an abbreviation for intersex, although Mesa Verde has not confirmed this understanding. Sex information was not specified for 10 detainees at Mesa Verde. **Table 3** incorporates that intersex assumption, as well as the number of detainees for which sex information was missing.

*Table 3. Distribution of Detainee Population by Sex Throughout All Reviewed Facilities as of Cal DOJ's Site Visits*

| Sex | Count | Percent |
|---|---|---|
| Female | 815 | 13.6% |
| Male | 5,177 | 86.2% |
| Intersex | 2 | <0.1% |
| Missing Data | 10 | 0.2% |

---

111    The term *cisgender* refers to people whose gender identity ideologically aligns with the sex they were assigned at birth (e.g. cisgender women, cisgender men). This term contrasts with *transgender*, which describes people whose gender identity does not ideologically align with the sex they were assigned at birth (e.g. transgender women, transgender men).

Excluding the intersex and missing sex information from Mesa Verde, **Figure 1** shows the distribution of female versus male detainees throughout each facility on the dates of Cal DOJ's site visits.

*Figure 1. Distribution of Female vs. Male Detainees by Facility as of Cal DOJ's Site Visits*



**Figure 2** compares the number of female detainees housed at each applicable facility during Cal DOJ's 2023 site visits versus the 2025 site visits. Cal City is not included in this figure because this facility was not operating during the 2023 site visit. The figure demonstrates that the number of female detainees increased between site visits at the applicable facilities.

*Figure 2. Comparison of the Number of Female Detainees Between Cal DOJ's 2023 and 2025 Site Visits*

In 2023, only two of the six active facilities at that time (Adelanto and Otay Mesa) reported a population of female detainees. At the time of Cal DOJ's 2025 site visits, five out of the seven facilities active in 2025 reported female detainees.

## Detainee Security Classification

Each facility must develop and implement a system for classifying detainees.[112] In making classification determinations, each facility reviews information such as detainees' criminal histories, perceived threat levels, and perceived vulnerabilities.

The names of security classifications vary across facilities. Adelanto, Desert View, Golden State, and Mesa Verde use (abbreviations of) intensity terminology, including "Low", "Medium Low", "Medium High" and "High". These facilities did not use a "Medium" category. Imperial uses a mix of color and intensity terms. Otay Mesa and Cal City report ICE threat levels. For **Table 4** and **Figure 3**, and other analyses related to security classification, Cal DOJ synthesizes these disparate systems into a unified set of intensity terms: "Low", "Medium Low", "Medium", "Medium High", and "High".

*Table 4. Detainee Security Classifications Across All Facilities on the Date of Cal DOJ's 2025 Site Visits*

| Security Classification | Count | Percent |
|---|---|---|
| Low | 3,721 | 62.0% |
| Medium Low | 306 | 5.1% |
| Medium | 307 | 5.1% |
| Medium High | 703 | 11.7% |
| High | 925 | 15.4% |
| Unclear or Missing Data | 42 | 0.7% |

**Table 4** shows the percentage of detainees assigned to each security classification across all reviewed facilities on the date of Cal DOJ's site visits. **Figure 3** shows the percentage of detainees assigned to each security classification at each facility as of the date of Cal DOJ's site visit.

Some detainees are excluded from **Table 4** and **Figure 3** because their security classification was not specified or unclear. Golden State did not provide security classification information for 28 detainees. At Cal City, the security classification was coded as "detainee" for 14 individuals, such that their ICE threat level is unclear.

---

112    ICE, PBNDS 2011, Part 2.2 Custody Classification System, Part V, § A, pp. 61-62; ICE, NDS 2025, Part 2.2 Custody Classification System, Parts I-II, p. 21.

*Figure 3. Percent of Detainees by Security Classification at Each Facility as of Cal DOJ's 2025 Site Visits*



Individuals classified as "Low" accounted for the largest percentage of detainees at all facilities. Over half of all detainees were classified as "Low" at all facilities except Adelanto and Golden State. Adelanto had the highest percentage of detainees classified as "High".

## Detainee Length of Detention

**Table 5** provides descriptive statistics of detainee length of detention in days by facility. Length of detention was calculated by Cal DOJ as the time elapsed between a detainee's arrival date and the date the roster was created.

*Table 5. Detainees' Length of Detention in Days for Each Facility*

| Facility | Minimum | Maximum | Mean | Median | Standard Deviation |
|---|---|---|---|---|---|
| Adelanto | 0 | 1,939 | 38.6 | 28 | 78.7 |
| Desert View | 16 | 437 | 64.1 | 32 | 59.3 |
| Golden State | 1 | 1,237 | 82.8 | 43 | 133.6 |
| Mesa Verde | 0 | 107 | 29.2 | 14 | 32.2 |
| Imperial | 0 | 688 | 133.7 | 82 | 127.8 |
| Otay Mesa | 1 | 481 | 126.5 | 89 | 105.9 |
| Cal City | 0 | 84 | 45.6 | 41 | 28.6 |

The longest stays in detention were associated with detainees housed at Adelanto and Golden State. The highest average (mean) and median stays in detention were associated with Imperial and Otay Mesa. The highest standard deviations were associated with Golden State and Imperial, indicating that there was more variability in detainees' lengths of detention at these facilities.

## Detainee Countries of Origin

All facilities provided information about detainees' citizenship or nationality (country/countries of origin hereafter). However, for some records this information was missing or ambiguous. "Missing" in this context refers to records where this characteristic was left blank. "Ambiguous" here refers to records where the country was unclear. For example, there were records where only "Congo" was entered, such that it is ambiguous whether the intended meaning was the Democratic Republic of Congo or the Republic of Congo. In this and similar cases, the analyses presented in this section count each representation separately, e.g., "Congo," "Democratic Republic of Congo," and "Republic of Congo" are distinct values. Finally, the analyses exclude 148 records that did not indicate a country (i.e. "Africa," "None," "Other or Not Listed," "Stateless," and missing data).

Approximately 127 countries were identified as detainees' countries of origin across facilities using this method. Cal DOJ's analysis indicates that Adelanto detainees were associated with 87 countries, Desert View with 50 countries, Golden State with 61 countries, Mesa Verde with 44 countries, Imperial with 71 countries, Otay Mesa with 86 countries, and Cal City with 74 countries. **Figure 4** displays the top 10 countries across facilities. The most frequently identified countries were Mexico, India, and Guatemala. For a full list of all countries of origin across all reviewed facilities, please see **Figure 6** in this chapter and **Table 22** in the **Appendix** to this report.

*Figure 4. Top 10 Countries of Origin Reported Across All Facilities Based on Cal DOJ's 2025 Site Visits*



**Figure 5** compares the number of distinct detainee countries of origin between Cal DOJ's 2023 and 2025 site visits. Cal City is excluded from this figure because this facility was not operating in 2023. The figure indicates that the diversity of detainees' countries of origin increased at each applicable facility except Desert View between 2023 and 2025.

*Figure 5. Comparison of the Number of Detainee Countries of Origin Between Cal DOJ's 2023 and 2025 Site Visits*



**Figure 6** is a color-coded map indicating all countries of origin listed for all facilities. Countries are shaded according to number of detainees listed as having that country of origin according to the above method, with darker shades corresponding to higher numbers of detainees in the population at the time of Cal DOJ's site visits.

*Figure 6. All Countries of Origin Across All Facilities (Map)*

**Number of Detainees at Time of Cal DOJ Site Visits**

1-5    6-10    11-20    21-50    51-100    101-250    251-500    500+

# 7.  Adelanto ICE Processing Center & Desert View Annex

## I.  Introduction and Summary of Key Findings

Cal DOJ conducted a site visit of the Adelanto ICE Processing Center (Adelanto) and the Desert View Annex (Desert View) on July 8-9, 2025. This report discusses both facilities together because they share most of the same staff and essentially operate together.

The visits to these facilities followed reports of "poor" and "inhumane" conditions at the facilities as a result of a large influx of immigrants being housed there.[113] The population of Adelanto increased from 7 in 2023 to 1,570 by early July 2025 after a court gave final approval of a settlement in a lawsuit that had temporarily limited the population at Adelanto.[114] The substantive increase in the population levels at both Adelanto and Desert View also coincided with the marked increase in immigration enforcement in Southern California that led to the federalization of the California National Guard.[115] Over half of the detainees we interviewed during our site arrived at the facility in June or July of 2025.

The substantive increase in detainees at Adelanto adversely impacted the conditions at both facilities. The observations and interviews at Adelanto and Desert View paint a picture of an understaffed facility overwhelmed with detainees and unprepared to provide basic necessities. Key findings discussed in this report include:

- Adelanto, and to a lesser extent, Desert View, were overwhelmed by the rapid increase of detainees brought to the facilities in the first weeks of June and July. Between June 5-8, 2025, 621 detainees arrived at both facilities. Detainees reported unpredictable intake conditions during this time. Additionally, detainees did not consistently receive adequate clothing and blankets.

- Based on expert review and detainee reports, medical and detention staffing levels were inadequate to meet the needs of the surge of detainees housed at Adelanto and Desert View.

- All detainees were classified as "Low" or "Medium Low" at Desert View. At Adelanto, 573 detainees (about 36%) were classified at these levels.

- According to detainee interviews, the staff at Adelanto failed to consistently conduct the medical, dental, and mental health screening required at detainee intake. According to detainee interviews and review of detainee medical files, Adelanto medical staff frequently failed to conduct necessary follow up for those who did receive medical screenings.

- In interviews conducted by Cal DOJ's staff, detainees reported that they were unable to access requested medical appointments and did not receive necessary and timely medical treatment, even for emergency medical care.

---

113   See, e.g., Jarvie & Solis, *Moldy Food, Dirty Towels: Critics Warn of Inhumane Conditions at California's Largest Detention Center*, L.A. Times (June 20, 2025) <https://www.latimes.com/california/story/2025-06-20/unsanitary-overcrowded-and-inhumane-red-flags-raised-about-conditions-in-adelanto-detention-center> (as of Mar. 19, 2026); Juarez, *California Congress Members Concerned About 'Poor Conditions' Inside Adelanto ICE Facility*, ABC7 (June 17, 2025) <https://abc7.com/post/california-congressmembers-concerned-poor-conditions-inside-adelanto-ice-processing-center/16778053/> (as of Apr. 2, 2026).

114   See *Roman v. Wolf* (C.D.Cal. June 2, 2025, No. 5:20-cv-00768-TJH) ECF No. 2704.

115   See, e.g., Duara et al., *Gavin Newsom Asks Trump to Withdraw Troops From Los Angeles as Protests Intensify*, Cal Matters (June 8, 2025) <https://calmatters.org/justice/2025/06/national-guard-los-angeles> (as of Mar. 19, 2026); Martinez, *Photos Show National Guard with Rifles on ICE Enforcement Missions*, ABC News (June 11, 2025) <https://abcnews.com/Politics/photos-show-national-guard-rifles-ice-enforcement-missions/story?id=122729129> (as of Mar. 19, 2026).

- Detainees at Adelanto and Desert View with chronic and acute medical conditions were not consistently provided necessary referrals for follow up medical and dental care within the facility or to outside medical providers. Cal DOJ's medical expert concluded that these lapses in medical care could be expected to rise without an increase in staffing commensurate to an increase in detainees.

- There were four detainee deaths at Adelanto between September 2025 and March 2026. In all four cases, the families of the deceased allege medical care deficiencies.

- Detainees at Adelanto and Desert View reported that the facilities were serving improperly cooked food at inconvenient and inconsistent times occasionally conflicting with detainees' scheduled recreation times. Detainees also reported poor water quality and insufficient water during intake surges.

- Uses of force at times included inappropriate or concerning uses of pepper spray, including in confined areas.

## II.   Facility Background

**Adelanto.** Adelanto is a facility located in Adelanto, California in San Bernardino County, that is owned and operated by The GEO Group, Inc. (GEO Group). GEO Group purchased the facility, formerly a state prison, from the City of Adelanto in 2010 and through a subcontract started housing civil immigrant detainees in 2011.[116] In December 2019, ICE entered a new contract with GEO Group that included Desert View, which opened in 2021 and operates in a former state prison adjacent to Adelanto's East building.[117] In September 2024, ICE exercised a five-year option extending its Adelanto contract, including Desert View, with GEO Group through December 19, 2029.[118] The PBNDS apply to Adelanto and Desert View.[119]

Adelanto has an official capacity of 1,940 beds.[120] ICE pays GEO Group a guaranteed minimum of 640 beds at Adelanto.[121] Adelanto is separated into an east wing, which primarily consists of dorms, that holds both female and male detainees, and a west wing holding only male detainees in two- to eight-person cells.

116   Lindstrom, *Adelanto Seals City-Owned Prison Sale for $28 Million*, Victorville Daily Press (Mar. 30, 2010) <https://www.vvdailypress.com/story/news/2010/03/29/adelanto-seals-city-owned-prison/37089771007/> (as of Mar. 24, 2026); ICE, Office of Detention Oversight, *Adelanto ICE Processing Center Inspection* (Sept. 16-18, 2025) <https://www.ice.gov/doclib/foia/odo-compliance-inspections/AdelantoProcessingCenterAdelantoCA-September-16-18-2025.pdf> (as of Mar. 26, 2026).

117   ICE, Detention Facility Contractor Contract with the GEO Group and Amendment (2019) <https://www.ice.gov/doclib/foia/detFacContracts/70CDCR20D00000009_org_AdelantoDetFac_AdelantoCA.pdf> (as of Mar. 26, 2026).

118   ICE, Detention Facility Contractor Contract with the GEO Group Amendment (2024) <https://www.ice.gov/doclib/foia/detFacContracts/70CDCR20D00000009_P00020-21_AdelantoDetFac_AdelantoCA.pdf> (as of Mar. 26, 2026).

119   ICE, *Adelanto ICE Processing Center Inspection* (Sept. 2025), p. 4.

120   The GEO Group, Inc., *Locations: Adelanto ICE Processing Center* <https://www.geogroup.com/facilities/adelanto-ice-processing-center/> (as of Mar. 24, 2026)

121   ICE, *Detention Management* (Mar. 23, 2026) <https://www.ice.gov/detain/detention-management> (as of Mar. 24, 2026). Cal DOJ reviewed ICE FY25 Detention Statistics (Jul. 7, 2025) to assist with this preparation of this analysis. ICE, Detention Management, Fiscal Year 2025 National Detention Statistics (Jul. 7, 2025) (as of Mar. 24, 2026) ("ICE FY25 Detention Statistics (Jul. 2025)").

*Table 6. Key Data Points, Adelanto ICE Processing Center*

| | |
|---|---|
| **Facility:** | **Adelanto ICE Processing Center** |
| **Operator:** | GEO Group |
| **Housing Detainees Since:** | 2010 |
| **Bed Capacity:** | 1,940 |
| **Type(s) of Detainees Facility Can Hold:** | Female and Male Civil Adult Detainees |

Prior to Cal DOJ's visit, the last reported full inspection of Adelanto had been conducted by the Department of Homeland Security Office of Detention Oversight (ODO) in February 2024.[122] In this inspection, ODO assessed the facility's compliance with 29 PBNDS standards, finding one deficiency: facility supervisors did not punctually sign the shift logs in 13 out of the 66 logs inspected.[123] ODO conducted a follow-up inspection in July 2024, at which time it assessed the facility's compliance with 18 PBNDS standards and found no deficiencies.[124]

In September 2025, two months after Cal DOJ's visit, ODO inspected Adelanto.[125] In this inspection, ODO assessed Adelanto's compliance with 29 PBNDS standards and found six deficiencies in three PBNDS standards: ODO found that facility staff did not always complete reclassification within 24 hours before a detainee left the Special Management Unit;[126] that the facility did not always secure detainee property bags or return detainee property on their release; and that the facility's detainee grievance appeal board did not always provide a decision within five days of an appeal, did not always note the outcome of the decision, and did not always provide the decision or supporting documentation to the facility administrator.[127] According to ODO, the "sudden influx" of detainees to Adelanto may have contributed to these deficiencies.[128]

On January 26, 2026, the Coalition for Humane Immigrant Rights (CHIRLA) and four detainees seeking to represent a class of all detainees at Adelanto filed a complaint against ICE, DHS, and officials at those agencies.[129] In the complaint, the plaintiffs described the medical care at Adelanto as "grossly inadequate and dangerous," and that detainees face "shocking levels of medical neglect" partly attributed to staffing shortages impacting the provision of medical and mental health care of the facility.[130] The plaintiffs allege that: 1) the conditions of confinement and insufficient medical care at the facility deprive detainees of their due process rights under the Fifth Amendment to the U.S. Constitution; 2) disabled detainees are not provided reasonable accommodations due to them under the federal Rehabilitation Act; and 3) ICE is not properly enforcing the PBNDS standards at the facility in violation of the Administrative Procedure Act.[131]

---

122   ICE, Office of Detention Oversight, *Adelanto ICE Processing Center Unannounced Compliance Inspection* (Feb. 6-8, 2024) <https://www.ice.gov/doclib/foia/odo-compliance-inspections/adelantoIPC_AdelantoCA_Feb6-8_2024.pdf> (as of Mar. 19, 2026).
123   *Id.* at p. 8.
124   ICE, Office of Detention Oversight, *Adelanto ICE Processing Center Follow-up Compliance Inspection* (July 16-18, 2024) <https://www.ice.gov/doclib/foia/odo-compliance-inspections/2024-AdelantoIPC-AdelantoCA-July.pdf> (as of Mar. 26, 2026).
125   ICE, *Adelanto ICE Processing Center Inspection* (Sept. 2025), *supra*, p. 4.
126   Special Management Units, as defined by the PBNDS, are units in detention facilities that segregate certain detainees from the general population, including detainees who are separated for disciplinary or administrative reasons, or detainees who have been placed in protective custody. ICE, PBNDS 2011, Part 2.12 Special Management Units, Part II, p. 171. Facility staff are required to complete a special reclassification of any detainee in the twenty-four hours before a detainee leaves the Special Management Unit. ICE, PBNDS 2011, Part 2.2 Custody Classification System, Part V, § H, p. 65.
127   ICE, *Adelanto ICE Processing Center Inspection* (Sept. 2025), *supra*, pp. 6-7 (the number of instances for each deficiency is redacted).
128   *Id.* at p. 7.
129   *L.T. v. ICE* (C.D.Cal. Jan. 26, 2026, No. 5:26-cv-00322) ECF No. 1.
130   *Id.* at pp. 24-25.
131   *Id.* at pp. 54-61.

At the time of this publication, four detainees who arrived at Adelanto after Cal DOJ's visit died while in the custody of GEO Group: Ismael Ayala Uribe on September 22, 2025, Gabriel Garcia Aviles on October 23, 2025, Alberto Gutierrez Reyes on February 27, 2026, and Jose Guadalupe Ramos-Solano on March 25, 2026.[132]

**Desert View**. ICE pays GEO Group a guaranteed minimum of 480 beds at Desert View.[133] The last reported inspection of Desert View was conducted by ODO in February 2025.[134] In this review, ODO assessed the facility's compliance with 28 PBNDS standards and found one deficiency: none of the seven holding rooms at the facility had floor drains.[135]

*Table 7. Key Data Points, Desert View*

| Facility: | Desert View |
|---|---|
| Operator: | GEO Group |
| Housing Detainees Since: | 2021 |
| Bed Capacity: | 750 |
| Type(s) of Detainees Facility Can Hold: | Male Adult Civil Detainees |

## III.  Methodology and Limitations

Cal DOJ staff and experts, including a medical expert and an immigration detention expert, visited Adelanto and Desert View on July 8-9, 2025. The site visit was planned in response to reports of the rapid increase in the number of detainees at Adelanto in particular and focused on the impacts of the population increase on conditions of confinement. Cal DOJ collected data and observed conditions at the facilities, interviewed detainees and facility staff, and reviewed relevant documents.

Cal DOJ and its medical expert usually interview the Medical Director, Health Services Administrator, and other health care staff to complete its review of detainee medical and mental health care. During this site visit, however, the Medical Director and the Director of Nursing were not available for interviews. Cal DOJ instead interviewed GEO Group's Regional Health Services Director and a facility physician.

Cal DOJ also interviewed individuals detained at the facilities, chosen by selecting a sampling of detainees from different housing units with a range of intake dates and countries of origin. In addition, Cal DOJ interviewed detainees who signed up to speak with Cal DOJ on notices posted in dormitories during the week preceding the site visit. In total, Cal DOJ interviewed 23 detainees at Adelanto and 15 detainees at Desert View over the course of the two-day visit. These interviews took place in a private setting with either one or two Cal DOJ team members. Cal DOJ interviewed detainees in their preferred language, either by Cal DOJ staff who were proficient in the language or through a telephone interpretation service. The languages used during the interviews included English, Hindi, Mandarin, Russian, Spanish, and Urdu.

---

132    ICE, *Detainee Death Reporting* (Mar. 4, 2026) <https://www.ice.gov/detain/detainee-death-reporting> (as of Apr. 14, 2026) (ICE database containing detainee death reports for any deaths occurring in ICE custody). ICE refers to detainees as "illegal aliens" in its death reports and press releases. Cal DOJ does not use this terminology to refer to detainees.

133    ICE FY25 Detention Statistics (Sept. 2025), *supra*.

134    ICE, Office of Professional Responsibility, *Desert View Modified Community Correctional Facility Inspection* (Feb. 25-27, 2025) <https://www.ice.gov/doclib/foia/odo-compliance-inspections/DesertViewModifiedCommCorrFac_AdelantoCA_Feb25-27_2025.pdf> (as of Mar. 19, 2026).

135    *Id.* at p. 7.

## IV. Detained Population

**Adelanto**. At the time of Cal DOJ's July 2025 visit, 195 female detainees and 1,375 male detainees were held at Adelanto; about 37% of detainees came from Mexico or Guatemala. The detainees at Adelanto represented approximately 87 different countries.[136] The top 10 countries of origin were Mexico (432 detainees), Guatemala (151), Cuba (138), El Salvador (126), Colombia (64), Honduras (58), Russia (56), China (54), Venezuela (47), and Iran (46). [137]

*Table 8. Snapshot of Detainees Housed at Adelanto ICE Processing Center on July 7, 2025*

| | |
|---|---|
| **No. of Countries of Origin:** | **87** |
| **No. of Female Detainees:** | 195 |
| **No, of Male Detainees:** | 1,375 |
| **Average Age:** | Data Not Provided |
| **Average Length of Detention:** | 39 Days |
| **Longest Length of Detention:** | 1,939 Days |

*Settlements Impacting the Number of Detainees at Adelanto.*

Adelanto's detainee population of 1,570 at the time of Cal DOJ's site visit represents an increase of 1,563 detainees since Cal DOJ's site visit in November 2023, when Adelanto held only seven detainees.[138] According to the roster provided to Cal DOJ by GEO Group, only two Adelanto detainees present on July 7, 2025, arrived at the facility before 2025.

Following a lawsuit over a dangerous outbreak of COVID-19 at Adelanto, in April 2020, a federal judge ordered the release of some detainees, a suspension of new intakes, and a reduction of Adelanto's detainee population.[139] As a result of the court's order, Adelanto held only seven detainees when Cal DOJ visited Adelanto in November 2023.[140] The parties reached a settlement agreement in late 2024. Following preliminary approval of the settlement, the court ordered a temporary lift of the ban on new intakes on January 24, 2025, allowing Adelanto to house up to 475 detainees.[141] The final approval of the settlement agreement was granted on June 2, 2025, allowing Adelanto to once again house up to 1,950 detainees.[142]

ICE increased its immigration enforcement efforts in Los Angeles shortly after the settlement removed the cap on detainees in June 2025. As a result of this surge in enforcement efforts and transfers from other facilities, the population in Adelanto at the time of Cal DOJ's visit on July 8 and 9 was approximately 1,570. **Figure 7** shows the distribution of arrivals by month and year for detainees held at Adelanto as of July 7, 2025. Forty-seven detainees arrived on January 31 and February 1, many of whom were moved over from Desert View. These were among the first new detainees at Adelanto.

---

136    GEO Group produced to Cal DOJ a roster of detainees dated July 7, 2025.
137    Seventy-five detainees (4.8%) on the Adelanto roster provided by GEO Group did not have a country of citizenship listed.
138    Cal Dept. of Justice, Office of the Attorney General, *Immigration Detention in California* (Apr. 2025) <https://oag.ca.gov/system/files/media/immigration-detention-2025.pdf?> p. 26 (as of Apr. 1, 2026).
139    *Roman v. Wolf* (C.D.Cal. Apr. 23, 2020, No. 5:20-cv-00768-TJH) ECF No. 55.
140    *Immigration Detention in California* (Apr. 2025), *supra*, p. 26.
141    *Roman v. Wolf* (C.D.Cal. Dec. 23, 2024, No. 5:20-cv-00768-TJH) ECF No. 2636 (settlement agreement and release); see *Roman v. Wolf* (C.D.Cal. Jan. 24, 2025, No. 5:20-cv-00768-TJH) ECF No. 2670 (temporarily lifting ban on new detainee intakes at Adelanto, pending final approval of the settlement agreement); see also Castillo, *Once on the Brink of Closure, Adelanto Facility Will Resume Detaining Immigrants*, L.A. Times (Jan. 29, 2025) <https://www.latimes.com/california/story/2025-01-29/adelanto-immigration-facility-to-resume-housing-migrants> (as of Mar. 19, 2026).
142    *Roman v. Wolf* (C.D.Cal. June 2, 2025, No. 5:20-cv-00768-TJH) ECF No. 2704.



*Figure 7. Arrival Month of Detainees on July 7, 2025 Roster at Adelanto*

As shown in **Table 9**, a review of arrival dates of those held at the facility as of July 7, 2025, indicates that Adelanto experienced a surge of daily intakes starting on June 4, 2025, following the increase of enforcement efforts in Los Angeles in June.

*Table 9. Arrival Dates of Detainees at Adelanto present on July 7, 2025: June 1-10, 2025*

| Date | Number of Arrivals |
|---|---|
| **June 1, 2025** | 3 |
| **June 2, 2025** | 0 |
| **June 3, 2025** | 2 |
| **June 4, 2025** | 76 |
| **June 5, 2025** | 33 |
| **June 6, 2025** | 157 |
| **June 7, 2025** | 59 |
| **June 8, 2025** | 109 |
| **June 9, 2025** | 105 |
| **June 10, 2025** | 69 |

These numbers are not a complete account of the numbers of detainees arriving at the facility in 2025; they only reflect the population as of July 7, 2025, and not all detainees entering and exiting the facility between January and July 7, 2025.

**Desert View**. Desert View had 517 detainees at the time of Cal DOJ's visit, a population increase of 100 detainees compared to Cal DOJ's site visit in November 2023, when Desert view held 417 detainees.[143] The detainees at Desert View at the time of Cal DOJ's visit represented about 50 different

---

143    *Immigration Detention in California* (Apr. 2025), *supra*, p. 27.

countries; around 30% of detainees were from Mexico and Guatemala.[144] The top 10 countries of origin were Mexico (88 detainees), Guatemala (65), China (41), India (38), Nicaragua (25), El Salvador (24), Venezuela (21), Colombia (19), Cuba (19), and Nepal (17).

### *Table 10. Snapshot of Detainees Housed at Desert View Annex on July 8, 2025*

| | |
|---|---|
| **No. of Countries of Origin[145]:** | **50** |
| **No. of Female Detainees:** | 0 |
| **No. of Male Detainees:** | 517 |
| **Average Age:** | Data Not Provided |
| **Average Length of Detention:** | 64 Days |
| **Longest Length of Detention** | 437 Days |

According to facility staff, all detainees classified as high were moved from Desert View to Adelanto when Adelanto's population cap was lifted.[146] **Figure 8** provides a breakdown of when the 517 detainees held at Desert View at the time of Cal DOJ's site visit arrived at the facility.

### *Figure 8. Arrival Month of Detainees on July 7, 2025 Roster at Desert View*



**263 of the 517 detainees at Desert View on July 7, 2025, arrived at the facility over the course of four days in June 2025: June 5 to June 8**. As for all facilities discussed in this report, these numbers only reflect the detainees who were at the facility as of Cal DOJ's July 7, 2025 site visit, and not all persons detained at Desert View from April 2024 to July 7, 2025 and who may have been released, transferred, or deported prior to Cal DOJ's site visit.

## V.   Conditions of Confinement

Conditions of confinement consist of various factors, policies, and protocols that affect the experiences of detainees, including the provision of health care and mental health. The conditions reviewed below include 1) intake and orientation process; 2) food, nutrition, and access to water; 3) housing units; 4)

---

144   Nine detainees on the Desert View roster provided by GEO did not have a country of citizenship listed.
145   This figure is from GEO Group's roster of detainees provided to Cal DOJ on July 7, 2025. Nine detainees did not have a country of origin listed.
146   *Roman v. Wolf* (C.D.Cal. Jan. 24, 2025, No. 5:20-cv-00768-TJH) ECF No. 2670.

detention and safety; and 5) access to social and programming opportunities. Cal DOJ found several deficiencies, including an unpredictable intake process where detainees reported waiting days or even weeks before assignment to a housing unit, improperly cooked food, and uses of force that at times included inappropriate or concerning uses of pepper spray, including in confined areas.

### A. Intake and Orientation

#### 1. Intake Process

The influx of detainees at Adelanto and Desert View in early June 2025 appears to have created a chaotic environment in which the facility failed to comply with PBNDS standards relating to intake. Detainees reported waiting days and even weeks before receiving a classification and housing assignment, and in many cases, not receiving a medical screening at all.

Generally, a detainee's first point of contact with the facility is in the intake area. For all new arrivals at Adelanto and Desert View, intake for male detainees is at Adelanto West; those being housed at Desert View are moved there after the intake process. Female detainees are processed through the intake area at Adelanto East. Each wing of Adelanto has around eight holding rooms in the intake area, each of which held one to 10 detainees at the time of Cal DOJ's tour during the visit, and two examination rooms for health examinations. Each holding room contains a flat surface for sitting or sleeping, and one toilet. Cal DOJ did not observe showers in any of the holding rooms or in the intake area. A third-party contractor handles fingerprinting, issuance of A numbers, and interviews for asylum-seekers. Desert View has a similar intake area, with five holding rooms.

PBNDS 2.1 requires detention facilities to implement an orderly process for the intake and reception of newly arrived detainees. This process, which includes recording a detainee's basic personal information, a criminal history check, and a medical, dental, and mental health screening, should take no longer than 12 hours.[147] Thus, within 12 hours of arriving at the facility and before placement in a housing unit, detainees must receive an initial medical, dental, and mental health screening, be assigned a security classification, receive clothing and personal hygiene items, and be assigned to a housing unit.[148] During this time, detainees still in the intake process are to be kept separated from the detainee population that has already been assigned a permanent housing unit. ICE's stated reason for the initial separation is to protect the "safety, security and good order of the facility."[149] Depending on when they arrived at Adelanto, detainees reported waiting in the intake area from several hours to several days before being assigned to a housing unit. Two detainees reported staying in the intake area for two nights, and one detainee for four days. Five interviewed detainees reported staying in the intake area overnight.

Three detainees who arrived at the beginning of June reported being required to sleep on the floor of a dining room for several days, without receiving a medical screening or receiving a housing unit assignment through the classification process and after spending the night shackled in a van. Other detainees reported that they were not provided blankets or pillows and had to use trash bags as blankets. These detainees further detailed how they were temporarily transferred to a housing unit, where they stayed for up to two weeks, and then taken back to the intake area for the formal intake process.

---

147    ICE, PBNDS 2011, Part 2.1 Admission and Release, Part II, pp. 49-50, Part V, § A, pp. 49-51.
148    ICE, PBNDS 2011, Part 2.1 Admission and Release, Part V, §§ A-B, pp. 50-51; Part 2.2 Custody Classification System, Part V, § D, p. 63; Part 4.3 Medical Care, Part V, § J, p. 266.
149    ICE, PBNDS 2011, Part 2.1 Admission and Release, Part V, § A, p. 50.

*Figure 9. Dining Hall Used for Uniform Sorting at Adelanto*



One detainee reported that, while detainees were awaiting the intake process in a dining area with no blankets or pillows, a detention officer pepper sprayed the detainees, filling a room which contained about 50 detainees. This detainee reported that the detainees were then moved to a housing unit, but still reported eye and skin irritation for days after the incident. While this incident is concerning on its own, it is especially noteworthy because GEO Group has been sued in the past for pepper spraying detainees as a control measure in enclosed areas at Adelanto.[150] Although Cal DOJ could not definitively confirm that this incident occurred in the manner described by the detainee, a use of force incident report prepared by facility staff at around the same time the detainee stated the incident occurred specified that facility staff deployed pepper spray to subdue multiple detainees in the dining room. This report blamed the incident on a detainee striking a detention officer in a struggle over food.

At Desert View, four detainees who arrived in June reported waiting in the intake area from six to 12 hours, with multiple detainees stating that they waited a full day before being processed.

### 2. Orientation

PBNDS 2.1 requires that all detention facilities provide an orientation and handbook to each detainee.[151] Adelanto and Desert View facility staff stated that they provide know-your-rights materials and handbooks in English or Spanish to detainees. PBNDS 2.1 requires a facility to provide a translator or access to interpreter services if a detainee does not understand English or Spanish.[152] Cal DOJ requested a list of languages in which the handbooks are provided at Adelanto and Desert View; GEO Group provided English and Spanish handbooks only, consistent with detainee and staff reports. Cal DOJ did observe some handouts posted in languages other than Spanish and English but did not see evidence of in-depth materials being offered in additional languages.

---

150     *Rivera Martínez v. GEO Group* (C.D.Cal. May 25, 2018, No. 5:18-cv-01125) ECF No. 1 (Complaint). The suit, filed by eight Adelanto detainees, was settled in January 2020. *Rivera Martínez v. GEO Group* (C.D.Cal. Jan. 30, 2020, No. 5:18-cv-01125) ECF No. 205 (Notice of Conditional Settlement); see Plevin, *Asylum-Seekers Allegedly Pepper-Sprayed at Adelanto Detention Center Settle with GEO Group*, Palm Springs Desert Sun (Feb. 6, 2020) <https://www.desertsun.com/story/news/2020/02/06/asylum-seekers-allegedly-pepper-sprayed-adelanto-detention-center-settle-geo-group/4680659002> (as of Mar. 16, 2026).

151     ICE, PBNDS 2011, Part 2.1 Admission and Release, Part V, §§ F-G, pp. 55-57.

152     *Id.* at pp. 55-56.

### 3. Security Classification System

Detention facilities are required to implement a formal classification process for "managing and separating detainees based on verifiable and documented data."[153] When detainees are assigned to Adelanto or Desert View, they are given a security classification level: High, Medium-High, Medium-Low, and Low. These classification levels are assigned by the facility based on a detainee's documented current or past criminal offenses, institutional disciplinary history, medical information, and other objective credible evidence, and should not be based on the personal opinion of classification staff.[154] The security classification level determines, among other things, a detainee's housing assignment. The classification system is intended to protect detainees from harm by assigning detainees to housing with persons of similar backgrounds and criminal histories.[155]

Figure 10 displays the distribution of active detainee security classification levels at Adelanto and Desert View.

*Figure 10. Adelanto and Desert View Detainees by Security Classification as of July 7, 2025*



In its 2021 and 2025 reports, Cal DOJ identified concerns with GEO Group's classification systems. The systems for custody level assignment and housing placement of detainees designated as gang-affiliated were opaque and assignments did not always match the information received from GEO Group.[156]

During the July 2025 site visit, Cal DOJ was not able to conduct an in-depth review of the facilities' security classification processes. As part of the site visit, Cal DOJ requested a review of a sampling of detainee custody files, which includes classification and intake records. Several of the files presented to Cal DOJ by GEO Group were incomplete, and missing classification records and intake forms. As a result, Cal DOJ was unable to complete its review of the custody classification systems based on detainee files. Additionally, during the period when Cal DOJ was scheduled to review detention files, facility staff were printing intake records and appeared to be assembling files, suggesting the records were not already maintained. Cal DOJ is concerned that the poor maintenance of detainee records could lead to misclassification, among other problems.

---

153  ICE, PBNDS 2011, Part 2.2 Custody Classification System, Part I, p. 60.
154  ICE, PBNDS 2011, Part 2.2 Custody Classification System, Part V, §§ C-D, pp. 62-63.
155  ICE, PBNDS 2011, Part 2.2 Custody Classification System, Part II, p. 60, Part V, §§ D-G, pp. 63-65.
156  *Immigration Detention in California* (Apr. 2025), *supra*, pp. 45-46; Cal Dept. of Justice, Office of the Attorney General, *Immigration Detention in California* (Jan. 2021) <https://oag.ca.gov/sites/all/files/agweb/pdfs/publications/immigration-detention-2021.pdf> pp. 22-23 (as of Apr. 1, 2026).

In interviews, two detainees expressed concern with their custody level assignments. One detainee reported being assigned a Low-Level security threat classification at a previous detention facility but being re-classified as Medium-High upon arrival at Adelanto; the detainee was not given an explanation for why they had been reassigned to a higher custody level. This detainee expressed concern that his appearance in a bond hearing could be prejudiced by the orange uniform he is required to wear as a result of his higher custody level.

### 4.   Initial Medical Care (Intake Screening and Comprehensive Health Assessment)

PBNDS 4.3 requires that detention facility health care staff conduct an initial medical, dental, and mental health screening of new detainees as soon as possible, but no later than 12 hours after a detainee's arrival to the facility.

At Adelanto, only four detainees who were asked about this screening (17%) reported they received all the required components within 12 hours. In contrast to detainees at Adelanto, most detainees at Desert View who were asked this question reported that they received the screening (13; 87%). Many detainees reported that they did not receive a dental screening. An Adelanto detainee who received a medical screening reported only receiving it after spending 24 hours in the intake area. Another detainee reported that they did not receive a medical screening until a week after they arrived.

### 5.   Departures

In interviews with Cal DOJ, facility staff estimated that they were processing an average of 40 detainees per day while releasing about 15-20 detainees per week from the facilities. At the time of Cal DOJ's tour of the facilities, Cal DOJ personnel observed over 20 detainees in intake holding rooms in Adelanto West. In Adelanto East, eight female detainees were waiting to be processed into and five female detainees waiting to be processed out of Adelanto. Twelve male detainees were waiting to be processed out of Desert View.

### B.   Food, Nutrition, Access to Water

*Meals*

PBNDS 4.1 requires that three meals are served to every detainee per day, and that no more than 14 hours elapse between dinner and breakfast.[157] Facility staff reported that breakfast is served starting at 5:00 a.m., lunch is served starting at 11:00 a.m., and dinner is served starting at 4:30 p.m. Every detainee reported receiving three meals per day, but nearly everyone commented that food is delivered to the housing units at irregular hours. According to the detainees, breakfast can arrive between 5:00 a.m. and 9:00 a.m., lunch between 11:00 a.m. and 3:00 p.m., and dinner between 7:00 p.m. and 10:00 p.m.

Detainees reported disruptions to meal service practices impacting both meals and other access to health-promoting activities. Facility staff reported that prior to the influx of detainees at Adelanto in early June 2025, meals were served at the dining areas of both facilities but were delivered from the kitchen and served in the housing areas at both facilities after the influx occurred. Additionally, detainees reported that the irregular mealtimes at both facilities sometimes conflicted with the limited recreation time detainees are offered. Meals were sometimes delivered when a housing unit was called for recreation in the recreation yard. One detainee reported that meals have arrived late at night after bedtime and during population counts, when all detainees must be in their cells or by their beds. In those situations, the detainee reported being instructed to take their meals and eat in bed.

---

157    ICE, PBNDS 2011, Part 4.1 Food Service, Part V, § D, p. 232.

Almost every detainee interviewed at both facilities complained about the quality of the food. According to detainee reports, meat often appears undercooked or rotten. One detainee reported that they are not consistently provided silverware and have to keep using the same spoon for days at a time. Meals are reportedly cold by the time they are delivered to the housing unit, and four detainees had multiple complaints about the blandness and quality of the food. One detainee at Desert View reported that food quality declined, meal portions shrank, and meals were delivered at more inconsistent times relative to before the influx of detainees to the facility. Detainees also reported that they were unable to acquire salt or other seasonings from the kitchen or commissary.

During staff interviews, the facility reported that 20-24 staff members are split between the kitchens of each facility, with no detainees working in the kitchen at Adelanto and one detainee working in the Desert View kitchen, washing dishes and cleaning.

During the facility tour, Cal DOJ's medical expert observed that all dietary modifications (i.e., religious diets, medical diets, and food allergy diets) were posted in the kitchen, showing all dietary modifications by unit. Food allergy diets were displayed with other diet options. Cal DOJ's medical expert recommends that the facility separate out food allergy diet modifications to highlight the allergy diets and increase food service safety for those detainees who are allergic to certain foods.

*Figure 11. Kitchen at Adelanto*



### Water

PBNDS 4.1 requires that clean, potable drinking water is available to detainees at all times.[158] However, detainees reported problems with both water quality and availability.

Detainees at both facilities reported that the water from the tap is murky, dirty, and white. Cal DOJ staff observed murky water in the tap of the female housing unit at Adelanto. Detainees in the female unit also approached Cal DOJ staff during the tour to advise that they did not have adequate drinking water.

---

158     ICE, PBNDS 2011, Part 4.1 Food Service, Part V, § D, p. 232.

Each housing unit (housing around 80 detainees when at full capacity) is provided with two water coolers. Detainees interviewed by Cal DOJ stated that the water coolers were not re-filled frequently enough to meet demand, and one reported being told that there is not enough staff at the facility to ensure that the water coolers are refilled. Several detainees reported that at times the water coolers were not filled for periods of five to twelve hours, or even until the next day. One detainee at Adelanto reported that the water coolers were refilled at a sufficient rate prior to the surge but were not being refilled more frequently to account for the increase in detainees per housing unit. Another detainee described that detainees have found ways to protest in support of receiving more water, primarily by refusing to join the detainee counts until water is refilled. Another described being unable to take medications at times due to lack of adequate water supply.

The facility reported that the water coolers are provided at facility discretion during the summer months and replenished once during each of the three staffing shifts and took the position that the tap water is sufficient for detainees.

### C.  Housing Units

Adelanto has two wings—east and west. Each wing is divided into housing units, and each housing unit is divided into four parts. The east wing consists of dorms and is divided into two housing units. At the time of Cal DOJ's visit, female detainees were housed in one housing unit in the east wing. All female detainees with Medium-High and High security classification levels (and one detainee with a Medium-Low classification level) were assigned to one section of the unit; the female detainees designated with Low and Medium-Low classification levels were assigned to two other sections of the housing unit. All the detainees in the east wing male housing unit were assigned to two sections of the housing unit and had security classifications of Low or Medium-Low. The west wing of Adelanto consists of two- to eight- person cells and is divided into five housing units. Four of the housing units held male detainees with a security classification of Medium-High or High. Three sections of the fifth housing unit held male detainees with a security classification of Low or Medium-Low, with the fourth section housing male detainees with a security classification of High or Medium-High.

Desert View is divided into two dorm housing units, and, at the time of Cal DOJ's visit, only held male detainees with Low and Medium-Low security classifications.

### 1.  General Condition of Facility and Housing Units

PBNDS provides that facility staff must ensure that staff and detainees maintain a high standard of facility sanitation and general cleanliness, which includes daily dusting, mopping and trash disposal,[159] but detainees are only required to maintain their immediate living areas by making the bed, stacking loose papers and keeping the floor around their spaces neat.[160] Cal DOJ's site visit occurred several weeks after Cal DOJ had initially requested access. Detainees reported that housing unit conditions were worse before Cal DOJ visited. For example, three detainees interviewed, one in each wing of Adelanto and one from Desert View, described extremely dirty facility conditions such as bags of trash piling in the hallways, dirty surfaces in the housing units, and bathrooms and hallways and tables covered in debris and dirt. One of these three, along with two other detainees reported never seeing the hallways and housing units cleaned until the days prior to Cal DOJ's visit or visits by other reviewing entities such as GEO Group management. At least one detainee complained of strong fumes from the products used for cleaning the showers, which are cleaned by the detainees.[161]

---

159    ICE, PBNDS 2011, Part 1.2 Environmental Health and Safety, Part V, § A, p. 21.
160    ICE, PBNDS 2011, Part 5.8 Voluntary Work Program, Part V, § C, p. 406.
161    GEO Group was sued in 2023 by a class of detainees alleging harm caused by toxic chemicals in a disinfectant, HDQ Neutral. And, in 2021, the U.S. Environmental Protection Agency issued a Notice of Warning to GEO Group over the use of HDQ Neutral at Adelanto and later filed an administrative complaint in June 2024 over the continued use of that disinfectant. *In the Matter of The GEO Group, Inc.* (2024) U.S. E.P.A. Region IX, No. FIFRA-09-2024-0066. The EPA complaint was withdrawn in June 2025. See Lerner & Song, *EPA Drops Legal Case Against the GEO Group, a Major*

One detainee at Adelanto stated that the lights-out and lights-on times are inconsistent, describing patterns that would make it difficult to maintain a normal sleep schedule. They reported that detention officers turn the lights on at unpredictable times that can be as late as 10 a.m. and turning off the lights at times as late as 1 a.m. One Desert View detainee reported that the last count of the night is generally around 1 a.m. and detainees are woken up at 5 a.m. in their housing unit.

### 2.  Access to Basic Needs

Detention facilities have an obligation to provide basic necessities to the detainees they hold. PBNDS 4.5 requires a facility to issue at least two sets of uniforms, including two pairs of socks, two pairs of underwear, and one pair of shoes.[162] When shoes are worn out or damaged, they must be replaced at no cost to the detainee.[163] Detainees are also entitled to a daily change of socks and underwear and an exchange of uniforms at least twice per week (with a maximum of 72 hours between changes).[164]

According to 12 detainee accounts, neither facility met the clothing requirements set by the PBNDS. Detainees reported that prior to the first week of June, they received at least two uniforms, including three pairs of underwear, shower sandals, a pair of shoes, sheets, a pillow, and a blanket. Two detainees who arrived in May and June 2025 reported that they received only one pair of underwear and one uniform. Facility staff stated that when there are shortages in clothing issued during intake, more uniforms are issued after detainees were placed in their housing units.

One detainee reported that they were held in the intake area for four days and did not receive any clothes, blankets, or pillows during their time in intake. Another detainee, who was sent directly to a housing unit without going through the classification and intake process, reported not receiving any pillows, blankets, uniform, clothes, or soap. As a result, they wore the same clothes they had on when they were apprehended for two weeks. After two weeks, they were processed at intake, where they received one new set of clothes.

Other detainees stated that they did not receive new or laundered clothes for weeks and had to make do with the one set of clothes that they were provided, which at times did not fit them. One detainee at Adelanto described having to resort to handwashing their own clothes and underwear due to the lack of clean clothes. Other detainees told Cal DOJ that the shoes they initially received had fallen apart and had not been replaced by the facility, such that they appeared for the interview in their one pair of sandals or in borrowed shoes.

### D.  Detention and Safety

#### 1.  Staffing

The PBNDS require staffing levels at each facility that ensure sufficient supervision for those detained.[165]

In preparation for the site visit, Cal DOJ submitted a request to GEO Group for relevant records and documents from the facilities. At that time Cal DOJ requested staffing information including the facility organization chart for both detention and health care staff, the current detention and health care staff roster, and information about scheduling and vacancies. GEO Group produced most of the requested documents but did not produce information on staffing levels, claiming that the information is proprietary and confidential information that implicates security and operational concerns.

---

*Trump Donor, Over Its Misuse of Harmful Disinfectant in an ICE Facility*, ProPublica (June 10, 2025) <https://www.propublica.org/article/epa-legal-complaint-geo-group-trump> (as of Mar. 19, 2026).

162    ICE, PBNDS 2011, Part 4.5 Personal Hygiene, Part V, § B, p. 328.
163    Ibid.
164    ICE, PBNDS 2011, Part 4.5 Personal Hygiene, Part V, § H, p. 330.
165    ICE, PBNDS 2011, Part 2.4 Facility Security and Control, Part V, § A, p. 82; Part 2.11 Abuse and Assault Prevention and Intervention, Part IV, § E, p. 151.

During an interview at the facility on July 8, 2025, the Facility Administrator told Cal DOJ he would provide the numbers of full-time staff and vacancies. On July 24, 2025, Cal DOJ reiterated the request for the facility organization chart and current staff roster including vacancies. To date, GEO Group has not produced requested documents related to staffing. In its inspection in September 2025, two months after Cal DOJ's visit, the ODO reported that the facility employed 439 "support personnel," a term not defined in the ODO report.[166] Staffing levels at these facilities are of particular concern, as the total number of detainees in the two facilities dramatically increased over the course of just a few months, and the facilities generally share health care and administrative staff.

Information from interviews indicates staffing shortages at the time of the site visit. Facility staff stated that the facility was short-staffed because of the increase in detainees and that detention staff at the facilities were required to work overtime. They also said that GEO Group had to bring in temporary staff, around 40 staff members, from other facilities and from GEO Group corporate headquarters to temporarily fill the vacancies.

Detainees reported that the level of detention staff appeared inadequate for the population level at the facility and described dynamics between detention officers and detainees that made daily life tasks difficult. Several detainees expressed concern that the facilities did not hire more detention officers after the detainee population increased. One detainee reported having been mocked by detention officers for not speaking English.

Detainees at both facilities frequently attributed the issues with food, recreation time, and grievances to insufficient staff at the facilities. One detainee reported that they did not see an increase in detention officers in conjunction with the increase of detainees in the first week of June 2025. These reports are consistent with facility staff's reports that each housing unit has one officer per shift; staff did not report changing this practice based on the number of beds or custody level of detainees housed in the housing unit.

## 2.  Use of Force

Upon request, GEO Group provided logs of instances of force used by its staff on detainees. From January 1 through July 7, 2025, GEO Group logged 11 uses of force at Adelanto (nine involved one detainee, one involved two detainees, and one involved six detainees) and five uses of force at Desert View (all involving one detainee). Eight of the 11 incidents at Adelanto occurred in the month of June, after the increase in detainees. Of the 11 incidents at Adelanto, facility staff used pepper spray in six of them, and in two of the five incidents at Desert View.

Cal DOJ's immigration detention expert reviewed multiple use of force incidents at Adelanto. Two of these incidents involved detainees who appeared to be experiencing mental health episodes. In one incident, detention officers used calculated force[167] to remove a detainee from the facility and transport him to an outside mental health facility. Detention officers used pepper spray on the detainee and did not report that they summoned or consulted mental health staff before or during the incident. PBNDS 2.15 mandates that detention officers consult with appropriate medical or mental health staff prior to a calculated use of force on a detainee with special needs, including detainees with mental health conditions, that may impair their ability to understand their situation.[168] In another incident, a detainee consumed a handful of unidentified pills and ignored officers' commands to stop. Detention officers used pepper spray on this detainee, placed them in mechanical restraints, and transferred them to the medical unit. PBNDS 4.3 mandates that restraints for medical or mental health purposes may be authorized only by the facility's designated Clinical Medical Authority or initiated by qualified medical

---

166   ICE, *Adelanto ICE Processing Center Inspection* (Sept. 2025), *supra*, p. 3.
167   In calculated uses of force, facility personnel have some advance warning and are able to make preparations and obtain needed authorizations. See ICE, PBNDS 2011, Part 2.15 Use of Force and Restraints, Part V, §§ A, B, I, pp. 201-202, 206-207.
168   ICE, PBNDS 2011, Part 2.15 Use of Force and Restraints, Part V, § F, p. 205.

personnel with an authorization soon after the restraint.[169] The report for this incident did not indicate that mental health or medical personnel were consulted or utilized in the restraint of the detainee.

### E.  Access to Social and Programming Opportunities

#### 1.  Non-legal Visitation and Phone Calls

Access to communication with family members, recreation, and programming opportunities has a significant effect on a detainee's experience at detention facilities. PBNDS requires facilities to provide "reasonable and equitable access" to telephones, with certain restrictions, including "orderly facility operations" to prevent interference with counts and scheduled detainee movements.[170]

Detainees at Adelanto reported difficulties communicating with their loved ones. Cal DOJ observed about eight phones per housing unit for detainee use. Two detainees reported that phone calls are limited to only a few minutes, mainly because several phones in each housing unit do not work and the volume of detainees in each housing unit who need to use the phones limits the time each person can talk. Detainee reports also indicated that phones are disconnected at random times of the day. One detainee reported being told by facility staff that the phones are disconnected when a detainee is being transferred out of the facility. In one instance, a detainee reported that in one housing unit, phones were turned off one afternoon and not turned back on until the following morning. During Cal DOJ's tour of Adelanto, several detainees reported that the phones in their housing unit do not work all morning until around noon from Monday through Thursday, and all day on Fridays; these detainees had been at the facility for two months. During Cal DOJ's tour, detainees noted to Cal DOJ that all of the phones in one housing unit were disconnected at the time; Cal DOJ staff picked up several phones in this unit and confirmed that they were not working. Detainees reported similar difficulties when making personal calls.

Facility staff confirmed that phones are turned off throughout the facility when detainees are departing the facility. One staff member confirmed that the ratio of phones to detainee beds has been the same since 2019.

A limited number of tablets are available for detainees to make monitored video calls, to submit medical requests, or grievances and to access programming, if available. However, detainees told Cal DOJ that only a few tablets worked in housing units of 80 detainees and that detention officers frequently fail to keep the tablets charged.

#### 2.  Programming and recreation

PBNDS 5.4 requires that, if outdoor recreation is available at the facility, each detainee has access for at least one hour a day, seven days a week, at a reasonable time of day. It also requires that recreation schedules be provided to detainees. At both Adelanto and Desert View, detainees reported that recreation time was inconsistent. Three detainees reported that recreation was not available every day at Adelanto, one of whom reported receiving only a half-hour of recreation in a day. However, Cal DOJ observed that male detainees in at least one Adelanto housing unit had consistent access to a small outdoor space.

---

169    ICE, PBNDS 2011, Part 4.3 Medical Care, Part V, § Y, p. 275.
170    ICE, PBNDS 2011, Part 5.6 Telephone Access, Part V, § D, p. 387.

*Figure 12. Caged in Basketball Area at Adelanto*



## VI.  Due Process

Cal DOJ evaluated due process rights of detainees held at Adelanto and Desert View. PBNDS 6.3 requires that facilities give detainees access to legal materials, legal calls, and mail, provide the ability to access legal services and representation, and facilitate a detainee's attendance in court.[171] Each facility had a library with legal material, but Cal DOJ was unable to confirm the content of the material during its tour. Various legal settlements were posted to corkboards in the housing units. Cal DOJ, however, did not identify any posting of the terms of the *Franco-Gonzalez* settlement agreement in a public area of the facility accessible by detainees, as required by the terms of the agreement.[172]

---

171     ICE, PBNDS 2011, Part 6.3 Law Libraries and Legal Material, Part V, §§ A-N, pp. 422-428.
172     The permanent injunction under *Franco-Gonzalez v. Holder* provides that detainees diagnosed with certain mental health disorders be appointed an attorney, among other processes, and that facilities post information notifying detainees of the settlement. *Franco-Gonzalez v. Holder* (C.D.Cal. Apr. 23, 2013, No. CV-10-02211-DMG (DTBx)) 2013 WL 8115423; *Franco-Gonzalez v. Holder* (C.D.Cal. Oct. 29, 2014, No. CV-10-02211-DMG (DTBx)) 2014 WL 5475097.

*Figure 13. Notice Board at Adelanto*



In 2020, a district court in the class action lawsuit *Torres v. U.S. Department of Homeland Security* entered a preliminary injunction allowing Adelanto detainees and attorneys to request, among other things: 1) that detainee calls to counsel phone numbers allow detainees to leave voice mail messages; 2) that calls between counsel and detainees are confidential and not monitored; and 3) that counsel's phone numbers be set to unmonitored, unrecorded, and free status from housing unit phones.[173] The parties reached a settlement in August 2025, after Cal DOJ's most recent visit, and dismissed the case in October 2025, dissolving the preliminary injunction.[174] The settlement institutes a process by which free confidential legal calls can be arranged, including outside regular telephone hours, and Adelanto detainees are allowed to make unrecorded and unmonitored phone calls from their housing units.[175]

Around half of the detainees interviewed at Adelanto (14; 61%) and Desert View (6; 40%) had an attorney at the time of their interview. Thirteen of the represented detainees interviewed at Adelanto reported they had been able to contact their attorneys. However, three detainees described having difficulty reaching their attorneys. One detainee's attorney was unable to schedule phone calls through the facility and was only able to visit the detainee in person; the other two detainees reported that they had difficulty reaching their attorney because the phones were shut off when detainees were removed from the facility, as described in the Non-legal Visitation, Phone Calls, and Mail section, above. Two detainees interviewed at Desert View reported they had been unable to contact their attorneys but did not ascribe this issue to the facility.

## VII.  Health Care

As with other conditions of confinement at these facilities, the quality of medical care appeared to suffer in part because of the rapid influx of detainees. Although GEO Group medical leadership reported that additional health care staff were in the process of being hired and onboarded, the amount of health care staff at the time of Cal DOJ's visit did not appear to be sufficient to address

---

173    *Torres v. DHS*, (C.D.Cal. Apr. 24, 2020, No. 5:18-cv-2604) 2020 WL 3124305, p. *1; ICE, *Legal Notices 2020-Torres v. DHS* (Apr. 11, 2020) <https://www.ice.gov/legal-notices> (as of Mar. 19, 2026).

174    *Torres v. DHS*, (C.D.Cal Oct. 15, 2025, No. 5:18-cv-2604) ECF No. 233.

175    *See* Immigration Defenders Law Center, *Settlement Protects Access to Counsel and Phone Calls in Immigration Detention* (Aug. 20, 2025) <https://www.immdef.org/blog/torres-v-noem-aug-20-2025> (as of Mar. 19, 2026).

detainee needs. Cal DOJ's medical expert reviewed patient records and identified lapses in care attributable to the increase in demand for health care services.

### A.  Intake Assessments, Evaluations and Diagnoses

PBNDS 4.3 requires that detention facility health care staff conduct an initial medical, dental, and mental health screening of new detainees as soon as possible, but no later than 12 hours after a detainee's arrival to the facility.[176] Facility staff are required to ask detainees for information regarding any known acute or emergent conditions.[177] If a detainee identifies such a condition, staff must refer the detainee to a qualified, licensed health care provider as soon as possible, but in no later than two working days.[178] Additionally, if a detainee arrives with a prescription or reports a prescription, that detainee must be evaluated within 24 hours, and the facility must make a plan to acquire and provide the necessary medication.[179] Regardless of the results of the screening, the detention facility's health care provider must conduct a comprehensive health assessment of each detainee within 14 days of the detainee's arrival.[180]

**Cal DOJ's medical expert reviewed 14 patient files; for four of these patients, facility staff identified acute, chronic, or emergent medical conditions at the patients' initial screenings but did not provide the two-day referral required by the PBNDS.** One patient was referred for a next day medical assessment after their initial screening and was not seen by a doctor for eight days. Another patient with a chronic condition waited nine days for an appointment with the physician and was referred for lab work for medication management. At the time of Cal DOJ's visit, thirty days after the referral, their lab work had still not been drawn.

Detainees at Adelanto likewise experienced delays in receiving their full medical evaluations, if they received one at all. Only six detainees interviewed at Adelanto (26%) reported receiving a comprehensive health assessment within 14 days. Detainees at Adelanto additionally reported that they did not receive necessary medication, or only received it after excessive delays, with delays ranging from one week to one month.

### B.  Sick Call and Medical Care

Immigration detention facilities are required to have a sick call procedure that allows detainees the unrestricted opportunity to freely request health care services.[181] All sick call requests must be received and triaged by medical personnel within 24 hours after a detainee submits the request, but in urgent situations, medical personnel must be notified immediately.[182] Medical request slips must be provided in English and in the languages most commonly used by detainees at the facility; for detainees who do not speak these languages, the facility must provide services to assist the detainee to complete the request.[183] At Adelanto and Desert View, detainees can seek medical services through paper requests. Tablets were available in the past for requesting medical care; however, Cal DOJ's medical expert was unable to verify how many functional tablets were in circulation.

Detainees at Adelanto and Desert View described difficulties receiving medical care after they requested it. Eight detainees interviewed by Cal DOJ at Adelanto and Desert View reported requesting medical appointments for concerns such as chest and stomach pain, skin issues, special medical diets, a knee brace that had been removed during apprehension and never replaced, severe foot pain,

---

176    ICE, PBNDS 2011, Part 4.3 Medical Care, Part V, § J, p. 266.
177    *Id*. at pp. 266-267.
178    *Id*. at p. 266.
179    ICE, PBNDS 2011, Part 4.3 Medical Care, Part V, § U, p. 273.
180    ICE, PBNDS 2011, Part 4.3 Medical Care, Part V, § M, p. 268.
181    ICE, PBNDS 2011, Part 4.3 Medical Care, Part V, § S, pp. 271-272.
182    *Id*. at p. 271.
183    *Id*. at pp. 271-272.

an ear infection, broken glasses, persistent tooth pain, x-rays for a broken wrist, and treatment for thyroid disease and liver disease. According to these detainees, none of them had received a medical evaluation for their requests as of the time of Cal DOJ's site visit. Overall, of the 22 interviewed detainees at Adelanto who reported requesting medical services, only four (18%) reported that they had received the help that they needed. Many detainees who mentioned medical issues to Cal DOJ staff reported that they had been waiting for a medical appointment for weeks. For example, two detainees reported flu-like symptoms and told Cal DOJ that others in their housing units had similar symptoms. One detainee with these symptoms reported that they did not receive treatment until they started coughing up blood. **In a sampling of medical files, Cal DOJ's medical expert identified three cases of detainees with serious medical issues that did not receive timely emergency care.**

Detainees also described delays related to urgent mental health care. A detainee who reported having suicidal thoughts during detention reported having to wait for over four days for an appointment with a psychologist when requesting care for depression. A detainee who had reported they had repeatedly requested mental health appointments and an appointment with a physician for assessment of chest pain since arriving at the facility during the surge of detainees in early June did not receive appointments until two days before Cal DOJ's site visit in early July, approximately four weeks later.

Because the facilities do not have a dental hygienist on staff, detainees' access to dental cleanings depends on whether the dentist provides dental cleanings and the availability of the dentist. The medical doctor interviewed by Cal DOJ staff said that he urgently treated individuals with dental pain with medications but was not able to provide information on typical wait times for dental services. One detainee at Desert View who arrived in early June reported that they had received a dental examination and was told that they would have to have a tooth removed, but had not received a follow up appointment. One medical chart reviewed by Cal DOJ documented a different case in which the facility had initiated a timely referral for dental care two days after the detainee had made the request, and the detainee was placed on a waitlist for a tooth extraction. However, at the time of Cal DOJ's site visit several weeks later, there was no documentation in the detainee's chart indicating that they had received the extraction.

Detainees reported barriers to communication in medical contexts. Two detainees who did not speak English or Spanish reported difficulties in making health care requests in their language and one told Cal DOJ that they did not receive Russian interpretation services for their medical appointments.

PBNDS 4.3 requires a physician be present at the facility or on call for emergency care.[184] One detainee reported a concerning incident that occurred several weeks after arriving at the facility, when they experienced physiological symptoms that needed immediate medical attention. The detainee reported being placed in a cell in the medical observation area after notifying medical staff of the need for care, but that they did not receive a physician's examination that night. The detainee was able to see a physician three days after the episode, after symptoms had subsided.

Cal DOJ's medical expert reviewed detainee medical records, revealing concerning issues. One detainee reported that they were vomiting blood and received a referral for immediate care by the triage nurse. This detainee was not treated by any medical staff until they saw a physician one-and-a-half weeks later. Another detainee requested medical care for chest pain and was promptly attended to by a nurse, who noted that he should receive a physician sick call the following day; the detainee's medical record did not contain a physician note addressing this chest pain. This detainee was next attended to by medical staff 17 days later for neurological symptoms and was transferred to a hospital for treatment. GEO Group corporate staff lacked the information to provide an estimate of the frequency of medical emergency encounters or 911 calls when requested in an interview and did not believe that those calls were logged by the facility.

---

184    ICE, PBNDS 2011, 4.3 Medical Care, Part V, § T, p. 272.

### C.  Referrals to outside care

During interviews with Cal DOJ staff, one detainee at Adelanto and one at Desert View reported having a serious medical issue that required referrals to outside care, and that they did not receive that care. One detainee who arrived at Adelanto before June 2025 had a condition causing pain in their feet and torso. After requesting medical care several times, they were attended to by a medical specialist in April 2025 who told them that they would refer the detainee for outside care for steroid injections. The detainee reported that they had not yet received the necessary care as of the time of Cal DOJ's site visit, which was two to three months after the visit with the specialist.

Another detainee at Desert View reported that they had broken a leg in detention and requested emergency assistance but did not receive a response. The detainee reported that their leg started turning black after seven days without care. The detainee eventually received an X-ray and after five days, was attended to by a facility physician, and was told that they needed to be sent to the hospital. After two months, the detainee was finally treated by an outside specialist. The specialist was able to treat the detainee but informed the detainee that they should have been treated two months earlier.

**In reviewing detainee medical files, Cal DOJ's medical expert identified several instances where detainees were provided referrals to outside care for necessary specialized treatment but never received the treatment.** One detainee was referred for ophthalmology care three weeks prior to Cal DOJ's visit and had still not been seen. Another detainee had not been seen for a scheduled three-month follow-up from a neurosurgery visit four months prior to Cal DOJ's visit. One detainee with an infectious disease only received a referral for an infectious disease consultation[185] 24 days after arrival at the facility. Another detainee with the same infectious disease never received such a referral. Generally, the reviewed detainee medical files did not contain notes recording the steps taken by the facility medical staff to refer a detainee to outside care. As a result, it was difficult to determine the steps taken by the facility to ensure a referral for outside care is timely completed, creating a risk that a detainee's medical condition worsens while waiting for a response from outside medical providers.

### D.  Discharge Planning

Discharge planning was also of concern. PBNDS 4.3 requires that, upon transfer between ICE facilities or release or removal from ICE custody, detainees are provided medication, referrals to community-based providers as medically appropriate, and a detailed medical care summary.[186] The medical staff Cal DOJ interviewed indicated that medical records were only provided to detainees upon release from ICE custody if they request them; PBNDS requires that all detainees receive this information upon discharge.[187]

### E.  Staffing

Cal DOJ has concerns that Adelanto's health care staffing level is insufficient to ensure the health and safety of detainees housed at the facility. In interviews, facility staff told Cal DOJ that they were caught off guard by the number of detainees admitted to the facilities during the surge in immigration arrests in June 2025. As noted above in the Methodology and Limitations section, the Medical Director (who has served in this role at the facilities for approximately five years and was out of the country on leave at the time of the visit) and the Health Services Administrator (who, according to GEO Group, had been hired three weeks before Cal DOJ's visit and had just completed training) were not made available for interviews. Cal DOJ and its medical expert interviewed the Regional Health Services Director (a position that oversees health services at all GEO facilities in the region) and a part-time physician at

---

185   Best practices provide that these consultations are given to patients with infectious diseases to help manage their symptoms. These consultations are generally outside the scope of a primary care practitioner without specialized training and certification.

186   ICE, PBNDS 2011, 4.3 Medical Care, Part V, §§ Z, BB, pp. 276, 278-279.

187   *Id.* at pp. 278-279.

the facilities. The Regional Health Services Director gave conflicting answers about staffing changes, was not able to provide details on clinical workload tracking or staffing adjustments at Adelanto and Desert View. They were also not able to provide information on the certifications or specializations of physicians at the facilities. The Regional Director further stated that no corrective actions or changes in health services had been made in the prior several months despite the dramatic rise of the number of detainees at Adelanto. However, on further discussion, it did appear that some additional staff (five Registered Nurses and five Licensed Vocational Nurses) had been hired in response to the increase and about twenty additional nurses were undergoing the background check process with ICE and GEO Group. However, the Regional Director claimed that she had "no idea" who had made the request or decision to increase staff. Neither the Regional Director nor the part-time physician provided any further information on quality control other than noting a monthly quality control meeting attended by health care staff but not attended by either the Regional Director or the part-time physician.

A new Director of Nursing (DON) at the facilities had started about a month prior to the visit and was not made available for an interview with Cal DOJ. Before the new DON had been hired, the position at the facilities had been vacant for some time. The Regional Health Services Director estimated that the position had been vacant since approximately December 2024, which was around seven months prior to Cal DOJ's visit. They also reported that the previous Director of Nursing had left after only a few months in the position, with no reason given by GEO Group. Notably, the DON position was also vacant at the time of Cal DOJ's previous visit in November 2023.[188]

At the time of the site visit, the facilities had a staff of two full-time physicians, including the Medical Director, and one part-time physician for patient care. When interviewed during Cal DOJ's 2023 site visits, the Medical Director had previously described most of his time as spent reviewing charts and performing other administrative duties. The Medical Director previously reported that he was not board certified; board certification is a general standard for clinical directors but is not required by the PBNDS.[189] GEO Group reported three full-time and one part-time (on an as-needed basis) advanced practitioners (medical providers such as a physician's assistant or nurse practitioner); in November 2023, the facilities had three advanced practitioners and one vacant position.[190]

In its 2025 report following its 2023 site visit, Cal DOJ acknowledged that health care provision at Adelanto and Desert View had fewer problematic areas compared to other detention facilities.[191] However, at that time Cal DOJ identified gaps in targeted medical services, management of infectious diseases, and monitoring during hunger strikes.[192] At the time, Cal DOJ also identified concerns with mental health care and medical staffing levels. Specifically, Cal DOJ was concerned whether levels were adequate to serve the combined population of the two facilities, noting that several key positions in the medical staff were vacant at the time of the site visit and that if the combined detainee population increases any further, it should be a priority to fill mental health care positions to maintain the current level of care.[193] While the number of physicians and advanced practitioners increased between November 2023 and July 2025, these numbers are still less than what was reported during Cal DOJ's visit in February 2021, when GEO reported three full time physicians and five advanced practitioners for a population of 79 detainees. The combined population of both facilities, which shared health care staff, increased by 1,663 detainees between November 2023 and July 2025.[194] GEO Group did not provide assurances that staffing levels increased to correspond with the increase in detainee population. Cal DOJ renews these concerns with greater urgency to ensure the health and safety of the detainees in GEO Group's care.

---

188    *Immigration Detention in California* (Apr. 2025), *supra*, p. 40.
189    *Ibid.*
190    *Ibid*.
191    *Id.* at pp. 28, 34-36, 40.
192    *Id*. at p. 40.
193    *Id*. at p. 33.
194    *Id*. at p. 27.

F.    Detainee Deaths

Four detainees who arrived at Adelanto after Cal DOJ's visit died while in the custody of GEO Group. All four deaths appear to involve detainees who received or attempted to receive medical services at Adelanto.

Ismael Ayala-Uribe died at age 39 on September 22, 2025, after one month of detention at Adelanto.[195] According to media reports, his family reported that Mr. Ayala-Uribe was relatively healthy when he entered the facility, but about two weeks after arriving, he told facility staff that he was feeling sick with a cough and fever.[196] Mr. Ayala-Uribe died in an external hospital days later after a transfer for surgery for an abscess.[197] On December 31, 2025, Mr. Ayala-Uribe's family sued GEO Group over the death, alleging that the facility operators were negligent in addressing Mr. Ayala-Uribe's medical needs.[198]

Gabriel Garcia Aviles died on October 23, 2025, at the age of 54, about a week after entering detention in Adelanto.[199] ICE reported that he died of natural causes and alcohol withdrawal.[200] According to media reports, Mr. Garcia Aviles' family stated that he had been healthy prior to his detention.[201] They also reported that he was intubated and had blood on his forehead and lips, broken teeth, a cut on his tongue, and bruising on his body when they visited him at the hospital shortly before his death.[202]

Alberto Gutiérrez Reyes died on February 27, 2026, at the age of 48, after reportedly submitting multiple requests for medical attention.[203] His family claims these requests were denied.[204] ICE reported that Mr. Gutiérrez Reyes had a fever and fainted before being hospitalized at Victor Valley Global Medical Center in Victorville, California, where he passed away.[205]

On March 25, 2026, Jose Guadalupe Ramos-Solano died at the age of 36.[206] ICE reported that facility staff discovered Mr. Ramos-Solano unconscious and unresponsive and immediately initiated life-saving procedures and transported him to Victor Valley Global Medical Center in Victorville, California.[207] Cal DOJ received a report, however, that at least one detainee heard Mr. Ramos-Solano say he was overheating and experiencing difficulty breathing; this report indicated that facility staff knew about Mr. Ramos-Solano's distress and prevented other detainees from assisting him and that medical staff did not take action until he was already unresponsive.

195    ICE, *Detainee Death Report: Ayala Uribe, Ismael* <https://www.ice.gov/doclib/foia/reports/ddrIsmaelUribeAyala.pdf> (as of Mar. 19, 2026).

196    Vives & Jarvie, *A Former DACA Recipient Died in ICE Custody. Did Officials Ignore his Pleas for Help?*, L.A. Times (Sept. 24, 2025) <https://www.latimes.com/california/story/2025-09-23/former-daca-recipient-dies-in-ice-custody-after-being-hospitalized> (as of Mar. 24, 2026).

197    *Ibid.*

198    *Ayala Roman v. GEO Group* (C.D.Cal. Dec. 31, 2025, No. 2:25-cv-12436) ECF No. 1; Nelson, *Family of Orange County Man who Died in ICE Detention Sues Prison Operator*, San Bernardino Sun (Jan. 6, 2026) <https://www.sbsun.com/2026/01/04/family-of-orange-county-man-who-died-in-ice-detention-sues-prison-operator> (as of Mar. 19, 2026). On January 7, 2026, the case was transferred within the Central District Court of California and renumbered as 8:25-cv-2893. See Ayala Roman v. GEO Group (C.D.Cal. Dec. 31, 2025, No. 2:25-cv-12436) at ECF No. 2.

199    ICE, *Detainee Death Report: Garcia Aviles, Gabriel* <https://www.ice.gov/doclib/foia/reports/dderGabrielGarciaAviles.pdf> (as of Mar. 19, 2016).

200    ICE, *Detainee Death Notifications* (Nov. 3, 2026) <https://www.ice.gov/news/releases/illegal-alien-dies-victorville-medical-center-california-after-complications-alcohol> (as of Apr. 17, 2026).

201    Ramirez, *Ten Days After Adelanto Internment, This Beloved Grandfather Died in Custody*, L.A. Taco (Nov. 4, 2025) <https://lataco.com/second-death-adelanto-custody> (as of Mar. 24, 2026).

202    *Ibid*.

203    ICE, *Detainee Death Notifications* (Mar. 4, 2026) <https://www.ice.gov/news/releases/criminal-illegal-alien-passes-away-california-hospital> (as of Apr. 14, 2026).

204    Ramirez, *Los Angeles Father Dies Under ICE Custody – 9th Death This Year*, L.A. Taco (Feb. 28, 2026) <https://lataco.com/los-angeles-father-dies-ice-9th-death> (as of Mar. 19, 2026).

205    Ortega, *Muere Inmigrante Mexicano en la Cárcel del ICE en Adelanto*, La Opinión (Mar. 1, 2026) <https://laopinion.com/2026/03/01/muere-inmigrante-mexicano-en-la-carcel-del-ice-en-adelanto> (as of Mar. 19, 2026).

206    ICE, *Detainee Death Notifications* (Mar. 30, 2026) <https://www.ice.gov/news/releases/criminal-illegal-alien-passes-away-ice-custody> (as of Apr. 14, 2026); Cota-Robles, *Los Angeles Family Demands Answers After Father Dies in ICE Custody*, ABC7 (Mar. 30, 2026) <https://abc7.com/post/los-angeles-family-demands-answers-father-dies-ice-custody/18811932> (as of Apr. 2, 2026).

207    Ramirez, *Another Death at Adelanto: Family Seeks Truth as L.A.'s Mexican Consulate Highlights 'Alarming Trend' of ICE Custody Fatalities*, L.A. Taco (Mar. 31, 2026) <https://lataco.com/death-adelanto-mexican-consulate> (as of Apr. 2, 2026).