TODD BLANCHE
Acting Attorney General
BILAL A. ESSAYLI
First Assistant United States Attorney
DANIEL A. BECK
Assistant United States Attorney
Acting Chief, Civil Division
ALARICE M. MEDRANO
Assistant United States Attorney
Acting Chief, Complex and Defensive Litigation Section
PUSHKAL MISHRA (Cal. Bar No. 298695)
Special Assistant United States Attorney
     Federal Building, Suite 7516
     300 North Los Angeles Street
     Los Angeles, California 90012
     Telephone: (714) 338-3503
     E-mail: pushkal.mishra@usdoj.gov

Attorneys for Defendants

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| L.T., et al.,<br>      Plaintiffs,<br>        v.<br>U.S. IMMIGRATION AND<br>CUSTOMS ENFORCEMENT, et al.,<br>      Defendants. | No. 5:26-cv-00322-SSS-SP<br><br>**DEFENDANTS' EX PARTE<br>APPLICATION FOR A<br>STAY PENDING APPEAL**<br><br>Honorable Sunshine S. Sykes<br>United States District Judge |

# EX PARTE APPLICATION FOR
# A STAY PENDING APPEAL

Defendants respectfully apply ex parte, pursuant to Local Rule 7-19, for an order under Federal Rule of Civil Procedure 62(d) and Federal Rule of Appellate Procedure 8(a)(1) staying enforcement of this Court's July 16, 2026 Order (ECF 104) in its entirety pending appeal. Defendants have filed a notice of appeal of ECF 104 to the Ninth Circuit. ECF 109. This status-quo-preserving stay is necessary to prevent irreparable harm to the Government and to avoid mooting the appeal. The application is governed by the four *Nken* factors. *Nken v. Holder*, 556 U.S. 418, 426 (2009).

This application is based on this ; the attached Memorandum of Points and Authorities; the concurrently filed declaration of the responsible U.S. Immigration and Customs Enforcement official; the concurrently filed Declaration of Daniel A. Beck (filed pursuant to Local Rules 7-19 and 7-19.1); the pleadings, records, and files in this action; and any further argument or evidence the Court may permit. A proposed order has been included herewith.

Pursuant to Local Rule 7-19, counsel for Defendants notified counsel for Plaintiffs of the date, substance, and grounds of this ex parte application on July 30, 2026. The information for Plaintiffs' lead counsel is as follows: Rebecca Brown, Public Counsel, 610 S. Ardmore Ave., Los Angeles, CA 90005, 213-385-2977, rbrown@publiccounsel.org. Plaintiffs oppose the requested relief.

Ex parte relief is warranted because the fourteen-day deadlines ECF 104 imposes, running to July 30, 2026, cannot be heard on the regular noticed-motion track in time to avoid irreparable harm. Defendants would be irreparably harmed—and the appeal potentially mooted—if required to comply with ECF 104 or to litigate the merits in parallel before the Ninth Circuit can act. *See* L.R. 7-19, 7-19.1.

# **TABLE OF CONTENTS**

DESCRIPTION                                                                          PAGE

I.    INTRODUCTION ....................................................................................................1

II.   BACKGROUND ......................................................................................................3

III.  LEGAL STANDARD ..............................................................................................4

IV.   ARGUMENT ...........................................................................................................5

    A.    Defendants Are Likely to Succeed on the Merits of the Appeal. .................5

        1.    Plaintiffs Lack Article III Standing Because Their Injuries Are Neither Fairly Traceable to Defendants Nor Redressable by an Injunction Against Them. ...................................................................5

        2.    GEO Is a Necessary and Indispensable Party Under Rule 19, and the Injunction Cannot Stand Without It. .............................................7

        3.    GEO's Day-to-Day Operations Are Not the Government's, Which Independently Defeats Both the Merits and the Remedy. ...................................................................................................8

        4.    The Remedy Independently Fails: Rule 65(d) and Basic Equitable Limits Do Not Permit a Court to Run a Nonparty's Facility Through Defendants Who Lack Operational Control. ..........9

        5.    The Order Issued Without the Findings *Winter* Requires and Intrudes on the Executive's Plenary Authority Over Immigration Detention. .....................................................................11

        6.    The Provisional Class Cannot Stand, and It Cannot Deliver Relief That Article III, Rule 23, and *CASA* Forbid ...........................13

    B.    Defendants Will Be Irreparably Injured Absent a Stay. ............................14

    C.    A Stay Will Not Substantially Injure Plaintiffs...........................................18

    D.    The Public Interest Strongly Favors a Stay.................................................19

V.    CONCLUSION......................................................................................................19

## TABLE OF AUTHORITIES

**Page(s)**

**Federal Cases**

*All. for the Wild Rockies v. Cottrell,*
632 F.3d 1127 (9th Cir. 2011) .................................................................. 2

*Assurance Wireless USA, L.P. v. Reynolds,*
100 F.4th 1024 (9th Cir. 2024) .............................................................. 19

*Autotel v. Nevada Bell Tel. Co.,*
697 F.3d 846 (9th Cir. 2012) .................................................................. 9

*Bennett v. Spear,*
520 U.S. 154 (1997) .............................................................................. 4

*Castle v. Eurofresh, Inc.,*
731 F.3d 901 (9th Cir. 2013) ................................................. 14, 15, 16

*Dayton Bd. of Ed. v. Brinkman,*
433 U.S. 406 (1977) ............................................................................ 11

*Diné Citizens Against Ruining Our Env't v. Bureau of Indian Affairs,*
932 F.3d 843 (9th Cir. 2019) .................................................................. 7

*E. & J. Gallo Winery v. Gallo Cattle Co.,*
967 F.2d 1280 (9th Cir. 1992) ............................................................ 11

*Fiallo v. Bell,*
430 U.S. 787 (1977) ...................................................................... 12, 19

*FTC v. Qualcomm Inc.,*
935 F.3d 752 (9th Cir. 2019) .................................................................. 5

*Garcia v. Google, Inc.,*
786 F.3d 733 (9th Cir. 2015) (en banc) .............................................. 10

*GEO Group, Inc. v. Newsom,*
50 F.4th 745–52 (9th Cir. 2022) (en banc) ........................................ 8, 9

*Gilmore v. California,*
220 F.3d 987 (9th Cir. 2000) ................................................................ 11

*Government's, Logue v. United States,*
412 U.S. 521 (1973) ........................................................................... 1, 8

i

*Heckler v. Chaney,*
   470 U.S. 821 (1985) ................................................................................ 12, 13

*Johnson v. Couturier,*
   572 F.3d 1067 (9th Cir. 2009) ..................................................................... 16

*Judicial," Bell v. Wolfish,*
   441 U.S. 520 (1979) ............................................................................... 13, 19

*Kescoli v. Babbitt,*
   101 F.3d 1304 (9th Cir. 1996) ....................................................................... 7

*Lujan v. Defenders of Wildlife,*
   504 U.S. 555 (1992) ....................................................................................... 1

*Maryland v. King,*
   567 U.S. 1301 (2012) ................................................................................... 17

*McCormack v. Hiedeman,*
   694 F.3d 1004 (9th Cir. 2012) ..................................................................... 11

*Mendia v. Garcia,*
   768 F.3d 1009 (9th Cir. 2014) ....................................................................... 4

*Mullin v. Doe,*
   2026 WL 1825840 (U.S. June 25, 2026) (plurality opinion) ....................... 5

*Murthy v. Missouri,*
   603 U.S. 43 (2024) ......................................................................................... 1

*Nken v. Holder,*
   556 U.S. 418 (2009) ............................................................................. 4, 5, 19

*NLRB v. Express Publishing Co.,*
   312 U.S. 426–36 (1941) ............................................................................... 11

*O'Shea v. Littleton,*
   414 U.S. 488 (1974)

*Procunier v. Martinez,*
   416 U.S. 396 (1974) ..................................................................................... 13

*Rizzo v. Goode,*
   423 U.S. 362 (1976) ..................................................................................... 10

*Ronduen v. GEO Group, Inc.,*
   2025 WL 3050059 (C.D. Cal. Sept. 26, 2025) ............................................ 14

ii

*Schmidt v. Lessard,*
    414 U.S. 473 (1974) ........................................................................................... 10

*Simon v. E. Kentucky Welfare Rts. Org.,*
    426 U.S. 26 (1976) ......................................................................................... 5, 6

*TransUnion LLC v. Ramirez,*
    594 U.S. 413 (2021) ......................................................................................... 13

*Trump v. CASA, Inc.,*
    606 U.S. 831 (2025) ........................................................................... 1, 2, 14, 17

*U.S. Dep't of Transp. v. Paralyzed Veterans of Am.,*
    477 U.S. 597 (1986) ......................................................................................... 14

*United States v. Boyd,*
    378 U.S. 39 (1964) ............................................................................................. 8

*United States v. New Mexico,*
    455 U.S. 720 (1982) ........................................................................................... 8

*United States v. Orleans,*
    425 U.S. 807 (1976) ........................................................................................... 8

*United States v. S.A. Empresa de Viacao Aerea Rio Grandense (Varig Airlines),*
    467 U.S. 797 (1984) ......................................................................................... 12

Wal-Mart Stores, Inc. v. Dukes,
    564 U.S. 338 (2011) ..................................................................................... 13, 14

*Winter v. Natural Resources Defense Council, Inc.,*
    555 U.S. 7 (2008) ........................................................................................ 11, 12

**Federal Statutes**

8 U.S.C. § 1231(g) ........................................................................................ 17, 18, 19

8 U.S.C. § 1231(h) .................................................................................................... 12

**Federal Rule of Appellate Procedure**

Fed. R. Civ. P. 19(a)(1)(A) ......................................................................................... 7

Fed. R. Civ. P. 19(a)(1)(B)(i) ...................................................................................... 7

Fed. R. Civ. P. 65(d)(1)(B) ......................................................................................... 9

Fed. R. Civ. P. 65(d)(2) ............................................................................................... 9

## I.    INTRODUCTION

This Court's July 16, 2026 Order (ECF 104) is a broad, structural injunction over every operational aspect of the Adelanto ICE Processing Center—a facility that ICE does not own, staff, or run. The Order directs Defendants to guarantee detailed conditions of confinement (water, food, sanitation, hygiene, clothing, bedding, privacy, and at least four hours of individual yard access per day), caps headcounts, restricts administrative segregation, orders a comprehensive medical-and-disability remedial plan within fourteen days, installs two Defendant-funded "Independent Monitors" with unannounced-inspection authority and monthly reporting for the life of the litigation, waives the Rule 65(c) bond, and applies facility-wide to a provisionally certified class of all current and future Adelanto detainees. ECF 104 ¶¶ 1–7. The difficulty is not the conditions the Order describes; it is that the Order commands ICE to produce results inside a facility that The GEO Group, Inc.—a private federal contractor that is not a party in the litigation—owns, staffs, and operates every hour of every day. Plaintiffs say so too. FAC ¶¶ 32–35.

Defendants have filed a notice of appeal of ECF 104 to the Ninth Circuit. ECF 109. Under Federal Rule of Civil Procedure 62(d) and Federal Rule of Appellate Procedure 8(a)(1), Defendants seek a stay of enforcement of ECF 104 pending that appeal to preserve the status quo. Defendants are likely to succeed for reasons that go to the power to enter this decree at all—and that require reversal even if every conditions allegation is credited. Plaintiffs lack Article III standing, because their asserted injuries flow from the actions of a nonparty and an injunction against ICE alone cannot redress them by its own force. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 562 (1992); *Murthy v. Missouri*, 603 U.S. 43, 57 (2024). A contractor's day-to-day operations are not the Government's, *Logue v. United States*, 412 U.S. 521, 529–30 (1973), and the Government cannot singularly bring about major structural reforms at a facility over which it lacks operational control. The class also violates Rule 23 and *Trump v. CASA, Inc.*, 606 U.S. 831 (2025). And because the conditions the Order commands are, in substance, the very standards GEO already owes

ICE by contract, the Court has packaged contractual terms as a judicial decree against a party that does not perform them.

At a minimum, the Order is overbroad, and a partial stay is warranted. Several provisions go beyond anything the ICE–GEO contract requires and, on ICE's operational showing, are affirmatively counterproductive or dangerous: The four-hour individual-yard mandate concentrates security-threat groups in the yard and collides with ongoing construction prompted by a detainee's attempted escape; the headcount restrictions "will adversely impact suicide prevention, prevention of introduction of contraband, identifying medical emergencies, [and] prevention of physical assault by other detainees"; the contact-visitation mandate invites the very channel through which contraband entered the facility approximately two months ago; and the West-facility privacy alterations create concealment risks of self-harm and contraband. Decl. of Ryan L. Smith ("Smith Decl.") ¶¶ 11, 14–16. Other provisions duplicate standards GEO already owes by contract and that current practice already meets. *Id.* ¶¶ 8–10, 17. If the Court does not stay ECF 104 in its entirety, it should at a minimum stay the provisions that exceed the contract or that ICE has identified as dangerous.

Nor can Plaintiffs escape through the sliding scale. Even then, an injunction may issue only where a plaintiff raises "serious questions going to the merits," shows "a balance of hardships that tips sharply" in its favor, and "also shows that there is a likelihood of irreparable injury and that the injunction is in the public interest." *All. for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1135 (9th Cir. 2011). But that flexibility calibrates a plaintiff's burden on the merits of the claims; it neither supplies Article III jurisdiction nor enlarges a court's remedial power—threshold questions of law that no showing on the equities can satisfy. Because each ground above requires reversal even if every conditions allegation is credited, Plaintiffs' serious questions about the conditions neither reach those grounds nor diminish Defendants' strong showing of likely success on appeal.

The remaining factors point the same way. The Government suffers irreparable injury when a court enjoins it from administering the detention laws Congress entrusted

to the Executive, and when it is ordered to spend unappropriated, unrecoverable funds on court-appointed monitors under a bond the Court waived. Smith Decl. ¶¶ 4–7. Plaintiffs face no offsetting injury: Their own post-hearing chart maps each provision of the Order to a Performance-Based National Detention Standard, ECF 99 at 3–6, so a stay restores the ordinary contractual-enforcement architecture rather than opening a protection gap. And the public interest favors orderly appellate review of a decree that installs an Article III court as the day-to-day supervisor of an Article II function.

## II.    BACKGROUND

On July 16, 2026, the Court entered ECF 104, an in-chambers minute order granting in part Plaintiffs' renewed motion for a preliminary injunction and provisionally certifying a class of "[a]ll people who are now, or who in the future will be," detained at Adelanto, with a disability subclass. ECF 104 at 7. The Order enjoins Defendants to ensure detailed conditions of confinement at Adelanto (Paragraphs 1–3), to file within fourteen days a comprehensive medical-and-disability remedial plan (Paragraph 4), to propose and fund two court-appointed "Independent Monitors" with unannounced-inspection and records-access authority and monthly reporting for the duration of the litigation (Paragraph 5), and it bars retaliation and waives the Rule 65(c) bond (Paragraphs 6–7). ECF 104 ¶¶ 1–7. The Order issued with a memorandum of decision to follow, but its deadlines run now: The remedial plan and the parties' joint monitor proposal are due July 30, 2026.

Adelanto is owned and operated by GEO under an Indefinite Delivery/Indefinite Quantity contract with ICE. ECF 80-1 (Quevedo Decl.) ¶¶ 4, 8; *see also* ECF 80-2 (Ex. 1) (APC Contract). ICE "contracts with GEO Group, Inc. (GEO) to manage APC's day-to-day operations" and "provides oversight to ensure applicable detention standards and conditions of confinement are met." Smith Decl. ¶ 7; *see also* ECF 80-1 (Quevedo Decl.) ¶¶ 3–16. ICE assigns approximately 52 federal personnel on-site—principally deportation officers managing the detained docket—while GEO employs approximately 100 medical staff and approximately 350 security and operations personnel. ECF 80-1 ¶ 5. The contract requires GEO to perform "in compliance with" the 2011 Performance-Based National

Detention Standards ("PBNDS") and Prison Rape Elimination Act, American Correctional Association ("ACA"), and National Commission on Correctional Health Care ("NCCHC") standards. ECF 80-2 (Ex. 1) at 2–3.

This is the second preliminary-injunction round. The Court denied Plaintiffs' first motion on May 5, 2026, holding that an injury must not be "the result of the *independent* action of some third party not before the court" and that Plaintiffs "must provide facts to show that Defendants' unlawful conduct was 'a substantial factor motivating the third parties' actions.'" ECF 70 at 9–10 (quoting *Bennett v. Spear*, 520 U.S. 154, 167 (1997), and *Mendia v. Garcia*, 768 F.3d 1009 (9th Cir. 2014)). The Court also found that the requested medical relief "will inherently require an individualized determination and may vary based on a detainee's health condition and concerns." *Id.* at 12. Defendants opposed the renewed motion on jurisdictional and merits grounds at every stage, ECF 80, 81, 87, 93, and preserved a stay request on the record at the July 10 hearing, which the Court deferred. ECF 105 (Hr'g Tr.) 52:24–53:24. Defendants have filed a notice of appeal of ECF 104 to the Ninth Circuit. ECF 109.

## III.    LEGAL STANDARD

A district court has authority to stay an order pending appeal under Federal Rule of Civil Procedure 62(d), and the same authority is preserved by Federal Rule of Appellate Procedure 8(a)(1). The standard is the familiar four-factor test: "(1) whether the stay applicant has made a strong showing that he is likely to succeed on the merits; (2) whether the applicant will be irreparably injured absent a stay; (3) whether issuance of the stay will substantially injure the other parties interested in the proceeding; and (4) where the public interest lies." *Nken*, 556 U.S. at 434. The first two factors are "the most critical." *Id.* When the Government is the movant, the third and fourth factors "merge." *Id.* at 435.[1]

---

[1] A stay pending appeal serves a function the Supreme Court has long recognized: It "does not make time stand still, but does hold a ruling in abeyance to allow an appellate court the time necessary to review it." *Nken*, 556 U.S. at 421.

## IV.    ARGUMENT

### A.    Defendants Are Likely to Succeed on the Merits of the Appeal.

To obtain a stay, the movant must make "a strong showing that he is likely to succeed on the merits." *Nken*, 556 U.S. at 434. Defendants need not show that success is "more likely than not"; a "reasonable probability" or "fair prospect" of success suffices. *FTC v. Qualcomm Inc.*, 935 F.3d 752, 755 (9th Cir. 2019). Defendants make that showing several times over. Because a court of appeals "may reverse on either jurisdictional or merits grounds a lower court order that granted interim relief," *Mullin v. Doe*, No. 25-1083, 2026 WL 1825840, at *11 (U.S. June 25, 2026) (plurality opinion), each of the independent grounds below establishes the requisite likelihood of success—and each requires reversal even if every conditions allegation is credited.

#### 1.    Plaintiffs Lack Article III Standing Because Their Injuries Are Neither Fairly Traceable to Defendants Nor Redressable by an Injunction Against Them.

Plaintiffs consciously decided not to name GEO as a defendant in this action. ECF 68 (Hr'g Tr.) 27:23–24. That choice dooms their suit, because any injunction running against the Government alone cannot redress their injuries, which are attributable to how GEO runs its facility, over which it has control. As a result, Plaintiffs lack Article III standing. *See Simon v. E. Kentucky Welfare Rts. Org.*, 426 U.S. 26, 41 (1976).

Most fundamentally, Plaintiffs' injuries are not fairly traceable to ICE because they do not allege that ICE told GEO to take any of the actions that are now remedied in the injunction's list of corrective actions. To the contrary, Plaintiffs repeatedly allege that ICE's contract requires GEO *not* to take the allegedly harmful actions, and that GEO is disobeying those commands. FAC ¶¶ 36–37, 209–10. The injunction thus addresses injuries that are not fairly traceable to ICE; they are traceable only to GEO. Plaintiffs must demonstrate Article III standing—including therefore traceability—for each form of relief they seek; Plaintiffs thus lack standing to obtain *this* injunction (regardless of whether they could establish traceability for some *other* form of relief).

For similar reasons, the injunction here will not redress Plaintiffs' injuries. GEO—not ICE—owns and operates Adelanto and controls conditions day-to-day: The contract "does not reserve to ICE any direct control of any part of the contracted work," ECF 80-1 ¶ 10; GEO must "furnish all personnel," and GEO's warden bears "the ultimate responsibility for managing and operating the contracted detention facility," *id.*, Ex. 6 (Performance Work Statement) at 13, 7. As *Ahn v. GEO Group, Inc.* held on materially identical contracts, "GEO alone runs . . . operations, deciding whether it has the capability to accept detainees with medical issues, how to classify detainees, where to house them, how to supervise them, and how to ensure that they receive necessary medical treatment and intervention." No. 1:22-cv-00586, 2024 WL 1258428, at *8–10 (E.D. Cal. Mar. 25, 2024). The Court itself observed as much: "GEO Group is essentially the group managing the day-to-day operations of the Adelanto facility," ECF 68 (Hr'g Tr.) 5:12–15, while ICE personnel on site are "mostly moving people, taking people to court, perhaps observing but not making these day-to-day decisions," ECF 105 (Hr'g Tr.) 13:2–4. Indeed, a named Plaintiff has sued GEO himself over these very conditions in state court, conceding in his own filings that GEO—not ICE—is the operator responsible for them. *Salazar-Garza v. Warden*, No. 5:26-cv-02726 (C.D. Cal.), ECF 1 at 76 (citing *Salazar-Garza v. The GEO Group, Inc.*, No. CIVVS2506377 (Cal. Super. Ct.)).

GEO is an independent actor, not simply an extension of the Government: Because "all the terms of the Preliminary Injunction are action items related to the day-to-day operations of the facility, any change forced upon ICE would create an undue burden as it relates to the contractual agreement between ICE and GEO as GEO has not been required to be a party to this matter." Smith Decl. ¶ 7.

Plaintiffs' requested remedy is something the Government lacks the power to provide. The proper course here would have been for Plaintiffs to have named GEO as a defendant, such that this Court could issue a remedy controlling the party that actually controls the facility at issue. Because Plaintiffs chose not to do so, however, this Court cannot paper over the consequences of that error by ordering the Government to

6

effectively commandeer a private party, and force it to manage its facility in a given manner.

### 2. GEO Is a Necessary and Indispensable Party Under Rule 19, and the Injunction Cannot Stand Without It.

For the same reasons, the injunction that the district court did enter violates Rule 19, which requires necessary and indispensable parties to be joined. In particular, a party must be joined where, "in that person's absence, the court cannot accord complete relief among existing parties." Fed. R. Civ. P. 19(a)(1)(A). In addition, a person must be joined if the person has "an interest relating to the subject of the action" and "disposing of the action in the person's absence may . . . as a practical matter impair or impede the person's ability to protect the interest." Fed. R. Civ. P. 19(a)(1)(B)(i). As noted, the injunction here contains six pages of detailed instructions for actions that GEO must take. But if those actions are what are required to give "complete relief" to Plaintiffs, then GEO must be a party, for it is the only one that can take those actions. Similarly, GEO obviously has an interest in what actions it is required to take at the Adelanto facility, and a ruling that GEO must take those actions would as a practical (and formal) matter impair that interest. It would be one thing if the injunction had simply enjoined ICE from asking or requiring GEO to take the allegedly harmful actions that Plaintiffs seek to stop. Such an injunction might be improper for other reasons (such as a failure to establish that ICE ever asked or required such things), but at least it would not necessarily require GEO's presence in the suit. But as it stands, the injunction the district court chose to enter requires GEO to take actions even though GEO is not in the suit. That is a textbook violation of Rule 19. *See, e.g.*, *Diné Citizens Against Ruining Our Env't v. Bureau of Indian Affairs*, 932 F.3d 843, 851–53 (9th Cir. 2019); *Kescoli v. Babbitt*, 101 F.3d 1304, 1310 (9th Cir. 1996). The parallel California City litigation confirms the point from the operator's side: There, the facility operator itself moved to intervene—as the entity that actually runs the facility— and the court granted intervention. *Gomez Ruiz v. U.S. Immigr. & Customs Enf't*, No. 3:25-cv-09757-MMC, ECF 82 (N.D. Cal. Mar. 3, 2026); *id.*, ECF 144 (E.D. Cal. May 13, 2026).

### 3.    GEO's Day-to-Day Operations Are Not the Government's, Which Independently Defeats Both the Merits and the Remedy.

The Supreme Court has long held that federal supervision—even a contractual duty to follow the Government's precise rules "governing the care and custody of persons committed"—does not turn a contractor's operations into the Government's, because "the day-to-day operations of the contractor's facilities" remain "in the hands of the contractor . . . ." *Logue*, 412 U.S. at 529–30. *Logue* arose from exactly this arrangement: a contract facility holding federal detainees. *Id.* at 522-23. "A critical element in distinguishing an agency from a contractor is the power of the Federal Government 'to control the detailed physical performance of the contractor,'" and even where the Government "fix[es] specific and precise conditions to implement federal objectives," such "regulations do not convert the acts of entrepreneurs . . . into federal governmental acts." *United States v. Orleans*, 425 U.S. 807, 814–16 (1976) (quoting *Logue*, 412 U.S. at 528). The Ninth Circuit, sitting en banc, has held the same in this exact setting: "Private contractors do not stand on the same footing as the federal government," recognizing that "ICE has decided to rely almost exclusively on privately owned and operated facilities" run by GEO and further that Section 1231(g)(1) gives both "responsibility" and "broad discretion" to the Secretary "to choose the place of detention for deportable aliens." *GEO Group, Inc. v. Newsom*, 50 F.4th 745, 750–52 (9th Cir. 2022) (en banc); *accord United States v. New Mexico*, 455 U.S. 720, 736 (1982) (federal contractors are not "so assimilated by the Government as to become one of its constituent parts"); *United States v. Boyd*, 378 U.S. 39, 46–48 (1964). ICE's powers to "enforce, extend, modify, or terminate the contract" are "the canonical exercise of a contracting party's rights . . . and do[] not constitute day-to-day operational control." ECF 80 at 8 (citing *Orleans*, 425 U.S. at 815). The inquiry "is the same whether the question is sovereign immunity or Article III traceability; either way, harm produced by the contractor's independent operations is not the Government's doing." ECF 87 at 8.

Nor is there any tension with the Government's position in *Newsom*. ECF 105 at 41:7-42:16. That was a state-regulation case: The en banc court held California could not

"override the federal government's decision, pursuant to discretion conferred by Congress, to use private contractors," 50 F.4th at 750–51—a Supremacy Clause holding that protects the federal choice of who performs federal functions, and that rests on the very separateness premise Defendants invoke here.

4. The Remedy Independently Fails: Rule 65(d) and Basic Equitable Limits Do Not Permit a Court to Run a Nonparty's Facility Through Defendants Who Lack Operational Control.

The injunction violates Rule 65(d) and should be stayed on that basis alone. Rule 65(d)(1)(A) requires "[e]very" injunctive order to "state the reasons why it issued." The order here, however, includes just a single paragraph of boilerplate conclusions. ECF 104 at 1 (asserting that the four *Nken* factors are met, without elaboration). Conclusions are not "reasons." This Court would never consider an argument in a brief to be preserved if it included only conclusory assertions with no accompanying reasoning. *E.g.*, *Autotel v. Nevada Bell Tel. Co.*, 697 F.3d 846, 857 n.9 (9th Cir. 2012). By the same token, the conclusory assertions here do not qualify as "reasons" under Rule 65(d)(1)(A). To be sure, the district court promised to issue an opinion eventually; but the compliance deadline is now and still no such opinion has been issued.

The injunction also violates Rule 65(d)(2). An injunction binds only "the parties," their "officers, agents, servants, employees, and attorneys," and persons "in active concert or participation" with them, Fed. R. Civ. P. 65(d)(2), and must "state its terms specifically" and "describe in reasonable detail—and not by referring to the complaint or other document—the act or acts restrained or required," Fed. R. Civ. P. 65(d)(1)(B)–(C). But a contractor is generally distinct from the Government, and GEO is not under the operational control of the Government. Accordingly, ECF 104's monitor-and-remedial-plan regime directs the daily operations of a nonparty through Defendants who lack the operational control to deliver compliance—and it leaves the acts required of Defendants to be written later by a monitor and a remedial plan. *See also* ECF 104 ¶¶ 4–5; ECF 105 (Hr'g Tr.) 14:1–7 (Plaintiffs' counsel proposing this route: "[T]he answer is in the remedial plan with

the independent monitoring which give defendants an opportunity to present what they believe would achieve their constitutional compliance."). The Order is also mandatory relief, which issues only when "the facts and law clearly favor" the movant. *Garcia v. Google, Inc.*, 786 F.3d 733, 740 (9th Cir. 2015) (en banc). Neither does here.

*Rizzo v. Goode*, 423 U.S. 362 (1976), forecloses this architecture. There, a district court restructured a police department's internal disciplinary procedures based on the misconduct of individual officers; the Supreme Court reversed, because "the responsible authorities had played no affirmative part in depriving any members of the two respondent classes of any constitutional rights," so the case "presented no occasion for the District Court to grant equitable relief against petitioners," *id.* at 377, and "[w]hen it injected itself by injunctive decree into the internal disciplinary affairs of this state agency, the District Court departed from these precepts," *id.* at 380. ECF 104 does what *Rizzo* forbids—it restructures the internal operations of an institution based on the day-to-day conduct of persons over whom Defendants only have contractual levers, not operational control. Nor can monitors supply the decree's missing content: "[T]he specificity provisions of Rule 65(d) are no mere technical requirements"; the Rule "was designed to prevent uncertainty and confusion on the part of those faced with injunctive orders, and to avoid the possible founding of a contempt citation on a decree too vague to be understood." *Schmidt v. Lessard*, 414 U.S. 473, 476 (1974). The Ninth Circuit sustained a compliance monitor in *Melendres v. Skinner* because the underlying injunction gave the enjoined party "specific directives with which to comply"—unlike the vacated decrees in *Mickalis*, which essentially commanded the defendant to obey a broad category of laws generally and delegated authority to the special master to fill in gaps created by that vague and general requirement, and were "problematic because of the extent to which they vest[ed] the [s]pecial [m]aster with discretion to determine the[ir] terms." 113 F.4th 1126, 1139–40 (9th Cir. 2024) (quoting *City of New York v. Mickalis Pawn Shop, LLC*, 645 F.3d 114, 145 (2d Cir. 2011)). ECF 104 sits on the *Mickalis* side of that line twice over: The monitor supplies the compliance yardstick *after the fact*, ECF 104 ¶ 5.b–.c, and a remedial plan

10

drafted *after the injunction issues* supplies the operative terms, *id.* ¶ 4.a; *see also* ECF 105 (Hr'g Tr.) 14:1–7 (Plaintiffs' counsel proposing this route: "[T]he answer is in the remedial plan with the independent monitoring which give defendants an opportunity to present what they believe would achieve their constitutional compliance."). And an "outcome" decree over every operational detail is an obey-the-law injunction in substance: As the Supreme Court has held, "the mere fact that a court has found that a defendant has committed an act in violation of a statute does not justify an injunction broadly to obey the statute and thus subject the defendant to contempt proceedings if he shall at any time in the future commit some new violation unlike and unrelated to that with which he was originally charged." *NLRB v. Express Publishing Co.*, 312 U.S. 426, 435–36 (1941). The operator in the California City litigation has pressed this defect against the narrower decree there—it grants "unfettered discretion to the monitor to subjectively define and enforce" compliance and amount to a vague "obey the law" instruction with "no benchmarks or standards for compliance." *Gomez Ruiz*, ECF 86 at 22–23 (N.D. Cal. Mar. 3, 2026).

The Order also lacks tailoring. An injunction must be "tailored to eliminate only the specific harm alleged," *E. & J. Gallo Winery v. Gallo Cattle Co.*, 967 F.2d 1280, 1297 (9th Cir. 1992), must be "no more burdensome to the defendant than necessary to provide complete relief to the plaintiffs," *McCormack v. Hiedeman*, 694 F.3d 1004, 1019 (9th Cir. 2012), and "must heel close to the identified violation," *Gilmore v. California*, 220 F.3d 987, 1005 (9th Cir. 2000); and "[o]nly if there has been a systemwide impact may there be a systemwide remedy." *Dayton Bd. of Ed. v. Brinkman*, 433 U.S. 406, 420 (1977). The Order inverts these limits: Entered as an in-chambers minute order, it decrees facility-wide, systemwide relief without a finding of a systemwide violation in any domain.

5. The Order Issued Without the Findings *Winter* Requires and Intrudes on the Executive's Plenary Authority Over Immigration Detention.

The Order issued without the findings its extraordinary remedy demands. A preliminary injunction "may only be awarded upon a clear showing that the plaintiff is entitled to such relief," *Winter v. Natural Resources Defense Council, Inc.*, 555 U.S. 7, 22

11

(2008), yet ECF 104 is an in-chambers minute order that recites the *Winter* factors in a single paragraph and defers its reasons to a memorandum "to follow"—while its fourteen-day deadlines run now. The record it rests on cuts against systemic deliberate indifference: A plaintiff must show "something akin to reckless disregard," *Fraihat*, 16 F.4th at 636, and an agency that "took steps to address" identified risks is "far from recklessly disregarding" them, *id.* at 637. The September 2025 ODO inspection found Adelanto compliant in 26 of 29 PBNDS standards—with no deficiencies in Medical Care or in Disability Identification, Assessment, and Accommodation, the two systems Plaintiffs attack—and GEO completed corrective action on the rest. ECF 80-1 ¶¶ 13, 17; ECF 80-6 (Ex. 5). Plaintiffs disclaimed the only theory that could bridge that gap: They told the Court they "are not challenging the policies or insufficiencies of the policies themselves," ECF 105 (Hr'g Tr.) 19:21–23, and are "not making any argument about whether those policies on their face . . . are or are not constitutionally required," *id.* 21:15–17.

A separation-of-powers principle cuts against Plaintiffs' claims: The political branches, not the courts, are vested with plenary authority over immigration and arrangements by which removable aliens are detained. *See Fiallo v. Bell*, 430 U.S. 787, 792 (1977) ("This Court has repeatedly emphasized that over no conceivable subject is the legislative power of Congress more complete than it is over the admission of aliens." (cleaned up)). Congress has exercised that authority by committing to the Executive broad discretion to "arrange for appropriate places of detention," 8 U.S.C. § 1231(g)(1), and by expressly providing that nothing in the section creates "any substantive or procedural right or benefit" enforceable by "any party," *id.* § 1231(h). How closely to police a contractor's performance is discretion, not law: "When an agency determines the extent to which it will supervise the safety procedures of private individuals, it is exercising discretionary regulatory authority of the most basic kind." *United States v. S.A. Empresa de Viacao Aerea Rio Grandense (Varig Airlines)*, 467 U.S. 797, 819–20 (1984); *see Heckler v. Chaney*, 470 U.S. 821, 831–32 (1985) ("This Court has recognized on several occasions over many years that an agency's decision not to prosecute or enforce, whether through

civil or criminal process, is a decision generally committed to an agency's absolute discretion.").

An injunction directing how ICE must inspect, staff, and supervise its detention contractor requires an Article III court to perform, in effect, an Article II function—setting and supervising immigration-enforcement policy. "[T]he operation of our correctional facilities is peculiarly the province of the Legislative and Executive Branches of our Government, not the Judicial," *Bell v. Wolfish*, 441 U.S. 520, 548 (1979), and courts owe "wide-ranging deference" to detention administrators in "the adoption and execution of policies and practices that in their judgment are needed to preserve internal order," *id.* at 547; *accord Fraihat v. ICE*, 16 F.4th 613, 643 (9th Cir. 2021); *Procunier v. Martinez*, 416 U.S. 396, 404–05 (1974). ECF 104 dictates at what hours detainees may be counted, how many hours of "yard" they receive (and that it not be the "mini-yard"), and the procedures for any future segregation decision—the judicial management of immigration detention that ECF 59 warned against, over a facility that even the named Defendants do not run.

6.    The Provisional Class Cannot Stand, and It Cannot Deliver Relief That Article III, Rule 23, and *CASA* Forbid.

The class defects are threshold and structural. ***First***, standing: "Unless the named plaintiffs are themselves entitled to seek injunctive relief, they may not represent a class seeking that relief." *Hodgers-Durgin v. de la Vina*, 199 F.3d 1037, 1045 (9th Cir. 1999) (en banc); *accord O'Shea v. Littleton*, 414 U.S. 488, 494 (1974) (making clear that "if none of the named plaintiffs purporting to represent a class establishes the requisite of a case or controversy with the defendants, none may seek relief on behalf of himself or any other member of the class"). For the reasons above, no named Plaintiff has standing—and "Article III does not give federal courts the power to order relief to any uninjured plaintiff, class action or not." *TransUnion LLC v. Ramirez*, 594 U.S. 413, 431 (2021). ***Second***, commonality: "Rule 23(b)(2) applies only when a single injunction or declaratory judgment would provide relief to each member of the class," *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 360 (2011), and this Court has already found that the requested

13

medical relief "will inherently require an individualized determination and may vary based on a detainee's health condition and concerns," ECF 70 at 12. The PBNDS functions like *Wal-Mart*'s corporate policies—it sets standards—while GEO's officers, nurses, and administrators exercise independent judgment detainee by detainee; Plaintiffs "have not identified a common mode of exercising discretion that pervades the entire" facility. 564 U.S. at 356. Another court in this district denied certification at Adelanto itself for exactly this reason. *Ronduen v. GEO Group, Inc.*, No. 23-0481, 2025 WL 3050059, at *7 (C.D. Cal. Sept. 26, 2025) ("variations in exposure and, resultingly, whether each individual was actually injured, are essential components of their claims").

*Third*, the class sweeps in "[a]ll people who are now, or who in the future will be," detained at Adelanto—a class with no temporal limit that includes detainees with no medical needs, no disability, and no complaints, in defiance of *TransUnion*, and whose facility-wide decree collides with *Trump v. CASA, Inc.*: "[T]he question is not whether an injunction offers complete relief to everyone potentially affected by an allegedly unlawful act; it is whether an injunction will offer complete relief *to the plaintiffs before the court*." 606 U.S. 831, 852 (2025).. *Fourth*, the Rehabilitation Act subclass founders on the statute's grantee structure: Section 504 runs against the recipient of federal financial assistance, and Plaintiffs have not sued the recipient—GEO. *U.S. Dep't of Transp. v. Paralyzed Veterans of Am.*, 477 U.S. 597, 606 (1986) (Congress "imposes the obligations of § 504 upon those who are in a position to accept or reject those obligations"); *Castle v. Eurofresh, Inc.*, 731 F.3d 901, 908 (9th Cir. 2013); ECF 87 at 12. These defects were briefed in full, ECF 81 at 2–19, and the minute order certified provisionally without engaging them.

### B.    Defendants Will Be Irreparably Injured Absent a Stay.

The operational record makes the injury concrete and immediate. The Order "severely compromises ICE's ability to carry out its immigration enforcement responsibilities and operations at APC," Smith Decl. ¶ 4, and "forces ICE to comply with arbitrary court-imposed conditions of confinement that are contrary to detainee and staff

safety as well as security of the facility," *id.* ¶ 6. All of its terms "impose requirements that cannot be implemented by ICE without agreement of and action by a party not before this Court," *id.*, because GEO—not ICE—manages the facility's day-to-day operations, and "any change forced upon ICE would create an undue burden as it relates to the contractual agreement between ICE and GEO." *Id.* ¶ 7. And condition by condition, compliance beyond current practice "would require modification of the current contract as well as significantly increased costs." *Id.* ¶ 10; *see also id.* ¶¶ 8–9, 12, 14 (same as to water, meals, clothing, and recreation—including "a significant cost increase associated with modification of the contract with GEO").

ECF 104's conditions requirements inflict a further, immediate operational and security injury that a stay would prevent. The Order dictates the frequency and timing of headcounts, mandates four hours per day of individual access to the main yard for every detainee, requires that physical contact be permitted during visitation absent a documented security risk, and imposes shower and restroom privacy measures at the West facility— directives that fall on ICE through the GEO contract and interfere with established safety measures at Adelanto. Smith Decl. ¶¶ 11, 14–16. Lengthening the intervals between headcounts "will adversely impact suicide prevention, prevention of introduction of contraband, identifying medical emergencies, [and] prevention of physical assault by other detainees," and "poses a safety risk to contracted detention personnel and detainee flight risk 24 hours a day," *id.* ¶ 16; the visitation requirement invites the introduction of contraband, as it did approximately two months ago when a detainee was caught in a post-visitation pat-down with contraband transferred through physical contact during the visit—and the visitor was charged with introducing it. *Id.* ¶ 15. The four-hour individual-yard mandate is not operationally feasible: It concentrates higher-security-risk detainees and members of security threat groups in the yard at once, displaces immigration-court, attorney, medical, meal, headcount, and visitation schedules, and cannot be accommodated while ongoing construction—prompted by a detainee's attempted escape about a week ago through the base of the perimeter fence—secures the recreational areas;

15

and the West-facility privacy requirement cannot be met without concealment risks that heighten the danger of self-harm, assault, and contraband. *Id.* ¶¶ 11, 14. Meeting these directives would require "modification of preexisting real property structures," "contract changes," and "significant capital expenditure"—all at a facility ICE does not operate. *Id.* ¶¶ 11, 14.

The Order also "frustrates and impedes ICE's mission of enforcing immigration laws, preventing terrorism, and combating transnational criminal threats"—the mission of identifying, arresting, detaining, and removing aliens that ERO exists to perform. Smith Decl. ¶ 5. "After aliens are detained, ICE has a duty to hold them safely in custody," *id.*, yet the Order "forces ICE to comply with arbitrary court-imposed conditions of confinement that are contrary to detainee and staff safety as well as security of the facility." *Id.* ¶ 6.

The injury to the public fisc would not be remediable, especially given the Court's waiver of any security from Plaintiffs. ECF 104 disposes of "Federal Rule of Civil Procedure 65(c)'s bond requirement" in a single line, without findings. ECF 104 at 7. Dispensing with a bond is reserved for the case in which the court "concludes there is no realistic likelihood of harm to the defendant from enjoining his or her conduct," *Johnson v. Couturier*, 572 F.3d 1067, 1086 (9th Cir. 2009) (quoting *Jorgensen v. Cassiday*, 320 F.3d 906, 919 (9th Cir. 2003))—the opposite of an Order that itself mandates the monetary harm. With the bond waived, every dollar of compliance spending is permanently lost to the public fisc if Defendants prevail. ICE's declarant makes that exposure concrete: Compliance beyond current practice entails "a significant cost increase associated with modification of the contract with GEO," Smith Decl. ¶ 9, and "significantly increased costs" across the ordered domains, *id.* ¶¶ 10, 12—demands on public funds that accrue now, before any appellate court reviews the decree.

The California City litigation—prosecuted by an overlapping plaintiffs' counsel network against the same agency—confirms he burden and where it lands. The court there ordered a single external monitor "for a period of 120 days, subject to renewal by court

16

order," *Gomez Ruiz*, ECF 72 at 3–4 (N.D. Cal. Feb. 10, 2026), and the appointment order fixed compensation "at a rate of $425/hour," payable by the government upon order of the court, with a single end-of-term report subject to a fourteen-day pre-filing comment procedure. *Gomez Ruiz*, ECF 112 ¶¶ 7–8 (Mar. 30, 2026). ECF 104 exceeds that model in every dimension: two monitors rather than one; unannounced inspections; monthly reports rather than a single term-end report; no sunset; no comment procedure; and unfixed "reasonable rates" with no court-approval gate. And when the facility operator sought a stay there, the denial rested on a ground that proves the Government's injury here: The contractor could not show the compliance costs would ultimately rest with it, because the ICE contract allows it to "negotiate a prospective change in the bed day or other rates." *Gomez Ruiz v. ICE*, No. 1:26-cv-02546-JLT-CDB, ECF 145 at 5–6 (E.D. Cal. May 14, 2026). The costs, in other words, flow through the contract to the United States—and the same contract structure operates here. *See* Smith Decl. ¶¶ 7, 9–10, 12.

The Government "suffers a form of irreparable injury" "[a]ny time [it] is enjoined by a court from effectuating statutes enacted by representatives of its people," *Maryland v. King*, 567 U.S. 1301, 1303 (2012) (Roberts, C.J., in chambers), and the Supreme Court has now said so as a holding: "The question before us is whether the Government is likely to suffer irreparable harm from the District Courts' entry of injunctions that likely exceed the authority conferred by the Judiciary Act. The answer to that question is yes." *CASA*, 606 U.S. at 860–61 (relying on *King*, 567 U.S. at 1303). A decree of this kind "is not merely an erroneous adjudication of a lawsuit between private litigants, but an improper intrusion by a federal court into the workings of a coordinate branch of the Government." *INS v. Legalization Assistance Project*, 510 U.S. 1301, 1305–06 (1993) (O'Connor, J., in chambers). The structural insult is highly specific here: Detention of noncitizens pending removal is Executive administration—Article II "assigns the 'executive Power' to the President and provides that the President 'shall take Care that the Laws be faithfully executed,'" *United States v. Texas*, 599 U.S. at 678, Congress clarifies the broad discretion to Executive Branch in that area, 8 U.S.C. § 1231(g)-(h)—and ECF 104's monitors,

monthly reports, and court-supervised remedial planning place an Article III court in day-to-day charge of that Article II function for the life of the litigation. "Our constitutional system of separation of powers 'contemplates a more restricted role for Article III courts.'" *Id.* at 681 (quoting *Raines v. Byrd*, 521 U.S. 811, 828 (1997)).

### C.    A Stay Will Not Substantially Injure Plaintiffs.

A stay works no protection gap, because the conditions ECF 104 prescribes are obligations GEO already owes ICE by contract. That is true of the Order's substantive care standards; other provisions—the individual-yard mandate, the headcount restrictions, contact visitation, and the monitor regime—go beyond the contract, and a stay of those provisions denies Plaintiffs nothing the contract promises them. There is no contradiction in the two points: Part of the Order duplicates GEO's contract and part goes beyond it, and both halves favor a stay—the first because protection continues under the contract, the second because the added burdens lack any offsetting protective necessity. The APC Contract binds GEO to the PBNDS 2011 domains the Order covers, ECF 80-2 (Ex. 1) at 2–3; Smith Decl. ¶ 7 ("ICE provides oversight to ensure applicable detention standards and conditions of confinement are met."), and Plaintiffs' own post-hearing chart maps each provision of the proposed order to a PBNDS 2011 standard, ECF 99 at 3–6. A stay therefore restores the ordinary enforcement architecture—contract administration, surveillance under the contract's Quality Assurance Surveillance Plan, unannounced and scheduled inspections, and documented corrective action, ECF 80-1 ¶¶ 13, 17—in place of court superintendence, while the appeal tests whether a federal court may superintend that architecture at all. The current compliance record stands unrebutted: 26 of 29 PBNDS standards, no deficiencies in the two systems Plaintiffs attack, and completed corrective action as to the rest. ECF 80-1 ¶¶ 13, 17; ECF 80-6 (Ex. 5). And ICE's declarant attests, domain by domain, that current practice already meets the ordered conditions: The drinking water "was sampled and tested at various distribution points by an independent third party . . . and determined to be clean per Food and Drug Administration (FDA) standards," Smith Decl. ¶ 8; meals are dietician-approved and the kitchen passed the San

Bernardino County Health Department's inspection, *id.* ¶ 9; the facility "is cleaned daily, with the cleaning recorded in the cleaning logs," and hygiene products are free of charge, *id.* ¶ 10; privacy measures "are compliant with the Prison Rape Elimination Act (PREA)" requirements, *id.* ¶ 11; and, as to segregation, "[t]he current policies and procedures are compliant with the terms set forth in the order." *Id.* ¶ 17.

Plaintiffs cannot recast the pause as harm from unlawful conduct. A stay does not authorize any condition; it substitutes contractual enforcement for a judicial decree that likely exceeds the Court's power. Any claimed interim effect is outweighed by Defendants' strong showing that the Order is improper. *Nken*, 556 U.S. at 434.

**D.    The Public Interest Strongly Favors a Stay.**

The fourth factor merges with the second when the United States is a party. *Nken*, 556 U.S. at 435; *see Assurance Wireless USA, L.P. v. Reynolds*, 100 F.4th 1024, 1031 (9th Cir. 2024). The public interest favors a stay for three reasons. First, the public interest lies in allowing the Executive to administer the detention laws Congress assigned to it, free of judicial superintendence the courts of appeals are likely to vacate—the plenary-authority and deference principles above are themselves expressions of where the public interest resides. *Fiallo*, 430 U.S. at 792; *Bell*, 441 U.S. at 548. Second, the public interest disfavors the entrenchment of an order that likely exceeds the Court's authority under § 1252(f)(1) and Article III—including taking unappropriated public funds. Third, the public interest favors orderly appellate review: A stay "does not make time stand still," but "hold[s] a ruling in abeyance to allow an appellate court the time necessary to review it," *Nken*, 556 U.S. at 421.

**V.    CONCLUSION**

Defendants respectfully request that the Court grant this ex parte application.

19

Respectfully submitted,

Dated: July 30, 2026

TODD BLANCHE
Acting Attorney General
BILAL A. ESSAYLI
First Assistant United States Attorney
DANIEL A. BECK
Assistant United States Attorney
Acting Chief, Civil Division
ALARICE M. MEDRANO
Assistant United States Attorney
Acting Chief, Complex and Defensive Litigation
Section

*/s/ Daniel Beck*
DANIEL A. BECK

Attorneys for Defendants

## CERTIFICATE OF COMPLIANCE WITH L.R. 11-6.2

The undersigned, counsel of record for Defendants, certifies that the memorandum of points and authorities contains 6,999 words, which complies with the 7,000 word limit of Local Rule 11-6.1.

Dated: July 30, 2026

*/s/ Daniel Beck*
DANIEL A. BECK

20