TODD BLANCHE
Deputy Attorney General
BILAL A. ESSAYLI
First Assistant United States Attorney
DANIEL A. BECK
Assistant United States Attorney
Acting Chief, Civil Division
ALARICE M. MEDRANO
Assistant United States Attorney
Acting Chief, Complex and Defensive Litigation Section
PUSHKAL MISHRA (Cal. Bar No. 298695)
Special Assistant United States Attorney
Federal Building, Suite 7516
300 North Los Angeles Street
Los Angeles, California 90012
Telephone: (714) 338-3503
E-mail: pushkal.mishra@usdoj.gov

Attorneys for Defendants

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| L.T., *et al.*,<br><br>Plaintiffs,<br><br>v.<br><br>U.S. IMMIGRATION AND CUSTOMS ENFORCEMENT, *et al.*,<br><br>Defendants. | No. 5:26-cv-00322-SSS-SP<br><br>Honorable Sunshine Suzanne Sykes<br>United States District Judge |

**DECLARATION OF ASSISTANT FIELD OFFICE DIRECTOR RYAN L. SMITH**

I, RYAN L. SMITH, declare the following under 28 U.S.C. § 1746, and state that under the penalty of perjury the following is true and correct to the best of my knowledge and belief:

1. I am an Assistant Field Office Director (AFOD) for Enforcement and Removal Operations (ERO) with U.S. Immigration and Customs Enforcement (ICE), U.S. Department of Homeland Security, assigned to the Adelanto ICE Processing Center (APC) in Adelanto, California. I have held this position since July 2025. I was previously a Supervisory Detention and Deportation Officer at the APC from October 2019-July 2020, and I have been serving within the Los Angeles Field Office in various positions since May 2012.

2. The statements in this declaration are based on my personal knowledge, reasonable inquiry, and information made available to me in the course of my official duties from information obtained from records, systems, databases, other DHS employees, and/or information portals maintained and relied upon by DHS.

3. This declaration is submitted in support of Defendants' Motion to Stay the Preliminary Injunction issued by the Court in this matter on July 16, 2026.

4. I have reviewed the Preliminary Injunction enjoining ICE to comply with a list of conditions of confinement. The Preliminary Injunction severely compromises ICE's ability to carry out its immigration enforcement responsibilities and operations at APC.

**Impact of the Court's July 16, 2026, Order**

5. The Court's Preliminary Injunction frustrates and impedes ICE's mission of enforcing immigration laws, preventing terrorism, and combating transnational criminal threats. It is ERO's mission to identify, arrest, and remove aliens who present a danger to national security or are a risk to public safety, as well as those who enter the United States illegally or otherwise undermine the integrity of the United States' immigration laws and border control efforts. ERO manages all logistical aspects of the removal process by identifying, apprehending, and, when appropriate, detaining removable aliens during the

course of immigration proceedings and pending physical removal from the United States. After aliens are detained, ICE has a duty to hold them safely in custody.

6. The Preliminary Injunction forces ICE to comply with arbitrary court-imposed conditions of confinement that are contrary to detainee and staff safety as well as security of the facility. Further, all terms of the Preliminary Injunction impose requirements that cannot be implemented by ICE without agreement of and action by a party not before this Court.

7. ICE contracts with GEO Group, Inc. (GEO) to manage APC's day-to-day operations. ICE provides oversight to ensure applicable detention standards and conditions of confinement are met. Because all the terms of the Preliminary Injunction are action items related to the day-to-day operations of the facility, any change forced upon ICE would create an undue burden as it relates to the contractual agreement between ICE and GEO as GEO has not been required to be a party to this matter.

8. The Preliminary Injunction requires that ICE provide detainees with "24-hour access to clean potable water." *See* ECF No.104 at 2. The drinking water at APC is sourced from the City of Adelanto Water Department, in partnership with PERC Water Corporation (PERC). Currently and prior to the Preliminary Injunction detainees had and currently have 24-hour access to clean potable water. Every dorm room has a water fountain which is accessible to detainees 24 hours per day as well as drinking fountains in the common areas and dayrooms. Detainees are free to obtain drinking water at any time throughout the day as their quarters remain unlocked even through the evening, unless for security reasons, when though not the norm, or during count. Detainees prefer to drink from the water jugs that are provided for added convenience because they mistakenly believe that the water fountains do not provide clean water. On or about January 2026, the drinking water was sampled and tested at various distribution points by an independent third party contracted by GEO throughout the facility and determined to be clean per Food and Drug Administration (FDA) standards. Any further requirements to supply additional water quality requirements beyond the current measures which are compliant with any

level of detention standards would create an undue burden and expense for ICE because the City of Adelanto provides the water to the facility. Because the water tests clean inside the facility, additional water quality improvements could only be obtained through municipal infrastructure upgrades which ICE cannot do or compel the City of Adelanto or PERC to do.

9. The preliminary injunction requires that ICE provide detainees with "[n]utritious and sanitary meals that contain a sufficient number of calories". ECF No.104 at 2. Meals are prepared and transported by Sysco to APC and the facility utilizes refrigeration and freezer logistic systems, as temperature control systems. Sysco provides similar food distribution services and supplies to K-12 public school and education facilities. Currently, detainees are provided with nutritious and calorie sufficient meals. The meals are selected from pre-approved five cycle menus. All meals are pre-approved by a certified dietician and tested for nutrition and caloric content to ensure that food quality standards are met. Each day GEO provides a daily menu for food preparation along with special requests or meal options for detainees with medically prescribed dietary requirements or specific religious dietary needs. Further, all kitchen equipment and serving areas, carts, and are cleaned and sanitized by GEO before and after meals throughout the day. All meals are controlled by the GEO kitchen manager utilizing industry wide standards, temperature control, and heating measures to include continued and ongoing refrigeration protocols before preparation. GEO discards food daily after use and does not maintain packaged or canned goods beyond their expiration date. GEO takes a daily food sampling in the event a detainee raises any issue or concern with food. A full-time kitchen manager is continuously monitoring and inspecting the meal line and food provided to detainees throughout the day. For every meal service instance, a random meal is selected and provided to a Deportation Officer who is a member of the compliance team for consumption to ensure the highest quality standards. On May 19, 2026, the San Bernardino County Health Department inspected the APC kitchen and received a positive mark in accordance with the county guidelines for handling, processing, preparation, and

cleanliness. Ex. A – Inspection Report. The San Bernardino County Health Department completes a health inspection of the APC kitchen annually. All food preparation is maintained and served in accordance with ICE's Performance Based National Detention Standards 20111, revised in 2016 (PBNDS), food safety and inspection service guidelines. Any additional food quality standards imposed on APC in excess of commonly accepted standards would subject ICE to a significant and undue burden as well as a significant cost increase associated with modification of the contract with GEO and GEO's contract with Sysco.

10. The Preliminary Injunction requires "[a]dequate sanitation throughout [APC] East and West. At a minimum, [ICE] must ensure that (1) the facility is cleaned daily; (2) soap and hygiene products are consistently available to detainees free of charge; and (3) mold is identified, treated, and remediated at the facility." ECF No.104 at 2. The facility is inspected for mold during daily cleaning. At this time, there has been no mold identified by GEO within the alleged areas noted by the Plaintiff, or within the ventilation system, or any other areas of the facilities. The facility, including restrooms and shower areas, is cleaned daily, with the cleaning recorded in the cleaning logs. GEO provides all hygiene products, including feminine hygiene products, and soap for bathing at a central control point for all detainees at no cost. GEO inventories all hygiene products for bulk-ordering and maintains sufficient supplies for distribution to all detainees. Detainees can obtain hygiene products at a podium in the common area that is staffed with a podium guard twenty-four hours a day, seven days a week. As a preventative waste measure, some products (e.g., bottle of body wash for shower use) come with a suggestion to exchange the empty container for a full one. Any additional hygiene or sanitation standards imposed on APC in excess of commonly accepted standards would subject ICE to a significant and undue burden. To provide further sanitation would require modification of the current contract as well as significantly increased costs.

11. The Preliminary Injunction requires providing "[a]dequate privacy to detainees when using the facility restroom or showering that is consistent with the safety

needs of the facility." ECF No.104 at 2. Privacy methods currently provided to detainees when using the restrooms and showers are compliant with the Prison Rape Elimination Act (PREA) and ICE Sexual Abuse and Assault Prevention and Intervention Program (SAAPI) requirements. The East facility already has existing privacy curtains in the shower area. In the West facility, the adjoining communal shower area is divided by walls and has already a limited view, unless someone is directly peering into the open showers due to the configuration of the shower walls. The West facility's configuration and design pose a security risk if curtains are installed due to limited view for the dorm officer and it could lead to potential hazards such as self-harm, harm of others, or concealment of contraband. The West facility houses high-level detainees, who are more prone to breaching security and violating facility rules if their actions could be concealed behind curtains. Further, modification of preexisting real property structures or concrete cement blocks would entail significant efforts outside the present contractual obligations to stand up privacy attachments required to be built-in to the walls for each shower, bathroom, or community area of the entire detention facility of more than 100 units. Any additional privacy standards imposed on APC in excess of commonly accepted standards would subject ICE to a significant and undue burden on additional capital improvements maintained by GEO, an unnamed party.

12. The Preliminary Injunction requires providing "[a]ccess to clean, sanitary, and temperature-appropriate clothing." ECF No.104 at 2. During intake, detainees are issued three pairs of trousers, three outer shirts, three undershirts, three boxer shorts/undergarments, one sweatshirt, three pairs of socks, and one pair of shoes. Clothing is replaced upon detainee's request. The detainee retains the same number of clothing items issued at intake. Clothing items can be exchanged for a replacement if they become damaged or worn out, or to change size. Laundry services are provided six days per week, with detainee clothing items being delivered in the morning to GEO and returned the same day in the afternoon. Any additional laundry standards imposed on APC in excess of the current process which is compliant with commonly accepted standards would subject ICE

to a significant and undue burden. To provide further sanitation would require modification of the current contract as well as significantly increased costs and undue burden GEO, an unnamed party.

13. The Preliminary Injunction requires providing "[a]ccess to clean, sanitary, and temperature-appropriate mattresses, pillows, and blankets." ECF No.104 at 2. During intake, detainees are issued two blankets – one wool and one cotton, one set of bed sheets, and one pillow. Laundry service for detainee bedding occurs with the same frequency as with clothing. *See supra* at ¶11.

14. The Preliminary Injunction requires ICE to provide "[a]ccess to outdoor recreation spaces that must include individual access to the yard (i.e., not the "mini-yard") for at least four hours per day, seven days per week, unless there are documented security risks or reasons necessitating otherwise." ECF No.104 at 2. At APC, there is a large yard which consists of a full-sized soccer field, basketball court, benches, and walking area. The "mini- yard" is 990 square feet of unencumbered space (55' x 18'), and consists of a handball court, basketball half-court, and exercise area with a pull-up bar and exercise station. There are significant safety concerns with having too many detainees in the large yard at the same time, with the high concentration of higher-level security and flight risk detainees is of particular concern. This also is not operationally feasible given the number of hours in a day, the fact that outdoor temperatures in the high desert pose a heat/cold risk, and the fact that mandating a four-hour requirement of recreation time in the large yard would disrupt other competing priority activities, such as ongoing immigration court schedules, client-attorney meetings, medical appointments, mealtimes, headcounts, family visitation schedules, and other operational concerns. Further, due to a recent attempted detainee escape, there is ongoing construction to secure recreational areas and fencing, which temporarily limits access to the "large" yard and is expected to be completed by next month. The most recent escape attempt was approximately a week ago in which the detainee was unwinding and cutting the bottom links in the chain link fence so the detainee could escape under the fence. Further, increasing the number of detainees in the yard at

the same time creates unmanageable safety risks for all detainees due to various levels of security threat groups, exposing lower security level populations to interaction with dangerous detainees. Also, increased yard time would severely affect the ability to organize mealtimes, court appearances, and visitation times as well as require a subdivided yard due to population size. Further, modification of preexisting real property structures, such as the large yard, would entail contract changes and sufficient timeframes to divide of the large yard with appropriate fencing for segmented yards to maintain adequate security essentially creating divided mini-yards in order to maintain and ensure the safety of all detainees and not to mention to prevent attempted escapes of higher threat level detainees. At this time the detainees are afforded two hours of large yard time along with the medium yard that remains open during day, excluding headcount, and other extracurricular activities such as visiting the law library for computer research, using tablets in their quarters, and attending mental health courses. Any additional recreation-time standards imposed on APC in excess of commonly accepted standards would subject ICE to a significant and undue burden, especially standards that would require significant capital expenditure and services on GEO, an unnamed party.

15. The Preliminary Injunction requires "[v]isits must not be subject to time limits unless such visits interfere with normal operation of the facility or visitation rooms reach capacity. Detained individuals and their families must be allowed to use the restroom during visits without the visit being subject to automatic cancellation. Physical contact (e.g., hugging, holding hands, etc.) must be allowed during visitation absent a documented security risk justifying otherwise." ECF No.104 at 2. Currently, physical contact within the guards' eyesight is permitted during visitation for some security groups and not for others. However, restroom usage during visitation poses a heightened security risk due to the potential introduction of contraband into the facility and would require significant increase in guard personnel to provide escort to the restroom area and to search restroom area for potential contraband. The West facility has no restrooms co-located in close proximity to the visitation area because of the size of that wing. Departure from the West

facility visitation area poses an additional security risk to contract personnel, since the outside visitor is required to exit the sterile environment and reintroduce themselves to APC security for assurance of their secure reentry through a security checkpoint and metal detector. The process is similar to that of entering and exiting the secure portion of an airport terminal. This is not the case for the East facility where positive control is maintained by GEO over third-party visitors that require use of the restroom that is in close proximity the holding area. Approximately two months ago, a detainee was caught during post-visitation pat-down with contraband that was transferred through physical contact during the visit. The visitor was subsequently charged for introducing contraband to the facility through physical contact. Per policy, pat down searches are standard industry practice at the start and end of a visitation session for security reasons. These security measures serve to prohibit the introduction or transfer of contraband inside the facility from the visitors, and failure to do so would pose a significant security risk by allowing unfettered access through proposed physical contact. This would increase the challenge of detecting and preventing any introduction of contraband, more specifically controlled substances like narcotics and fentanyl that are difficult to detect during pat searches due to their size and concealment. Again, unchecked facility access would be a high security risk with the introduction of contraband and weapons. This security threat would adversely impact the ability to maintain and safeguard contracted security personnel and would pose a safety risk for other detainees, visitors and staff alike. The same security threat would exist for failing to meet limited visitation periods, which is not possible to maintain, where detainees are permitted to see visitors on the same day on a first-come basis, for the same reasons associated with compromising security along with implication of depriving other detainees of their own allocated visitation times. Due to safety and security for staff, detainees, and visitors, the schedule is strictly maintained for time and for division by security threat level of detainee.

16. The Preliminary Injunction requires:

> [ICE] must ensure headcounts are conducted in a manner and at times that

minimize disruption to the operation of the facility.

a. **9:00 A.M. to 8:00 P.M.:** Absent a documented security risk or reasons necessitating otherwise, headcounts conducted between 9:00 A.M. and 8:00 P.M. must be performed on an out-count basis. Out-count basis is defined as a headcount that occurs while detainees are temporarily outside their assigned housing or units. No more than two headcounts may occur between 9:00 A.M. to 8:00 P.M.

b. **8:01 P.M. TO 8:59 A.M.**: Headcounts conducted between 8:01 P.M. to 8:59 A.M. must be performed in a manner designed to minimize intrusion on the detainees while they are sleeping. No more than two headcounts can occur between 8:01 P.M. to 8:59 A.M.

ECF No.104 at 2. Currently, four headcounts are performed between 8:01 p.m. and 8:59 a.m. Increasing the time intervals between observations of the detainees prioritizes detainee convenience over operational needs and safety. The Court's rigid instruction regarding the number of headcounts to perform and how to perform them creates a significant risk to detainee health, safety, and welfare, as the lack of operational flexibility will adversely impact suicide prevention, prevention of introduction of contraband, identifying medical emergencies, prevention of physical assault by other detainees, etc. Also, restricting the manner and number of headcounts overall poses a safety risk to contracted detention personnel and detainee flight risk 24 hours a day. Further, headcounts can be performed without interrupting detainee sleep so long as the detainee has not obstructed the viewing window in the door. Obstructing the view from the door in this manner is a High Moderate Offense and security risk not to mention a preventive measure for operations to identify self-harm or illness immediately, per the Detainee Disciplinary Code.

17. The Preliminary Injunction states, "[d]efendants are enjoined from isolating detainees in the Special Housing Unit, Special Management Unit, or administrative segregation absent (1) a documented security concern that threatens the safety and/or

security of the facility or staff, or (2) a request from a detainee to be placed in administrative segregation. If a detainee is placed in administrative segregation, that detainee must be given notice of (1) the reasons why they have been placed in administrative segregation within 24 hours of their placement, and (2) the process by which they can contest such placement. Any segregation must account for the detainee's mental and physical health and evaluate whether segregated housing is likely to worsen their health. If segregation is likely to worsen a detainee's mental or physical health, alternative remedies must be considered and segregated housing should only be used if absolutely necessary." ECF No. 104 at 2. The current policies and procedures are compliant with the terms set forth in the order.

Executed on this 30th day of July 2026.

RYAN L SMITH

Digitally signed by RYAN L SMITH
DN: cn=RYAN L SMITH, o=U.S. Government, ou=People, email=Ryan.L.Smith@ice.dhs.gov, c=US
Date: 2026-07-30T17:11:18-0700

Ryan L. Smith
Assistant Field Office Director