UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
CIVIL MINUTES—
GENERAL

| | | | |
|---|---|---|---|
| Case No. | 5:26-cv-00322-SSS-SPx | Date | August 12, 2026 |
| Title | *L.T., et al., v. United States Immigration and Customs Enforcement, et al.* | | |

| | |
|---|---|
| Present: The Honorable | SUNSHINE S. SYKES, UNITED STATES DISTRICT JUDGE |

| | |
|---|---|
| Irene Vazquez | Not Reported |
| Deputy Clerk | Court Reporter |
| Attorney(s) Present for Plaintiff(s): | Attorney(s) Present for Defendant(s): |
| None Present | None Present |

**Proceedings: (IN CHAMBERS) MEMORANDUM OF DECISION REGARDING PLAINTIFFS' RENEWED MOTION FOR PRELIMINARY INJUNCTION [DKT. NO. 77] AND MOTION FOR CLASS CERTIFICATION [DKT. NO. 57]**

> [Detention] conditions provide a particularly accurate barometer of a society's values, because the society's conception of human rights, of the basic dignity to which a person is entitled because of the simple fact of her humanity, is typically the primary, sometimes even the only constraint on what sufferings the [government] can impose. Even in the United States, an affluent and industrialized nation with a stable representative democracy and a comparatively strong civil rights tradition, serious human rights violations occur in [its detention facilities.]

*Kane v. Winn*, 319 F. Supp. 2d 162, 175 (D. Mass. 2004); *see also* Attributed to Feodor Mikhailovich Dostoyevsky, *Respectfully Quoted: A Dictionary of Quotations,* no. 1527 (Library of Congress 1989) ("The degree of civilization in a society can be judged by entering its [detention facilities].").

This case concerns constitutional and statutory limits on the federal government's treatment of civil immigration detainees. Over the past year and

half, Defendant United States Immigration and Customs Enforcement (ICE) executed targeted raids in this District, detaining Plaintiffs L.T., J.M., Sevak Mesrobian, and Jose Mauro Salazar Garza and transferring them to Adelanto ICE Processing Center pending removal proceedings.

Plaintiffs bring a putative class action alleging Defendants fail to ensure that detainees at Adelanto receive adequate medical care and are not subjected to punitive conditions of confinement. They seek an injunction requiring humane treatment consistent with ICE's constitutional and statutory duties. Plaintiffs and other detainees report inadequate medical care, lack of disability accommodations, and punitive conditions.

Before the Court are Plaintiffs' Renewed Motion for Preliminary Injunction and Motion for Class Certification, both opposed. After considering the parties' written and oral arguments, relevant legal authority, and record in the case, the Court summarily granted the preliminary injunction motion and provisionally certified two classes, noting a memorandum of decision was to follow. This is that memorandum.

## I. BACKGROUND

### A. GEO Group and Its Ownership of Adelanto ICE Processing Center

GEO Group—one of the largest for-profit state prison corporations in the United States—purchased Adelanto in 2010 for $28 million and opened it as an immigration detention center in 2011.[1] Adelanto ICE Processing Center, a former state prison in the Mojave Desert, has East and West units and a capacity of approximately 1,940 detainees.[2]

### B. ICE's Contract with GEO Group (APC Contract)

#### 1. Terms of the Contract

ICE, a component of Defendant United States Department of Homeland Security (DHS), enforces civil immigration laws, including detention and removal

---

[1] Dkt. No. 74, First Am. Compl. (FAC) ¶ 32.

[2] *Id.* ¶¶ 31, 33.

and must ensure that civil immigration detainees "are kept in conditions that comply with the Constitution and the law."[3]

In 2019, ICE and GEO Group contracted to detain, transport, and provide medical services to detainees at Adelanto.[4] The contract requires compliance with the 2011 Performance-Based National Detention Standards (PBNDS) as revised in 2016.[5] The PBNDS recognizes ICE's duty to detain in the most humane manner, sets minimum standards tailored to civil immigration detention, and dictates detainee treatment.[6]

### 2. The Performance-Based National Detention Standards

The 455-page PBNDS sets guidelines and minimum standards tailored to immigration detention's purpose: securing noncitizens' presence for immigration proceedings and removal.[7] In the preface to the PBNDS, ICE expressly acknowledges that it "must" detain people "in the most humane manner possible with a focus on providing sound conditions and care."[8]

a. Medical care

PBNDS requires access to appropriate and necessary medical, dental and mental health care, including emergency services.[9] GEO Group must provide detainees with timely comprehensive health assessments; continuous health care at arrival and departure; appropriate chronic care; daily health services with timely responses; 24-hour emergency medical and mental health services; and transfers for care beyond Adelanto's resources.[10] To achieve these goals, the PBNDS establishes the following standards:

---

[3] *Id.* ¶ 36.

[4] *See id.* ¶¶ 26, 32; Dkt. No. 34-3, Decl. William Adams (Adams Decl.) Ex. B, APC Contract at 65; Dkt. No. 54-1, Decl. Rosa Quevedo (Quevedo Decl.) ¶¶ 6, 14, 15.

[5] FAC ¶ 36; APC Contract at 65.

[6] Dkt. No. 35, Req. Judicial Notice Ex. A, Performance-Based National Detention Standards 2011 (PBNDS) at 3.

[7] *Id.*

[8] *Id.*

[9] *Id.* at 262.

[10] *Id.* at 262–63.

***Initial and Subsequent Health Assessments:*** Within 12 hours of arrival GEO Group must provide comprehensive medical, dental, and mental health intake screening by a qualified, medical health professional or a specially trained detention officer respecting privacy.[11] Urgent conditions require evaluation by a licensed health care provider as soon as possible but no later than two working days.[12] Assessments identify urgent medical needs; ensure continuity of care, disability accommodations; and prevent the spread of contagious diseases.[13] A more comprehensive assessment is due within 14 days of the initial intake screening.[14]

***Sick-Call Procedures:*** GEO Group must allow unrestricted requests for medical, mental health and dental services to a qualified health professional.[15] Requests must be triaged within 24 hours after a detainee submits the request.[16] In urgent situations, the housing unit officer at Adelanto must notify medical personnel immediately.[17]

***Continuity of Care:*** GEO Group must provide continuity of care for arriving and departing detainees.[18] Chronic conditions require appropriate treatment, medication monitoring, diagnostic testing, and access to a chronic care clinic.[19] This requires GEO Group to develop a written treatment plan that must be approved by an appropriate qualified licensed health care provider and in consultation with the detainee.[20] If there is a change of placement of detention or status, GEO Group must develop a plan to provide continuity of medical care.[21]

---

[11] *Id.* at 258, 271–73.

[12] *Id.* at 271.

[13] Dkt. No. 34-4, Decl. Altaf Saadi, M.D. (Saadi Decl.) ¶ 17.

[14] *Id.* at 263.

[15] *Id.* at 276.

[16] *Id.*

[17] *Id.*

[18] *Id.* at 257–58.

[19] *Id.* at 258.

[20] *Id.* at 278.

[21] *Id.* at 281.

***Delivery of Medication:*** GEO Group must timely order, dispense, and administer prescription medications as prescribed.[22] Detainees arriving with or reporting prescriptions must be evaluated as soon as possible but no later than 24 hours after arrival.[23] Medically necessary medications must be secured.[24]

***Emergency Response:*** GEO Group must provide 24-hour emergency medical and mental health services to all detainees with a written plan, including 24-hour on-call physician, dentist, and mental health professional; annual CPR training; and procedures for immediate transfer for emergency care.[25]

***Mental Health:*** GEO Group must have 24/7 on-call mental health staffing.[26] Referrals must be evaluated by a qualified health care provider within 72 hours, or sooner as needed.[27] If the provider is not a mental health provider, GEO Group must ensure the detainee is evaluated by a mental health provider within the next business day.[28]

b. Disability Accommodations

GEO Group must comply with Section 504 of the Rehabilitation Act of 1973 and provide reasonable accommodations so detainees with disabilities can access Adelanto's programs, services, and activities.[29] Detainees must be able to identify disabilities and request a reasonable accommodation.[30] GEO Group must proactively "identify detainees with impairments that are open, obvious, and apparent" and ensure physical access to services, including access to "toileting and bathing facilities."[31]

[22] PBNDS at 258.

[23] *Id.* at 278.

[24] *Id.*

[25] *See id.* at 258, 277.

[26] *Id.* at 257.

[27] *Id.* at 274, 275.

[28] *Id.*

[29] *Id.* at 325.

[30] *Id.* at 328–29.

[31] *Id.* at 329.

c. Environmental Health and Safety, Recreation, and Special Management Units

***Water:*** GEO Group must provide detainees with safe, potable water throughout Adelanto,[32] including in their hold rooms.[33]

***Food***: GEO Group must provide nutritious and appetizing meals and ensure safe food preparation.[34] Dietary needs must be accommodated for religious and medical reasons.[35] GEO Group must provide detainees three meals a day, at least two of which must be hot meals.[36]

***Sanitation***: GEO Group must maintain a clean and sanitary facility at the highest level.[37] Floors must be mopped daily and when soiled, using double-bucket technique with a hospital disinfectant-detergent solution.[38] A clean mop head must be used each time.[39]

***Privacy screens***: GEO Group must ensure safety, security and comfort in hold rooms, including lavatory/toilet fixtures with modesty panels.[40] Bathing and toilet facilities must offer a reasonably private environment.[41]

***Clothing and Bedding:*** GEO Group must regularly issue and exchange clean, laundered, temperature-appropriate clothing, bedding, linens, and towels.[42] New detainees must receive clean, laundered, and temperature-appropriate clothing during intake.[43] Unserviceable or indelibly stained clothes and shoes must be

---

[32] PBNDS at 24, 237.

[33] *Id.* at 106.

[34] *Id.* at 233.

[35] *Id.*

[36] *Id.* at 237.

[37] *Id.* at 24, 26.

[38] *Id.* at 26.

[39] *Id.*

[40] *See id.* at 104–05.

[41] *Id.* at 310.

[42] *Id.* at 308.

[43] *Id.* at 309.

discarded and replaced as soon as practicable.[44] Clean bedding, linens, and towels must be provided weekly.[45]

***Headcounts***: GEO Group must conduct counts to ensure the security, safety, and orderly operation of Adelanto.[46] Formal counts must occur at least once every eight hours, with additional counts as needed.[47] Counts must ensure accountability "with minimal interference with daily work and activity schedules."[48] Counts may be conducted in open area so long as there are two officers present, one to count and one to observe detainees' movements.[49]

***Outdoor recreation***: General population must have four hours of outdoor recreation daily, seven days a week.[50] Segregated detainees must have access to exercise and equipment outside the living area, at least one hour daily (five days for disciplinary segregation).[51]

***Visitation Policies:*** GEO Group must allow detainees "to maintain ties to their families and friends in the community."[52] Limits on visitors and visit length must be based "only by reasonable constraints of space, scheduling, staff availability, safety, security and good order. Generally visits should be for the maximum period practicable but not less than one hour with special consideration given to family circumstances and individuals who have traveled long distances."[53] Contact with visitors at the beginning and end of the visit is encouraged.[54] GEO Group must facilitate contact visitation with children, stepchildren, and foster children.[55]

---

[44] PBNDS at 309.

[45] *Id.* at 311.

[46] *Id.* at 116.

[47] *Id.* at 116–17.

[48] *Id.* at 117.

[49] *See id.*

[50] *Id.*at 351, 352.

[51] *See id.* at 351–54.

[52] *Id.* at 373.

[53] *Id.*; *see also id.* at 376–77.

[54] *Id.* at 378.

[55] PBNDS at 377.

***Segregation***: GEO Group must maintain Special Management Units (SMUs) and Administrative Segregation sections.[56]

"Administrative Segregation status is a nonpunitive status in which restricted conditions of confinement are required only to ensure the safety of detainees or others, the protection of property, or the security or good order of the facility."[57] A detainee may be placed in Administrative Segregation for limited reasons, including to protect a person's life, for the security and orderly operation of Adelanto, and medical reasons.[58] Before placing a detainee in Administrative Segregation, GEO Group or a designee must review the case "to determine whether administrative segregation is in fact warranted."[59]

Disciplinary Segregation is punitive and may be imposed only after a hearing, and a finding of a prohibited act, with segregation used to regulate behavior.[60]

In either Administrative or Disciplinary Segregation detainees must be provided basic living conditions.[61]

### 3. ICE's Compliance Methods and Enforcement Tools

Plaintiffs assert ICE is "legally responsible for conditions" at Adelanto, with extensive control and authority to remedy.[62] Plaintiffs allege ICE sets standards and exercises pervasive oversight through on-site personnel, reviews, inspections, discrepancy reporting, corrective action, withholding payment, penalties, and contract remedies.

Although ICE lacks direct day-to-day control,[63] Plaintiffs assert ICE maintains extensive oversight control over GEO Group, including observing, identifying, and notifying GEO Group of compliance issues.[64] ICE Field Office

---

[56] *Id.* at 178.

[57] *Id.* at 178.

[58] *Id.* at 179.

[59] *Id.* at 178.

[60] *Id.* at 182.

[61] *Id.* at 176, 185, 186.

[62] FAC ¶ 47.

[63] Quevedo Decl. ¶ 7.

[64] *See* FAC ¶ 49; *see also* Quevedo Decl. ¶¶ 3, 7.

Directors and Assistant Field Office Directors manage detention operations in their geographic area and ICE ERO's Los Angeles office identifies deficiencies and corrective action at Adelanto."[65]

ICE maintains on-site monitoring, reviews grievances, and employs an on-site Detention Services Manager (DSM), also known as a Standards Compliance Officer to conduct audits and oversee corrective actions.[66] This officer maintains a presence at Adelanto in order to "conduct ongoing compliance reviews and assist the facility in developing and monitoring corrective actions to ensure compliance and conduct daily scheduled and unscheduled audits and reviews of contractor performance."[67] The compliance officer identifies any deficiencies and proposes corrective action. The ICE field office bears the responsibility to correct any deficiencies.[68]

ICE also assigns an Immigration Health Services Corp (IHSC) employee at Adelanto to oversee medical services provided at the facility.[69] IHSC is responsible for ensuring that the medical care being provided meets detention standards.[70]

DHS may correct deficiencies through inspections, and contract quality assurance tools.[71]

***Inspection Process:*** ICE—through its Office of Professional Responsibility (OPR) and Office of Detention Oversight (ODO)—conducts periodic and routine inspections of Adelanto.[72] Adelanto is also subject to annual and random inspections from various federal governmental entities.[73] When an inspection is conducted, the responsible entity generates a report and sends it to GEO Group.[74]

---

[65] FAC ¶ 49.

[66] *Id.* ¶ 50.

[67] *Id.*

[68] *Id.*

[69] *Id.* ¶ 52.

[70] *Id.*

[71] *Id.* ¶ 54.

[72] Quevedo Decl. ¶ 7.

[73] *Id.* ¶ 7.

[74] *Id.* ¶ 8.

An ICE Contracting Officer Representative manages day-to-day contract oversight and is responsible for ensuring compliance.[75] ICE may informally resolve issues, issue Discrepancy Reports, require corrective action plans, withhold payment, or impose financial penalties."[76]

Defendants exercise pervasive operational control: setting standards; employing on-site personnel; approving staffing plans; adjudicating GEO staff complaints; using inspections and contract tools to order remedial action; and enforcing, extending, modifying, or terminating the contract. ICE is not a passive purchaser of bed space but dictates and controls the conditions of confinement at Adelanto and bears responsibility for all detainees' treatment."[77]

### C. GEO Group's History of Noncompliance With the PBNDS, and ICE's Failure to Hold GEO Group Accountable

Plaintiffs allege GEO Group has a history of PBNDS noncompliance, and ICE has failed to hold GEO Group accountable. In 2015, DHS' Office for Civil Rights and Civil Liberties (CRCL) warned that Adelanto's medical leadership "was not competent and that negligent medical care was occurring as a result."[78] Just two years later, CRCL again found that "medical care at Adelanto was seriously deficient and did not meet the 2011 PBNDS" and the refusal to hire competent medical leadership and correct this "critical failure" "more likely than not . . . led to inadequate detainee medical care that contributed to medical injuries, including bone deformities and detainee deaths, and continue[d] to pose a risk to the safety of other detainees."[79]

The following year, in 2018, CRCL found Adelanto placed an "alarming" number of detained individuals with serious mental illness in solitary confinement and isolated many for "shockingly" long periods of time.[80] That same year, DHS' Office of Inspector General (OIG)—the governmental entity tasked with providing independent oversight and holding DHS and its agencies accountable—conducted

---

[75] FAC ¶ 56.

[76] *Id.* ¶ 57.

[77] *Id.* ¶ 58.

[78] *Id.* ¶ 38.

[79] *Id* ¶ 39.

[80] *Id.* ¶ 40.

an unannounced inspection at Adelanto and found "nooses in cells, improper segregation, and inadequate medical care[.]"[81]

Further in 2019, OIG found that ICE did not adequately hold facility contractors accountable and did not fully use contracting tools for failing to meet performance standards."[82]

In that same year, Disability Rights California (DRC)—the state agency responsible for protecting individuals with disabilities—conducted a multi-day inspection of Adelanto.[83] In a 64-page report, DRC found that individuals with disabilities and mental health issues were subjected to abusive conditions.[84] DRC concluded that Adelanto had an "inadequate mental health care and medical care system" which failed to comply with disability laws and the PBNDS.[85] Detainees described being treated like "dogs in cages."[86]

In 2020, during the COVID-19 pandemic, the United State Environmental Protection Agency (EPA) investigated reports from detainees that GEO Group used toxic cleaning chemicals causing headaches, nausea, nosebleeds, fainting, eye irritation, skin irritation, and breathing issues and warned GEO Group about using registered pesticides in a manner inconsistent with its labeling.[87] District Judge Terry J. Hatter Jr. ordered GEO Group to cease using this chemical.[88] Judge Hatter also ruled that the federal government callously disregarded detainees' constitutional rights to safety during the pandemic and capped the number of detainees detained at Adelanto.[89]

---

[81] FAC ¶ 55.

[82] *See id.*¶ 54 n.69.

[83] *Id.* ¶ 42.

[84] *Id.*

[85] *Id.*

[86] *Id.* ¶ 4.

[87] *Id.* ¶ 43.

[88] *Id.* (citing *Roman v. Wolf,* No. EDCV 20-00768 TJH (PVCX), 2020 WL 5797918, at *5 (C.D. Cal. Sept. 29, 2020), *aff'd in part, vacated in part, remanded,* 977 F.3d 935 (9th Cir. 2020)).

[89] *Id.* ¶ 44 (citing *Roman*, 2020 WL 5797918, at *5).

### D. Defendants Repopulation of Adelanto and Continued Inability to Provide Medical Care and Safe Conditions

Since June 2025, Defendants have conducted sweeping immigration raids detaining noncitizens throughout the Central District of California. Plaintiffs allege one purpose was to abruptly repopulate Adelanto.[90]

Between 2020 and early 2025, Adelanto held fewer than a dozen detained individuals at a time.[91] After the COVID-19 intake limit was lifted, the population surged from 153 to over 1,200 detainees within a week.[92] By April 2026, nearly 1,800 noncitizens were detained.[93] A long-time staff member warned Adelanto was not equipped for the influx.[94]

As the population grew, detainees described inadequate medical care and punitive conditions. The Court summarizes below portions of the detainees' testimony.

#### 1. Inadequate Medical Care

***Xiaoman Ding:*** Ding was diagnosed with a pituitary brain tumor in 2019.[95] The tumor causes several symptoms and complications, including constant headaches, pain in her eyes, gradual loss of eyesight, and difficulty walking.[96] She takes special medications once a week to control the pain.[97] Ding also has depression.[98]

At her medical intake screening, Ding told the nurse that she took prescriptions for her headaches; however, she never received an immediate follow-up doctor's appointment or examination.[99] Instead of receiving her

---

[90] *Id.* ¶ 3.

[91] *Id.* ¶ 46.

[92] *Id.*

[93] *Id.* ¶ 3.

[94] *Id.* ¶ 4.

[95] Dkt. No. 34-16, Decl. of Xiaoman Ding (Ding Decl.) ¶ 9.

[96] *Id.* ¶ 9

[97] *Id.* ¶ 11.

[98] *Id.* ¶ 13.

[99] *Id.* ¶ 5.

prescription medications, Ding was only provided Tylenol and ibuprofen to help manage her pain.[100] Between June to September 2025, Ding submitted nearly 100 requests about her headaches and depression.[101] Her requests went unanswered for months.[102] Finally, in September 2025, Ding was able to see a counselor for her depression, and in October 2025, she was able to see a general physician for her headaches, but not a specialty care doctor.[103] However, by that point, Ding's headaches had become debilitating, and the Tylenol and ibuprofen did nothing to help.[104] Unable to bear the pain, in October 2025, Ding tried to commit suicide.[105] "I thought I would rather die and be done with it, or if I did not die, any severe bodily injury could catch someone's attention and get me to a doctor," she states.[106] Fortunately, other detainees stopped her from doing so.

***Salazar Garza:*** In September 2024, Salazar Garza was at another facility next to Adelanto ICE Processing center.[107] A detainee, who was experiencing a mental health episode, bit off and swallowed the end of Salazar Garza's pinky finger.[108] Although Salazar Garza's finger was amputated, the surgeon informed him that there were still bone fragments remaining.[109] In February 2025, Salazar Garza had an external follow-up appointment to see how his finger was doing.[110] The doctor told him he may need another surgery and ordered a follow-up MRI, which needed ICE approval.[111] A few weeks later at Adelanto, Salazar Garza asked the doctor about the MRI.[112] The doctor told him that Adelanto had no notes or paperwork regarding the MRI.[113] Salazar Garza was still experiencing severe

---

[100] *Id.* ¶ 13.

[101] *Id.*

[102] *Id.*

[103] *Id.*

[104] *See Id.* ¶ 15, 16.

[105] *Id.* ¶ 29.

[106] *Id.*

[107] Dkt. No. 34-26, Decl. Mauro Salazar Garza (Salazar Garza Decl.) ¶ 4.

[108] *Id.* ¶ 5.

[109] *Id.*

[110] *Id.* ¶ 8.

[111] *Id.*

[112] *Id.*

[113] *Id.*

pain in his hand.[114] His hand became swollen and painful, and tip of one of his amputated finger began turning yellow.[115] He later found that the amputation site had become infected.[116]

Several months later in June 2025, while he was asleep, the tip of his amputated finger burst with blood and black pus.[117] Salazar Garza called out for help.[118] A guard arrived and radioed for help, but no one came.[119] Salazar Garza was not provided bandages or supplies to clean the wound and was forced to wrap the tip of his finger with toilet paper.[120] More than a week later, Salazar Garza was finally brought to the hospital to have an MRI.[121] To this day, Salazar Garza has tingling and a crawling sensation around his finger.[122] He worries he will "get another infection and that staff will be slow to respond if I do."[123]

***L.T.:*** L.T. is a current detainee at Adelanto. About three years ago, L.T. suffered a stroke that resulted in paralysis in the right side of his body.[124] L.T. also has diabetes, sleep apnea, high blood pressure, high cholesterol, and arthritis.[125] All of these conditions require constant monitoring and care.[126] L.T. states, however, that Adelanto staff are not providing him with adequate medical care. For example, L.T requested a sleep apnea machine to help him breathe when he sleeps because, without it, he has a high risk of suffering another stroke.[127] Despite his requests, doctors refuse to provide him one.[128] Moreover, L.T. attests that

[114] Salazar Garza Decl. ¶ 9.

[115] *Id.*

[116] *Id.*

[117] *Id.* ¶ 10.

[118] *Id.*

[119] *Id.*

[120] *Id.*

[121] *Id.* ¶ 11.

[122] *Id.*

[123] *Id.*

[124] Dkt. No. 38-6, Decl. L.T. (L.T. Decl.) ¶ 6.

[125] *Id.*

[126] *Id.*

[127] *Id.* ¶ 15.

[128] *Id.*

Adelanto staff are failing to give him his diabetes medications consistently.[129] At one point, he went four weeks without medication because they ran out and had not yet received another order.[130]

Ding, Salazar Garza, and L.T.'s experiences are not unique. Plaintiffs have submitted over 20 declarations from themselves, other current and former detainees, and non-profit organizations whose clients are detainees, all of whom describe similar experiences of medical neglect at Adelanto.[131]

Based, in part, on these declarations, Plaintiffs' expert, Dr. Altaf Saadi, M.D., opines that (1) the medical intake and assessment processes at Adelanto are substandard and fail to adequately and consistently identify and treat detainees' medical conditions;[132] (2) Adelanto does not have a functioning sick-call system to respond to detainees' requests for medical care in a timely manner;[133] (3) detainees with chronic medical issues do not receive timely or adequately medical treatment or accommodations;[134] (4) Adelanto's system for administering prescription

---

129 L.T. Decl. ¶ 19.

130 *Id.* ¶ 19.

131 *See, e.g.*, Dkt. No. 38-1, Decl. A.A. (A.A. Decl.) ¶¶ 7, 10–13, 15–19, 36; Dkt. No. 38-2, Decl. A.A.A.A. (A.A.A.A. Decl.) ¶¶ 10–11, 14–16, 19–24, 26–28, 32–34; Dkt. No. 38-3, Decl. A.K. (A.K. Decl.) ¶ 16; Dkt. No. 34-13, Decl. Josue Jeison Pereira Amaya (Pereira Amaya Decl.) ¶¶ 9, 11–14, 15, 17, 18, 22–23; Dkt. No. 34-14, Decl. Gilbert Anthony Arnold (Arnold Decl.) ¶¶ 5–6, 8–9; Dkt. No. 34-15, Decl. Olga Beatriz Rodriguez Arzola (Rodriguez Arzola Decl.) ¶¶ 6, 8, 14, 15, 17, 18, 22; Ding Decl. ¶¶ 5, 13–16, 25, 27-28, 30–31; Dkt. No. 38-4, Decl. E.M. (E.M. Decl.) ¶¶ 9–12; Dkt. No. 34-25, Elmer Manuel Ruiz Escobar (Escobar Decl.) ¶¶ 7, 9, 12–16, 18–22; Dkt. No. 34-18, Decl. Jose Flores (Flores Decl.) ¶¶ 4, 8–10; Dkt. No. 34-19, Decl. Julius Omene Fredrick (Fredrick Decl.) ¶¶ 9–10, 12–16, 18; Dkt. No. 38-5, Decl. J.M. (J.M. Decl.) ¶¶ 6, 7, 9, 10, 13, 16, 20, 22, 30; Dkt. No. 34-21, Decl. Andrei Karamychev (Karamychev Decl.) ¶¶ 6, 8–12, 14–18, 24–25; Dkt. No. 34-22, Decl. Fernando A. Lopez (Lopez Decl.) ¶¶ 10–20, 23, 25–26, 28, 32, 34, 37; L.T. Decl. ¶¶ 6, 7, 15–17, 19–22; Dkt. No. 34-24, Decl. Sevak Mesrobian (Mesrobian Decl.) ¶¶ 13–16, 19–27, 36–39; Dkt. No. 34-6, Decl. Angelica Salas (Salas Decl.) ¶¶ 19–21; Salazar Garza Decl. ¶¶ 4, 7–15, 18; Dkt. No. 34-27, Decl. Saddam Samaan Daoud Samaan (Samaan Decl.) ¶¶ 7–11; Dkt. No. 34-28, Decl. Alton George Smith (Smith Decl.) ¶¶ 8–9, 11–13, 15–17; Dkt. No. 34-7, Decl. Amanda Schuft (Schuft Decl.) ¶¶ 11, 12, 14–17, 21; Dkt. No. 34-8, Decl. Nicolas Thompson-Lleras (Thompson-Lleras) ¶¶ 13–21; Dkt. No. 34-29, Decl. Phillip Winfield (Winfield Decl.) ¶¶ 4, 5, 10, 17, 18, 19, 20, 23.

132 Saadi Decl. ¶¶ 12(a), 14–27.

133 *Id.* ¶¶ 12(b), 28–43.

134 *Id.* ¶¶ 12(c), 44–56.

medication is dangerously ineffective;[135] (5) detainees that require specialty care do not receive that care;[136] (6) Adelanto staff do not respond to medical emergencies in a timely manner;[137] and (7) detainees suffering from mental health issues are subjected to conditions that worsen their mental health.[138] As a result of this substandard medical care, Dr. Saadi concludes that detainees at Adelanto are exposed to pain that could be managed, chronic conditions are likely to worsen that could be prevented, that detainees are unnecessarily exposed to illness and infections, which in turn risk of serious complications, and increased risk of morbidity and mortality.[139]

### 2. Punitive Conditions

At least 22 detainees recount that they and other detainees have been deprived of life's basic necessities and are being subjected to dangerous and unduly restrictive living conditions.[140] The tap water from their showers and

---

[135] Saadi Decl. ¶¶ 12(d), 57–71.

[136] *Id.* ¶¶ 12(e), 72–82.

[137] *Id.* ¶¶ 12(f), 83–93.

[138] *Id.* ¶¶ 12(g), 94–148.

[139] *Id.* ¶¶ 12(h), 149; *see also, e.g., id.* ¶¶ 23 ("Th[e] failure to identify disabilities or functional limitations and promptly provide accommodations interferes with the delivery of medical care and exposes some people to the risk of harm, including physical injury."), 40 (noting Adelanto's failure to provide detainee with gauze and cleaning supplied to clean wound left behind after the surgical removal of a large cyst on his head with granuloma "risks infection, recurrence of the cyst, and improper healing"), 56 (finding Adelanto's failure to provide medical care or accommodations for detainees with chronic conditions or disabilities "put[] patients at risk of serious harm"); 57 (Adelanto's inconsistent and ineffective system of administering prescription medications "can result in increased risk of medical complications"); 87 (explaining that failing to treat Mesrobian's seizures can result in more frequent and intense seizures, physical injuries, and even sudden death).

[140] A.A. Decl. ¶¶ 8, 27–29, 31–34; A.A.A.A. Decl. ¶¶ 10, 15, 25, 34, 38–48; A.K. Decl. ¶¶ 19–21; Arnold Decl. ¶¶ 12–13, 16–22, 24–33, 35–37; Arzola Decl. ¶¶ 24–28; Ding Decl. ¶¶ 34, 36–38, 40–41; E.M. Decl. ¶¶ 13, 14, 16; Escobar Decl. ¶¶ 24–29, 35, 39; Flores Decl. ¶¶ 18, 20–21; Fredrick Decl. ¶¶ 23–24, 27–28, 30, 32–34, 36–41, 43, 45–51, 52–56; J.M. Decl. ¶¶ 25–28, 32, 34; Karamychev Decl. ¶¶ 26–27, 28, 32–37; Lopez Decl. ¶ 6; L.T. Decl. ¶¶ 23–28; Mesrobian Decl. ¶¶ 40–43, 45–49, 51, 53–54, 56–61, 65–70, 74; Salas Decl. ¶ 24; Salazar Garza Decl. ¶¶ 22–25, 28–34; Samaan Decl. ¶¶ 15–17, 19, 20; Smith Decl. ¶¶ 22–28, 30; Schuft Decl. ¶¶ 8, 13–14, 16, 18–20; Thompson-Lleras ¶¶ 7–11; Winfield Decl. ¶¶ 7, 25, 27–29, 31–32, 35–36, 39.

faucets are discolored and foul-tasting.[141] Their drinking water is brought to them in large containers with contaminants either floating in the water or settled to the bottom of the jug.[142] When the container is empty, Adelanto staff take several hours to refill it.[143] Food is served spoiled or undercooked and in small portions.[144] The facilities are neither clean nor sanitary, with some detainees observing mold growing on the walls and showers, and others seeing rat and mice droppings in the cafeteria and by the walls where they eat.[145]

The living conditions are also highly restrictive. They are locked in their cell more than five times a day and an hour at a time for staff to conduct head counts.[146] The temperature in Adelanto fluctuates to extremes, but detainees lack temperature-appropriate clothing or bedding to stay cool or warm.[147] They receive the bare minimum of outdoor recreational time.[148] The detainees have no privacy when using the restroom or showers.[149] And visits are severely limited in time, and contact with their loved ones.[150] When detainees have spoken out about the conditions, guards have put them in solitary confinement to punish them.

Plaintiffs' expert, William Adams, finds there are no penological purposes for failing to ensure immigration detainees have these basic necessities or for subjecting them to these punitive conditions.[151]

---

[141] *See, e.g.*, Mesrobian Decl. ¶ 66; Schuft Decl. ¶ 8.

[142] *See, e.g.*, A.A.A.A. Decl. ¶ 39; Flores Decl. ¶ 18; Frederick ¶ 39.

[143] *See, e.g.*, Arnold ¶ 18; Frederick ¶ 39.

[144] *See, e.g.*, Mesrobian Decl. ¶¶ 76–77; Salas Decl. ¶¶ 28–29.

[145] *See, e.g.*, L.T. Decl. ¶¶ 30–31; Mesrobian ¶ 56.

[146] *See, e.g.*, Mesrobian Decl. ¶ 93; Salazar Garza Decl. ¶ 23.

[147] *See* Adams Decl. ¶ 77.

[148] *See, e.g.*, Salazar Garza Decl. ¶ 3.

[149] *See, e.g.*, Mesrobian Decl. ¶ 64; Salazar Garza Decl. ¶¶ 24, 26.

[150] *See* Adams Decl. ¶ 102.

[151] *Id.* ¶¶ 32–33, 45, 46, 57, 58, 68–69, 70, 82.

#### 3. Disability Accommodations

Several detainees have physical and mental disabilities that impact their lives.[152] Adelanto, however, lacks an effective system for identifying their disabilities that results in a denial of accommodations.[153]

### E. This Lawsuit

Plaintiffs allege Defendants fail to ensure adequate medical care and subject detainees to punitive conditions of confinement.[154] The four named plaintiffs are current or former Adelanto detainees, and the fifth is the Coalition for Humane Immigrant Rights.[155] They allege failures to provide adequate care and reasonable disability accommodations to the nearly 2,000 detainees, and further allege the imposition of punitive conditions are worse than those for convicted prisoners.[156]

Plaintiffs collectively assert three claims against Defendants: (1) a Fifth Amendment conditions of confinement claim, (2) a Fifth Amendment medical care claim, and (3) an Administrative Procedures Act claim. L.T., Mesrobian, and Salazar Garza separately assert a Section 504 of the Rehabilitation Act for failing to accommodate their disabilities.

On May 5, 2026, the Court denied Plaintiffs first motion for preliminary injunction.[157] Plaintiffs now renew their preliminary injunction motion and seek class certification.

## II. SUBJECT MATTER JURISDICTION

Defendants challenge subject matter jurisdiction over Plaintiffs' claims and requested relief.[158] Because the Court has an obligation to ensure it has jurisdiction over Plaintiffs' claims, it first addresses Defendants' jurisdictional challenges

---

[152] A.A. Decl. ¶¶ 9, 24–26, 30; A.A.A.A. Decl. ¶ 37; Ding Decl. ¶¶ 18–19, 24; Flores Decl. ¶¶ 14, 16, 17; L.T. Decl. ¶¶ 12–15; Ruiz Escobar ¶ 33.

[153] *Id.*

[154] *See generally* FAC.

[155] *Id.* ¶¶ 14–18.

[156] *Id.* ¶ 66.

[157] Dkt. No. 70, Order.

[158] *See* Dkt. No. 87, Opp'n Prelim. Inj. at 13–17; Dkt. No. 63, Opp'n Class Cer. at 9–13.

before proceeding to the merits. *Arbaugh v. Y&H Corp.*, 546 U.S. 500, 501 (2006).

### A. Article III Standing

Defendants raise three arguments challenging Plaintiffs' standing. *First*, Defendants renew their argument that Plaintiffs' injuries are not traceable to their conduct.[159] *Second*, Defendants claim Plaintiffs' injuries are not redressable through classwide injunctive relief.[160] And *finally*, Defendants argue that CHIRLA lacks both organizational and associational standing.[161]

The Court addresses each argument in turn.

#### 1. Traceability

Defendants argue that Plaintiffs lack Article III standing because their injuries are not fairly traceable to Defendants' conduct.[162] According to Defendants, any injuries Plaintiffs suffered are attributable solely to GEO Group's actions.[163] Defendants contend that the contract does not reserve ICE any direct control over the contracted work and ICE's presence at Adelanto is limited to an oversight role.[164]

Article III requires that Plaintiffs show that their injury is "fairly traceable" to Defendants' actions and "not the result of the independent action of some third party not before the court." *Bennett v. Spear*, 520 U.S. 154, 167 (1997). That Plaintiffs' harm may have resulted from indirect actions by Defendants does not preclude standing. *Warth v. Seldin*, 422 U.S. 490, 504 (1975). When a plaintiff alleges that government action caused injury by influencing the conduct of a third party, as Plaintiffs do here, "more particular facts are needed to show standing." *Nat'l Audubon Soc'y, Inc. v. Davis*, 307 F.3d 835, 849 (9th Cir. 2002) (internal quotation marks omitted).

---

[159] Opp'n Prelim. Inj. at 14; Opp'n Class Cer. at 10–11.

[160] Opp'n Prelim. Inj. at 14–16; Opp'n Class Cer. at 11–13.

[161] Opp'n Prelim. Inj. at 17.

[162] Opp'n Prelim. Inj. at 14; Opp'n Class Cer. at 10–11.

[163] *Id.*

[164] *Id.*

The Court previously concluded that Plaintiffs' injuries are fairly traceable to Defendants,[165] and the current record supports the same conclusion. ICE contracted with GEO Group to detain, transport, and provide medical services to detainees.[166] ICE dictates detainee treatment through the PBNDS, which mirrors what the Fifth Amendment guarantees to detainees.[167] Though ICE does not provide the day-to-day services, it must identify and notify GEO Group of noncompliance.[168] Declarations from Plaintiffs and other detainees not only show that GEO Group has failed to comply with the PBNDS in material ways, but also that Defendants have failed to hold GEO Group accountable for its noncompliance.[169] Defendants' failure to do so has allowed these issues to persist, allowing ongoing harm to Plaintiffs and other detainees.

Defendants' reliance on *Logue v. United States*, 412 U.S. 521 (1973) is misplaced.[170] *Logue* addressed the Federal Tort Claims Act's (FTCA) independent-contract exception. There, a Deputy United States Marshal arrested Reagan Logue and took him to a county jail that contracted with the Federal Bureau of Prisons to provide safekeeping, care, and subsistence to detainees. The deputy informed the county jail that Logue had suicidal tendencies but did not arrange for the county jail to monitor him, and the jail employees made only periodic checks on Logue. Logue committed suicide using a bandage from his arm. Logue's parents then sued the United States seeking to hold it liable under the FTCA for the negligent actions of the jail. 412 U.S. at 522.

The issue in *Logue* was whether the contracting jail can be considered an *employee of the government* "as that term is used in the Federal Tort Claims Act." *See id.* at 526. The Supreme Court held the county jail was not an employee of the federal government and thus the United States could not be held liable under the FTCA for the county jail's negligent acts. *Id.* It explained that whether the independent-contractor exception applies turns on the authority of the principal to control the physical conduct of the contractor in performance of the contract. *Id.* at 527. Because the United States did not have the authority to "physically supervise

---

165 Order at 9–11.

166 APC Contract at 65; Quevedo Decl. ¶¶ 6, 14–15.

167 *See* APC Contract at 65.

168 Quevedo Decl. ¶ 3.

169 *See* citations *supra* Section I.D.1 nn.130–38, I.D.2 n.139, I.D.3. nn.141–42.

170 *See* Opp'n Class Cer. at 10–11.

the conduct of the jail's employees," the Supreme Court concluded that the county jail was not considered an employee for purposes of the FTCA. *Id.* at 529–30.

*Logue* is inapplicable here. *First* and most importantly, traceability was not an issue in *Logue*. *Second*, Defendants offer no legal authority supporting the extension of the FTCA's independent-contractor exception to the claims at issue here.

Accordingly, Plaintiffs' injuries are traceable to Defendants' conduct.

**2. Redressability**

Defendants argue that Plaintiffs' injuries are not redressable by injunction.[171] An injunction against ICE, they contend, would not change the conditions at the facility as any improvement to the conditions would depend on GEO Group's unfettered choices "or on ICE's separate exercise of contractual or enforcement discretion."[172]

Article III requires "a likelihood that a plaintiff's injury will be redressed by a favorable court decision." *Tucson v. City of Seattle*, 91 F.4th 1318, 1325 (9th Cir. 2024) (citing *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992)); *see also Melendres v. Arpaio*, 784 F.3d 1254, 1265 (9th Cir. 2015) ("[I]njunctive relief must be tailored to remedy the specific harm alleged."). Plaintiffs' burden on proving redressability is "relatively modest." *Tucson*, 91 F.4th at 1325 (quoting *Bennett v. Spear*, 520 U.S. 154, 171 (1997). In evaluating redressability, the Court must assume Plaintiffs' claims have legal merit. *M.S. v. Brown*, 902 F.3d 1076, 1083 (9th Cir. 2018). Plaintiffs need not guarantee that their injuries will be redressed by an injunction; rather, they need only "show a 'substantial likelihood' that the relief sought would redress the injury." *Id.* (quoting *Mayfield v. United States*, 599 F.3d 964, 971 (9th Cir. 2010)).

Here, there is a substantial likelihood that an injunction will redress Plaintiffs' injuries. The injunction Plaintiffs seek requires Defendants to ensure the provision of adequate medical care, reasonable accommodations for their disabilities, and that they are not being subjected to punitive conditions of confinement.[173] Defendants may achieve this through multiple means such as

[171] Opp'n Prelim. Inj. at 14–16; Opp'n Class Cer. at 11–13.

[172] *Id.*

[173] FAC Prayer of Relief ¶ 5.

withholding payment, terminating its contract, or relocating the detainees to another facility. Although the Court is not here to theorize about the many ways Defendants can comply with an injunction, it makes these observations only to highlight that Plaintiffs' injuries are redressable by a favorable decision from this Court.

Defendants nevertheless contend that Plaintiffs' injuries are not redressable because 8 U.S.C. § 1252(f)(1) precludes this Court from granting the requested classwide injunctive relief. They assert that such relief would require them to operate Adelanto "in prescribed ways (water, food, sanitation, headcounts, yard, visitation, segregation, and medical and disability systems), produce remedial plans, and to submit to court appointed monitors, all on a facility wide, classwide basis."[174] Defendants further contend that such an injunction would interfere with their ability to "arrange for appropriate places of detention" under 8 U.S.C. § 1231(g)(1).[175]

Section 1252(f)(1) generally prohibits district courts from entering classwide injunctions that order federal officials to take or to refrain from taking actions to execute its obligations under 8 U.S.C. §§ 1221 through 1232. *See Garland v. Aleman Gonzalez*, 596 U.S. 543, 550 (2022); *Jennings v. Rodriguez*, 583 U.S. 281 313 (2018); *Reno v. American-Arab Anti-Discrimination Comm.*, 525 U.S. 471, 481–82 (1999). Section 1231(g)(1), in turn, provides that the Attorney General "shall arrange for appropriate places of detention for aliens detained pending removal or a decision on removal." 8 U.S.C. § 1231(g)(1).

The parties dispute therefore turns, in part, on the meaning of the phrase "arrange for appropriate places of detention" in Section 1231(g)(1). Defendants read that provision broadly, asserting that their authority to arrange for appropriate places of detention necessarily encompasses authority over the conditions under which detainees are held once placed in those facilities.

The statutory text does not support that conclusion. The ordinary meaning of the verb "arrange" is "to make preparations for." Merriam-Webster, https://www.merriam-webster.com/dictionary/arrange (last visited July 13, 2026). The adjective "appropriate" means "especially suitable or compatible" and it modifies "place," the object of the verb "arrange." Merriam-Webster,

---

[174] Opp'n Prelim. Inj. at 24.

[175] *Id.* at 17–18.

https://www.merriam-webster.com/dictionary/appropriate (last visited July 13, 2026). The ordinary meaning of "place" is "physical environment." Merriam-Webster, https://www.merriam-webster.com/dictionary/place (last visited July 13, 2026).

Read together, these terms authorize the Attorney General to arrange for suitable physical environments in which detainees will be housed while they await removal or a decision on removal. Nothing in Section1231(g)(1), however, authorizes the Attorney General to establish policies or procedures governing the provision of medical or other conditions of confinement after an appropriate place of detention has been selected.

The statutory context reinforces this conclusion. Section 1231(g)(2) provides that, before beginning a project to build a new detention facility, "the Commissioner shall consider the availability for purchase or lease of any existing prison, jail, detention center, or other comparable facility for such use." 8 U.S.C. § 1231(g)(2). This subsection requires consideration of other existing physical facilities (like Adelanto) that would be appropriate to house noncitizen detainees. Like Section 1231(g)(1), Section 1231(g)(2) does not command the Attorney General or Commissioner to arrange for how detainees will receive medical care or the conditions of their confinements after the detention facility has been purchased or leased.

Accordingly, Section 1252(f)(1) does not bar the Court from granting the requested classwide injunction to remedy the conditions of confinement and inadequate medical care at Adelanto. The injunction does not enjoin Defendants from carrying out their obligation to "arrange for appropriate places of detention" under Section 1231(g)(1).

### 3. CHIRLA's Standing

Defendants also argue that CHIRLA lacks organizational and associational standing.[176] As to organizational standing, they challenge Plaintiffs' resource-diversion theory. As to associational standing, they argue CHIRLA failed to identify any of its members by name.[177]

---

[176] Opp'n Prelim. Inj. at 17.

[177] *Id.*

The Court need not reach organizational standing because CHIRLA has established associational standing.

As an organization, CHIRLA can establish standing through organizational standing and associational standing. *One Fair Wage, Inc. v. Darden Restaurants Inc.*, No. 21-cv-02695-EMC, 2024 WL 950154, at *7 (N.D. Cal. Mar. 5, 2024). Under associational standing, an organization "has standing to bring suit on behalf of its members," even if the association itself has not suffered any injury. *Hunt v. Wash. State Apple Advert. Comm'n*, 432 U.S. 333, 342–43 (1977). "[A]n association has standing to bring suit on behalf of its members when: (a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." *Id.* at 343. "So long as this can be established, . . . [CHIRLA] may be an appropriate representative of its members, entitled to invoke the court's jurisdiction." *Warth*, 422 U.S. at 511.

Founded in 1986, CHIRLA is a nonprofit organization "with the mission to advance the human and civil rights of immigrants and refugees and ensure immigrant communities are fully integrated into our society with full rights and access to resources."[178] One of CHIRLA's many missions is "to protect the constitutional and statutory rights of its immigrant members, including those detained by federal immigration agencies."[179] CHIRLA provides legal support to its members, many of who do not have lawful status in the United States.[180]

CHIRLA's Executive Director Angelica Salas attests that CHIRLA has members who are current and former Adelanto detainees.[181] Members report denial of medical care and punitive conditions of confinement. One member states staff withheld prescription medication to coerce a voluntary departure.[182] This same member describes how Adelanto staff refused to accommodate his diet that

---

[178] Salas Decl. ¶ 4.

[179] *Id.* ¶ 7.

[180] *Id.* ¶¶ 4, 13.

[181] *See id.* ¶¶ 8, 17–32.

[182] *Id.* ¶¶ 18–19.

would allow him to control his blood sugar level and he was given such small portions he lost 16 pounds.[183]

Another CHIRLA member also experienced numerous instances of medical neglect. This member had two loose fillings which Adelanto staff refused to fix, "telling him that only detainees who have been at Adelanto for six months are entitled to dental procedures, and that he would have to wait since at that time he was a recent arrival."[184] This member also requested an appointment to address debilitating neck and back pain from an injury he suffered when ICE agents arrested him.[185] But Adelanto staff never got him an X-ray for his injury.[186] He also describes how he had to drink water that was brought to him in containers that were black with dirt.[187] When he asked a guard if he would eat the food, the guard responded, "that it is food for dogs."[188] Two other CHIRLA members describe similar experiences.[189] As the federal government continues to detain more people, Salas states that CHIRLA's "other members are at risk of being detained at Adelanto in these conditions."[190]

On this record, the Court finds, which the parties do not dispute, that the second and third prongs of associational standing are satisfied. The parties' sole dispute concerns the first prong. Defendants argue CHIRLA has failed to establish associational standing because it did not identify *by name* a member who has standing.[191]

To meet the first prong of associational standing, CHIRLA "must show that a member suffers an injury-in-fact that is traceable to the defendant and likely to be redressed by a favorable decision." *Associated Gen. Contractors of Am., S.D. Chapter, Inc. v. Cal. Dep't of Transp.*, 713 F.3d 1187, 1194 (9th Cir. 2013). An organization generally must offer "specific allegations establishing that at least one

---

183 *Id.* ¶ 20.

184 *Id.* ¶ 26

185 *Id.*

186 *Id.*

187 *Id.* ¶ 27.

188 *Id.*

189 *Id.* ¶¶ 28–29.

190 Salas Decl. ¶ 31.

191 Opp'n Prelim. Inj. at 17.

identified member had suffered or would suffer harm." *Id.* (quoting *Summers v. Earth Island Inst.*, 555 U.S. 488, 498 (2009).

However, the Ninth Circuit has confirmed that an organization need not always identify its members by name:

> "[W]here it is relatively clear, rather than merely speculative, that one or more members have been or will be adversely affected by a defendant's action, and where the defendant need not know the identity of a particular member to understand and respond to an organization's claim of injury, [there is] no purpose to be served by requiring an organization to identify by name the member or members injured' to establish associational standing."

*Vasquez Perdomo v. Noem*, 148 F.4th 656, 676 (9th Cir. 2025) (quoting *Nat'l Council of La Raza v. Cegavske*, 800 F.3d 1032, 1041 (9th Cir. 2015)).

It is relatively clear here that CHIRLA's members have been and will be adversely affected by Defendants' actions. Defendants need not know the members' names to understand and respond to claims of denied medical care and punitive conditions. *See Vasquez Perdomo*, 148 F.4th at 677 (concluding organizational plaintiffs had associational standing where the record showed the unnamed members had standing to seeking injunctive relief). Naming members serves no purpose at this stage.

CHIRLA establishes associational standing based on members' experiences at Adelanto and risk of future harm; identification by name is unnecessary where injury is clear and identities are not needed for Defendant's response.

### B. Article III Ripeness

Defendants also argue the claims are not ripe for a different reason than previously argued.[192] They contend that this action is no longer ripe because J.M.[193] was released and cannot pursue injunctive relief.[194] As to the remaining

[192] Opp'n Prelim. Inj. at 16; Opp'n Class Cer. at 13.

[193] Defendants claim two of the four named plaintiffs have been released. Opp'n Prelim. Inj. at 16. But the only filing to indicate that any of the plaintiffs have been released is the FAC, which notes only that J.M. has been released. FAC ¶ 17.

[194] Opp'n Prelim. Inj. at 16.

Plaintiffs, Defendants contend the record shows that no current problems exist as Plaintiffs rely on outdated reports that provide no insight about the conditions today, and the most recent 2025 inspection revealed only three deficiencies, all of which GEO Group has corrected.[195]

The doctrine of ripeness permits courts to "dispose of matters that are premature for review because the plaintiff's purported injury is too speculative and may never occur." *Changler v. State Farm Mt. Auto Ins. Co.*, 598 F.3d 1115, 1122 (9th Cir. 2010). Because this inquiry focuses on whether an injury "is real and concrete rather than speculative and hypothetical," it "merges almost completely with standing." *Thomas v. Anchorage Equal Rts. Comm'n*, 220 F.3d 1134, 1139 (9th Cir. 2000).

To begin, J.M.'s injury is not too speculative and is likely to occur again. Although J.M. has been released from detention, an immigration judge ordered him removed in June 2025.[196] Detention at Adelanto pending removal is a concrete likelihood.

The remaining plaintiffs' claims are ripe. L.T., Mesrobian, Salazar Garza, and CHIRLA's members are either currently detained or stand a considerable risk of being detained by ICE and housed at Adelanto. Once there, there is a real and concrete risk that they will be denied medical care and be subjected to punitive conditions of confinement. The 2025 inspection report offers little insight into current conditions, and the overwhelming evidence shows deeply rooted issues.

On this record, Plaintiffs' claims are ripe for disposition.

## III. MOTION FOR PRELIMINARY INJUNCTION

With subject matter jurisdiction established, the Court turns to the merits of the preliminary injunction motion.

### A. Legal Standard

To obtain a preliminary injunction, Plaintiffs must establish that (1) they are "likely to succeed on the merits," (2) they are "likely to suffer irreparable harm in the absence of preliminary relief," (3) "the balance of equities tips in [their] favor,"

---

[195] *Id.* at 16–17.

[196] Quevedo Decl. Ex. 12.

and (4) "an injunction is in the public interest." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). "If a plaintiff can only show that there are 'serious questions going to the merits'—a lesser showing than likelihood of success on the merits—then a preliminary injunction may still issue if the 'balance of hardships tips sharply in the plaintiff's favor, and the other two Winter factors are satisfied.'" *All. for the Wild Rockies v. Peña*, 865 F.3d 1211, 1217 (9th Cir. 2017) (quoting *Shell Offshore, Inc. v. Greenpeace, Inc.*, 709 F.3d 1281, 1291 (9th Cir. 2013)). "Where, as here, the party opposing injunctive relief is a government entity, the third and fourth factors—the balance of equities and the public interest—merge." *Hubbard v. City of San Diego*, 139 F.4th 843, 854 (9th Cir. 2025) (citation modified).

## B. Likelihood of Success on the Merits[197]

### 1. Fifth Amendment medical care claim

The Fifth Amendment's Due Process Clause prohibits the government from depriving a person of life, liberty, and property without due process of law. U.S. Const. amend. V. These protections extend to all persons physically present in the United States. *Zadvydas v. Davis*, 533 U.S. 678, 693 (2001). Although not a new notion, the phrase "all persons" includes noncitizens, even those whose presence is "lawful, unlawful, temporary, or permanent." *Id.*

Due Process requires the government to "provide conditions of reasonable health and safety to people in its custody." *Roman v. Wolf*, 977 F.3d 935, 943 (9th Cir. 2020). A violation occurs if

> (i) [they] made an intentional decision with respect to the conditions under which [Plaintiffs] w[ere] confined; (ii) those conditions put [Plaintiffs] at substantial risk of suffering serious harm; (iii) [Defendants] did not take reasonable available measures to abate that risk, even though a reasonable official in the circumstances would have appreciated the high degree of risk involved—making the

---

[197] As discussed below, the Court finds that Plaintiffs are entitled to the full scope of their requested injunctive relief based on their Fifth Amendment and Rehabilitation Act claims alone. The Court thus does not address Plaintiffs likelihood of success on their Administrative Procedures Act claim.

> consequences of [their] conduct obvious; and (iv) by not taking such measures, [Defendants] caused [Plaintiffs'] injuries.

*Fraihat v .U.S. Immigr. & Customs Enforcement*, 16 F.4th 613, 636 (9th Cir. 2021) (quoting *Gordon v. Cnty. of Orange*, 888 F.3d 1118, 1125 (9th Cir. 2018)). As to the third element, Defendants' "conduct must be objectively unreasonable, a test that will necessarily turn on the facts and circumstances of each particular case." *Roman*, 977 F.3d at 943 (citation modified). It is not enough that Defendants merely lacked due care; instead, Plaintiffs "must show 'something akin to reckless disregard.'" *Id.* (quoting *Gordon*, 888 F.3d at 1125). For the fourth element, Plaintiffs "need only prove a sufficiently imminent danger, because a remedy for unsafe conditions need not await a tragic event." *Id.* (citation modified).

Plaintiffs have shown that they are likely to succeed, or at least raised serious questions, on their Fifth Amendment medical care claim.

*First*, Defendants intentionally set conditions by contracting in 2019 with GEO Group to detain, transport, and provide medical services at Adelanto,[198] requiring compliance with PBNDS medical standards, which reflects what the Fifth Amendment guarantees to civil detainees.[199]

Defendants are not passive monitors of GEO Group; they retain a non-delegable constitutional duty to provide adequate medical care, even when contracting with private providers. *Cf. West v. Atkins*, 487 U.S. 42, 56 (1988) ("Contracting out prison medical care does not relieve the State of its constitutional duty to provide adequate medical treatment to those in its custody, and it does not deprive the State's prisoners of the means to vindicate their Eighth Amendment rights."); *Reaves v. Dep't of Corr.*, 333 F. Supp. 3d 18, 23–24 (D. Mass. Sep. 20, 2018) (holding state has non-delegable duty to ensure detainees are provided adequate medical care by ensuring its contracted medical providers are providing adequate medical care).

ICE retained contractual authority to observe, identify, and notify GEO Group of any deficiencies and has tools to ensure the detainees are receiving

---

[198] FAC ¶¶ 26, 32; APC Contract at 65; Quevedo Decl. ¶¶ 6, 14–15.

[199] FAC ¶ 36; APC Contract at 65.

adequate care.[200] Plaintiffs' evidence shows Defendants have failed to hold GEO Group accountable, allowing issues to persist.

*Second*, Plaintiffs' expert, Dr. Altaf Saadi, M.D., opines that inadequate medical care places detainees at substantial risk of suffering serious harm.[201] Dr. Saadi is a board-certified neurologist at Massachusetts General Hospital and Professor of Neurology at Harvard Medical School.[202] She has considerable experience assessing the medical and mental health conditions and treatment of individuals detained at ICE facilities across the United States.[203] Most notably, she served as the medical expert for the Disability Rights Center's 2019 report regarding the conditions at Adelanto.[204]

In her 48-page declaration, Dr. Saadi finds that (1) the medical intake and assessment processes are substandard and fail to adequately and consistently identify and treat detainees' medical conditions;[205] (2) Adelanto does not have a functioning sick-call system to respond to detainees' requests for medical care in a timely manner;[206] (3) detainees with chronic medical issues do not receive timely or adequately medical treatment or accommodations;[207] (4) Adelanto's system for administering prescription medication is dangerously ineffective;[208] (5) detainees that require specialty care do not receive that care;[209] (6) Adelanto staff do not respond to medical emergencies in a timely manner;[210] and (7) detainees suffering from mental health issues are subjected to conditions that worsen their mental health.[211] As a result of this substandard medical care, Dr. Saadi concludes detainees face unmanaged pain, preventable worsening of chronic conditions,

---

[200] FAC ¶¶ 56–57; Quevedo Decl. ¶¶ 7–8.

[201] Saadi Decl.

[202] *Id.* ¶ 2.

[203] *Id.* ¶ 5.

[204] Saadi Decl. ¶ 5.

[205] *Id.* ¶¶ 12(a), 14–27.

[206] *Id.* ¶¶ 12(b), 28–43.

[207] *Id.* ¶¶ 12(c), 44–56.

[208] *Id.* ¶¶ 12(d), 57–71.

[209] *Id.* ¶¶ 12(e), 72–82.

[210] *Id.* ¶¶ 12(f), 83–93.

[211] *Id.* ¶¶ 12(g), 94–148.

unnecessary exposure to illness and infection which risk serious complications, and increased morbidity and mortality.[212]

*Third*, Defendants have not taken reasonable measures despite obvious, widespread risks in Adelanto's medical system. Proper monitoring would likely have identified and corrected these issues. Defendants' failure reflects reckless disregard for detainees' health. On this record, Defendants have not taken reasonable measures despite obvious risks, reflecting at least reckless disregard.

*Finally*, Plaintiffs face sufficiently imminent danger of suffering injuries—and, in fact, have suffered injuries—from Defendants' failure to ensure that detainees are receiving adequate medical care at Adelanto. L.T., J.M., Mesrobian, and Salazar Garza and CHIRLA's members all suffer from medical conditions.[213] GEO Group's staff have not responded effectively or timely to Plaintiffs' medical issues and change appears unlikely absent an injunction. The Court need not wait for tragedy. Defendants' inaction creates imminent danger of further harm.

Accordingly, Plaintiffs are likely to succeed, or at least raise serious questions, on the Fifth Amendment medical care claim.

### 2. Fifth Amendment conditions of confinement claim

Civil immigration detainees are protected from punitive conditions of confinement. *See Fraihat*, 16 F.4th at 647. Because "civil detainees retain greater liberty protections than individuals detained under criminal process," it logically follows that civil immigration detainees are "entitled to protections at least as great as those afforded to a civilly committed individual and at least as great as those

---

[212] Saadi Decl. ¶¶ 12(h), 149; *see also, e.g., id.* ¶¶ 23 ("Th[e] failure to identify disabilities or functional limitations and promptly provide accommodations interferes with the delivery of medical care and exposes some people to the risk of harm, including physical injury."), 40 (noting Adelanto's failure to provide detainee with gauze and cleaning supplied to clean wound left behind after the surgical removal of a large cyst on his head with granuloma "risks infection, recurrence of the cyst, and improper healing"), 56 (finding Adelanto's failure to provide medical care or accommodations for detainees with chronic conditions or disabilities "put[] patients at risk of serious harm"); 57 (Adelanto's inconsistent and ineffective system of administering prescription medications "can result in increased risk of medical complications"); 87 (explaining that failing to treat Mesrobian's seizures can result in more frequent and intense seizures, physical injuries, and even sudden death).

[213] J.M. Decl. ¶¶ 5–7, 16; L.T. Decl. ¶¶ 9–10, 14, 19; Mesrobian Decl. ¶¶ 14–16, 19; Salazar Garza Decl. ¶¶ 4, 9–15, 20.

afforded to an individual accused but not convicted of a crime." *See Jones v. Blanas*, 393 F.3d 918, 931 (2004) (citations omitted).

The Fifth Amendment requires Defendants to do more than provide life's basic necessities to immigration detainees. *See id.* Rather, due process requires that conditions of confinement "'bear some reasonable relation to the purpose for which the individual is committed.'" *Id.* (quoting *Jackson v. Indiana* 406 U.S. 715, 738 (1972)). Because immigration detainees are civil detainees, they cannot be subjected to conditions that are punitive. *Fraihat*, 16 F.4th at 647.

A condition is punitive if (1) it is intended to punish, (2) it is excessive in relation to its non-punitive purpose, or (3) it is "employed to achieve objectives that could be accomplished in so many alternative and less harsh methods." *Id.* If a condition "is reasonably related to a legitimate governmental objective, it does not, without more, amount to 'punishment.'" *Id.* (quoting *Bell v. Wolfish*, 441 U.S. 520, 539 (1979). "Legitimate, non-punitive government interests include ensuring a detainee's presence at trial, maintaining jail security, and effective management of a detention facility." *Jones*, 393 F.3d at 932.[214]

The conditions at issue here fall into two categories: The first involves life's basic necessities (i.e., water, food, basic sanitation, clothing, linens, and mattresses), and the second involves the day-to-day conditions (i.e., privacy, visitation, recreation, and restrictive housing).

---

[214] Relying on *Jones v. Blanas*, 393 F.3d 918 (9th Cir. 2004), Plaintiffs argue there is a presumption that the conditions are punitive, thus shifting the burden to Defendants to show either a legitimate, non-punitive reason justifying the condition or that the conditions are not excessive in relation to these interests. *See* Mot. Prelim. Inj. at 7. In so doing, Plaintiffs appear to ask this Court to adopt the presumption the Ninth Circuit employed in *Jones*. There, the Ninth Circuit states "[when] a [person who is detained under California's Sexually Violent Predator Act] is confined in conditions identical to, similar to, or more restrictive than, those in which his criminal counterparts are held, we presume that the detainee is being subjected to 'punishment.'" *Id.* at 932. However, the Ninth Circuit has declined to address whether the *Jones* presumption applies to the context of federal immigration detainees, even when faced with the opportunity to do so. *See Fraihat*, 16 F.4th at 948 (acknowledging Ninth Circuit has not extended *Jones* presumption to the context of federal immigration detainees but assumed, without deciding, that it applied and concluding plaintiffs' arguments still failed even with the presumption). The Court need not resolve this issue here because Plaintiffs have shown a likelihood of success at proving—or at least, have raised serious questions to—that the conditions are punitive without this presumption.

a. Life's basic necessities

Plaintiffs show conditions unrelated to any non-punitive purpose. Detainees report insufficiently nutritious, inedible food often spoiled or rotten, inadequate portions causing weight loss, and unsanitary food preparation and service.[215][216][217]

Evidence also shows lack of consistent access to safe, potable drinking water. Detainees are provided drinking water in communal jugs that are unsanitary, with mold, sand, and other contaminants.[218] Water is often quickly depleted and not replenished for several hours, forcing detainees to drink dirty, discolored, or foul-smelling tap water.[219]

The record shows failures to maintain cleanliness, including unremediated mold.[220] Freshly laundered clothing returns dirty and foul-smelling and thin blankets and mattresses hinder maintaining appropriate temperature in very cold or hot conditions.[221]

---

[215] A.A.A.A. Decl. ¶¶ 40, 43; A.K. Decl. ¶ 21; Ding Decl. ¶ 38; E.M. Decl. ¶¶ 13–14; Flores Decl. ¶ 20; Mesrobian Decl. ¶ 58; Arzola Decl. ¶ 27.

[216] E.M. Decl. ¶¶ 13–14; Frederick Decl. ¶¶ 37–38; J.M. Decl. ¶ 28; Samaan Decl. ¶ 19; Smith Decl. ¶ 23; Winfield Decl. ¶ 25.

[217] A.A.A.A. Decl. ¶ 42; Mesrobian Decl. ¶¶ 56–57; Smith Decl. ¶ 22; Winfield Decl. ¶ 26.

[218] A.A.A.A. Decl. ¶ 39; Ding Decl. ¶ 40; E.M. Decl. ¶ 16; Flores Decl. ¶¶ 18, 39; Frederick Decl. ¶ 39; J.M. Decl. ¶ 26; Karamychev Decl. ¶ 26; Mesrobian Decl. ¶ 47; Escobar ¶ 25; Salazar Garza Decl. ¶ 24; Samaan Decl. ¶ 18; Winfield Decl. ¶ 27.

[219] A.A.A.A. Decl. ¶¶ 38–40; A.K. Decl. ¶ 19; Arzola Decl. ¶ 26; E.M. Decl. ¶ 16; Flores Decl. ¶ 18; Frederick Decl. ¶¶ 39–42; J.M. Decl. ¶¶ 26–27; Mesrobian Decl. ¶¶ 48–49; Escobar Decl. ¶¶ 25–26; Salazar Garza Decl. ¶ 24; Samaan Decl. ¶ 18; Smith Decl. ¶ 24; Winfield Decl. ¶¶ 28–29.

[220] A.A.A.A. Decl. ¶¶ 48–49; Arnold Decl. ¶¶ 13, 29–31; Ding Decl. ¶¶ 36–37; Flores Decl. ¶ 21; Frederick Decl. ¶¶ 33–34; Karamychev Decl. ¶¶ 27–28; L.T. Decl. ¶¶ 23–24, 27; Mesrobian Decl. ¶¶ 40–42, 51, 56; Rodriguez-Arzola Decl. ¶¶ 24–25; Escobar Decl. ¶¶ 27–28; Salazar Garza Decl. ¶ 28; Smith Decl. ¶¶ 25–27; Winfield Decl. ¶¶ 32–33.

[221] A.A.A.A. Decl. ¶ 15; A.K. Decl. ¶ 20; Arnold Decl. ¶ 33; Ding Decl. ¶ 34; *See* Frederick Decl. ¶ 30; J.M. Decl. ¶ 32; L.T. Decl. ¶¶ 25–26, 28; Mesrobian Decl. ¶¶ 53, 65–68; Rodriguez-Arzola Decl. ¶ 28; Escobar Decl. ¶ 24; Smith Decl. ¶ 28; Winfield Decl. ¶¶ 7, 31, 38.

Plaintiffs' expert, William Adams, opines there is no penological purpose for denying these basic necessities.[222]

Defendants argue detention is not punitive because a neutral immigration judge found grounds for custody.[223] But Plaintiffs challenge not whether the reasons used to justify their detention are legitimate, but the failure to provide them with basic necessities during their detention.

b. Day-to-day conditions

The record shows punitive day-to-day conditions: lack of privacy in restrooms and showers;[224] visits capped at one hour with little to no physical contact with loved ones;[225] excessive and disruptive headcounts;[226] curtailed outdoor recreation;[227] and restrictive housing used for punitive, unauthorized purposes[228]. Plaintiffs' expert opines no penological purpose justifies these conditions.[229]

* * *

Plaintiffs have clearly shown they are likely to succeed, or have at least raised serious questions, on the Fifth Amendment conditions of confinement claim.

### 3. Rehabilitation Act claim

The Rehabilitation Act bars federal agencies from disability discrimination. 29 U.S.C. 794(a). To prevail, L.T., Mesrobian, and Salazar Garza must show

---

[222] Adams Decl. ¶¶ 32–33, 45, 46, 57, 58, 68–69, 70, 82.

[223] *See* Opp'n Prelim. Inj. at 3, 19.

[224] A.A.A.A. Decl. ¶ 10; Frederick Decl. ¶ 32; Mesrobian Decl. ¶¶ 43, 46; Escobar Decl. ¶ 27; Salazar Garza Decl. ¶¶ 23, 25; Samaan Decl. ¶ 15; Winfield Decl. ¶ 35.

[225] A.A.A.A. Decl. ¶¶ 48–49; Arnold Decl. ¶ 35; Frederick Decl. ¶¶ 27–28; Salazar Garza Decl. ¶ 31.

[226] Arnold Decl. ¶ 12; Frederick Decl. ¶ 40; Mesrobian Decl. ¶ 74; Salazar Garza Decl. ¶ 22; Samaan Decl. ¶ 16.

[227] A.K. Decl. ¶ 20; Arnold Decl. ¶ 27; Ding Decl. ¶ 41; Frederick Decl. ¶¶ 23–24; Mesrobian Decl. ¶ 69; Salazar Garza Decl. ¶ 29; Samaan Decl. ¶ 17; Winfield Decl. ¶ 39.

[228] Arnold Decl. ¶¶ 20–22, 24; Frederick Decl. ¶¶ 46–47; Karamychev Decl. ¶¶ 29–37; Mesrobian Decl. ¶¶ 44–45; Salazar Garza Decl. ¶¶ 32–34; Samaan Decl. ¶ 20.

[229] Adams Decl. ¶¶ 83–149.

(1) they have qualifying disabilities, (2) they are otherwise qualified to receive benefits, (3) they were excluded from participation in or denied the benefits because of their disability, and (4) the program or activity is carried out by a federal agency. *Am. Council of the Blind v. Paulson*, 525 F.3d 1256, 1266 (D.C. Cir. 2008); *Constantine v. Rectors & Visitors of George Mason Univ.*, 411 F.3d 474, 503 (4th Cir. 2005).

L.T., Sevak Mesrobian, and Jose Mauro Salazar Garza have shown that they are likely to succeed, or have at least raised serious questions, on the Rehabilitation Act claim.

*First,* L.T., Mesrobian, and Salazar Garza all have impairments that substantially limit their ability to enjoy life. *See* 29 U.S.C. § 705(9)(B); 42 U.S.C. § 12102(1)(A)–(C), (3) (defining disability). L.T. has mobility limitations from prior strokes making walking more difficult;[230] Mesrobian suffers from recurring epileptic episodes affecting major bodily functions;[231] and Salazar Garza's severe bunions cause debilitating pain and ambulatory limits.[232]

*Second*, as civil detainees, Plaintiffs are otherwise qualified to receive the benefits. *Third*, Plaintiffs have been denied necessary accommodations. For example, L.T. was temporarily denied access to a room on the first floor despite mobility limits,[233] and Mesrobian was left alone without assistance during seizures.[234] And *fourth*, Defendants are undeniably federal agencies.

Defendants maintain that Plaintiffs are not entitled to relief under the Rehabilitation Act because they did not sue the entity receiving federal assistance—that is, GEO Group.[235] But Section 794(a) not only prohibits disability discrimination against an entity receiving federal assistance, but also "any program or activity by any *Executive agency*," like Defendants.

---

[230] L.T. Decl. ¶¶ 9, 15.

[231] Mesrobian Decl. ¶ 9.

[232] Salazar Garza ¶ 20.

[233] L.T. Decl. ¶ 13.

[234] Mesrobian Decl. ¶¶ 14–16.

[235] Opp'n Prelim. Inj. at 19–20.

Accordingly, Plaintiffs have shown that they are likely to succeed, or have at least raised serious questions, on their Rehabilitation Act claim.

### C. Irreparable Harm

"It is well established that the deprivation of constitutional rights 'unquestionably constitutes irreparable injury.'" *Hernandez v. Sessions*, 872 F.3d 976, 994 (9th Cir. 2017) (quoting *Melendres*, 695 F.3d at 1002). Plaintiffs have shown that Defendants have violated their Fifth Amendment rights. Plaintiffs need not show anything more to show they have been irreparably injured. *See Warsoldier v. Woodford*, 418 F.3d 989, 1001–02 (9th Cir. 2005).

The second *Winter* factor weighs in favor of granting a preliminary injunction.

### D. Balance of Equities and Public Interest

The public always has an "interest to prevent the violation of [Plaintiffs'] constitutional rights." *See Melendres*, 699 F.3d at 1002 (internal quotation marks and citations omitted). Moreover, "avoiding 'preventable human suffering' outweighs any administrative or financial concerns Defendants may have." *Gomez Ruiz v. U.S. Immigr. & Customs Enforcement*, No. 3:25-cv-09757-MMC, 2026 WL 851980, at *8 (N.D. Cal Mar. 27, 2026).

The third and fourth factors thus weigh in favor of granting a preliminary injunction.

### E. Bond

A preliminary injunction may issue "only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained." Fed. R. Civ. P. 65(c). "Despite the seemingly mandatory language, Rule 65(c) invests the district court with discretion as to the amount of security required, if any." *Johnson v. Couturier*, 572 F.3d 1067, 1086 (9th Cir. 2009) (internal quotation marks omitted). A district court "'may dispense with the filing of a bond when it concludes there is no realistic likelihood of harm'" to the nonmovant. *Id.* (quoting *Jorgensen*, 320 F.3d at 919). The nonmovant is not absolved of its "obligation of presenting evidence that a bond is needed, so that the district court is afforded an opportunity to exercise its discretion in setting the amount of the bond." *Conn. Gen. Life Ins. Co. v. New Images of Beverly Hills*, 321 F.3d 878, 883 (9th Cir. 2003).

Here, Defendants offered no evidence supporting a bond.[236] The Court thus exercises its discretion and waives the bond requirement.

* * *

After thorough consideration, the Court finds the four *Winter* factors weigh in favor of granting a preliminary injunction. The remaining issue is classwide relief.

## IV. MOTION TO CERTIFY CLASS

Plaintiffs move to certify two classes:

> **Adelanto Class:** All persons who are now, or in the future will be, in the legal custody of U.S. Immigration and Customs Enforcement and detained at the Adelanto ICE Processing Center.

> **Disability Subclass:** All members of the Adelanto Class who have disabilities within the meaning of the Rehabilitation Act § 504, 29 U.S.C. § 701 et seq.[237]

### A. Legal Standard

Class certification is governed by Federal Rule of Civil Procedure 23, which contains two separate sets of requirements under Rule 23(a) and 23(b). *Moyle v. Liberty Mut. Ret. Benefit Plan*, 823 F.3d 948, 964 (9th Cir. 2016). Under Rule 23(a), the party seeking class certification must show there are sufficiently numerous parties, common questions of law or fact, typicality of claims or defenses, and adequacy of representation. Fed. R. Civ. P. 23(a)(1)-(4); *Comcast Corp. v. Behrend*, 569 U.S. 27, 33 (2013). A court must conduct a rigorous analysis to determine whether Rule 23(a)'s requirements are satisfied. *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350-51 (2011). If Rule 23(a)'s threshold requirements are met, the moving party must then demonstrate that the class action can be maintained under one of the categorical requirements under Rule 23(b). *Id.*; Fed. R. Civ. P. 23(b)(1)–(3). Plaintiffs bear the burden of proving Rule 23's

---

[236] *See generally* Opp'n Prelim. Inj.

[237] Dkt. No. 57, Mot. Class Cert. at 11.

requirements are satisfied by a preponderance of the evidence. *Olean Wholesale Grocery Coop., Inc. v. Bumble Bee Foods LLC*, 31 F.4th 651, 665 (9th Cir. 2022).

**B. Discussion**

**1. Rule 23(a)**

a. Numerosity

Plaintiffs must first prove "the class is so numerous that joinder of all members is impracticable." Fed. R. Civ. P. 23(a)(1). There is no numerical threshold to satisfy Rule 23(a)(1), but courts have generally found numerosity is "satisfied when a class includes at least 40 members." *Rannis v. Recchia*, 380 F. App'x 646, 651 (9th Cir. 2010).

Plaintiffs have shown the Adelanto Class is sufficiently numerous that joinder of all members is impracticable. Adelanto has the capacity to house 1,940 detainees. Although current numbers are not specified, declarations from Plaintiffs, other current and former detainees, and organizations whose clients are detainees at Adelanto all show there are at least 25 to 30 detainees likely to be denied medical care and suffer punitive conditions.[238]

The Disability Class is also sufficiently numerous to satisfy Rule 23(a)(1). The record shows at least 8 detainees who have been denied reasonable accommodations,[239] and given that the Rehabilitation Act defines "qualifying disability" broadly, *see* 29 U.S.C. 705(9)(B); 42 U.S.C. 12102(1)(A)–(C), (3), it is reasonable to infer a considerable number of detainees are at risk.

Joinder is impracticable, particularly because the classes "include future, unknowable class members." *Hernandez v. Cnty. of Monterey*, 305 F.R.D. 132, 153 (N.D. Cal. 2015).

b. Commonality

Plaintiffs must also prove there is at least a single question of law or fact common to the class. Fed. R. Civ. P. 23(a)(2); *see also Dukes*, 564 U.S. at 359 (noting a *single* common question of law or fact satisfies the commonality requirement); *Stockwell v. City & Cnty. of S.F.*, 749 F.3d 1107, 1111 (9th Cir.

---

[238] *See* discussion *supra* Section I.D.1 n.1.

[239] *See* A.A. Decl. ¶¶ 9, 24–26, 30; A.A.A.A. Decl. ¶ 37; Ding Decl. ¶¶ 18–19, 24; Flores Decl. ¶¶ 14, 16, 17; L.T. Decl. ¶¶ 12–15; Ruiz Escobar ¶ 33.

2014) ("Rule 23(a)(2) requires a single significant question of law or fact") (cleaned up). Commonality requires Plaintiffs to demonstrate that the class members "have suffered the same injury." *Dukes*, 564 U.S. at 349–50 (quoting *Gen. Tel. Co. of Sw. v. Falcon*, 457 U.S. 147, 157 (1982)). This does not mean they may merely allege the putative class members suffered a harm under the same provisions of the law. *Id.* at 350. Instead, Plaintiffs must show the claims depend on a common contention that is "capable of classwide resolution—which means that determination of its truth or falsity will resolve an issue that is central to the validity" of their Fifth Amendment or Rehabilitation Act claims. *Id.* Commonality is construed permissively and is "less rigorous than the companion requirements of Rule 23(b)(3)." *Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1019 (9th Cir. 1998), *overruled on other grounds by Dukes*, 564 U.S. 338.

Plaintiffs identify common questions for both classes, challenging systemic failures to ensure adequate medical care (and disability accommodations) and nonpunitive conditions. For the Adelanto Class, common questions include the following:

- Have Defendants failed to ensure that GEO Group has an effective medical intake and assessment process that adequately identifies and treats detainees' medical conditions?

- Have Defendants failed to ensure that GEO Group has a functioning sick-call system to respond to detainees' requests for medical care in a timely manner?

- Have Defendants failed to ensure that GEO Group provides timely and adequate treatment or accommodations to detainees with chronic medical issues?

- Have Defendants failed to ensure that GEO Group has an effective system for administering prescription medication in a timely and consistent fashion?

- Have Defendants failed to ensure that GEO Group provides detainees with specialty care?

- Have Defendants failed to ensure that GEO Group's is responding to medical emergencies in a timely and adequate manner?

- Have Defendants failed to ensure that GEO Group provides detainees with enough safe, potable drinking water?

- Have Defendants failed to ensure that GEO Group provides detainees with sufficiently nutritious and edible food?
- Have Defendants failed to ensure that GEO Group provides detainees with a clean and sanitary environment?
- Have Defendants failed to ensure that GEO Group provides detainees with clean, sanitary, and temperature appropriate clothing, bedding, and linens?
- Have Defendants failed to ensure that GEO Group provides detainees with privacy when using the restroom or showering?
- Have Defendants failed to ensure that GEO Group uses restrictive housing appropriately?

Declarations and other common evidence can answer these questions, which are central to the Fifth Amendment claims and capable of classwide resolution.

For the Disability Subclass, common questions include the following:

- Have Defendants failed to ensure that GEO Group is properly identifying those detainees with qualifying disabilities?
- Have Defendants failed to ensure that GEO Group responds to detainees' requests for disability accommodations?
- Have Defendants failed to ensure that GEO Group provides reasonable accommodations to disabled detainees?

Declarations from L.T. Mesrobian, and Salazar Garza address these classwide questions. Thus, these common questions are capable of classwide resolution.

c. Typicality

Plaintiffs must further establish that their claims or defenses are typical of the classes. Fed. R. Civ. P. 23(a)(3). To show typicality exists, Plaintiffs must demonstrate that the putative class members have the same or similar injury as them, that Defendants' misconduct is not unique to them, and that the putative class members have been injured by the same course of misconduct. *Id.*

Here, the record shows classwide denial of adequate medical care and exposure to punitive conditions of confinement. The evidence likewise demonstrates denial of reasonable accommodations to the Disability Class. Defendants' failure to rectify these issues has caused or exposed Plaintiffs and these class members to a substantial risk of harm.

The typicality requirement is thus satisfied.

d. Adequacy

Plaintiffs and their counsel must finally show they "will fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a)(4). The purpose of this requirement is to "uncover conflicts of interest between named parties and the class they seek to represent." *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 625 (1997). Two questions comprise the adequacy inquiry: "(1) do the named plaintiffs and their counsel have any conflicts of interest with other class members and (2) will the named plaintiffs and their counsel prosecute the action vigorously on behalf of the class?" *Hanlon*, 150 F.3d at 1020.

Here, the record shows no conflicts and demonstrates Plaintiffs and their counsel will vigorously prosecute this action on behalf of the Adelanto Class and Disability Subclass.[240]

Plaintiffs have thus satisfied the adequacy requirement.

**2. Rule 23(b)(1)**

Having satisfied Rule 23(a)'s prerequisites, the Court proceeds to Rule 23(b). The Court need not reach Rule 23(b)(1) because certification is appropriate under Rule 23(b)(2).

Rule 23(b)(2) was added in 1966 to acknowledge that civil rights cases that "seek broad declaratory or injunctive relief for a numerous and often unascertainable or amorphous class of persons" can be brought as class actions. 2 William B. Rubenstein, *Newberg & Rubenstein on Class Actions* § 4:26 (6th ed. 2023). A class action may be maintained under Rule 23(b)(2) if Defendants have

[240] *See generally* J.M. Decl.; L.T. Decl.; Mesrobian Decl.; Salazar Garza Decl; Dkt. No. 57-1, Decl. Alvaro M. Huerta; Dkt. No. 57-2, Decl. Rebecca Brown; Dkt. No. 57-3, Decl. Nicholas Reddick; Dkt. No. 57-4, Decl. Carl Bergquist.

acted or refused to act on grounds that apply generally to the Adelanto Class and Disability Subclass, "so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class[es] as a whole." A class may be appropriate under this rule "[e]ven if some class members have not been injured by the challenged practice. *Walters v. Reno*, 145 F.3d 1032, 1047 (9th Cir. 1998).

This civil rights class action fits Rule 23(b)(2). Defendants have refused to ensure adequate medical care and nonpunitive conditions of confinement. Plaintiffs seek injunctive relief compelling compliance with constitutional and statutory duties for a numerous and constantly changing class.

The Rule 23(b)(2) requirements is thus satisfied .

## V. CONCLUSION

The evidence establishes severe and inhumane deficiencies in detainee treatment. Defendants' detention authority does not permit disregard the constitutional and statutory protections of noncitizens. The record demonstrates deficiencies in life's necessities—including spoiled/insufficient food, unsanitary food preparation, inconsistent access to safe water, inadequate sanitation (including mold), and inadequate clothing/bedding—as well as day-to-day conditions, including inadequate privacy for toilets/showers, restricted visitation, excessive headcounts that disrupt routines, curtailed recreation, and misuse of restrictive housing all without a penological purpose. ICE intentionally structured detainee care through its contract with GEO Group while retaining oversight and enforcement authority; yet Plaintiffs' evidence demonstrates material noncompliance and ICE's failure to correct it.

For these reasons, Plaintiffs' Renewed Motion for Preliminary Injunction and Motion for Class Certification are **GRANTED**. Nothing in this order alters, expands, or limits the Court's previous ruling in its July 16 order.

**IT IS SO ORDERED.**