TODD BLANCHE
Attorney General
BILAL A. ESSAYLI
First Assistant United States Attorney
DANIEL A. BECK
Assistant United States Attorney
Acting Chief, Civil Division
ALARICE M. MEDRANO
Assistant United States Attorney
Acting Chief, Complex and Defensive Litigation Section
PUSHKAL MISHRA (Cal. Bar No. 298695)
Special Assistant United States Attorney
Federal Building, Suite 7516
300 North Los Angeles Street
Los Angeles, California 90012
Telephone: (714) 338-3503
E-mail: pushkal.mishra@usdoj.gov

Attorneys for Defendants

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| L.T., *et al.*,<br><br>Plaintiffs,<br><br>v.<br><br>U.S. IMMIGRATION AND CUSTOMS ENFORCEMENT (ICE), *et al.*,<br><br>Defendants. | No. 5:26-cv-00322-SSS-SP<br><br>**DEFENDANTS' OPPOSITION TO PLAINTIFFS' EX PARTE APPLICATION FOR EMERGENCY HEARING RE INJUNCTION COMPLIANCE AND COURT-APPOINTED MONITORS (ECF 123)**<br><br>[Declarations of Rosa Quevedo, Daniel Pomplun, and Pushkal Mishra filed concurrently]<br><br>Honorable Sunshine Suzanne Sykes<br>United States District Judge |

# TABLE OF CONTENTS


DESCRIPTION PAGE

I. INTRODUCTION .......... 1

II. LEGAL STANDARD .......... 4

III. ARGUMENT .......... 5

A. Plaintiffs manufactured the exigency they invoke .......... 5

B. The Application would enlist the Court's Monitors in one party's case .......... 7

C. The Preliminary Injunction cannot be specific enough to defeat a stay in the Ninth Circuit yet too vague for the Court's own Monitors to follow here .......... 8

D. The Application rests on evidence that would not be received in court .......... 9

E. Isolated accounts cannot establish facility-wide noncompliance .......... 11

F. Measured against the order's actual terms, the allegations fail .......... 14

G. Generality impedes the compliance Plaintiffs demand .......... 18

IV. CONCLUSION .......... 20

# TABLE OF AUTHORITIES

**Page(s)**

**Federal Cases**

*Bell v. Wolfish*,
441 U.S. 520 (1979) .......... 12

*Califano v. Yamasaki*,
442 U.S. 682 (1979) .......... 11

*Coleman v. Brown*,
No. 2:90-cv-0520 KJM DB P, 2018 WL 6250852 (E.D. Cal. Nov. 28, 2018) .......... 7

*Coleman v. Newsom*,
131 F.4th 948 (9th Cir. 2025) .......... 4

*In re Dual-Deck Video Cassette Recorder Antitrust Litig.*,
10 F.3d 693 (9th Cir. 1993) .......... 4

*Fraihat v. U.S. Immigr. & Customs Enf't*,
16 F.4th 613 (9th Cir. 2021) .......... 11, 13

*G.K. Las Vegas Ltd. P'ship v. Simon Prop. Grp., Inc.*,
671 F. Supp. 2d 1203 (D. Nev. 2009) .......... 7

*Gorton v. Todd*,
793 F. Supp. 2d 1171 (E.D. Cal. 2011) .......... 7

*J.L. v. Soc. Sec. Admin.*,
971 F.2d 260 (9th Cir. 1992) .......... 13

*Lewis v. Casey*,
518 U.S. 343 (1996) .......... 11

*Logue v. United States*,
412 U.S. 521 (1973) .......... 18

*McCarthy v. Madigan*,
503 U.S. 140 (1992) .......... 13

*Melendres v. Skinner*,
113 F.4th 1126 (9th Cir. 2024) .......... 7

*Mission Power Eng'g Co. v. Cont'l Cas. Co.*,
883 F. Supp. 488 (C.D. Cal. 1995) .......... 3, 5, 9

*Nat. Res. Def. Council, Inc. v. Sw. Marine Inc.*, 242 F.3d 1163 (9th Cir. 2001) ........ 5, 9

*New Hampshire v. Maine*, 532 U.S. 742 (2001) ........ 8

*Oracle USA, Inc. v. Rimini St., Inc.*, 81 F.4th 843 (9th Cir. 2023) ........ 4

*Reno Air Racing Ass'n, Inc. v. McCord*, 452 F.3d 1126 (9th Cir. 2006) ........ 4

*Schmidt v. Lessard*, 414 U.S. 473 (1974) ........ 9

*Taggart v. Lorenzen*, 587 U.S. 554 (2019) ........ 4

*Thomas v. County of Los Angeles*, 978 F.2d 504 (9th Cir. 1992) ........ 4

*United States v. Whittemore*, 776 F.3d 1074 (9th Cir. 2015) ........ 9

**Rules**

Fed. R. Civ. P. 65 ........ 3-4, 8, 19

Fed. R. Evid. 602 ........ 9

Fed. R. Evid. 706 ........ 6

Fed. R. Evid. 801 ........ 9

Fed. R. Evid. 802 ........ 9

Fed. R. Evid. 805 ........ 9

C.D. Cal. L.R. 7-4 ........ 11

C.D. Cal. L.R. 7-19 ........ 11

# I. INTRODUCTION

Plaintiffs seek no contempt, no sanctions, and no operative relief, they say. ECF 123 at 1. Their papers belie that posturing: The sealing application, for example, admits that "Applicant's declaration pertains to Defendants' compliance with the Court's Preliminary Injunction . . . ." ECF 124 at 2. The Application accuses Defendants of having taken "no discernible steps toward compliance," titles its principal section "Defendants' Non-Compliance with the Preliminary Injunction," and closes by asking for "[a]ny further proceedings, orders, or relief the Court deems appropriate to secure compliance." ECF 123 at 1, 4, 15. Plaintiffs' declarants are more candid still. Sworn statements filed with the Application declare, "I submit this declaration in support of Plaintiffs' Motion to Enforce the Preliminary Injunction," ECF 123-4 ¶ 1, and the M.F. declaration is captioned "in Support of Plaintiffs' Motion to Enforce the Preliminary Injunction." ECF 123-7; *accord* ECF 125. Counsel swore the identical sentence three weeks earlier in support of their so-called "Status Report," ECF 120-2 ¶ 1—which makes plain that a "Motion to Enforce" has been their plan since at least August 5, 2026. However framed, this is a motion to enforce the Preliminary Injunction—one filed without proper notice under the Rules, without competent evidence, and without the response time the Rules guarantee.

What Plaintiffs seek is a hearing—demanded for the very next day—at which the Court's two newly appointed Monitors would be summoned to hear one side's articulation of their criticism and claims against a facility neither Monitor has yet inspected. The aim is to pre-enlist the Monitors into substantiating their claims. In other words, to prejudice and direct them to address claims the Plaintiffs believe are of particular concern. But Kellie Wasko and Dr. Marc Stern are the Court's independent experts; they serve the Court, not the parties. And they cannot act on their own: The Monitors' recommendations "must be adopted by the district court before they become effective." *L.T. v. ICE*, Appeal No. 26-4902, ECF 22.1 at 5. That design is the point: Whatever direction the Monitors need must flow from this Court, through orderly submissions from both parties—which is also why nothing about their schedule or duties requires an emergency hearing. Convening them to

sit through and absorb one party's untested narrative before they begin and then submit their work is not enforcement and is not neutral factfinding—it is an effort to make the Court's own neutrals the vessels for one side's advocacy and litigation theatrics. The Monitors' independence belongs to the Court; it is not Plaintiffs' to spend through a one-sided "orientation" for the purported benefit of the Monitors. *See infra* § III.B.

Plaintiffs disclaim contempt and sanctions, ECF 123 at 1, identify no dispositive order that must issue, and concede that the one date they call urgent—the Monitors' September 1 reports—can be moved by agreement, *id.* at 14.[1] A movable deadline is a scheduling matter, not an emergency. They waited seven days after the Ninth Circuit lifted the administrative stay, then filed within two hours of learning that Defendants opposed their application and had asked until Monday to respond. ECF 123-2 ¶ 9. The call came at 11:56 a.m.; the Application was on file by 1:24 p.m. and served fully on or around 3:01 p.m. Mishra Decl. ¶¶ 4, 6. An emergency of one's own making is not an emergency at all.

The Application also cannot bear the weight Plaintiffs place on it. Its evidence is largely counsel's account of what unnamed detainees said—inadmissible on its face and incompetent to support *ex parte* relief. One declaration it repeatedly cites—the "Declaration of J.A., dated August 26, 2026," described as "filed concurrently herewith," ECF 123 at 8—was never filed with the Court and has never been served on Defendants. Another account appears twice, three weeks apart—first relayed by counsel, then sworn directly—and is offered as though it were two. *Compare* ECF 120-2 ¶¶ 3, 9-15 (counsel's August 5 declaration relaying the client's account), *with* ECF 125 ¶¶ 4, 7-13 (executed August 25) (describing purportedly the same women's unit in Adelanto East—the same privacy curtains and cameras, communal laundry, and outdoor time). And measured against the Preliminary Injunction's actual terms, including the qualifications Plaintiffs omit, the accounts describe a facility in transition, not one standing still. And when the

---

[1] Plaintiffs disclose only part of the thread with Dr. Marc Stern. What followed was that Defendants proposed that the parties send a joint communication to him, to which the parties then agreed. Decl. of Pushkal Mishra (Mishra Decl.) ¶¶ 4-5.

declarants venture a cause, it is staffing, not defiance—"short staffed," "understaffed lately, with a lot of staff turnover," ECF 116-1 ¶¶ 6, 29; meals moved to the chow hall "possibly due to lack of staffing," Appeal No. 26-4902, ECF 20.2 ¶ 8—grounds for a noticed motion, not proof of willful or punitive defiance. Plaintiffs' own declarants, meanwhile, confirm privacy curtains, laundry service, daily outdoor time, and physical contact during visits, *see* ECF 125 ¶¶ 7–8, 10-11[2]—facts that may frame compliance disputes, but do not establish wholesale defiance, much less justify an overnight emergency hearing.

The Application also delivers—emphatically, if unintentionally—the very concession Defendants have pressed before the Ninth Circuit. Plaintiffs assured the court of appeals that the Preliminary Injunction supplies "specific directives with which to comply" and that "[t]he remedial plan and monitors do not render the order vague." *L.T. v. ICE*, Appeal No. 26-4902, ECF 20.1 at 11 (9th Cir. Aug. 17, 2026). Their Application now turns around and tells this Court that in reality the Monitors "require further clarity regarding their duties" and "require further direction from the Court on their obligations." ECF 123 at 1, 13. Their concession about the legal deficiency of the Preliminary Injunction is blunter still: "The Monitors ***cannot fulfill*** their Court-ordered obligations without further direction from the Court." *Id.* at 4 (emphasis added). If the two experts the Court appointed to superintend compliance cannot discern their duties from the order's text, then the order does not "state its terms specifically"—and that is Defendants' appeal. Fed. R. Civ. P. 65(d)(1)(B). Plaintiffs nowhere acknowledge the about-face: The concession arrives dressed as a scheduling request, in a filing that disclaims in name the motion to enforce its own declarations confirm it is. *See infra* § III.C.

If Plaintiffs believe Defendants are violating the Preliminary Injunction, they should file the noticed motion their own declarations say they support and prove it with admissible evidence. Defendants will then respond with evidence. The scheduling issues concerning

[2] Citations to ECF 125 are to the unredacted declaration; a redacted public version appears at ECF 123-7, with identical paragraph numbering.

Monitor deadlines and communications can be resolved by revised dates and a protocol. What the Rules do not permit is broad compliance litigated overnight, before the Court's experts, on hearsay and litigation theatrics. The Court should deny the Application.

## II. LEGAL STANDARD

*Ex parte* relief requires two showings. *First*, "the evidence must show that the moving party's cause will be irreparably prejudiced if the underlying motion is heard according to regular noticed motion procedures." *Mission Power Eng'g Co. v. Cont'l Cas. Co.*, 883 F. Supp. 488, 492 (C.D. Cal. 1995). *Second*, "it must be established that the moving party is without fault in creating the crisis that requires ex parte relief, or that the crisis occurred as a result of excusable neglect." *Id.* "It is the creation of the crisis—the necessity for bypassing regular motion procedures—that requires explanation." *Id.* at 493. "Ex parte applications are not intended to save the day for parties who have failed to present requests when they should have." *Id.* (cleaned up).

The showing must also rest on competent evidence. The reasons offered "must be supported by deposition transcripts or by affidavits or declarations whose contents would be admissible if the deponents, affiants, or declarants were testifying in court. A statement 'on information and belief' by the lawyer preparing the papers is insufficient." *Id.* at 492. The Ninth Circuit likewise rejects a conclusory assertion as a basis to bypass notice; otherwise, ex parte orders "would be the norm" and Rule 65's notice requirement would be gutted. *Reno Air Racing Ass'n, Inc. v. McCord*, 452 F.3d 1126, 1132 (9th Cir. 2006).

Civil contempt lies only for disobedience of a "specific and definite court order" by a party that failed "to take all reasonable steps within [its] power to comply," proved by clear and convincing evidence. *In re Dual-Deck Video Cassette Recorder Antitrust Litig.*, 10 F.3d 693, 695 (9th Cir. 1993). Substantial compliance defeats contempt where a party "has achieved near-total compliance through the exhaustion of all reasonable efforts." *Coleman v. Newsom*, 131 F.4th 948, 956 (9th Cir. 2025). Contempt "should not be resorted to where there is a fair ground of doubt as to the wrongfulness of the defendant's conduct," *Taggart v. Lorenzen*, 587 U.S. 554, 561 (2019) (cleaned up), and the Ninth Circuit

"forbid[s] contempt sanctions when the contested action was 'based on a good faith and reasonable interpretation'" of the order, *Oracle USA, Inc. v. Rimini St., Inc.*, 81 F.4th 843, 851 (9th Cir. 2023). Likewise, an injunction cannot be enforced through standards it does not define. *Thomas v. County of Los Angeles*, 978 F.2d 504, 510 (9th Cir. 1992). These rules require a provision-by-provision record tied to a specific command, act, and responsible actor. Plaintiffs cannot press a compliance adjudication while evading the governing standard by reserving sanctions for later.

The pending appeal narrows the field further. Although Rule 62(d) permits this Court to preserve the status quo while an injunction is on appeal, the Ninth Circuit has held that the rule—then numbered Rule 62(c)—"does not restore jurisdiction to the district court to adjudicate anew the merits of the case," and any action under it "may not materially alter the status of the case on appeal." *Nat. Res. Def. Council, Inc. v. Sw. Marine Inc.* (*NRDC*), 242 F.3d 1163, 1166 (9th Cir. 2001).

## III. ARGUMENT

### A. Plaintiffs manufactured the exigency they invoke

The Ninth Circuit lifted the administrative stay on August 20. Plaintiffs let seven days pass. When they learned that Defendants opposed their contemplated ex parte application and sought until Monday, August 31, to respond, they filed within roughly two hours and asked the Court to hear the matter the next day. ECF 123-2 ¶¶ 7–9; ECF 123 at 15. Nothing prevented a noticed motion, or an application to shorten time, at any point in that week. A party that treats conditions as tolerable for seven days cannot demand that the Court and its opponent treat them as an emergency on the eighth. A party that elects to wait, and then elects to file on one day's notice, has created the urgency it claims. *Mission Power* demands an explanation for bypassing noticed procedure; an admitted strategic pause is the opposite of one.[3]

[3] The unredacted M.F. declaration, ECF 125, was not served on Defendants until after 3:00 p.m. that day. ECF 126. Counsel's account of the conferral is also difficult to reconcile with itself: The Application recounts the August 27 call in which Defendants stated their position—opposition to the Application "in its current form" and a request to

*(footnote cont'd on next page)*

Plaintiffs knew how to place compliance before this Court on notice. Their seven-page Status Report, filed August 6, sought no relief and asked nothing of Defendants. ECF 120. The same filing plainly refutes Plaintiffs' claim to have "demanded a response (which the Government refused to give)." ECF 123 at 4 (citing ECF 120 at 2). The cited page recounts the July water reports; no demand, no deadline, and no refusal appears there—or anywhere else in the Status Report. The Application's own genesis tells the same story: On August 26, Defendants invited Plaintiffs' counsel to propose agreed language responding to the Medical Monitor; the reply to that invitation the next morning announced this Application. Mishra Decl. ¶ 4. And they pressed these same facts on the Ninth Circuit on August 17, citing the Status Report by docket number. *L.T. v. ICE*, Appeal No. 26-4902, ECF 20.1 at 1, 17. The panel ruled three days later. The conditions Plaintiffs describe are not a development that emerged after August 20 and required relief overnight.

The single fixed date Plaintiffs identify defeats their own urgency. They say the Monitors' September 1 reports are imminent—then volunteer that they "would be amenable to the Court setting a revised deadline," so long as the reports issue by "mid-September." ECF 123 at 14. A deadline the movant offers to move is a scheduling matter.

As for the Remedial Plan, Plaintiffs say the quiet part aloud: "[c]urrently, Defendants are under no obligation to remedy" the medical-care and disability systems, ECF 123 at 13, because the Plan takes effect through the Preliminary Injunction's own feedback-and-adoption sequence, ECF 104 at 5. An obligation that has not yet attached cannot be defied—the claimed "emergency" is the Court's order operating exactly as written and as the Court contemplated. The Medical Monitor's inquiry likewise concerns process—whether "there's a way—without violating proper procedure—for the parties to help us be in direct communication with the Court." Mishra Decl. ¶ 4 & Ex. 1. The parties can propose a protocol. Neither matter requires a hearing, let alone an *ex parte* one.

---

respond by 5:00 p.m. on Monday, August 31—and asserts in the next breath that "Defendants have not stated their position." ECF 123 at "Page 4 of 22"; ECF 123-2 ¶ 9. The call took place at 11:56 a.m. Pacific Time and lasted roughly 14 minutes. Mishra Decl. ¶ 4. Defendants' last stated position was that they opposed the Application. *Id.*

**B. The Application would enlist the Court's Monitors in one party's case**

What Plaintiffs seek is revealing and highly concerning. They ask that the Monitors attend so the parties may "address these matters in real time," ECF 123 at 14, and their proposed order directs the Clerk to notify the Monitors of the hearing, ECF 123-1. Kellie Wasko and Dr. Marc Stern are the Court's independent experts under Federal Rule of Evidence 706 and the Preliminary Injunction, appointed weeks ago. ECF 117; ECF 119. Their first exposure to conditions at Adelanto should not be a hearing convened at one party's insistence, on one day's notice, to receive that party's non-compliance narrative and argument of claims and concerns, compromising their independence.

Courts rightly guard this boundary. A party may not deal with a court-appointed neutral "as if it was [that party's] owned retained expert whose conduct they control . . . ." *G.K. Las Vegas Ltd. P'ship v. Simon Prop. Grp., Inc.*, 671 F. Supp. 2d 1203, 1229 (D. Nev. 2009). There, counsel compromised the expert's impartiality by meeting with him and supplying materials without notice. *Id.* A neutral appointment exists to "promote accurate factfinding," not advocacy. *Coleman v. Brown*, No. 2:90-cv-0520 KJM DB P, 2018 WL 6250852, at *4 (E.D. Cal. Nov. 28, 2018) (quoting *Gorton v. Todd*, 793 F. Supp. 2d 1171, 1179 (E.D. Cal. 2011)). A hearing designed to immerse the Monitors in one side's untested allegations would defeat that purpose. That safeguard matters because the Monitors' recommendations are not self-executing; they "must be adopted by the district court before they become effective." *L.T. v. ICE*, Appeal No. 26-4902, ECF 22.1 at 5 (9th Cir. Aug. 20, 2026) (citing *Melendres v. Skinner*, 113 F.4th 1126, 1139–40 (9th Cir. 2024)). *Melendres* approved monitor authority only after a trial, adjudicated noncompliance, and contempt proceedings—and because the court retained final authority. *Id.* at 1129–30, 1135–39. Nothing there licenses convening the Court's appointed Monitors in this case to absorb one party's untested allegations. Schedule adjustments require no such proceeding. If the Monitors' reporting timetable should change now that the stay has lifted, the parties can submit proposals, and the Court can direct its own appointees—without a proceeding staged around one side's allegations. And

if the Court nevertheless convenes them, every substantive communication should be docketed, both sides heard, and every compliance finding made by the Court on a proper adversarial record.

### C. The Preliminary Injunction cannot be specific enough to defeat a stay in the Ninth Circuit yet too vague for the Court's own Monitors to follow here

Plaintiffs' bluntest admission deserves first billing: "The Monitors cannot fulfill their Court-ordered obligations without further direction from the Court." ECF 123 at 4; *accord id.* at 1, 13. An order the Court's own experts cannot follow without more direction is an order that is not specific—which is exactly what Plaintiffs spent last week telling the Ninth Circuit was untrue. Ten days before this Application, opposing the stay in the Ninth Circuit, Plaintiffs represented that the Preliminary Injunction "complies with Rule 65(d)(1)(B)–(C)'s requirements to 'state its terms specifically' and 'describe in reasonable detail . . . the acts restrained or required,'" that its commands are "'specific directives with which to comply,' not a generalized command to obey the Constitution," and that "[t]he remedial plan and monitors do not render the order vague." *L.T. v. ICE*, Appeal No. 26-4902, ECF 20.1 at 11 (9th Cir. Aug. 17, 2026). They faulted the Government for having "never explained what specific provision it does not understand." *Id.* at 11–12. Two weeks earlier they told the same court that the order's terms are "concrete, specific, and enforceable—the opposite of a vague 'obey the law' decree." Appeal No. 26-4902, ECF 6.1 at 14 (9th Cir. Aug. 3, 2026). The Ninth Circuit took Plaintiffs at their word, Appeal No. 26-4902, ECF 22.1 at 2–3, and Plaintiffs' own Application recites the premise—Defendants "had not shown the Preliminary Injunction lacked 'specific directives with which to comply' or that its terms were ambiguous." ECF 123 at 2. A week later, Plaintiffs tell this Court the opposite: The Monitors "require further clarity regarding their duties" and "require further direction from the Court on their obligations." ECF 123 at 1, 13.

That is judicial estoppel. A party that succeeds on one position may not switch when its interests change. *New Hampshire v. Maine*, 532 U.S. 742, 749 (2001). Plaintiffs'

positions are clearly inconsistent; the motions panel accepted the first; and the switch would create both the appearance that one court was misled and the unfair advantage of orienting the Monitors to a gloss Plaintiffs swore the order did not need. *Id.* at 750–51.

Either the Preliminary Injunction "state[s] its terms specifically" and "describe[s] in reasonable detail" the acts required, Fed. R. Civ. P. 65(d)(1)(B)–(C), so the Monitors need no further direction—or the order fails Rule 65(d), whose specificity provisions prevent "uncertainty and confusion" and contempt based on a decree "too vague to be understood." *Schmidt v. Lessard*, 414 U.S. 473, 476 (1974). Plaintiffs cannot occupy both positions. Nor, while the order is on appeal, may this Court "materially alter the status of the case on appeal." *NRDC*, 242 F.3d at 1166. Plaintiffs identify no discrete term, proposed construction, or status-preserving act—only open-ended "further clarity" and "further direction." The invitation should be rejected.

**D. The Application rests on evidence that would not be received in court**

Most of what Plaintiffs offer is counsel's account of what unidentified detainees told counsel. The Wrench and Schuft declarations relay reports from anonymous clients and prospective clients whose housing units are, in most instances, unstated. ECF 123-4; ECF 123-5. That is not competent support for *ex parte* relief. *Mission Power*, 883 F. Supp. at 492. It is also inadmissible twice over: Hearsay within hearsay is inadmissible unless each layer independently satisfies an exception, Fed. R. Evid. 805; *see* Fed. R. Evid. 802. Because GEO is not a party, its employees' statements are not the admissions of a party-opponent, *see* Fed. R. Evid. 801(d)(2)(D), and counsel—the only declarant before the Court—lacks personal knowledge of any of it, *see* Fed. R. Evid. 602; *United States v. Whittemore*, 776 F.3d 1074, 1082 (9th Cir. 2015) ("Rule 602 requires any witness to have sufficient memory of the events such that she is not forced to fill the gaps in her memory with hearsay or speculation. Witnesses are not permitted to speculate, guess, or voice suspicions." (cleaned up)). That defect is not academic. The most serious statements in the Application—that a GEO officer said "nothing is happening with the PI Order," and that Captain Duran said ICE "had not told them to enforce it"—are counsel's recounting of

what an unidentified detainee reported that an unidentified officer said, offered to prove the state of mind of a non-party's employees. ECF 116-1 ¶¶ 4, 8; ECF 120 at 6.

A declaration the Application repeatedly cites is not before the Court. Plaintiffs cite a "Declaration of J.A.," described as "filed concurrently herewith." *E.g.*, ECF 123 at 7–8. It was not: The J.A. declaration is not among the Application's exhibits; it is not the declaration addressed by Plaintiffs' sealing application, ECF 124, or lodged as ECF 125—that is the declaration of M.F.; it is not listed in Plaintiffs' proof of service of their sealed papers, ECF 126; and it has never been served on Defendants. Counsel's own declaration confirms the gap: It promises declarations from "three individuals presently detained," ECF 123-2 ¶ 10; only two were filed. Assertions attributed to a declaration neither filed with the Court's leave nor served are not evidence.

Nor are Plaintiffs' sources as numerous as they appear. Counsel's declaration recounts an August 21 interview with an anonymous detainee whose reported statements are, word for word, those attributed to "J.A."—the same "dog food," the same bread "so hard you cannot cut it with a knife," the same "pig sty," the same five daily counts of an hour to an hour and a half, the same three to four days each week without large-yard access. *Compare* ECF 123 at 7–8, 11, *with* ECF 123-4 ¶¶ 4, 6, 11. The declarant of ECF 125 likewise appears twice: She appears to be the anonymous woman described in the August 6 Status Report—detained since April 2026 in a women's unit in Adelanto East, reporting the same privacy curtains and camera concern, the same communal laundry, the same unwashed pillows, the same two hours of outdoor time, the same hour-long counts and night lighting. *Compare* ECF 120-2 ¶¶ 3, 9-15, *with* ECF 125 ¶¶ 4, 7-13. Her account is materially unchanged across three weeks—which is not evidence of deterioration or noncompliance, and does not become two accounts by being presented twice—once through counsel and once directly.

Plaintiffs' own declarants also contradict the Application's headline that Defendants have taken "no discernible steps toward compliance." ECF 123 at 1. M.F. confirms privacy curtains at the bathroom and shower entrances, laundry service, daily

outdoor time, and physical contact at visits. ECF 125 ¶¶ 7–8, 10-11. Those admissions may leave disputes about adequacy; they foreclose Plaintiffs' bold claims.

Plaintiffs also miscast silence as admission. The August 6 Status Report requested no relief—and was filed the same day the Ninth Circuit administratively stayed the Preliminary Injunction. Nor did any rule or order invite it: The only status reports the Preliminary Injunction contemplates are the Monitors' monthly reports, ECF 104 at 5, and the Local Rules provide no vehicle for a party's unsolicited evidentiary report—advocacy proceeds by noticed motion or, on a proper showing, ex parte application. *See* C.D. Cal. L.R. 7-4, 7-19. And nothing in the injunction obliges Defendants to certify compliance to opposing counsel on their unilateral demand. Declining to perform an obligation that neither the Court nor the law ever imposed proves nothing.

The timing compounds those evidentiary defects. Much of the Application concerns a period when the Preliminary Injunction was not operative. Indeed, the Application's stay-period accounts rest on a declaration filed in the court of appeals, ECF 20.2, and not filed here; the rest are counsel's accounts of client reports dated August 10 through 17—all mid-stay. ECF 123-5 ¶¶ 8–11. The order was stayed from August 6 to August 20; conduct during that window cannot violate it.

**E. Isolated accounts cannot establish facility-wide noncompliance**

Roughly eight voices, several describing a single incident on a single day, cannot support a finding that an injunction is being defied across a facility housing approximately 1,800 people. *See Lewis v. Casey*, 518 U.S. 343, 356, 359 (1996) (two "instances were a patently inadequate basis for a conclusion of systemwide violation and imposition of systemwide relief"); *id.* at 360 ("The scope of injunctive relief is dictated by the extent of the violation established, not by the geographical extent of the plaintiff class" (quoting *Califano v. Yamasaki*, 442 U.S. 682, 702 (1979))). And where an agency responds to identified problems with corrective steps, that responsiveness defeats the inference Plaintiffs draw. The Ninth Circuit reversed a sweeping detention-conditions injunction where the record showed that, "far from recklessly disregarding" the risk, the agency "took

steps to address" it. *Fraihat v. U.S. Immigration & Customs Enforcement*, 16 F.4th 613, 637 (9th Cir. 2021); *see also id.* at 643 ("[T]he operation of our correctional facilities is peculiarly the province of the Legislative and Executive Branches of our Government, not the Judicial." (quoting *Bell v. Wolfish*, 441 U.S. 520, 548 (1979))). Before extrapolating facility-wide noncompliance, the Court would have to identify the asserted uniform practice and the evidence of classwide exposure to it. It cannot do that on anonymous summaries filed at day's end for a hearing the next morning.

Nor do these accounts land on an empty record. Defendants' sworn evidence, filed weeks before the Application, already addresses every domain the declarants touch: The drinking water "was sampled and tested at various distribution points by an independent third party . . . and determined to be clean per Food and Drug Administration (FDA) standards." ECF 113-2 (Decl. of Ryan L. Smith) ¶ 8. Meals come from cycle menus "pre-approved by a certified dietician and tested for nutrition and caloric content." *Id.* ¶ 9. The facility, "including restrooms and shower areas, is cleaned daily, with the cleaning recorded in the cleaning logs," and GEO provides hygiene products, "including feminine hygiene products, and soap for bathing," to all detainees "at no cost." *Id.* ¶ 10. Privacy methods in the restrooms and showers "are compliant with the Prison Rape Elimination Act (PREA) and ICE Sexual Abuse and Assault Prevention and Intervention Program (SAAPI) requirements," *id.* ¶ 11, and the segregation "policies and procedures are compliant with the terms set forth in the order." *Id.* ¶ 17.

Plaintiffs' declarants engage none of this record; the Application never mentions it. These steps carry legal consequence, not just atmosphere: The Fifth Amendment claims beneath the Preliminary Injunction require more than negligence—"something akin to reckless disregard," *Fraihat*, 16 F.4th at 636—or conditions imposed to punish. An agency shown to be testing the water, ECF 113-2 ¶ 8, correcting ODO findings, ECF 80-1 ¶¶ 13, 17, filing a remedial plan, ECF 111, and directing its contractor through a documented compliance loop—before the injunction, ECF 80-1 ¶¶ 13-16, and since it, ECF 113-2 ¶ 7; ECF 110-112; Decl. of Rosa Quevedo, filed concurrently (Quevedo Decl.), ¶ 5 (GEO

Group notified of the Preliminary Injunction, notified that the stay was lifted); Decl. of Daniel Pomplun (Pomplun Decl.) ¶¶ 1, 4 (the Contract Officer Representative verifies GEO's contract performance and notified GEO of the injunction's requirements)—is the opposite of one recklessly disregarding risk or punishing anyone.

All that said, the absence of fulsome factual development is not happenstance; it is the bypass Defendants predicted. Defendants moved to dismiss because no named Plaintiff "exhausted—or even meaningfully invoked—the administrative remedies that exist for precisely these complaints": the PBNDS's multi-tiered grievance process. ECF 80 at 16–17 (citing PBNDS § 6.2 V.C.1–4); ECF 93 at 9–10 (futility is unavailable to "litigants who never filed anything"). The Application proves the point. Its declarants describe weeks of complaints about water, food, sanitation, privacy, recreation, and counts—yet none claims to have ever filed a grievance about any of them, and the only administrative requests they mention are two medical kites. ECF 123-4 ¶ 12; ECF 123-6 ¶ 12. The tiered process exists because "agency expertise makes agency consideration necessary to generate a proper record," *J.L. v. Soc. Sec. Admin.*, 971 F.2d 260, 271 (9th Cir. 1992), and because "an agency ought to have an opportunity to correct its own mistakes with respect to the programs it administers before it is haled into federal court." *McCarthy v. Madigan*, 503 U.S. 140, 145 (1992). Racing to an emergency hearing on anonymous, hearsay and double hearsay accounts—with no grievance record against which to test a single allegation—is exactly the evasion of orderly review, and of factual development, that Defendants warned would follow. *See* ECF 80 at 17; ECF 93 at 9–10.

The pattern is not new. At class certification, Defendants showed that three of the four Individual Plaintiffs "never filed a single grievance about the conditions they now challenge," and the fourth "grieved only Wi-Fi and yard access"—and that "there has been no disclosure of the monetary compensation that the Plaintiffs and their ostensibly pro bono counsel may be pursuing through their pleading of EAJA claims in this action, which may significantly distort how the case is litigated and why it is litigated that way." ECF 81 at 14. Class counsel's own filings elsewhere supply the incentive Defendants could

only infer: Two weeks ago, opposing a stay of fees in another Adelanto detainee's case, CHIRLA—co-counsel here—told another court of this district that "[n]on-profit legal aid organizations rely heavily on timely EAJA fee recoveries to maintain operational liquidity," and that its client had executed "a valid contractual assignment of all EAJA fees directly to CHIRLA." *Barragan Ayala v. Semaia*, No. 5:26-cv-02429-AJR (C.D. Cal.), ECF 18 at 5 (filed Aug. 17, 2026). A grievance swiftly resolved at the facility through its process earns no fee; litigation does generate fee claims. The choices on display here—no grievances, an unnecessary ex parte application, the Court's Monitors summoned to a one-sided hearing—are what that incentive structure predicts, and they bear on the adequacy-of-representation concerns Defendants have raised. ECF 81 at 14.

**F. Measured against the order's actual terms, the allegations fail**

The order's text narrows the dispute further: Its provisions contain qualifications the Application reads out. Taken provision by provision, the accounts describe disputes about degree and scheduling—not defiance.

*Drinking water (¶ 1(a))*. Paragraph 1(a) requires "24-hour access to clean potable drinking water." ECF 104 at 2. The current complaints are about taste—and they conflict with one another and with M.F.'s own statement that she "usually cannot taste the difference" between sink and dispenser water. ECF 125 ¶ 5; ECF 123-4 ¶ 3; ECF 123-6 ¶ 3; ECF 120-2 ¶ 4 (*compare* ECF 120-2 ¶¶ 3, 9-15, *with* ECF 125 ¶¶ 4, 7-13 (same unit, same particulars)). Taste is not potability. The water is municipal, and it tests clean: Sampling "at various distribution points by an independent third party" in January 2026 was "determined to be clean per Food and Drug Administration (FDA) standards," every dorm has 24-hour water fountains, and GEO's inspection of the jugs after the August worm allegation found "no contamination, insects or larvae." Quevedo Decl. ¶¶ 6-7. ICE notified GEO of the allegations and of the injunction's water requirements by e-mail on July 17, 2026. Pomplun Decl. ¶ 4. The June 23 outage predates the injunction, ECF 116-1 ¶ 13, and the August 7 report arose mid-stay, ECF 123-5 ¶ 3. No clinical finding attributes any detainee's illness to the facility's water; the hospitalization reports are mid-

stay and pre-injunction. Potable water is provided; no violation is shown.

*Food (¶ 1(b)).* Paragraph 1(b) requires "[n]utritious and sanitary meals that contain a sufficient number of calories." ECF 104 at 2. The complaints are palatability and repetition. ECF 123-6 ¶ 4; ECF 123-4 ¶ 4. The chow-hall transition reflects orderly service, Appeal No. 26-4902, ECF 20.2 ¶¶ 8-15, and the menu system provides for medically prescribed and religious diets. ECF 113-2 ¶ 9. The menus are dietician-approved on a five-week cycle; the GEO nutritionist confirmed on August 25-26, 2026 that daily intake runs approximately 2,800 calories; and the San Bernardino County Health Department inspected the kitchen on May 19, 2026 with a positive mark. Quevedo Decl. ¶¶ 8-10. The June spoiled-meat report predates the injunction, ECF 120-2 ¶ 6, and one tray (ECF 120-3 ¶ 5) proves nothing facility-wide. The meals meet the order's terms.

*Sanitation, hygiene, and mold (¶ 1(c)).* Paragraph 1(c) requires daily cleaning, consistently free hygiene products, and mold identification, treatment, and remediation. ECF 104 at 2. The declarants confirm cleaning occurs; the dispute is frequency. ECF 123-6 ¶ 6; ECF 125 ¶ 6. The supply and mold reports are dated—mid-July and mid-stay, ECF 123-6 ¶ 7; ECF 123-5 ¶ 7; Appeal No. 26-4902, ECF 20.2 ¶ 16—and the August 6 report itself acknowledges that menstrual-hygiene products were supplied. ECF 120-2 ¶ 8. The facility "is cleaned daily, with the cleaning recorded in the cleaning logs"; daily inspections have identified no mold; and hygiene products—including feminine-hygiene products—are free at a podium staffed twenty-four hours a day, with cleaning products available on request. Quevedo Decl. ¶ 11. Reports like these warrant investigation and response—not an emergency inference that nothing has been done.

*Privacy (¶ 1(d)).* Paragraph 1(d) requires restroom and shower privacy "consistent with the safety needs of the facility." ECF 104 at 2. The declarants confirm privacy curtains. ECF 125 ¶ 7; ECF 123-6 ¶ 8. The residual dispute—camera placement and curtain height—is the safety consideration the provision itself accommodates, and the contrary "no privacy at all" is counsel's account of an unnamed individual. ECF 123-4 ¶ 7. The accounts even trade floors: In early August, M.F. used only the first-floor

bathrooms to avoid the second-floor cameras, ECF 120-2 ¶ 9; by August 25, she "prefer[s] to use the upstairs toilets and showers" to avoid the first-floor cameras. ECF 125 ¶ 7. Each version concedes a workable floor. Privacy methods "are compliant with the Prison Rape Elimination Act (PREA)" and ICE's sexual-abuse-prevention requirements; the East facility has shower curtains; and the West facility's configuration reflects documented security judgments about sightlines, self-harm, and contraband. Quevedo Decl. ¶ 13. Privacy consistent with safety is provided.

*Clothing and bedding (¶¶ 1(e)-(f)).* Paragraphs 1(e) and (f) require access to clean, sanitary, and temperature-appropriate clothing, mattresses, pillows, and blankets. ECF 104 at 2. The complaints—a shared basket, another detainee's hygiene, unwashed pillows, ECF 125 ¶¶ 8-9; ECF 123-6 ¶ 9, and outerwear and blankets said to be too thin for air-conditioned units, ECF 123-4 ¶¶ 8-9—do not show the service is unavailable: Laundry runs six days a week with same-day return, bedding is laundered on the same schedule, and each detainee is issued blankets, sheets, and a pillow at intake. ECF 113-2 ¶¶ 12-13. The order fixes no pillow-replacement interval. And the same account concedes three changes of clothing, washed "multiple times per week." ECF 120-2 ¶ 11. At intake each detainee receives three sets of clothing—replaced or exchanged on request—and two blankets, one wool and one cotton. Quevedo Decl. ¶ 15.

*Outdoor recreation (¶ 1(g)).* Paragraph 1(g) requires four hours of daily yard access "unless there are documented security risks or reasons necessitating otherwise." ECF 104 at 2. Current accounts report daily outdoor time—two hours, ECF 125 ¶ 10, and ninety minutes of large yard every third day, ECF 123-6 ¶ 10—and the one-hour reports are mid-stay. ECF 123-5 ¶¶ 5-6. The least-yard declarant goes rarely by choice, to avoid pat-downs. ECF 123-6 ¶ 10. The documented basis is current: The large yard reopened on August 17, 2026; a detainee attempted escape approximately a week ago by cutting the fence; security construction on the recreation areas is underway and "expected to be completed by next month"; and detainees currently receive two hours of large-yard time with the medium yard open through the day. Quevedo Decl. ¶¶ 16-17. A scheduling

dispute within a documented-security carve-out is not defiance.

*Visitation (¶ 1(h)).* Paragraph 1(h) permits time limits where visits "interfere with normal operation of the facility or visitation rooms reach capacity," and requires physical contact "absent a documented security risk." ECF 104 at 2. The glass-barrier accounts are July's. ECF 116-1 ¶¶ 33-35. The only current account confirms contact—"one hug at the beginning and end." ECF 125 ¶ 11. Visitation runs on a same-day, first-come schedule maintained by security level; physical contact is permitted within guards' sight for some security groups; and a contraband hand-off through visit contact was caught approximately two months ago. Quevedo Decl. ¶ 19.

*Headcounts (¶ 2).* Paragraph 2 permits two daytime counts (9:00 a.m.-8:00 p.m.), on an out-count basis absent documented security reasons, and two overnight counts conducted to minimize sleep intrusion. ECF 104 at 2-3. The only schedule of record lists six counts, ECF 123-6 ¶ 11—but its two daytime counts are exactly what the order permits, and Plaintiffs' July declaration itself identified two overnight counts, the permitted maximum. ECF 116-1 ¶ 38. Nor can the declarants agree on the number: "several," ECF 120-2 ¶ 14; five, ECF 123-4 ¶ 11; six, ECF 123-6 ¶ 11; "four or more," ECF 125 ¶ 12. The dispute is how, not how often: modality, the 6:00 a.m. count, and overnight lighting. ECF 125 ¶ 13. Delayed evening counts trace to chow-hall escorts. Appeal No. 26-4902, ECF 20.2 ¶ 19.

*Medical care.* Paragraph 4 addresses medical care and disability accommodations through a court-supervised Remedial Plan and the Medical Monitor's review. ECF 104 at 3-5. The accounts here are two individual grievances and a generality: an arrest-force complaint predating Adelanto, followed at the facility by a kite, a checkup, and medication, ECF 123-4 ¶¶ 12-13; a knee-scan kite, ECF 123-6 ¶ 12; and unit colds, ECF 123-4 ¶ 14. ODO found no Medical Care or Disability deficiencies. ECF 80-1 ¶¶ 13, 17. Systemic medical relief belongs to the Remedial Plan process—the very process the Application would short-circuit. And it is moving: Under the Remedial Plan, every arrival is triaged within eight hours, with medication continued on arrival. Quevedo Decl. ¶ 23.

*Administrative segregation (¶ 3)*. Paragraph 3 permits segregation on a documented security concern or the detainee's own request, with notice within 24 hours and a process to contest. ECF 104 at 3. The lone account is secondhand, anonymous, and three weeks old: a week's segregation after fermenting fruit—a contraband concern. ECF 120-2 ¶ 16. No declarant says the placement lacked notice, a documented basis, or review, and the policies "are compliant with the terms set forth in the order." ECF 113-2 ¶ 17. Current policy provides notice of the basis within 24 hours and a process to contest placement, accounting for the detainee's mental and physical health. Quevedo Decl. ¶ 22.

Read in sequence, Plaintiffs' own filings show movement, not stasis: July's "no privacy" became confirmed curtains; July's glass-barrier visit became hugs at each end; late July's larvae and hospitalization reports became complaints about taste; a month without the large yard became daily outdoor time. *Compare* ECF 116-1 ¶¶ 25, 28, 34 and ECF 120-1 ¶¶ 6-14, *with* ECF 125 ¶¶ 7, 10-11 and ECF 123-4 ¶ 3. Stale complaints followed by improvement are the opposite of an emergency. Provision by provision, Plaintiffs show issues capable of investigation and response—not the clear, facility-wide refusal their rhetoric assumes. Courts enforce injunctions according to their text, not according to the adjectives in an ex parte application.

**G. Generality impedes the compliance Plaintiffs demand**

The provision-by-provision disputes also expose the practical flaw in Plaintiffs' demand. The Government does not operate Adelanto. GEO owns, staffs, and runs it under contract, as this Court has recognized: "GEO Group is essentially the group managing the day-to-day operations of the Adelanto facility through the contract that it has with the Federal Government," ECF 68 (Hr'g Tr.) 5:12–15—and ICE personnel on site are "just mostly moving people, taking people to court, . . . but not making these day-to-day decisions." ECF 105 (Hr'g Tr.) 13:2–4. That arrangement is the ordinary one. *See Logue v. United States*, 412 U.S. 521, 529–30 (1973).

That structure defines the reasonable steps available to Defendants. The Ninth Circuit has said the Government remains "ultimately responsible for ensuring that the

conditions of confinement are constitutionally acceptable," Appeal No. 26-4902, ECF 22.1 at 2–3, but responsibility does not convert ICE into Adelanto's day-to-day operator. ICE identifies a concrete deficiency, invokes the contractual mechanism requiring GEO to investigate or correct it, ECF 80-4 at "Page 19 of 20" (QASP § 8(a): Contract Discrepancy Report with a response due date); ECF 80-7 at "Page 14 of 75" (PWS § II.C: duty of "full and complete cooperation" with any Government request or investigation), and verifies GEO's response, ECF 80-4 at "Page 16 of 20" through "Page 17 of 20" (production of policies, logs, and investigative files on the COR's request); ECF 80-1 ¶¶ 13-16 (a completed cycle: written notice, corrective action, verification). That sequence depends on particulars: which unit, which date, which dispenser, which meal, which count, which detainee. The Application supplies almost none. Its declarants are anonymous or initialed, their units mostly unstated, their accounts relayed by counsel; the J.A. declaration has been neither filed nor served. Defendants cannot direct GEO to remediate an unnamed dispenser, in an unidentified unit, on an unstated date.

And the record shows that ICE has used those levers: It holds regular ICE–GEO grievance meetings, requested records concerning the injunction allegations, and received A-files, telehealth records, and medical and detainee records. ECF 80-1 ¶¶ 13, 22–23. The contracting channel is active as well: The COR "has been in direct communication with GEO Group since the outset of the PI" and e-mailed GEO provision-by-provision notification. Pomplun Decl. ¶¶ 4-10. But those tools still require an allegation specific enough to investigate.

Plaintiffs have largely withheld particularity. Most declarants are anonymous or initialed; housing units go unstated; counsel summarizes reports from persons not named. The one identified declarant proves the rule: With ECF 125, Defendants can respond—not by operating the facility themselves, but through the machinery described above, supplemented by two further levers: ICE may order a tailored special report, ECF 80-7 at 65 (PWS § VII.G); and ICE has on-request access to detainee medical records, ECF 80-7 at 51 (PWS § VI.E.17-18). ICE's declarant AFOD Quevedo previously invoked exactly

that machinery here—she requested and reviewed GEO's records on these allegations. ECF 80-1 ¶¶ 22-23. That is how Defendants locate a unit's records, cause the assigned staff to be interviewed, and answer an account with evidence. The same is possible for every declarant if Plaintiffs identify them—under seal, if they want, as they do with M.F. in ECF 125. And the mechanism works when used. The Application abandons that workable mechanism for its demand for an overnight hearing.

## IV. CONCLUSION

Defendants respectfully request that the Court deny Plaintiffs' ex parte application.

Respectfully submitted,

Dated: August 28, 2026

TODD BLANCHE
Attorney General
BILAL A. ESSAYLI
First Assistant United States Attorney
DANIEL A. BECK
Assistant United States Attorney
Acting Chief, Civil Division
ALARICE M. MEDRANO
Assistant United States Attorney
Acting Chief, Complex and Defensive Litigation Section

*/s/ Pushkal Mishra*
PUSHKAL MISHRA
Special Assistant United States Attorney

Attorneys for Defendants

## CERTIFICATE OF COMPLIANCE WITH L.R. 11-6.2

The undersigned, counsel of record for Defendants, certifies that the memorandum of points and authorities contains approximately 6,983 words, which complies with the word limit of Local Rule 11-6.1.

Dated: August 28, 2026

*/s/ Pushkal Mishra*
PUSHKAL MISHRA