FILED
CLERK, U.S. DISTRICT COURT
OCT 1 2026
CENTRAL DISTRICT OF CALIFORNIA
BY: MG DEPUTY

**UNITED STATES DISTRICT COURT**

**FOR THE CENTRAL DISTRICT OF CALIFORNIA**

L.T., et al.,

Plaintiffs,

v.

U.S. IMMIGRATION AND CUSTOMS ENFORCEMENT, et al.

Defendants.

Case No. 5:26-cv-00322-SSS-SPx

**OCTOBER 1, 2026 STATUS REPORT OF THE COURT-APPOINTED CONDITIONS MONITOR**

# STATUS REPORT OF THE COURT-APPOINTED CONDITIONS MONITOR

**STATUS REPORT OF THE COURT-APPOINTED MONITOR Case:** L.T., et al v. U.S. Immigration and Customs Enforcement, et al
**Case No.:** 5:26 cv-00322-SSS-SP
**Court:** U.S. District Court for the Central District of California
**Reporting Period:** Sept 2-30, 2026
**Date Submitted:** September 29, 2026

This Status Report is submitted pursuant to the Court's Order dated August 3, 2026, appointing the Conditions Monitor to assess compliance with the Court's Preliminary Injunction. This report covers monitoring activities conducted between September 2nd and September 30, 2026.

**Introduction**

The Adelanto Processing and Detention Facility is located in Adelanto, CA, in a fairly remote location. The facility consists of 3 separate buildings; my authority is limited to evaluating and monitoring two of those buildings. The East and West buildings are the 2 structures under my purview. Adelanto is operated by the GEO Group, with oversight and case management of all detainees provided by ICE agents. There are approximately 60 ICE staff assigned to this site. The security staffing contract provides for 375 staff members across all three buildings. They are 100% staffed at the time of my initial assessment.

Although the title of the facility is a "Processing and Detention" center, the detainees that arrive at Adelanto have already been processed into ICE custody at satellite facilities before their transfer to Adelanto. On the day of my visit, the population for the facilities (all 3) was 1708 total, with 273 being females and 1435 male detainees. The facility processes approximately 500 detainees **into** the center and approximately 500 detainees **out** of the center per week.

I arrived at the facility unannounced, and the staff were very kind and cooperative but were unable to allow me access to the facility for about 45 minutes, as they had no "authority" from ICE to allow me in. I provided my government identification, and they ran a background check on me and waited for authorization to allow my entry. I was not allowed to take anything into the facility with me. The Warden and Associate Warden were very kind and cooperative with me throughout the entire visit, but it was difficult to complete the requirements of my visit without the necessary technology. They expressed that ICE makes the decisions on what can be brought into the facility, and they declined to allow me to bring in the camera that was previously agreed upon in the status conference on Sept 4th.

I submitted a data request to the representing attorneys and have received some responsive documents. I have submitted a second data request and have not received that information yet. I also asked the warden to take several photos for me to document my findings during the visit and

have not received any of the photos. The photos are important in this monitoring because it not only documents the areas of significant concern, it documents the areas of significant compliance.

**Findings:**

My priority in this assessment was the conditions of confinement, related sanitation, and potable water. Upon my arrival, I spent approximately 45 minutes in the main lobby where I could assess that the area was very clean. Approximately 15 people were waiting in the lobby.

I toured the West side first and visited 4 main units, each holding 4 pods of detainees who were assigned according to their classification levels. Each pod holds approximately 80 detainees.

Detainee classification levels are a system used by detention/correctional facilities to assess an individual's security risk, supervision needs, and housing placement. Classification is typically based on factors such as current charges, criminal history, behavior, escape risk, and special medical or mental health needs.

The Adelanto facility has 4 classification levels used to appropriately house its detainees:

- Minimum
- Medium Low
- Medium High
- High

Then I toured the East side of the facility that houses all classifications of women and the lower classification of men. There are 2 units on the East side: one unit with 4 pods for women and one unit with 3 pods for men.

The units in both East and West buildings are organized to house detainees by classification according to the physical plant of the facilities.

**Conditions Observed**:

1. **A. 24-hour access to clean potable drinking water**
   I had a clear cup with me on the tour, and I took water from every unit faucet, and at least one igloo available to detainees in both West and East buildings, and random faucets in the cells of detainees who wanted me to see their cells or water. I smelled and visualized the water through the clear cup, and I drank water from every pod. The water in the igloos was cold and clear. I opened the tops of the igloos and did not see any contamination or particles floating in the water. The igloos are located in each housing pod on the lower tier, typically adjacent to the water faucet or on one of the dining tables within the day halls where the cells are located. The Warden and GEO housing unit officers told me that the igloos are cleaned and filled at the beginning of every 8-hour shift, and detainees have unfettered access to the igloos 24/7, except during count times,

when they return to their cells for approximately an hour. The detainees also have access to the faucet in the day hall and the faucets in their cells.

The water from the faucets in the day halls and the cells was not "cold." It was room temperature, at best. The water was very aerated with bubbles. Warmer liquids commonly have aeration bubbles, and by simply deaerating by tapping the bottom of the cup or vibrating the cup gently on a surface, the aeration resolved and the water was clear. Many detainees watched this process with me and said that they thought the water was "dirty." The water was quite clear but still lukewarm. It was 104 degrees the day that I was there, and it's not uncommon for water left standing in water lines to be warm. The facility provides ice water in igloos in addition to the faucet water.

It is worth noting that I was approached by several detainees with various containers with water in them, who were saving them to show me that the water was "contaminated." They handed me containers which could be plastic beverage bottles or plastic food containers. Specifically, one bottle was handed to me and the detainee said the water was dirty and had a "foul smell." Upon inspection of the container and contents, I discovered that the water was being stored in an old Coke plastic bottle. It smelled like soda, and the inside of the lid was black with mold. I explained to the detainee that this bottle was not intended for water storage. Another detainee handed me another container that was labeled as a plastic storage container for "Folgers instant coffee." The contents had a slight hue of brown, and it clearly smelled like coffee. I explained to this detainee the same thing: the container is not intended for water storage and has residual coffee in it.

As I toured through the facility, every unit had multiple cells where detainees were storing water in various containers. I asked the detainees why they stored the water, and several told me that it was for the convenience of not having to go to the Igloos to retrieve water at night. Others told me that it was to store the water on the cold floor so warm water from the tap could be cooled.

While touring the kitchen in the West Building, I asked to see where the igloos are filled for each shift. I was taken to an area with four water faucets connected to a single water line. As I observed the water line, I noticed a filtration system installed beneath the sink through which the main water line flowed. The Warden informed me that this filtration system is used to filter the water used to fill the igloos.

The Warden explained that the current system is a "simple" filtration system that has been installed as a temporary measure until an NSF-certified filtration system can be implemented. According to the Warden, the facility has already prepared for a Sparkletts water cooler system that includes NSF-certified filters; however, ICE has not yet authorized the funding necessary to move forward with the installation. In the meantime, the facility is using this temporary filtration system exclusively for water used to fill the igloos on the West side only. The water cooler system would include one water cooler for each housing pod that provides filtered hot and cold water.

In the East building, I also asked to see where the Igloos are filled in the kitchen and was taken to a single water spigot; it was not on a filtration system.

I requested that the Warden provide photographs of the filtration system; however, I have not yet received any photos.

In researching Adelanto water quality reports, the last public report shows testing completed in April 2023. That report states that there were 3 contaminants in the City of Adelanto's water.[1] These three contaminants are considered "above health goals," but they still exceed the minimum requirements of the EPA. The remedy for all three contaminants, which is recommended for all community members of the City of Adelanto, is to filter household drinking water with NSF-certified filters 53 or 58. According to the Warden, the Sparkletts water cooler filtration system meets these NSF standards.

Appendix A has a detailed report of the exact locations I sampled/observed/tasted water and the outcomes of that assessment.

**B. Nutritious and sanitary meals contained a sufficient number of calories**

I have requested a master menu for the last 6 months as well as a report from the Dietician that works with GEO Corp. I received the menu, but it lacked the caloric values as well as a substitution report. I have resubmitted a request for the menus with caloric values as well as the substitution reports. A substitution report shows deviations from the prescribed menu that is approved by a registered dietitian. I have also requested the latest report from the dietitian.[2]

**C. Adequate sanitation throughout Adelanto ICE Processing Center East and West. At a minimum, Defendants must ensure that:**

1) **The facility is cleaned daily**

During my visit, the facilities were generally clean and well-kept. The sanitation habits of carceral settings can be very telling as to how they operate. The facility was not expecting me on the day that I visited, and my first impressions were a facility that is clean and without dirt or wax buildup in the corners of hallways or within the detainee living areas. The Warden shared that the officers are responsible for the cleaning of the bathrooms and showers in the common areas of the facility. The facility does not utilize a detainee work program at the direction of ICE. The day rooms were remarkably clean and without odors. The hallways were clean; walls were clean with minimal scuffs, floors were free of dirt or debris, and the floors were waxed. I personally saw the officer cleaning crews throughout the tour cleaning showers, hallways, and the intake area. I will continue to assess on future visits, as the area below is going to require me to return to reassess cleaning crew habits.

[1] https://www.tapwaterdata.com/ca/adelanto - City of Adelanto Water Quality Report

[2] I am told that the dietitian visited and submitted a report approximately 3 weeks before my visit

One area that I observed in the East building and asked the Warden to take photos for me was in Unit 2A upper left dorm – the air conditioning duct had cracks in it, and there was quite a bit of airborne debris blowing around the dorm. The detainees tell me that they feel someone is always getting a cold or sick because of the particles coming from the ducts. It is significant and does need to be remediated.

**2) <u>Soap and hygiene products are consistently available to detainees free of charge</u>**

Soap, toothpaste, shampoo, etc. were available in the podium drawers where the officers are in each day hall. I asked random detainees in each day hall how they get soap, toilet paper, or other hygiene products, and they all told me the same thing – they just ask the correctional officers for whatever they need, and they get it out of the podium, which is locked. I also asked the female detainees if they were provided personal hygiene products for menstruation, and they said they are provided sanitary pads anytime they need them.

**<u>3) Mold is identified, treated, and remediated at the facility</u>**

As I toured the West side of the facility, I observed mold in every General Population shower room. This would include Units 2,3,4 and 5 in the West building. Each Unit has 4 pods. In each pod are 7 shower stalls: 6 regular access and one ADA accessible shower stall. Every shower room in all pods of Units 2,3,4 and 5 of the West building has a large amount of mold growing throughout the shower room – not within the shower stalls. The non-ADA shower stalls are stainless steel inserts, and the officers clean them daily with scrub brushes (personally observed in more than one unit). The ADA stall is tiled.

The shower rooms exhibit recurring peeling paint. Facility staff reported that the response to mold concerns has generally involved applying Kilz and/or painting over affected surfaces, in some instances as frequently as monthly. This approach does not address the underlying condition and has not resulted in a sustained resolution of the problem. Addressing the ventilation is the only way to mitigate the mold problem.

Compounding the sanitation concerns in the showers, I discovered larvae on the floors of the shower room (again, not in the showers). These larvae were small, black, round in shape, and alive. I asked the warden to take a photo for me, and I have not received that photo to document this finding. The Warden told me that they have had these larvae, which were reported to be gnat larvae, exterminated before. I explained that without mitigating the humidity and plumbing issues in the shower rooms, extermination is not going to resolve this issue.

I visited the showers the first time in the afternoon after detainees had been showering all day, and the walls were soaking wet; the ceiling was dripping water, and paint was saturated and separating from the wall. The next day, I was

at the facility early before the detainees were up to use the showers, and the ceilings were still dripping water from showers the day before. You could see where the officers had scrubbed the moldy areas as part of the daily sanitation cleaning schedule, but the amount of humidity in those shower rooms only creates the perfect environment for aggressive mold growth.

The showers on the East side did not have any mold and appeared to have adequate ventilation. The area on the East that requires attention is the actual shower curtains. They are too big for the openings, and they are torn, dragging on the wet floor, and have developed mold and mildew and an odor. The shower curtains are all that need to be replaced, as the shower stalls appear to be well ventilated in the dorms.

**D. Adequate privacy to detainees when using the restroom or showering that is consistent with the safety needs of the facility**

Beginning with the showers in the **West** building. As previously detailed, they are stainless steel shower stalls that are inserted in a narrow room, 3 on each side of the room – directly across from each other and without any privacy barrier. This is not typical in any carceral setting. The showers in the East Building are much more private, with every shower having a shower curtain. The warden tells me that they have the shower curtains for the West side shower rooms but cannot install anything without the explicit authorization from ICE for a cost approval. **NOTE: The Warden shared with me that the showers (west building) all have privacy curtains now. 9/28/2026**

The toilets are very different. The cells in the West building are "wet cells," meaning that they all have toilets and sinks, so detainees can use the bathroom in their own cell and not in a common restroom. The toilets are part of "combo-units" where the toilet and sink are contained within the same stainless steel structure, with the plumbing secured within. Some of the cells have 2 detainees, and they go up to as many as 8 detainees. Therefore, up to 8 people use the same toilet in the cell without any privacy barrier. The detainees had developed their own barriers in many cells, which are constructed by modifying bed sheets and other materials. These are removed by security staff as they are not approved.

There is a compelling security rationale for prohibiting privacy barriers inside cells. Barriers can obstruct line of sight for staff members, create areas of concealment for contraband, and interfere with safety/security checks. Perhaps the biggest concern for establishing anything permanent in cells is the risk that is associated with suicide. However, with that being said – these cell structures offer some ability to maneuver makeshift and temporary 1/2 curtains that can be secured with Velcro. Of course, there will be some cells that cannot have even a temporary curtain within the cell because of the risk of the detainees that are assigned to those cells. But I believe that for the majority of the general population and especially the large 4,6 and 8-man cells, this is not unachievable.

In the **East** building, the housing is dorm-style with communal restrooms. There were curtains for all the toileting and showering areas, and nobody shared any privacy

concerns in my conversations with detainees. The female unit had multiple toilets in one room with a privacy curtain at the ends of the room.

**E. Access to clean, sanitary, and temperature-appropriate clothing**

I was not able to access the laundry room to talk with staff on this visit, but will make it there on the next visit. I went to intake and observed one of the "new detainee" intake packets. There were clothes, bedding, and hygiene products in every packet. I asked multiple detainees on both the East and West side if they had any issues with their clothing. The only complaint that detainees expressed was their air conditioning in their units was so cold that they needed additional sweatshirts and blankets. I asked detainees throughout my tour if they had issues with the clothing they received, and none of the detainees made any complaints.

**F. Access to clean, sanitary, and temperature-appropriate mattresses, pillows and blankets**

The detainees are issued a set of bedding that includes: 2 sheets, 1 pillowcase, and 1 blanket when they arrive at the facility. The Warden shared that the detainees can send their linen to be cleaned 6 days per week. I looked at several bunks on the West side and the East side, and I did not see any soiled or torn linens. The sheets are very thin. The detainees told me that they request additional blankets because their units are cold. I did see that there are bunks positioned directly under or adjacent to the vent ducts, and the air is quite cool.

The mattresses on the bunks are very thin, and many of them had cracks and holes in them on both the West and East sides. On the East side, there were some mattresses that were as thin as 2 inches. The majority of complaints that I received were about the mattresses. Numerous cells on the West side had 2 and some as many as 3 mattresses on their bunks.

**G. Access to outdoor recreation spaces that must include individual access to the yard (i.e., not the "mini-yard") for atleast four hours per day, seven days per week, unless there are documented security risks or reasons necessitating otherwise.**

**West** – The west side detainees are receiving 6 hours per day, 7 days per week, of outdoor recreation in the "mini yards." They receive 1 hour per day, 5 days per week, of the outside field yard or "Big Yard." The warden tells me that they are working on a plan to allow more time on the big yard. The requirements of the injunction would require combining pods and units in the big yard, and they are mitigating custody issues to ensure the process is done safely.

**East** – The East side detainees are receiving 1 ½ to 3 hours per day, 5 days per week of the outdoor courtyards. They receive 2 hours per day, 3 days per week of the Big yard. The warden is working on a recreation plan with his staff to meet the requirements of the injunction.

**H. Visits during the facility's business hours. Visits must not be subject to time limits unless such visits interfere with normal operation of the facility or visitation rooms reach capacity. Detained individuals and their families must be allowed to use the restroom during visits without the visit being subject to automatic cancellation. Physical contact (e.g., hugging, holding hands, etc.) must be allowed during visitation absent a documented security risk justifying otherwise.**

I was not able to observe the visitation room on my site visit. However, I received visitation logs for the last 90 days prior to my visit. After analyzing the logs, I determined that visitation is offered 7 days per week. The schedule articulates that visitation is *available* from 8 am to 6 pm, 7 days per week. However, the visitation log shows that they very rarely begin at 8 am. The majority of the entries show that visitors arrive, check in, and wait as much as an hour, routinely, for visiting to start in the morning. The visitation log shows many discrepancies and consistently shows that visitation does not start at the scheduled times. Many visitors wait as much as 3 hours for a visit, and there are periods of 1 hour that show the visiting room is empty while there are visitors waiting in the lobby.

**West** – The detainees in the west building housing units have scheduled days for visitation. One unit (1A) has visiting scheduled 4 days per week. The intervals vary from 3 hours of non-contact visits 3 days per week and one 6-hour interval of contact visits one day per week. This is a General Population (GP) unit that houses transgender individuals and sex offenders. Their visitation days are segregated from other GP units due to their classification designation as transgender or sex offenders. I have not seen this practice in other facilities.
The segregation units (1B) have 2 days per week of visitation for a period of 2 hours each time. I have not seen the visiting area yet, so I am not sure if there are enough non-contact visiting booths to accommodate the number of detainees in the segregation units, which was 29 at my visit.
All other GP units have 6 hours of visitation, 3 days per week.

The visitation policy allows for a brief kiss and hug at the beginning and end of the visits. This is common practice in visitation policy. But it specifically states that there will be no physical touching between the detainee and adult visitors. It's very common to allow visitors to hold hands above the visiting table when they are in contact visits. If this is allowed, it would meet the requirements of the injunction.

The visitation policy states that a detainee is taken back to their cell if they need to use the restroom and that visitors have to use the restroom in the lobby. It does not specify that a visit be terminated because someone has to use the bathroom. However, there is a restroom in the visiting area that the policy specifically prohibits visitors from using. Again, I have not observed visitation yet, but I would expect that a visitor be allowed to use the restroom in visiting if it is available. Good security practices and searches would prevent the passing of contraband through the bathrooms.

The Warden and I discussed the nationwide contraband introduction challenges, and I offered some remedies to consider that would allow for more privileges in their visitation process.

**East** – The detainees in the East building have a visitation schedule that is available 7 days per week, with each unit on a rotating schedule.
Units 1&2, which are GP, men and women, have 3 visiting days allotted with 3-hour intervals each day.
The segregation unit has 2 days of visitation for those assigned to Administrative Segregation: 4 hours one day and 2 hours another day. Disciplinary segregation has visitation allotted for 4 hours both days.
I will review the visiting area on my next site visit and observe the process.

**2. Headcounts: Defendants must ensure headcounts are conducted in a manner and at times that minimize disruption to the operation of the facility.**

**a. 9:00A.M. to 8:00 P.M.: Absent a documented security risk or reasons necessitating otherwise, headcounts conducted between 9:00 A.M. and 8:00 P.M. must be performed on an out-count basis. Out-count basis is defined as a headcount that occurs while detainees are temporarily outside their assigned housing or units. No more than two headcounts may occur between 9:00 A.M. and 8:00 P.M.**

The detainee count process is one of the most critical security functions within a detention facility. To ensure an accurate, timely, and verifiable count, all detainees are required to return to their assigned cells at count time and remain there until the count has been completed and officially cleared. Unlike many detention facilities, Adelanto allows doors in General Population to remain unlocked 24 hours per day except for count times. It's unusual to see the doors unlocked during hours of sleep, but this allows the detainees to leave their cells and go to the water Igloos in the day hall or sit at the tables in the day hall. This is commendable.

Allowing detainees to congregate in day halls during count creates security risks and increases the potential for count inaccuracies, delays, and confusion regarding detainee accountability. Temporarily restricting detainees to their assigned cells enables staff to positively identify each individual, confirm housing assignments, and promptly detect any discrepancies. This process enhances institutional safety and supports the facility's responsibility to maintain continuous accountability of every detainee in custody. Returning to assigned cells from within the day halls at count time is not merely a procedural expectation; it is a fundamental security requirement that protects staff, detainees, and the integrity of facility operations. Failure to follow count procedures can compromise security, disrupt operations, and delay completion of one of the facility's most important accountability functions. Adelanto experienced 3 escape attempts in a 4-month timeframe. Counting detainees contributes to ensuring that all are accounted for.

The facility is currently conducting 6 counts per 24-hour period. There are 2 types of counts: formal and informal. The formal count is conducted once per 24-hour period at Adelanto, and that is at 6:30 pm. This requires all detainees to go back to their cell, where

they are physically counted by a "name and face" count, and their facility ID is compared to their face for an official count. The other 5 count times per day are informal counts where detainees are sent back to their cells for a "body count," where the detention officer verifies how many bodies are in each cell and then compares that number to the unit and pod assignment sheet. This can be accomplished by simply walking through the pods and counting the detainees in each cell.

Typically, there would be 4-5 counts in 24 hours for a detention facility with 1 to 2 formal counts. The facility has not changed its count process according to the injunction. However, the warden shared that the informal counts allow for out-counts, and they are making minimal disruptions during hours of sleep. I was present for 2 count times. The detainees who are present in the pods at count time are sent back to their cells for count and then immediately released back into the pods once count clears. They did have detainees who were out-counted in visiting, medical, or other areas of the facility. There is a large span of time (8 hours) between the 2 day counts. I typically see 2-3 counts during the daytime hours and 2 during hours of sleep.
Adelanto has 2 day counts and 4 counts during hours of sleep.

**b. 8:01 P.M. to 8:59 A.M. : Headcounts conducted between 8:01 A.M. to 8:59 P.M. must be performed in a manner designed to minimize intrusion on the detainees while they are sleeping. No more than two headcounts can occur between 8:01 P.M. to 8:59 A.M.**
Between the hours of 8:01 PM and 8:59 AM, there are currently 4 counts, with none of them being a formal count. I will watch video of the night counts at my next visit to observe the process and times during hours of sleep.

**3. Administrative Segregation: Defendants are enjoined from isolating detainees in the Special Housing Unit, Special Management Unit, or administrative segregation absent 1) a documented security concern that threatens the safety and/or security of the facility or staff, or 2) a request from a detainee to be placed in administrative segregation. If a detainee is placed in administrative segregation, that detainee must be given notice of 1) the reasons why they have been placed in administrative segregation within 24 hours of placement, and 2) the process by which they can contest such placement.**

**Any segregation must account for the detainee's mental and physical health and evaluate whether segregated housing is likely to worsen their health. If segregation is likely to worsen a detainee's mental or physical health, alternative remedies must be considered, and segregated housing should only be used if absolutely necessary.**

I visited the designated "Special Management Unit" that includes all detainees on Disciplinary and administrative segregation sanctions. I also received some data that I had requested regarding sanctions to the SMU. Although the information that I received was incomplete and required me to submit another request, which I have not received yet, I made some observations and reviewed files while I was in the SMU.

The SMU was housing 29 detainees the day that I was there. 20 were housed under disciplinary or administrative sanctions for rule violations, and 9 were in protective custody (PC). I toured the first tier, and all detainees were identified on the outside of their doors with their intake date and their anticipated release date.

I asked for three files of detainees: one was an attempted escape, one was an assault on a staff member, and one was a PC detainee. I reviewed all 3 files and found the investigation documentation to be adequate for identifying **a documented security concern that threatens the safety and/or security of the facility or staff** for the escape attempt and the staff assault. I found the PC file to adequately contain appropriate documentation for **a request from a detainee to be placed in administrative segregation.**

For the two detainees that were housed for escape attempt and assault on staff, I found the Notice of Charges present in both files that explains to the detainee why they are being housed in the SMU, as well as the process for appealing the decision to sanction them to the SMU. All were presented within 24 hours of their admission to segregation. Also present in the files is weekly documentation of reviews that are conducted by multi-disciplinary teams (MDT) that include administration, SMU staff, ICE personnel, mental health, and other staff as indicated. The weekly review and Notice of Charges have allocated space for mental health referrals to be noted.

The Warden explained that the MDT meets weekly on all detainees housed in the SMU to determine if further segregation is warranted based on behavior. I spoke separately with the SMU correctional officer and the sergeant, and they explained the process of serving Notice of Charges and the information discussed in the MDT meetings. The staff and Warden told me that if a detainee with mental health needs is brought to the SMU, mental health will come and visit with the detainee and can bring them out of the unit, if requested. At the time of my visit, it was reported that there were no detainees housed in SMU with mental health needs. But they also told me that *there is no alternative location* to house those with mental health needs other than within the SMU.

The unit was clean and without odors. The officers provide cold drinking water to the detainees upon request from the Igloos in the unit. I checked the water igloos but did not go inside the cells in the SMU to check the tap water in the cells.

The data that I received for the SMU shows that the average length of stay for those in Administrative Segregation is 50 days, and for those in disciplinary segregation is 13 days. In the last 6 months, the aggregate data showed that there were 120 placements in disciplinary segregation with sanctions for 30 days or less. However, this data did not show me whether that was 120 different <u>detainees</u> or whether there were multiple placements of detainees. I have requested that data and have not received it yet. It also showed me that there were 24 detainees sanctioned to more than 30 days but less than 60 days in disciplinary. Also, awaiting the more granular data to review those placements.

The data indicated that 170 disciplinary hearings were conducted during the same period in which the sanctions identified above were imposed. Of those hearings, 144 resulted in placement in the Special Management Unit (SMU), reflecting an 84.7% guilty findings rate.

The data further showed that the average daily SMU population between May 1, 2026, and September 1, 2026, was 27 detainees. This figure includes detainees housed in Protective Custody (PC) status.

The SMU is located within the West Building, which has a design and operational capacity of 1,280 beds. Based on an average daily SMU population of 27 detainees, the SMU housed approximately 2.1% of the facility's total design capacity on any given day during the review period.

While 144 disciplinary sanctions resulted in SMU placement during the reporting period, the average daily SMU census remained comparatively low at 27 detainees. This suggests that many disciplinary placements were either of short duration, staggered throughout the review period, or offset by detainees exiting the SMU, resulting in a relatively stable and limited daily SMU population. I will be able to identify the specific pattern represented in the data once I receive the next dataset.

**4.b., Disability Accommodations: The remedial plan must also specify policies, procedures, staffing, and required training to ensure the following:**

**i. A system to identify and track all detainees who have qualifying disabilities, as defined by section 504 of the Rehabilitation Act and its implementing regulations, upon intake and throughout the period of detention;**

**ii. A system for identifying and tracking reasonable accommodations necessary for detainees with qualifying disabilities to participate in programs, services, and activities for the facility; and**

**iii. Disabled detainees are provided reasonable accommodations; and**

**iv. Provision of disability-specific materials, translate as appropriate, for all detainees that inform them of their right to reasonable accommodations and procedures to request reasonable accommodation.**

I requested documentation showing that there is a process by which detainees may 1) submit an accommodation request, 2) the disposition of those accommodation requests, and 3) proof of practice that this designation is communicated to the security, education, program, and administrative staff of the facility. All 3 of these tasks would establish a foundation for a compliant process for administering disability accommodations.

I received a list of detainees that have received assistive devices for a variety of reasons, which are not all inclusive of ADA disabilities. Example – patient on line 9 of the "ADA – Disability List" that I was provided shows "Disability/DX" as "Injury: Twisted right ankle. Pain in right ankle/joints (Temp)." This is not a qualifying ADA diagnosis. This is documentation that this detainee was issued crutches for a twisted ankle in July of 2026. It appears on the spreadsheet as an assistive device that is permanent. ADA tracking of accommodations goes far beyond a list of detainees with assistive devices and lower

bunk assignments. I did not receive any proof of communication for requesting accommodations, declaring an ADA disability, approval or denial of requests or dispositions of accommodations, or a mechanism to communicate accommodations to staff. There also is no tracking of Disability detainees and access to programs, services, or activities with accommodations.
Furthermore, the Detainee Handbook, dated August 19, 2026, does not contain any information regarding requests for accommodation or compliance with Section 504 of the Rehabilitation Act in making all services, programs, and activities available to all detainees, regardless of disability.

Section 504 of the Rehabilitation Act is very precise in its requirements.

From a correctional health and operations compliance perspective, common indicators of Section 504 compliance include:

- Formal disability accommodation policies.
- Tracking systems for accommodation requests.
    - This includes approvals and denials for accommodations
- Documentation of disability assessments.
- Accessible housing inventories.
- Interpreter and auxiliary-aid services.
- Staff training regarding disability rights.
- Monitoring and quality assurance for accommodation implementation.

I was informed that there is a clinical person assigned to "ADA," and there is a part-time GEO employee assigned to "ADA" who the facility has requested be funded to a full-time position. However, when I reviewed the Handbook for the facility, no section explains to detainees how to request an accommodation for a disability; there is no description articulated anywhere of what a qualifying disability is, and I did not find any signage throughout the facility that articulates how to request disability accommodations.[3]

According to the Performance Based National Detention Standards, 2025 edition:
"For purposes of these detention standards, the term "disability" means either of the below:

> a. A physical or mental impairment that substantially limits one or more of an individual's major life activities; or
> b. A record of such a physical or mental impairment. "Major life activities" are basic activities that a detainee without a disability in the general population can perform with little or no difficulty, including, but not limited to, caring for oneself, performing manual tasks, seeing, hearing, eating, sleeping, walking, standing, lifting, bending, speaking, breathing, learning, reading, concentrating, thinking, communicating, and working. A major life activity can also include the operation of major bodily functions, like the immune, endocrine, and neurological

[3] Required by the PBNDS, Section 4.7, page 145, and the Judges' Injunction, Section 4 (b) (iv)

systems; normal cell growth; digestion, respiration, and circulation; and the operations of the bowel, bladder, and brain."[4]

Disability specific materials that would show compliance with a comprehensive Disability Accommodation Program within a carceral setting include:

**Individuals Who Are Blind or Have Low Vision**
**Required Materials**

- Detainee handbook in:
  - Braille
  - Large print
  - Accessible electronic format
  - Audio format
- Tactile signage
- Accessible kiosks
- Audible emergency alerts

**Individuals Who Are Deaf or Hard of Hearing**
**Required Materials**

- Captioned orientation videos
- Medical education videos
- Qualified ASL interpreters
- Video Remote Interpreting (VRI)
- TTY/TDD access
- Captioned telephones
- Pocket talkers/amplification devices

The Department of Justice specifically identifies communication assistance and guidance for individuals who are deaf or hard of hearing as an ADA requirement.[5]

**Individuals With Mobility Disabilities**
**Required Materials**

- Accessible housing assignment procedures
- Medical accommodation requests
- Evacuation procedures
- Program access requests

Facility accessibility and barrier removal are core ADA requirements[6]

**Individuals With Intellectual or Developmental Disabilities**
**Required Materials**

- Easy-read detainee handbook
- Simplified grievance forms
- Visual instruction sheets

---

[4] Performance Based National Detention Standards Section 4.7, page 137
[5] Reference: ada.gov
[6] Reference: ada.gov, adachecklist.org

- Pictorial schedules
- Simplified disciplinary notices

**Individuals With Learning Disabilities**
**Required Materials**
- Plain-language documents
- Audio learning materials
- Reading assistance resources
- Modified educational materials

**Individuals With Serious Mental Illness or Psychiatric Disabilities**
**Required Materials**
- Easy-to-understand orientation information
- Program participation materials – such as workbooks, etc

**Individuals With Speech Disabilities**
**Required Materials**
- Alternative communication boards
- Writing tablets
- Electronic communication devices
- Picture-based communication systems
- Alternative communication plan

**Facility-Wide ADA Materials**

Every detention facility should maintain:

**Policies**

ADA Program Policy
- Reasonable Accommodation Process
- Auxiliary Aids and Services Process
- Disability Identification Process
- Accessible Housing Process
- Disability Grievance Process
- Emergency Evacuation Process

**Forms within the ADA Policy**
- ADA Accommodation Request Form
- ADA Appeal Form
- ADA Grievance Form
- Interpreter Request Form
- Medical Accommodation Request Form
- Auxiliary Aid Request Form

**Tracking Logs**
- ADA accommodation log
- Auxiliary aid log

- Interpreter utilization log
- Accessible housing roster detailing locations of all ADA-compliant cells and occupancy
- Disability grievance tracker
- Program denial tracker

**Staff training should include:**

- Disability awareness
- Effective communication
- ADA housing requirements
- Reasonable accommodations
- Emergency evacuation of persons with disabilities
- Healthcare accommodation requirements
- Documentation standards

These documents create a comprehensive ADA compliance framework that aligns operational, custody/security, and healthcare functions to ensure disability requests for accommodations are accessible.
I have requested the ADA policy and additional data points, which I have not received yet. I also completed the electronic health record (EHR) training so that I can review specific medical assessment notes for those detainees listed on the "ADA-Disability List."

**Summary and preliminary recommendations:**
At the time of the assessment, the facility was generally clean and well maintained. Staffing was at 100% of the required level, and staff appeared diligent in maintaining cleanliness throughout the assessed area.
I met with detainees in the day halls of every unit that I visited. I also visited individual cells if they had anything they wanted to show me. The detainees had some legitimate concerns that the Warden immediately communicated to supervisors or maintenance to address.

During the site visit, it was evident that ICE maintains a substantial operational presence within the facility, with approximately 60 ICE personnel assigned on-site. This level of involvement appears to contribute significantly to decision-making processes. Additionally, several facility documents, including the detainee handbook, reflect joint endorsement through co-signatures by ICE personnel. The debriefing that I conducted with the Warden at the end of my visit included 3 ICE employees who are assigned to Adelanto.

The observations presented in this report are more extensive in certain areas due to the need to assess and document detainees' access to drinking water and the adequacy of sanitary living conditions. As monitoring activities continue, future reports will encompass a broader evaluation of all conditions of confinement and provide more comprehensive analysis, findings, and recommendations.

I have included a quick reference dashboard as Exhibit B to show my notes and current compliance with each measure of the injunction after each visit. I will include it with my monthly status reports.

The preliminary recommendations that follow identify opportunities to establish and strengthen practices and address specific conditions observed during the assessment.

**Recommendation #1**: Continue to provide the iced water igloos in all units and pods in all buildings.
**Recommendation #2**: Implement the installation of the Sparklett water tanks in all units and pods as soon as possible to mitigate the PFOS/PFAS contamination.
**Recommendation #3:** Clean the ducts in the housing area of the East building and repair the ducts that are leaking
**Recommendation #4:** Implement a ventilation mechanism to mitigate the invasive mold in all showers in the West building
**Recommendation #5:** Develop and implement a security-approved and safe, quick-release (ex: Velcro) privacy barrier around toilets in cells within GP, beginning with those cells with more than 2 occupants
**Recommendation #6:** Replace all thin, cracked, and worn mattresses with new mattresses
**Recommendation #7:** Complete a plan to establish a facility schedule for all detainees to receive outdoor recreation in the big yard 4 hrs per day, 7 days per week.
**Recommendation #8:** Begin visitation at 0800, per the facility schedule and the public notice for families
**Recommendation #9:** Refine the visitation policy to allow for physical contact above the table with adult visitors
**Recommendation #10:** Refine the count policy to meet the injunction and decrease the number of nighttime counts
**Recommendation #11:** Establish an alternative to segregation for detainees with mental or physical health disorders
**Recommendation #12: Refine the Remedial Plan for Disability Accommodations to include:** Establishing a policy for disability identification, assessment, and accommodation consistent with Section 504 of the Rehabilitation Act and PBNDS Section 4.7
**Recommendation #12.1:** Establish a process for detainees to request accommodations and participate in an interactive process that shares dispositions of the request and initiates tracking of all requests and accommodations.
**Recommendation #12.2:** Post signage and update the detainee handbook to represent the process by which detainees can request accommodations for disability

This concludes my initial assessment and status report. As monitoring progresses, I will continue to evaluate all areas within the scope of the injunctions and will provide detailed analyses, findings, and recommendations to facilitate sustained compliance and continuous improvement.

Respectfully,

Kellie R. Wasko

Kellie R. Wasko
Conditions Monitor
Adelanto Processing and Detention Center

Appendix A - Water conditions assessment report by unit
Appendix B - Quick Reference Compliance Dashboard

Appendix A

Adelanto Processing and Detention Center
Site Visit: September 8, 2026

| Location | Custody level | Igloo | Observation | Faucet Day Hall | Observation | Cell # | Observation |
|---|---|---|---|---|---|---|---|
| 5A West | Min/Med Low | 2 | Clean with clear iced water | 1 | Clean/Warm and aerated | none | none |
| 5B West | Min/Med Low | 2 | Clean with clear iced water | 1 | Clean/Warm and aerated | B108 | Clean/warm/aerated |
| 5B West | Min/Med Low | | | | | B102 | Clean/warm/aerated |
| 5B West | Min/Med Low | | | | | B210 | Clean/warm/aerated |
| 5C West | Min/Med Low | 2 | Clean with clear iced water | 1 | Clean/Warm and aerated | C107 | Clean/warm/aerated |
| 5C West | Min/Med Low | | | | | C108 | Clean/warm/aerated |
| 5D West | Min/Med Low | 2 | Clean with clear iced water | 1 | Clean/Warm and aerated | D107 | Clean/warm/aerated |
| 5D West | Min/Med Low | | | | | D108 | Clean/warm/aerated |
| 5D West | Min/Med Low | | | | | D201 | Clean/warm/aerated |
| 4A West | High/Med High | 2 | Clean with clear iced water | 1 | Clean/Warm and aerated | A105 | Clean/warm/aerated |
| 4A West | High/Med High | | | | | A108 | Clean/warm/aerated |
| 4B West | High/Med High | 2 | Clean with clear iced water | 1 | Clean/Warm and aerated | B106 | Clean/warm/aerated |
| 4B West | High/Med High | | | | | B108 | Clean/warm/aerated |
| 4C West | High/Med High | 2 | Clean with clear iced water | 1 | Clean/Warm and aerated | C206 | Clean/warm/aerated |

Adelanto Processing and Detention Center
Site Visit: September 8, 2026

| Location | Custody level | Igloo | Observation | Faucet Day Hall | Observation | Cell # | Observation |
|---|---|---|---|---|---|---|---|
| 4C West | High/Med High | | | | | C105 | None recorded |
| 4D West | High/Med High | 1full 1 Empty | Clean with clear iced water | 1 | Clean/Warm and aerated | D102 | Clean/Warm/aerated |
| 3A West | High/Med High | 2 | Clean with clear iced water | 1 | Clean/Warm and aerated | A105 | Clean/Warm/aerated |
| 3A West | High/High Med | | | | | A107 | Clean/Warm/aerated |
| 3B West | High/Med High | 1full 1 Empty | Clean with clear iced water | 1 | Clean/Warm and aerated | B101 | Clean/Warm/aerated |
| 3B West | High/Med High | | | | | B105 | Clean/Warm/aerated |
| 3C West | High/Med High | 2 | Clean with clear iced water | 1 | Clean/Warm and aerated | C101 | Clean/Warm/aerated |
| 3D West | High/Med High | 2 | Clean with clear iced water | 1 | Clean/Warm and aerated | D108 | Clean/Warm/Aerated |
| 2A West | High/Med High | 2 | Clean with clear iced water | 1 | Clean/Warm and aerated | A103 | Clean/Warm/Aerated |
| 2A West | High/Med High | | | | | A104 | Clean/Warm/Aerated |
| 2B West | High/Med High | 2 | Clean with clear iced water | 2 | Clean/Warm and aerated | B209 | Clean/Warm/Aerated |
| 2B West | High/Med High | | | | | B205 | Clean/Warm/Aerated |

2

Adelanto Processing and Detention Center
Site Visit: September 8, 2026

| Location | Custody level | Igloo | Observation | Faucet Day Hall | Observation | Cell # | Observation |
|---|---|---|---|---|---|---|---|
| 2C West | High/Med High | 2 | Clean with clear iced water | 1 | Clean/Warm and aerated | C106 | Clean/Warm/Aerated |
| 2C West | High/Med High | | | | | C203 | Clean/Warm/Aerated |
| 2D West | High/High Med | 2 | Clean with clear iced water | 1 | Clean/Warm and aerated | D108 | Clean/Warm/Aerated |
| 1A West | Mixed Class | 2 | Clean with clear iced water | 1 | Clean/Warm and aerated | A107 | Clean/Warm/Aerated |
| 1A West | Mixed Class | | | | | A112 | Clean/Warm/Aerated |
| 1B West | SMU | 2 | Clean with iced water | None | NA | NA | NA |
| Kitchen | NA | | 4 Igloo filling stations with a filter on the main water line | NA | NA | NA | NA |
| 1A East | Low/Med Low | 2 | Clean with iced water | 2 | Clean/Cool/Aerated | Dorm | NA |
| 1B East | Women's mixed class | 2 | Clean with iced water | 2 | Clean/Cool/Aerated | Dorm and SMU | NA |
| 1C East | High/Med High | 2 | Clean with iced water | 1 | Clean/Cool/Aerated | Dorm | NA |
| 1D East | Med/Low Med | 2 | Clean with Iced water | 1 | Clean/Cool/Aerated | Dorm | NA |
| 2A East | Low/Low Med (Men) | 2 | Clean with Iced water | 1 | Clean/Cool/Aerated | Dorm | NA |

3

Adelanto Processing and Detention Center
Site Visit: September 8, 2026

| Location | Custody level | Igloo | Observation | Faucet Day Hall | Observation | Cell # | Observation |
|---|---|---|---|---|---|---|---|
| 2B East | Low/Low Med | 2 | Clean with iced water | 2 | Clean/Cool/aerated | Dorms | NA |
| 2C East | Low/Low Med | 2 | Clean with Iced Water | 2 | Clean/Cool/Aerated | Dorms | NA |

Appendix B

# Adelanto Processing Center
# Conditions Dashboard

| Injunction Category | Compliance Level | Color Code | Notes |
|---|---|---|---|
| **24 hr access to clean, potable water** | Partial-compliance | | Water in select cells and every day hall faucet was observed to be clear or aerated and without odor or foul taste. Water from cold spigots never reached a "cold" temperature. Lukewarm at best. Additionally, every day hall has 2 Large igloos with filtered ice water that was clear and without foul odor or taste. Water Quality reports indicate all Adelanto water users should filter household drinking water with NSF filters 53/58. GEO has a Sparklett water cooler installation pending Govt approval. |
| **Nutritious and sanitary meals that contain a sufficient number of calories** | Non-compliant | | Unable to assess without master menus and narrative summary from visiting dietician. |
| **Facility is cleaned daily** | Partial-compliance | | The facility was very clean. Walls, ceiling tiles, floors, corners, windows, and cells were clean, with staff assigned to facility sanitation responsibilities daily. The ventilation system was very dirty, and apparent cracks in the ductwork allowed lint and dirt to leak into the room and become airborne. This was evident for both west and east facilities. |
| **Soap and hygiene products available free of charge** | Compliant | | Soap and hygiene products were provided in the new intake packages as well as at each officer's podium in the units. Offenders told me they had no obstruction to obtaining whatever they needed from the officers. |
| **Mold is identified, treated, and remediated** | Non-compliant | | Mold in the shower rooms on the west side is very bad and very prevalent. The staff cleans the shower rooms daily, |

| | | | |
|---|---|---|---|
| | | | but the moisture is not mitigated and therefore does not dry out. Mitigation is necessary to remedy. |
| **Adequate privacy when using the bathroom or showering** | Partial-compliance | | Showers on the west side have open bay shower stalls, and the privacy issue for the showers was corrected by installing shower curtains (**updated 9/28/2026**. Detainees have makeshift privacy curtains in their cells that need to be considered for alternative barriers for privacy but also with safety in mind. Especially for the 4, 6 and 8 man cells. |
| **Access to clean, sanitary, temperature-appropriate clothing** | Partial Compliance | | Detainees reported that their cells are cold from the AC and they ask for additional blankets or sweatshirts so they aren't cold at night. This was true for both the east and west sides of the facility, inthe male and female housing areas. |
| **Access to clean, sanitary, and temperature-appropriate mattresses, pillows, and blankets** | Non-Compliant | | The mattresses throughoutboth the East and West buildings are worn, cracked, and very thin. They must be replaced. |
| **Access to outdoor recreation4hrs/day/7d/wk** | Non-Compliant | | West side offers 6 hours to the small yard and 1 hour/6 days/wk to the large yard. Warden is working on a plan to meet the injunction. |
| **Visiting during business hours** | Non-Compliant | | Visitation is offered by assigned unit days. The facility continues working on a possible plan for visitation expansion. Visiting consistently doesn't start at the times that are listed on the visitation schedule. There are times in the visiting logs that the visiting room appears empty during visiting hours. |
| **Count times and out counts** | Non-Compliant | | 0630, 1030, **1830**, 2300, 0100, 0300<br>1 formal standing count and 5 informal counts, with 4 of them during hours of sleep. |
| **Administrative segregation: documented security concern** | Compliant | | For those detainees housed in the RH unit at the time of the site visit, all had a documented rationale for security concerns |

| | | | |
|---|---|---|---|
| **Administrative segregation: request for placement (PC)** | Compliant | | 9 PC placements were housed in RH, and all had documented requests for PC. The detainee signed the placement order for RH that states PC. |
| **Administrative segregation: Notice of charges within 24 hours** | Compliant | | All disciplinary placements had thorough, signed notices of charges in their files with subsequent weekly multi-disciplinary review forms. |
| **Administrative segregation: Appeal process explained to detainee** | Compliant | | 3 ways the appeals process is explained to detainees – in the disciplinary packet, read to them in the disciplinary hearing, and then also in the detainee handbook. |
| **Disability Accommodations: Identify and track all detainees with qualifying disabilities** | Non-Compliant | | There is not a tracking process for detainees with reported or diagnosed disabilities. The ADA Coordinator needs to establish a process for requesting accommodations and tracking disability accommodations |
| **Disability Accommodations: ID and track those with qualifying disabilities to participate in programs, services, and activities** | Non-Compliant | | There is not a tracking process for those detainees with qualifying disabilities who participate in programs, services or activities at the facility. |
| **Disability Accommodations: Disabled detainees are provided reasonable accommodations** | Non-Compliant | | There is not a meaningful process for a detainee to request accommodations through the facility |
| **Disability Accommodations: Disability specific materials, translated as appropriate, for all detainees that inform them of their right to reasonable accommodations** | Non-Compliant | | There are no identifiable disability specific materials available through signage or the Detainee Handbook for Adelanto that explain how to request disability accommodations. |