TODD BLANCHE
Attorney General
BILAL A. ESSAYLI
First Assistant United States Attorney
DANIEL A. BECK
Assistant United States Attorney
Chief, Civil Division
ALARICE M. MEDRANO
Assistant United States Attorney
Chief, Complex and Defensive Litigation Section
PUSHKAL MISHRA (Cal. Bar No. 298695)
Assistant United States Attorney
CHRISTOPHER M. BUTLER (Cal. Bar No. 318219)
Assistant United States Attorney
Federal Building, Suite 7516
300 North Los Angeles Street
Los Angeles, California 90012
Telephone: (714) 338-3503
E-mail: christopher.butler2@usdoj.gov

Attorneys for Defendants

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| L.T., *et al.*,<br><br>Plaintiffs,<br><br>v.<br><br>U.S. IMMIGRATION AND CUSTOMS ENFORCEMENT (ICE), *et al.*,<br><br>Defendants. | No. 5:26-cv-00322-SSS-SP<br><br>**DEFENDANTS' OPPOSITION TO PLAINTIFFS' RENEWED MOTION TO ENFORCE THE FIRST AMENDED PRELIMINARY INJUNCTION (ECF 200)**<br><br>[Declaration of Rosa Quevedo filed concurrently]<br><br>Honorable Sunshine Suzanne Sykes<br>United States District Judge |

# TABLE OF CONTENTS


DESCRIPTION — PAGE

I. INTRODUCTION .......... 1

II. BACKGROUND .......... 2

A. The Injunction's Terms, Their Qualifications, and the Monitors' Charge .......... 2

B. Adelanto Is Operated by GEO Under a Federal Contract, and Plaintiffs Chose Not to Sue GEO .......... 2

C. ICE's Compliance Steps Since the Injunction .......... 3

D. The Monitor's First Report .......... 4

E. Plaintiffs' Enforcement Filings and the Present Motion .......... 4

III. LEGAL STANDARD—CLEAR AND CONVINCING EVIDENCE RELATIVE TO SPECIFIC WRITTEN TERMS .......... 4

IV. ARGUMENT .......... 5

A. Measured Against the Order's Terms and the Monitor's Findings, There Is No Violation to Enforce .......... 5

B. Plaintiffs' Asserted Evidence Would Not Be Received in Court, and Their Own Declarants Undo Their Theory .......... 12

C. ICE Cannot Be Held in Contempt for a Nonparty's Performance, and Plaintiffs Chose Not to Sue the Nonparty .......... 14

D. Part V Is a New Injunction, Which Plaintiffs Seek to Be Entered Through a Contempt Motion While the Order Is on Appeal .......... 15

E. The Sanctions Request Fails on Its Own Terms .......... 17

F. The Sewage Finding in the Proposed Order Violates Local Rule 7-3 and the Record .......... 18

V. CONCLUSION .......... 18

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Armstrong v. Brown*,
939 F. Supp. 2d 1012 (N.D. Cal. 2013) ........................................ 12, 15, 16

*Armstrong v. Exceptional Child Ctr., Inc.*,
575 U.S. 320 (2015) ........................................ 17

*Astra USA, Inc. v. Santa Clara Cnty.*,
563 U.S. 110 (2011) ........................................ 17

*Campos v. INS*,
62 F.3d 311 (9th Cir. 1995) ........................................ 17

*Coleman v. Newsom*,
131 F.4th 948 (9th Cir. 2025) ........................................ 5, 12, 14, 17

*DeMichiel v. AEG Live NJ, LLC*,
No. CV 16-00913-BRO (AGRx), 2017 WL 8114930 (C.D. Cal. Jan. 24, 2017) ...... 13

*FTC v. Affordable Media, LLC*,
179 F.3d 1228 (9th Cir. 1999) ........................................ 15

*Gompers v. Buck's Stove & Range Co.*,
221 U.S. 418 (1911) ........................................ 14

*Google LLC v. Point Fin., Inc.*,
No. 25-CV-04033-BLF, 2026 WL 1245439 (N.D. Cal. May 6, 2026) ...................... 4

*Griffin v. City of Los Angeles*,
No. 2:24-cv-06312-RGK-MAR, 2026 WL 2393153 (C.D. Cal. July 28, 2026) ....... 16

*Hangarter v. Paul Revere Life Ins. Co.*,
289 F. Supp. 2d 1105 (N.D. Cal. 2003) ........................................ 5

*Harcourt Brace Jovanovich Legal & Pro. Publ'ns, Inc. v. Multistate Legal Studies, Inc.*,
26 F.3d 948 (9th Cir. 1994) ........................................ 13

*In re Dual-Deck Video Cassette Recorder Antitrust Litig.*,
10 F.3d 693 (9th Cir. 1993) ........................................ 5, 12

*Int'l Union, United Mine Workers of Am. v. Bagwell*,
512 U.S. 821 (1994) ........................................ 14, 17

*L.T. v. ICE*,
No. 26-4902, Dkt. 22.1 (9th Cir. Aug. 20, 2026) .................................................. 2, 16

*Labor/Cmty. Strategy Ctr. v. L.A. Cnty. Metro. Transp. Auth.*,
564 F.3d 1115 (9th Cir. 2009) .................................................................................. 12

*Lashify, Inc. v. Qingdao Network Tech. Co., Ltd.*,
No. 25-cv-4183 (LJL), 2025 WL 3215439 (S.D.N.Y. Nov. 18, 2025) ..................... 13

*Logue v. United States*,
412 U.S. 521 (1973) .................................................................................................. 14

*Melendres v. Skinner*,
113 F.4th 1126 (9th Cir. 2024) .................................................................................... 2

*Nat. Res. Def. Council, Inc. v. Sw. Marine Inc.*,
242 F.3d 1163 (9th Cir. 2001) .................................................................................. 16

*Newman v. Graddick*,
740 F.2d 1513 (11th Cir. 1984) ................................................................................ 14

*Oracle USA, Inc. v. Rimini St., Inc.*,
81 F.4th 843 (9th Cir. 2023) ..................................................................................... 12

*Parsons v. Ryan*,
949 F.3d 443 (9th Cir. 2020) .................................................................................... 17

*Schmidt v. Lessard*,
414 U.S. 473 (1974) .................................................................................................. 16

*Taggart v. Lorenzen*,
587 U.S. 554 (2019) ............................................................................................. 5, 12

*Thomas v. County of Los Angeles*,
978 F.2d 504 (9th Cir. 1992) ................................................................................ 12, 16

*United States v. Ayres*,
166 F.3d 991 (9th Cir. 1999) .................................................................................... 17

*United States v. Whittemore*,
776 F.3d 1074 (9th Cir. 2015) .................................................................................. 13

*Wolfard Glassblowing Co. v. Vanbragt*,
118 F.3d 1320 (9th Cir. 1997) .................................................................................... 5

**Statutes**

8 U.S.C. § 1231(g) .................... 17
8 U.S.C. § 1231(h) .................... 17

**Rules**

Fed. R. Civ. P. 65(d) .................... 5, 16
Fed. R. Evid. 602 .................... 13
Fed. R. Evid. 801(d)(2)(D) .................... 13
Fed. R. Evid. 805 .................... 13
C.D. Cal. L.R. 7-3 .................... 2, 4, 18

## I. INTRODUCTION

Plaintiffs say the Monitor "documented Defendants' ongoing noncompliance with nearly every conditions provision." ECF 200-1 at 1. What she found, walking every unit of Adelanto in September and drinking the water in every pod, was a facility "generally clean and well maintained," "100% staffed," with staff "diligent in maintaining cleanliness," and water that "still exceed[s] the minimum requirements of the EPA." ECF 177 at 2, 5, 17. Since her visit, her recommendations have been answered one by one: filtered hot-and-cold water units in every housing unit, 500 new mattresses on order, a funded contract modification for the large yard and visitation, a ventilation contractor's proposal under review. Declaration of Rosa Quevedo, ICE Assistant Field Office Director at Adelanto, filed concurrently ("Quevedo Decl.") ¶¶ 10–48. That is the record on which Plaintiffs ask this Court to hold the United States in contempt.

Their new asserted evidence is three declarations from their lawyers relaying what detainees had told them, and in the most serious passage, what a detainee said an unnamed GEO lieutenant and sergeant had said. ECF 200-8 ¶ 5. In ECF 179 and ECF 200, not one detainee has signed a declaration, including the named Plaintiffs counsel spoke to. ECF 200-7 ¶¶ 39, 49; ECF 200-8 ¶ 3. The same declarants who report "instructions not to follow" the order report in the same breath that GEO is "too understaffed" to follow it, ECF 200-8 ¶¶ 5, 16, 23, and the Motion recites the injunction's provisions without the qualifiers the Court wrote into them. ECF 200-1 at 8. Hearsay about hearsay, from witnesses who will not be named, measured against an order Plaintiffs quote selectively, is not clear and convincing evidence. *See* Parts IV.A–B, *infra*.

What Plaintiffs are after is a new injunction. Part V would add ten terms the order does not contain, on three- to thirty-day clocks, while the order is on appeal, and back these pervasive changes with a $500-a-day fine that Defendants could purge only when the Monitors "verif[y]" that a nonparty has performed. ECF 200-1 at 16–18. Moreover, Plaintiffs created the nonparty problem by electing to proceed without GEO: Asked by this Court why they had not sued GEO, the entity that runs Adelanto, counsel answered

that it was "more efficient" to sue the Government "because of the particular defenses that GEO Group might have." ECF 68 at 27:8–24. A fine the contemnor cannot end by obeying is punishment, and a fine that pressures a nonparty through a party is one no court may impose. *See* Parts IV.C–E, *infra*. And the sewage finding in the proposed order was never conferred on, the same Local Rule 7-3 defect that sank this motion the first time. ECF 193 ¶ 3; *see* Part IV.F, *infra*.

The Court built a neutral Monitor process into its injunction, focused on using subject matter experts rather than relying on adversarial claims made by lawyers; every housing unit now has a red box through which detainees write to the Monitors directly, Quevedo Decl. ¶ 49, and the next reports are due November 1. The Court should let its Monitors report rather than sanction the United States on uncorroborated hearsay by attorneys. *See* ECF 203 at 15, 18 (explaining that Plaintiffs' piecemeal motions distract from the Court's neutral Monitor process). The Motion should be denied.

## II. BACKGROUND

### A. The Injunction's Terms, Their Qualifications, and the Monitors' Charge

On July 16, 2026, this Court provisionally certified a class of all persons detained at Adelanto and entered a preliminary injunction, modified August 28 and amended September 11. ECF 104; ECF 130; ECF 147. Paragraphs 1 and 2 set nine operational requirements, most with their own qualifier. ECF 147 ¶¶ 1–2. The order says nothing about filtration systems, breakfast hours, shorts, mattress thickness, cameras, ductwork, or shower ventilation. *See* Part IV.A, *infra*.

Paragraph 5 appoints two independent Monitors "[t]o ensure compliance with this order" and requires monthly reports "detailing their findings and recommendations." ECF 147 at 4–5. Their recommendations "must be adopted by the district court before they become effective." No. 26-4902, Dkt. 22.1 at 5 (citing *Melendres v. Skinner*, 113 F.4th 1126, 1139–40 (9th Cir. 2024)). The injunction is on appeal. No. 26-6685 (9th Cir.).

### B. Adelanto Is Operated by GEO Under a Federal Contract, and Plaintiffs

**Chose Not to Sue GEO**

Adelanto's East facility holds up to 660 detainees in eight open dormitories; its West facility holds up to 1,280 in four- and eight-bed dorms across 17 units and a segregation unit (the SMU); the population on September 1, 2026 was 1,730. Quevedo Decl. ¶ 5; ECF 80-1 ¶ 2. GEO operates the facility under a detention services contract (the APC Contract) that requires compliance with ICE's 2011 Performance-Based National Detention Standards. ICE's on-site personnel "observe, identify, and notify the various contractors or sub-contractors of any perceived deficiencies," but the contract "does not reserve to ICE any direct control of any part of the contracted work," and ICE's "only recourse for a deficiency is contractual." ECF 80-1 ¶¶ 4, 9–10. Facility upgrades under the contract require "approval by the Contracting Officer via a contract modification and funding obligated via task order." ECF 80-2 at "Page 8 of 15." ICE compliance officers inspect the facility daily and refer any issue to GEO. Quevedo Decl. ¶ 7. The facility is accredited by the American Correctional Association and the National Commission on Correctional Health Care. *Id.* ¶ 8; ECF 80-1 ¶ 12.

Plaintiffs sued ICE, and did not name GEO, which runs Adelanto's day-to-day operations. ECF 68 at 5:6–15. Asked at the April 28 hearing why not order GEO directly, counsel chose the Government's defenses over GEO's. *Id.* at 27:8–24. Plaintiffs thus chose a structure in which the injunction—and its enforcement—reaches the operator only through ICE's contract. *See* ECF 203 at 17–18.

**C. ICE's Compliance Steps Since the Injunction**

ICE notified GEO of the injunction on July 17, 2026, has provided GEO each subsequent order, and has relayed the Monitors' requests to GEO. Quevedo Decl. ¶¶ 9, 19; ECF 127-1 ¶¶ 5–6; ECF 129 ¶ 5; ECF 148 ¶¶ 7, 9. On September 18, 2026, ICE negotiated and executed a contract modification with GEO to bring the facility into compliance with the Court's order on the large yard and visitation. Quevedo Decl. ¶¶ 31, 34. On October 2, 2026, the United States acquired the facility from GEO, which continues to operate it under the contract; since the acquisition, service and infrastructure changes

of this kind require a contract modification, which triggered a 60-day transition period from the September 18 contract extension. *Id.* ¶ 18. *See* Part IV.A, *infra*.

**D. The Monitor's First Report**

The Conditions Monitor's unannounced two-day September visit covered every unit and every faucet and igloo. ECF 177 at 2–3, 6, 17, 20–23. She found the facility "generally clean and well maintained" and the security contract "100% staffed." *Id.* at 2, 17. She was back on site on October 5. ECF 181 at 2. Her second report is due November 1. ECF 147 at 5.

**E. Plaintiffs' Enforcement Filings and the Present Motion**

This is Plaintiffs' fourth compliance-centric filing in eleven weeks. *See* ECF 203 at 2–4, 16–18 (explaining that the August 6 "Status Report," August 27 ex parte application, and October 7 motion each pressed compliance claims before the Court's Monitor process could play out). At the September 1 hearing the Court explained that "the proper procedure would be to file a motion to enforce," and noted that the government "is ensuring that they are complying by virtue of informing them of the injunction and the parameters of that injunction," which "it appears . . . has been done." ECF 150 at 3:22–4:17. The October 7 motion was denied for failure to comply with Local Rule 7-3. ECF 193 ¶ 3.

The Motion refiles the October 7 motion with the same relief, *compare* ECF 200-1 at 16–18, *with* ECF 179-1 at 15–17, and seeks an order to show cause on ¶¶ 1(a)–(h) and 2, ten new "specific compliance measures," ECF 200-1 at 2, on three- to thirty-day deadlines, $500 per day per provision purgeable only on a showing "verified by the Monitors," and weekly sworn reports. ECF 200-1 at 16–18. The proposed order would also find "repeated sewage water flooding in Adelanto East," ECF 200-2 at 2, an issue on which counsel declared Plaintiffs "would not seek relief." ECF 200-3 ¶ 14.

**III. LEGAL STANDARD—CLEAR AND CONVINCING EVIDENCE RELATIVE TO SPECIFIC WRITTEN TERMS**

A district court enforces its injunction "through the court's civil contempt power." *Google LLC v. Point Fin., Inc.*, No. 25-CV-04033-BLF, 2026 WL 1245439, at *2 (N.D.

Cal. May 6, 2026) (quoting *Hangarter v. Paul Revere Life Ins. Co.*, 289 F. Supp. 2d 1105, 1107 (N.D. Cal. 2003)). The movant must "show by clear and convincing evidence that [the alleged contemnor] violated the [injunction] beyond substantial compliance, and that the violation was not based on a good faith and reasonable interpretation of the judgment." *Wolfard Glassblowing Co. v. Vanbragt*, 118 F.3d 1320, 1322 (9th Cir. 1997). Contempt lies only for disobedience of a "specific and definite court order" by a party that failed "to take all reasonable steps within [its] power to comply," *In re Dual-Deck Video Cassette Recorder Antitrust Litig.*, 10 F.3d 693, 695 (9th Cir. 1993); substantial compliance, meaning "near-total compliance through the exhaustion of all reasonable efforts," is a defense, *Coleman v. Newsom*, 131 F.4th 948, 956 (9th Cir. 2025); and contempt "should not be resorted to where there is a fair ground of doubt as to the wrongfulness of the defendant's conduct," *Taggart v. Lorenzen*, 587 U.S. 554, 561 (2019) (cleaned up).

## IV. ARGUMENT

### A. Measured Against the Order's Terms and the Monitor's Findings, There Is No Violation to Enforce

Disregarding the specificity requirement of Fed. R. Civ. P. 65(d)(1), the Plaintiffs recite the injunction's nine provisions and systematically leave out their qualifiers. ECF 200-1 at 8. Provision by provision, the Court's own Monitor and the sworn record describe a facility implementing the order, not defying it, and the accompanying declaration answers the Monitor's twelve recommendations. Quevedo Decl. ¶¶ 10–40.

*Drinking water (¶ 1(a)).* Plaintiffs' water claim has shrunk to taste and a "white residue." ECF 200-7 ¶ 27; ECF 200-8 ¶ 8. The order requires "24-hour access to clean potable drinking water," not demineralized water or water that tastes good. The facility's water comes from the City of Adelanto, which tests daily and sends weekly samples to a certified laboratory; an independent laboratory retained by GEO tested the water at distribution points inside the facility in January 2026 and detected neither coliform bacteria nor Legionella. Quevedo Decl. ¶ 10 & Exs. L–M; ECF 80-1 ¶ 58; ECF 113-2 ¶ 8; ECF 113-4. GEO provided 24-hour access to potable water before the injunction and still

does. Quevedo Decl. ¶ 11; ECF 127-1 ¶ 7. The Monitor drank from every pod and found the water "cold and clear," reported that the municipal supply "still exceed[s] the minimum requirements of the EPA," and rated water "Partial-compliance," not noncompliance. ECF 177 at 3–5, 20–24. The ice coolers, which detainees opened to reach the ice, are gone. Quevedo Decl. ¶¶ 11–12; ECF 80-1 ¶ 59. In their place GEO installed approximately 33 filtered hot-and-cold units, one in every housing unit and the SMU, each with an NSF-certified filter, available at all hours except during the 30-to-40-minute counts, with installation completed October 16, 2026; they supersede both the coolers and the Sparkletts system that was awaiting approval when the Monitor reported. Quevedo Decl. ¶ 12 & Ex. A; ECF 177 at 4. The residue is likely the mineral content of the City's moderately hard water, 74 mg/L. *Id.* ¶ 12 & Ex. M. Taste is not potability.

*Meals (¶ 1(b)).* Plaintiffs plead the Monitor's "unable to assess" as a finding of noncompliance. ECF 200-1 at 1, 9–10; ECF 177 at 5, 24. It was a request for the menus, and the menus have arrived: a five-week cycle with a template report listing portions and nutrients for every item, totaling 2,800 to 2,900 calories a day, Quevedo Decl. ¶ 13 & Ex. O; a registered dietitian's October 6 tray tests finding correct portions and temperatures, palatable meals, and clean kitchens following the menus, *id.* ¶ 14 & Ex. P; kitchens staffed by GEO employees only, with portions set by serving spoons sized to the menu, not by the tray; medical diets approved by a provider and kosher, halal, and common-fare diets approved by the Chaplain, prepared and labeled for each detainee, *id.* ¶¶ 13, 15 & Ex. I; weekly kitchen inspections, daily discard of prepared food, and a retained sample of each day's meals; a May 19, 2026 county health inspection finding compliance; and meals at approximately 4:30 a.m., 11:30 a.m., and 4:30 p.m. *Id.* ¶ 15 & Exs. N, R. Both kitchens were observed on three days during the week of October 19 and were clean and sanitary each time; a randomly selected tray each day was palatable, at temperature, and in the correct portions. *Id.* ¶ 15. What is left of the meals claim is portion size, presentation, and a breakfast hour the order never mentions. ECF 200-8 ¶¶ 9–11; ECF 200-7 ¶¶ 29–32; Quevedo Decl. ¶ 15. Part V's "breakfast no earlier than 6:00 a.m." is a new term that is

not in the injunction. ECF 200-1 at 17.

*Sanitation, hygiene, and mold (¶ 1(c)).* The Monitor found the facility Plaintiffs call unsanitary "generally clean and well-kept," the dayrooms "remarkably clean and without odors," "officer cleaning crews throughout the tour," and staff "diligent in maintaining cleanliness." ECF 177 at 5, 17. The order's minimums are daily cleaning, free hygiene products, and mold "identified, treated, and remediated." The housing units, dayrooms, kitchens, laundry, intake areas, and SMU are cleaned daily by GEO staff, not detainees, on a written schedule with a log; the restrooms are cleaned from 6:00 a.m. to 2:00 p.m. seven days a week; and during the week of October 19 the housing units and common areas were clean and orderly. Quevedo Decl. ¶¶ 6, 16; ECF 113-2 ¶ 10; ECF 127-1 ¶ 11. On hygiene, the Monitor found products in the intake packages and at each officer's podium and rated the requirement "Compliant." ECF 177 at 6, 24. Hygiene items are issued at intake and exchanged item for item on request, as the Handbook Supplement provides; toilet paper, soap, and shampoo are stocked at each officer station and replenished from the warehouse; and cleaning products are available on request from the janitor's closets. Quevedo Decl. ¶ 17 & Ex. R; ECF 113-2 ¶ 10; ECF 127-1 ¶ 11. Accounts of shortages on particular days, ECF 200-8 ¶¶ 15, 17, do not show that hygiene products are not "consistently available." ECF 147 ¶ 1(c).

The "mold" claim is paint. The Monitor found staining in the West shower rooms, "not within the shower stalls," concluded that "[a]ddressing the ventilation is the only way to mitigate the mold problem," and found that the East showers "did not have any mold." ECF 177 at 6–7. A ventilation problem lets moisture accumulate and deteriorates the floor paint; GEO inspects for mold during its daily cleaning and has identified none in the shower rooms, the ventilation system, or elsewhere; the light-brown discoloration is consistent with mildew and deteriorated paint; the stainless-steel stalls are unaffected; and GEO cleans the rooms regularly, although paint discoloration cannot be removed by cleaning. Quevedo Decl. ¶ 18 & Ex. D. GEO engaged a contractor to correct the ventilation; the contractor visited on October 27, 2026, GEO is reviewing its proposal, and

GEO plans to redo the floors once the ventilation is corrected. *Id.* The drain-fly larvae the Monitor saw are a hot-weather condition endemic to the area; Orkin has treated the drains for years and increased its service from biweekly to weekly; and none were observed during the week of October 19. *Id.* ¶ 20. The cracked duct the Monitor described in East Unit 2A was photographed at her request on October 12 and has been sealed. *Id.* ¶ 19 & Ex. S. What remains is a ventilation project moving through the contract, and contempt does not lie for a building repair in progress.

*Privacy (¶ 1(d)).* The Monitor found the privacy the order requires and the security rationale the order anticipates: curtains in every East toileting and showering area, that "nobody shared any privacy concerns," and "a compelling security rationale for prohibiting privacy barriers inside cells," naming sightlines, contraband, and "the risk that is associated with suicide." ECF 177 at 7–8. The order requires privacy "consistent with the safety needs of the facility," and that is what exists. Privacy curtains are installed on every shower in the West and East housing units and on every toilet in the East dormitories; the only West showers without curtains as of October 21 were the accessible stalls, for which the material arrived that week; the SMU showers have privacy screens; and the East male units raised no complaints. Quevedo Decl. ¶¶ 22, 30 & Exs. D, J. The cameras in the East dormitory restrooms monitor the entry and common area, as the Prison Rape Elimination Act requires, and do not capture the interior of a stall behind a drawn curtain. *Id.* ¶ 22. The toilets inside the four- and eight-bed West dorms have no curtains because officers must be able to see into those dorms to detect self-harm, assault, and contraband; a barrier would defeat that; a hanging curtain in a high-ceilinged dorm is a hanging hazard; and because the dorm doors are unlocked except during counts, a detainee can ordinarily use the toilet with the dorm to himself. *Id.* ¶ 23; ECF 80-1 ¶ 63; *see also* ECF 113-2 ¶ 11. The quick-release barrier the Monitor suggested would still block the officer's view. Quevedo Decl. ¶ 23. Plaintiffs' answer is to "remove surveillance cameras" and hang barriers the Court's own expert said cannot safely be hung. ECF 200-1 at 17. Neither suggestion is in the injunction, and Ms. Steffel's camera complaint, ECF 200-7

¶ 33, concerns the East women's unit, where the Monitor found curtains and no privacy concerns.

*Clothing and bedding (¶¶ 1(e)–(f)).* The Monitor inspected intake packets, asked detainees about clothing, and reported that "none of the detainees made any complaints"; she "did not see any soiled or torn linens." ECF 177 at 8. At intake each detainee receives three sets of clothing, shower shoes, tennis shoes, a sweatshirt now issued year-round, bedding, towels, hygiene items, and a radio; the laundry runs six days a week with same-day return and ample replacement stock; worn, damaged, stained, or wrong-size items may be exchanged at any time; and the only shortage GEO knows of was approximately 18 months ago, when the facility was activated. Quevedo Decl. ¶¶ 24–26 & Ex. R; ECF 113-2 ¶ 12; ECF 127-1 ¶ 15. No detainee raised a clothing, laundry, bedding, mattress, or hygiene concern with the Assistant Facility Administrator during his walk-throughs of every housing unit the week of October 19. Quevedo Decl. ¶ 25. Shorts are not in the injunction order; Part V seeks to add them. ECF 200-1 at 17. The one substantive finding is thin or cracked mattresses, ECF 177 at 8, and GEO's Facility Administrator has ordered 500 replacement mattresses. Quevedo Decl. ¶ 27. A fourteen-day deadline for a procurement enforces no term of the injunction; it writes one.

*Outdoor recreation (¶ 1(g)).* The yard provision carries the qualifier Plaintiffs omit: four hours "unless there are documented security risks or reasons necessitating otherwise." The Court's own Monitor documented them. She reported that West detainees receive six hours a day in the outdoor mini-yards plus big-yard time, that the injunction's big-yard requirement "would require combining pods and units in the big yard," and that the Warden "is working on a recreation plan . . . to meet the requirements of the injunction," ECF 177 at 8, and she separately recorded "3 escape attempts in a 4-month timeframe." *Id.* at 10. In the West facility each pair of units shares a small open-air yard, with each unit on the yard up to six hours a day and dayroom access all day because the dorm doors are unlocked; medium- and high-security detainees receive the same access; the East units have larger yards shared by several units; and every unit other than the SMU has one hour

on the large yard every day, which GEO reopened on August 17 after repairing the fence. Quevedo Decl. ¶¶ 28–31 & Exs. E–G; ECF 127-1 ¶¶ 16, 20. The large yard is used one unit at a time because the facility has no guard towers and relies on a mobile perimeter patrol; a single unit of about 80 already produced two escape attempts from the yard, one in which a detainee unraveled the inner perimeter fence and reached the space between the fences; and combining units would put 160 to 240 detainees on the yard at once, including units kept apart after fights, over debts, or by gang affiliation. Quevedo Decl. ¶¶ 32–33 & Ex. G; ECF 113-2 ¶ 14. On September 18, 2026, ICE negotiated and executed a contract modification funding the staffing needed to supervise the large yard and expand detainee hours there, to bring the facility into compliance with the Court's order; GEO is hiring under it. Quevedo Decl. ¶ 31. Part V would delete the qualifier and order "four hours of outdoor recreation in the main yard, seven days per week," for all class members, within three days. ECF 200-1 at 17. That again is a different order, one written anew by Plaintiffs' counsel, without the security judgment the Court had built in.

*Visitation (¶ 1(h)).* The Monitor "was not able to observe the visitation room," ECF 177 at 9, so Plaintiffs' visitation claim rests on no finding at all. The order permits time limits where visits "interfere with normal operation of the facility or visitation rooms reach capacity," and requires physical contact "absent a documented security risk." Each unit is scheduled for visiting blocks three days a week; a visit lasts one hour, and two hours for a visitor who has traveled 500 miles or more; the East visiting room is small and regularly full on weekends, so removing the limit would give West detainees longer visits than the women in the East; and restroom time during a visit is added back. Quevedo Decl. ¶¶ 34, 36 & Ex. Q. Facility policy permits a detainee and visitor to embrace at the beginning and end of a visit; continuous contact is not permitted, because the visiting room is a principal route for drugs and cell phones, visitors are screened only by metal detector and pat search and detainees are not strip-searched, and continuous contact invites sexual contact in a room with other visitors, including children. *Id.* ¶ 37 & Ex. Q; ECF 113-2 ¶ 15. Every unit has a bank of telephones available at all hours except counts, and tablets that place calls

even during counts and dock for video calls. *Id.* ¶ 35 & Ex. B. The order does not require continuous contact, and the security risk is documented.

*Headcounts (¶ 2).* The order permits two counts in each window, and two is what GEO conducts. ECF 147 ¶ 2. The daytime counts are at 10:30 a.m. and 6:30 p.m.; the first is an out-count and the second is the standing, face-to-face count of the day. Overnight, GEO conducts four checks, at 11:00 p.m., 1:00 a.m., 3:00 a.m., and 6:30 a.m., of which only the last is a headcount; the three others are observation rounds conducted with the lights off and flashlights away from faces, during which no detainee is counted by bed-return, woken, or required to move. Quevedo Decl. ¶ 38; ECF 131 ¶¶ 5–8. A detainee is woken only if he is missing from his bunk or has hung a sheet or blanket over it so the officer cannot see him; staff repeatedly direct the coverings down, other detainees put new ones up, some cover the dorm-door window as well, and obstructing the count is an offense under the Detainee Disciplinary Code. Quevedo Decl. ¶ 40 & Exs. K, R; ECF 131 ¶ 7. The Monitor found that "informal counts allow for out-counts," that the facility makes "minimal disruptions during hours of sleep," and that "[t]he detainee count process is one of the most critical security functions within a detention facility." ECF 177 at 10–11. The checks detect a detainee who has slipped into another dorm to prey on its occupants; night is when a suicidal detainee is most likely to attempt self-harm; and the rounds detect medical emergencies, assaults, contraband, and escape. Quevedo Decl. ¶¶ 38–39. Plaintiffs ask the Court to count the rounds as counts and to hold ICE in contempt for the difference.

*Matters outside the Motion.* The declarations wander into medical complaints, grievance handling, mail, and segregation, ECF 200-8 ¶¶ 28–45; ECF 200-7 ¶¶ 50–51, on which the Motion seeks no relief. ECF 200-1 at 2, 16–18. Medical care proceeds under the ¶ 4 Remedial Plan and the Medical Monitor's review, ECF 147 at 3–5, and the Monitor found the segregation documentation "adequate" and the notices served "within 24 hours." ECF 177 at 12. The record is complete anyway: The 32-cell SMU held about 26 detainees the week of October 19, nine at their own request; disciplinary placements are reviewed

weekly, averaged 13 days over six months, and none exceeded 60; SMU detainees keep their property, get an hour outdoors daily plus dayroom time, and have the same filtered water, telephones, tablets, and Lexis access; psychology and medical staff see them on schedule; no detainee was held there for mental-health reasons; disability accommodation notices are posted in the facility; every arrival is triaged for disability and medical needs within eight hours under the Remedial Plan. Quevedo Decl. ¶¶ 41–49 & Exs. B, C, H, J, R; ECF 127-1 ¶¶ 22–23.

This is a facility that moved on every one of the Monitor's varied recommendations within eleven weeks of an order that was stayed for two of them. That is substantial compliance at the least, and any dispute over how a qualifier applies is a "fair ground of doubt." *Taggart*, 587 U.S. at 561; *Coleman*, 131 F.4th at 956.

### B. Plaintiffs' Asserted Evidence Would Not Be Received in Court, and Their Own Declarants Undo Their Theory

Plaintiffs' statement of the law stops where that law starts to matter. It recites the Court's power to enforce and the contempt burden, ECF 200-1 at 6–8, and omits the limits that decide this Motion, *Taggart*, *Coleman*, and *Thomas*, and the Ninth Circuit's rule that contempt is forbidden when the contested action was "based on a good faith and reasonable interpretation" of the order. *Oracle USA, Inc. v. Rimini St., Inc.*, 81 F.4th 843, 851 (9th Cir. 2023) (cleaned up). They cite *Dual-Deck*, ECF 200-1 at 7, but not its holding: It *vacated* contempt because technical violations were consistent with substantial compliance under a good-faith reading. 10 F.3d at 695–96. The Ninth Circuit affirmed denial of contempt where an operational decree preserved discretion and conditioned added staffing on need, *Labor/Cmty. Strategy Ctr. v. L.A. Cnty. Metro. Transp. Auth.*, 564 F.3d 1115, 1123–24 (9th Cir. 2009), and Plaintiffs' own *Armstrong v. Brown* clarified a prison order yet denied contempt for a good-faith misunderstanding, 939 F. Supp. 2d 1012, 1021–22 (N.D. Cal. 2013). The evidence fares no better than the law: counsel's account of what detainees said, and of what a detainee said an unidentified lieutenant and sergeant said. ECF 200-8 ¶ 5.

Plaintiffs' evidence is a chain of hearsay sworn to by the last link, counsel for one side. Uncorroborated, inadmissible, hearsay from anonymous sources is insufficient for Plaintiffs to meet their burden to provide clear and convincing evidence. *Harcourt Brace Jovanovich Legal & Pro. Publ'ns, Inc. v. Multistate Legal Studies, Inc.*, 26 F.3d 948, 953 (9th Cir. 1994) (affirming denial of contempt where proof of alleged disparagement depended on inadmissible double hearsay); *DeMichiel v. AEG Live NJ, LLC*, No. CV 16-00913-BRO (AGRx), 2017 WL 8114930, at *5 (C.D. Cal. Jan. 24, 2017) (denying contempt where counsel's uncorroborated account of a third party's statement failed the clear-and-convincing burden); *Lashify, Inc. v. Qingdao Network Tech. Co., Ltd.*, No. 25-cv-4183 (LJL), 2025 WL 3215439, at *4 (S.D.N.Y. Nov. 18, 2025) (rejecting counsel's secondhand testimony as hearsay incompetent to support contempt).

The Wrench and Steffel declarations relay reports from largely anonymous clients whose housing units are mostly unstated. ECF 200-7 ¶ 2; ECF 200-8 ¶ 3. Hearsay within hearsay is inadmissible unless each layer satisfies an exception. Fed. R. Evid. 805. Because GEO is not a party to this action (by the Plaintiffs' own free choice and design), its employees' statements are not the admissions of a party-opponent, *see* Fed. R. Evid. 801(d)(2)(D), and Plaintiffs' counsel—the only declarant now before the Court—lacks any personal knowledge of any of it, *see* Fed. R. Evid. 602; *United States v. Whittemore*, 776 F.3d 1074, 1082 (9th Cir. 2015). Ms. Wrench's declaration is largely "resubmitted" from October 7 and covers September 4 through October 20, ECF 200-8 ¶¶ 1, 3, so much of it predates the Monitor's September 8 visit and everything done since. A press release and a news article, ECF 200-1 at 1 n.1, 10 n.3, are not evidence.

Even when read for what they say, the declarations undo Plaintiffs' theory. The declarant who reports "instructions not to follow" the order reports, in the same declaration, that GEO guards are "too understaffed to fulfill the court order requirements," and Plaintiff Salazar attributes the yard shortfall to "understaffing because they barely have enough staffing to let them out." ECF 200-8 ¶¶ 5, 16, 23. Counsel-relayed accounts of an unidentified supervisor's remark, contradicted by the same declarants' explanation,

are not clear and convincing evidence that the United States told its contractor to defy a federal court. ICE gave no such instruction. Quevedo Decl. ¶ 9; *see also* ECF 127-1 ¶¶ 4–5; ECF 129 ¶ 4. The detainees who speak to GEO's Assistant Facility Administrator on his walk-throughs raised, the week of October 19, their immigration cases, medical issues, and items like a burned-out cell light or a broken tablet, already known to the unit officer and being resolved; two East female units raised the periodic sewage backups, which were referred to plumbing. Quevedo Decl. ¶ 50. And the Monitor found the security contract "100% staffed." ECF 177 at 2, 17.

### C. ICE Cannot Be Held in Contempt for a Nonparty's Performance, and Plaintiffs Chose Not to Sue the Nonparty

Plaintiffs sued the wrong defendant for the relief they want, and they did it on purpose. The Government does not operate Adelanto. GEO staffs and runs it under contract, as this Court has recognized: "GEO Group is essentially the group managing the day-to-day operations of the Adelanto facility . . . ," ECF 68 (Hr'g Tr.) 5:12–15—and ICE personnel on site are "just mostly moving people, taking people to court, . . . but not making these day-to-day decisions." ECF 105 (Hr'g Tr.) 13:2–4. That arrangement is the ordinary one. *See Logue v. United States*, 412 U.S. 521, 529–30 (1973).

Civil contempt is coercive, which means the contemnor must hold the key. The contemnor "is able to purge the contempt and obtain his release by committing an affirmative act, and thus 'carries the keys of his prison in his own pocket.'" *Int'l Union, United Mine Workers of Am. v. Bagwell*, 512 U.S. 821, 828 (1994) (quoting *Gompers v. Buck's Stove & Range Co.*, 221 U.S. 418, 442 (1911)). A court may not hold one party in contempt to pressure a nonparty into performing; that "so-called 'hostage' theory of contempt . . . has no legal support." *Newman v. Graddick*, 740 F.2d 1513, 1528 (11th Cir. 1984). "Inability to comply with an order is . . . a complete defense to a charge of contempt." *Coleman*, 131 F.4th at 959 (cleaned up). Yet that is the Motion: Fine ICE as contempt, until the contractor GEO performs.

Plaintiffs' answer rests on two sentences in the Monitor's report: that the Warden

"cannot install anything without the explicit authorization from ICE for a cost approval," and that ICE "has not yet authorized the funding" for the water system. ECF 177 at 4, 7; ECF 200-1 at 15. From these they argue that the obstacle is ICE's "own decision," citing *FTC v. Affordable Media, LLC*, 179 F.3d 1228, 1239–41 (9th Cir. 1999). ECF 200-1 at 15. *Affordable Media* involved contemnors who placed their own assets in an offshore trust designed to frustrate U.S. courts, kept control of it, and then pleaded impossibility, 179 F.3d at 1239–43; a cost approval is federal procurement law, not a self-created impossibility: Work outside the contract requires a contracting officer's modification and obligated funds. ECF 80-2 at "Page 3 of 15," "Page 8 of 15"; ECF 78-1 at 11. That channel produced the records-access modification within days of the Court's order, ECF 148 ¶¶ 8–9; ECF 167, the September 18 modification negotiated to comply with the order, and the filtered water units now installed in every unit, whose cost ICE approved the day GEO proposed it. Quevedo Decl. ¶¶ 12, 31.

The reasonable steps available to ICE are the contract's powers: notice of the requirement, a discrepancy report with a response date, corrective action, verification, and, where the work is new, a funded modification. ECF 80-4 at "Page 19 of 20"; ECF 80-7 at "Page 14 of 75"; ECF 80-1 ¶¶ 13–16. ICE has used each of them. Quevedo Decl. ¶¶ 9, 18–19, 31; *see* Part II.C, *supra*. Plaintiffs' own *Armstrong* denied contempt because added contract sign-language interpreters and newly authorized civil-service positions made coercion unnecessary. 939 F. Supp. 2d at 1025–26. Plaintiffs declined to sue the entity that "cannot install anything" without a contract action, ECF 177 at 7; ECF 68 at 27:8–24, and they cannot now treat the contract they litigated around as proof of willful disobedience. That contract process requires detailed information that Plaintiffs have not provided.

### D. Part V Is a New Injunction, Which Plaintiffs Seek to Be Entered Through a Contempt Motion While the Order Is on Appeal

Part V does not enforce the injunction; it replaces it. Each item adds a term the order does not contain and fixes a deadline the order does not set, from a filtration system "in all units" in fourteen days to four hours "in the main yard, seven days per week" with the

security qualification deleted, each satisfiable by "such other measures as achieve compliance" "subject to the Monitors' verification." ECF 200-1 at 16–17. An order whose content is whatever "other measures" the Monitors later recommend or accept does not "state its terms specifically," Fed. R. Civ. P. 65(d)(1)(B), and cannot support "a contempt citation" founded "on a decree too vague to be understood." *Schmidt v. Lessard*, 414 U.S. 473, 476 (1974); *Thomas v. County of Los Angeles*, 978 F.2d 504, 509–10 (9th Cir. 1992). Applying the *Armstrong v. Brown* decision Plaintiffs cite, this District enforced an express deadline but "DENIE[D] the request to expand the Order with Plaintiffs' overreaching definition of 'formal.'" *Griffin v. City of Los Angeles*, No. 2:24-cv-06312-RGK-MAR, 2026 WL 2393153, at *4 (C.D. Cal. July 28, 2026). Part V largely tracks the Monitor's recommendation list, *compare* ECF 177 at 18, *with* ECF 200-1 at 16–17, filed before her November 1 report and before this Court adopts anything. The Ninth Circuit described the design: The Monitors' recommendations "must be adopted by the district court before they become effective." No. 26-4902, Dkt. 22.1 at 5. Plaintiffs would skip that adoption requirement and keep the contempt, disregarding the Defendants' rights under law. The monitor-access orders Plaintiffs call "comparable," ECF 200-1 at 2, concerned discrete deliverables the Court raised itself, ECF 155; ECF 178, not operational conditions the Court's expert is still assessing. And while the injunction is on appeal this Court "may not materially alter the status of the case on appeal." *Nat. Res. Def. Council, Inc. v. Sw. Marine Inc.* (*NRDC*), 242 F.3d 1163, 1166 (9th Cir. 2001) (cleaned up). *NRDC* permitted adjustments to timing and testing methods that left the appealed order intact, 242 F.3d at 1166–67; ten new or expanded terms backed by contempt are a different order. Every item in Part V is GEO's work, which the United States can deliver only by procuring GEO's performance by contract. To survive dismissal they told this Court that "Plaintiffs Do Not Sue to Enforce" the contract, that they "do not assert a cause of action as third-party beneficiaries of the ICE-GEO contract," and that the contract "is relevant here only as evidence." ECF 88 at 14. Counsel conceded that "enforcement of a contract" is "not what our claims are about here." ECF 68 at 24:10–14. Part V is that disclaimed claim by another

route: A fine that runs until GEO performs enforces, as a right against the United States, a contractor's performance of an arrangement made under 8 U.S.C. § 1231(g), and Congress withheld that right (8 U.S.C. § 1231(h)); *Campos v. INS*, 62 F.3d 311, 313–14 (9th Cir. 1995) (reading a materially identical clause to bar judicial relief); *Armstrong v. Exceptional Child Ctr., Inc.*, 575 U.S. 320, 328 (2015) (holding that equity cannot "circumvent Congress's exclusion of private enforcement"). A party with no enforceable right cannot "overcome that obstacle by suing to enforce the contract's . . . obligations instead." *Astra USA, Inc. v. Santa Clara Cnty.*, 563 U.S. 110, 118 (2011). The objection is preserved on appeal, No. 26-6685, Dkt. 12.1 at 60–66; the Court need not reach it.

**E. The Sanctions Request Fails on Its Own Terms**

The proposed sanction fails three ways on its face. First, Defendants could not purge it. Plaintiffs cite *United States v. Ayres*, 166 F.3d 991 (9th Cir. 1999), for the proposition that the fine would be "entirely within Defendants' control," ECF 200-1 at 16, but *Ayres* reversed three days of $500 fines for the opposite reason: The contemnor's ability to purge depended on the opposing party's acquiescence, which "effectively renders the contempt punitive, rather than civil." *Ayres*, 166 F.3d at 997. A fine that runs until the Monitors "verif[y]" a nonparty's performance, ECF 200-1 at 18, is that same punitive arrangement. Second, per-violation fines require a record nothing like this one. *Parsons v. Ryan* affirmed fines only after a stipulation with defined measures, an order to show cause, hearings, and measure-by-measure findings, 949 F.3d 443, 451–57 (9th Cir. 2020), and the amount requires its own findings. *Coleman*, 131 F.4th at 965. The Court's own $500-per-day orders were tied to discrete deliverables, after a response and a status conference. ECF 155 at 3; ECF 193 ¶¶ 1–2. Here there is no provision-by-provision finding, no identified act, no responsible actor, and no inquiry into ability; there is a motion that treats "unable to assess" as an adjudicated violation. Fines policing an entire conditions regime on that footing are criminal in character and require criminal process. *Bagwell*, 512 U.S. at 833–34, 837–38. Third, weekly reports served on Monitors "who may file a response," ECF 200-1 at 18, would turn the Court's neutrals into adversaries of one side's sworn

statements.

### F. The Sewage Finding in the Proposed Order Violates Local Rule 7-3 and the Record

The sewage finding is in the proposed order, ECF 200-2 at 2, because Plaintiffs could not get it into the Motion. Their counsel declared that Plaintiffs "would not seek relief on the sewage water issue in their forthcoming motion," ECF 200-3 ¶ 14, the Motion's itemized relief contains no sewage item, ECF 200-1 at 16–18, and no one conferred on it. That is the Local Rule 7-3 defect that sank this Motion the first time. ECF 193 ¶ 3; *see* ECF 203 at 10–13 (showing that Plaintiffs disclaimed sewage and skipped the Local Rule 7-3 conference); *id.* at 2 & n.2, 17 & n.5 (explaining that Plaintiffs' piecemeal motions track their counsel's press releases and co-counsel's reliance on "timely EAJA fee recoveries"). On the merits, the backups in the East female units are caused by items flushed into the line, most often paper towels and sanitary products, and once a shirt; the system is not defective; the October 9 backup was cleared within approximately two and one-half hours of the report, and the October 20 clog in West 1B, apparently caused by clothing, was cleared the same evening; the floors were cleaned and disinfected before the units returned to use; and no work order records standing wastewater one to two inches deep in any unit. Quevedo Decl. ¶ 21; ECF 203-1 ¶¶ 4–6; ECF 203 at 6–7 (recounting GEO's same-day response to each report). Plaintiffs' own declarant records that the unit "had stopped flooding" by October 19. ECF 200-7 ¶¶ 21, 23. A clogged line cleared within hours is not a failure of "[a]dequate sanitation." The Monitor saw the East plumbing problem on her October 5 visit, found that building "starkly different than [her] last visit, in terms of cleanliness," "was assured it was a new development and would be corrected," and has it "included in [her] upcoming report." ECF 200-5 at 2. That is the process the Court itself built, three days from reporting. The finding should be disregarded, and the Steffel sewage narrative with it. ECF 200-7 ¶¶ 4–26.

## V. CONCLUSION

Defendants respectfully request that the Court deny Plaintiffs' Motion.

Respectfully submitted,

Dated: October 29, 2026

TODD BLANCHE
Attorney General
BILAL A. ESSAYLI
First Assistant United States Attorney
DANIEL A. BECK
Assistant United States Attorney
Chief, Civil Division
ALARICE M. MEDRANO
Assistant United States Attorney
Chief, Complex and Defensive Litigation Section

*<u>/s/ Christopher M. Butler</u>*
CHRISTOPHER M. BUTLER
Assistant United States Attorney
PUSHKAL MISHRA
Assistant United States Attorney

Attorneys for Defendants

**<u>CERTIFICATE OF COMPLIANCE WITH L.R. 11-6.2</u>**

The undersigned, counsel of record for Defendants, certifies that the memorandum of points and authorities contains 6,999 words, which complies with the word limit of Local Rule 11-6.1.

Dated: October 29, 2026

*<u>/s/ Christopher M. Butler</u>*
CHRISTOPHER M. BUTLER