**UNITED STATES DISTRICT COURT**
**FOR THE CENTRAL DISTRICT OF CALIFORNIA**

| | |
|---|---|
| L.T., et al.,<br><br>Plaintiffs,<br><br>v.<br><br>U.S. IMMIGRATION AND CUSTOMS ENFORCEMENT, et al.<br><br>Defendants. | Case No. 5:26-cv-00322-SSS-SPx<br><br>**CONDITIONS MONITOR'S NOVEMBER 2026 STATUS REPORT** |

# STATUS REPORT OF THE COURT-APPOINTED CONDITIONS MONITOR

**STATUS REPORT OF THE COURT-APPOINTED MONITOR Case:** L.T., et al v. U.S. Immigration and Customs Enforcement, et al
**Case No.:** 5:26 cv-00322-SSS-SP
**Court:** U.S. District Court for the Central District of California
**Reporting Period:** October 1-31, 2026
**Date Submitted:** October 30, 2026

This Status Report is submitted pursuant to the Court's Order dated August 3, 2026, appointing the Conditions Monitor to assess compliance with the Court's Preliminary Injunction. This report covers monitoring activities conducted between October 1st and October 31, 2026.

## Introduction

The Adelanto Processing and Detention Facility is located in Adelanto, CA, in a fairly remote location. The facility consists of 3 separate buildings; my authority is limited to evaluating and monitoring two of those buildings. The East and West buildings are the 2 structures under my purview. Adelanto is operated by the GEO Group, with oversight and case management of all detainees provided by ICE agents. There are approximately 60 ICE staff assigned to this site. The security staffing contract provides for 375 staff members across all three buildings. They remain 100% staffed at the time of my second visit. The Warden also shared with me that they have received additional staffing positions to facilitate stronger janitorial presence in the facility and they have posted and are currently interviewing for the positions.

Although the title of the facility is a "Processing and Detention" center, the detainees that arrive at Adelanto have already been processed into ICE custody at satellite facilities before their transfer to Adelanto.

I arrived at the facility unannounced on October 5th, and the staff were very kind and cooperative upon my arrival. The facility had a posted notice at the security check-in desk that allowed the monitors immediate access to the facility. The staff complied with that directive and I was admitted to the facility and allowed to bring my personal phone in for photographing. Additionally, I had two members of the court also join me on this assessment.

I submitted a second data request to the representing attorneys and have received the data that I requested. During this visit, I took several photos to document follow-up from my last visit.

**Findings:**

During my initial assessment in September, I spent the majority of my time assessing the conditions of confinement, related sanitation, and potable water. On the second visit, I conducted follow-up on water and shower conditions in every unit of both West and East buildings. Additionally, I was able to visit the laundry facilities for both buildings, as well as the visiting rooms, West medical unit, and kitchen.

I visited the West side first and visited the 4 main units, each holding 4 pods of detainees who were assigned according to their classification levels. Each pod holds approximately 80 detainees.

Then I visited the East side of the facility that houses all classifications of women and the lower classification of men. There are 2 units on the East side: one unit with 4 pods for women and one unit with 3 pods for men.

**Conditions Observed**:

1. **A. 24-hour access to clean potable drinking water**
   As I did on the last visit, I brought a clear cup with me to randomly check faucets in the day halls. The water was significantly different than the last visit. Every faucet produced cold, clear water at the day hall faucet tap. Additionally, since my last visit in September, every day hall in every unit has the Sparklett water coolers installed. One of the units had installers actively attaching the water coolers to the water main line, and I was able to take a photo of the filter that meets the EPA requirements for mitigating PFOS/PFAS contaminants. This is a significant improvement. I spoke with detainees in every day hall about the water cooler installations, and they were all very appreciative. The water coolers have hot and cold valves, so either temperature of water can be accessed by all detainees in each pod.
   This improvement mitigates the contaminant problem, running out of water in the Igloos, and access to cold and hot potable water within the units.

   Appendix A has a detailed report of the exact locations I sampled/observed/tasted water and the outcomes of that assessment.

   Also see Exhibit D for photos.

   **B. Nutritious and sanitary meals contained a sufficient number of calories**

   I received a master menu with all caloric values for the last 6 months as well as a report from the Dietitian that works with the GEO Group.

   In addition, I, the Warden, and the Associate Warden, along with the 2 court staff, ate the lunch meal that was prepared in the West kitchen. We had chicken fried steak, potatoes with gravy, salad with Thousand Island dressing, and peas and carrots with a dinner roll

and butter. The meal is pre-cooked/prepared and is reheated in the West side kitchen prior to serving. It presented well, and it tasted okay to me.

I also inspected some of the trays in the housing units to ensure that the detainee population was receiving the same presentation and meal content, and they did.

The American Correctional Association (ACA), which this facility was recently re-accredited with, and the National Commission for Correctional Healthcare (NCCHC) recommend that incarcerated individuals receive between 2500-3000 calories per day. However, there is a notable difference when we discuss calorie counts, and then we analyze what those calories are made of. It is very important, especially with a sedentary population in a detention center, that we distinguish between calorie sufficiency and nutritional adequacy. If a detainee receives a meal that is 3000 calories but it is composed of refined carbs, fats, and sodium-rich foods, they can still be malnourished and therefore complain of being hungry.

The complaints from many detainees included: not feeling full; not getting enough to eat on a tray; food was rubbery or mush; running out of food and not getting the same as others; "just gross tasting"; too many beans; no cultural foods (numerous Asian detainees told me that they don't eat the amount of fats that are served and it's making them sick with stomach pains and diarrhea); food causes swelling; undercooked food and insufficient portions.

The food that is served at Adelanto is pre-cooked food that requires re-heating on-site. Many of the foods come in prepared trays or cans for re-heating. These types of foods tend to be shelf-stable, mass-produced meals that are high in sodium, preservatives, and refined grains.

I analyzed 7 days of the menu, which included the caloric values alongside the recommended daily nutritional intake requirements for adults, using a 3000-calorie diet marker. The actual breakdown of each of the 7 days is included in **Appendix C**. In summary, the caloric values average about 2900 calories per day. Most notable are the values for fat and sodium, which exceed the recommended daily requirements, and the protein content is on the lower end of the protein range for the daily requirement. Meaning that the caloric value does not necessarily equate to nutritional adequacy.

The report that was written by the GEO dietitian states that she was on-site and taste-tested trays, checked temperatures and portion sizes, and found the meals to be palatable. I am unsure if she is the dietitian who developed and approved the master menu. Therefore not sure if she reviewed the menu for nutritional values. However, she did not find any issues with the kitchens or meals. And the diet meets caloric values based on accreditation requirements.

I did not receive any substitution reports. The facility tells me that they have "never" had to substitute meals. While this is very unusual, I will continue to check for substitution reports for meals.

See Exhibit D for meal photos

**C. Adequate sanitation throughout Adelanto ICE Processing Center East and West. At a minimum, Defendants must ensure that:**

**1) The facility is cleaned daily**

West – The West building was quite clean and without odors. The main entry, hallways, dining room, kitchen, medical unit, visitation room and all housing day hall areas were very clean and orderly. The security staff were actively cleaning areas of the facility on my visit. The Warden shared with me that the facility has been given an additional 20 positions to serve in the capacity of janitorial and sanitation staff. He is actively filling those positions at this time.

East – The East building was significantly different than the last visit. One notable thing for me was the number of detainees sharing space in the open bay day halls. There were a lot of detainees in the very limited space. There was trash on the floor and the bathroom areas had a strong smell of sewage. 2 of the toilets in the women's unit were awaiting maintenance as they were not flushing. There was at least one toilet in the men's dorm that was backed up and had sewage inside the stool as well as a sink that was filled with black water. The sink with black water was very concerning. When I asked the detainees how long it had been like that, they told me a couple of days. The officer in the unit said that it had been reported to maintenance at the beginning of the shift and there hadn't been anyone to come look at it yet. The Associate Warden was with me, and he immediately called someone and told me that they were coming to look at the plumbing issues. The Associate Warden told me that they have had frequent issues with the detainees flushing clothing down the toilets to block the plumbing. While this is not an unusual issue within corrections, it does require that the maintenance staff be very responsive and remove the blockage. Also, would recommend more frequent officer rounds for deterrence and also to identify clogs and report accordingly.

On Friday, October 16th, Plaintiffs counsel sent an email to the Defendants counsel and copied me that the women were complaining of sewage on the floor in their unit. Unclear if this is a new occurrence or an ongoing plumbing issue from my visit. I did reply to the email and advise that there were also plumbing issues noted by me on my visit on the 5th.

**2) Soap and hygiene products are consistently available to detainees free of charge**

Soap, toothpaste, shampoo, etc. were available in the podium drawers where the officers are in each day hall. I asked random detainees in each day hall how they get soap, toilet paper, or other hygiene products, and they all told me the same thing – they just ask the correctional officers for whatever they need, and they get it out of the podium, which is locked. I also asked the female detainees if they

were provided personal hygiene products for menstruation, and they said they are provided sanitary pads anytime they need them.

**3) Mold is identified, treated, and remediated at the facility**

West – I returned to every unit and pod shower to inspect the mold situation. The staff continue to scrub and clean those shower bays as well as I noted 2 of them had fresh paint over the mold areas. However, the situation remains intrusive of mold. The drains were filthy and had a lot of mold, and there were many areas of larvae on the floor. In one shower room, the corner had gnats on the wall, thus the gnat larvae.
There are exhaust fans noted in each shower, however, the exhaust "pull" from the shower area is either very light or obstructed as the vents are extremely dirty OR they have been painted over and the holes to the exhaust are blocked. Absent a significant modification to the exhaust system for these shower areas, the mold is not going to resolve.

The shower rooms continue to exhibit recurring peeling paint on the ceiling, walls and floors.

The showers on the East side did not have any mold and appeared to have adequate ventilation.
See exhibit D for photos.

**D. Adequate privacy to detainees when using the restroom or showering that is consistent with the safety needs of the facility**

West – all of the open bay showers have curtains on them that cover the opening of the shower for privacy. This resolves the privacy issues for the shower rooms.

The cells in the West building are "wet cells," meaning that they all have toilets and sinks, so detainees can use the bathroom in their own cell and not in a common restroom. The toilets are part of "combo-units" where the toilet and sink are contained within the same stainless steel structure, with the plumbing secured within. Some of the cells have 2 detainees, and they go up to as many as 8 detainees. Therefore, up to 8 people use the same sink and toilet in the cell without any privacy barrier. The detainees had developed their own barriers in many cells, which are constructed by modifying bed sheets and other materials. These are removed by security staff as they are not approved.

There has been no progress to establish privacy in the cells housing more than 2 detainees. I would recommend obscuring view from within the cell with a 40"- 48" screen between cell occupants and the toilet – still allows visibility from the door for security purposes.
Shower curtains in the east side communal showers need replaced with curtains that fit the shower opening and provide the same privacy as the old curtains that were replaced.

East – The shower curtains that were recommended to be replaced have been replaced but they are too small for the opening of the showers. The detainees have modified the shower curtains in an effort to keep them closed for privacy. The new curtains do not go the width of the shower opening. They need to be replaced with curtains that fit.
No complaints from detainees regarding the bathroom privacy as curtains are provided near toileting area.

**E. Access to clean, sanitary, and temperature-appropriate clothing**

I visited the laundry unit on the West side. The laundry is operated by GEO employees. They demonstrated how the laundry is picked up, laundered and returned in the same net bags that they are sent to the laundry in. They also showed me how clothing/bedding is exchanged on a one for one basis. I see no concerns with the laundering process and have received no complaints from the detainees on this last visit regarding the cleanliness of their clothing. The one thing that I would recommend to this task is that the staff ensure that the laundry bags with clothes in them receive adequate time in the dryer to ensure all contents are dry after laundering. This would address the initial complaints of clothes being damp when returned to detainees.

**F. Access to clean, sanitary, and temperature-appropriate mattresses, pillows and blankets**

The facility administration tells me that they have made rounds and checked the mattresses in the units and are in the process of ordering more mattresses to replace those that are thin, worn and torn. The mattresses on this visit remain to have tears and are quite thin.

**G. Access to outdoor recreation spaces that must include individual access to the yard (i.e., not the "mini-yard") for atleast four hours per day, seven days per week, unless there are documented security risks or reasons necessitating otherwise.**

**West** – The west side detainees are receiving 6 hours per day, 7 days per week, of outdoor recreation in the "mini yards." They receive 1 hour per day, 5 days per week, of the outside field yard or "Big Yard." The warden tells me that they are working on a plan to allow more time on the big yard. The requirements of the injunction would require combining pods and units in the big yard, and the Warden and his staff continue to work to mitigate custody issues to develop a process for accommodating the injunction requirements. Something to consider in moving toward partial compliance would be purchasing one or two mobile tower units that can be secured within the yard for officer presence at recreation with larger volumes of population. Can be immediately implemented.

**East** – The East side detainees were quite vocal on this visit regarding their recreation time. As I stated earlier in my report, the detainees in the East unit were quite crowded in the day halls and sleeping areas. There is very limited room for them to move around with all the tables in the day hall full.

I was approached by 2 male detainees, separately, one was in tears telling me that his mental health was suffering and he felt like the room was getting smaller because he hasn't been able to go outside to the "soccer field." I asked him if he was getting to go outside at all and he stated that going outside a "few days a week" and then "being trapped inside the housing unit" was making him want to "bust at the seams." The other detainee similarly told me that he "can't take it not being able to go outside but for an hour or two at a time."

On the female side, there were numerous females that asked me if I could "please, please ask them to let us go outside more often."

Considering the amount of congestion in these small dorm style housing units, it's understandable that these detainees need more recreation time. I would prioritize assembling a recreation plan for the East side as soon as possible. There is an inner court yard that could be used on a rotating basis throughout the day, while working on a larger plan for more access to the "soccer field." These minimum custody units have the lowest risk detainees in them and its not unreasonable for them to have more unlimited access to the outdoor areas.

**H. Visits during the facility's business hours. Visits must not be subject to time limits unless such visits interfere with normal operation of the facility or visitation rooms reach capacity. Detained individuals and their families must be allowed to use the restroom during visits without the visit being subject to automatic cancellation. Physical contact (e.g., hugging, holding hands, etc.) must be allowed during visitation absent a documented security risk justifying otherwise.**

I was able to tour the visitation rooms on the west and east sides this visit. Visitation is open from 8:00AM – 6:15PM, 7 days per week.

**West** – I was at the West side visiting room before 0800, the scheduled start time for visiting in that building. The visiting room is quite small for a facility this large. It has occupancy for 13 non-contact visits and max capacity of 72 in the main visiting room. There are 4 staff assigned to the visiting room, with typically 2 on shift at a time. There are 3 staff in the visiting room on the heavier visiting days.

On the day that I visited, there were 2. There are 2 public restrooms within the visiting area and they are not used due to passing of contraband. The visiting department has a "rule of thumb" for considering special visits, which would be visits that are scheduled for longer than the policy maximum of 1 hour, and that is if the visitor is coming from more than 300 miles away and the special visit is pre-arranged. The visiting room was clean and there is a very small mobile table for children to sit and play at that is located in the visiting area as well. I assessed the security equipment type(s) and locations and found them to be standard.

I did verify that if a detainee needs to use the restroom, they are removed from the visiting room and taken to a holding cell right outside of the visiting room to use the bathroom. If the visitor has to use the restroom, they are escorted to the lobby to use the restroom. The visit is not terminated and can resume. The proximity for the restrooms is

not unreasonable and the fact that the visit is not terminated is satisfactory practice as well.

The visitation policy continues to allow for a brief kiss and hug at the beginning and end of the visits. It specifically states that there will be no physical touching between the detainee and adult visitors during the visit. It's very common to allow visitors to hold hands above the visiting table when they are in contact visits. If this is allowed, it would meet the requirements of the injunction. I did not get the perception that this is being considered to change. Although the exchange of contraband is a valid and serious concern, good security practices alongside officer presence mitigate contraband exchanges. Physical contact between incarcerated individuals and their family members is an important element of preserving familial relationships. While correctional institutions have legitimate security responsibilities, restrictions on physical contact should be supported by identifiable security concerns and balanced against the significant importance of maintaining family relationships. This balance for the detainee results in stable behavior.

During my visit, there were no visitors signed up to visit in the morning. Later in the morning when a visitor arrived, I was called to go to the visiting room to monitor the process. The detainee is allowed a brief embrace and kiss with the adult visitor and was allowed to pick up his children and embrace and kiss them. The detainee and adult visitors then sit across from each other approximately 4-5 feet apart with a short coffee table styled table between them. While this arrangement is not "wrong." It does not allow for the continuous physical contact that would typically be allowed in a contact visit or by the requirements of the injunction.

I am told that the busier visitation days are Friday, Saturday and Sunday and I will ensure that I am available to assess the busier days as I would like to see how the visiting room is utilized and managed at or near capacity. In instances like the visit that I observed, there were no other visitors in the visitation room or in the waiting room – I would expect that a visit longer than an hour would be acceptable. But the policy states that the visit can only be for one hour.

**East** – I also visited the visitation room on the East side and it is much smaller than the West side. At the time that I toured, there were no visits being conducted. The room was clean and had appropriate security equipment with one staff member overseeing the visitation process. I will attempt to re-visit when there are more families and loved ones visiting East side detainees.

**<u>2. Headcounts: Defendants must ensure headcounts are conducted in a manner and at times that minimize disruption to the operation of the facility.</u>**

**a. 9:00A.M. to 8:00 P.M.: Absent a documented security risk or reasons necessitating otherwise, headcounts conducted between 9:00 A.M. and 8:00 P.M. must be performed on an out-count basis. Out-count basis is defined as a headcount**

**that occurs while detainees are temporarily outside their assigned housing or units. No more than two headcounts may occur between 9:00 A.M. and 8:00 P.M.**

The facility has not changed its count process according to the injunction.

The detainee count process is one of the most critical security functions within a detention facility. To ensure an accurate, timely, and verifiable count, all detainees are required to return to their assigned cells at count time and remain there until the count has been completed and officially cleared. Unlike many detention facilities, Adelanto allows doors in General Population to remain unlocked 24 hours per day except for count times. It's unusual to see the doors unlocked during hours of sleep, but this allows the detainees to leave their cells and go to the water Igloos in the day hall or sit at the tables in the day hall. This is commendable.

The facility continues to conduct 6 counts per 24-hour period. The formal count is conducted once per 24-hour period at Adelanto, and that is still at 6:30 pm. This requires all detainees to go back to their cell, where they are physically counted by a "name and face" count, and their facility ID is compared to their face for an official count. The other 5 count times per day are informal counts where detainees are sent back to their cells for a "body count," where the detention officer verifies how many bodies are in each cell and then compares that number to the unit and pod assignment sheet. This can be accomplished by simply walking through the pods and counting the detainees in each cell.

I watched video and monitored the process for counting at night or during hours of sleep in 4 different units on 4 different nights and count times. I did note that the officers are conducting the night counts appropriately and with the least amount of disruption by using their flashlights to reflect on the floor of the cell, casting ambient light toward the bunks where the officer can count bodies in the bunks. They are done thoroughly and with minimal disruption. However, they conduct these counts every 2-3 hours throughout the night. Not sure that these necessarily require "count times" as the officers should be conducting these rounds and assessments of population, routinely anyway. Eliminating the rounds as "count times" would not eliminate the necessity and appropriateness for conducting rounds every 2 hours or as prescribed by the Warden.

As I mentioned in my last monthly report, there is a large span of time (8 hours) between the 2 allotted day counts. Although the American Correctional Association allows for up to 8 hours between count times, I would still expect to see 2-3 counts during the daytime hours and 2 during hours of sleep. The concentration of counts during hours of sleep when the facility is secure, no detainees are leaving the secure housing units and there is minimal movement in and out of the actual hard perimeter by anybody – seems excessive. The 8-hour gap during the day is when there is movement throughout the facility, movement in and out of the hard perimeter, transports going in and out of the facilities, delivery trucks going in and out of the secure perimeter and no accountability for the detainee population for a period of 8 hours. If this were a minimum custody facility, it would be more appropriate. But this is a multi-custody facility with high

risk/high custody detainees and a lot of movement through multiple security envelopes and it would allow hours for a detainee to be absent before anyone would be able to determine someone missing.
Adelanto still has 2 day counts and 4 counts during hours of sleep.

**b. 8:01 P.M. to 8:59 A.M. : Headcounts conducted between 8:01 A.M. to 8:59 P.M. must be performed in a manner designed to minimize intrusion on the detainees while they are sleeping. No more than two headcounts can occur between 8:01 P.M. to 8:59 A.M.**
Between the hours of 8:01 PM and 8:59 AM, there are currently 4 counts, with none of them being a formal count.

**3. Administrative Segregation: Defendants are enjoined from isolating detainees in the Special Housing Unit, Special Management Unit, or administrative segregation absent 1) a documented security concern that threatens the safety and/or security of the facility or staff, or 2) a request from a detainee to be placed in administrative segregation. If a detainee is placed in administrative segregation, that detainee must be given notice of 1) the reasons why they have been placed in administrative segregation within 24 hours of placement, and 2) the process by which they can contest such placement.**

**Any segregation must account for the detainee's mental and physical health and evaluate whether segregated housing is likely to worsen their health. If segregation is likely to worsen a detainee's mental or physical health, alternative remedies must be considered, and segregated housing should only be used if absolutely necessary.**

I visited the "Special Management Unit" that includes all detainees on Disciplinary and administrative segregation sanctions. I conducted chart reviews of the last 10 detainees that had been admitted into the Unit. Upon reviewing the files, 6 of the 10 were incomplete. 4 of the admissions had been within the last 72 hours. So they had orders for disciplinary placement but no investigative reports or notices of charges yet as they were within the timeframe of the PBNDS.
That left 2 files that were greater than 72 hours without investigative reports or notices of charges in the detainee file upon admission to the Special Management Unit. When I asked about the incomplete files, it was explained that there were incidents that happened between the end of the previous week and the day I was reviewing the files (Monday). Although the orders for placement were compliant with the injunction requirements, the lack of notice of charges outside 72 hours was not. The majority of the documentation in the Special Management Unit is very thorough and I do not see a pattern of non-compliance.
However, I am going to be requesting more data on an ongoing basis for the Special Management Unit as I have concerns on repeat admissions to SMU within short time frames of release from SMU.
Also, there are protective custody detainees with more than 120 days in these conditions of confinement that I would like to review their files more thoroughly before making any comment to the process.

They also informed me that there is no alternative location to house those with mental health needs other than within the SMU.

The unit was clean and without odors. The officers provide cold drinking water to the detainees upon request.

**4.b., Disability Accommodations: The remedial plan must also specify policies, procedures, staffing, and required training to ensure the following:**

**i. A system to identify and track all detainees who have qualifying disabilities, as defined by section 504 of the Rehabilitation Act and its implementing regulations, upon intake and throughout the period of detention;**
**ii. A system for identifying and tracking reasonable accommodations necessary for detainees with qualifying disabilities to participate in programs, services, and activities for the facility; and**
**iii. Disabled detainees are provided reasonable accommodations; and**
**iv. Provision of disability-specific materials, translate as appropriate, for all detainees that inform them of their right to reasonable accommodations and procedures to request reasonable accommodation.**

I requested documentation showing that there is a process by which detainees may 1) submit an accommodation request, 2) the disposition of those accommodation requests, and 3) proof of practice that this designation is communicated to the security, education, program, and administrative staff of the facility. All 3 of these tasks would establish a foundation for a compliant process for administering disability accommodations.

I was provided with all the documentation that I had requested, that is available. I did a thorough document review before scheduling interviews with the 2 facility ADA Coordinators. I interviewed the clinical ADA Coordinator (RN) and the facility ADA Coordinator, virtually, the week after my site visit.
This is my understanding of the process according to the interviews:

The clinical ADA Coordinator is new to this position and has been completing this work for approximately 2 months. When detainees are processed into the facility, if they declare any ADA disabilities OR the intake officers or nurses note any ADA concerns, it is documented and passed onto the clinic for scheduling for assessment.
Anybody in the facility can refer a detainee for suspected ADA disability.
If an ADA disability includes a mobility or communication (blind or deaf) disability, then a Disability Accommodation Notification (DAN form) is completed and sent to the clinical ADA coordinator who ensures that the orders for any durable medical equipment (DME) or housing accommodations, is completed.

There is no process for mental health ADA accommodations. And the clinical coordinator does not track any mental health ADA accommodations. Per the PBNDS, Section 4.7, II, A, 1, b, the definition of a disability includes: "A physical ***or mental*** impairment that substantially limits one or more of an individual's major life activities."

(Emphasis added) Therefore, the detainees diagnosed with a serious mental illness are not designated, tracked or accommodated as ADA.

Once the disability has been affirmed and ordered by the GEO medical provider, the clinical ADA coordinator ensures that ICE is made aware of the need for durable medical equipment (DME) to be ordered. The GEO clinical staff cannot order DME equipment for accommodations. It must be approved by the ICE Health Service Corps (IHSC). IHSC is responsible for "….upholding health care standards across ICE-owned and contracted facilities and ensures the provision of healthcare delivery for detained aliens."[1] Although IHSC states that, "while IHSC *does not directly provide medical services* in non-IHSC staffed facilities, IHSC audits the facilities' compliance with national detention standards, as required by each facility's contract with ICE," it could be argued that they directly affect the level of care that can be delivered by requiring DME requests to be submitted for review and approval prior to purchase(*emphasis added*). If this process was speedy and decisions turned around within a reasonable timeframe, it could be effective.

While I was conducting chart reviews, there was a particular patient that had been referred for an audiology appt in June of 2026. That audiology appt was scheduled by GEO and conducted within 2 weeks. The audiology recommendation for "moderate bilateral hearing loss" was to issue 2 hearing aides. When I reviewed this case with the clinical ADA coordinator and asked why it took nearly 3 ½ months to get the hearing aides, she told me that it was awaiting IHSC approval. In the meantime, the detainee was provided hearing amplifier devices by GEO but she explained that they don't always have enough amplifiers available to provide to detainees awaiting hearing aides. This would be a delay in accommodating an ADA disability. But it's due to the additional review and approval processes after a medical provider at the facility has already assessed and referred, and a specialist has recommended, assistive devices.

Once the clinical ADA Coordinator has documented the ADA outcomes and issued either the interim devices or the issued devices, she notifies the facility ADA Coordinator.

The facility ADA coordinator said that she has been in her position as the designee for ADA Coord for approximately 5 years. She then takes the information and adds it to the individual housing unit "binders" that identifies the ADA designated detainees in each living unit to the staff on the units.

There are no designated forms to fill out to request ADA accommodation if a detainee needs to declare a disability after being processed into Adelanto. They send a "kite" to medical and ask to be seen and that request is sent to the clinical ADA coordinator who then ensures that they are scheduled.
Typical follow up is conducted through the Chronic Care Clinics (CCC) every 90 days. When I asked about denial decisions, I was told that there are no denials – 100% of requests are fulfilled. This would be concerning in the fact that there are also no accommodations for those with serous mental illnesses. I do not see that "requests" are

[1] ICE.GOV ICE Health Service Corps

being logged anywhere rather than a tracking log of all approved accommodations and also medical appliances for injuries. If requests aren't being tracked then it would be easy to say that nothing is denied. Discussions with detainees allege that there are denied requests.
Both ADA Coordinators told me that there is a facility review committee that convenes every other Wednesday to discuss all ADA accommodations.

While this information is much clearer and does account for 2 of the 3 steps to establish a foundation for a comprehensive ADA accommodation process, there is still information lacking. Most notably is the lack of communication to the detainee population of their rights to declare an ADA disability and the process by which they can request accommodation.
The only documentation that was not provided to me was requests for accommodation because there is no formal process for making an accommodation request. Detainees "usually just submit a kite." Which wouldn't necessarily be a problem if there was something in writing that explains what ADA is, what a disability is and how to request an accommodation.

The Detainee Handbook, dated August 19, 2026, still does not contain any information regarding requests for accommodation or explain the responsibility of the facility to make all services, programs, and activities available to all detainees, regardless of disability. The facility does not have signage that is posted for detainees regarding their rights to ADA accommodations and processes to make a request.

Lastly, there was a detainee who was wheelchair bound and was asking about going to the recreation yard. When I asked him how he gets there, he stated that he has to wheel himself or he must "convince" one of the other detainees to take him to the yard. Accessibility to the main recreation yard for mobility impaired detainees is the facility's responsibility as an accommodation which makes all services, programs and activities available to detainees, regardless of disability. This would also be the same for any blind detainee. Industry best practices to meet these needs of disabled detainees involve processes where facilities train and hire "pushers," which are detainees that assist with getting ADA detainees to services and programs. However, Adelanto does not operate a detainee work program, so the onus of meeting the needs of these ADA detainees becomes their own when the burden lies with the facility to accommodate.

**Forms that should be within the ADA Policy**

- ADA Accommodation Request Form
- ADA Appeal Form
- ADA Grievance Form
- Interpreter Request Form
- Medical Accommodation Request Form
- Auxiliary Aid Request Form

**Tracking Logs**

- ADA accommodation log

- Auxiliary aid log
- Interpreter utilization log
- Accessible housing roster detailing locations of all ADA-compliant cells and occupancy
- Disability grievance tracker
- Program denial tracker

**Staff training should include:**

- Disability awareness
- Effective communication
- ADA housing requirements
- Reasonable accommodations explained
- Emergency evacuation of persons with disabilities
- Healthcare accommodation requirements
- Documentation standards

I will be submitting another data request to further document the ADA process.

**Summary and preliminary recommendations:**
At the time of the assessment, the West facility was generally clean and well maintained. Staffing was at 100% of the required level, and staff appeared diligent in maintaining cleanliness throughout the assessed area.

I met with detainees in the day halls of every unit that I visited. I also visited individual cells if they had anything they wanted to show me or discuss privately.

The East side was vastly different than the last visit. Much more congestion, more complaints from the detainees in all day halls and the plumbing issues were new. I don't believe that the staff were not cleaning the unit, I believe that the congestion contributes to the food and trash on the floors and tables, sewage back ups and general crowding.

While touring both the west and the east units, there were numerous complaints of dental issues. Several detainees showed me broken teeth with sharp edges cutting their gums, decayed and broken teeth, one detainee had all four of his front teeth badly decayed anteriorly and he had complaints of pain and no response from dental. Several other detainees complained of tooth aches and inability to chew food due to missing teeth. I have shared some of these examples with the medical monitor and also engaged the associate warden as we were visiting. The number of complaints related to access to care and clinical response were very concerning on this visit.

During this visit, there were quite a few more case management type questions that the detainees were asking. As I understand that all case management is provided by ICE personnel, I would expect to see the ICE case managers housed within the housing units to meet routinely with the detainees. One detainee approached myself and the court staff regarding a hearing that was scheduled to take place within 3 hours and he was unsure of what he was supposed to do. This is something that I would expect a case manager would be meeting with him and preparing him for the hearing. I do have concerns that there is not a case management presence in the units.

I have updated the quick reference dashboard in Exhibit B to show my notes and current compliance with each measure of the injunction after this visit. I will continue to update it with my monthly status reports.

The preliminary recommendations that follow identify opportunities to establish and strengthen practices and address specific conditions observed during this visit.

**Recommendation #1**: Continue to provide the iced water igloos in all units and pods in all buildings. RESOLVED – recommend removing the water igloos where filtered coolers have been installed.
**Recommendation #2**: Implement the installation of the Sparklett water tanks in all units and pods as soon as possible to mitigate the PFOS/PFAS contamination. RESOLVED – Completed.
**Recommendation #3:** Clean the ducts in the housing area of the East building and repair the ducts that are leaking RESOLVED – forementioned ducts were cleaned and sealed.
**Recommendation #4:** Implement a ventilation mechanism to mitigate the invasive mold in all showers in the West building **RENEWED**
**Recommendation #5:** Develop and implement a security-approved and safe, quick-release (ex: Velcro) privacy barrier around toilets in cells within GP, beginning with those cells with more than 2 occupants **RENEWED**
**Recommendation #6:** Replace all thin, cracked, and worn mattresses with new mattresses **RENEWED**
**Recommendation #7:** Complete a plan to establish a facility schedule for all detainees to receive outdoor recreation in the big yard 4 hrs per day, 7 days per week. **RENEWED**

> **Recommendation #7(2) –** Prioritize the East units getting out of their day halls at least daily as soon as possible to relieve the congestion in the crowded day halls.

**Recommendation #8:** Begin visitation at 0800, per the facility schedule and the public notice for families **RENEWED**
**Recommendation #9:** Refine the visitation policy to allow for physical contact above the table with adult visitors **RENEWED**
**Recommendation #10:** Refine the count policy to meet the injunction and decrease the number of nighttime counts **RENEWED**
**Recommendation #11:** Establish an alternative to segregation for detainees with mental or physical health disorders **RENEWED**
**Recommendation #12: Refine the Remedial Plan for Disability Accommodations to include:** Establishing a policy for disability identification, assessment, and accommodation consistent with Section 504 of the Rehabilitation Act and PBNDS Section 4.7 RESOLVED in part

> **Recommendation #12.1:** Establish a process for detainees to request accommodations and participate in an interactive process that shares dispositions of the request and initiates tracking of all requests and accommodations. **RENEWED in part**
>
> **Recommendation#12.1(2)** Establish a process for detainees to request accommodations

**Recommendation #12.2:** Post signage and update the detainee handbook to represent the process by which detainees can request accommodations for disability **RENEWED**

This concludes my monthly status report. As monitoring progresses, I will continue to evaluate all areas within the scope of the injunctions and will provide detailed analyses, findings, and recommendations to facilitate sustained compliance and continuous improvement.

Respectfully,

Kellie R. Wasko

Kellie R. Wasko
Conditions Monitor
Adelanto Processing and Detention Center

Appendix A - Water conditions assessment report by unit
Appendix B - Quick Reference Compliance Dashboard
Appendix C – Caloric Analysis 7 days
Appendix D – Sept and Oct photos

Adelanto Processing and Detention Center

Site Visit: October 5, 2026

APPENDIX A

| Location | Custody level | Igloo | Observation | Faucet Day Hall | Observation | Cell # | Observation |
|---|---|---|---|---|---|---|---|
| 5A West | Min/Med Low | NA | | 1 | Clean/Clear/Cold | NA | |
| 5B West | Min/Med Low | NA | | 1 | Clean/Clear/Cold | NA | |
| 5B West | Min/Med Low | | | | | | |
| 5B West | Min/Med Low | | | | | | |
| 5C West | Min/Med Low | NA | | 1 | Clean/Clear/Cold | NA | |
| 5C West | Min/Med Low | | | | | | |
| 5D West | Min/Med Low | NA | | 1 | Clean/Clear/Cold | NA | |
| 5D West | Min/Med Low | | | | | | |
| 5D West | Min/Med Low | | | | | | |
| 4A West | High/Med High | NA | | 1 | Clean/Clear/Cold | NA | |
| 4A West | High/Med High | | | | | | |
| 4B West | High/Med High | NA | | 1 | Clean/Clear/Cold | NA | |
| 4B West | High/Med High | | | | | | |
| 4C West | High/Med High | NA | | 1 | Clean/Clear/Cold | NA | |

Adelanto Processing and Detention Center

Site Visit: October 5, 2026

APPENDIX A

| Location | Custody level | Igloo | Observation | Faucet Day Hall | Observation | Cell # | Observation |
|---|---|---|---|---|---|---|---|
| 4C West | High/Med High | | | | | | |
| 4D West | High/Med High | NA | | 1 | Clean/Clear/Cold | NA | |
| 3A West | High/Med High | NA | | 1 | Clean/Clear/Cold | NA | |
| 3A West | High/High Med | | | | | | |
| 3B West | High/Med High | NA | | 1 | Clean/Clear/Cold | NA | |
| 3B West | High/Med High | | | | | | |
| 3C West | High/Med High | NA | | 1 | Clean/Clear/Cold | NA | |
| 3D West | High/Med High | NA | | 1 | Clean/Clear/Cold | NA | |
| 2A West | High/Med High | NA | | 1 | Clean/Clear/Cold | NA | |
| 2A West | High/Med High | | | | | | |
| 2B West | High/Med High | NA | | 1 | Clean/Clear/Cold | NA | |
| 2B West | High/Med High | | | | | | |

APPENDIX A

Adelanto Processing and Detention Center

Site Visit: October 5, 2026

| Location | Custody level | Igloo | Observation | Faucet Day Hall | Observation | Cell # | Observation |
|---|---|---|---|---|---|---|---|
| 2C West | High/Med High | NA | | 1 | Clean/Clear/Cold | NA | |
| 2C West | High/Med High | | | | | | |
| 2D West | High/High Med | NA | | 1 | Clean/Clear/Cold | NA | |
| 1A West | Mixed Class | NA | | 1 | Clean/Clear/Cold | NA | |
| 1A West | Mixed Class | | | | | | |
| 1B West | SMU | NA | | None | NA | NA | NA |
| Kitchen | NA | NA | | NA | NA | NA | NA |
| 1A East | Low/Med Low | NA | | NA | NA | Dorm | NA |
| 1B East | Women's mixed class | NA | | NA | NA | Dorm and SMU | NA |
| 1C East | High/Med High | NA | | NA | NA | Dorm | NA |
| 1D East | Med/Low Med | NA | | NA | NA | Dorm | NA |
| 2A East | Low/Low Med (Men) | NA | | NA | NA | Dorm | NA |
| | | | | | | | |

APPENDIX A

Adelanto Processing and Detention Center

Site Visit: October 5, 2026

| Location | Custody level | Igloo | Observation | Faucet Day Hall | Observation | Cell # | Observation |
|---|---|---|---|---|---|---|---|
| 2B East | Low/Low Med | NA | | NA | NA | Dorms | NA |
| 2C East | Low/Low Med | NA | | NA | NA | Dorms | NA |

# APPENDIX B

## Adelanto Processing Center

## Conditions Dashboard

October 2026 visit

| Injunction Category | Compliance Level | Color Code | Notes |
|---|---|---|---|
| **24 hr access to clean, potable water** | Compliant | | GEO installed Sparklett water coolers in all housing units that meet the EPA filter requirements for PFOS/PFAS contaminants. |
| **Nutritious and sanitary meals that contain a sufficient number of calories** | Compliant | | Sufficient number of calories average 2900/day |
| **Facility is cleaned daily** | Partial - Compliance | | The west facility was very clean. Walls, ceiling tiles, floors, corners, windows, and cells were clean, with staff assigned to facility sanitation responsibilities daily. East unit sanitation and plumbing issues need resolved. Ducts were cleaned and repaired in the East unit. |
| **Soap and hygiene products available free of charge** | Compliant | | Soap and hygiene products were provided in the new intake packages as well as at each officer's podium in the units. Offenders told me they had no obstruction to obtaining whatever they needed from the officers. |
| **Mold is identified, treated, and remediated** | Non-compliant | | Mold in the shower rooms on the west side is still very bad. The staff cleans the shower rooms daily, but the moisture is not mitigated and therefore does not dry out. Mitigation is necessary to remedy. |
| **Adequate privacy when using the bathroom or showering** | Partial-compliance | | West side showers have privacy curtains installed Detainees have makeshift privacy curtains in their cells that need to be considered for alternative barriers for |

# APPENDIX B

| | | | |
|---|---|---|---|
| | | | privacy but also with safety in mind. Especially for the 4, 6 and 8 man cells. Obscuring view from within the cell with a 40"- 48" screen between cell occupants and toilet – still allows visibility from the door for security purposes. Shower curtains in the east side communal showers need replaced with curtains that fit the shower opening and provide the same privacy as the old curtains that were replaced. |
| **Access to clean, sanitary, temperature-appropriate clothing** | Compliant | | Detainees have clean, sanitary and temperature appropriate clothing available to them |
| **Access to clean, sanitary, and temperature-appropriate mattresses, pillows, and blankets** | Non-Compliant | | The mattresses throughout both the East and West buildings are worn, cracked, and very thin. They must be replaced. Warden is working on this. Expect this to be remedied. |
| **Access to outdoor recreation4hrs/day/7d/wk** | Non-Compliant | | West side offers 6 hours to the small yard and 1 hour/6 days/wk to the large yard. Warden is working on a plan to meet the injunction. Recommend purchasing one or two mobile tower units that can be secured within the yard for officer presence at recreation with larger volumes of population. Can be immediately implemented. East side needs to be prioritized to have outdoor recreation on a daily basis to alleviate the congestion in the dorm day halls. |
| **Visiting during business hours** | Non-Compliant | | Limited access to seeing the visiting process with more than one visitor at a time. The visitation room is clean. Security systems are adequate. Visitors are allowed a brief embrace at beginning of visit and no further physical contact. Not compliant with the injunction for more allowed physical contact. |

# APPENDIX B

| | | | |
|---|---|---|---|
| **Count times and out counts** | Non-Compliant | | 0630, 1030, **1830**, 2300, 0100, 0300<br>1 formal standing count and 5 informal counts, with 4 of them during hours of sleep. |
| **Administrative segregation: documented security concern** | Compliant | | Further monitoring to ensure ongoing compliance and review for repeat housing to SMU |
| **Administrative segregation: request for placement (PC)** | Compliant | | 10 PC placements were housed in RH, and all had documented requests for PC. |
| **Administrative segregation: Notice of charges within 24 hours** | Partial - Compliance | | Numerous files lacking documentation – want to conduct further review |
| **Administrative segregation: Appeal process explained to detainee** | Compliant | | 3 ways the appeals process is explained to detainees – in the disciplinary packet, read to them in the disciplinary hearing, and then also in the detainee handbook. |
| **Disability Accommodations: Identify and track all detainees with qualifying disabilities** | Compliant | | Tracking process in place for those that have been identified and issued DME |
| **Disability Accommodations: ID and track those with qualifying disabilities to participate in programs, services, and activities** | Partial compliance | | There is a tracking in place that identifies those with qualifying disabilities but it is not used to ensure that they have access to participate in programs, services and activities. |
| **Disability Accommodations: Disabled detainees are provided reasonable accommodations** | Partial-compliance | | Detainees may not receive accommodation devices right away but they receive interim devices. Period of waiting for DME approval from govt is excessive. |
| **Disability Accommodations: Disability specific materials, translated as appropriate, for all detainees that inform them of their right to reasonable accommodations** | Non-Compliant | | There are no identifiable disability specific materials available through signage or the Detainee Handbook for Adelanto that explain how to request disability accommodations. |

# APPENDIX C

Adelanto ICE Processing Center

Master Menu Week 2 Analysis

The recommended Daily Nutritional Values for a 3000 calorie diet are in red.

| Day | Total Calories | Protein g 75-260g | Carb g 338-488g | Fat g 67-117g | Sodium g <2300g |
|---|---|---|---|---|---|
| 1 | 2880 | 115.109g | 350.360 g | 117.729g | 4884.690g |
| 2 | 2849 | 95.124g | 314.408g | 140.004g | 4776.665g |
| 3 | 2922 | 97.721g | 363.230g | 124.446g | 4166.087g |
| 4 | 2979 | 138.817g | 357.119g | 113.558g | 2901.285g |
| 5 | 3049 | 123.568g | 393.852g | 112.181g | 3071.239g |
| 6 | 2902 | 126.875g | 307.198g | 131.084g | 5551.354g |
| 7 | 2946 | 98.565g | 340.165g | 133.571g | 4309.503g |

Total Average Calories for one day: **2932 calories per day**

Total Average Protein for one day: **113.68g protein per day**

Total Average Carbs for one day: **346.61g carbohydrates per day**

Total Average Total Fat for one day: **125g fat per day**

Total Average Sodium for one day: **4237.26g sodium per day**

# APPENDIX D




Water cooler proximity to detainee housing. Water cooler lower right hand corner adjacent to detainee cells on left of photo.

# APPENDIX D



Clear water taken from igloos in the September visit.



Clear water from detainee cell sink in September visit.

# APPENDIX D



East ducts cracked and leaking dust into the East side dorm rooms above detainee beds. September visit.

# APPENDIX D



Cracked and leaking duct work in East men's dorms in detainee sleeping area. September visit.

APPENDIX D



Gnats on the walls in the West showers – Oct visit



Blurry quality but this is a picture of the black, live gnat larvae, taken from the shower floor on west side. Sept visit.

# APPENDIX D



Shower drain on west side with mold on the upper left and larvae within the drain – October visit.

# APPENDIX D



October visit - Peeling paint and mold in the shower room



October visit – peeling paint and mold (this shower was being scrubbed when this photo was taken)

APPENDIX D



Lunch meal served to monitor – Oct visit



Lunch meal served to detainee – Oct visit

# APPENDIX D



Repaired duct work in East unit - Oct visit

Repaired duct work – East Unit- October visit



# APPENDIX D




This is the filter on the new water coolers with the NSF/ASPI recommended filter system – 53.

October visit.

END OF APPENDIX