PUBLIC COUNSEL
REBECCA BROWN (SBN 345805)
rbrown@publiccounsel.org
SOPHIA WRENCH (SBN 354416)
swrench@publiccounsel.org
AMELIA PIAZZA (SBN 342473)
apiazza@publiccounsel.org
BELINDA ESCOBOSA (SBN 214178)
bescobosa@publiccounsel.org
610 South Ardmore Avenue
Los Angeles, CA 90005
Tel: 213-385-2977

*Attorneys for Plaintiffs*
Additional Counsel Listed on Following Page

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| L.T., SEVAK MESROBIAN, JOSE MAURO SALAZAR GARZA, AND J.M., on behalf of themselves and all others similarly situated; COALITION FOR HUMANE IMMIGRANT RIGHTS,<br>Plaintiffs,<br>v.<br>U.S. IMMIGRATION AND CUSTOMS ENFORCEMENT; DAVID J. VENTURELLA, Senior Official Performing the Duties of the Director; JAIME RIOS, Acting Director of Los Angeles Field Office, Enforcement and Removal Operations, U.S. Immigration and Customs Enforcement; U.S. DEPARTMENT OF HOMELAND SECURITY; MARKWAYNE MULLIN, Secretary, U.S. Department of Homeland Security,<br>Defendants. | Case No. 5:26-cv-00322-SSS-SPx<br><br>**PLAINTIFFS' REPLY IN SUPPORT OF RENEWED MOTION TO ENFORCE THE FIRST AMENDED PRELIMINARY INJUNCTION**<br><br>**CLASS ACTION**<br><br>Ctrm: 2, 2nd Floor<br>3470 12th Street<br>Riverside, CA 92501<br>Hon. Sunshine Sykes<br><br>Date Filed: January 26, 2026<br>Trial Date: November 8, 2027 |

IMMIGRANT DEFENDERS LAW CENTER
ALVARO M. HUERTA (SBN 274787)
ahuerta@immdef.org
CARSON ADRIANNA SCOTT (SBN 337102)
cscott@immdef.org
ALISON STEFFEL (SBN 346370)
asteffel@immdef.org
634 S. Spring Street, 10th Floor
Los Angeles, CA 90014
Tel: 213-634-0999

COALITION FOR HUMANE IMMIGRANT RIGHTS
CARL BERGQUIST (*pro hac vice*)
cbergquist@chirla.org
2351 Hempstead Road
Ottawa Hills, OH 43606
Tel: 310-279-6025

ADAM REESE (SBN 362898)
areese@chirla.org
2533 West Third Street, Suite 101
Los Angeles, CA 90057
Tel: 213-353-1333

WILLKIE FARR & GALLAGHER LLP
NICHOLAS REDDICK (SBN 288779)
nreddick@willkie.com
STEPHEN HENRICK (SBN 310539)
shenrick@willkie.com
ALYXANDRA VERNON (SBN 327699)
avernon@willkie.com
JACOB KARIM (SBN 340376)
jkarim@willkie.com
333 Bush Street, 34th Floor
San Francisco, CA 94104
Tel: 415-858-7400

VINCENT R. BIAGIOTTI (*pro hac vice*)
vbiagiotti@willkie.com
787 Seventh Avenue
New York, NY 10019-6099
Tel: 212-728-8000

*Attorneys for Plaintiffs*

## I. INTRODUCTION

Plaintiffs' Motion (ECF 200-1, "Motion") asks the Court to enforce the Preliminary Injunction by ordering specific compliance directives, issuing an order to show cause, and requiring compliance reporting. Motion at 16–18. Defendants' Opposition (ECF 206, "Opp.") does not show why any of that relief is inappropriate. The factual disputes about actual compliance are few and limited. Defendants largely concede what the Conditions Monitor found in her October and November reports: more than three months after this Court ordered immediate relief, they have not complied. *See* ECF 177 at 24–25; ECF 207 at 22–24.

To ward off compliance measures, Defendants invoke the Injunction's "qualifiers," Opp. at 5–11 (none of which rescue them), challenge counsel's declarations, Opp. at 12–13 (which the Court may accept in the current procedural posture), and repeat their "wrong defendant" and "too vague" arguments, Opp. at 14–17 (which this Court and the Ninth Circuit rejected). These are red herrings, none of which precludes the Court's enforcement of its order by the incremental means Plaintiffs propose: concrete orders to remedy noncompliance on a set timeline, initiation of proceedings that will adjudicate Defendants' alleged compliance efforts, and mandated compliance reporting to generate an accountable record. The Motion should be granted. In light of the Monitor Report docketed on November 2, 2026, Plaintiffs concurrently file an Amended [Proposed] Order that refines the relief sought.

## II. ARGUMENT

### A. Defendants Are In Violation of the Preliminary Injunction

Defendants' Opposition pleads steps toward future compliance as reason not to hold them in contempt. Opp. at 1. But the Preliminary Injunction ordered Defendants to provide Plaintiffs with safe and sanitary living conditions "immediately." ECF 147 ¶ 1. Plaintiffs' Motion contains overwhelming evidence that Defendants remain out

of compliance with most provisions in Paragraphs 1 and 2 of the Preliminary Injunction. In her October Report, the Conditions Monitor rated Defendants noncompliant or partially compliant on nearly every provision, and a month later, her November Report makes largely the same findings, with Defendants still out of compliance on sanitation, mold remediation, bedding, privacy, outdoor recreation, visitation, and headcounts, and additional concerns raised regarding food and clothing. ECF 177 at 24–25; ECF 207 at 4, 7, 22–24. One of Defendants' few improvements was the installation of water coolers with EPA-compliant filters; Plaintiffs accordingly withdraw their request to enforce Paragraph 1(a), while reserving their rights to move for enforcement again if needed. ECF 207 at 3.

Ms. Quevedo's supporting declaration, ECF 206-1 ("Quevedo Dec."), does not rebut the Monitor's findings, instead offering intentions (GEO "plans to redo" shower floors), works in progress (hiring to increase yard time is "underway"), or generalized rationalizations for noncompliance (contact visitation "would substantially increase the opportunity to pass contraband"). Quevedo Dec. ¶¶ 18, 31, 37. That testimony does not change the reality affecting detained people at Adelanto every day; it shows violations by a clear and convincing standard.

***Food (¶ 1(b)).*** Defendants proffer that the meals are the "correct portions and temperatures," ECF 206 at 6. However, the Monitor's November Report corroborates what has been reported to class counsel: people in Adelanto are hungry. ECF 207 at 4; ECF 200-7 ¶ 29. Distinguishing between "calorie sufficiency and nutritional adequacy," the Monitor described meals that "exceed the recommended daily requirements" for fat and sodium and cause people to feel ill. ECF 207 at 4; November 2, 2026 Declaration of Alison Steffel ("Steffel Nov. 2 Decl.") ¶ 2. As for the 4:30 a.m. breakfast, while Defendants call a restriction on mealtimes "a new term," Opp. at 6–7, common sense dictates that Defendants do not provide detained people with "a sufficient number of calories" if one of every three meals is offered during sleeping

hours. ECF 147. A person who goes to bed after lights out (11:00 p.m. or later) and wakes up for breakfast (4:30 a.m.) will sleep for less than six hours each night. A person who sleeps through breakfast goes nineteen hours without a meal (from 4:30 p.m. dinner to 11:30 a.m. lunch), in violation of the PBNDS capping time between meals at fourteen hours. ECF 35-1 at 237 (PBNDS 4.1). A meal schedule that forces detained people to choose between sleep and calories is not a good-faith interpretation of the Preliminary Injunction.

***Sanitation and Mold (¶ 1(c)).*** Defendants rely on the Monitor's September observation that the facility was "generally clean and well-kept." Opp. at 7; ECF 177 at 5. The Monitor's November Report paints a different picture: the East Building was "significantly different than the last visit," with trash on the floor, a "strong smell of sewage" in the bathrooms, a backed-up toilet, and a sink "filled with black water" that detainees said had been that way for a couple of days. ECF 207 at 5. Plaintiffs' declarations document the same unsanitary conditions. Motion at 10–11; Steffel Nov. 2 Decl. ¶ 4. Nor do Defendants confirm remediation of "aggressive mold" and larvae in the West Building, ECF 177 at 6–7. Defendants offer only that GEO "has identified no mold" and the larvae are "endemic to the Adelanto area." Quevedo Dec. ¶¶ 18, 20. Meanwhile, the November Monitor Report states that "[t]he drains were filthy and had a lot of mold, and there were many areas of larvae on the floor," and warns that "[a]bsent a significant modification to the exhaust system for these shower areas, the mold is not going to resolve." ECF 207 at 6. As for that underlying ventilation issue, which Defendants concede, GEO is still "reviewing [a contractor's] proposal" to correct the problem. Quevedo Dec. ¶ 18.

***Privacy (¶ 1(d)).*** Defendants have not implemented quick-release privacy barriers around toilets in general population cells—the solution the Monitor identified as a feasible means of complying with the Injunction after her in-person facility visit. ECF 177 at 7, 18. Defendants outright rejected the Monitor's proposal based on their

own conclusion that "any barrier"—even the half-curtains the Monitor suggested—"blocks the officer's view of that part of the dorm." Quevedo Dec. ¶ 23. The Monitor's November report reiterates her recommendation for privacy barriers in shared cells, explicitly stating that a 40-to-48-inch screen between the cell occupants and the toilet "still allows visibility from the door for security purposes." ECF 207 at 6. Defendants' fallback, that a person can "ordinarily" use the toilet alone, Quevedo Dec. ¶ 23, is an inadequate assurance where up to eight people share one cell. The Monitor also reports that current shower curtains in the East Building are "too small for the opening of the showers," providing insufficient privacy. ECF 207 at 7; Steffel Nov. 2 Decl. ¶ 8. Defendants' representation that the East restroom cameras do not capture stall interiors, Quevedo Dec. ¶ 22, is new and unverified; Plaintiffs will defer their request for relief until the Monitor has verified the extent of camera surveillance in restrooms.

***Clothing (¶ 1(e)).*** Defendants concede that they do not issue shorts. Quevedo Dec. ¶ 24 ("[s]horts may be purchased through the commissary"). Their explanation, that "[s]horts are not in the injunction," Opp. at 9, is an overly narrow read of an order to provide "temperature-appropriate clothing" at a facility where outdoor temperatures regularly exceed ninety degrees. ECF 147 ¶ 1(e). At the other extreme, detained individuals on both sides of the facility told the Monitor that the air conditioning is so cold that they need additional sweatshirts and blankets. ECF 177 at 8, 25. Defendants answer that a sweatshirt (singular) "is now issued year-round," Quevedo Dec. ¶ 24, but a single sweatshirt provides no warmth while it is in the laundry. The November Monitor Report also recommended that the laundry bags "receive adequate time in the dryer to ensure all contents are dry after laundering," which would address detained individuals' repeated reports that their laundry is returned to them damp. ECF 207 at 7; ECF 200-7 ¶ 42.

***Bedding (¶ 1(f)).*** Defendants admit that mattresses—as many as 500—were "significantly compressed or cracked," and that 500 replacements were "ordered," but give no delivery date or confirmation they have been replaced. Quevedo Dec. ¶ 27. The November Monitor Report confirms that mattresses remain thin and torn and rates Defendants "Non-Compliant" with the bedding requirement. ECF 207 at 7, 23.

***Outdoor Recreation (¶ 1(g)).*** Defendants confirm that one hour a day "remains the current schedule," relying on the Injunction's security qualifier to excuse noncompliance. Opp. at 9–10; Quevedo Dec. ¶ 31. But Defendants' stated reasons for such drastically limited outdoor recreation are staffing limitations and a generalized concern about placing multiple units on the large yard. Quevedo Dec. ¶¶ 31–33. The record suggests these problems are solvable: in September, ICE approved a contract modification to hire more staff, and the warden informed the Monitor that "they are mitigating custody issues" to allow for combining units in the yard safely. Quevedo Dec. ¶ 31; ECF 177 at 9. Yet over one month later, Defendants are still noncompliant on outdoor recreation. ECF 207 at 8. Some detained individuals do not visit the large yard for weeks at a time. ECF 200-7 ¶¶ 37–39; Steffel Nov. 2 Decl. ¶ 9. The Monitor's November report recommended "purchasing one or two mobile tower units that can be secured within the yard for officer presence at recreation with larger volumes of population," ECF 207 at 7, and prioritizing "a recreation plan for the East side as soon as possible" given "the amount of congestion in these small dorm style housing units." *Id.*

***Visitation (¶ 1(h)).*** Defendants concede that both the East and West visiting rooms "could accommodate longer visits," depending on capacity, Quevedo Dec. ¶ 34, yet still impose a default one-hour limit on every visit unless a visitor has traveled more than 500 miles. *Id.* And even after the Monitor recommended "[r]efin[ing] the visitation policy to allow for physical contact above the table with adult visitors," ECF 177 at 18, Defendants do not identify any change to the March 4, 2026 policy

prohibiting all but "a brief embrace" during visitation. ECF 206-2 at 157, 159; *see* Quevedo Dec. ¶ 37; ECF 200-8 ¶¶ 25–26. Nor do Defendants identify a particularized "documented security risk" justifying a categorical restriction on above-the-table contact; the generic contraband rationale, Quevedo Dec. ¶ 37, applies to every visit at every facility. The Monitor has now personally observed visitation and confirms that the existing policy does not satisfy the Injunction's physical-contact requirement. ECF 207 at 9, 23; *see also* ECF 200-7 ¶¶47–48. If Defendants believe circumstances unique to Adelanto merit relief from this provision, they may seek to modify the Court's order; they have not done so.

***Headcounts (¶ 2).*** Defendants concede that the 6:30 p.m. count is a standing, face-to-face count, Quevedo Dec. ¶ 38, for which all detainees return to their cells, rather than the "out-count" basis the Injunction requires. ECF 147 ¶ 2(a). As for excessive nighttime counts, Defendants' only answer is to relabel three of the four counts "security observation rounds." Quevedo Dec. ¶ 38. Meanwhile, the Monitor reports that she "typically see[s]" two counts during hours of sleep compared to Adelanto's four, ECF 177 at 11. Defendants do not indicate any intention to adjust the count schedule, nor have they sought relief from this provision. The Monitor's latest report confirms that Adelanto "continues to conduct 6 counts per 24-hour period," including four during sleeping hours, and again rates Defendants noncompliant with the headcount requirements. ECF 207 at 10–11, 24; *see also* ECF 200-7 ¶¶ 44–45.

**B. Defendants Have Not Shown Why The Court Should Not Order Plaintiffs' Requested Relief**

This Court has "inherent power to enforce" its order when Defendants fail to comply. *U.S. v. Yacoubian*, 24 F.3d 1, 5 (9th Cir. 1994). Defendants do not contest that authority, apart from arguing that the Court "may not materially alter the status of the case on appeal." Opp. at 16 (citing *Nat. Res. Def. Council, Inc. v. Sw. Marine*

*Inc.*, 242 F.3d 1163, 1166 (9th Cir. 2001)). Plaintiffs do not seek a material alteration—they seek enforcement of injunctive provisions the Ninth Circuit found unambiguous. No. 26-4902, DE 22.1 at 5. Federal Rule of Civil Procedure 62(d) (formerly 62(c)) "authorizes a district court to continue supervising compliance with [an] injunction" on appeal. *A&M Recs., Inc. v. Napster, Inc.*, 284 F.3d 1091, 1099 (9th Cir. 2002).

Instead, Defendants take the position that because "[t]he Court built a neutral Monitor process into its injunction . . . [it] should let its Monitors report" rather than grant Plaintiffs' Motion. But the Conditions Monitor has now filed two reports documenting continuing deficiencies. *See* ECF 177; ECF 207. There is no "adoption requirement" that would prevent Plaintiffs from seeking relief based on the Monitor's findings of noncompliance. Opp. at 16. The Court's appointment of subject-matter experts does not deprive Plaintiffs of the right to seek enforcement. And here, each piece of relief Plaintiffs seek is well within the Court's enforcement authority and tailored to the record before the Court.

**1. Compliance Directives Are An Appropriate Enforcement Mechanism**

Defendants claim that Plaintiffs want a "new injunction." Opp. at 1, 15. They do not. Each requested measure is designed to secure compliance with obligations imposed by the July 16, 2026 injunction. ECF 147. A more specific directive—in almost every case based on a Monitor's recommendation to achieve compliance—does not concede ambiguity in the order; it enforces relief against a party resisting good-faith interpretation and implementation. *See Epic Games, Inc. v. Apple Inc.*, 161 F.4th 1162, 1176 (9th Cir. 2025), *cert. granted in part,* 146 S. Ct. 2812 (2026) (courts "look to the spirit of the injunction when a litigant applies a dubiously literal interpretation of the injunction . . .") (citation omitted). And setting concrete deadlines

is not inappropriate where Defendants remain out of compliance more than three months after the Court ordered "immediate" relief.

**2. An Order to Show Cause Is An Appropriate Enforcement Mechanism**

Defendants devote much of their Opposition to arguing that the current record cannot support contempt or sanctions. Opp. at 12–17. But that misstates Plaintiffs' request. Plaintiffs ask the Court to order Defendants to show cause in writing "why they should not be held in civil contempt" for violations of the Preliminary Injunction, and after Plaintiffs have a chance to respond, "determine whether to hold Defendants in contempt and, if so, whether to impose sanctions . . ." ECF 200-2 at 5. An order to show cause is not a substantive adjudication of a party's rights; it is a procedural device to ensure a party—in this case, ICE—is afforded due process. Defendants' objection that there has been no hearing and no provision-by-provision finding, Opp. at 17, describes the due process that an order to show cause will provide.

Defendants' remaining arguments regarding contempt and sanctions are not persuasive. First, as with the orders to show cause previously issued in this case, Defendants point to ICE's contract with GEO Group to disclaim any contemptible conduct. But this Court and the Ninth Circuit have already dismissed Defendants' "day-to-day operator" argument. ECF 121 at 20–22; No. 26-4902, DE 22.1 at 2. Moreover, the federal government acquired ownership of Adelanto on October 2, 2026, although GEO continues to operate the facility. Opp. at 3. And Defendants themselves concede that ICE has an indispensable role to play in compliance efforts, for example by approving costs and contract modifications. Opp. at 8–10, 20; Quevedo Dec. ¶ 18. Moreover, Defendants have never suggested that current noncompliance is due to GEO's defiance in the face of ICE's instructions. Indeed, Defendants stand behind the generalized security rationales they claim justify current noncompliance. *See generally* Quevedo Dec. In short, the GEO contract does not

foreclose an inquiry into whether ICE has taken "all reasonable steps" to achieve compliance. *In re Dual-Deck Video Cassette Recorder Antitrust Litig.*, 10 F.3d 693, 695 (9th Cir. 1993).

Second, Defendants suggest that responding to the Monitors' recommendations establishes substantial compliance. Opp. at 1. But the compliance clock started in July, not October. And without actual compliance, the Court need not take Defendants at their word that they have achieved substantial compliance—that is, "near-total compliance through the exhaustion of all reasonable efforts." *Coleman v. Newsom*, 131 F.4th 948, 956 (9th Cir. 2025) (citation omitted). This is precisely the purpose of the order to show cause—in a contempt proceeding, the burden shifts to Defendants to demonstrate they took "every reasonable step to comply." *Stone v. City & Cnty. of San Francisco*, 968 F.2d 850, 856 n. 9 (9th Cir. 1992), as amended on denial of reh'g (Aug. 25, 1992).

Third, coercive sanctions would be premised on a more extensive record following an order to show cause, and they would be purgeable. Plaintiffs do not propose the sanctions scheme rejected in *Ayres*, where purgation depended on a condition entirely outside the sanctioned party's control. *United States v. Ayres*, 166 F.3d 991, 997 (9th Cir. 1999). Verification here would rest with Court-appointed neutrals who simply confirm what Defendants have done or not done. Motion at 16, 18. And the proposed sanctions are squarely civil because they are intended to "coerce[] compliance with a court order." *See Parsons v. Ryan*, 949 F.3d 443, 455 (9th Cir. 2020) (citations omitted). The Ninth Circuit has affirmed imposition of per-violation civil fines to enforce similar conditions injunctions. *Id.* at 454–56.

**3. Compliance Reporting Is An Appropriate Enforcement Mechanism**

Defendants do not meaningfully oppose Plaintiffs' proposed weekly compliance reporting. Their sole objection—that mandated reports to which Monitors may respond "would turn the Court's neutrals into adversaries of one side's sworn

statements," Opp. at 17—presupposes the content of the Monitors' (optional) responses. And although Defendants challenge weekly reporting as a defect in Plaintiffs' sanctions request, *id.*, Plaintiffs request weekly reporting independent of any order to show cause. *Cf.* ECF 200-2 at 5 (§ III.B) (proposing the Court issue an order to show cause, with contempt findings and coercive sanctions to follow at the Court's discretion) with *id.* (§ III.C) (proposing that the Court order Defendants to file a sworn compliance report every seven days).

Defendants' Opposition only underscores the need for regular sworn compliance reports. The provision on drinking water provides an example. At the parties' October 13, 2026 conference regarding the present Motion, Plaintiffs' counsel asked Defendants' counsel to relay any status updates from ICE regarding the conditions at issue, including drinking water. ECF 200-3 ¶ 3. Over a week later, Plaintiffs still had no assurances from Defendants, and Plaintiffs filed their Motion on October 22, 2026. *Id.* ¶ 15. Only then did Defendants disclose that ICE approved the cost of a filtration system on or about September 10, 2026, and that installation in every housing unit was completed on October 16, 2026. Quevedo Dec. ¶ 12. That withholding of information not only frustrates the purpose of Local Rule 7-3, but it also obscures the compliance record, hindering targeted enforcement as the Injunction approaches the four-month mark. Sworn provision-by-provision compliance reporting builds an accountable compliance record that will inform the Court's continued administration of its Order.

## III. CONCLUSION

Plaintiffs respectfully request that the Court enter the Amended [Proposed] Order Granting Plaintiffs' Renewed Motion to Enforce the First Amended Preliminary Injunction, filed concurrently with Plaintiffs' Reply.

Dated: November 2, 2026

WILLKIE FARR & GALLAGHER LLP

By: */s/ Nicholas Reddick*
Nicholas Reddick
Stephen Henrick
Alyxandra Vernon
Jacob Karim
Vincent R. Biagiotti (*pro hac vice*)

PUBLIC COUNSEL

By: */s/ Rebecca Brown*
Rebecca Brown
Sophia Wrench
Amelia Piazza
Belinda Escobosa

IMMIGRANT DEFENDERS LAW CENTER

By: */s/ Alvaro M. Huerta*
Alvaro M. Huerta
Carson Adrianna Scott
Alison Steffel

COALITION FOR HUMANE IMMIGRANT RIGHTS

By: */s/ Carl Bergquist*
Carl Bergquist (*pro hac vice*)
Adam Reese

**WORD COUNT CERTIFICATE**

The undersigned counsel of record for Plaintiffs certified that this Reply Brief contains 3,212 words, which complies with the word limit of L.R. 11-6.1.

Dated: November 2, 2026

Respectfully Submitted,

WILLKIE FARR & GALLAGHER LLP

By: */s/ Nicholas Reddick*
Nicholas Reddick
Stephen Henrick
Alyxandra Vernon
Jacob Karim
Vincent R. Biagiotti (*pro hac vice*)